UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ECHOMAIL, INC.,

Plaintiff,

v.

AMERICAN EXPRESS COMPANY,
INC., and IBM CORP.,

Defendants.

Civil Action No. **05 11318 GAO**

RECEIPT # _65/73_
AMOUNT $ _250.00_
SUMMONS ISSUED _N/A_
LOCAL RULE 4.1 _—_
WAIVER FORM _—_
MCF ISSUED _—_
BY DPTY. CLK. _M.P._
DATE _6/23/2005_

## NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1441 and 1446, defendants American Express

Company, Inc. ("American Express") and IBM Corporation ("IBM"), by their

undersigned attorneys, submit this Notice of Removal and respectfully state as follows:

## NATURE OF THE ACTION          MAGISTRATE JUDGE RBC

1.      On or about June 20, 2005, plaintiff EchoMail, Inc. ("EchoMail")

filed a Complaint (the "Complaint") in the Commonwealth of Massachusetts, Suffolk

Superior Court, entitled EchoMail, Inc. v. American Express Co. and IBM Corp., Civil

Action No. 05-2477 BLS (the "State Court Action") purporting to allege claims against

both American Express and IBM for misappropriation of trade secrets under Mass. Gen.

L. ch. 93 and New York law, unfair competition, and unfair and deceptive trade

practices in violation of ch. 93A, § 11. In addition, EchoMail asserts claims against

American Express alone for breach of contract, breach of the covenant of good faith and

fair dealing, and interference with contractual relations.

2.      A true and correct copy of the Complaint and all records and

proceedings filed before the Superior Court are attached hereto as Exhibit A.

Doc #:NY6:964142.1

## TIMELINESS OF THIS NOTICE

3.      On June 21, 2005 defendants American Express and IBM received copies of the initial pleading in the State Court Action setting forth the causes of action upon which the suit is based. This Notice of Removal is therefore timely under 28 U.S.C. § 1446(b).

## PARTIES

4.      According to the Complaint, plaintiff EchoMail is a Delaware corporation, and maintains its headquarters and principal place of business at 701 Concord Avenue, Cambridge, Massachusetts.

5.      Defendant American Express is now, and was at the time of the filing of the Complaint and at all times intervening, a corporation organized and existing under the laws of the State of New York with its principal place of business in the State of New York.

6.      Defendant IBM is now, and was at the time of the filing of the Complaint and at all times intervening, a corporation organized and existing under the laws of the State of New York with its principal place of business in the State of New York.

Doc #:NY6:964142.1

## JURISDICTION

### Diversity of Citizenship

7.    Complete diversity of citizenship exists within the meaning of 28 U.S.C. § 1332, as plaintiff is a citizen of the Commonwealth of Massachusetts and defendants are citizens of the State of New York.

### Jurisdictional Amount

8.    The matter in controversy in this civil action exceeds the sum or value of $75,000.00, exclusive of interest and costs, within the meaning of 28 U.S.C. § 1332.

## REMOVAL PROCEDURES

9.    This action is now removable pursuant to 28 U.S.C. § 1441(a). This Notice of Removal is being timely filed.

10.    This Notice of Removal is being filed within thirty (30) days of the defendants' receipt of the initial pleading setting forth the claim for relief upon which this action is based.

11.    The United States District Court for the District of Massachusetts embraces the place where the State Court Action is currently pending.

12.    Written notice of the filing of this Notice of Removal will be given to plaintiff, and a copy of this Notice will be filed in the appropriate state court, as required by 28 U.S.C. § 1446(d).

Doc #:NY6:964142.1

14.    By filing this Notice of Removal, defendants do not waive any defense that may be available to any of them, including, but not limited to, the right to challenge personal jurisdiction or the validity of service of process, and do not concede that the allegations in the Complaint state a valid claim under applicable law.

15.    Pursuant to Local Rule 81.1(a), defendants shall request from the clerk of the Suffolk County Superior Court certified or attested copies of all records and proceedings in the state court, and certified or attested copies of all docket entries therein, including a copy of this Notice of Removal, and will file the same with this Court within thirty (30) days after the filing of this Notice of Removal.

WHEREFORE, defendants American Express and IBM respectfully request that the above-captioned action now proceeding against them in the Trial Court of the Commonwealth of Massachusetts, be removed therefrom and proceed in this Court as an action duly removed.

Dated:  June 23, 2005

Respectfully submitted,

AMERICAN EXPRESS
COMPANY, INC.
By its attorney,


John F. Farrah, Jr. (BBO # 568194)
Evan Georgopoulos (BBO # 628480)
GREENBERG TRAURIG LLP
One International Place
Boston, MA 02110
Tel: (617) 310-6000
Fax: (617) 310-6001

IBM CORPORATION
By its attorneys,


Stephen D. Poss, P.C. (BBO # 551760)
GOODWIN PROCTER LLP
Exchange Place
53 State Street
Boston, MA 02109
Tel: (617) 570-1000
Fax: (617) 523-1231

4

## CERTIFICATE OF SERVICE

I, Evan Georgopoulos, hereby certify that on the 23rd day of January, 2005, I caused to served by hand a copy this Notice of Removal to the following counsel of record:

Alan D. Rose, Jr.
Rose & Associates
29 Commonwealth Avenue
Boston, MA 02116

Evan Georgopoulos

5

**SUFFOLK, ss.**    # Commonwealth of Massachusetts



SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION

No. **05-2477 BLS**

_____ **ECHOMAIL INC** _____, Plaintiff(s)

v.

_____ **AMERICAN EXPRESS CO ET AL** _____, Defendant(s)

### SUMMONS AND ORDER OF NOTICE

To the above-named Defendant: **AMERICAN EXPRESS CO and IBM CORP**

You are hereby summoned and required to serve upon ____ **Rose & Associates** _____

plaintiff's attorney, whose address is ___ **29 Commonwealth Ave.   Boston, MA 02116** _____,

an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at Boston either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

WE ALSO NOTIFY YOU that application has been made in said action, as appears in the complaint, for a preliminary injunction and that a hearing upon such application will be held at the court house at said Boston of our said court on **Thursday in room 1309    13th Floor** the **twenty third** day of **June** A.D. 200 **5**, at _____ **two** _____ o'clock **PM**, at which time you may appear and show cause why such application should not be granted.

Witness, Barbara J. Rouse, Esquire, at Boston, the ____ **twentieth** _____ day of _____ **June** _____, in the year of our Lord two thousand ___ **five** ___.

_Tim Walsh_

**Asst. Clerk/Magistrate**

NOTES.
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.

FORM CIV.P.2 3M 12/04

**PROOF OF SERVICE OF PROCESS**

I hereby certify and return that on _____ , 200____, I served a copy of the within summons and order of notice, together with a copy of the complaint in this action, upon the within-named defendant, in the following manner (See Mass. R. Civ. P. 4 (d) (1-5):

_____

_____

_____

Dated:_____ , . 200____.         _____

N.B.    **TO PROCESS SERVER:—**
    PLEASE PLACE **DATE** YOU MAKE SERVICE ON DEFENDANT IN
    THIS BOX **ON THE ORIGINAL AND ON COPY SERVED ON DEFENDANT.**

> 6-21    , 2005.

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION
No. _____

_____ , Plff(s).

v.

_____ , Deft(s).

**SUMMONS**
**(Mass. R. Civ. P. 4)**
**AND**
**ORDER OF NOTICE**
**ON**
**APPLICATION FOR PRELIMINARY**
**INJUNCTION**

# Rose & Associates

COUNSELLORS AT LAW

29 COMMONWEALTH AVENUE
BOSTON • MASSACHUSETTS • 02116
www.rose-law.net

ALAN D. ROSE
MICHAEL L. CHINITZ
ALAN D. ROSE, JR.
RICHARD E. BOWMAN
MICHAEL J. MOTT

TEL: 617/536-0040
FAX: 617/536-4400

June 20, 2005

**By Hand Delivery**

Civil Clerk
Business Litigation Session
Suffolk Superior Court
Three Pemberton Square
12th Floor
Boston, MA  02108

>        Re:   <u>Echomail, Inc. v. American Express and IBM,</u>
>              Civil Action No.

Dear Sir or Madam:

Enclosed for filing please find:

1. Verified Complaint;

2. Plaintiff EchoMail, Inc.'s Motion, Inc. for Issuance of Preliminary Injunctive Relief Upon Short Order of Notice;

3. Plaintiff EchoMail, Inc.'s Memorandum in Support of Motion for Preliminary Injunction;

4. Plaintiff EchoMail, Inc.'s Motion for an Order Requiring the Defendants to Preserve Documents, Computerized Data and Materials;

5. Affidavit of V.A. Shiva Ayyadurai;

6. Proposed Order;

7. Motion for Appointment of Special Process Server;

**Rose & Associates**

COUNSELLORS AT LAW

Civil Clerk
June 20, 2005
Page 2 of 2


8.    Filing fee in the amount of $275; and

9.    Civil Action Cover Sheet.


Thank you for your assistance with this matter.

Very truly yours,

Alan D. Rose, Jr.

ARJ:mct
Enclosures
cc:  CT Corporation Systems, registered agent for American
         Express Company and IBM Corporation (2 copies by
         hand)
     American Express Company (by overnight mail)
     IBM Corporation (by overnight mail)

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                          SUPERIOR COURT
                                      CIVIL ACTION NO.        -BLS

```
ECHOMAIL, INC.,            )
                           )
          Plaintiff,       )
                           )
v.                         )
                           )
AMERICAN EXPRESS CO.       )
and IBM CORP.,             )
                           )
          Defendants.      )
_____)
```

### VERIFIED COMPLAINT

### Introduction

1.     Defendants American Express Company ("AmEx") and IBM
Corporation (collectively "defendants") obtained unprecedented
access to the confidential and proprietary technology of
plaintiff EchoMail, Inc. ("EchoMail") by fraudulently,
pretextually, and illegally using AmEx's contractual
relationship with EchoMail to obtain an "architecture" review of
EchoMail's cutting-edge, patented, email management system.   IBM
had no right whatsoever to access EchoMail's technology and
proprietary information, but deceptively did so.   AmEx permitted
this deception to occur.   The defendants will improperly use
EchoMail's technology and proprietary information in the absence
of judicial intervention.   Injunctive relief is necessary to

protect EchoMail's technology from improper use and
dissemination by the defendants.

2.    In addition to its request for injunctive relief,
EchoMail brings this complaint for misappropriation of trade
secrets, unfair competition, unfair and deceptive acts and
practices, breach of contract, breach of the covenant of good
faith and fair dealing, and intentional interference with
contractual relations.

## Parties and Jurisdiction

3.    Plaintiff EchoMail is incorporated in the State of
Delaware, and maintains its headquarters and principal place of
business at 701 Concord Avenue, Cambridge, Massachusetts.
EchoMail is a leading provider of electronic mail management
services, software and hardware.

4.    Defendant American Express Company is incorporated in
the State of New York, and maintains its principal place of
business at 200 Vesey Street, New York, New York.  AmEx is a
world-wide, financial services company doing business in
Massachusetts, and is subject to the jurisdiction of this Court
under the Massachusetts Long-Arm Statute, G.L. c. 223A, §3.

5.    Defendant IBM Corporation is incorporated in the State
of New York, and maintains its principal place of business at 1
Orchard Road, Armonk, New York.  IBM is a world-wide,
information technology company which does business in

- 2 -

Massachusetts, and is subject to the jurisdiction of this Court under the Massachusetts Long-Arm Statute, G.L. c. 223A, §3.

### Facts

#### The Development of EchoMail and Its
#### Confidential and Proprietary Technology

6.   V. A. Shiva Ayyadurai ("Shiva"), who has verified this Complaint, is the principal inventor of the technology underlying EchoMail's proprietary email management, storage and web-based technology.

7.   In 1977, when he was 14 years old, Shiva obtained copyrights for the first email system. For his groundbreaking work in the email technology field, Shiva was honored by the Westinghouse Science Awards Committee for meritorious work in scientific research which supported his entrance to the Massachusetts Institute of Technology ("MIT"). In 1986, Shiva obtained a bachelor of science in electrical engineering and computer science from MIT. In 1989 and 1990, after working in high-tech for many years, Shiva received dual master's degrees from the MIT Media Lab and the MIT Department of Mechanical Engineering.

8.   In 1993, while he was pursuing his Ph.D. at MIT in artificial intelligence focused on pattern analysis, Shiva entered a White House sponsored contest focused on finding new and innovative ways to catalogue emails. Shiva won that

- 3 -

contest, and the technology he developed and used became the early technological foundation of EchoMail.

9.   EchoMail incorporated and began to operate in 1994 under the name Information Cybernetics, Inc., and later merged with Millennium Productions in 1996 to become General Interactive, Inc., with its leading product being called EchoMail.  In or about 2000, General Interactive renamed itself EchoMail, Inc.  In 1994, A T & T became the first customer to use the EchoMail product.

10.   In its early stages, from 1994 to 1999, EchoMail engaged in pioneering work by hosting web-based email applications in its Cambridge facility.  Shiva also designed and developed applications that extracted and analyzed critical elements from an email so that an accurate response could be formulated.

11.   Until approximately 1998, EchoMail had no more than 7 employees.

### EchoMail Today

12.   EchoMail currently operates in a competitive environment.  It has approximately 18 employees in Cambridge and contracts for additional personnel in India.  EchoMail has approximately 30 customers across an array of industries, including insurance, financial services, consumer packaged goods, retail and non-profits.

- 4 -

13.   EchoMail provides its customers with web-based software, hardware and services for email and electronic communications management, including, but not limited to, inbound email management, outbound email management and email storage.  With respect to incoming email, EchoMail's proprietary web-based software technology collects and stores incoming email for EchoMail's customers; analyzes the emails for "attitude," "requests," "issues," "products" and "customer type"; proposes a response based on the analysis; and routes the email to a web-based platform where it can be viewed and worked on by the customer's support personnel before a response is sent to the customer.

14.   EchoMail's products are widely recognized as the industry leaders, and EchoMail has received accolades and awards for its products and services.

15.   EchoMail is in the final stages of developing version 8.1 of its product, an integrated email solution suite designed to provide its three core services (inbound, outbound and storage) to its customers in one integrated web-based application.

16.   Shiva serves as EchoMail's Chairman and CEO.  Mathew "Sonu" Abraham serves as EchoMail's President and runs its day-to-day operations, including personnel and customer support.

## EchoMail's Relationship With AmEx

17.   In 1998, AmEx was faced with an increasing volume of email from its customers across its multiple business units.   At that time, AmEx wanted to contract with one vendor to manage its incoming email from customers for all of its business units.

18.   AmEx was aware that EchoMail was a leader in the field of managing electronic communication.   In 1998, AmEx contacted Shiva and requested that EchoMail respond to AmEx's request for proposal ("RFP") seeking one vendor to manage its incoming email.

19.   In July 1999, despite the fact that the competition included large consulting companies, EchoMail was awarded the AmEx contract for managed incoming email services.   Exhibit A.

20.   In or about 2000, AmEx sought to invest in EchoMail. Over the course of EchoMail and AmEx's continuing relationship, AmEx continued to attempt to invest in EchoMail.   EchoMail repeatedly refused.

21.   From 1999 to 2004, as a result of successive contract renewals, EchoMail provided up to 11 AmEx business units with EchoMail for managed incoming email services.

22.   In 2003, AmEx notified EchoMail that it was going to institute another RFP process to determine if EchoMail was still the best provider of managed incoming email services.   EchoMail

- 6 -

invested hundreds of man-hours in participating in this RFP process and provided its response in or about November 2003.

23.  In or about February 2004, EchoMail won the RFP, and, thereafter, in August 2004, executed a three-year contract for services with AmEx running from January 1, 2005 through December 31, 2007.  Exhibit B.  Under that contract, in addition to providing its web-based software and services, EchoMail also provided the hardware necessary to manage AmEx's incoming email. AmEx had previously supplied its own hardware to EchoMail.

24.  EchoMail has invested substantial amounts of capital in its hardware and software in order to support AmEx.  Much of that investment was done at no cost to AmEx in reliance on AmEx's good faith in honoring its contract with EchoMail.

25.  Due to the high level of service EchoMail provided to AmEx, AmEx referred to EchoMail as one of its "premium partners" or "true partners."  Since 1998 and continuing though May 2005, AmEx repeatedly praised EchoMail for its products and service. By early 2005, EchoMail was successfully processing approximately 300,000 emails per month for AmEx's business units.

## EchoMail's Dealings With IBM

26.  IBM recognizes EchoMail as an industry leader in hosted, web-based email management software and services.  Since in or about 1996, IBM has sought to learn EchoMail's

- 7 -

confidential and proprietary technology related to hosted, web-based email management software and services.  EchoMail has repeatedly refused to provide IBM access to confidential and proprietary technology related to EchoMail's hosted, web-based email management software and services.

27.  In or about 1996, IBM approached EchoMail seeking to host EchoMail's applications at IBM's facilities so IBM could "resell" EchoMail to other customers.  EchoMail refused to allow IBM to host EchoMail's applications, since EchoMail was capable of providing the service itself.

28.  In or about 2000, IBM approached EchoMail seeking to invest in EchoMail.  EchoMail again refused.

29.  In or about 2002, IBM approached EchoMail seeking a partnership in which IBM would gain access to EchoMail's confidential and proprietary outbound email marketing technology and code.  EchoMail refused to give IBM access to its confidential and proprietary technology.

30.  In or about 2004, IBM approached EchoMail seeking to "host," or provide the hardware necessary, to run EchoMail's web-based, "on demand" software applications.  EchoMail, which designed, built and developed its own hardware facility, again refused, since EchoMail already offered its technology in a hosted web-based model.

- 8 -

AmEx Breaches its Contract
with EchoMail and Misappropriates
EchoMail's Technology with IBM

31.   Despite their longstanding relationship and recent
execution of the 3 year contract, AmEx breached the contract
with EchoMail by canceling it in violation of its terms, and
deceptively gaining access to, and permitting IBM to gain access
to, EchoMail's confidential and proprietary technology.

32.   In December, 2004, after execution of its contract
with EchoMail, AmEx replaced several of its key managers for
electronic communication and customer support.

33.   In or about September 2004, AmEx relocated from Tampa,
Florida to Gurgaon, India one of its electronic customer support
centers, or "call centers."  This required that AmEx's personnel
in India use and operate the EchoMail system.  AmEx refused
EchoMail's offer to assist in coordinating part of the move and
training the new personnel.  AmEx then failed to properly train
and supervise its personnel in India and failed to properly
store, retain and process its email using EchoMail.

34.   Reena Paniker was a newly assigned AmEx employee in
early 2005, responsible for coordinating the AmEx call center
relocation to India, including the use of EchoMail.  Paniker was
insufficiently familiar with EchoMail.  Paniker failed to
properly educate and train herself and her employees on the
proper use of EchoMail's products and services.

- 9 -

35.  On or about April 4, 2005, after AmEx's mismanagement of the relocation and misuse of EchoMail's product, AmEx finally requested that EchoMail provide personnel in Gurgaon, India to identify and solve the problems AmEx had created at its call center.  That very day, EchoMail sent one of its key employees to India to assist AmEx.  AmEx's misuse of EchoMail through untrained employees had created a backlog of unprocessed email, causing the system to slow.  AmEx's processing rate was 300% slower than that of the typical EchoMail customer because AmEx had refused the necessary training and assistance from EchoMail. From April 4 to 7, 2005, EchoMail's staff worked to rectify the problems at the call center in Gurgaon, India.

36.  In or about mid-April 2005, AmEx began a new RFP process starting with a Request for Information ("the new RFP process") for the same scope of services that AmEx had already contracted for with EchoMail.  EchoMail received the RFI only two days before its response was due.  Greg Daniels, an AmEx business manager who was newly assigned to manage AmEx's relationship with EchoMail, never informed EchoMail about the RFI.

37.  Shiva called Daniels and asked why the new RFP process was necessary, given EchoMail and AmEx's existing three year contract commencing in January, 2005.  Daniels falsely claimed that "it was a formality" which was occurring because AmEx had

"new people" involved and "EchoMail should not worry about it."
Shiva told Daniels that EchoMail should not have to participate
in the new RFP process because a contract already existed.
Nevertheless, EchoMail responded to the RFI.

38.   Shortly thereafter, in late-April, 2005, AmEx
confirmed to EchoMail that AmEx wanted to proceed with an
"architecture" review of EchoMail's new, proprietary, version
8.1, to which EchoMail's customers would soon upgrade.

39.   In general, an architecture review reveals the
confidential and proprietary technology, or "code," contained in
hardware and/or software.

40.   AmEx falsely claimed that AmEx's desire for an
architecture review was to make sure that the upgrade to version
8.1 was successful, that EchoMail and AmEx were "partners," and
that AmEx wanted to help EchoMail succeed in its upgrade to the
new version.

41.   Based on Daniels' statements, Shiva reluctantly agreed
to the architecture review.   Prior to the review, EchoMail
provided AmEx with certain proprietary information in
preparation for the review.   On May 4 and 5, 2005, the
architecture review occurred.   At least eight employees from
AmEx participated in the review, either telephonically or by
coming in person to EchoMail's facility in Cambridge.

- 11 -

42.    The architecture review exposed to AmEx's employees
EchoMail's confidential and proprietary information and
technology, or "code," including the process by which EchoMail
hosts its web-based, on demand technology.

43.    During the review, AmEx technical personnel praised
EchoMail's product and service and stated that the review was a
success, that EchoMail "did well," and that they were favorably
impressed with EchoMail and version 8.1 and the many
capabilities EchoMail had to offer beyond just its incoming
email management technology that AmEx was then using.    AmEx
employees stated that they wanted to use additional products and
services offered by EchoMail.

44.    In fact, AmEx surreptitiously included in the review
technical personnel from IBM without disclosing this fact in
advance to EchoMail.    This violated the terms of the contract
between AmEx and EchoMail.    In fact, lists of personnel who
would be attending the architecture review which were provided
by AmEx to EchoMail had not referred to any personnel from IBM.
In fact, the presence of IBM personnel would not have been
disclosed to EchoMail at all, except that very late in the
review process, an IBM employee participating in the review by
phone stated that he worked for IBM and that he believed that
the information revealed to him "created a conflict."

45.  EchoMail would not have allowed the architecture
review to occur at all if EchoMail had known that personnel from
IBM would be present.  Since the time of the review, and despite
EchoMail's requests, AmEx has refused to provide any information
to EchoMail concerning IBM's participation.

46.  On May 25, 2005, approximately three weeks after the
architecture review, Daniels called EchoMail and stated that
EchoMail "failed" the review, and as a result, the new RFP
process would continue without EchoMail.  This necessarily meant
that AmEx was replacing EchoMail with a new vendor.  Shiva
questioned Daniels about Daniels' earlier claims that the new
RFP process and architecture review were unrelated.  Shiva told
Daniels that Daniels and AmEx were deceitful and that they had
breached the contract.

47.  Although Daniels earlier told Shiva that Paniker was
not involved in the new RFP process or the architecture review,
on May 25, 2005, Daniels stated to Shiva that Paniker was in
fact running the new RFP process and the architecture review and
that Daniels had ceded all authority over the matter to Paniker.

48.  On or about May 26, 2005, in a conference call,
Paniker initially denied that she was running the new RFP
process.  When Abraham confronted her with Daniels' prior
statement, Paniker finally admitted that she was in fact running
the new RFP process and the architecture review and that they

- 13 -

were in fact related. Paniker reiterated that AmEx's relationship with EchoMail was terminated and told EchoMail to "do what it had to do" and hung up the phone on Abraham. Thereafter, on May 26, 2005, and only in response to Paniker's termination of the Contract, Shiva notified AmEx of termination.

49.   In fact, the real reason for AmEx's architecture review, which AmEx intentionally did not disclose to EchoMail, was to gain access to all details of EchoMail's confidential and proprietary technology so that AmEx and IBM could use the technology after AmEx breached its contract and severed its relationship with EchoMail. In addition, AmEx intended to use the architecture review as a pretext for (a) continuing its RFP process without EchoMail's participation, and (b) terminating its contract with EchoMail.

50.   In addition to its other contract and tort damages (which are considerable), EchoMail currently has invoices based on the contract of approximately $600,000.

51.   "New Co." is an independent business that was formed through AmEx's spin-off of two of its business entities serviced by EchoMail. "New Co." had selected EchoMail as its managed email services provider. At or about the time of its breach of the agreement with EchoMail, AmEx caused "New Co." to stop doing business with EchoMail.

- 14 -

EchoMail Has Gone to Great
Lengths to Protect its Confidential
and Proprietary Information

52.   EchoMail's software, hardware, and storage technology,
and web-based hosting process is confidential and proprietary
and is not generally known outside of select EchoMail employees,
or entities in a confidential relationship with EchoMail which
have contractually agreed to safeguard that information.   Over
the course of its existence, EchoMail has spent considerable
time, money and effort on its product development and on its
efforts to protect the confidentiality of its proprietary
technology, as fully set forth above.

53.   As a matter of course, EchoMail enters into non-
disclosure and confidentiality agreements with entities which
may have access, or even limited access, to any portion of
EchoMail's confidential and proprietary technology.   EchoMail
does so with respect to its customers and prospective customers,
vendors and prospective vendors, and its customers' vendors.

54.   Prior to the existence of its contractual relationship
for services with AmEx, a confidentiality agreement between AmEx
and EchoMail protected EchoMail's confidential and proprietary
technology.   The services contract between AmEx and EchoMail
also protects EchoMail's confidential and proprietary
technology.   In addition, AmEx's other vendors, which are
exposed to EchoMail's confidential and proprietary technology,

- 15 -

are required by EchoMail to execute nondisclosure and/or confidentiality agreements.

55. EchoMail's employees are required to execute agreements which further protect EchoMail's confidential and proprietary information. Even among its own employees, EchoMail limits disclosure of its confidential and proprietary technology.

56. In addition to these steps, EchoMail has protected its confidential and proprietary technology by obtaining patents. On December 23, 2003, EchoMail obtained a patent protecting its overall process for managing email. On April 6, 2004, EchoMail obtained two patents protecting (a) its technology used to analyze emails, and (b) its technology used to construct a response to a customer's email.

## AmEx's Relationship With IBM

57. Upon information and belief, AmEx and IBM have entered into a multi-billion dollar contract under which IBM provides AmEx with computer hardware, software and services. As part of that contract, IBM commercializes AmEx business processes through the use of AmEx's internal technology or vendor technology.

58. Upon information and belief, the information obtained by AmEx and IBM during the EchoMail architecture review will be used to unfairly compete against EchoMail in a number of ways,

- 16 -

including though its unauthorized use by IBM and AmEx directly

or its resale to IBM customers.

59.    Injunctive relief is necessary to prevent IBM and AmEx

from using or disseminating EchoMail's technology, or otherwise

unfairly competing with EchoMail.

### Claims

Count I
Misappropriation of Trade
Secrets in Violation of
Mass. G.L. c. 93, §42 and New York Law
(Against Both Defendants)

60.    EchoMail incorporates, as if fully set forth herein,

the allegations contained in paragraphs 1 through 59.

61.    IBM and AmEx, through the conduct described above,

misappropriated, with the intent to convert to their own use,

EchoMail's confidential and proprietary technology.

62.    IBM and AmEx have no rightful claim of interest in

EchoMail's confidential and proprietary technology.

63.    The actions of IBM and AmEx are causing irreparable

harm to EchoMail which is not compensable through money damages.

64.    EchoMail has a substantial likelihood of success on

the merits of its claims.

65.    Through injunctive relief, no harm will accrue to IBM

and AmEx as they have no rightful claim to EchoMail's

confidential and proprietary technology.

66.   IBM and AmEx's actions have damaged EchoMail.   IBM and AmEx are liable in tort to EchoMail, including double damages.

Count II
Unfair Competition
(Against Both Defendants)

67.   EchoMail incorporates, as if fully set forth herein, the allegations contained in paragraphs 1 through 59.

68.   As set forth above, IBM and AmEx have engaged in unfair competition.

69.   Such unfair competition has caused and will continue to cause damage to EchoMail.

Count III
Unfair and Deceptive
Acts and Practices in
Violation of G.L. c. 93A, §11
(Against Both Defendants)

70.   EchoMail incorporates, as if fully set forth herein, the allegations contained in paragraphs 1 through 59.

71.   As set forth above, the actions of IBM and AmEx, which occurred primarily and substantially in Massachusetts, constitute unfair and deceptive acts and practices unrelated to the contract at issue in this matter.

72.   As a result of the unfair and deceptive acts and practices engaged in by IBM and AmEx, EchoMail has suffered damages and is entitled to recover treble damages, costs and attorneys' fees.

- 18 -

## Count IV
## Breach of Contract
### (Against AmEx)

73.   EchoMail incorporates, as if fully set forth herein,
the allegations contained in paragraphs 1 through 59.

74.   EchoMail performed under the contract.  By its
actions, as set forth above, AmEx has materially breached its
contract with EchoMail.

75.   Through AmEx's breach EchoMail has been harmed and
will continue to be harmed.

## Count V
## Breach of the Covenant of Good Faith
## and Fair Dealing
### (Against AmEx)

76.   EchoMail incorporates, as if fully set forth herein,
the allegations contained in paragraphs 1 through 59.

77.   By its actions, as set forth above, AmEx breached the
covenant of good faith and fair dealing that was incorporated
into its contract with EchoMail.

78.   AmEx's breach has caused damage to EchoMail.

## Count VI
## Interference with Contractual Relations
### (Against AmEx)

79.   EchoMail incorporates, as if fully set forth herein,
the allegations contained in paragraphs 1 through 59.

80.   AmEx was aware of the contractual and/or business
relationship between New Co. and EchoMail.

- 19 -

81. By its actions as set forth above, AmEx interfered, through the use of improper means and motives, with EchoMail's relationship with New Co.

82. AmEx's interference has caused damage to EchoMail.

WHEREFORE, EchoMail seeks the following remedies and relief against the defendants American Express Company and IBM:

(a) injunctive relief as set forth in EchoMail's motion for injunctive relief filed herewith;

(b) judgment on counts I through VI;

(c) damages, including multiple damages, in an amount to be determined at trial;

(d) costs and reasonable attorneys' fees; and

(e) such other relief as this Court deems just and proper.

PLAINTIFF ECHOMAIL HEREBY RESPECTFULLY DEMANDS A TRIAL BY JURY FOR ALL COUNTS SO TRIABLE.

Respectfully submitted,

ECHOMAIL, INC.,

By its attorneys,

Alan D. Rose (BBO#42]280)
Alan D. Rose, Jr. (BBO#628871)
ROSE & ASSOCIATES
29 Commonwealth Avenue
Boston, Massachusetts 02116
617-536-0040

June 20, 2005

- 20 -

A

## Stand Alone Agreement for Consulting Services

Consultant:
**General Interactive**
66 Church St. Harvard Square
Cambridge, MA  02138-3730

Agreement No.:PHX-07/09/99-RLG1
Effective Date:July 9, 1999

This Stand Alone Agreement for Consulting Services ("Agreement") is made and entered into as of the Effective Date above, between American Express Travel Related Services Company, Inc., having an office at American Express Tower, World Financial Center, New York, NY 10285 ("Amexco"), and the Consultant specified above.

1. **Scope of Services** - Consultant shall provide, under the provisions of this Agreement, the services that are mutually agreed upon and described on attachments to this Agreement, substantially in the form of the attached Exhibit 1 - Sample ("Schedule"). Each Schedule shall be effective, incorporated into, and form a part of this Agreement when duly executed by both parties. If there is a conflict between this Agreement and any Schedule, the terms of the Schedule will govern the provision of the services involved.

2. **Schedules** - Both time and materials and fixed price Schedules may be entered into hereunder. Schedules should be numbered for identification and must include a complete description of services to be performed, deliverables or other materials to be produced, the schedule for completion of each of the foregoing, the applicable fixed price or time and materials charges, and any additional terms the parties mutually agree to include. Amexco, its parent, subsidiaries and affiliated companies (each, an "Amexco Entity") may enter into Schedules with Consultant and for purposes of any such Schedule shall be considered "Amexco" as that term is used herein.

3. **Work Policy/Personnel** - For each Schedule, each party will designate a Project Manager to serve as the main contact between them. The scope and specific conduct of Consultant's services, consistent with the Schedule, must be coordinated with Amexco's Project Manager at all times. Consultant will use its best efforts to ensure the continuity of Consultant's employees assigned to perform services under any Schedule. There will be no charge to Amexco for any replacement personnel assigned by Consultant until Amexco and Consultant agree that each such replacement has acquired the necessary orientation and background to make a productive contribution.

On a periodic basis, as specified on the Schedule, Consultant will submit written status reports describing its activities during the preceding period, including:  the current status of activities

# 96555

(with an explanatory narrative when appropriate); resources used since the last report, with a cumulative total to date; and identification of any problems and actions taken to resolve them. Upon request, Consultant will meet with Amexco management to review the status of Consultant's activities.

Consultant personnel will observe and comply with Amexco's security procedures, rules, regulations, policies, working hours and holiday schedules. Consultant will use its best efforts to minimize any disruption to Amexco's normal business operations at all times. Amexco will only provide working space, resources and materials if specified on the Schedule. If any Consultant employee performing services is found to be unacceptable to Amexco for any reason, Amexco shall notify Consultant and Consultant shall immediately take appropriate corrective action. Amexco shall be the sole judge as to performance capability hereunder. Unless otherwise agreed to in writing, neither party will hire or solicit the employment of the other party's personnel during the term of each Schedule and for a period of six (6) months thereafter.

Consultant agrees and represents that it is an independent contractor and its personnel are not Amexco's agents or employees for federal tax purposes or any other purposes whatsoever, and are not entitled to any Amexco employee benefits. Consultant assumes sole and full responsibility for their acts and Consultant and its personnel have no authority to make commitments or enter into contracts on behalf of, bind or otherwise obligate Amexco in any manner whatsoever. Consultant, and not Amexco, is solely responsible for the compensation of personnel assigned to perform services hereunder, and payment of worker's compensation, disability and other income and other similar benefits, unemployment and other similar insurance and for withholding income and other taxes and social security.

4. **Acceptance** – Each deliverable shall be subject to a verification of acceptability by Amexco to ensure that such deliverable meets acceptance criteria as defined in each schedule and/or statement of work.. If any deliverable is not acceptable, Amexco shall notify Consultant specifying its reasons in reasonable detail, and Consultant will, at no additional cost (provided such deliverable was created on a fixed fee basis), conform such deliverable to Amexco's requirements. If, within thirty (30) days of such Amexco notification, any deliverable is still not acceptable, Amexco may at any time thereafter, at its option and without obligation or liability of any kind(except for the payment of services already performed), terminate the Schedule involved. When any deliverable is acceptable to Amexco, Amexco will promptly notify Consultant in writing of its acceptance.

5. **Ownership** -
The parties agree that certain Services may consist of
modifications of licensed Consultant's Software, creating a
derivative work, including all materials, products, reports,
computer programs (source and object code), documents,
deliverables and inventions related to such derivative work
developed or prepared for Amexco by Consultant ("Consultant Work
Product"), while providing Services to Amexco. With respect to
the creation of derivative works of Consultant's Software in the
process of providing Services hereunder, Amexco agrees that
Consultant retains all right, title and interest in such
Consultant Work Product. Amexco hereby assigns to Consultant all
right, title and interest in such copyrights, patents and other
proprietary rights, and agrees to take all actions deemed
necessary by Consultant to perfect Consultant's rights in said
materials.    Consultant Work Product shall not include any
software licensed from any third party. Except as specifically
set forth in writing and signed by both Amexco and Consultant on
an exception basis in a Schedule(s) hereunder, Consultant shall
have all copyright and patent rights with respect to all
materials developed in the course of performing the Services
under this Agreement or Schedules hereunder, and Amexco is hereby
granted a non-exclusive license to use and employ such materials
for internal use within Amexco's business.

Nothing herein shall be construed to restrict, impair or deprive
Consultant of any of its rights or proprietary interest in
technology or products that existed prior to and independent of
the performance of services or provision of materials under this
Agreement or any Schedule.

6. **Charges and Terms of Payment** - The applicable fixed prices
and/or time and materials charges shall be specified on the
Schedule.    In no event shall any charges exceed Consultant's
applicable standard published rates.  For services performed on a
time and materials basis, any hours worked in excess of eight (8)
in any one day or on Saturdays, Sundays or holidays, shall be at
no additional cost unless specifically authorized in advance.
Amexco also agrees to pay for reasonable out-of-pocket costs and
expenses required and actually incurred in performing services,
provided that Consultant has:  (i) obtained Amexco's prior written
consent; (ii) detailed them on a form acceptable to Amexco and
approved them in accordance with Amexco's own expense policies,
written copies of which shall be furnished to Consultant
concurrently with the execution hereof; and (iii) submitted
supporting documentation satisfactory to Amexco.

Amexco will pay all taxes levied against or upon the services
provided hereunder, or arising out of this Agreement, exclusive,
however, of taxes based on Consultant's income, which shall be

3

paid by Consultant. Amexco agrees to pay directly any tax for which it is responsible or will reimburse Consultant upon receipt of proof of payment.

Unless other payment terms are specified on the Schedule, Consultant shall invoice Amexco: (i) upon Amexco's written acceptance of any deliverables, products or work performed on a fixed price basis; or (ii) monthly in arrears, for services provided on a time and materials basis and for out-of-pocket expenses. All invoices, except for amounts disputed by Amexco, shall be payable within thirty (30) days of receipt. Any disputed amounts shall not affect payment of non-disputed charges and expenses.

Consultant will maintain complete and accurate accounting records in connection with services performed and materials provided hereunder, in accordance with generally accepted accounting principles, to substantiate its charges. Consultant will provide Amexco access to such records for audit purposes for one (1) year from the date of final payment under each Schedule.

7. **Warranties** - Consultant warrants that: (i) it has the authority and the right to enter into this Agreement and each Schedule, to perform services and provide materials, information and deliverables hereunder, and that its obligations hereunder are not in conflict with any other Consultant obligations; (ii) each of its employees has the proper skill, training and background necessary to accomplish their assigned tasks; (iii) all services will be performed in a competent and professional manner, by qualified personnel and will conform to Amexco's requirements hereunder; (iv) neither any deliverables, information, or materials, nor the performance of any services by Consultant infringe upon or violate the rights of any third party and (v) at the time of acceptance, each deliverable will conform to its specifications and Amexco's requirements and that for ninety (90) days following Amexco's acceptance, Consultant shall correct and repair, at no cost to Amexco, any defect, malfunction or non-conformity that prevents such deliverable from conforming and performing as warranted.

GII warrants that any Software provided by GII shall conform to GII's then current documentation therefor. In the event any Software does not so conform to such documentation, GII shall undertake reasonable commercial efforts to correct such non-conformity. Such correction shall constitute Company's sole remedy and GII's sole liability in the event of any breach of such warranty by GII.

THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE ARE HEREBY EXPRESSLY EXCLUDED.

GII shall defend, indemnify and hold harmless Company from all costs, expenses, damages, suits and other proceedings incurred by Company, its officers, directors, employees or agents in connection with any claim that the Software infringes any patent, copyright, trade secret or other proprietary rights of any third party, provided that (a) Company promptly informs GII of the existence of any matter Company asserts to be covered by this Section 13.1, and (b) Company furnishes to GII all information and assistance in connection therewith which may be reasonably requested by GII from time to time. GII shall have the sole right to settle, defend, or otherwise handle any such claim. In the event the use of any Software is enjoined, GII shall, at its option, either (a) procure for Company the right to continue to use such Software, (b) replace or modify the same to make it non-infringing, or (c) terminate the agreement and provide a pro rata refund to Company of all amounts paid by Company for the allegedly infringing Software to GII hereunder, based upon a five (5) year life of such Software.

GII's obligations under this Section shall be only for the benefit of Company. GII shall not be obligated to defend or to be liable under this Section to the extent the infringement asserted arises out of (a) compliance with specifications originating with Company; (b) use or combination of Software with items not provided by GII to the extent such infringement would not have occurred but for such use or combination with such other items; (c) use of other than the latest unmodified version of Software if such infringement would have been avoided by the use of such later version; or (d) modification of Software other than by GII.

This Section states the exclusive remedy of Company and the entire liability of GII with respect to infringement of any patent, copyright, or other proprietary rights of third parties by items furnished by GII hereunder.

EXCEPT AS EXPRESSLY PROVIDED HEREIN, GII SHALL HAVE NO LIABILITY UNDER THIS AGREEMENT, WHETHER FOR BREACH OF WARRANTY OR CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, UNLESS AND UNTIL THE AGGREGATE AMOUNT OF ANY CLAIMS HEREUNDER EXCEEDS $25,000, AND THEN ONLY TO THE EXTENT OF ANY SUCH EXCESS UP TO AN AGGREGATE MAXIMUM OF $1,000,000 FOR SOFTWARE AND/OR SERVICES WHICH ALLEGEDLY DAMAGED COMPANY. IN NO EVENT SHALL GII HAVE ANY LIABILITY FOR INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES OF ANY KIND, WHETHER UNDER THIS AGREEMENT OR OTHERWISE, EVEN IF GII HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS.

To the extent that Consultant licenses to and/or develops software for Amexco, Consultant further warrants that the software has been

tested and is fully capable of providing accurate results using data having date ranges spanning the twentieth (20th) and twenty first (21st) centuries (e.g., years 1900-2100). Without limiting the generality of the foregoing, Consultant warrants that all software licensed from and/or developed by Consultant shall (a) manage and manipulate data involving all dates from the 20th and 21st centuries without functional or data abnormality related to such dates; (b) manage and manipulate data involving all dates from the 20th and 21st centuries without inaccurate results related to such dates; (c) have user interfaces and data fields formatted to distinguish between dates from the 20th and 21st centuries; and (d) represent all data related to include indications of the millennium, century, and decade as well as the actual year.

Consultant further warrants that Consultant's work product will be tested and will be fully capable of providing accurate results using data having date ranges spanning the twentieth (20th) and twenty first (21st) centuries (e.g., years 1900-2100). Without limiting the generality of the foregoing, Consultant warrants that all systems that are worked on by Consultant shall (a) manage and manipulate data involving all dates from the 20th and 21st centuries without functional or data abnormality related to such dates; (b) manage and manipulate data involving all dates from the 20th and 21st centuries without inaccurate results related to such dates; (c) have user interfaces and data fields formatted to distinguish between dates from the 20th and 21st centuries; and (d) represent all data related to include indications of the millennium, century, and decade as well as the actual year.

Consultant shall ensure adequate Anti-Virus software is installed to prevent damages to Company. Consultant has not and shall not insert any code which would have the affect of disabling or otherwise shutting down all or any portion of any program or network of company. Consultant shall use its best efforts to ensure that no viruses or similar items are coded or introduced in any program or network of the company.

EXCEPT AS SPECIFICALLY PROVIDED IN THIS AGREEMENT, THERE ARE NO OTHER WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

8.    **General**

**Term & Termination:**    This Agreement shall commence as of the Effective Date and shall continue in full force and effect thereafter unless and until terminated as provided hereunder. Notwithstanding anything herein to the contrary, After an initial one (1) -year period, Amexco may terminate this Agreement and/or any Schedule upon thirty (30) days' prior written notice. Amexco

# 96555                                6

agrees to pay Consultant for services performed up to the effective date of termination, at the agreed upon rates. Notice of termination of any Schedule shall not be considered notice of termination of this Agreement unless specifically stated in the notice.

**Material Breach**: Subject to the above termination language, in the event of any material breach of this Agreement by one party and after giving effect to any applicable cure periods herein prescribed, the other party may (reserving cumulatively all other remedies and rights under this Agreement and in law and in equity) terminate the Schedule(s) involved, in whole or in part, by giving thirty (30) days' written notice thereof; provided, however, that any such termination shall not be effective if the party in breach has cured the breach of which it has been notified prior to the expiration of said thirty (30) days.

**Limitation of Liability**: In no event will either party be liable, one to the other, for special, indirect, or consequential damages or losses in connection with or arising out of this Agreement.

**Intellectual Property Infringement**: Consultant, at its own expense, will defend and/or handle any claim or action against any Amexco Entity for actual or alleged infringement of any patent, copyright, intellectual or industrial property right or any other similar right (including, but not limited to, misappropriation of trade secrets) based on any deliverables, information, materials and/or any services furnished to or obtained by Amexco or the use thereof by Amexco. Consultant agrees to give Amexco prompt written notice of any threat, warning or notice of any such claim or action that could have an adverse impact on Amexco's use or possession of same. Consultant shall have the right to conduct the defense of any such claim or action and consistent with Amexco's rights hereunder, all negotiations for its settlement; provided, however, that Amexco may participate in such defense or negotiations to protect its interests. Consultant further agrees to indemnify and hold each Amexco Entity harmless from and against any and all liabilities, losses, damages, costs and expenses (including reasonable attorneys' fees) associated with any such claim or action.

**Confidential Information**: Consultant and Amexco agree to regard and preserve as confidential all information related to the business and activities of any Amexco Entity and Consultant , their respective clients, suppliers and other entities with whom such Amexco Entity and Consultant do business, that may be obtained by Consultant and Amexco from any source or may be developed as a result of this Agreement. Amexco and Consultant agree to hold such information in trust and confidence for Amexco and Consultant and not to disclose such information to any person, firm or enterprise, or use (directly or indirectly) any such information for its own benefit or the benefit of any other party,

unless authorized by Amexco or Consultant  in writing, and even then, to limit access to and disclosure of such confidential information to Consultant's employees on a "need to know" basis only. Information shall not be considered confidential to the extent, but only to the extent, that such information is:  (i) already known to the receiving party free of any restriction at the time it is obtained from the other party; (ii) subsequently learned from an independent third party free of any restriction and without breach of this Agreement; (iii) is or becomes publicly available through no wrongful act of either party; (iv) is independently developed by one party without reference to any Confidential Information of the other; or (v) required to be disclosed pursuant to a requirement of a governmental agency or law so long as the parties provide each other with timely written prior notice of such requirements.

To the extent this provision is applicable to and specified on a Schedule, Consultant acknowledges that services performed for Amexco may relate to past, present or future strategies, plans, business activities, methods, processes and/or information which afford Amexco certain competitive or strategic advantages.  To further ensure the protection of Amexco's interests in this regard, upon written notice by Amexco to Consultant of Amexco's intention to invoke Consultant's noncompetition obligation as set forth in this paragraph, and upon terms and conditions to be mutually agreed upon by the parties hereto on a Schedule-by-Schedule basis, Consultant agrees that during the term of any Schedule and for a period of six (6) months thereafter (unless a shorter time period is mutually agreed upon and specified on the applicable Schedule), Consultant shall not assign or utilize (directly or indirectly) any individual assigned to perform services for Amexco in connection with any Schedule hereunder, for or in support of any Competitive Project.  For purposes of this Section, "Competitive Project" is defined as any task or work effort by any person, firm or enterprise conducting a business or providing or supporting a product or service in the payment instrument (including charge card, credit and debt card), consumer lending, travelers cheques or travel-related business whose intent or result is or will be substantially similar to any contemplated by a Schedule.  If there is any doubt whether any task or work effort is deemed a "Competitive Project," Consultant shall obtain Amexco's advance written approval (not to be unreasonably withheld), which decision shall be deemed final and controlling for all purposes hereunder.

Consultant shall, upon request by Amexco, require each employee assigned to perform services under any Schedule and each employee who obtains or is in a position to obtain any Amexco information or materials required by the terms of this Agreement to be kept confidential, to execute a Non-Disclosure Agreement in the form attached hereto as Exhibit 2, which forms a part hereof. Consultant will provide Amexco with a true copy of each such

Agreement upon request. Consultant further agrees to take any other steps reasonably required and/or appropriate to ensure compliance with the obligations set forth herein.

Consultant acknowledges and agrees that, in the event of a breach or threatened breach of any of the foregoing provisions, Amexco will have no adequate remedy in damages and, accordingly, shall be entitled to injunctive relief against such breach or threatened breach; provided, however, that no specification of a particular legal or equitable remedy shall be construed as a waiver, prohibition or limitation of any legal or equitable remedies in the event of a breach hereof.

**Excusable Delay**: Neither party will be liable to the other for any delay or failure to perform due to causes beyond its control and without its fault or negligence.

**Advertising**: Neither party will use the other party's name or marks, refer to or identify the other party in any advertising or publicity releases or promotional or marketing correspondence to others without such other party's written approval.

**Governing Law & Interpretation**: This Agreement shall be construed and enforced under the substantive laws of the State of New York. Headlines are for reference only and shall not affect the meaning of any terms. If any provision of this Agreement is held invalid, illegal or unenforceable, the remaining provisions will continue unimpaired.

**Insurance**: Throughout the term of this Agreement and Schedules thereto, Consultant must maintain adequate workers compensation, liability, disability, unemployment and, automobile insurance as required under law for the Consultant and each of its employees performing Services under this Agreement and any Schedules.

Consultant must also maintain throughout the term of this Agreement and any Schedules thereto, the following types of insurance coverage at, or above the minimum policy amounts set out below. All insurance companies must have and maintain an AM Best rating of A- or better.

The Consultant shall provide verification of its insurance coverage by providing a valid certificate of insurance to Amexco upon request. All certificates of insurance must provide that Amexco will be notified thirty (30) days before cancellation. Consultant's insurance shall be primary and non-contributory with any insurance maintained by Amexco.

9

| Type of coverage | Coverage as broad as | Policy Minimums | Amexco as Additional insured |
|---|---|---|---|
| Workers Compensation | Statutory Requirements | Statutory requirements | No |
| Employers' Liability | Combined with workers compensation policy | Each accident, $1,000,000<br><br>Disease police limit, $1,000,000<br>Disease each employee, $1,000,000 | No |
| Commercial General Liability and Personal Injury | ISO Form CG0001 | General aggregate, $2,000000<br>Completed ops products, $2,000,000<br>Each occurrence, $2,000,000<br>Personal injury, $2,000,000 | Yes |
| Commercial Auto, Including Employer's Non-Owned auto | ISO Form CA0001 | Combined single limit, $2,000,000 | No |
| Commercial Umbrella Liability | Underlying EL, GL and Auto | May, if necessary, be used in any combination with the primary policy limit to fulfill the above limit requirements. | Yes |
| Professional Liability | N/A | Minimum policy limits of $1,000,000. Increased amounts subject to Amexco's discretion | Yes |

**Assignment:** Neither party may assign, transfer or subcontract the performance of its services, or any of its rights and/or obligations, without the other party's prior written consent, and any attempt to do so shall be void. Amexco may assign this Agreement, any Schedule and/or any of its rights or obligations to any Amexco Entity, without Consultant's consent and upon written notice to Consultant, provided that such entity agrees in writing to the terms of this agreement.

**Subcontracting:** Consultant may subcontract its responsibilities and obligations under this Agreement upon first obtaining Amexco's written consent to do so and to specific firms or entities mutually agreed upon by the parties. Consultant shall require its subcontractors performing services for Amexco hereunder to execute the Non-Disclosure Agreement in the form attached hereto as Exhibit 2. Consultant shall be solely responsible for all its obligations and responsibilities hereunder notwithstanding such subcontracting.

10

# 96555

**Notices**: All notices shall be in writing and delivered personally or properly mailed, first class mail, to the addresses of the parties set forth at the beginning of this Agreement, to the attention of the undersigned, and, as to any Schedule, with a copy to the signatories of the Schedule involved, at the same address, or to such other address or addressee as either party may designate by written notice. Any such notice shall be deemed given on the date delivered or when placed in the mails as specified.

**Entirety**: This Agreement, together with the Exhibits, Schedules and attachments hereto, contains the entire agreement between the parties and supersedes any prior or inconsistent agreements, negotiations, representations and promises, written or oral. No modification to this Agreement nor any failure or delay in enforcing any term, exercising any option or requiring performance shall be binding or construed as a waiver unless agreed to in writing by the parties hereto.

AMERICAN EXPRESS TRAVEL                 GENERAL INTERACTIVE, INC.
RELATED SERVICES COMPANY, INC.

By: _____          By: _____

Name: _____          Name: _Roland Westgate_____
         (Type or Print)                          (Type or Print)
                                        Title: _Director of Electronic Adm._
Title: _TECHNOLOGY CONTRACTS_

Date: ___8/30/99_____           Date: ___8/20/99_____

GII Schedule # PHX-8/24/99-WJG-01

## SCHEDULE

Consultant:
General Interactive, Inc.
66 Church Street
Cambridge, MA 94063

Schedule No.: PHX-08/24/99-WJG-01
Agreement No.: PHX-07/09/99-RLGI
Effective Date: July 16,1999
Date: August 24, 1999

This Schedule is issued pursuant to the above-referenced Master Agreement for Consulting Services between American Express Travel Related Services Company, Inc. and the above-named Consultant. Any term not otherwise defined herein, shall have the meaning specified in the Agreement.

| Amexco Project Managers | Consultant Location |
|---|---|
| Angel M. Rodriguez<br>Gavin M Berg | New York City, NY |

| Consultant Project Manager | Status Reports are required: |
|---|---|
| Ray Billings | Weekly |

See Attachment A (S.O.W. titled E-Mail Servicing dated August 19, 1999) for a complete description of the services, deliverables and/or other tasks to be accomplished, the milestone or implementation schedule, the charges and/or rates applicable to this Schedule and any other mutually agreeable information.

### SPECIAL TERMS AND CONDITIONS:

A.  PRICING: The following line item prices are awarded in this schedule (the total dollar amount is a not-to-exceed amount of  $ 820,025 which includes the Firm Fixed Price and Not-To-Exceed amounts). All not-to-exceed amounts are not to be exceeded with prior written approval from one of the Project Managers listed above:

1.  Secure Email Integration Costs:  Not-To-Exceed price of $28,700 based upon a Not-To-Exceed maximum of 270 person-hours (Reference S.O.W. dated August 19, 1999, page 30, para. 9.2.5.1a-c).

2.  Hardware/Software Costs (Reference S.O.W. dated August 19, 1999, page 31, para 9.2.6.a-e):
    a.  Intrusion Detection Systems as specified in Exodus document Intrusion Detection Service:  Not-To-Exceed amount of $28,950 ($1,930/mo X 15mos).
    b.  Firewall Detection Systems as specified in Exodus document labeled Exodus Communications Firewall Service:  Not-To-Exceed amount of $44,625 ($2,975/mo X 15mos).
    c.  One-time, Firm Fixed Price of $155,000 for Initial Implementation.
    d.  An exercizable option to upgrade to High End SUN (E450) replacement for the Data Server at a Firm Fixed Price of $100,000.
    e.  An exercisable option to setup up to six (6) Additional Business Units at a Not-To-Exceed price of $150,000.  This is based on a one-time, Firm Fixed Price setup cost of  $25,000 for each Additional Business Unit.

3.  Email Transaction Costs (Reference S.O.W. dated August 19, 1999, page 32, paragraph 9.2.6.f-j):
    a.  Confirmation Email to senders on receipt: Unlimited Number of Confirmation Emails at No-Cost.
    b.  Simple routing of Email to other American Express domains: Not-To-Exceed price of $6,000 (maximum of 20,000Emails/mo X 15mos X $0.02/Email).
    c.  Routing to Groups accessing Echomail and servicing within the system: Not-To-Exceed price of $112,500 (maximum of 30,000Emails/mo X 15mos X $0.25/Email).
    d.  Automation: Not-To-Exceed price of $93,750 (maximum of 5,000Emails/mo X 15mos X $1.25/Email).
    e.  Emails incorrectly answered due to classification software malfunction: Unlimited Number of Incorrectly answered Emails at No-Cost.

1

www.echomail.com
info@echomail.com -WJG-01

3. Consulting/Training costs Not-To-Exceed $100,000 based upon hourly rates on S.O.W. page 33, paragraph 9.2.6.k.
4. Additional User Fees: Each Additional User over thirty (30) covered in XT1 configuration or Business Unit Setup fee shall be a fixed price each of $250 (one time fee). This shall not exceed a maximum of two users for an amount Not-To-Exceed of $500. (Reference paragraph 9.2.6.l).
5. Down Time Chargeback: Down Time for ISU shall be used to calculate breach of service chargeback (rebate). This shall be at $320/per downtime hour. Refer to paragraph 9.2.4 and definition of downtime for additional details in this regard. (Reference paragraph 9.2.6.m).

B. PAYMENT TERMS: Payments are as identified in the attached SOW, paragraph 10.

C. PERIOD OF PERFORMANCE:  This contract is effective from contract award including options through 09/01/2002. Amex reserves the right to terminate the contract after one year from award with a 60 day notice requirement.

D. PURCHASE ORDER # PHX039044 AND CHANGE ORDER #1: This Schedule incorporates the pricing in and replaces P.O. # PHX039044 and Change Order #1.

AMERICAN EXPRESS TRAVEL
RELATED SERVICES COMPANY, INC.

By: _____

Name: ___JAMES A RATH____
        (Type or Print)

Title: ___DIRECTOR_____

Date: ___9/24/99_____

GENERAL INTERACTIVE, INC.

By: _____

Name: __ROLAND WESTGATE___
        (Type or Print)

Title: ___SECRETARY_____

Date: ___25 Aug '99_____

((echomail®

GII SOW Dated 8/19/1999

*Excerpts from 50*

# EMAIL SERVICING

# STATEMENT OF WORK

## American Express Co
## &
## General Interactive, Inc

Interactive Technologies

American Express, Co.

August 19, 1999

GII SOW Dated 8/19/1999

# Table of Contents

1     REPRESENTATIVE INFORMATION ................................................................................... 2

2     INTRODUCTION ................................................................................................................... 2

3     GOLD SERVICE LEVEL AGREEMENT FROM GENERAL INTERACTIVE, INC. ............ 3

4     REQUIREMENTS FOR GOLD SERVICE LEVEL AGREEMENT ..................................... 3

    4.1   REQUIREMENTS FROM AMERICAN EXPRESS RFI ............................................................. 3
       4.1.1   Auto Response Requirements ........................................................................... 3
       4.1.2   End User Administration .................................................................................. 4
    4.2   ENTERPRISE-WIDE FUNCTIONALITY ............................................................................. 4
    4.3   SECURITY/PRIVACY/AUDITING ..................................................................................... 5
    4.4   REPORTING/COMMUNICATION ...................................................................................... 5
    4.5   WORKFLOW REQUIREMENTS ......................................................................................... 7

5     INFORMATION INTEGRITY REQUIREMENTS ............................................................ 13

    5.1   ADDITIONS/CLARIFICATIONS TO GOLD SERVICE LEVEL AGREEMENT ........................ 19

6     PROFESSIONAL SERVICES OVERVIEW ....................................................................... 23

    6.1   INTEGRATION WITH SECURE EMAIL: MODIFICATION REQUIREMENTS FROM INTERACTIVE TECHNOLOGIES ... 23
    6.2   CONSULTING SERVICES COVERED BY GENERAL INTERACTIVE ...................................... 24
    6.3   ASSUMPTIONS FOR PROFESSIONAL SERVICES OVERVIEW ............................................. 24

7     FUTURE DEPLOYMENT .................................................................................................. 26

    7.1   MULTI-LINGUAL SUPPORT ........................................................................................... 26

8     DELIVERY SCHEDULE MILESTONES ........................................................................... 27

9     FINANCIAL AND COSTING INFORMATION ............................................................... 29

    9.1   PERIOD OF PERFORMANCE ............................................................................................ 29
    9.2   FIXED PRICE AMOUNTS ................................................................................................ 29
       9.2.1   Security Design Review Items ........................................................................ 29
       9.2.2   Network Design Review Items ........................................................................ 29
       9.2.3   Physical Review items .................................................................................... 29
       9.2.4   Breaches of Service – Charge back calculation ............................................ 29
       9.2.5   Secure Email Integration Costs ..................................................................... 30
       9.2.6   Hardware / Software Costs ............................................................................. 31

10    METHOD AND FREQUENCY OF PAYMENT ................................................................ 34

    10.1   SECURE EMAIL INTEGRATION ...................................................................................... 34
    10.2   SECURE EMAIL ACCEPTANCE CRITERIA ...................................................................... 34
    10.3   HARDWARE / SOFTWARE SETUP CRITERIA ................................................................... 35
    10.4   HARDWARE/SOFTWARE ACCEPTANCE CRITERIA .......................................................... 35
    10.5   PER TRANSACTION COSTS AND ACCEPTANCE LEVELS ................................................... 36

11    SEVERITY DEFECT(S) DEFINITION ............................................................................. 37

12    DEFINITION OF TERMS, ACRONYMS AND ABBREVIATIONS .................................. 38

13    ATTACHMENT I – SECURITY DESIGN REVIEW (ECDR) FINDINGS ........................ 45

GII SOW Dated 8/19/1999

# 9   Financial and Costing Information

## 9.1   Period of Performance

The period of performance for the entire contract extends from the date contract is signed through 9/01/2002.  Amex reserves the right to terminate the contract after one year with 60 day notice to GI.

## 9.2   Fixed Price Amounts

### 9.2.1   Security Design Review Items

1) General Interactive, Inc. will address all issues reported in SDR, Attachment (1), at no cost to American Express. These issues represent industry accepted standards to address widely known data and service integrity threats.  GI will deliver corrections to American Express per the schedule outlined previously.

### 9.2.2   Network Design Review Items

1) General Interactive, Inc. will address all issues reported in the physical site and network review at no cost to American Express. These issues represent industry standards to address widely known data and service integrity threats. Exceptions to this include additional network line encryption requested by American Express using American Express approved hardware / software.

### 9.2.3   Physical Review items

1) General Interactive, Inc. will address issues found during the physical facility review at no cost to American Express. Findings represent industry accepted standards not available at the hosting facility

### 9.2.4   Breaches of Service -- Charge back calculation

1) Per-transaction costs of non-executed transactions during the down time, plus hourly business unit operational costs multiplied by the down time. Business unit operational costs will vary per business unit and will be agreed at Business Unit set up time. These costs will be deducted from the monthly per-transaction fees charged to American Express (See definition of "down time").  No deductions are to be applied to the ongoing costs if the minimum availability of 98.5% up time is met. Refer to the definition of downtime for complete calculation.



08/24/99

9.2.5   Secure Email Integration Costs

1) Assumptions
   a) A maximum of 270 person-hours of time (NTE) will be utilized for the execution
      of the Professional Services outlined in Section 6 of this Statement of Work.
      Additional hours require both parties to sign a new Statement of Work and will be
      charged at the rates specified herein.

   b) Project Manager will submit written status and participate in weekly status and
      time/material meetings throughout the development and roll out of the effort.

   c) Any additional resource costs incurred over the proposed budget of 270 person-
      hours will be paid by General Interactive, Inc., unless written consent is provided
      by the American Express project manager

   d) American Express will be invoiced with the actual hours spent implementing the
      Secure Email per the schedule outlined later in this section

   e) The following is an estimate of the implementation provided by GI as a base line
      for the NTE amount.  Additional efforts in a given category required by American
      Express that exceed these numbers will be provided at the rate used in the
      following table.

| Resource Skill Level | Estimated Hours | Cost |
|---|---|---|
| Project Manager | 30 | $ 2,100 |
| Systems Architect | 30 | $ 6,000 |
| Principal Engineer | 80 | $ 9,600 |
| Senior Engineer | 80 | $ 8,000 |
| QA Tester | 50 | $ 3,000 |
| TOTAL | 270 | $ 28,700 |

*(handwritten annotations to right of table: — $70, — $200, — $120, — $100, — $60)*



08/24/99

9.2.6  Hardware / Software Costs

All hardware & base software (e.g. OS, IIS, and SQL Server) will be owned by American Express Company.  General Interactive retains ownership of the Echomail and CC products that are to configured and installed on these workstations.

| Description | Cost |
|---|---|
| a.  Intrusion Detection Systems as specified in Exodus document  Intrusion Detection Service | $1,930 per Month |
| b.  Firewall Detection Systems as specified in Exodus document labeled Exodus Communications Firewall Service | $2,975 per month |
| c.  One-time setup cost for Initial implementation Includes:<br>XT1 Setup<br>&bull; 1 Server configured to operational status<br>&bull; 3 additional NT boxes @ $15K each<br>&bull; 4 additional NT TEST boxes @ $15K each<br>&bull; 1 Day of On-Site Training for 30 Users<br>&bull; 30 Initial Business Users<br>&bull; 10 Initial Technical Users<br>&bull; 110 categories<br>  &bull; Up to 50 categories at setup<br>  &bull; 5 additional categories per month<br><br>Hardware purchase (Intel Based), setup and maintenance (Per Server), in addition to server included in XT1 setup. This price includes hardware/software for deployment and completion of the 3-tier architecture as depicted in Attachment (5).  All h/w will be the sole property of American Express. | $155,000 |



08/24/99

| | |
|---|---|
| **d. Contract Option:**<br>Should American Express determine that volumes warrant an upgrade to the data server the following option may be exercised:<br>• High End SUN (E450) replacement for the Data Server. Not Oracle based.<br><br>Rate defined is good until September 1, 2000. There- after the option can be exercised for up to three years with a maximum increase of 5% per year. | $100,000 |
| **e. Contract Option:**<br>One-time setup cost per Additional Business Unit Includes:<br>• 1 Day of On-Site Training for up to 30 additional Users<br>• 30 additional users granted access<br>• 110 categories<br>   • Up to 50 categories at setup<br>   • 5 additional categories per month<br><br>Rate defined is good until September 1, 2000. There- after the option can be exercised for up to three years with a maximum increase of 5% per year. | $25,000 |

f.    Confirmation Email to senders on receipt

| Number of Emails | $/Email |
|---|---|
| Unlimited | Free |

g.    Per Transaction Costs ( simple routing of email to other American Express domains)

| Number of Emails | $/Email |
|---|---|
| Unlimited | $0.02 |

h.    Per Transaction Costs ( Routing to Groups accessing Echomail and servicing within the system)

| Number of Emails | $/Email |
|---|---|
| 30,000 | $0.25 |
| 50,000 | 0.20 |
| 100,000 | 0.17 |
| 500,000 | 0.14 |
| 2,000,000 | 0.10 |

Email Servicing – Statement of Work



08/24/99

| i.  Per Transaction Costs ( Automation ) | |
|---|---|
| Number of Emails | $/Email |
| 10,000 | $1.25 |
| 20,000 | 1.15 |
| 50,000 | 0.88 |
| 200,000 | 0.48 |
| 1,000,000 | 0.27 |
| j. Emails incorrectly answered to due to classification software malfunction ( see definition of "successfully automated email" in "Definition of terms" section | Free |
| k.  Consulting Fees | $200/hr |
| Additional Training costs not part of XT1 configuration or Business Unit setup | $150/hr |
| l.   Each Additional User over the thirty (30) covered in XT1 configuration or Business Unit Setup | $250 one time fee |
| m.  Amex Fees: Down Time Costs for ISU to be used to calculate breach of service charge back. Refer to 9.2.4 and definition of down time for additional details. | $320/hr |

GII SOW Dated 8/19/1999

# 10 Method and Frequency of Payment

## 10.1 Secure Email Integration

| Percentage | Payment Amount ($) | Date | Method | Billing/Delivery Conditions |
|---|---|---|---|---|
| 30% | 8,610 | 7/22 | Purchase Order | Completed |
| 30% | 8,610 | 8/5 | Purchase Order | Completed |
| 40% | | | | Two weeks after Production Deployment and no pending Sev 1 or 2 items for 30 days following implementation. Invoice must include total number of hours by resource type spent on the effort. |
| NTE Total Payments | 28,700 | | | |

## 10.2 Secure Email Acceptance Criteria

The application interfaces will be accepted by American Express following complete installation and verification of operation in both the Production and Testing environments. The application changes are expected to be have as documented in this Statement of Work. The backup/recovery process will also be validated prior to making final payment.

08/24/99

10.3

## 10.4 Hardware / Software Setup Criteria

| % | Payment Amount ($) | Date | Method | Acceptance/Billing Conditions |
|---|---|---|---|---|
| 10% | 16,390 | 7/22/99 | Purchase Order | Acceptance of 3-tier architecture requirements and initiation of h/w order (Complete) |
| 10% | 16,390 | 8/5/99 | Purchase Order | Hardware installed and ready to be used by American Express (Complete) |
| 50% | 77,500 | 8/31/99 | Invoice | Network/Physical configuration reviewed and approved by American Express. All Training Conducted |
| 30% | 44,720 | | Invoice | Routing Rules and Knowledge base ready for System Testing, Initial testing completed (network traffic/communication validated) Two weeks after Production Deployment No Severity 1 or 2 issues are present |
| | 155,000 | | | |

## 10.5 Hardware/Software Acceptance Criteria

The hardware and software acceptance criteria are based on two factors. 1) The physical network and site review and 2) verification of behaviors documented in section 4 of this SOW. All features associated with this effort must behave as advertised/demonstrated during the RFP process. All items detailed for correction during the physical site review must be corrected or have mutual agreement on the disposition of the discrepancy identified. The physical site reviews will also verify Intrusion Detection and Firewall systems. Ongoing billing for the two services will be provided with the monthly billing for the transactional costs attributed to the Echomail service (see next section).

**AMERICAN EXPRESS**

08/24/99

### 10.6 Per Transaction Costs and Acceptance Levels

The following process will be utilized when determining the costs associated with the variable portions of this contract.

a) All reports utilized to create the invoice are either a part of the standard General Interactive product suite or will be developed at no additional cost to American Express. All reports will be made available to both companies so that the companies can track current month expenditures (this will require ad-hoc report support as well as end of month reports)

b) The individual per transaction costs will be applied in the first full month following implementation. This is primarily to disassociate testing of the auto reply/auto-suggested email as they are fully integrated into production.

c) A part of the General Interactive, Inc., Gold agreement is to provide Quality Assurance and Semantic Network requests. Since American Express also plays a part in helping the automation engine to achieve the 40% automation goal. Proper training and professional advice must be provided to reach and maintain at least 40% automation, every calendar month, at no additional cost.

d) Performance less than 90% availability in a given month is to result in no transactional fees to be paid for that month. Availability over the 90% threshold will dictate the amount to be charged to American Express for the transactional fees. Refer to the definition of DOWNTIME for a complete description of how the available number is to be calculated. Fees associated with the performance are to be calculated as follows; Total Transaction Fees for the month minus (downtime in hours times the American Express Downtime rate).

Email Servicing – Statement of Work

GII Schedule # PHX-8/24/99-WJG-01

<u>SCHEDULE</u>

Consultant:
**General Interactive, Inc.**
66 Church Street
Cambridge, MA 94063

Schedule No.: **PHX-08/24/99-WJG-01**
Agreement No.: **PHX-07/09/99-RLG1**
Effective Date:  July 16,1999
Date:   August 24, 1999

This Schedule is issued pursuant to the above-referenced Master Agreement for Consulting Services between American Express Travel Related Services Company, Inc. and the above-named Consultant.  Any term not otherwise defined herein, shall have the meaning specified in the Agreement.

| <u>Amexco Project Managers</u> | <u>Consultant Location</u> |
|---|---|
| Angel M. Rodriguez<br>Gavin M Berg | New York City, NY |

| <u>Consultant Project Manager</u> | <u>Status Reports are required:</u> |
|---|---|
| Ray Billings | Weekly |

See <u>Attachment A</u> (S.O.W. titled E-Mail Servicing dated August 19, 1999) for a complete description of the services. deliverables and/or other tasks to be accomplished, the milestone or implementation schedule, the charges and/or rates applicable to this Schedule and any other mutually agreeable information.

**SPECIAL TERMS AND CONDITIONS:**

**A.**  PRICING: The following line item prices are awarded in this schedule (the total dollar amount is a not-to-exceed amount of  S 820,025 which includes the Firm Fixed Price and Not-To-Exceed amounts). All not-to-exceed amounts are not to be exceeded with prior written approval from one of the Project Managers listed above:

1.  Secure Email Integration Costs:  Not-To-Exceed price of $28,700 based upon a Not-To-Exceed maximum of 270 person-hours (Reference S.O.W. dated August 19, 1999, page 30, para. 9.2.5.1a-e).

2.  Hardware/Software Costs (Reference S.O.W. dated August 19, 1999, page 31, para 9.2.6.a-e):
    a.  Intrusion Detection Systems as specified in Exodus document Intrusion Detection Service:  Not-To-Exceed amount of $28,950 ($1,930/mo X 15mos).
    b.  Firewall Detection Systems as specified in Exodus document labeled Exodus Communications Firewall Service:  Not-To-Exceed amount of $44,625 ($2,975/mo X 15mos).
    c.  One-time, Firm Fixed Price of $155,000 for Initial Implementation.
    d.  An exercizable option to upgrade to High End SUN (E450) replacement for the Data Server at a Firm Fixed Price of $100,000.
    e.  An exercisable option to setup up to six (6) Additional Business Units at a Not-To-Exceed price of $150,000.  This is based on a one-time, Firm Fixed Price setup cost of  $25,000 for each Additional Business Unit.

3.  Email Transaction Costs (Reference S.O.W. dated August 19, 1999, page 32, paragraph 9.2.6.f-j):
    a.  Confirmation Email to senders on receipt: Unlimited Number of Confirmation Emails at No-Cost.
    b.  Simple routing of Email to other American Express domains: Not-To-Exceed price of $6,000 (maximum of 20,000Emails/mo X 15mos X $0.02/Email).
    c.  Routing to Groups accessing Echomail and servicing within the system: Not-To-Exceed price of $112,500 (maximum of 30,000Emails/mo X 15mos X $0.25/Email).
    d.  Automation: Not-To-Exceed price of $93,750 (maximum of 5,000Emails/mo  X  15mos  X $1.25/Email).
    e.  Emails incorrectly answered due to classification software malfunction: Unlimited Number of Incorrectly answered Emails at No-Cost.

GII Schedule # PHX-8/24/99-WJG-01

3. Consulting/Training costs Not-To-Exceed $100,000 based upon hourly rates on S.O.W. page 33, paragraph 9.2.6.k.
4. Additional User Fees: Each Additional User over thirty (30) covered in XT1 configuration or Business Unit Setup fee shall be a fixed price each of $250 (one time fee). This shall not exceed a maximum of two users for an amount Not-To-Exceed of $500. (Reference paragraph 9.2.6.l).
5. Down Time Chargeback: Down Time for ISU shall be used to calculate breach of service chargeback (rebate). This shall be at $320/per downtime hour. Refer to paragraph 9.2.4 and definition of downtime for additional details in this regard. (Reference paragraph 9.2.6.m).

B. PAYMENT TERMS: Payments are as identified in the attached SOW, paragraph 10.

C. PERIOD OF PERFORMANCE:    This contract is effective from contract award including options through 09/01/2002. Amex reserves the right to terminate the contract after one year from award with a 60 day notice requirement.

D. PURCHASE ORDER # PHX039044 AND CHANGE ORDER #1: This Schedule incorporates the pricing in and replaces P.O. # PHX039044 and Change Order #1.

AMERICAN EXPRESS TRAVEL
RELATED SERVICES, COMPANY, INC.

By: _____

Name: _____
    (Type or Print)

Title: __Director__

Date: __9/24/99__

GENERAL INTERACTIVE, INC.

By: _____

Name: _____
    (Type or Print)

Title: __Secretary__

Date: __25 Aug '99__



G E N E R A L
I N T E R A C T I V E
» T h e  E - M a i l  C o m p a n y «

# Statement of Work

Job Number: P0011

Customer: American Express
Project Title: AEFA - Brokerage
Project Type: EchoMail CC/BI Installation
Date: January 1, 2000

## Overview
This document delineates the work and costs associated with the installation of
EchoMail CC/BI for the Brokerage business unit of American Express Financial
Advisors. The Project will be divided three two steps:
1. Sign off on this Statement of Work
2. Tasks as outlined below
3. Payment as detailed in Schedule A

## Tasks
- Strategic Planning
- EchoMail CC Implementation
  - EchoMail Software Set-up
  - EchoMail Client Configuration
- EchoMail BI Implementation
- On-Site Business Analysis
- Routing Plan Creation
- Client Training and Set-up
- EchoMail Pilot
  - Alpha Phase
  - Beta Phase
  - Gold Phase
- Testing in Live Environment

## Team Members
The following is a list of contact names, titles, and contact information for the Project:

### GII Team
- Account Manager:          Paul Smith
                           Phone: (617) 354-8585 x 263
                           e-mail: psmith@interactive.com

### Customer Team
- Project Manager          Jonna Costello
                           Phone:
                           e-mail: jonna.m.Costello@aexp.com

© 1999 General Interactive, Inc.
Proprietary and Confidential.

## Project Schedule

The *estimated* Project Schedule is as follows:

| | Start | End |
|---|---|---|
| Strategic Planning | Week 1 | Week 1 |
| EchoMail CC Implementation | Week 1 | Week 1 |
| EchoMail Software Set-up | Week 1 | Week 1 |
| EchoMail Client Configuration | Week 1 | Week 1 |
| EchoMail BI Implementation | Week 2 | Week 2 |
| On-Site Business Analysis | Week 2 | Week 2 |
| Routing Plan Creation | Week 2 | Week 2 |
| Client Training and Set-up | Week 3 | Week 3 |
| EchoMail Pilot | Week 3-5 | Week 3-5 |
| Alpha Phase | Week 3 | Week 3 |
| Beta Phase | Week 4 | Week 4 |
| Gold Phase | Week 5 | Week 5 |
| Testing in Live Environment | Week 6 | Week 6 |

Project Cost

| Item | One-time | Monthly |
|---|---|---|
| EchoMail CC/BI Installation | $25,000 | N/a |
| | | |

Both parties below acknowledge and agree to execute the above items:

General Interactive, Inc.

By: _____

Print: _____

Title: _____

Date: _____

Customer

By: _____

Print: _____

Title: _____

Date: _____



## G E N E R A L
## I N T E R A C T I V E
### » T h e  E - M a i l  C o m p a n y «

# Statement of Work

Job Number: P0012

Customer: American Express
Project Title: AEFA – Retirement Services
Project Type: EchoMail CC/BI Installation
Date: January 1, 2000

## Overview

This document delineates the work and costs associated with the installation of
EchoMail CC/BI for the Brokerage business unit of American Express Financial
Advisors. The Project will be divided three two steps:

1. Sign off on this Statement of Work
2. Tasks as outlined below
3. Payment as detailed in Schedule A

## Tasks

- Strategic Planning
- EchoMail CC Implementation
  - EchoMail Software Set-up
  - EchoMail Client Configuration
- EchoMail BI Implementation
- On-Site Business Analysis
- Routing Plan Creation
- Client Training and Set-up
- EchoMail Pilot
  - Alpha Phase
  - Beta Phase
  - Gold Phase
- Testing in Live Environment

## Team Members

The following is a list of contact names, titles, and contact information for the Project:

### GII Team

- Account Manager:    Paul Smith
  Phone: (617) 354-8585 x 263
  e-mail: psmith@interactive.com

### Customer Team

- Project Manager    Jonna Costello
  Phone:
  e-mail: jonna.m.Costello@aexp.com

© 1999 General Interactive, Inc.
Proprietary and Confidential.

## Project Schedule

The *estimated* Project Schedule is
as follows:

| | Start | End |
|---|---|---|
| Strategic Planning | Week 1 | Week 1 |
| EchoMail CC Implementation | Week 1 | Week 1 |
| EchoMail Software Set-up | Week 1 | Week 1 |
| EchoMail Client Configuration | Week 1 | Week 1 |
| EchoMail BI Implementation | Week 2 | Week 2 |
| On-Site Business Analysis | Week 2 | Week 2 |
| Routing Plan Creation | Week 2 | Week 2 |
| Client Training and Set-up | Week 3 | Week 3 |
| EchoMail Pilot | Week 3-5 | Week 3-5 |
| Alpha Phase | Week 3 | Week 3 |
| Beta Phase | Week 4 | Week 4 |
| Gold Phase | Week 5 | Week 5 |
| Testing in Live Environment | Week 6 | Week 6 |

## Project Cost

| Item | One-time | Monthly |
|---|---|---|
| EchoMail CC/BI Installation | $25,000 | N/a |
| | | |

Both parties below acknowledge and agree to execute the above items:

General Interactive, Inc.                     Customer

By: _____          By: _____

Print: _____          Print: _____

Title: _____          Title: _____

Date: _____          Date: _____

© 1999 General Interactive, Inc.
Proprietary and Confidential.

01/31/09  MON 08:48 FAX 602 766 3790        AMEX INTERACTIVE SVCS                    ☒001

# Statement of Work

Job Number: P0011

> Customer:  American Express Co.
> Project Title: TBASS
> Project Type:  Customer Service Review
> Date: January 25, 2000

## Overview

This document delineates the work and costs associated with the execution of the TBASS project. The Project will be divided into two steps:

1. Sign off on this Statement of Work
2. Tasks as outlined below

## Tasks

- Pull 1,000 closed E-mails from database ( from prior 2 weeks)
- Create Microsoft Access file: Ticket Number, Message, Response, Date e-mail responded to, E-mail address of sender

## Team Members

The following is a list of contact names, titles, and contact information for the Project:

**EchoMail, Inc. Team**
- Account Managers:

> Paige Brown, Paul Smith
> Phone: (617) 354-8585 x 205
> E-mail: pbrown@interactive.com

**Customer Team**
- Project Manager:

> Karin Madsen
> Phone: (602) 766-3742
> E-mail:  Karin.Madsen@aexp.com

## Project Schedule

The Project Schedule is
as follows:                          Start:  1/25/00        End:  1/31/00

## Project Cost

| Item | January Fee: | |
|------|--------------|--|
| TBASS | $3,840 | |

© 1999 General Interactive, Inc.

Both parties below acknowledge and agree to execute the above items:

EchoMail, Inc.

By: _____

Print: _Roland Westgate_

Title: _Corp Secretary_

Date: _1-31-2000_

American Express

By: _____

Print: _JAMES SHALOM_

Title: _DEVELOPMENT VENDOR_

Date: _1/31/00_

B



## Amendment of Master Agreement & Schedule: PHX-07/09/99-RLG1

American Express Co ("Amexco") with principal place of business at American Express Tower, World Financial Center, New York, NY 10285 and EchoMail, Inc. ("Consultant"), formerly known as General Interactive, Inc. ("GII"), with principal place of business at 701 Concord Avenue, Cambridge, MA 02138 entered into a business agreement with effect from July 9, 1999 subject to the terms of certain Master Agreement and Schedule: PHX-07/09/99-RLG1 ("Master Agreement").

This Amendment modifies the Master Agreement with respect to the terms described herein. Amexco and EchoMail represent that there are no other changes to Master Agreement. This Amendment is incorporated by reference and becomes a part of the Master Agreement.

The parties agree to modify the following provisions of the Master Agreement.

(1) **Name and address of Consultant:**
Name of Consultant shall be revised as: EchoMail, Inc. ("EchoMail")
Address of Consultant shall be revised as: 701 Concord Avenue, Cambridge, MA 02138

(2) **Reference to "General Interactive, Inc.", "General Interactive", "GII", & "GI" to describe the name of Consultant:**
All references to "General Interactive, Inc.", "General Interactive", "GII", & "GI" shall be referred to as "EchoMail" to describe the name of Consultant

(3) **Pricing for Use of Licenses, Infrastructure, Hosting, Maintenance and Professional Services:**
All pricing shall be revised as per the terms of Schedule RR subject to the Effective Term of Schedule RR, attached herewith as Exhibit A.

(4) **Effective Term of the Master Agreement:**
Effective Term of the Master Agreement shall be effective from July 15, 2004 until December 31, 2005. The Master Agreement shall automatically renew for an additional 12-month term from January 1 2006 to December 31, 2006 unless Amexco terminates by written notice to Consultant at least sixty (60) days prior to December 31, 2005. If the Master Agreement has been renewed for second term, it shall automatically renew for third term from January 1 2007 to December 31, 2007 unless Amexco terminates by written notice to Consultant at least sixty (60) days prior to December 31, 2006. In the event Amexco terminates Schedule RR, the Master Agreement shall become automatically terminated.

(5) **Effective Term of Schedule RR:**
Effective Term of Schedule RR shall be effective from January 1, 2005 for a period of 12 months. Schedule RR shall automatically renew for an additional 12-month term from January 1 2006 to December 31, 2006 unless Amexco terminates by written notice to Consultant at least sixty (60) days prior to December 31, 2005. If Schedule RR has been renewed for second term, it shall automatically renew for third term from January 1 2007 to December 31, 2007 unless Amexco terminates by written notice to Consultant at least sixty (60) days prior to December 31, 2006. In the event Amexco terminates Schedule RR, the Master Agreement shall become automatically terminated.

EchoMail, Inc.
701 Concord Avenue
New Media Park
Cambridge, Mass.
02138-1057

tel: 617-354-8585
fax: 617-354-8899
www.echomail.com



(6) **Reference to "Exodus" and "Exodus Communications":**
All references to "Exodus" and "Exodus Communications" shall be considered removed. Consultant shall define and provide all services enlisted as defined and provided by "Exodus" and "Exodus Communications".

(7) **Business Continuity Plan Requirements:**
Consultant shall take reasonable efforts to conform to the requirements of Business Continuity Plan requirements attached hereto as Exhibit A.

(8) **E-Mail Processing Time Commitment:**
Consultant agrees to the following terms for E-Mail Processing Time Commitment.
   a. 100% of the E-Mails received by Mail servers at EchoMail will be processed and made available on the web-based user interface of EchoMail Customer Care software in four (4) hours, calculated on a per E-Mail basis
   b. 70% of the E-Mails received by Mail servers at EchoMail will be processed and made available on the web-based user interface of EchoMail Customer Care software in One and half (1.5) hours, calculated on a per E-Mail basis
   c. Amexco will not be billed by EchoMail Customer Care and Business Intelligence processing license fees for those E-Mails that took more time to process than the limits defines above.
   d. Above processing time commitment excludes any and all issues that are outside the scope of EchoMail Hosting Center including without limitation, problems of the internet, problems with telecommunication lines, devices not controlled by EchoMail, human errors or delays caused by staff not employed by EchoMail.

(9) **Security Patch Upgrade Commitment:**
Consultant agrees to the following terms for Security Patch Upgrade Commitment.
   a. All non-critical patches shall be installed once in a quarter
   b. All security related critical patches shall be installed within 12 days of issuance of such patches by the patch issuer
   c. Identification of patch as critical patch shall be designated by the issuer

Amexco and Consultant execute this Amendment, in their respective corporate names by their duly authorized representatives on this 13th day of August 2004.

_8 - 13 -2004_
EchoMail, Inc.                                    Date
Authorized Representative

_8/20/04_
American Express Co                              Date
Authorized Representative



# Exhibit A

## Schedule RR

**Customer Name:**   American Express ("Customer")

**Customer Address:** American Express Tower, World Financial Center, New York, NY 10285

**Account Manager:** Bruce Thomann

**Effective Term:**   January 1, 2005 – December 31, 2007[1]

**Description:**     EchoMail will provide the following services for the business units currently being supported as of the start of the Effective Term:
1. Hardware for the EchoMail Application. In addition EchoMail will provide all necessary hardware to maintain 50% CPU capacity of servers for EchoMail v7.3 and EchoMail v8.x
2. Hardware Maintenance
3. Third Party Software Maintenance
4. EchoMail Software Licenses
5. Professional Services as required
6. Hosting Services
7. Security
8. Gold Service Level Agreement

Pricing Schedule

| Part Number | Part Description | Units | Unit Price | Expiration Date | (Monthly) | One Time |
|---|---|---|---|---|---|---|
| | Licenses | | | | | |
| CC-LI-User | EchoMail Customer Care User Licenses for additional users (units in users) | 1 | $  275.00[2] | N/A | $    0.00 | Number of Users to be decided |

---

Effective Term of this Schedule shall be effective from January 1, 2005 for a period of 12 months. Schedule RR shall automatically renew for an additional 12-month term from January 1 2006 to December 31, 2006 unless Amexco terminates by written notice to Consultant at least sixty (60) days prior to December 31, 2005. If Schedule RR has been renewed for second term, it shall automatically renew for third term from January 1 2007 to December 31, 2007 unless Amexco terminates by written notice to Consultant at least sixty (60) days prior to December 31, 2006.
[2] Additional users license fees will increase in uncompounded increments of 5% per year of agreement starting January 1, 2006 to reflect a 5%, and 10% increase over revised cost of $275.00 that is effective from January 1, 2005. Additional users are any users beyond eight hundred and thirteen (813) users already purchased as of start of effective date, not including users that belong to EchoMail, up to six (6) Admin users that belong to American Express Technology group and up to 30 additional users for each new business unit added per the following rate card:

| Transaction Costs | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|
| User Licenses | Current | 0% | 5% | 10% |
| First 10,000 | 262.50 | 275.00 | 288.75 | 302.50 |

Any additional users purchased over the original 30 users are transferable across business units.



| CC-Li-Advanced | EchoMail Customer Care (CC) Processing Licenses for workflow | 1 | See Note[3] | N/A | TBD | $ 0.00 |
| BI-LI-Advanced | EchoMail Business Intelligence (BI) - Processing Licenses for analysis | 1 | See Note[4] | N/A | TBD | $ 0.00 |
| | | | | Sub-Total | See Payment Terms | See Payment Terms |
| | **Hosting and Maintenance** | | | | | |
| HDW-SRVR-Leasing | EchoMail Hosting Services for the business units currently being supported as of the start of the Effective Term including - EchoMail Enterprise Hardware Infrastructure for 50% CPU capacity of servers for EchoMail CCBI v7.3 and EchoMail v8.x for business units currently being supported at start of effective date[5] Includes currently existing servers for Antivirus, Test installations and Production installations (units in years) If Customer opt to not terminate this Schedule for second and third years, lease shall extend @ $200,000 for second and third years | 1 | $ 800,000.00 | N/A | $ 800,000.00 | $ 0.00 |
| HDW-SRVR-Hosting | EchoMail Hosting Services for the business units currently being supported as of the start of the Effective Term including - Power, | 12 | $ 19,000.00 | N/A | $ 19,000.00 | $ 0.00 |

[3] Customer Care Licenses will be billed monthly per the following rate card fees and will increase in uncompounded increments of 5% per year of agreement starting January 1, 2005 to reflect a 5%, 10% and 15% increase over original cost:

| Transaction Costs | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|
| CC Transactions | 0% | 5% | 10% | 15% |
| First 30,000 | 0.25 | 0.26 | 0.28 | 0.29 |
| 30,000 - 50,000 | 0.2 | 0.21 | 0.22 | 0.23 |
| 50,000 - 100,000 | 0.17 | 0.18 | 0.19 | 0.20 |
| 100,000 - 500,000 | 0.14 | 0.15 | 0.15 | 0.16 |
| 500,000 - 2,000,000 | 0.1 | 0.11 | 0.11 | 0.12 |

Above License volume totals are calculated monthly across all business units of Customer
"Heartbeat' monitoring e-mails sent by Customer, test e-mails sent by EchoMail and all test e-mails sent by Customer prior to handing over production installation to new business unit will not be considered for billing.
[4] Business Intelligence Licenses will be billed monthly per the following rate card and will increase in uncompounded increments of 5% per year of agreement starting January 1, 2005 to reflect a 5%, 10% and 15% increase over original cost:

| Transaction Costs | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|
| BI Transactions | 0% | 5% | 10% | 15% |
| First 10,000 | 1.25 | 1.31 | 1.38 | 1.44 |
| 10,000 - 20,000 | 1.17 | 1.23 | 1.29 | 1.35 |
| 20,000 - 50,000 | 0.88 | 0.92 | 0.97 | 1.01 |
| 50,000 - 200,000 | 0.48 | 0.50 | 0.53 | 0.55 |

Above License volume totals are calculated monthly across all business units of Customer
"Heartbeat' monitoring e-mails sent by Customer, test e-mails sent by EchoMail and all test e-mails sent by Customer prior to handing over production installation to new business unit will not be considered for billing.
BI Processing License fees for E-Mails incorrectly classified by Business Intelligence software will not be charged. Incorrectly classified E-Mails are identified as E-Mails on which user performed "Select" operation in EchoMail CC application. Incorrectly classified E-Mails are defined as E-Mails on which user performed "Select" operation to change more than 1 out 4 categories.
[5] In the event Customer adds new business units, Hardware for additional business units will be added for a fee of $25,000.00/business unit.




Sept 2004-5

| | | | | | |
|---|---|---|---|---|---|
| | UPS, Generator, Floor Space, Video Monitoring, Environmental Monitoring, Air Conditioning, Fire Suppression, N+1, Physical Security, and Telecommunications, and data archival services and storage Includes currently existing servers for Antivirus, Test installations and Production installations (units in months) | | | | |
| EM-SCTY-MAINT | EchoMail Security Services including Intrusion Detection and Firewall (units in months) | 12 | $ 4,905.00 | N/A | $ 4,905.00 | $ 0.00 |
| HDW-TPS-MAINT | EchoMail Third Party Software Maintenance for hosted sewers (units in years) | . | Included | N/A | $ 0.00 | $ 0.00 |
| HDW-SRVR-MAINT | EchoMail Server Hardware Maintenance for hosted servers (units in years) | . | Included | N/A | $ 0.00 | $ 0.00 |
| MT-SLA-Gold | EchoMail Gold Service Level Agreement including 10 hours of professional services (units in months) | 1 | Included | N/A | $ 0.00 | $ 0.00 |
| | | | | Sub-Total | See Payment Terms | $ 0.00 |
| | Professional Services | | | | |
| | EchoMail Implementation Services for New Business Units[6], if Customer adds new Business Units | 1 | $ 25,000.00 | N/A | $ 0.00 | $ 25,000.00 |
| EM-PS-Consulting | EchoMail Professional Services | 1 | See Note[7] | N/A | TBD | $ 0.00 |
| | | | | Sub-Total | See Payment Terms | $ 25,000.00 |
| | | | | Net Due | See Payment Terms | $ 915,000.00 |

---

[6] Hosting fees for additional business units will be added for a fee of $1,700.00/business unit.

[7] Professional Services will be billed monthly per the following rate card and will increase in uncompounded increments of 5% per year of agreement starting January 1, 2005 to reflect a 5%, 7% and 9% increase over original cost:

| Transaction Costs | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|
| | 0% | 5% | 7% | 9% |
| Professional Services | $ 157.50 | $ 165.38 | $ 168.53 | $ 171.68 |
| Project Management | $ 210.00 | $ 220.50 | $ 224.70 | $ 228.90 |
| Consulting | $ 265.00 | $ 278.25 | $ 283.55 | $ 288.85 |



**Payment Schedule:**
Customer agrees to pay according to the following payment schedule:

Year One
Timing
March 1, 2005

Monthly

Amount
$1,086,860.00 (Infrastructure Leasing, Year One Software and Hardware Maintenance fees, Year One Hosting Fees, and Year One Security Fees)
EchoMail will accept payment in whole or in part anytime during the period August 16, 2004 to March 1, 2005
Professional Services, BI Licenses, and CC Licenses

Year Two
Timing
March 1, 2006

Monthly

Amount
$486,860.00 (Infrastructure Leasing, Year One Software and Hardware Maintenance fees, Year One Hosting Fees, and Year One Security Fees)
Professional Services, BI Licenses, and CC Licenses

Year Three
Timing
March 1, 2007

Monthly

Amount
$486,860.00 (Infrastructure Leasing, Year One Software and Hardware Maintenance fees, Year One Hosting Fees, and Year One Security Fees)
Professional Services, BI Licenses, and CC Licenses

Additional charges shall apply at the Unit Price set forth above in the event that quantity of use of the foregoing licensed software and services exceeds purchased amounts hereunder. EchoMail reserves the right to audit license usage of customer on a monthly basis. Such additional charges shall be billed directly to Customer on a monthly basis. EchoMail, Inc. shall issue no credits to Customer for any licenses not used by Customer on the Expiration Date, and unused licenses may not be carried over into subsequent periods.

Subject to customers pre-approval costs for shipping, telecommunications (including cell and phone costs), mailing costs, and out-of-pocket expenses incurred by EchoMail, Inc. in its performance of this Schedule and the Statement(s) of Work attached hereto and made a part hereof are not included herein, and will be billed directly to Customer on a monthly basis. If Customer requires EchoMail to travel on behalf of Customer for execution of this Schedule or associated Statement of Work, and such travel is pre-approved by Customer, then Customer agrees to administrate travel including ticket purchase, hotel, and car. If EchoMail administers the travel, a thirty-percent (30%) processing fee will be charged.

This Schedule is governed by the attached Terms and Conditions and/or the Master Agreement. Payment or PO# is due prior to start of work. Both parties below acknowledge and agree to the foregoing as of this 13'th day of August 2004, and to execute their respective performance obligations as set forth in the Statement(s) of Work attached hereto and made a part hereof.

EchoMail, Inc.

By: _A. Ayyadurai_

Print: V. Ayyadurai

Title: Chief Administration Officer

Customer

By: _Russell K. Coplen_

Print: _____ 8/20/04

Title: _____RUSSELL K. COPLEN_
_SR. MANAGER_
_TECHNOLOGY CONTRACTS_

PO#: _____

# EXHIBIT A

### Section: Business Continuity Plan

Throughout the term of the Agreement, Vendor shall maintain a Business Continuity Plan (the "Business Continuity Plan") and the capacity to execute such a plan; which, at a minimum, shall conform to generally accepted BCP/DR industry standards.

The requirements for Vendor's Business Continuity Plan are included in Schedule A.

Prior to implementing any change to the Business Continuity Plan that will materially alter the standards of performance (i.e., recovery time objectives) such that Vendor would not be able to meet the standards of performance described in ScheduleA, Vendor will provide sixty (60) days' prior written notice to AXP in order that AXP may review the changes and provide Vendor with a list of concerns. Vendor will use reasonable commercial efforts to provide a written response that addresses AXP's concerns within ten (10) business days following receipt of such list.

As part of the Services, Vendor shall (1) maintain Business Continuity Plans for all service locations, (2) update and confirm the operability of the BCP in effect at that time on an annual basis at minimum or when material changes occur, (3) certify to AXP in writing that the BCP is fully operational, at minimum, once per year, and (3) within two (2) hours of a Disaster, or as soon as reasonably possible, provide AXP with notice of a Disaster and implement the BCP upon the occurrence of a Disaster at a Vendor Service Location (as defined in the services agreement between Vendor and AXP) or otherwise affecting the provisions or receipt of the Services. For purposes hereof, a "Disaster" shall mean any Force Majeure (see below), as well as any other occurrence that results in Vendor being unable to provide all or substantially all the Services at any single Vendor Service Location for a period in excess of 120 minutes. Vendor shall abide by the RTO requirements set forth in Schedule A. In the event Vendor provides the Services from a business recovery center for more than 30 days, AXP may terminate this Agreement immediately for cause upon notice to Vendor and without regard to Section . In the event of a Disaster, Vendor shall not increase its charges under this Agreement or charge AXP usage fees in addition to the Fees. Further, in the event of a Disaster, Vendor shall consider providing the Services to AXP to be the primary priority of Vendor, such priority being greater than, or at least equal to, the services Vendor must provide to itself.

Force Majeure: Neither AXP nor Vendor shall be liable for any delay in the performance of its obligations pursuant to this Agreement (1) provided that such delay (a) could not have been prevented by commercially reasonable precautions and (b) cannot be circumvented by the non-performing party through the use of commercially reasonable alternate sources, work-around plans or other means, and (2) if and to the extent such delay is caused, directly or indirectly, by fire, flood, earthquake, elements of nature or acts of God, acts of war, terrorism, riots, civil disorders, rebellions or revolutions, or any other similar cause beyond the reasonable control of such party or agent thereof (each, a "Force Majeure Event"). Upon the occurrence of a Force Majeure Event, the non-performing party shall be excused from any further performance of those of its obligations pursuant to this Agreement (other than Vendor's obligation to provide either normal recovery procedures or any other Business Continuation Services as described in Section ) affected by the Force Majeure Event for as long as (a) such Force Majeure Event continues and (b) such party continues to use commercially reasonable efforts to recommence performance whenever and to whatever extent possible without delay; provided, however, that Vendor shall be relieved of the Service Level requirements for no longer than 30 days from the occurrence of such Force Majeure Event. The party delayed by a Force Majeure Event to such party shall immediately

notify the other party of the occurrence of a Force Majeure Event and describe in reasonable detail the nature of the Force Majeure Event. If any Force Majeure Event prevents Vendor's performance of the Services for more than 120 hours, AXP may terminate this Agreement as of the date specified by AXP without regard to Section   . The occurrence of a Force Majeure Event with respect to another customer of Vendor shall not constitute a Force Majeure Event under this Agreement.

<u>Allocation of Resources</u>: Whenever a Force Majeure Event or a Disaster causes Vendor to allocate limited resources between or among Vendor customers and affiliates, AXP shall receive no lower priority than Vendor itself or any other customer or affiliate of Vendor.

**Below is the BCP schedule that service providers should adhere to. This should also be a part of the contract as an exhibit or schedule - a separate attachment to the contract with this additional detail, including the Interactive Vendor BCP Requirements.**

Schedule A
*Vendor* Business Continuity Plan

### BCP Term Definitions

*Business Continuation Planning (BCP) Program* The policies, standards, organizations, and management processes by which American Express, and/or third party providers, creates and maintains plans for continuation of critical business functions and plans for recovery of work environments. This includes all the requirements and supporting plans (e.g. disaster recovery plans) to ensure *continuation of the critical business functions.* It also includes work environment requirements (office space requirements, equipment, people, band/level info, etc.) for *recovery of all business functions to an alternate site.*

*Business Interruption* An event that disrupts access to a company's facilities, customers, or information or threatens the health or safety of employees and visitors of a company. Business continuation plans are not designed to mitigate the effects of routine events that can be resolved through normal problem resolution practices.

*Disaster Recovery Planning (DRP)* The policies, standards, organizations, and management processes by which a company creates and maintains plans for recovery of technology, including hardware, network connectivity, telecommunications and system and application software.

*Plan Maintenance Scheduled* and *Unscheduled* Plan updates and changes including but not limited to business functions, technology, contact lists, tasks, equipment, recovery requirements, etc.

*Recovery Objective (RO)* The level of recovery and the time to resume a process or function based on regulatory requirements and/or an assessment of the financial, operational and brand damage resulting from a business interruption. This includes:



Vendor BCP Map
IED Business Continuity Planning

*Maximum Allowable Outage (MAO)* – The maximum amount of time a business process can be unavailable before significant impact (financial, customer, regulatory) is felt.

*Recovery Point Objective (RPO)*– The currency of the data you are recovering. Varies from the last good backup, which may be 24 - 48 hours old (traditional recovery), up to the last recorded transaction before the disaster (Rapid Recovery).

*Recovery Time Objective (RTO)*– The time taken to restore user access to the applications and data.

*Vital Records* Any information that is essential for the continuation or restoration of any business process or computer operation that supports AXP. Examples include: tape media, diskettes, CD ROM, microfilm or fiche, any electronic data, hardcopy files, manuals, books, special forms, engineering drawings, facility inventories, vendor lists, supplier lists, desk reference and procedure manuals

## *Vendor* Business Continuity Plan Requirements

Vendor must perform an initial self-assessment of Vendor's Business Continuity Plan against the American Express Interactive Vendor Business Continuity Requirements listed below.

| Req | | | Requirement |
|-----|--|--|-------------|
| 1 | | | Vendor will complete and maintain a Business Continuity Plan for its business, which will include a plan for all systems and operations it supports for AXP. |
| 2 | | | Vendor Business Continuation Roles & Responsibilities are clearly defined. |
| 3 | | | Recovery Profile (priorities, recovery time and point objectives, assumptions, strategies, and resources needed) for your Business and the services that you provide AXP are documented and implemented, including all technology that impacts AXP, and meets AXP function/process requirements. Recovery time objectives will be mutually agreed to by AXP and the vendor based on the following: <br><br> - Definition of critical processes that support AXP, as defined by the AXP Business Impact Analysis (BIA). <br><br> - Recovery prioritization of those critical processes. <br><br> - Business impact to AXP of a service disruption. <br><br> Recovery time objectives will be reviewed at least every two years by vendor and AXP as the BIA is refreshed or significant changes take place. |
| 4 | | | For each technical function critical to AXP, vendor has documented Disaster Recovery plan that contains the following (as applicable): <br><br> - All above requirements as pertaining to AXP BCP. <br><br> - Ownership is clearly defined for all components that impact AXP. <br><br> - Technology and Operational Process to support BCP Strategy (e.g. switching to an |



| | | | with appropriate contact information for AXP for communication in the event of a disruption. Integrated communications testing will take place annually. |
|---|---|---|---|
| 12 | | | Upon execution of a plan, post incident reporting is to be provided to AXP by the vendor within fourteen (14) days of the end of such an event. During any time that the Business Continuity Plans are executed, service level measurement and reporting are to continue. |
| 13 | | | A contingency plan is in place to address the loss of any key people assigned to operating the utility/software that supports any AXP function, such as cross-training initiatives. |
| 14 | | | Single points of failure for recovery of the critical business function have been identified and eliminated. If not, a work plan for implementing a recovery strategy for these components must be in place, accompanied by written acknowledgement signed by all affected parties. Redundancy does not ensure recovery. Redundancy at the same location is not an acceptable recovery strategy. |
| 15 | | | In the event of a loss of a data center or building, the ability to process required transaction volume with sufficient processing time for the anticipated workload should be in place and tested.<br><br>- Alternate sites allow the use of the facility until a full recovery of the affected entity's own facilities (defined in the BC Strategy).<br>- Alternate sites provide for physical and data security.<br>- Work requirements are met (space, equipment, office supplies, technology) |
| 16 | | | As applicable, all critical vital records related to AXP are stored using an agreed upon method and at an agreed upon location.<br><br>- Process for retrieval is clearly understood by authorized personnel.<br>- Frequency of updates is documented.<br>- Vital records include key operating procedures. |
| 17 | | | A Call Center Disaster Recovery plan is in place, as applicable, that supports AXP will include the following elements:<br><br>- Defined procedures for redirecting inbound calls (Carrier's offer services).<br>- Strategy supports AXP recovery point/time objectives.<br>- Interim call handling strategy defined (Voice response unit message).<br>- Alternate call center is defined (Internal or External).<br>- A plan for the Re-establishment of Agents is defined- e.g. internal/alternate site, external/vendor, combination?<br>- Work area Recovery Requirements: Database access recovery procedure has been defined. |




Dept 30041

*Vendor* and AXP will mutually create applicable detail to those items listed above as Vendor Business Continuity Plan requirements. Vendor will deliver to AXP, not later than the commencement of the first Project Schedule, Vendor's completed self-assessment of above requirements and Vendor's Business Continuity Plan for review and approval.

AXP and Vendor will mutually address any deficiencies identified within Vendor Business Continuity Plan within sixty (60) days after launch. AXP may alter the above Business Continuity Plan Requirements, at any time during the term of this contract. Any changes to the Business Continuity Plan Requirements may be negotiated with the Vendor.



| CIVIL ACTION COVER SHEET | **B.L.S.** | ~~Trial Court of Massachusetts~~ **Superior Court Department** County: **SUFFOLK** |
|---|---|---|

| PLAINTIFF(S) EchoMail, Inc. | DEFENDANT(S) American Express Company IBM Corporation |
|---|---|
| ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE Ian D. Rose; Alan D. Rose, Jr. Rose & Associates, 29 Commonwealth Ave. Board of Bar Overseers number: Boston, MA 02116 (BBO#427280; 628871) | ATTORNEY (if known) |

### Origin Code

### Original Complaint

### TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)

| CODE NO. | TYPE OF ACTION (specify)    TRACK | IS THIS A JURY CASE? |
|---|---|---|
| .2. | Misappropriation of trade secrets; breach of contract) | ( X ) Yes    ( ) No |

The following is a full and detailed statement of the facts on which plaintiff relies to determine eligibility in to The Business Litigation Session.

Defendants American Express Company ("AmEx") and IBM Corporation (collectively "defendants") obtained unprecedented access to the confidential and proprietary technology of plaintiff EchoMail, Inc. ("EchoMail") by fraudulently, pretextually, and illegally using AmEx's contractual relationship with EchoMail to obtain an "architecture" review of EchoMail's cutting-edge, patented, email management system.  IBM had no right whatsoever to access EchoMail's technology and proprietary information, but deceptively did so.  AmEx permitted this deception to occur.  The defendants will improperly use EchoMail's technology and proprietary information in the absence of judicial intervention.  Injunctive relief is necessary to protect EchoMail's technology from improper use and dissemination by the defendants.

In addition to its request for injunctive relief, EchoMail brings this complaint for misappropriation of trade secrets, unfair competition, unfair and deceptive acts and practices, breach of contract, breach of the covenant of good faith and fair dealing, and intentional interference with contractual relations.

A Special Tracking Order shall be created by the Presiding Justice of the Business Litigation Session at the Rule 16 Conference.

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."

Signature of Attorney of Record _____    DATE: 6/2/05

C-6 mtc005-11/99
SJC 1-2000

## CIVIL ACTION COVER SHEET
### INSTRUCTIONS

## SELECT CATEGORY THAT BEST DESCRIBES YOUR CASE

claims relating to the governance and conduct of internal affairs of entities
claims relating to employment agreements
· claims relating to liability of shareholders, directors, officers, partners, etc

shareholder derivative claims
· claims relating to or arising out of securities transactions

, claims involving mergers, consolidations, sales of assets, issuance of debt, equity and like interests

! claims to determine the use or status of, or claims involving, intellectual property
! claims to determine the use or status of, or claims involving, confidential, proprietary or trade secret information
! claims to determine the use or status of, or claims involving restrictive covenants

BE.1 claims involving breaches of contract or fiduciary, fraud, misrepresentation, business torts or other violations involving business relationships

BF. 1 claims under the U.C.C. involving complex issues

BG.1 claims arising from transactions with banks, investment bankers and financial advisers, brokerage firms, mutual and money funds

BH.1 claims for violation of antitrust or other trade regulation laws
BH.2 claims of unfair trade practices involving complex issues

BI. 1 malpractice claims by business enterprises against professionals

BJ.1 claims by or against a business enterprise to which a government entity is a part

BK.1 other commercial claims, including insurance, construction, real estate and consumer matters involving complex issues

## TRANSFER YOUR SELECTION TO THE FACE SHEET.

EXAMPLE:

| CODE NO. | TYPE OF ACTION (SPECIFY) | TRACK | IS THIS A JURY CASE? |
|---|---|---|---|
| BD3 | Restrictive covenants | * (B) | [X] Yes   [ ] No |

DUTY OF THE PLAINTIFF. The plaintiff, or plaintiff's counsel, shall set forth, on the face sheet, a statement specifying in full detail the facts upon which the plaintiff then relies for 'presumptive" entry into the Business Litigation Session. A copy of the civil action cover sheet shall be served on all defendants, together with the complaint.

DUTY OF THE DEFENDANT. Should the defendant contest the entry into the Business Litigation Session, the defendant shall file with the answer (or dispositive motion) a statement specifying why the action does not belong in the Business Litigation Session. Such Statement shall be served with the answer (or dispositive motion).

## A CIVIL ACTION COVER SHEET MUST BE FILED WITH EACH COMPLAINT.

### FAILURE TO COMPLETE THIS COVER SHEET THOROUGHLY AND ACCURATELY MAY RESULT IN THE TRANSFER OF THIS ACTION FROM THE BUSINESS LITIGATION SESSION TO ANOTHER APPROPRIATE SESSION OF THE SUPERIOR COURT.

* A Special Tracking Order shall be created by the Presiding Justice of the Business Litigation Session at the Initial Rule 16 Conference.

**SUFFOLK, ss.**          # Commonwealth of Massachusetts

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION

No. **05-2477 BLS**

_____ **ECHOMAIL INC** _____ , Plaintiff(s)

v.

_____ **AMERICAN EXPRESS CO ET AL** _____ , Defendant(s)

## SUMMONS AND ORDER OF NOTICE

To the above-named Defendant:  **AMERICAN EXPRESS CO and IBM CORP**

You are hereby summoned and required to serve upon  **Rose & Associates** _____

plaintiff's attorney, whose address is  **29 Commonwealth Ave. Boston, MA 02116** _____ ,

an answer to the complaint which is herewith served upon you, within 20 days after service of this summons
upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against
you for the relief demanded in the complaint. You are also required to file your answer to the complaint in
the office of the Clerk of this court at Boston either before service upon plaintiff's attorney or within a reason-
able time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which
you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter
of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

WE ALSO NOTIFY YOU that application has been made in said action, as appears in the complaint,
for a preliminary injunction and that a hearing upon such application will be held at the court house at said
Boston of our said court on **Thursday in room 1309   13th Floor** the **twenty third**
day of **June** A.D, 200 **5** , at **two** o'clock **PM**., at which time you may
appear and show cause why such application should not be granted.

Witness, Barbara J. Rouse, Esquire, at Boston, the **twentieth** day of
**June** ,in the year of our Lord two thousand **five** .

*Tim Walsh*

**Asst. Clerk/Magistrate**

NOTES.
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant,
   each should be addressed to the particular defendant.

FORM CIV.P.2  3M 12/04

## PROOF OF SERVICE OF PROCESS

I hereby certify and return that on _____, 200___, I served a copy of the within summons and order of notice, together with a copy of the complaint in this action, upon the within-named defendant, in the following manner (See Mass. R. Civ. P. 4 (d) (1-5):

_____

_____

_____

Dated:_____, . 200___.        _____

**N.B.    TO PROCESS SERVER:—**
PLEASE PLACE **DATE** YOU MAKE SERVICE ON DEFENDANT IN
THIS BOX **ON THE ORIGINAL AND ON COPY SERVED ON DEFENDANT.**

| , 200 . |
|---|

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION
No. _____

_____, Plff(s).

v.

_____, Deft(s).

**SUMMONS**
**(Mass. R. Civ. P. 4)**
**AND**
**ORDER OF NOTICE**
**ON**
**APPLICATION FOR PRELIMINARY**
**INJUNCTION**

ROSE & ASSOCIATES
COUNSELLORS AT LAW
29 COMMONWEALTH AVENUE
BOSTON, MA 02116

2681

5-7017-2110

| EXPLANATION | AMOUNT |
| --- | --- |
| Filing fee - Feb Mail | 275 |
| | |
| | |
| | |

PAY
AMOUNT
OF   Two hundred seventy five 00/xx

TO THE ORDER OF   Suffolk Superior Court

DATE   6.2.05

DOLLARS

| DESCRIPTION | CHECK NUMBER |
| --- | --- |
| | 2681 |

CHECK
AMOUNT

$ 275.—

CITIZENS BANK
MASSACHUSETTS

⑈00 2681⑈ ⑆211070175⑆ ⑈2006545681⑈

111011

| CIVIL ACTION COVER SHEET | **B.L.S.** | Trial Court of Massachusetts **Superior Court Department** County: **SUFFOLK** |

| PLAINTIFF(S) EchoMail, Inc. | DEFENDANT(S) American Express Company IBM Corporation |

| ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE Alan D. Rose; Alan D. Rose, Jr. Rose & Associates, 29 Commonwealth Ave. Board of Bar Overseers number: Boston, MA 02116 (BBO#427280; 628871) | ATTORNEY (if known) |

**Origin Code**

**Original Complaint**

**TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)**

| CODE NO. | TYPE OF ACTION (specify)   TRACK | IS THIS A JURY CASE? |
| --- | --- | --- |
| B.2. | Misappropriation of trade secrets; breach of contract) | ( X )Yes     (   ) No |

**The following is a full and detailed statement of the facts on which plaintiff relies to determine eligibility in to The Business Litigation Session.**

Defendants American Express Company ("AmEx") and IBM Corporation (collectively "defendants") obtained unprecedented access to the confidential and proprietary technology of plaintiff EchoMail, Inc. ("EchoMail") by fraudulently, pretextually, and illegally using AmEx's contractual relationship with EchoMail to obtain an "architecture" review of EchoMail's cutting-edge, patented, email management system. IBM had no right whatsoever to access EchoMail's technology and proprietary information, but deceptively did so. AmEx permitted this deception to occur. The defendants will improperly use EchoMail's technology and proprietary information in the absence of judicial intervention. Injunctive relief is necessary to protect EchoMail's technology from improper use and dissemination by the defendants.

In addition to its request for injunctive relief, EchoMail brings this complaint for misappropriation of trade secrets, unfair competition, unfair and deceptive acts and practices, breach of contract, breach of the covenant of good faith and fair dealing, and intentional interference with contractual relations.

A Special Tracking Order shall be created by the Presiding Justice of the Business Litigation Session at the Rule 16 Conference.

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT

I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."

Signature of Attorney of Record _____     DATE: 6 20 05

FC-6 mkc005·11/99
S.C. 1-2000

## CIVIL ACTION COVER SHEET
## INSTRUCTIONS

### SELECT CATEGORY THAT BEST DESCRIBES YOUR CASE

claims relating to the governance and conduct of internal affairs of entities

claims relating to employment agreements

claims relating to liability of shareholders, directors, officers, partners, etc

shareholder derivative claims

claims relating to or arising out of securities transactions

claims involving mergers, consolidations, sales of assets, issuance of debt, equity and like interests

claims to determine the use or status of, or claims involving, intellectual property

claims to determine the use or status of, or claims involving, confidential, proprietary or trade secret information

claims to determine the use or status of, or claims involving restrictive covenants

BE.1 claims involving breaches of contract or fiduciary, fraud, misrepresentation, business torts or other violations involving business relationships

BF. 1 claims under the U.C.C. involving complex issues

BG.1 claims arising from transactions with banks, investment bankers and financial advisers, brokerage firms, mutual and money funds

BH.1 claims for violation of antitrust or other trade regulation laws

BH.2 claims of unfair trade practices involving complex issues

BI. 1 malpractice claims by business enterprises against professionals

BJ.1 claims by or against a business enterprise to which a government entity is a part;

BK.1 other commercial claims, including insurance, construction, real estate and consumer matters involving complex issues

### TRANSFER YOUR SELECTION TO THE FACE SHEET.

EXAMPLE:

| CODE NO. | TYPE OF ACTION (SPECIFY) | TRACK | IS THIS A JURY CASE? |
|---|---|---|---|
| BD3 | Restrictive covenants | *(B) | ☒ Yes  ☐ No |

**DUTY OF THE PLAINTIFF.** The plaintiff, or plaintiff's counsel, shall set forth, on the face sheet, a statement specifying in full detail the facts upon which the plaintiff then relies for "presumptive" entry into the Business Litigation Session. A copy of the civil action cover sheet shall be served on all defendants, together with the complaint.

**DUTY OF THE DEFENDANT.** Should the defendant contest the entry into the Business Litigation Session, the defendant shall file with the answer (or dispositive motion) a statement specifying why the action does not belong in the Business Litigation Session. Such Statement shall be served with the answer (or dispositive motion).

### A CIVIL ACTION COVER SHEET MUST BE FILED WITH EACH COMPLAINT.

### FAILURE TO COMPLETE THIS COVER SHEET THOROUGHLY AND ACCURATELY MAY RESULT IN THE TRANSFER OF THIS ACTION FROM THE BUSINESS LITIGATION SESSION TO ANOTHER APPROPRIATE SESSION OF THE SUPERIOR COURT.

* A Special Tracking Order shall be created by the Presiding Justice of the Business Litigation Session at the Initial Rule 16 Conference.

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                          SUPERIOR COURT
                                      CIVIL ACTION NO.    -BLS

```
_____
                           )
ECHOMAIL, INC.,            )
                           )
            Plaintiff,     )
                           )
v.                         )
                           )
AMERICAN EXPRESS CO.       )
and IBM CORP.,             )
                           )
            Defendants.    )
_____  )
```

### (PROPOSED) ORDER

It is hereby ORDERED that the defendants in this action American Express Company ("AmEx") and IBM Corporation ("IBM") maintain and preserve for the life of this litigation documents concerning the following:

(1)   AmEx's contract(s) with EchoMail;

(2)   IBM's participation in the architecture review referred to in the Verified Complaint;

(3)   each of AmEx's RFP processes referred to in the Verified Complaint;

(4)   EchoMail's performance under its contract with AmEx;

(5)   AmEx's decision to undertake the architecture review;

(6)   AmEx's decision to terminate its contract with EchoMail;

(7)   all communications between AmEx employees and/or IBM employees concerning EchoMail;

(8)   all communications between and among AmEx's employees concerning EchoMail;

(9)   all communications between and among IBM's employees concerning EchoMail;

(10) AmEx's decision to award contracts (and contract renewals) to EchoMail;

(11) AmEx and/or IBM's design and/or development of electronic communication management systems or processes; and

(12) all documents concerning EchoMail or AmEx's use or dissemination of EchoMail's technology.

This Order extends to all documents set forth above including electronic documents regardless of how those documents are maintained, preserved, or kept.

SO ORDERED.

_____
Hon. Allan van Gestel
Justice, Superior Court

June __, 2005

- 2 -

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                          SUPERIOR COURT
                                      CIVIL ACTION NO.         -BLS

ECHOMAIL, INC.,                  )
                                 )
                Plaintiff,       )
                                 )
v.                               )
                                 )
AMERICAN EXPRESS CO.             )
and IBM CORP.,                   )
                                 )
                Defendants.      )
_____  )

## MOTION FOR APPOINTMENT OF SPECIAL PROCESS SERVER

Plaintiff EchoMail, Inc. hereby moves that that Thomas
Savage or another disinterested party over the age of eighteen be
appointed as a special process server, to serve all legal process
in this action.  Mr. Savage is a disinterested party in this
matter, who is over the age of eighteen and is experienced in the
service of process.

//

//

//

//

//

//

//

//

- 1 -

Respectfully submitted,

ECHOMAIL, INC.,

By its attorneys,

_____
Alan D. Rose (BBO#427280)
Alan D. Rose, Jr. (BBO#628871)
ROSE & ASSOCIATES
29 Commonwealth Ave
Boston, Massachusetts 02116
Tel: 617-536-0040
Fax: 617-536-4400

Date: June 20, 2005

- 2 -

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                          SUPERIOR COURT
                                      CIVIL ACTION NO.    -BLS

```
ECHOMAIL, INC.,                )
                               )
              Plaintiff,       )
                               )
v.                             )
                               )
AMERICAN EXPRESS CO.           )
and IBM CORP.,                 )
                               )
              Defendants.      )
_____)
```

### PLAINTIFF ECHOMAIL, INC.'S MOTION
### FOR PRELIMINARY INJUNCTIVE RELIEF
### UPON SHORT ORDER OF NOTICE

Pursuant to Mass. R. Civ. P. 65 and Mass. G.L. c. 93, § 42A,

plaintiff EchoMail, Inc. ("EchoMail") hereby moves that this

Court grant a preliminary injunction on short order of notice

against defendants American Express Company and IBM Corporation

(collectively "defendants"). EchoMail asks that this matter be

heard after no more than 48 hours notice to defendants. EchoMail

has already suffered and will continue to suffer great and

irreparable harm that cannot adequately be measured by monetary

damages. This harm includes, among other things, loss of income,

goodwill, and the misappropriation of its confidential

technology. Moreover, EchoMail has no adequate remedy at law.

EchoMail seeks the following relief pending the adjudication

of this case:

1.    The defendants, and all persons acting for or on their
behalf or in concert with them, are restrained and enjoined as
follows:

     (a)   from using, in any way, EchoMail's confidential and proprietary technology, or any part thereof;

     (b)   from disseminating, in any way, EchoMail's confidential and proprietary technology, or any part thereof;

     (c)   from altering, destroying, or discarding EchoMail's confidential and proprietary technology, or any part thereof.

    2.   The defendants, and all persons acting for or on their behalf or in concert with them, are temporarily restrained from failing to:

     (a)   immediately return to EchoMail all of EchoMail's confidential and proprietary technology, related information, and all parts thereof;

     (b)   immediately provide to EchoMail any and all notes, emails, memoranda, recording or electronic compilation setting forth the proprietary information or technology derived from the "architecture review" and telephonic conference held on May 4-5, 2005.

    3.   Such other and further relief as the Court deems just and proper.

    In support of this Motion, EchoMail respectfully refers this Court to its Verified Complaint, Affidavit of V.A. Shiva Ayyadurai, and EchoMail's Memorandum of Law.

WHEREFORE, for all of the reasons stated in its Verified Complaint, the Affidavit, and Memorandum of Law, EchoMail respectfully requests that this motion be granted.

Respectfully submitted,

ECHOMAIL, INC.,

By its attorneys,

Alan D. Rose (BBO#427280)
Alan D. Rose, Jr. (BBO#628871)
ROSE & ASSOCIATES
29 Commonwealth Ave
Boston, Massachusetts 02116
Tel: 617-536-0040
Fax: 617-536-4400

June 20, 2005

- 3 -

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                          SUPERIOR COURT
                                      CIVIL ACTION NO.        -BLS

```
_____
ECHOMAIL INC.,                  )
                                )
            Plaintiff,          )
                                )
v.                              )
                                )
AMERICAN EXPRESS CO.            )
and IBM CORP.,                  )
                                )
            Defendants.         )
_____)
```

### PLAINTIFF ECHOMAIL, INC.'S MOTION FOR AN
### ORDER REQUIRING THE DEFENDANTS TO PRESERVE
### DOCUMENTS, COMPUTERIZED DATA AND MATERIALS

Plaintiff EchoMail Inc., ("EchoMail"), brings this motion

seeking an Order that defendants American Express Company

("AmEx") and IBM Corporation ("IBM") (collectively,

"defendants") be required to preserve and maintain all relevant

documents until the conclusion of this action.  EchoMail

requests that the Order extend to all information in any form,

electronic or otherwise, regardless of where it is stored or how

it is maintained.  EchoMail requests that this Order apply to

all documents concerning:

    (1)  AmEx's contract(s) with EchoMail;

    (2)  IBM's participation in the architecture review
        referred to in the Verified Complaint;

    (3)  each of AmEx's RFP processes referred to in the
        Verified Complaint;

(4) EchoMail's performance under its contract with AmEx;

(5) AmEx's decision to undertake the architecture review;

(6) AmEx's decision to terminate its contract with EchoMail;

(7) all communications between AmEx employees and/or IBM employees concerning EchoMail;

(8) all communications between and among AmEx's employees concerning EchoMail;

(9) all communications between and among IBM's employees concerning EchoMail;

(10) AmEx's decision to award contracts (and contract renewals) to EchoMail;

(11) AmEx and/or IBM's design and/or development of electronic communication management systems or processes; and

(12) all documents concerning EchoMail or AmEx's use or dissemination of EchoMail's technology.

In support of this Motion, EchoMail respectfully refers this Court to its Verified Complaint, and states that EchoMail reasonably believes that the requested relief is necessary to preserve evidence in this action. See also Takesian v. Kelleher, C.A. No. 01-1973 BLS, *Findings, Rulings and Order for Judgment on Complaint for Contempt* (Mass. Super. Ct. July 24, 2001)(violation of preservation order constituted contempt of court).

Respectfully submitted,

ECHOMAIL, INC.,

By its attorneys,

Alan D. Rose (BBO#427280)
Alan D. Rose, Jr. (BBO#628871)
ROSE & ASSOCIATES
29 Commonwealth Ave
Boston, Massachusetts 02116
Tel: 617-536-0040
Fax: 617-536-4400

June 20, 2005

- 3 -

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                SUPERIOR COURT
                                            CIVIL ACTION NO.        -BLS

```
_____
                              )
ECHOMAIL, INC.,               )
                              )
            Plaintiff,        )
                              )
v.                            )
                              )
AMERICAN EXPRESS CO.          )
and IBM CORP.,                )
                              )
            Defendants.       )
_____)
```

### PLAINTIFF ECHOMAIL, INC.'S MEMORANDUM
### IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Defendants American Express Company ("AmEx") and IBM
Corporation (collectively "defendants") obtained unprecedented
access to the confidential and proprietary technology of plaintiff
EchoMail, Inc. ("EchoMail") by fraudulently, pretextually, and
illegally using AmEx's contractual relationship with EchoMail to
obtain an "architecture" review of EchoMail's cutting-edge,
patented, email management system.  IBM had no right whatsoever to
access EchoMail's technology and proprietary information, but
deceptively did so.  AmEx permitted this deception to occur and
violated the terms of its contract with EchoMail.  The defendants
will improperly use EchoMail's technology and proprietary
information in the absence of judicial intervention.  Injunctive
relief is necessary to protect EchoMail's confidential and

proprietary technology from improper use or dissemination by the defendants.

In addition to its request for injunctive relief, EchoMail brings claims for misappropriation of trade secrets, unfair competition, unfair and deceptive acts and practices, breach of contract, breach of the covenant of good faith and fair dealing, and intentional interference with contractual relations.

Summary of Relevant Facts[1]

1.   The Development of EchoMail and Its Confidential
     and Proprietary Technology

EchoMail's Chairman and CEO, V. A. Shiva Ayyadurai ("Shiva"), who has verified the Complaint in this case, is the principal inventor of the technology underlying EchoMail's proprietary email management, storage and on demand, web-based technology.  Verified Complaint ¶¶ 6, 16.

In 1993, while he was pursuing his Ph.D. at MIT in artificial intelligence focused on pattern analysis, Shiva entered a White House sponsored contest focused on finding new and innovative ways to catalogue emails.  Shiva won that contest, and the technology he developed and used became the technological foundation of EchoMail. Id. at ¶ 8.

---

[1]A full recitation of the facts is set forth in the Verified Complaint, and, therefore, this section summarizes the facts that are most relevant to the issue of injunctive relief.

In its early stages, from 1994 to 1999, EchoMail engaged in pioneering work by hosting web-based email applications in its Cambridge facility.  Shiva also designed and developed applications that extracted and analyzed critical elements from an email so that an accurate response could be formulated.  Id. at ¶ 10.

EchoMail operates in a competitive environment.  It has approximately 18 employees in Cambridge and contracts for additional personnel in India.  EchoMail has approximately 30 customers across an array of industries, including insurance, financial services, consumer packaged goods, retail and non-profits.  Id. at ¶ 12.

EchoMail provides its customers with web-based software, hardware and services for email and electronic communications management including, though not limited to, inbound email management, outbound email management and email storage.  With respect to incoming email, EchoMail's proprietary web-based software technology collects and stores incoming email for EchoMail's customers; analyzes the emails for "attitude," "requests," "issues," "products" and "customer type"; proposes a response based on the analysis; and routes the email to a web-based platform where it can be viewed and worked on by EchoMail's customer's support personnel before a response is sent to the customer.  Id. at ¶ 13.  Exhibit 1 provides a simple visual example of EchoMail's process.

- 3 -

EchoMail's products are widely recognized as the industry leaders, and EchoMail has received accolades and awards for its products and services. Id. at ¶ 14.

2.   EchoMail's Relationship With AmEx

In 1998, AmEx was faced with an increasing volume of email from its customers across its multiple business units. At that time, AmEx wanted to contract with one vendor to manage its incoming email from customers for all of its business units. AmEx was aware that EchoMail was a leader in the field of managing electronic communication. In 1998, AmEx contacted Shiva and requested that EchoMail respond to AmEx's request for proposal ("RFP") seeking one vendor to manage its incoming email. Id. at ¶¶ 17, 18.

In July 1999, EchoMail was awarded the AmEx contract for managed incoming email services. From 1999 to 2004, as a result of successive contract renewals, EchoMail provided up to 11 AmEx business units with managed incoming email services. Id. at ¶¶ 19, 21.

In 2003, AmEx notified EchoMail that it was going to institute another RFP process to determine if EchoMail was still the best provider of managed incoming email services. EchoMail invested hundreds of man-hours in participating in this RFP process and provided its response in or about November 2003. In or about February 2004, EchoMail won the RFP, and, thereafter, in August

- 4 -

2004, executed a three-year contract for services with AmEx running from January 1, 2005 through December 31, 2007. The relevant contractual documents are attached to the Verified Complaint, at Exhibits A (the "Master Agreement") & B (the 2005-2007 extension). Id. at ¶¶ 22, 23.

Due to the high level of service EchoMail provided to AmEx, AmEx referred to EchoMail as one of its "premium partners" or "true partners." Since 1998 and continuing though May 2005, AmEx repeatedly praised EchoMail for its products and service. By early 2005, EchoMail was successfully managing approximately 300,000 emails per month for AmEx's business units. Id. at ¶ 25.

3.   EchoMail's Dealings With IBM

IBM recognizes EchoMail as an industry leader in hosted, web-based email management software and services. Since in or about 1996, IBM has sought to learn EchoMail's confidential and proprietary technology related to hosted, web-based email management software and services. EchoMail has repeatedly refused to provide IBM with access to its confidential and proprietary technology related to EchoMail's hosted, web-based email management software and services. Id. at ¶ 26.

In or about 1996, IBM approached EchoMail seeking to host EchoMail's applications at IBM's facilities, in part, so IBM could "resell" EchoMail to other customers. EchoMail refused to allow

- 5 -

IBM to host EchoMail's applications, since EchoMail was capable of providing the service itself.

In or about 2000, IBM approached EchoMail seeking to invest in EchoMail. EchoMail again refused. In or about 2002, IBM approached EchoMail seeking a partnership in which IBM would gain access to EchoMail's confidential and proprietary outbound email marketing technology and code. EchoMail refused to give IBM access to its confidential and proprietary technology. In or about 2004, IBM approached EchoMail seeking to "host," or provide the hardware necessary, to run EchoMail's web-based, "on demand" software applications. EchoMail, which designed, built and developed its own hardware facility, again refused, since EchoMail, already offered its technology in a hosted, web-based model. Id. at ¶¶ 27-30.

4.    AmEx Breaches its Contract with EchoMail and
      Misappropriates EchoMail's Technology with IBM

Despite their longstanding relationship and recent execution of the 3 year contract, AmEx breached the contract with EchoMail by canceling it in violation of its terms, and deceptively gaining access to, and permitting IBM to gain access to, EchoMail's confidential and proprietary technology. Id. at ¶ 31.

In or about mid-April 2005, AmEx began a new RFP process starting with a Request for Information ("RFI") for the same scope of services that AmEx had already contracted for with EchoMail.

- 6 -

EchoMail received the RFI, as part of the new RFP process, only two days before its response was due. Greg Daniels, a newly assigned AmEx business manager, never informed EchoMail about the RFI. Id. at ¶ 36.

Shiva called Daniels and asked why a new RFP process was necessary given EchoMail and AmEx's existing three year contract. Daniels falsely claimed that "it was a formality" which was occurring because AmEx had "new people" involved and "EchoMail should not worry about it." Shiva told Daniels that EchoMail should not have to participate in the new RFP process because a contract already existed. Nevertheless, EchoMail responded to the RFI. Id. at ¶¶ 36-37.

Shortly thereafter, in late-April, 2005, AmEx confirmed to EchoMail that AmEx wanted to proceed with an "architecture" review of EchoMail's new, proprietary version 8.1, to which EchoMail's customers would soon upgrade. In general, an architecture review reveals the confidential and proprietary technology, or "code," contained in hardware and/or software. AmEx falsely claimed that AmEx's desire for an architecture review was to make sure that the upgrade to version 8.1 was successful, that EchoMail and AmEx were "partners," and that AmEx wanted to help EchoMail succeed in its upgrade to the new version. Id. at ¶ 38-40.

Based on Daniels' statements, Shiva reluctantly agreed to the architecture review. Prior to the review, EchoMail provided AmEx

- 7 -

with certain proprietary information in preparation for the review.
On May 4 and 5, 2005, the architecture review occurred.  At least
eight employees from AmEx participated in the review either
telephonically, or by coming in person to EchoMail's facility in
Cambridge.  The architecture review exposed to AmEx's employees
EchoMail's confidential and proprietary information and technology,
or "code," including the process by which EchoMail hosts its web-
based, on demand technology.  Id. at ¶¶ 41, 42.

AmEx surreptitiously included in the review technical
personnel from IBM without disclosing this fact in advance to
EchoMail.  In fact, lists of personnel who would be attending the
architecture review which were provided by AmEx to EchoMail did not
refer to any personnel from IBM.  The presence of IBM personnel
would not have been disclosed to EchoMail at all, except that very
late in the review process, an IBM employee participating in the
review by phone stated that he worked for IBM and that he believed
that the proprietary information revealed to him "created a
conflict."  EchoMail would not have allowed the architecture review
to occur at all if EchoMail had known that personnel from IBM would
be present.  Id. at ¶¶ 44, 45.

On May 25, 2005, approximately three weeks after the
architecture review, Daniels called EchoMail and stated that
EchoMail "failed" the review, and as a result, the RFP process
would continue without EchoMail.  This necessarily meant that AmEx

- 8 -

was replacing EchoMail with a new vendor.  Shiva questioned Daniels about Daniels' earlier claims that the RFP process and architecture review were unrelated.  Shiva told Daniels that Daniels and AmEx were deceitful and that they had breached the contract.  Although Daniels earlier told Shiva that Reena Paniker, a newly assigned AmEx customer service manager, was not involved in the new RFP process or the architecture review, on May 25, 2005, he stated to Shiva that Paniker was in fact running the new RFP process and the architecture review and that Daniels had ceded all authority over the matter to Paniker.  Id. at ¶¶ 46, 47.

On or about May 26, 2005, in a conference call, Paniker initially denied that she was running the new RFP process.  When EchoMail's president confronted her with Daniels' prior statement, Paniker finally admitted that she was in fact running the new RFP process and the architecture review and that they were in fact related.  Paniker reiterated that AmEx's relationship with EchoMail was terminated and told EchoMail to "do what it had to do."  Then she hung up the phone on EchoMail's president.  Id. at ¶ 48.

5.   AmEx's Relationship With IBM

AmEx and IBM have entered into a multi-billion dollar contract under which IBM provides AmEx with computer hardware, software and services.  As part of that contract, IBM commercializes AmEx's business processes through the use of AmEx's internal technology or vendor technology.  The information obtained by AmEx and IBM during

- 9 -

the EchoMail architecture review will be used to unfairly compete

against EchoMail in a number of ways, including though its

unauthorized use by IBM and AmEx directly, or its resale to IBM

customers.  Id. at ¶¶ 57, 58.

Injunctive relief is necessary to prevent IBM and AmEx from

using or disseminating EchoMail's technology, or otherwise unfairly

competing with EchoMail.  Id. at ¶ 59.

Legal Argument

I.    ECHOMAIL IS ENTITLED TO AN INJUNCTION TO PROTECT ITS
      CONFIDENTIAL AND PROPRIETARY TECHNOLOGY

Under Massachusetts law, EchoMail is entitled to an injunction

upon demonstrating that (1) it has a substantial likelihood of

success on the merits (2) the preliminary relief it is requesting

is necessary to prevent immediate and irreparable harm to it

pending trial (3) the relief requested does not pose a substantial

risk of harm to the defendant and (4) granting the injunction is in

the public interest.  Packaging Industries Group v. Cheney, 380

Mass. 609, 617 (1980).  Under New York law[2], EchoMail is entitled to

---

[2]The contract in this case, the "Stand Alone Agreement for
Consulting Services," or Master Agreement, states that "[t]his
Agreement shall be construed and enforced under the substantive
laws of the state of New York."  See Verified Complaint, Ex. A at
p. 9.  The plain language of the contract limits the application of
New York law to the construction and interpretation of the
contract.  Therefore, New York law should not apply to statutory
and tort claims which arise outside of the contract.  However,
rather than argue about which law governs at this stage, this
memorandum demonstrates that an injunction is appropriate under

an injunction upon demonstrating the first three of the four

elements set forth above. Aetna Inc. v. Capasso, 75 N.Y.2d 860,

862, 552 N.Y.S.2d 918, 552 N.E.2d 166 (1990).  As fully set forth

below, in circumstances such as these -- AmEx has breached its

contractual obligations to safe guard EchoMail's proprietary

technology, deceitfully obtained an architecture review of

EchoMail's proprietary technology and surreptiously included IBM in

the review -- Massachusetts and New York courts have not hesitated

to issue injunctive relief.  EchoMail's claims for misappropriation

of trade secrets, unfair competition and breach of contract support

the entry of injunctive relief.

     A.    EchoMail Has a Substantial Likelihood of Success on
          the Merits of its Claims

          1.    AmEx and IBM misappropriated EchoMail's confidential
              and proprietary technology and engaged in unfair and
              deceptive acts and practices

Pursuant to Massachusetts law, G.L. c. 93, § 42A, "an entity

is entitled to injunctive relief for misappropriation of trade

secrets.  Indeed, by G.L. c. 266, § 30, such a misappropriation

could constitute a crime."  Transkaryotic Therapies, Inc. v. Bain &

Co., Inc., 2002 WL 799694, *3 (Mass. Super. 2002)(van Gestel,

J.)(attached hereto as Exhibit 2); see also N.Y. Penal Law §§

155.00, 155.30, 156.30, 156.35 (making trade secret violations a

crime).  Under Massachusetts law, a trade secret is defined as

_____

either Massachusetts or New York law.  EchoMail does not concede
the applicability of New York law to any of its claims.

- 11 -

"anything tangible or intangible or electronically kept or stored, which constitutes, represents, evidences or records a secret scientific, technical, merchandising, production or management information, design, process, procedure, formula, invention or improvement."  G.L. c. 266 § 30.

In addition, the Massachusetts Consumer Protection Act, G.L. c. 93A, § 11, provides a cause of action for persons engaged in trade or commerce against another such person who engages in unfair competition or in an unfair or deceptive act or practice.  Section 11 has been applied by Massachusetts courts to misappropriation of trade secrets.  See, e.g., Peggy Lawton Kitchens, Inc. v. Hogan, 18 Mass. App. Ct. 937 (1984).  "The standards for finding misappropriation of a trade secret provide the criteria for finding an unfair or deceptive act or practice."  Prescott v. Morton International, Inc., 769 F.Supp. 404, 407 (D. Mass. 1990).

In addition, "under Massachusetts trade secret law, a third party who knowingly benefits from a trade secret which a person in a confidential relationship obtained from the plaintiff is liable to the plaintiff for misappropriation of that trade secret."  Data General Corp. v. Grumman Systems Support Corp., 795 F.Supp. 501, 507 (D. Mass. 1992)(citation omitted).

In determining whether certain information is a "trade secret," courts focus on the time, effort and expense devoted to developing and maintaining the information, whether developing the

- 12 -

information is difficult and whether the information is a matter of public knowledge or general knowledge in the industry. Augut, Inc. v. Aegis, Inc., 409 Mass. 165, 169-70 (1991); USM Corp. v. Marston Fastener Corp., 379 Mass. 90, 92-93 (1979). New York trade secret law -- though common law as opposed to statutory -- is similar to Massachusetts.

Under New York law, "the essence of an unfair competition claim is that the defendant has misappropriated the labors and expenditures of another," including some element of bad faith. Saratoga Vichy Spring Co. v. Lehman, 625 F.2d 1037, 1044 (2d Cir. 1980). In order to establish a claim for misappropriation of trade secrets, the plaintiff must show (1) that it possesses a trade secret and (2) that the defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means. Sylmark Holdings Ltd. v. Silicone Zone International, Ltd., 5 Misc.3d 285, 783 N.Y.S.2d 758, 2004 N.Y. Slip Op. 24288 (2004).

New York courts have adopted the trade secret definition set forth in the Restatement of Torts § 757, Comment B, as "any formula pattern device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." See Ashland Mgt. Inc. v. Janien, 82 N.Y.2d 395, 407, 604 N.Y.2d 912, 624 N.E.2d 1007 (1993). Under the Restatement and New York common law, the factors

considered in evaluating trade secret claims include: (1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken to guard the secrecy of the information; (4) the value of the information [to the business] and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. Restatement of Tort § 757, Comment B. In general, "computer software, or programs are clearly protectable under the rubric of trade secrets, if the other elements are also proven." Q-Co Indus. Inc. v. Hoffman, 625 F.Supp. 608, 617 (S.D.N.Y.1985). Both the underlying source code, and the architecture of a computer program, may qualify as trade secrets. Fabkom, Inc. v. R.W. Smith & Assoc., Inc., 1996 WL 531873 (setting out New York trade secret law as it relates to computer software and issuing an injunction) (attached hereto as Exhibit 3).

### a.    EchoMail has gone to extraordinary lengths to protect its technology

EchoMail's industry leading, patented, confidential and proprietary technology is certainly a "trade secret". EchoMail's software, hardware, storage technology and web-based hosting process is not known outside of select EchoMail employees, or entities in a confidential relationship with EchoMail which have

contractually agreed to safeguard that information. Over the course of its existence, EchoMail has spent considerable time, money and effort on its product development and on its efforts to protect the confidentiality of its proprietary technology. Verified Complaint ¶ 52.

As a matter of course, EchoMail enters into non-disclosure and confidentiality agreements with entities which may have access, or even limited access, to any portion of EchoMail's confidential and proprietary technology. EchoMail does so with respect to its customers and prospective customers, vendors and prospective vendors, and its customers' vendors. Id. at ¶ 53.

Prior to the existence of its contractual relationship for services with AmEx, a confidentiality agreement between AmEx and EchoMail protected EchoMail's confidential and proprietary technology. The services contract between AmEx and EchoMail also protects EchoMail's confidential and proprietary technology. In addition, AmEx's other vendors, which are exposed to EchoMail's confidential and proprietary technology, are required by EchoMail to execute nondisclosure and/or confidentiality agreements. Id. at ¶ 54.

EchoMail's employees are required to execute agreements which further protect EchoMail's confidential and proprietary information. Even among its own employees, EchoMail limits

disclosure of its confidential and proprietary technology.  Id. at
¶ 55.

In addition to these steps, EchoMail has protected its
confidential and proprietary technology by obtaining patents.  On
December 23, 2003, EchoMail obtained a patent protecting its
overall process for managing email.  On April 6, 2004, EchoMail
obtained two patents protecting (a) its technology used to analyze
emails and (b) its technology used to construct a response to an
email.  Id. at ¶ 56.

There's no question, that EchoMail has gone to great lengths
to protect its confidential and proprietary technology, and
"maintain [the technology's] mystery and narrow the circle of those
privy to its essentials."  Peggy Lawton, 18 Mass. App. Ct. at 939.
EchoMail's efforts to protect its technology should also be viewed
"against the conduct of the defendant in acquiring the
information."  USM Corp., 379 Mass. at 100.  Indeed, it is only
through breach of contract and deceit that the defendants were able
to gain access to EchoMail's computer code.  The real reason for
AmEx's architecture review, which AmEx intentionally did not
disclose to EchoMail, was to gain access to all details of
EchoMail's confidential and proprietary technology so that AmEx and
IBM could use the technology after AmEx breached its contract and
severed its relationship with EchoMail.  Id. at ¶ 49.  In addition,
AmEx intended to use the architecture review as a pretext for (a)

- 16 -

continuing its new RFP process without EchoMail's participation,
and (b) terminating its contract with EchoMail.  Id.

AmEx and IBM's conduct in this case is intolerable.  "The law
puts its imprimatur on fair dealing, good faith and fundamental
honesty.  Courts condemn such conduct which fails to reflect these
minimum accepted moral values by penalizing such conduct whenever
it occurs."  USM Corp., 379 Mass. at 104.

For these reasons, EchoMail has a substantial likelihood of
success on the merits of its claims for misappropriation of trade
secrets and unfair and deceptive acts and practices.

> 2.    AmEx Breached its Contract with EchoMail by
>        Failing to Protect the Confidentiality of
>        EchoMail's Proprietary Technology

To establish a breach of contract claim under either New York
or Massachusetts law, the plaintiff must allege the specific terms
of the contract, the consideration, the plaintiff's performance and
the defendants breach of the agreement.  Sylmark Holdings Ltd, 5
Misc.2d at 295, 783 N.Y.S.2d at 769.  A contract to retain the
confidentiality of certain matters which should be kept in
confidence will be enforced by injunction.  See Karpinski v.
Ingrasci, 28 N.Y.2d 45, 320 N.Y.S.2d 1, 268 N.E.2d 751 (1971).

EchoMail and AmEx had a valid contract.  The contract
specifically provides that AmEx will "preserve as confidential all
information related to the business and activities of [EchoMail]"
and "hold such information in trust and confidence [] and not

- 17 -

disclose such information to any person or enterprise, or use (directly or indirectly) any such information for its own benefit or the benefit of another party." Verified Complaint, Ex. A at p. 7.

As fully set forth above, AmEx revealed EchoMail's confidential and proprietary technology to IBM by deceiving EchoMail about IBM's participation in the architecture review, and, conducting the review on a pretext. For these reasons, EchoMail has a substantial likelihood of success on the merits of its breach of contract claim.

B.    EchoMail Will Be Immediately and Irreparably
      Harmed if an Injunction Does Not Issue

EchoMail will suffer immediate and irreparable harm if an injunction does not issue. "An irreparable injury is one that cannot be addressed through a monetary award." JSG Trading Corp. v. Tray Wrap, Inc., 917 F.2d 75, 79 (2nd Cir. 1990). Under New York law, "irreparable injury is presumed, where, as here, trade secrets have been misappropriated." Sylmark Holdings Ltd, 5 Misc.2d at 299, 783 N.Y.S.2d at 772, citing Double Click, Inc. v. Henderson, 1997 WL 731413, *7 (Sup. Ct., N.Y. County 1997), and Lumex, Inc. v. Highsmith, 919 F.Supp. 624, 628 (E.D.N.Y. 1996); FMC Corp. v. Taiwan Tainan Giant Indus. Co., 730 F.2d 61, 63 (2nd Cir. 1984)("it is clear that the loss of a trade secret cannot be measured in money damages... and is thus considered irreparable harm"); Sylmark

- 18 -

Holdings Ltd, 5 Misc.2d at 299, 783 N.Y.S.2d at 772 ("the loss of the advantage of being a pioneer and a market leader may constitute irreparable harm"), citing Lumex, Inc., 919 F.Supp. at 628.

Massachusetts courts similarly recognize that the misappropriation of trade secrets constitutes irreparable harm. See e.g., Transkaryotic Therapies, 2002 WL 799694 at *3 (finding plaintiff would suffer irreparable harm if an injunction did not protect its trade secrets); TouchPoint Solutions, Inc. v. Eastman Kodak Co., 345 F. Supp.2d 23, 32 (finding "the loss of a trade secret is generally found to constitute irreparable harm"); Storage Technology Corp. v. Custom Hardware Engineering Inc., 2004 WL 1497688, *5 (D. Mass. July 2, 2004)(finding "theft of trade secrets require no further proof of harm because harm is presumed") (attached hereto as Exhibit 4).

The harm suffered by EchoMail is by definition irreparable -- unlawful access to its patented, industry leading technology and the potential for the use or dissemination of it without remuneration to EchoMail.

C.   A Balancing of Harms Weighs Heavily In Favor of EchoMail and the Public Interest Favors an Injunction

EchoMail's injury, if no injunction issues, will far outweigh any harm to AmEx or IBM if the injunction does issue. The inquiry concerning the balancing of the harms should focus on "the risk of such harm in light of the parties' chance of success on the

- 19 -

merits." See Packaging Indus., 380 Mass. at 617. EchoMail faces catastrophic injury if its technology is used without remuneration, or if it is reproduced or disseminated. In addition, as demonstrated above, EchoMail has a substantial likelihood of success on the merits. The entry of an injunction will not harm the defendants at all. Simply put, there can be no harm to the defendants in being prevented from using or disseminating that to which the defendants are not entitled -- EchoMail's proprietary technology.

In this case, where the defendants have engaged in intentionally wrongful conduct, the public interest is best served by enjoining the defendants from using, for their benefit or the benefit of others, technology that they have no right to. Indeed, allowing the defendants to use or disseminate the technology will allow them to wrong EchoMail yet again.

EchoMail meets all of the standards for issuance of a preliminary injunction.

## Conclusion

For the reasons set forth above, EchoMail respectfully requests that this Court allow its motion for a preliminary injunction.

Respectfully submitted,

ECHOMAIL, INC.,

By its attorneys,

Alan D. Rose (BBO#427280)
Alan D. Rose, Jr. (BBO#628871)
ROSE & ASSOCIATES
29 Commonwealth Avenue
Boston, Massachusetts 02116
617-536-0040

June 20, 2005

1

Customer receives a quick and accurate response to their original inquiry.

The Email is finalized and sent back to the Customer.

An American Express Representative accesses the Email and proposed response through the web, making changes if necessary.

EchoMail's proprietary system automatically generates a response tailored to the Customer's Email.

The Customer's Email is analyzed, using EchoMail's patented technology, for:
Attitude
Issues
Request
Product
Customer Type

echomail.
701 Concord Avenue
Cambridge, MA 02138

American Express Customer

The Customer Logs onto the American Express Website to contact the Company with questions and/or issues.

Customer Composes an Email

The Customer's Email is sent to American Express which routes the Email to EchoMail for storage and processing.

2

Westlaw.

Not Reported in N.E.2d
14 Mass.L.Rptr. 397, 2002 WL 799694 (Mass.Super.)
(Cite as: 2002 WL 799694 (Mass.Super.))

Page 1

C

Superior Court of Massachusetts.
TRANSKARYOTIC THERAPIES, INC.,
v.
BAIN & COMPANY, INC. et al.
No. 020747BLS.

March 5, 2002.

MEMORANDUM AND ORDER ON PLAINTIFF'S
REQUEST FOR PRELIMINARY INJUNCTIVE
RELIEF

ALLAN van GESTEL, Justice.

**\*1** This matter is before the Court on the request of
the plaintiff, Transkaryotic Therapies, Inc. ("TKT"),
for preliminary injunctive relief against the
defendants Bain & Company, Inc. ("Bain") and
Laurie Eleanor J. Herriman, M.D. ("Herriman").

BACKGROUND
TKT is a biopharmaceutical company developing
protein-based and cell-based therapeutics for the
treatment of a wide range of diseases.

Bain is a Massachusetts corporation that describes
itself as being engaged in the business of converting
"strategy and action into economic performance."
Herriman is a physician employed by Bain in some
form of consultant capacity.

At the present time, TKT is involved in conducting
clinical trials of one of its products, Replagal, in a
variety of patient populations, including affected
females and kidney transplant recipients. These
studies are designed to provide further insight into
Replagal as a treatment for Fabry disease, to support
regulatory filings around the world, and to expand
Replagal in countries where it is already approved.

Replagal is an enzyme replacement therapy for long-
term treatment of patients with Fabry disease, which
is a lysosomal storage disease resulting in extreme
pain in the extremities, hearing loss, kidney failure,
heart disease and stroke. Patients suffering from
Fabry disease generally die around the age of 40.

TKT has been granted marketing authorization for
Replagal in the fifteen countries of the European
Union, as well as Norway, Iceland, New Zealand,
Israel, Switzerland and The Czech Republic.

TKT's only competition in the development of
therapies to fight Fabry disease is a product called
Fabrazyme produced by Genzyme Corporation
("Genzyme"). Both TKT and Genzyme have been
granted competing co-orphan drug exclusivity in the
European Union for a period of up to ten years. No
companies other than TKT and Genzyme are known
to be testing or selling a protein product to treat
Fabry disease.

It is principally to obtain marketing authorization
from the United States Food and Drug
Administration ("FDA") that TKT is conducting the
present clinical trials. Genzyme is also seeking such
FDA approval through clinical trials of its own. The
situation is highly competitive, with huge amounts of
money and prestige at stake. For example, annual
sales for such a drug in the worldwide market are
estimated to exceed $500 million. The two
companies are in a high-stakes war to see who can
get to the United States market first.

Clinical trials are performed by a small number of
highly qualified investigators at specified sites in
strict compliance with a clinical protocol and all
applicable laws, regulations and guidelines, good
clinical practices, and the quality standards required
by the FDA. These clinical trials are highly
confidential endeavors, and each employee at the
clinical trial site is bound to explicit written
confidentiality and non-disclosure agreements.

TKT has learned that Herriman, on behalf of Bain's
client Genzyme, has recently been in contact with
TKT's principal investigator in its clinical trials, Dr.
William J. Rhead at The Medical College of
Wisconsin, inquiring about the progress and other
matters relating to the TKT clinical studies on
Replagal. Attached to the complaint is a copy of a
February 8, 2002, e-mail from Herriman to Dr. Rhead
revealing that she previously had been in contact with
him, asking additional questions about the Replagal
studies and reporting that Dr. Rhead's "honorarium
should be ready in the next two weeks."

**\*2** TKT seeks to protect its confidential information
regarding the clinical studies, which it characterizes
as trade secrets.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
14 Mass.L.Rptr. 397, 2002 WL 799694 (Mass.Super.)
(Cite as: 2002 WL 799694 (Mass.Super.))

Page 2

Bain's opposition readily concedes that Herriman, "a Bain employee," has been in contact with Dr. Rhead in order to "provide strategic advice, and to gather data" regarding TKT's trials to and for Genzyme. Bain contends, however, that it has done so by "above board" means.

Bain describes the e-mail attached to TKT's complaint as "a single, incomplete shred of evidence about Bain's contacts with one of TKT's clinical investigators." Bain insists that the investigator--Dr. Rhead--"simply advised Bain that there was certain information he could not discuss because it was covered by a nondisclosure agreement with TKT." A complete recitation of Dr. Rhead's response reads:

> NO TO [QUESTION] 1, AND I BELIEVE THAT THE CONFIDENTIALITY IN CONTRACT I'VE SIGNED WITH TKT FORBIDS ME TO ANSWER THE QUESTIONS BELOW; SORRY, BUT PLS FEEL FREE TO CALL ME NEXT WEEK IF YOU WISH TO DISCUSS THIS FURTHER.

On the subject of "honorariums," Bain says that "[i]n the course of its information gathering, Bain offered honorariums intended to compensate for time spent talking to Bain. The amounts paid ranged between $150 and $250 (two sources received total honorariums of $500, reflecting two interviews)." Bain claims that "such modest honorariums are a common practice in information gathering." Bain says that Dr. Rhead's honorarium was $250, and at his request would be donated to the Children's Hospital of Wisconsin in his name.

This Court is not surprised at TKT's concern that Bain, on behalf of TKT's sole competitor, has been contacting its lead investigator on the all-important clinical trials, hopefully leading to FDA approval, and is paying him money for the communication.

Through an affidavit from Genzyme, Bain complains that TKT may well be doing its own information gathering, complete with a Bain clone and honoraria similar in kind to that proffered by Bain's Dr. Herriman. [FN1]

> FN1. Indeed, Genzyme's counsel was present at the hearing and, although declining to subject his client to party status, took the opportunity to argue, with considerable vigor, that TKT did exactly the same thing regarding Genzyme as Genzyme was doing regarding TKT. Either they are both saints or both sinners. Who is getting the sauce, the goose or the gander? But only

one of them is before the Court; and the other is not even named as a party.

Bain complains that the injunction sought by TKT is far too broad. While arguing that no injunction is warranted, however, Bain has offered: (1) to preserve the information collected; (2) to refrain from further communications with TKT's clinical investigators; and (3) to refrain from disclosing confidential information obtained from TKT's clinical investigators.

## DISCUSSION

In order to prevail on a request for preliminary injunctive relief, whether it be to protect a trade secret or to enforce a non-disclosure agreement covering confidential information, TKT bears the burden of showing: (1) its likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunctive relief sought is not granted; and (3) that its harm, without the injunction, outweighs any harm to Bain and Herriman by being enjoined. *GTE Products Corp. v. Stewart,* 414 Mass. 721, 722-23 (1993); *Packaging Indus. Group, Inc. v. Cheney,* 380 Mass. 609, 616-17 (1980).

\*3 "When ... a party seeks to enjoin governmental action, the [C]ourt also considers whether the relief sought will adversely affect the public." *Tri-Nel Management, Inc. v. Board of Health of Barnstable,* 433 Mass. 217, 219 (2001). See also *Commonwealth v. Mass. CRINC,* 392 Mass. 443, 447 (1983); *Biotti v. Board of Selectmen of Manchester,* 25 Mass.App.Ct. 637, 640 (1988). Here, of course, it is not governmental action that is sought to be enjoined, but the information involved is certainly part of a process in which the government, through the FDA, is deeply involved and in which the public-- particularly those suffering from Fabry disease--has a significant interest.

The granting or denial of preliminary injunctive relief is a matter within the sound discretion of the Court. *Tri-Nel Management, Inc.,* 433 Mass. at 219.

It seems worth noting that by statute in Massachusetts, G.L.c. 93, Sec. 42A, an entity is entitled to injunctive relief for misappropriation of its trade secrets. Indeed, by G.L.c. 266, Sec. 30, such a misappropriation could be a crime. A "trade secret" is defined in c. 266, Sec. 30, as "anything tangible or intangible or electronically kept or stored, which constitutes, represents, evidences or records a secret scientific, technical, merchandising, production or management information, design, process, procedure,

Page 3

formula, invention or improvement." It does not seem too much of a leap to conclude that the confidential part of the clinical trials in issue fall within that statutory reach.

Further, confidential information, even if not truly a trade secret, and even if there is no ascertainable damage, is entitled to protection by injunction. See, e.g., *Warner-Lambert Company v. Execuquest Corporation,* 427 Mass. 46, 50 (1998); *Middlesex Neurological Assoc., Inc. v. Cohen,* 3 Mass.App.Ct. 126, 132 (1975).

This Court is of the belief that the granting of a preliminary injunction is warranted in the circumstances before it. The Court is comfortable that TKT has demonstrated a reasonable likelihood of success on the merits, that it will suffer irreparable harm in the absence of protection, and that the balance of harms between TKT, on the one hand, and Bain and Herriman, on the other, falls squarely in TKT's favor.

### PRELIMINARY INJUNCTION

For the reasons set forth above, this Court hereby issues a preliminary injunction enjoining the defendants Bain & Company, Inc. and Laurie Eleanor J. Herriman, M.D., and their officers, agents, attorneys, servants and employees, as well as any persons, firms or entities in active concert or participation with them, in connection with the plaintiff's clinical trials for Replagal, who receive actual notice of this injunction, from:

1. Destroying any and all documents and communications of any kind whatsoever, including e-mails and other electronic forms of information, concerning the plaintiff's clinical trials for Replagal and failing to preserve all such documents and communications for discovery during the course of this litigation;

\*4 2. Communicating with any of the plaintiff's known clinical investigators, or their agents, servants and employees, or any other persons known to be working with or assisting such investigation concerning the clinical trials for Replagal; and

3. Without first obtaining the written approval of TKT, or from the Court or its appointed Master, disclosing to anyone any and all data or information concerning the plaintiff's clinical trials for Replagal that the defendants have obtained from any of the plaintiff's clinical investigators or from any other source known to the defendants to be subject to confidentiality agreements.

This injunction shall remain in full force and effect unless and until further order of this or any appropriate appellate court.

14 Mass.L.Rptr. 397, 2002 WL 799694 (Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3

Westlaw.

Not Reported in F.Supp.                                                                      Page 1
Not Reported in F.Supp., 1996 WL 531873, 1997 Copr.L.Dec. P 27,590
**(Cite as: Not Reported in F.Supp.)**

ᐅ

Not Reported in F.Supp., 1996 WL 531873, 1997
Copr.L.Dec. P 27,590
Briefs and Other Related Documents

United States District Court, S.D. New York.
FABKOM, INC., Plaintiff,
v.
R.W. SMITH & ASSOCIATES, INC., Cliff
deQuilettes and ZIA Corporation, Defendants.
**No. 95 Civ. 4552 (MBM).**

Sept. 19, 1996.

Walter Klasson, New York City, for Plaintiff.
Baila Celedonia , Mary Kevlin , Cowan Liebowitz &
Latman, P.C., New York City, for Defendant R.W.
Smith, Inc.
C. Dean Little , Stuart C. Allen , Brian T. Schuster ,
Reed McClure, P.C., Seattle, WA, for Defendant
R.W. Smith & Associates, Inc.
Cliff deQuilettes, Seattle, WA, pro se.
Michael Quinn , Crummy, Del Deo, Dolan,
Griffinger & Vecchione, Newark, NJ, for Defendant
ZIA Corporation.

### OPINION AND ORDER

MUKASEY, District Judge.

Plaintiff Fabkom, Inc., a software developer, has sued
R.W. Smith & Associates, Inc. ("RWS"), Cliff
deQuilettes, and ZIA Corporation, alleging, *inter
alia,* copyright infringement, misappropriation of
trade secrets, breach of contract and unfair
competition.    Plaintiff moves for a preliminary
injunction pursuant to 17 U.S.C. § 502 (1994) , 15
U.S.C. § 1116 (1994), and state law, to enjoin
defendants from marketing or distributing software
developed by ZIA which RWS currently uses in its
municipal bond trading operations and which
plaintiff alleges was unlawfully copied from its own
software. For the reasons stated below, the motion
for preliminary injunction is granted.

### I.

#### A. *The Municipal Bond Trading Industry and
Fabkom's MTS Software*

Fabkom is a New York corporation with offices in
New York City. Its principal line of business is the
creation and marketing of software designed to
manage the trading operations of municipal bond
broker's-brokers.    (Bloksberg Decl. ¶ 15) The
municipal bond industry includes broker-dealers and
broker's-brokers. Broker-dealers arrange for the sale
and purchase of bonds. In such transactions, they
may be acting either for their own account or on
behalf of retail customers. (*Id.* ¶ 26) A broker's-
broker [FN1], on the other hand, arranges transactions
between independent sellers and buyers. It receives
its compensation from a commission or from the
difference between the price paid to the seller and the
price received from the buyer. (*Id.* ¶ 25; Van der
Merwe Decl. ¶ 2) It does not own any of the bonds
involved in the transaction and functions solely as a
matchmaker.

> FN1. For the balance of this opinion,
> broker's-brokers will be referred to simply
> as brokers, and broker-dealers as dealers.

There are two principal transactions relevant to a
broker's business, at least as it relates to the present
action.    One is a "bids-wanted" transaction.
(Bloksberg Decl. ¶ 29) In effect, this transaction
involves an auction: a seller submits a request to sell
a bond, without specifying a price, and prospective
buyers bid on the bond. (*Id.*) The auction usually
lasts a short time, terminating at the cut-off time
stipulated by the seller.    The second type of
transaction is an "offering." In an offering, the seller
proposes a sale price and places no time limit on the
sale. (*Id.*)

Brokers need certain information to effect these
transactions.    When executing a bids-wanted
transaction, the broker must keep track of the bids on
the subject bond, including the identity of each
bidder, the bid amount, and the rank of the bids. (*Id.*
¶ 30) The bid may be expressed either as a dollar
price or as a percentage yield on the bond. (*Id.*) The
history of prior bids on the bonds also is useful to the
broker. (*Id.* ¶ 32) Further, once a transaction is
completed, the broker must produce a tangible record
of the transaction, known as a "ticket," which is then
used to generate a confirmation to the buyer and
seller and to comply with internal accounting and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

record-keeping requirements. (*Id.* ¶ 31)

This information can be tracked manually, but its collection and use can be greatly facilitated with the aid of a computer. (*Id.* ¶ 30) Plaintiff developed software, called MTS, which facilitates these transactions.     Plaintiff currently provides MTS to nine of the 21 municipal bond brokers in the United States, and is by far the largest provider of such software in the market. (*Id.* ¶ 16)

The MTS program's importance lies primarily in the execution of bids-wanted transactions.     The initial screen contains a master listing of bonds being offered for sale, as well as information on the cutoff time and date, and the status of the sale. (*Id.,* Ex. I) For each bond the broker may call up the "bid pad," which is the central feature of the software.    The bid pad allows the broker to monitor the bids made by prospective buyers and to track their ranking.    The pad contains a description of the bond, taken from a public source. (*Id.* ¶ 63) Below the bond description are nine columns of information on any outstanding bids:

    Customer (the broker-dealer making the bid); Broker (the individual entering the bid for the customer); Lot (the amount of bonds bid on-allows acceptance of partial bids); Bid (for entry of a bid in the yield or basis format); Dollar Price (for entry of a bid in the dollar price format or calculated from a yield or basis bid); Bid Less Commission (a feature unique to MTS, which shows the bid, in whichever format it is entered, minus the dollar price commission and concession, if any); Dollar Price Less Commission (which calculates and displays the first ranked bid in dollar price format regardless of the bid format, and in a feature unique to MTS, calculates and displays the dollar price difference between each lower bid and the top bid); Status (a series of one letter indicators of the bid's status in the process from submission to the seller through acceptance and approval by each side); and Rank.

(*Id.* ¶ 64). MTS also uses the same initial screen for displaying offerings transactions as it does for bids-wanted transactions, although some of the information is used only in one or the other transaction. (*Id.* ¶ 70)

The MTS program contains additional screens.     A user may access a further detailed description of the bond being offered for sale. (*Id.* ¶ 109) This screen contains a space for notes and comments. (*Id.* ¶ 111) A user may also access the history of bidding on a particular bond. (*Id.* ¶ 112) The same screen is used

for item description and history for both offering and bids-wanted transactions. (*Id.* ¶¶ 109, 112) Plaintiff obtained copyright registration for the MTS program on June 5, 1995, under copyright registration no. TXU 680-645. (*Id.* ¶ 83)

### B. *The Relationship Between Fabkom and RWS*

RWS is a municipal securities broker. (Def.Mem., at 1) Plaintiff licensed its MTS software to RWS for five years under a licensing agreement signed in July 1992.    (Bloksberg Decl., Ex. C) The agreement permitted RWS to use the software only in its own offices.     It provided that RWS would have the software for "its own use only" and that it could not "in any manner demonstrate the software for any party who is not an employee, agent, representative or Affiliate ... of Customer, duplicate or reproduce the Software, or any part thereof, without the prior written consent of Fabkom." (*Id.,* Ex. C at 3) Further, RWS agreed that

    the Software (other than the Tailored Software), its source codes, revisions, upgrades and new revisions, and any copyright therein, is the sole and exclusive property of Fabkom, Customer agrees and warrants to keep such materials confidential, shall protect such materials and their contents, and shall not authorize disclosure or duplication by its agents, servants, employees or representatives.

(*Id.,* Ex. C at 4)

As a result of disagreements between Fabkom and RWS, this arrangement was terminated by a written agreement dated December 27, 1994. (*Id.* ¶ 36) The December, 1994 agreement provided that the license would expire on March 31, 1995, although an extension was eventually granted through April 30, 1995. (*Id.* ¶ 36, 38) Plaintiff terminated the license four days early because of a series of alleged breaches. (*Id.* ¶ 39) In May, 1995, plaintiff learned that RWS was using a different system (the "deQuilettes software") that contained many similarities to the MTS software. (*Id.* ¶ 40) The new system had been developed by one of RWS's employees, Cliff deQuilettes. (deQuilettes Decl. ¶¶ 6-13; Allgood Decl. ¶ 19) Plaintiff claimed that the deQuilettes software was derived from its own proprietary software, in violation of the licensing agreement.     It therefore commenced this lawsuit, claiming, *inter alia*, copyright infringement, misappropriation of trade secrets, and breach of contract.

After engaging in some months of settlement

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

negotiations with RWS, plaintiff obtained a copy of a bid pad report generated by the software RWS was using at that time. (Bloksberg Decl. ¶ 44) This report, which had been created from software developed by defendant ZIA, seemed to plaintiff very similar to the MTS system's bid pad. (*Id.* ¶ 44)

### C. *ZIA's Broker Software*

ZIA sells software to the municipal bond dealer market. (Burnett Aff. ¶ 3) Its TAOS software, developed in 1991, provides dealers with the necessary information for dealer trading. (*Id.* ¶ 9) It pulls together public information on each bond from many disparate sources. (*Id.* ¶ 11) Unlike MTS, the TAOS system does not allow the entry and organization of multiple bids for each bids-wanted request. Instead, it "allow[s] for inputting batches of bids wanted, as would be received from other dealers, retrieving bond descriptions from J.J. Kenny, entering bids on the items (one per item), and doing calculations on the securities and printing of bids wanted, with or without the bids." (Hartmann Aff. ¶ 3)

ZIA's relationship with RWS began in February 1994. (Burnett Aff. ¶ 13) ZIA agreed to license another of its products to RWS, and suggested during these discussions that RWS might retain ZIA to convert the TAOS program, originally designed for dealers, for use by brokers. (*Id.* ¶ 15) An actual agreement to provide such a system was reached in April 1995 for initial delivery by May 1, 1995 to replace the plaintiff's no longer licensed MTS software. (*Id.* ¶ 18) The delivery was then postponed until early July, as a result of RWS's decision to try the deQuilettes software after discontinuing its use of Fabkom's MTS program. (*Id.* ¶ 20) The ZIA program was eventually phased in at RWS offices from August 3, 1995 to September 12, 1995. (Allgood Decl. ¶ 24)

The broker trading software ZIA developed for RWS ("ZIA software") contains a master listing of bids-wanted and some description of each bond. Through this master listing, the user can access the bid pad for each bond, which contains nine columns of information. The columns and their respective abbreviations, are as follows: Customer ("Cust"), Broker ("Brkr"), Lot, Bid, Dollar Price ("$Price"), Bid Less Commission ("Bid-Com"), Dollar Price Less Commission ("$Prc-Com"), Status, and Rank. (Bloksberg Decl., Ex. H; Hartmann Aff., Ex. K) The software also contains a detail or bond description

screen, not included in the TAOS software, which allows for a more detailed description of bonds than the information above the bid pad. This screen includes space for notes and comments. (Hartmann Aff. ¶ 32) In this item description screen, some fields appear solely in bids-wanted transactions and not in offerings transactions, or vice versa. (*Id.* ¶ 34)

ZIA vehemently denies that it used the MTS software in the development of its own broker trading program. (Hartmann Aff. ¶ 45) It asserts that the software was developed by adapting its TAOS software to meet broker needs-specifically, by allowing for the entry of multiple bids for each bid wanted instead of only a single bid by a particular dealer. (*Id.* ¶ 16) Many of the changes from the TAOS program-including allowing for the entry of a partial bid, use of some headings not previously used, listing of the difference between winning bids and losing bids in the Dollar Price Less Commission column, and addition of a field to indicate the status of the transaction-were included at RWS's request. (*See, e.g.,* Hartmann Aff. ¶ ¶ 25, 26, 29, 30) TAOS also had extensive discussions with RWS personnel, including Carl Van der Merwe, a trading assistant. (*Id.* ¶ 40)

Fabkom, however, claims that ZIA's program was copied from MTS. It presents documentary evidence to demonstrate ZIA's access to the MTS source code [FN2], including a facsimile dated June 7, 1995 from Barbara Hartmann of ZIA to Ben Allgood at RWS, containing source code for the ticketing feature of the MTS program. (Bloksberg Decl., Ex. F) Further, ZIA was given an RWS server, which allowed it access to RWS's network. (Burnett Aff. ¶ 26) Fabkom claims that the MTS software, or the variation on it-the deQuilettes software-was still on the RWS system during the time ZIA had access to the network. (Bloksberg Reply Decl. ¶ ¶ 32, 33) RWS does not dispute that Fabkom's software was not fully removed from the RWS system even after the April 26, 1995 license termination. (*Id.* ¶ 32) Neither, apparently, does ZIA.

> FN2. "Source code" refers to "the literal text of a [computer] program's instructions written in a particular programming language. Once the source code has been completed, it is translated or is 'compiled' into 'object code' which is the binary language comprised of zeros and ones through which the computer directly receives its instructions." *Computer Int'l*

*Assoc. v. Altai, Inc.,* 22 F.3d 32, 33 n. 1 (2d Cir.1994) (citations omitted).

Plaintiff amended its complaint on March 12, 1996, to join ZIA as a defendant, claiming copyright infringement, misappropriation of trade secrets and unfair competition pursuant to the Lanham Act, 15 U.S.C. § 1125 (1994), and state law. Plaintiff now moves for a preliminary injunction prohibiting defendants from further disclosing, marketing, or distributing any software which used by RWS since 1992, including the current ZIA software. Plaintiff has requested that as part of the relief, RWS be permitted to continue to use the ZIA software during this litigation. RWS does not oppose the injunction, but requests that it be permitted to continue using the ZIA software in its operations during the course of this litigation. (Def. RWS Mem., at 1-2)

## II.

Plaintiff seeks an injunction on two grounds: First, that defendants infringed the copyright covering the MTS system. Second, that defendants misappropriated trade secrets by obtaining and using copies or demonstrations of plaintiff's software in violation of the licensing agreement between Fabkom and RWS.

The copyright infringement issue presents difficult questions of whether plaintiff's MTS software constitutes expression protectable under the copyright laws. However, because I find that plaintiff has shown enough to obtain an injunction based on misappropriation of trade secrets, I need not resolve the copyright infringement issue at this early stage of the proceedings.

### A. *Choice of Law*

There would appear to be a choice of law issue in this case as a result of the multitude of contacts that parties and occurrences had with a variety of states. However, because all of the parties rely on New York law, I will infer their consent to use New York law. *See Tehran-Berkeley Civil and Envtl. Eng'rs v. Tippetts-Abbett-McCarthy-Stratton,* 888 F.2d 239, 242 (2d Cir.1989) ; *Pompano-Windy City Partners, Ltd. v. Bear Stearns & Co.,* 794 F.Supp. 1265, 1289 n. 12 (S.D.N.Y.1992) (finding implied consent to apply New York law in tort case).

### B. *Preliminary Injunction-Irreparable Harm*

To obtain a preliminary injunction, a party "must show (a) that it will suffer irreparable harm in the absence of an injunction; and (b) either (i) a likelihood of success on the merits or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *Tom Doherty Assoc., Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 33 (2d Cir.1995).

"An irreparable injury is one that cannot be redressed through a monetary award." *JSG Trading Corp. v. Tray-Wrap, Inc.,* 917 F.2d 75, 79 (2d Cir.1990). Irreparable harm is presumed where the defendant has misappropriated trade secrets because monetary measurement of such injury is nearly impossible. *FMC Corp.,* 730 F.2d at 63 ("[I]t is clear that the loss of trade secrets cannot be measured in money damages.... A trade secret once lost is, of course, lost forever."); *Computer Associates Int'l, Inc.,* 784 F.Supp. at 986 ("Of particular relevance to this action is the recognition by the Second Circuit that the loss of 'trade secrets' is not measured in terms of monetary damages ... and is thus considered 'irreparable harm.' "). In addition, "the potential loss of an industry leader's present market and loss of the advantage of being the pioneer in [a] field and [a] market leader, may constitute irreparable harm." *Computer Assoc. International, Inc.,* 784 F.Supp. at 986; *see also Anacomp, Inc. v. Shell Knob Serv., Inc.,* No. 93 Civ. 4003, 1994 WL 9681, at *5 (S.D.N.Y. Jan. 10, 1994) ("This loss of market leadership, like the loss of a trade secret, could not be compensated through money damages.").

Fabkom has demonstrated that it will likely be able to prove that ZIA misappropriated the content, if not the source code, of its MTS software. Thus, losses from the unauthorized copying cannot be measured monetarily. Fabkom's dominant position in the broker market is threatened by ZIA's software. The likelihood of irreparable harm absent an injunction is real.

### C. *Preliminary Injunction-Likelihood of Success*

We must now consider whether plaintiff has shown it is likely to succeed in proving that MTS is a trade secret and that ZIA misappropriated it in violation of a duty.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1. *Status of the MTS Software as a Trade Secret*

To prove misappropriation of trade secrets under New York law, "the plaintiff must demonstrate (i) that it possessed a trade secret and (ii) that the defendant used that trade secret in breach of an agreement, or confidential relationship, or duty, or as a result of discovery by improper means." *Hudson Hotels Corp. v. Choice Hotels Int'l,* 995 F.2d 1173, 1176 (2d Cir.1993).

Under the Restatement of Torts, which New York has adopted, *see FMC Corp. v. Taiwan Tainan Giant Indus. Co.,* 730 F.2d 61, 63 (2d Cir.1984) (per curiam); *Ashland Management, Inc. v. Janien,* 82 N.Y.2d 395, 604 N.Y.S.2d 912 (1993), "A trade secret may consist of any formula, pattern or device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Restatement of Torts,* § 757, cmt. b (1939). New York courts must evaluate six factors in deciding whether a party possessed a trade secret:

"(1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others."

*Restatement of Torts,* § 757 cmt. b; *see Integrated Cash Management Serv., Inc. v. Digital Transactions, Inc.,* 920 F.2d 171, 173 (2d Cir.1990) ; *Eagle Comtronics, Inc. v. Pico, Inc.,* 89 A.D.2d 803, 803-04, 453 N.Y.S.2d 470, 472 (4th Dep't 1982).

In general, "[c]omputer software, or programs, are clearly protectable under the rubric of trade secrets, if the other elements are also proven." *Q-Co Industries, Inc. v. Hoffman,* 625 F.Supp. 608, 617 (S.D.N.Y.1985); *see also Computer Assoc. Int'l, Inc. v. Altai, Inc.,* 982 F.2d 693, 717 (2d Cir.1992) ( "Precisely because trade secret doctrine protects the discovery of ideas, processes, and systems which are explicitly precluded from coverage under copyright law, courts and commentators alike consider it a necessary and integral part of the intellectual property protection extended to computer programs."); *Business Intelligence Serv., Inc. v. Hudson,* 580 F.Supp. 1068, 1072 (S.D.N.Y.1984). Both the underlying source code, and the architecture of a computer program, may qualify as trade secrets. *See*

*Integrated Cash Management Serv., Inc.,* 920 F.2d at 174; *Computer Assoc. Int'l, Inc. v. Bryan,* 784 F.Supp. 982, 988 (E.D.N.Y.1992) ("[E]ven though independently each of the 'building blocks' may consist of general or public knowledge, collectively the various components may form a 'unique whole.' ").

Here, evidence on the first factor is uncontested. The source code, format, structure, and organization of the software is certainly not known outside the business. Further, defendants do not challenge plaintiff's claim that information regarding the general functioning and preferred methods of operations in the broker's business, information integral to the creation of the software, is "not known outside of the securities industry." (Bloksberg Decl. ¶ 74)

The second and third factors encompass the requirement that the matter be secret. "While absolute secrecy is not necessary ... a showing of substantial measures to protect the secret nature of the process is required." *Julie Research Laboratories, Inc. v. Select Photographic Engineering, Inc.,* 810 F.Supp. 513, 520 (S.D.N.Y.1992), *aff'd in part and vacated in part,* 998 F.2d 65 (2d Cir.1993); *see also Defiance Button Mach. Co. v. C & C Metal Prod. Corp.,* 759 F.2d 1053, 1063 (2d Cir.1985), *cert. denied,* 474 U.S. 844 (1985). The plaintiff must show that the information could be acquired only through improper means. *Id.* at 1063.

Plaintiff has taken measures to preserve the secrecy and confidentiality of both the source code, and the architecture of its system. First, MTS is distributed to its customers only in its executable object code form. (Bloksberg Decl. ¶ 76) This means that any person attempting to reveal the programming instructions would see an incomprehensible sequence of numbers, representing machine level commands to the computer's central processing unit. (*Id.*) The source code form, which would reveal the English words of the programming language, is restricted to plaintiff's principals. (*Id.*)

Second, the software is given to clients only after they have signed a confidentiality agreement. Plaintiff enters confidentiality and non-disclosure agreements with its customers before allowing them to use its software. (Bloksberg Decl. ¶ 77) For instance, the licensing agreement between plaintiff and RWS contains a clause prohibiting RWS from copying or demonstrating the MTS software to any

Not Reported in F.Supp.                                                                                    Page 6
Not Reported in F.Supp., 1996 WL 531873, 1997 Copr.L.Dec. P 27,590
(Cite as: Not Reported in F.Supp.)

non-employee.    (Bloksberg Decl., Ex. C at 3)
Distribution to clients of a computer program through
a licensing agreement requiring confidentiality does
not destroy secrecy of a trade secret, but rather
reinforces it.    *See, e.g., Trandes Corp. v. Guy F.*
*Atkinson Co.,* 996 F.2d 655, 664 (4th Cir.), *cert.*
*denied,* 510 U.S. 965 (1993) ; *Data General Corp. v.*
*Grumman Sys. Support Corp.,* 825 F.Supp. 340, 359
(D.Mass.1993), *remanded in part,* 36 F.3d 1147 (1st
Cir.1994) ; *ISC-Bunker Ramo Corp. v. Altech, Inc.,*
765 F.Supp. 1310, 1334 (N.D.Ill.1990).

Defendant ZIA argues that the inputs into the system,
*i.e.,* the different categories of bid data, are public
information and therefore the MTS program, which
merely synthesizes this information, is unprotected.
However, even if the components of the system are
public, courts have found that the architecture, or
organization and structure, of a program may itself be
protectable as a trade secret, even when the
component information is not.    *See Integrated Cash*
*Management Serv., Inc.,* 920 F.2d at 174.    Thus,
even if the various categories of information
significant for bond trading are widely known, the
architecture, structure and organization of the
plaintiff's program is still unique and constitutes a
trade secret.    Moreover, the source code is certainly
not public knowledge.

The fourth factor-the value of the information to the
trade secret holder and his competitors-encompasses
the competitive advantage which a plaintiff derives
from a process.    *See Julie Research Laboratories,*
810 F.Supp. at 517.    Plaintiff has certainly
demonstrated that the MTS program gives it
considerable advantage in the market for software for
municipal bond broker trade execution.    Plaintiff's
software is used by nine of the 21 municipal bond
broker in the country. (Bloksberg Decl. ¶ 16) No
other competitor has managed to accumulate more
than two clients. *(Id.)* RWS notes that "[f]rom 1990
to May, 1995, Fabkom was the sole vendor of such
software to the 21 broker's brokers in the United
States market."    (Def. RWS Mem., at 3) This is
strong evidence of the information's competitive
significance.    *See, e.g., Data General Corp.,* 825
F.Supp. at 359.

Moreover, plaintiff commands substantial fees for the
use of its software.    For instance, the licensing
agreement between plaintiff and RWS provided for
monthly fees for the first three years of the license of
$300 for the first 10 work stations equipped with the
program, $250 for the next 10 work stations, $200 for
the third group of 10, and $150 for any further work

stations.    These fees were reduced by 40% in the
fourth year. (Bloksberg Decl., Ex. C, Schedule D)
Such fees demonstrate the value of the MTS program
to Fabkom and the competitive advantage Fabkom
derives from it.

Plaintiff also has presented uncontroverted evidence
of the fifth and sixth factors-the amount of effort
expended on the development of the process and the
amount of effort required from a competitor to
duplicate the process.    Plaintiff notes that extensive
effort and experience is required for the creation of
bond trading software. (Bloksberg Decl. ¶ ¶ 18, 19,
75) This is true from both an industry and a computer
software perspective.    Extensive knowledge of the
municipal bond industry is required to create a
program to manage trading. *(Id.* ¶ 75) Any software
competitor seeking entry into the municipal bond
market would need to expend a considerable amount
of energy to develop such a program.    Further, from
a technical standpoint, software development
inherently requires much time and investment.
Defendant ZIA admits that at least one of its
employees working on the project spent 600 hours to
create broker software for RWS. (Hartmann Aff. ¶
39) Thus, plaintiff has demonstrated that it will likely
be able to prove that the MTS software constitutes a
trade secret.

### 2. *Misappropriation and Use of the Trade Secret*

The second requirement for a misappropriation-of-
trade-secrets claim is that a plaintiff demonstrate
"that the defendant used the trade secret in breach of
an agreement, a confidential relationship, or duty, or
as a result of discovery by improper means." *Hudson*
*Hotels Corp.,* 995 F.2d at 1176.    There are two facets
to this inquiry:  first, the trade secret must be used;
and second, the use must be in breach of an
agreement or duty.

"Misappropriation and misuse can rarely be proved
by convincing and direct evidence.    In most cases
plaintiffs must construct a web of perhaps ambiguous
circumstantial evidence from which which the trier of fact
may draw inferences which convince him that it is
more probable than not that what plaintiffs allege
happened did in fact take place." *Q-Co Industries,*
*Inc.,* 625 F.Supp. at 618 (quoting *Greenberg v.*
*Croydon Plastics Co.,* 378 F.Supp. 806, 814
(E.D.Pa.1974)).    Specifically, "[c]opying can be
established by showing access and substantial
similarity."    *Julie Research Laboratories,* 810
F.Supp. at 517.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Here, plaintiff claims that defendant RWS breached the licensing agreement by disclosing the MTS program to defendant ZIA. Plaintiff has not yet taken discovery, and so lacks direct proof of duplication of the actual source code of the MTS program in the ZIA program. (Bloksberg Decl. ¶ 84) Instead, Fabkom relies on the evidence of ZIA's access to the MTS program through RWS's unauthorized demonstration or disclosure, to show that ZIA could have used the trade secrets in developing its own program, and on the substantial similarities in the MTS and ZIA software programs to show that ZIA did so.

Plaintiff points to several pieces of evidence to prove ZIA's access to the MTS software. First, and most important, plaintiff provided a copy of a facsimile relating to the ticket generation function of the MTS program that it obtained from RWS during their settlement discussions. (Bloksberg Decl. ¶ 89) The facsimile, dated June 7, 1995, appears to have been sent from Barbara Hartmann, a systems analyst/programmer at ZIA, on a ZIA facsimile cover sheet, and was addressed originally to Ben Allgood, the Director of Business Development at RWS. (Bloksberg Decl., Ex. F) A line has been drawn through Allgood's name, with an arrow pointing to the letters CdQ, which presumably stands for Cliff deQuilettes, Director of Management Information Services at RWS at that time. Attached to the cover sheet are three pages of text, with two columns of writing on each page. At the top of the first page is the title "Tickets definitions," right above the words "Fabkom (Mts) system." The first column of text is headed "Field Name," while the second column is headed "Field Type." The title at the top of the second page is "Ticket definitions," while the title at the top of the third page is "Ticket Parts (Fabkom)." Next to some of the column entries are handwritten comments.

According to plaintiff, the names under the "Field Name" column are the "exact names, or labels, used by plaintiffs in its MTS data base design and code to identify fields of data to be filled in and manipulated by the rest of MTS, here in connection with the Tickets screen and functions." (*Id.* ¶ 91) The "Field Type" column consists of codes defining the kind and size of the data referred to in each field. (*Id.*) Plaintiff also claims that the comments reveal a significant understanding of the MTS program. (*Id.* ¶ 92)

Defendant ZIA fails to fully explain this apparent

access to and analysis of the plaintiff's source code. Hartmann, in her affidavit, explains that she was reviewing the information to determine how to interface the ZIA program with the program developed by another software manufacturer, BONDCO, which RWS used in its back office operations. (Hartmann Aff. ¶ 43) However, rather than denying that the facsimile includes the source code for the MTS program, or that she had ever seen it, Hartmann merely claims that the organization of the information in the facsimile does not make sense and that this information was not used in the development of the ticketing function of the ZIA system or in the interface with the BONDCO program. (*Id.* ¶ ¶ 43, 44) Although it remains unclear whether any of the particular information contained in the facsimile was used in the ZIA program, the facsimile itself demonstrates that ZIA had access to at least part of the source code of the MTS program and that it may have utilized it, even if only minimally, in the development of its own software.

Plaintiff claims also that ZIA had access to plaintiff's software through two servers which RWS shipped to ZIA. A server is "a central computing unit on a [local area network] on which a main program, such as MTS, is located for use from other computers." (Bloksberg Decl. ¶ 97) The first server was shipped in late May or early June. It contained data that was capable of disclosing information regarding the database developed internally by deQuilettes for use by RWS, which plaintiff alleges was developed using the MTS program. (Allgood Decl. ¶ 25) When RWS realized that access to this data could provide access also to the architecture of its system, it immediately requested that the server be returned, and ZIA claims it never accessed any information on the server. (*Id.*; Burnett Aff. ¶ 24)

A second server was sent in late June, 1995. That server did not contain any Fabkom data. (Allgood Decl. ¶ 28) However, that server did allow ZIA to connect with RWS's network. ZIA claims that it did not receive fiber optic connection to allow access to the RWS network until August 1995, by which time, according to ZIA, the MTS program had been removed from the system. (Burnett Aff. ¶ 27) Plaintiff hotly disputes the claim that the MTS program was no longer on the network at the time ZIA was able to log on. It states that the MTS program was on the system until November, 1995, (Bloksberg Decl. ¶ 43; Bloksberg Reply Decl. ¶ 32) and RWS does not contradict this claim. However, even before the date on which ZIA obtained a fiber

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

optic connection, ZIA concedes that it had modem access to the system. (Burnett Aff. ¶ 27) ZIA claims that security measures prevented access to MTS software through the modem without monitoring by Tim Haggerty, the network administrator at RWS, but this claim is contradicted by Haggerty's statement that he did not start monitoring ZIA's access until July 17, 1995. (Haggerty Decl. ¶ 10) Haggerty notes that, before that date, the "system was not secure," and access to the network could be achieved through modem. He states that he does not know whether, prior to July 17, 1995, "some unauthorized person had access to the Smith computer system." (*Id.* ¶ 15) Further, even after that date, he "cannot guarantee that Fabkom, ZIA, or some other unauthorized person could not have entered the RWS computer system in order to open files containing Fabkom software...." (*Id.*) Thus, from early June to July 17, 1995, ZIA could freely access the RWS network, including MTS and RWS's internally developed software, with no supervision, and after that point ZIA still may have been able to access the network. Access to the RWS network is yet another piece of evidence that suggests that ZIA could have used Fabkom's software to develop its own.

In addition to proof of access, plaintiff emphasizes the similarities between the MTS product and the ZIA product as evidence that this access was translated into actual use and copying. The area of greatest congruence is in the organization and structure of the bid pad. Both bid pads contain the same nine entries, in the same order, with nearly the same headings, and with nearly the same capabilities in each column.

The organization, presence, and labelling of these columns represented a deviation from ZIA's previous dealer software. (Bloksberg Decl. ¶ 105 and Ex. J; Hartmann Aff., Exs. A, B) ZIA claims that some of the similarities in labels to the MTS program are the result of requests by RWS for certain formats. (Hartmann Aff. ¶ ¶ 26, 27; Burnett Aff. ¶ 43) Further, ZIA claims that these labels conform to industry custom and that the columns are necessary to perform the trading tasks. (Burnett Aff. ¶ 38) However, the RWS employee who functioned as the consultant to ZIA in the development of the ZIA software, when listing the minimum industry requirements for a software program, left out some of the entries which both the MTS and the ZIA programs contain and which ZIA now claims were requested and customary within the industry. Carl Van der Merwe, a trading-assistant employed at RWS, lists in his declaration the following required

entries on a bid pad, which he states that he communicated as requirements to ZIA personnel:

(a) the identity of the selling broker; (b) the specific broker; (c) the "lot"-which is a broker's broker customary term for the quantity of bonds; (d) the identity of each bidding dealer; (e) the price which is bid by each dealer; (f) the rank of the bids from high to low; (g) the bid price less the commission, because it is the high-bid price less commission which is communicated to the selling broker, and (h) the amount by which each lower bid was under the higher bid....

(Van der Merwe Decl. ¶ 12) Not included within this list are features that appear in both the MTS program and the ZIA software, including: almost identical status information, listing of the bid in yield terms, and the capability of making partial bids.

Even if ZIA could explain the similarities in the bid pad with reference to RWS's requests, it is likely that RWS's requests were influenced, if not dictated, by the structure of the MTS program which it had been using for years. Communication of these requests to ZIA in any specific manner, and use of specific requests to develop the ZIA program, would constitute demonstration of the plaintiff's software, in violation of the licensing agreement, and thus a breach of the agreement. (Bloksberg Decl., Ex. C) In effect, RWS would be using requests for features as a way of painting a word picture of how the Fabkom system worked-*i.e.,* demonstrating the system. Contrary to ZIA's assertions, Fabkom is not thereby granted a monopoly over information pertaining to the municipal bond broker industry. Rather, ZIA should have been more vigilant in collecting data regarding the industry to ensure that such information was not colored by years of exposure to plaintiff's software.

The similarities between the two programs go far beyond the inclusion of similar information. The entries on the bid pad appear in the same order. The column headings are almost identical. While similarity in some of the headings is unsurprising, e.g., "cust" for customer, others present greater evidence of duplication, *e.g.,* "$Prc-com" for price in dollars less commission. Further, some unique features of the MTS program appear in the ZIA program, including the capability of making partial bids; the listing of each bid below the winning bid not by the dollar price but by the difference between that bid and the winning bid; and creating a distinct column to enter the bid price in either yield or dollar terms and then another column converting this price into price less commission. (Hartmann Aff., Ex. K;

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 531873, 1997 Copr.L.Dec. P 27,590
(Cite as: Not Reported in F.Supp.)

Page 9

Bloksberg Decl., Ex. H) It is difficult to believe that such substantial similarities are attributable merely to coincidence.

Plaintiff presents other similarities in the flow and structure of the program which defendant alleges are either not similarities or are explainable through common industry practice. These issues will be resolved at a later stage of the proceedings. Suffice it to say that while there are many contested issues, the uncontested similarities alone are sufficient, in combination with the evidence of access, to demonstrate that plaintiff will likely be able to prove some copying of the MTS program by ZIA.

### 3. *Use of the Trade Secret in Breach of Agreement, Confidential Relationship, or Duty*

Beyond use of its trade secret, the plaintiff in a misappropriation of trade secrets case must demonstrate that such use breached an agreement, a confidential relationship, or a duty. *See Hudson Hotels Corp.,* 995 F.2d at 1176. A misappropriation of trade secrets claim may be based on the breach of an agreement by a third party where the party receiving and using the trade secret knows or has reason to know that its receipt of the information breaches the third party's duty. *See Computer Assoc. Int'l, Inc.,* 982 F.2d at 718 (quoting *Restatement of Torts,* § 757 (1939)). It is irrelevant whether the breach is committed by an employee of the defendant or by a third party; all that is required is that the defendant know or have reason to know of the breach and still continue to use the trade secret. *See, e.g., Forro Precision, Inc. v. International Business Mach.,* 673 F.2d 1045, 1057 (9th Cir.1982) ; *Williams v. Curtiss-Wright Corp.,* 681 F.2d 161, 164 (3d Cir.1982).

Constructive notice of the breach is sufficient to impose liability. *Computer Assoc. Int'l, Inc.,* 982 F.2d at 718. A defendant is on constructive notice of a breach when "from the information which he has, a reasonable man would infer [a breach of confidence], or if, under the circumstances, a reasonable man would be put on inquiry and an inquiry pursued with reasonable intelligence and diligence would disclose the breach." *Computer Assoc. Int'l, Inc.,* 982 F.2d at 718; *see also Data General Corp.,* 825 F.Supp. at 360 ("[T]he requisite notice may be found where the defendant knew or should have known that the proffered information is the trade secret of another.").

When there is enough evidence to show that ZIA

likely used MTS software to develop its own broker trading program, it is a small step to find that such use occurred in breach of the Fabkom-RWS licensing agreement. The licensing agreement provided that RWS could not "in any manner demonstrate the software for any party who is not an employee, agent, representative or Affiliate ... of Customer, duplicate or reproduce the Software, or any part thereof, without the prior written consent of Fabkom." *(Id.,* Ex. C at 3) Further, RWS agreed that

the Software (other than the Tailored Software), its source codes, revisions, upgrades and new revisions, and any copyright therein, is the sole and exclusive property of Fabkom, Customer agrees and warrants to keep such materials confidential, shall protect such materials and their contents, and shall not authorize disclosure or duplication by its agents, servants, employees or representatives.

*(Id.,* Ex. C at 4) By providing the source code for the ticketing function to ZIA, and giving ZIA both access to the MTS program and a demonstration through its verbal descriptions of the program's features, RWS breached its agreement to keep confidential MTS and its source code.

There are two factors here that strongly suggest that ZIA was or should have been on notice that RWS was breaching its confidentiality obligation under the licensing agreement by revealing the source code and content of the MTS program. First, ZIA was on notice, through statements of RWS employees and its awareness of the commencement of this litigation, that plaintiff considered the MTS program to be a trade secret and that any copying or disclosure of this program to a third party would breach RWS's duties under the licensing agreement. ZIA began development of its broker software for RWS in April 1995. (Burnett Aff. ¶ 18; Allgood Aff. ¶ 20) At that time, "Smith gave specific instructions to its employees ... and to ZIA, that ZIA was to modify its TAOS software without reference to, access to, or use of Fabkom's MTS software...." (Allgood Aff. ¶ 21) ZIA's admonitions to its employees early in its relationship with RWS to refrain from viewing the MTS program demonstrates its understanding of RWS's obligations under the licensing agreement. (Burnett Aff. ¶ 23) Further, on June 16, 1996, plaintiff filed this lawsuit against RWS claiming, *inter alia,* copyright infringement and misappropriation of trade secrets. This complaint asserted that the MTS software was a trade secret, and that RWS had a duty under the licensing agreement not to disclose, copy or demonstrate the program for a third party. (Compl. ¶ 21)

Not Reported in F.Supp.                                                                                    Page 10
Not Reported in F.Supp., 1996 WL 531873, 1997 Copr.L.Dec. P 27,590
(Cite as: Not Reported in F.Supp.)

Second, it is standard industry practice to market software through licensing agreements that impose confidentiality obligations on customers. *See Data General Corp.,* 825 F.Supp. at 360 ("Moreover, Grumman admitted that it knew confidentiality agreements were widely used in the business to restrict disclosure of proprietary information by customers and former employees."); *ISC-Bunker Ramo Corp.,* 765 F.Supp. at 1323; Leonard T. Nuara, *The Importance of the Scope of the License Grant Clause for Multimedia Software Development Agreements,* 418 PLI/Pat 71, 76 ("Many traditional software license agreements include provisions which utilize phraseology such as 'software must be used for "internal use" only' or other similar language."). Such agreements are the only way to restrict dissemination of software beyond intended users and to capture fees for its use. Thus, ZIA, a participant in the software development market and aware that RWS was charging fees for MTS, must have been aware at least of a high probability that there was a confidentiality agreement protecting MTS.

#### D. *Preemption*

Although I have found that the plaintiff is likely to succeed on its allegation of misappropriation of trade secrets, there remains the issue of whether the trade secret claim is preempted by the Copyright Act. Were I to conclude the MTS software is not protectable expression, preemption obviously would not be an issue. However, even if the software is copyrightable, the misappropriation of trade secrets claim would not be preempted.

"A state law cause of action is preempted by federal copyright laws if the subject matter of the state-law right falls within the subject matter of the copyright laws and the state-law right asserted is equivalent to the exclusive right protected by federal copyright law." *Ex-Tixz, Inc. v. Hit-Tix, Inc.,* 919 F.Supp. 728, 737 (S.D.N.Y.1996). However, if the state law claim requires an element which the copyright claim does not, it is not preempted by federal law. *Kregos v. Associated Press,* 3 F.3d 656, 666 (2d Cir.1993), *cert. denied,* 510 U.S. 1112 (1994). A misappropriation of trade secrets claim advanced under New York law is therefore not preempted because beyond proving some sort of copying, the plaintiff must also demonstrate a breach of duty or agreement. *Computer Assoc. Int'l, Inc.,* 982 F.2d at 717.

In the present case, plaintiff has alleged the extra element required to avoid federal preemption. It claims that defendant RWS had a duty not to disclose its program information; that ZIA "knew or should have known that Plaintiff claimed all intellectual property rights in MTS and that ZIA had no right to receive from DeQuilettes or otherwise from Smith any information concerning MTS or to use, copy or disclose any part of MTS or any information derived from MTS;" and that defendants "have willfully and intentionally engaged in and permitted unauthorized use and disclosure of Plaintiff's trade secrets and confidential business information in violation of Plaintiff's rights and defendants' obligations." (Amended Compl. ¶ 91-94)

#### III.

Even if Fabkom had not proved a likelihood of success on the merits, it could obtain a preliminary injunction also if it demonstrates "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *Able v. United States,* 44 F.3d 128, 130 (2d Cir.1995) (per curiam). As noted above, plaintiff has certainly raised serious questions regarding ZIA's possible misappropriation and use of the MTS program to develop its own program, with constructive notice that such disclosure and copying were in breach of the Fabkom-RWS licensing agreement.

The balance of hardships tips decidedly in Fabkom's favor. If ZIA has misappropriated plaintiff's trade secrets and used the MTS program to develop a competing program, ZIA will be able to market the improperly developed program in the broker market during the litigation in direct competition with Fabkom. Any diminution of Fabkom's market share would be difficult to reverse. Fabkom claims, and ZIA does not deny, that ZIA has already begun to solicit Fabkom clients. (Bloksberg Reply Decl. ¶ 71) To allow ZIA to benefit from its misdeeds for any period of time would be highly inequitable.

ZIA, on the other hand, will suffer little harm from a preliminary injunction. Its major market strength lies in the dealer market with its TAOS software. That market will be unaffected by any injunction, because ZIA may continue to market its TAOS software, which was developed before ZIA's relationship with RWS began. ZIA's only current broker client is RWS, which it may retain. Any loss of future clients as a result of the injunction is purely speculative. ZIA therefore will suffer little harm

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 531873, 1997 Copr.L.Dec. P 27,590
**(Cite as: Not Reported in F.Supp.)**

from a limitation on the sale of its broker software during this litigation.    ZIA's claims of harm to its reputation are unfounded;  the preliminary injunction does not represent a final judgment as to its guilt, but merely a preliminary assessment of the case. Certainly, ZIA has presented no concrete evidence of any loss of business that may result from an adverse ruling.   Thus, the balance of hardships tips decidedly in plaintiff's favor.

For the reasons set forth above, the motion for a preliminary injunction is granted and defendants are ordered to refrain from marketing, advertising, distributing or otherwise disclosing to any third party, directly or indirectly, any copy, part or derivative of any computer software which RWS is currently using or has used since 1992 for its municipal bond trading operation,  including all information about such software.    RWS may continue to use its current software throughout the course of the litigation.

A conference will be held on September 24, 1996, 9:15 a.m., to discuss an appropriate bond, *see* Fed.R.Civ.P. 65(c), and further steps to be taken in this case.

SO ORDERED.

S.D.N.Y.,1996.
Fabkom, Inc. v. R.W. Smith & Associates, Inc.
Not Reported in F.Supp., 1996 WL 531873, 1997 Copr.L.Dec. P 27,590

Briefs and Other Related Documents (Back to top)

• 1:95CV04552 (Docket) (Jun. 16, 1995)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Westlaw.

Not Reported in F.Supp.2d                                                Page 1
Not Reported in F.Supp.2d, 2004 WL 1497688, 2004 Copr.L.Dec. P 28,820
(Cite as: Not Reported in F.Supp.2d)

H
Not Reported in F.Supp.2d, 2004 WL 1497688, 2004
Copr.L.Dec. P 28,820
Briefs and Other Related Documents

United States District Court,D. Massachusetts.
STORAGE TECHNOLOGY CORPORATION d/b/a
Storagetek
v.
CUSTOM HARDWARE ENGINEERING &
CONSULTING, INC., and David York
No. Civ.A. 02-12102RWZ.

July 2, 2004.

Edwin G. Harvey , Thompson Coburn LLP, St.
Louis, MO, Consolidated Plaintiff, Defendant and
Counter Claimant.
Bobbee J. Musgrave , Tracy L. Ashmore , Musgrave
& Theis LLP , Charles Steese , Heather Beller ,
Steese and Evans P.C. , Denver, CO, Brian E.
Whiteley , Scibelli & Whiteley, LLP , Boston, MA,
Jerry A. Riedinger , Michael D. Broaddus , Perkins
Coie LLP, Seattle, WA, for Plaintiff.
Joseph L. Stanganelli , Scibelli and Whiteley, LLP,
Boston, MA, for Plaintiff and Counter Defendant.
Anthony G. Simon , Simon-Passanante, PC , Dean L.
Franklin , Thompson Coburn LLP , St. Louis, MO,
Alexander Klibaner , Peter E. Ball , Sally & Fitch
LLP, Boston, MA, for Defendants.
Anthony Mirenda , Foley Hoag LLP , David E.
Plotkin , Joseph D. Steinfield , Prince, Lobel Glovsky
& Tye LLP , Boston, MA, Dean L. Franklin ,
Nicholas B. Clifford , Thompson Coburn LLP, St.
Louis, MO, for Defendants and Counter Claimants.

*MEMORANDUM OF DECISION*

ZOBEL, J.
Plaintiff,    Storage    Technology    Corporation
("StorageTek"), has devised and sells systems for
storing and retrieving very large and extensive
amounts of computer data. The systems consist of
hardware, software and Library Storage Modules
installed at customers' sites and connected to
computers that control the operation of the modules.
Plaintiff also services the customers' installations by
means of diagnostic software, the "Maintenance
Code," which it uses to identify malfunctions and
problems in the customers' storage system. Although

the storage systems are programmed with the
Maintenance Code along with the functional
operations software, the Code is not sold, and only
plaintiff has access to it. Plaintiff has copyright
registration certificates for virtually all versions of its
Maintenance Code and has taken great pains to
protect access thereto with a proprietary algorithm it
calls a GetKey. Nonetheless, plaintiff charges,
defendants have circumvented its security measures
and are using the Maintenance Code in their business
as a third-party service provider for plaintiff's
systems. [FN1] It claims that defendants thereby infringe
its copyrights, violate the Digital Millennium
Copyright Act of 1998, Pub.L. 105-304 , codified in
relevant part at 17 U.S.C. §  1201 *et seq.,* and
unlawfully use its trade secrets. [FN2] The case is now
before me on plaintiff's motion for a preliminary
injunction.

> FN1. The only defendants implicated in the
> instant motion are Custom Hardware
> Engineering & Consulting, Inc. and David
> York. Three other defendants have only
> recently been brought into the litigation, and
> no evidence tied them to copyright and/or
> trade secret violations.

> FN2. The Third Amended Complaint in fact
> includes a number of other counts, and
> defendants, in addition to denying all
> allegations of wrongful conduct, have
> counterclaimed and asserted affirmative
> defenses of antitrust violations, misuse of
> copyright and laches. However, in its motion
> for a preliminary injunction, plaintiff relies
> only on the claims set forth above.

At the hearing on the motion, both parties adduced
the testimony of witnesses and submitted a number of
affidavits; they also filed extensive briefs and
proposed orders. They are in substantial agreement as
to the requisites for the issuance of a preliminary
injunction, namely, a showing of 1) a substantial
likelihood of success on the merits, 2) irreparable
harm, 3) greater injury to plaintiff from the denial of
the injunction than harm to defendant from the
granting thereof, and 4) benefit to the public interest.
*Charlesbank Equity Fund II v. Blinds to Go, Inc.,* 370
F.3d 151, 162 (1st Cir.2004). Although the parties
contest the precise contours of these requisites as

Not Reported in F.Supp.2d                                                                                          Page 2
Not Reported in F.Supp.2d, 2004 WL 1497688, 2004 Copr.L.Dec. P 28,820
(Cite as: Not Reported in F.Supp.2d)

applied in this case, they do agree that the decisive question is whether plaintiff has adequately established the likelihood of success on the merits. If that question is answered affirmatively, irreparable harm is presumed, the weighing of harms to the respective parties is resolved in favor of the copyright holder and, almost by definition, the public interest is best served by upholding copyright protections. *Concrete Machinery, Co., Inc. v. Classic Lawn Ornaments, Inc.,* 843 F.2d 600, 611-12 (1st Cir.1988).

The following description of plaintiff's system and defendants' circumvention techniques constitutes my findings of fact. Indeed, the parties' evidence presents little divergence of facts-their disagreement concerns largely the characterization and interpretation of those facts.

Plaintiff's storage systems are, at their most basic, a large number of tape libraries that plaintiff collectively calls Silo Systems. They have three components: 1) a Library Storage Module, 2) a Library Control Unit, and 3) a Library Management Unit. The first is a very large box-like structure (14  x 14  x 8 ) and a piece of hardware with robotics that is operated by software in the Control and Management units. It typically contains thousands of tapes, tape drives and a robotic arm to store and retrieve tapes as directed.

The Management Unit is the computer that coordinates an entire system and communicates among its several parts. It receives job requests, usually many at the same time, from the several host computers. Then, based on priorities and availability of robotic hardware, it determines the order in which the jobs are to be completed, and issues commands to the multiple Control Units to produce orderly completion of the jobs. Each Management Unit can operate up to 24 Control Units, each of which, in turn, runs one Storage Unit.

The Control Units are computers that send commands to the robotic mechanisms in the Storage Modules and then monitor their effectiveness. The Control Unit receives its commands from the Management Unit; after receipt it instructs the robots to carry out the assigned task and sends back to the Management Unit a completion report.

Plaintiff has written the software for the operation of the Management and Control Units, designated Functional Code, and for the maintenance of the entire system, designated Maintenance Code. When activated, the latter runs a series of diagnostic tests, provides information as to the nature of the problem and where in the system difficulties have occurred or are likely to blossom, and performs other maintenance-specific operations. It is programmed to be set at different levels between 0 and 9. At 0, the "at rest" and usual setting, the Maintenance Code is disabled, although the system continues to operate normally. Above 0 the Maintenance Code activates specific diagnostic functions at different levels. Among the most important of these are Control Unit event logging, Management Unit event logging and the SAE event log environment user interface. These are the functions that concern the generation, transmittal, storage and display of Event Messages that are triggered as a result of the detection and interpretation of faults or malfunctions in the robotic operations. The Event Messages translate the data readings generated by the diagnostic software into text messages in English that a service technician can read.

Plaintiff licenses the use of the Functional Code when it sells its systems. However, it retains exclusive use of the Maintenance Code portion and zealously guards it by means of its copyright registrations and by disabling and enabling the functions of the Code with its GetKey. The Maintenance Code is specified as either 9330 or 9311 in the copyright registration certificates. Plaintiff holds the GetKey algorithm source code in a secure location at its headquarters in Louisville, Colorado. To enable the Maintenance Code for a particular Management Unit, plaintiff's technician must contact plaintiff's technical support staff, identify him or herself, provide the serial number of the equipment being serviced and identify the desired level of Maintenance Code. This process will yield a GetKey password specific to this request that the technician must enter into the Management Unit. He or she then reinitializes all the units to reset the Maintenance Level. During the process of accessing the Maintenance Code and changing the level, a complete copy of the 9311 Code and a virtually complete copy of the 9330 Code is made in the Management Unit. As the diagnostic work proceeds, specific blocks of Maintenance Code are caused to run and create Event Messages. These Event Messages, generated from the Code, are sent along the local area network (LAN) wire from the Control to the Management Unit. The Management Unit copies the messages from the Code to its storage disk and allows a connected terminal to display them.

Defendants' business is made up in large part of

servicing the library systems plaintiff has sold. To do that work effectively and efficiently, they, too, needed a diagnostic tool, and they chose to piggyback on plaintiff's Maintenance Code. Defendants have done so by circumventing the GetKey to gain access to the Maintenance Code and then resetting the maintenance level. They thus stealthily obtain plaintiff's Event Messages, which they transmit to their own computers in Tucson, Arizona. From that data, defendants' service personnel learn what repair functions need to be performed.

To circumvent the GetKey, defendants have used two methods. Until March 2003, defendants used their Library Event Manager ("LEM") device, a computer they attached to the LAN wires that connect to plaintiff's Control and Management Units. A program called "reverse.exe" allowed defendants to defeat the security of the GetKey, albeit through the sometimes very lengthy process of testing different password combinations until the code was cracked. They would then use the GetKey to set a maintenance level above 0, usually 9, and the system proceeded as designed. After March 2003, defendants used "ELEM," software and a specially designed computer that worked similarly to the LEM, except that it did not use the reverse.exe program. Instead, defendant's ELEM incorporated a forged file identical to one that in the normal course of events would be created by the Control Unit and that tricks the Control Unit to reset the maintenance level at 6, at which level the trickery is not detectable by plaintiff. With both methods, the entire Maintenance Code is perforce copied, and both produced the same results as the GetKey-creation and transmission of the Event Messages.

Plaintiff is likely to succeed on the merits of all three of the claims asserted in support of the motion for a preliminary injunction.

To prove its claim of copyright infringement, plaintiff has to show that 1) it owns a valid copyright in the contested material and 2) defendants copied the protected work. *Concrete Machinery,* 843 F.2d at 605. Defendants do not dispute that a computer program such as plaintiff's Maintenance Code may be protected by copyright. Rather, they deny that the Event Messages generated by the Maintenance Code are protected, and they vehemently defend any copying of the Maintenance Code as sanctioned by 17 U.S.C. § § 117(a) and (c) and authorized by plaintiff's license agreements with its customers. Defendants also contest the validity of plaintiff's copyrights.

Infringement first. I find as a matter of fact that defendants copy to RAM the entire Maintenance Code when they use their LEM or ELEM mechanisms for the express purpose of circumventing plaintiff's GetKey and resetting the Maintenance Level. Such copying infringes plaintiff's copyrights, *MAI Systems Corp. v. Peak Computer, Inc.* 991 F.2d 511, 519 (9th Cir.1993), cert. dismissed, 510 U.S. 1033, 114 S.Ct. 671, 126 L.Ed.2d 640 (1994) , and, contrary to their assertions, defendants are not saved by 17 U.S.C. § 117. [FN3] That section was passed in 1998 as part of the Digital Millennium Copyright Act to protect computer technicians who risked violating copyright law just by turning on the machines they were to service. Thus, the statute provides that it is not an infringement for the owner or lessee of a machine to authorize the making of a copy of a computer program if the program is copied solely by turning on the machine for the purpose only of maintenance and repair and 1) the copy "is used in no other manner and is destroyed immediately after the maintenance and repair is completed," and 2) any part of the computer program that is not necessary for the machine to be activated is not accessed or used. 17 U.S.C. § 117(c). Defendants copy the Code by turning on the machine; however, they do so not just for repair, but also for the express purpose of circumventing plaintiff's security measures, modifying the Maintenance Level, and intercepting plaintiff's Event Messages. Neither the statutory language nor its legislative history is expansive enough to safeguard such use of plaintiff's program. Defendants also fail to destroy the copies they make immediately after completion of repairs. I credit the testimony of plaintiff's expert, Christian B. Hicks, that the copy remains in RAM on an ongoing basis as the system operates with the LEM or ELEM attached.

> FN3. The claim of infringement by copying Event Messages presents more difficult questions that I need not reach, as plaintiff has proven infringement of its copyrights by other means.

Defendants' contention that plaintiff's licenses to its customers authorize their conduct is unavailing as the licenses simply and explicitly do not encompass the Maintenance Code. That fact further undercuts defendants' § 117 argument in that the owners and licensees who have no rights in the Maintenance Code cannot, in any event, authorize its use by defendants.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

As for the validity of plaintiff's copyrights, the record shows that plaintiff did erroneously label a derivative work of the 9330 Code as an original version. But the record also shows that it followed the Copyright Office's correction procedures to correct the error, and no evidence has been submitted to show that plaintiff's conduct was knowing, that it harmed defendants or was in any way fraudulent. I am persuaded that all versions of the 9330 Code that had substantial application are registered, and no significant errors were in those applications. The copyrights in suit are valid.

The Digital Millennium Copyright Act provides in 17 U.S.C. § 1201(a) that "[n]o person shall circumvent a technological measure that effectively controls access to a work protected under this title." Plaintiff charges defendants with violating this provision. To sustain its claim, plaintiff has to establish 1) an access control measure that effectively controls access to their work and 2) circumvention of such access control mechanism. *Id.* The GetKey is unquestionably a qualifying access control measure. It is designed to prevent precisely what defendants achieved, the modification of the Maintenance Level and consequent ability to access the Event Messages. Nor is there any question that defendants bypass the GetKey with their LEM and ELEM devices and that they thereby violate the statute. Defendants' reliance on § 1201(f) is misplaced as that provision only exempts circumvention if it does not constitute infringement, an exemption not applicable in this case.

Plaintiff's final claim is that defendants, by intercepting the Event Messages, misappropriated its trade secret. To make that claim under the Massachusetts statute, plaintiff must show that 1) the Event Messages are trade secrets, 2) it took reasonable steps to protect them, and 3) defendants used improper means to acquire them. *Data General Corp. v. Grumman Systems Support Corp.,* 36 F.3d 1147, 1165 (1st Cir.1994). A trade secret includes "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.,* 357 Mass. 728, 260 N.E.2d 723, 729 (Mass.1970).

The Event Messages-the means plaintiff devised to enable it to monitor, maintain and repair the data storage systems it sells-clearly fit within the definition of a trade secret. This is so whether the data alone is considered or whether viewed in combination with the manner of its creation, formulation and transmission.

Plaintiff has unquestionably taken reasonable steps to protect the secrecy of the Event Messages. The GetKey process requires anyone seeking access to jump through not one, but several hoops to get there. The evidence further shows that plaintiff requires its employees to sign confidentiality agreements and that it denies its customers any rights to the Maintenance Code and Event Messages. That there may have been some instances when plaintiff inadvertently allowed a former customer continued access after repairs were completed does not defeat its rights, as the protections it devised and sustained are reasonable beyond peradventure. The description given above of defendants' methods to gain access surreptitiously to these trade secrets demonstrates the third element, the theft of plaintiff's trade secret.

Plaintiff has shown that defendants' conduct has caused it irreparable harm. First, infringement of copyright and theft of trade secrets require no further proof of harm because harm is presumed. *Concrete Machinery,* 843 F.2d at 611-12. Second, although I had in earlier stages of these proceedings suggested that money damages were sufficient to make plaintiff whole, the equation has since then changed. The evidence shows that plaintiff's financial losses to date and those projected if the injunction does not issue are far in excess of defendants' ability to pay.

The balance of harm to plaintiff from the denial of the injunction against that to defendant from the grant thereof tilts heavily to plaintiff given its financial losses and damage to its customer relations from defendants' deliberate and calculated misconduct and theft. Lastly, the policy providing for and favoring protection of intellectual property also suggests that the public interest is best served when infringement of rights to and misappropriation of intellectual property are restrained. *Id.* at 612.

Defendants have interposed antitrust defenses that, they argue, bar the issuance of an injunction. They accuse plaintiff of illegal tying arrangements: Maintenance Code to maintenance service contracts. These allegations appear to have even less merit than the antitrust counterclaims rejected by the Court of Appeals in *Data General Corp.,* 36 F.3d at 1178-81. The record is devoid of any evidence that plaintiff offers to sell to its customers its Maintenance Code if only they will also enter into service contracts. The

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

evidence is all the other way. Plaintiff does not sell its Maintenance Code separately. Nor does the evidence in the record support defendants' contention that plaintiff has monopoly power in the markets for storage systems and their maintenance. Finally, defendants cannot avoid an injunction against their illegal conduct by alleging violations of antitrust law on plaintiff's part. *Id.* at 1170 n. 43.

The motion for a preliminary injunction is allowed.

### *PRELIMINARY INJUNCTION ORDER*

Based on the Memorandum of Decision dated July 2, 2004,

IT IS HEREBY ORDERED that:

I. The defendant, Custom Hardware Engineering & Consulting, Inc. ("CHE"), a corporation, and each and all of its shareholders, officers, agents, representatives, past and present employees, attorneys, successors and assigns, and any and all persons in active concert or participation with CHE including defendant David York, or with any of these described persons, who have received actual notice of this consent decree by personal service or otherwise, are hereby restrained and enjoined from circumventing Storage Technology Corporation ("StorageTek")'s GetKey process; and copying in whole or in part StorageTek's Code in order to gain access to any portion of StorageTek's Maintenance Code, where Maintenance Code is defined as any

portion of the code whose only purpose is to support maintenance functionality above Maintenance Level zero. Furthermore, CHE and all other persons described in this paragraph, are restrained and enjoined from using or executing any of the operations that are activated when the Maintenance Level is set at any level above zero. Specifically, defendant CHE and all other persons described in this paragraph shall not do any of the following acts:

A. Powering on the Management Unit and/or the Control Unit or the Storage Module if one of the purposes of powering on the unit is to reset the Maintenance Level.

B. Using any hardware or software, including without limitation the "LEM" or "ELEM," by any process or method, to communicate with and/or inform the Control Unit that it should return Event Messages about the inner workings of the Storage Module or the Control Unit to the Management Unit.

C. Deceiving the Control Unit into acting as though the Maintenance Level is set to other than Zero.

D. Circumventing the "GetKey" protections by any means-including calculation of registration numbers using StorageTek equipment serial numbers and "checksum"-to access Maintenance Levels other than zero.

E. Causing the Control Unit and/or Management Unit to internally copy, transfer, store and/or display Event Messages, dump diagnostic information, or fault symptom code information.

F. Copying any of the Maintenance Code that is contained in the copyright registrations listed below:

| TX Number | Title of Work |
|---|---|
| TXu 591-072 | 4430 LMU Functional and Diagnostic Microcode Release Level 3.6.51, 4411 LCU Functional and Diagnostic Microcode Release Level 3.6.50, and 9311 LCU Functional and Diagnostic Microcode Release Level 2.0.10 |
| TXu 591-075 | 4430 LMU Functional and Diagnostic Microcode Release Level 3.2 |
| TXu 591-073 | 4430 LMU Functional and Diagnostic Microcode Release Level 3.4, 4411 LCU Functional and Diagnostic Microcode Release Level 1.05 |
| TX5 654-520 | 4430 Source Code Version 4.0.07 |
| *TX5 654-523* | *4430 Source Code Version 4.0.07* |

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1497688, 2004 Copr.L.Dec. P 28,820
(Cite as: Not Reported in F.Supp.2d)

*TX5 654-519*
TX5 788-632
*TX5 654-518*

TX5-654-522
TX5-545-368

*TX5-654-521*
TX5-814-538
TX5-704-840
TX5-704-841
TX5-656-769
TX5-656-765
TX5-656-767
TX5-656-770
TX5-656-766
TX5-656-771
TX5-656-768
TX5-814-537
TX5-814-536

*4430 Source Code Version 4.4.00*
4430 Object Code Version 1.0.E
*9330 LMU Hardware Microcode 1.0.15*
*9330 LMU Hardware Microcode 1.1.20*
*9330 LMU Hardware Microcode 1.6.11*
9330 LMU Hardware Microcode 1.7.03
9330 Library Management Unit
Hardware Microcode
*9330 LMU Hardware Microcode 2.0.20*
9330 LMU Hardware Microcode 1.2.02
9311 LCU Source Code Version 2.1.09
9311 LCU Source Code Version 3.0.11
9311 LCU Source Code Version 3.2.03
9311 LCU Source Code Version 3.5.17
9311 LCU Source Code Version 3.6.08
9311 LCU Source Code Version 3.7.02
9311 LCU Source Code Version 3.8.04
9311 LCU Source Code Version 4.1.02
9311 LCU Source Code Version 4.2.01
9311 LCU Source Code Version 2.2.01
9311 LCU Source Code Version 3.9.05

G. Using Maintenance Code at any level above zero in performing services for any customer including, without limitation, customers who have a contract with StorageTek that states that StorageTek is the owner of the Maintenance Code.

H. Causing Maintenance Code to activate within the Control Unit such that the Control Unit sends Event Messages along the LAN wire toward the Management Unit.

I. Capturing the Event Messages sent by the Control Unit and intended for the Management Unit in a StorageTek Silo System, i.e., diverting the Event Messages to any device other than the Management Unit and preventing the Event Messages from reaching the Management Unit.

J. Monitoring the Event Messages, sent by the Control Unit and intended for the Management Unit in a StorageTek Silo System, i.e., observing the Event Messages during transmission, without preventing them from reaching the Management Unit.

K. Copying the Event Messages, sent by the Control Unit and intended for the Management Unit in a StorageTek Silo System.

L. Translating the numeric Event Messages sent by the Control Unit into human-readable text.

M. Causing the generation of and/or copying, transferring, storing and/or displaying the system failure dump logs.

N. Activating, deriving benefit from, using, copying, or creating any aspect of a program from the run-time diagnostics contained within the Control Unit or Management Unit codes.

O. Displaying StorageTek Event Messages or any translation of those messages on any CHE user interface.

P. Accessing, using and/or copying any portion of the Event Messages.

Q. Creating a program based, in whole or in part, upon copying StorageTek's Maintenance Code, or any excerpt or portion thereof that is necessary to a function of the Maintenance Code including, but not limited to, the Event Messages.

R. Circumventing StorageTek's GetKey in order to access Maintenance Code, including accessing Event Messages, dump diagnostic information, fault symptom code information and/or in order to run protected diagnostic tests.

II. Within fifteen (15) days after the date of entry of this Preliminary Injunction, CHE shall do the following:

A. Provide a copy of Section V of this Preliminary Injunction, by personal service or by registered mail, to each and all of its officers, agents, representatives, past and present employees, attorneys, successors, assigns, and any and all persons in active concert of participation with them, or any of them;

B. Provide counsel for Storage Technology Corporation, Inc., Charles W. Steese, Steese & Evans, P.C., 6400 S. Fiddlers Green Circle, Suite 1820,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 7
Not Reported in F.Supp.2d, 2004 WL 1497688, 2004 Copr.L.Dec. P 28,820
(Cite as: Not Reported in F.Supp.2d)

Denver, Colorado, 80111, with an affidavit stating the fact and manner of compliance with paragraph A above and identifying the names, addresses, and positions of all persons notified under paragraph A above.

III. If CHE violates this Preliminary Injunction and is found in civil or criminal contempt thereof, CHE shall, in addition to other remedies, reimburse StorageTek for its reasonable attorney fees and costs relating to such contempt proceedings.

IV. Within fifteen (15) days of the date of entry of this Preliminary Injunction, CHE shall notify, by letter, all of its customers for which CHE maintains StorageTek equipment that, pursuant to an order of this Court, CHE cannot continue to perform its contracts to maintain StorageTek Silo Systems using the LEM, ELEM, or any other technology that requires the Maintenance Level to be set at anything other than zero, or that manipulates the Silo System to act as though the Maintenance Level is set at anything other than zero, or that in any way intercepts transmission of Event Messages, or any excerpt of the Maintenance Code, within the StorageTek Silo Systems.

V. Within thirty (30) days of the date of entry of this Preliminary Injunction, CHE shall provide to the above-named counsel for StorageTek, an affidavit stating the fact and means of its compliance with paragraph IV. The affidavit shall identify the names, addresses, and positions of all persons notified pursuant to paragraph IV, and shall include a copy of each letter sent pursuant to paragraph IV.

VI. CHE shall immediately cease and discontinue representing to customers or potential customers that it is capable of lawfully performing maintenance services on StorageTek Silo Systems using its LEM, ELEM, or any other technology that requires the Maintenance Level to be set at other than zero, or manipulates the Silo System to act as though the Maintenance Level is set at other than zero, or that in any way intercepts transmission of Event Messages, or any other excerpt of Maintenance Code, within the StorageTek Silo Systems.

VII. Within fifteen (15) days of date of entry of this Preliminary Injunction, CHE shall impound all copies of the Maintenance Code or excerpts thereof, LEM code, ELEM code, and any and all LEM or ELEM hardware or software, and hold them pending further order of the Court.

VIII. Within thirty (30) days of the date of entry of this Preliminary Injunction, CHE shall provide to the above-named counsel for StorageTek, an affidavit stating the fact and means of its compliance with paragraph VII.

IX. Within fifteen (15) days of date of entry of this Preliminary Injunction, CHE shall notify, by letter, and provide a copy of Section V of this Preliminary Injunction by personal service, or by registered mail, to any persons to whom CHE has provided the LEM, ELEM, or any aspect of them, whether in the United States or elsewhere, that pursuant to an order of this Court, they are permanently enjoined from doing any and all of the acts described in this Order.

X. Within thirty (30) days of date of entry of this Preliminary Injunction, CHE shall provide to the above-named counsel for StorageTek, an affidavit stating the fact and means of its compliance with paragraph IX and identifying each person to whom CHE has provided the LEM, ELEM, or any aspect of them, including such person's last known address.

XI. This Court retains jurisdiction over this action and parties hereto for the purposes of enforcing and modifying this Preliminary Injunction and granting such additional relief as the Court may find appropriate.

D.Mass.,2004.
Storage Technology Corp. v. Custom Hardware Engineering & Consulting, Inc.
Not Reported in F.Supp.2d, 2004 WL 1497688, 2004 Copr.L.Dec. P 28,820

Briefs and Other Related Documents (Back to top)

• 1:02CV12102 (Docket) (Oct. 29, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                          SUPERIOR COURT
                                      CIVIL ACTION NO.        -BLS

```
_____
                               )
ECHOMAIL, INC.,                )
                               )
            Plaintiff,         )
                               )
v.                             )
                               )
AMERICAN EXPRESS CO.           )
and IBM CORP.,                 )
                               )
            Defendants.        )
_____)
```

## AFFIDAVIT OF V.A. SHIVA AYYADURAI

I, V.A. Shiva Ayyadurai, under oath hereby depose and state as follows:

1.   I am the founder, Chairman, and CEO of EchoMail, Inc., of Cambridge, Massachusetts.  I have personal knowledge of the facts set forth in this affidavit and I verified the facts set forth in the Verified Complaint in this matter.  I make this affidavit to bring before the Court certain true and accurate copies of relevant documents.

2.   In my capacity as Chairman and CEO of EchoMail, I am responsible for the overall direction, strategies, and business of EchoMail.  I also closely monitor all of EchoMail's dealings with its customers, particularly major customers.  American Express Company ("AmEx") was for many years the company's single largest customer.  Therefore, I have had direct, first-hand

knowledge of the company's dealings and relationship with American Express.

3.   On February 3, 2004, AmEx notified EchoMail that EchoMail won the RFI and we would proceed with an amendment to the Master Agreement for the period 2005-2007.  The contract itself is attached to the Verified Complaint as Exhibits A and B.

4.   Attached as Exhibit 1 to this affidavit are emails or correspondence indicating AmEx's satisfaction with EchoMail's work for and with AmEx.

5.   EchoMail has always maintained, and currently maintains, strict control over the use and dissemination of its proprietary technology.  EchoMail has spent thousands of hours and hundreds of thousands of dollars on developing its proprietary technology.  Attached as Exhibit 2 is a copy of EchoMail's proprietary information policy, which is applicable to all EchoMail employees.  We require all EchoMail employees to sign agreements whereby they promise not to engage in unauthorized use or dissemination of information concerning Echomail's proprietary technology.

6.   EchoMail has always required its customers to maintain the confidentiality of EchoMail's confidential or proprietary information.  AmEx is subject to such restrictions contained in

the confidentiality provision of the contract (Verified
Complaint, Exhibit A, p. 7). In addition, attached as Exhibit 3
are copies of non-disclosure and confidentiality agreements
applicable to AmEx's vendors working with EchoMail's technology.

7. Before the architecture review meeting with personnel
from American Express on May 4-5, 2005, EchoMail required that
American Express provide EchoMail, in advance, with a list of
all attendees at this telephone conference call. American
Express provided such a list. The list is attached to this
affidavit as Exhibit 4. The list does not identify anyone from
IBM as participating in the review. If the list of attendees
had identified someone from IBM as participating on the call, we
would have required IBM to sign a non-disclosure or
confidentiality agreement with EchoMail before its employee
could participate in the call, or, if IBM were unwilling to do
this, we would have told the personnel from IBM that they could
not participate in the call. Under its agreement with EchoMail,
American Express was not permitted to allow employees of third
parties to have access to EchoMail's proprietary technology.

8. In the May 4-5 architecture review, American Express
asked for, and we revealed, our most prized technology,
including our computer code, to the group on the call. When we
did so, we assumed the accuracy of the list of attendees and we

- 3 -

had no knowledge, and no reason to know, that a person from IBM was on the telephone conference call.

9.     IBM has made many approaches to EchoMail over the past 9 years.  For example, IBM approached EchoMail and indicated that it wanted to become a partner of EchoMail and be a "reseller" of Echomail's system.  We declined to enter into such a relationship because it would mean revealing our code to IBM. One of the reasons I did not want to enter into a relationship with IBM is that I believed that they were already working with Kana, Inc., one of EchoMail's direct competitors.

10.    Based on the above approaches, it became clear to us that IBM wanted to learn our proprietary technology, which would enable IBM to compete against EchoMail.  Therefore, we would not have conducted the architecture review if we had known that an IBM employee was on the call.  Furthermore, if AmEx had told us in advance that an IBM employee would be on the call, we would have questioned AmEx's stated purpose in conducting the architecture review.

11.    As a result of IBM's surreptitious participation in the telephone conference call, IBM and AmEx now know EchoMail's proprietary and confidential technology, including its "code," concerning its web-based, on demand electronic communication management process.  Armed with this information they have the

- 4 -

knowledge and ability to copy our product and compete with us in the marketplace.

12.    I believe that AmEx and IBM are engaged in plans to compete with EchoMail. The basis for my belief is the history of EchoMail's relationship with AmEx and IBM, the way in which AmEx surreptitiously included IBM in the architecture review, AmEx's sudden termination of EchoMail's contract with AmEx shortly after the call, and AmEx and IBM's cooperation in developing and making business practices software and applications.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 20th DAY OF JUNE 2005.

V. A. Shiva Ayyadurai

- 5 -

1



**"Paul Murphy"**
**<paul.murphy@aexp**
**.com>**

03/12/04 10:11 AM

To: sonu@echomail.com
cc: Michael.Clarage@echomail.com
Subject: Re: Call


Sonu,

I would be happy to speak with Suzanne Shwetz from NPR.  I'm always glad to put
in a good word for Echomail.

My schedule for Monday and Tuesday is in flux right now.  I will let you know
later today or Monday morning when I can be available.

In the meantime, please feel free to give my number to Suzanne.  That way I can
coordinate the meeting with her directly.


Thanks,
Paul
212.640.1423


                        sonu@echomail.com
                                                To:      Paul
Murphy/AMER/TRS/AEXP@AMEX
                           03/12/04 09:58 AM    cc:
Michael.Clarage@echomail.com
                                                Subject:  Call



Paul,
Hope all is well.  I would like to ask a few minutes of your time to speak
with Suzanne Shwetz of National Public Radio (NPR).  NPR is ready to sign
an agreement with us and would like to speak with an EchoMail partner that
has been using tool well for few years.  Kindly spare a few minutes to give
your favorable comments to Suzanne.  Please let Michael and me know what
date and time is convenient for you - any time today or next week.  If you
give us the best phone number to reach you, we can have Suzanne call you.

Sonu Mathew Abraham
EchoMail, Inc.
701 Concord Avenue
New Media Park
Cambridge, MA 02138
P: 617-354-8585, x 247
F: 617-354-8899
Sonu@EchoMail.Com

American Express made the following
annotations on 03/12/2004 08:12:04 AM
--------------------------------------------------------------------------
**************************************************************************

"This message and any attachments are solely for the intended recipient
and may contain confidential or privileged information. If you are not the
intended recipient, any disclosure, copying, use, or distribution of the
information included in this message and any attachments is prohibited.  If
you have received this communication in error, please notify us by reply
e-mail and immediately and permanently delete this message and any
attachments.  Thank you."

**************************************************************************



"Paula Harvey"          To: sonu@echomail.com
<paula.harvey@aexp     cc:
.com>                  Subject: Re: Chinese Character Issue

03/01/04 09:23 AM


Sonu, thank you and your team for getting this resolved.  I appreciate the
focus that you put on it.
Regards,
Paula


From:  sonu@echomail.com on 03/01/2004 09:27 AM

To:    Paula Harvey@AMEX
cc:
Subject:   Chinese Character Issue


Good Morning Paula,

As Angela might have informed you, Raja worked with the team under Hari's
guidance to resolve this issue by Saturday night.  I am glad to note that
Thillai also confirmed that the issue is resolved after testing with Hari
and Raja.  If there is anything else, please do not hesitate to contact me.

Regards,
- Sonu

Sonu Mathew Abraham
EchoMail, Inc.
701 Concord Avenue
New Media Park
Cambridge, MA 02138
P: 617-354-8585, x 247
F: 617-354-8899
Sonu@EchoMail.Com




American Express made the following
 annotations on 03/01/2004 07:23:27 AM
-----------------------------------------------------------------------------
*****************************************************************************

     "This message and any attachments are solely for the intended recipient
and may contain confidential or privileged information. If you are not the
intended recipient, any disclosure, copying, use, or distribution of the
information included in this message and any attachments is prohibited.  If
you have received this communication in error, please notify us by reply

e-mail and immediately and permanently delete this message and any
attachments.   Thank you."

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*



**"Brett M Vankoski"**
<brett.m.vankoski@
aexp.com>

11/20/03 02:50 PM

To: sonu@echomail.com, michael.clarage@echomail.com
cc:
Subject: Amex has received Echomail's RFI submission

Michael, Sonu,

I want to thank you both for working very hard over the past couple of weeks to
complete the server migration and to submit this RFI. From our standpoint, the
server migration was a success. Echomail performed with near flawless
precision
over the past weekend. Some complications did arise, however we recognize these
were the result of problems at American Express.

Next steps for the RFI are as follows:

1. Over the next two-three weeks, we will be evaluating and scoring the 5
vendor submissions.
2. We may contact the vendors periodically to seek clarification or additional
comments regarding their submission. We may also ask to set up a conference
call or short presentation.
3. During the week of December 15th the results of the RFI will be
communicated
to all vendors.

As always, you are free to call me for a status or just to chat.

Brett


American Express made the following
 annotations on 11/20/2003 12:54:15 PM
------------------------------------------------------------------------------
******************************************************************************

    "This message and any attachments are solely for the intended recipient
and may contain confidential or privileged information. If you are not the
intended recipient, any disclosure, copying, use, or distribution of the
information included in this message and any attachments is prohibited.  If
you have received this communication in error, please notify us by reply
e-mail and immediately and permanently delete this message and any
attachments.  Thank you."

******************************************************************************


================================================================================



**"Paula Harvey"**
**<paula.harvey@aexp**
**.com>**

10/02/03 04:25 PM

To: michael.clarage@echomail.com, sonu@echomail.com
cc: v.a.shiva@echomail.com, "Janice M Chai-Chang"
<janice.m.chai-chang@aexp.com>, "Paul Murphy"
<paul.murphy@aexp.com>
Subject: Thank you

This has been a tough couple of days dealing with the Private Bank problems. I
wanted to take the time to say thank you for the support you've provided. I
know you've worked nights and put in an extra effort in trying to get things
resolved. Your cooperation and extra effort are really appreciated.

I look forward to taking a look at the whole picture when we visit with you in
a couple of weeks. Thanks again.

Regards,
Paula


American Express made the following
 annotations on 10/02/2003 01:25:09 PM
------------------------------------------------------------------------------
******************************************************************************

    "This message and any attachments are solely for the intended recipient
and may contain confidential or privileged information. If you are not the
intended recipient, any disclosure, copying, use, or distribution of the
information included in this message and any attachments is prohibited.  If
you have received this communication in error, please notify us by reply
e-mail and immediately and permanently delete this message and any
attachments.  Thank you."

******************************************************************************


===============================================================================



| | "Travis Rako" <travis.rako@aexp.co m> 05/05/05 10:00 AM | To | Zoe@EchoMail.com |
| | | cc | "Colleen J Dechon" <colleen.j.dechon@aexp.com>, "Donald H Giesen" <donald.n.giesen@aexp.com>, "Rupesh K Nellore" <rupesh.k.nellore@aexp.com> |
| | | Subject | NewCo |

Zoe,

I want to thank you for all your effort on NewCo. I am extremly pleased with the work done so far and I can assure you we are getting 100% from EchoMail. Relative to our other evendors I feel like the service, committment and work done thus far is ahead of the pack, which further solidifies our determination to continue our wonderful and productive relationship with EchoMail.

The next steps to our work lie mainly with NewCo to determine het will be shared with AMEX. I hope to have a decision on that or direction for our Monday call.

Travis Rako
Travel, Sales Services
American Madaddad
*** *** *** *** *** *** ***
travis.rako@aexp.com

---

"Travis Rako" <travis.rako@aexp.com>

04/04/2005 03:32 PM

To: zoe@Echomail.com

cc:

bcc:

Subject: EchoMail and NewCo (American Express Financial Services)

Zoe,

It was nice talking to you today. For those of us in Retirement Services, EchoMail has been a godsend for us by providing the automated response capabilities that now attributes to our 50 - 70% auto-response rate. We could not be happier with the product.





"Paul Murphy"
<paul.murphy@aexp
.com>

03/12/04 10:11 AM

To: sonu@echomail.com
cc: Michael.Clarage@echomail.com
Subject: Re: Call

Sonu,

I would be happy to speak with Suzanne Shwetz from NPR.  I'm always glad to put
in a good word for Echomail.

My schedule for Monday and Tuesday is in flux right now.  I will let you know
later today or Monday morning when I can be available.

In the meantime, please feel free to give my number to Suzanne.  That way I can
coordinate the meeting with her directly.

Thanks,
Paul
212.640.1423


                        sonu@echomail.com
                                                    To:        Paul
Murphy/AMER/TRS/AEXP@AMEX
                        03/12/04 09:58 AM           cc:
Michael.Clarage@echomail.com
                                                    Subject:   Call



Paul,
Hope all is well.  I would like to ask a few minutes of your time to speak
with Suzanne Shwetz of National Public Radio (NPR).  NPR is ready to sign
an agreement with us and would like to speak with an EchoMail partner that
has been using tool well for few years.  Kindly spare a few minutes to give
your favorable comments to Suzanne.  Please let Michael and me know what
date and time is convenient for you - any time today or next week.  If you
give us the best phone number to reach you, we can have Suzanne call you.

Sonu Mathew Abraham
EchoMail, Inc.
701 Concord Avenue
New Media Park
Cambridge, MA 02138
P: 617-354-8585, x 247
F: 617-354-8899
Sonu@EchoMail.Com

American Express made the following
 annotations on 03/12/2004 08:12:04 AM
--------------------------------------------------------------------------------
********************************************************************************

     "This message and any attachments are solely for the intended recipient
and may contain confidential or privileged information. If you are not the
intended recipient, any disclosure, copying, use, or distribution of the
information included in this message and any attachments is prohibited.  If
you have received this communication in error, please notify us by reply
e-mail and immediately and permanently delete this message and any
attachments.  Thank you."

********************************************************************************

================================================================================



"Paula Harvey"
<paula.harvey@aexp
.com>

03/01/04 09:23 AM

To: sonu@echomail.com
cc:
Subject: Re: Chinese Character Issue

Sonu, thank you and your team for getting this resolved.  I appreciate the
focus that you put on it.
Regards,
Paula


From:  sonu@echomail.com on 03/01/2004 09:27 AM

To:      Paula Harvey@AMEX
cc:
Subject:    Chinese Character Issue


Good Morning Paula,

As Angela might have informed you, Raja worked with the team under Hari's
guidance to resolve this issue by Saturday night.  I am glad to note that
Thillai also confirmed that the issue is resolved after testing with Hari
and Raja.  If there is anything else, please do not hesitate to contact me.

Regards,
- Sonu

Sonu Mathew Abraham
EchoMail, Inc.
701 Concord Avenue
New Media Park
Cambridge, MA 02138
P: 617-354-8585, x 247
F: 617-354-8899
Sonu@EchoMail.Com




American Express made the following
 annotations on 03/01/2004 07:23:27 AM
--------------------------------------------------------------------------
**************************************************************************

      "This message and any attachments are solely for the intended recipient
and may contain confidential or privileged information. If you are not the
intended recipient, any disclosure, copying, use, or distribution of the
information included in this message and any attachments is prohibited.  If
you have received this communication in error, please notify us by reply

e-mail and immediately and permanently delete this message and any
attachments.   Thank you."

****************************************************************************

================================================================================



**"Brett M Vankoski"**
**<brett.m.vankoski@**
**aexp.com>**

11/20/03 02:50 PM

To: sonu@echomail.com, michael.clarage@echomail.com
cc:
Subject: Amex has received Echomail's RFI submission

Michael, Sonu,

I want to thank you both for working very hard over the past couple of weeks to
complete the server migration and to submit this RFI. From our standpoint, the
server migration was a success. Echomail performed with near flawless precision
over the past weekend. Some complications did arise, however we recognize these
were the result of problems at American Express.

Next steps for the RFI are as follows:

1. Over the next two-three weeks, we will be evaluating and scoring the 5
vendor submissions.
2. We may contact the vendors periodically to seek clarification or additional
comments regarding their submission. We may also ask to set up a conference
call or short presentation.
3. During the week of December 15th the results of the RFI will be communicated
to all vendors.

As always, you are free to call me for a status or just to chat.

Brett


American Express made the following
annotations on 11/20/2003 12:54:15 PM
--------------------------------------------------------------------------------
********************************************************************************

     "This message and any attachments are solely for the intended recipient
and may contain confidential or privileged information. If you are not the
intended recipient, any disclosure, copying, use, or distribution of the
information included in this message and any attachments is prohibited.  If
you have received this communication in error, please notify us by reply
e-mail and immediately and permanently delete this message and any
attachments.  Thank you."

********************************************************************************


================================================================================



**"Paula Harvey"**
**<paula.harvey@aexp**
**.com>**

10/02/03 04:25 PM

To: michael.darage@echomail.com, sonu@echomail.com
cc: v.a.shiva@echomail.com, "Janice M Chai-Chang"
    <janice.m.chai-chang@aexp.com>, "Paul Murphy"
    <paul.murphy@aexp.com>
Subject: Thank you

This has been a tough couple of days dealing with the Private Bank problems.
I
wanted to take the time to say thank you for the support you've provided.  I
know you've worked nights and put in an extra effort in trying to get things
resolved.  Your cooperation and extra effort are really appreciated.

I look forward to taking a look at the whole picture when we visit with you in
a couple of weeks.  Thanks again.

Regards,
Paula


American Express made the following
 annotations on 10/02/2003 01:25:09 PM
------------------------------------------------------------------------------
******************************************************************************

     "This message and any attachments are solely for the intended recipient
and may contain confidential or privileged information. If you are not the
intended recipient, any disclosure, copying, use, or distribution of the
information included in this message and any attachments is prohibited.  If
you have received this communication in error, please notify us by reply
e-mail and immediately and permanently delete this message and any
attachments.  Thank you."

******************************************************************************



"Travis Rako"
<travis.rako@aexp.co m>
05/05/05 12:00 AM

To: Zoe@EchoMail.com

cc: "Colleen J Dechon" <colleen.j.dechon@aexp.com>, "Donald H Giesen" <donald.m.giesen@aexp.com>, "Rupesh K Nellore" <rupesh.k.nellore@aexp.com>

Subject: NewCo

Zoe,

I want to thank you for all your effort on NewCo. I am extremely pleased with the work done so far and I can assure you we are getting 100% from EchoMail. Relative to our other vendors I feel like the service, commitment and work done thus far is ahead of the pack, which further solidifies our determination to continue our wonderful and productive relationship with EchoMail.

The next steps to our work lie mainly with NewCo to determine hat will be shared with AMEX. I hope to have a decision on that or direction for our Monday call.

Travis Rako
Travel Sales Service
New Co Marketing
vox (212) 705-5012 fax 6284
travis.rako@aexp.com

---

"Travis Rako" <travis.rako@aexp.com>

04/04/2005 03:32 PM

To: zoe@Echomail.com

cc:

bcc:

Subject: EchoMail and NewCo (American Express Financial Services)

Zoe,

It was nice talking to you today. For those of us in Retirement Services, EchoMail has been a godsend for us by providing the automated response capabilities that now attributes to our 50 - 70% auto-response rate. We could not be happier with the product.



# EXHIBIT A
## PROPRIETARY INFORMATION AND INVENTIONS AGREEMENT

Effective as of _____, the following confirms an agreement between EchoMail, Inc., a Delaware corporation (the **Company**), and the individual identified on the signature page to this Agreement, which is a material part of the consideration for my employment by the Company.

1. **No Conflicts.** I have not made and agree not to make any agreement, oral or written, that is in conflict with this Agreement or my employment with the Company. I will not violate any agreement with or the rights of any third party. When acting within the scope of my employment (or otherwise on behalf of the Company), I will not use or disclose my own or any third party's confidential information or intellectual property, except as expressly authorized by the Company in writing. Further, I have not retained anything containing any confidential information of a prior employer or other third party, whether or not created by me.

2. **Inventions.**

   a. **Definitions.**

   **Assigned Invention** means any invention that is made, conceived or reduced to practice, in whole or in part, by me during the term of my employment with the Company and which arises out of research or other activity conducted by, for or under the direction of the Company (whether or not conducted at the Company's facilities, during working hours or using Company assets), or which relates directly or indirectly to any product, service, invention or Intellectual Property Right that is sold, leased, used or under consideration or development by the Company (collectively, **Company Interests**). The term Assigned Invention shall not include any invention that (i) I develop entirely on my own time, (ii) without use of any Company assets and (iii) which does not relate to any Company Interest.

   **Intellectual Property Rights** means any and all patent rights, copyright rights, mask work rights, trade secret rights, sui generis database rights and all other intellectual and industrial property rights of any sort throughout the world (including any application therefor).

   **Invention** means any idea, discovery,

invention, development, technology, work of authorship, trade secret, software, firmware, tool, process, technique, know-how, data, plan, device, apparatus, specification, design, circuit, layout, mask work, algorithm, program, code, documentation or other material or information, tangible or intangible, whether or not it may be patented, copyrighted or otherwise protected (including all versions, modifications, enhancements and derivative works thereof).

   b. **Assignment.** To the fullest extent allowed by applicable law, the Company shall own all right, title and interest in and to all Assigned Inventions (including all Intellectual Property Rights therein or related thereto). I will promptly disclose and provide all Assigned Inventions to the Company. I hereby make and agree to make all assignments to the Company necessary to accomplish the foregoing ownership.

   c. **Assurances.** I will further assist the Company, at its expense, to further evidence, record and perfect such assignments, and to perfect, obtain, maintain, enforce, and defend any rights specified to be so owned or assigned. I hereby irrevocably designate and appoint the Company as my agent and attorney-in-fact to act for and in my behalf to execute and file any document and to do all other lawfully permitted acts to further the purposes of the foregoing with the same legal force and effect as if executed by me.

   d. **Other Inventions.** If I wish to clarify that something created by me prior to my employment that relates to the Company's actual or proposed business is not within the scope of this Agreement, I have listed it on Appendix A. If (i) I use or disclose my own or any third party's confidential information or intellectual property when acting within the scope of my employment (or otherwise on behalf of the Company), or (ii) any Assigned Invention cannot be fully made, used,

EchoMail Proprietary and Confidential. Page 1

reproduced or otherwise exploited without using or violating the foregoing, I hereby grant and agree to grant to the Company a perpetual, irrevocable, worldwide royalty-free, non-exclusive, sublicensable right and license to exploit and exercise all such confidential information and Intellectual Property Rights therein.

e. **Moral Rights.** To the extent allowed by applicable law, the terms of this Section 2 include all rights of paternity, integrity, disclosure and withdrawal and any other rights that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, **Moral Rights**). To the extent I retain any such Moral Rights under applicable law, I hereby ratify and consent to any action that may be taken with respect to such Moral Rights by or authorized by the Company and agree not to assert any Moral Rights with respect thereto. I will confirm any such ratification, consent or agreement from time to time as requested by the Company.

3. **Proprietary Information.** I agree that all Assigned Inventions and all other business, technical and financial information, including the identity of and information relating to the Company's employees, Affiliates and Business Partners (as such terms are defined below), which I develop, learn or obtain during my employment that relate to the Company or the business or demonstrably anticipated business of the Company, or that are received by or for the Company in confidence, constitute **Proprietary Information.** I will hold in confidence and not disclose or, except within the scope of my employment, use any Proprietary Information. Proprietary Information will not include information that I can document is or becomes readily publicly available without restriction through no fault of mine. Upon termination of my employment, I will promptly return to the Company all items containing or embodying Proprietary Information (including all copies), except that I may keep my personal copies of (a) my compensation records, (b) materials distributed to shareholders generally and (c) this Agreement. I also recognize and agree that I have no expectation of privacy with respect to the Company's networks, telecommunications systems or information processing systems (including, without limitation, stored computer files, electronic mail messages and voice messages), and that my activity and any files or messages on or using any of those systems may be monitored at any time without notice.

4. **Restricted Activities.** For the purposes of this Section 4, the term Company includes the Company and all other persons or entities that control, are controlled by or are under common control with the Company (**Affiliates**).

a. **Definitions.**

**Any Capacity** means to (i) be an owner, partner, shareholder, director, consultant, agent, employee or co-venturer, (ii) invest, engage or participate in, or (iii) prepare to be or do any of the foregoing or to assist any third party to do so; _provided,_ that the term Any Capacity will not include being a holder of less than one percent (1%) of the outstanding equity of a public company.

**Business Partner** means any past, present or prospective customer, vendor, supplier, distributor or other business partner of the Company during my employment.

**Cause** means to recruit, employ, retain or otherwise solicit, induce or influence (or to attempt to do so).

**Competing Business** means any commercial activity which competes or is reasonably likely to compete with any business that the Company conducts, or demonstrably anticipates conducting, at any time during my employment.

**Restricted Period** means a period of two years immediately following the termination of my employment.

**Solicit** means to (i) service, take orders from or solicit the business or patronage of any Business Partner for myself or any other person or entity, (ii) divert, entice or otherwise take away from the Company the business or patronage of any Business Partner, or to attempt to do so, or (iii) to solicit, induce or encourage any Business Partner to terminate or reduce its relationship with the Company.

b. **As an Employee.** During my employment with the Company, I will not directly or indirectly: (i) Cause any person to

leave their employment with the Company (other than terminating subordinate employees in the course of my duties for the Company); (ii) Solicit any Business Partner; or (iii) act in Any Capacity in or with respect to any Competing Business.

c. **After Termination.** During the Restricted Period, I will not directly or indirectly: (i) Cause any person to leave their employment with the Company; (ii) Solicit any Business Partner; or (iii) act in Any Capacity in or with respect to any Competing Business located within the Commonwealth of Massachusetts, the rest of the region known as New England, the rest of the United States, or anywhere else in the world.

d. **Enforcement.** I understand that the restrictions set forth in Section 4 are intended to protect the Company's interest in its Proprietary Information and established relationships and goodwill with employees and Business Partners, and I agree that such restrictions are reasonable and appropriate for this purpose. If at any time any of the provisions of this Section 4 are deemed invalid or unenforceable or are prohibited by the laws of the state or place where they are to be performed or enforced, by reason of being vague or unreasonable as to duration or geographic scope or scope of activities restricted, or for any other reason, such provisions shall be considered divisible and shall become and be immediately amended to include only such restrictions and to such extent as shall be deemed to be reasonable and enforceable by the court or other body having jurisdiction over this Agreement. The Company and I agree that the provisions of this Section 4, as so amended, shall be valid and binding as though any invalid or unenforceable provision had not been included.

5. **Employment at Will.** I agree that this Agreement is not an employment contract for any particular term. I have the right to resign and the Company has the right to terminate my employment at will, at any time, for any or no reason, with or without cause. This Agreement does not purport to set forth all of the terms and conditions of my employment, and, as an employee of the Company, I have obligations to the Company which are not

described in this Agreement. However, the terms of this Agreement govern over any inconsistent terms and can only be changed by a subsequent written agreement signed by the President of the Company.

6. **Survival.** I agree that my obligations under Sections 2, 3 and 4 of this Agreement shall continue in effect after termination of my employment, regardless of the reason, and whether such termination is voluntary or involuntary on my part, and that the Company is entitled to communicate my obligations under this Agreement to any of my potential or future employers. My obligations under Sections 2, 3 and 4 also shall be binding upon my heirs, executors, assigns, and administrators and shall inure to the benefit of the Company, its subsidiaries, successors and assigns. This Agreement may be freely assigned by the Company to any third party.

7. **Governing Law; Remedies.** Any dispute in the meaning, effect or validity of this Agreement shall be resolved in accordance with the laws of the Commonwealth of Massachusetts without regard to the conflict of laws provisions thereof. I further agree that if one or more provisions of this Agreement are held to be illegal or unenforceable under applicable law, such illegal or unenforceable portion shall be limited or excluded from this Agreement to the minimum extent required so that this Agreement shall otherwise remain in full force and effect and enforceable. I also understand that any breach or threatened breach of this Agreement will cause irreparable harm to the Company for which damages would not be a adequate remedy, and, therefore, the Company will be entitled to injunctive relief with respect thereto (without the necessity of posting any bond) in addition to any other remedies.

EchoMall Proprietary and Confidential. Page 3

I HAVE READ THIS AGREEMENT CAREFULLY AND I UNDERSTAND AND ACCEPT THE OBLIGATIONS WHICH IT IMPOSES UPON ME WITHOUT RESERVATION. NO PROMISES OR REPRESENTATIONS HAVE BEEN MADE TO ME TO INDUCE ME TO SIGN THIS AGREEMENT. I SIGN THIS AGREEMENT VOLUNTARILY AND FREELY, IN DUPLICATE, WITH THE UNDERSTANDING THAT ONE COUNTERPART WILL BE RETAINED BY THE COMPANY AND THE OTHER COUNTERPART WILL BE RETAINED BY ME.

ECHOMAIL, INC.                                    EMPLOYEE

By:_____                     _____
    Name:                                                        Signature
    Title:                                        Name:

EchoMail Proprietary and Confidential.  Page 4

**Appendix A**

**PRIOR MATTERS**

EchoMail Proprietary and Confidential. Page 5

EMPLOYMENT AGREEMENT ("Agreement") made **Month day, year,** between EchoMail, Inc., having an address at 66 Church Street, Cambridge, Massachusetts 02138 (the "Company") and **full name** having an address **full address** ("Employee").

WITNESSETH THAT:

WHEREAS, the Company is engaged _inter alia_ in the development and sales of products, core technologies, strategies and solutions specifically for unified intelligent messaging and the application of such products, core technologies, strategies and solutions to automate or optimize the process of inbound and outbound digital relationship marketing, customer service, call center, help desk response and routing systems using the mediums of electronic mail, voice mail, pager, facsimile and other mediums, and

WHEREAS, the Company desires to employ the Employee as **title** to perform and maintain client installations (collectively, the "Duties"), and

WHEREAS, the Employee desires such engagement with the Company,

NOW, THEREFORE, in consideration of the mutual promises herein contained, the parties hereto agree as follows:

1.    Employment.  Subject to the provisions hereof, the Company hereby engages Employee to perform the Duties and as set forth in 2 below and Employee hereby accepts such engagement for a one year (unless sooner terminated) period ("Term") commencing upon the date hereof. The Term shall automatically be extended for 3 successive one year periods unless at least one month prior to the expiration of the Term, as it may be extended, either party gives notice of nonextension.

2.    Scope.  In to the Duties, Employee shall perform such services as may be designated by the Company's directors or by V. A. Shiva Ayyadurai, president of the Company.

3.    Inventions and Work.  Employee shall promptly and fully disclose to the Company any and all formulae, inventions, discoveries, developments, concepts and ideas ("Inventions," any one of such, an "Invention"), whether or not patentable and whether or not conceived, developed or reduced to practice by the Employee alone or by Employee and others during Employee's employment with the Company, whether before, during or after the Term and relating in any way to the

1

Company's business. At the Company's request, Employee shall execute assignments of Employee's full right, title and interest in any Invention to the Company (any such Inventions are deemed hereby Company property at all times). Employee shall execute any and all applications for domestic and foreign patents and shall do any and all other acts deemed necessary by the Company to be necessary for it to enjoy fully the benefits of any Invention. Any work ("Work") prepared for the Company in connection with the Duties shall be "work made for hire" owned by the Company. If any Work is determined not to be a "work made for hire" or such doctrine is not effective, Employee hereby irrevocably assigns, conveys and otherwise transfers to the Company, and its respective successors, licensees, and assigns, free and clear of all encumbrances, all right, title and interest, worldwide in and to the Work and all proprietary rights therein, including, without limitation, all copyrights, trademarks, design patents, trade secret rights, and all contract and licensing rights, and all claims and causes of action with respect to any of the foregoing, whether now known or hereafter to become known. The Employee agrees that all memoranda, notes, records, charts, formulae, reports, letters and other documents (including those related to Inventions) made, compiled, received, held or used by the Employee while employed by the Company (whether or not developed by the Employee) regarding any phase of the Company's business shall be the Company's property and shall be delivered by the Employee to the Company at the termination of the Employee's employment or at any time and from time to time upon request of the Company.

     4.    Confidentiality. Any confidential or proprietary knowledge or information pertaining to the business of the Company which is obtained by Employee during the Employee's engagement by the Company will be held in Employee's strictest confidence and Employee will not, during the course of Employee's service hereunder or at any time thereafter, except as necessary in the normal course of Employee's duties hereunder, disclose the same to any person or use the same in any manner whatsoever, without the prior consent of the Company.

     5.    Non Competition. During the Term, Employee will devote full time and best efforts to the business and affairs of the Company, to the exclusion of all other activities and during such period will take no action prejudicial to the financial condition, business affairs or prospects of the Company or its customers. Employee will not (i) during the Term hereof and (ii) for a period of two (2) years thereafter, compete directly or indirectly with the Company. The phrase "compete directly or indirectly with" shall be deemed to include, without limiting the generality of the same, engaging or being interested, directly or indirectly, as an owner, employee, director, partner, consultant, through stock ownership (except less than 5% of the stock of a publicly traded company), investment of

2

capital, lending of money or property, rendering of services, or otherwise, either alone or in association with others, in the ownership, operation, management or supervision of any other business enterprise in any way similar or competitive with the Company and, shall also be deemed to include engaging in any activity which is intended to attract or induce any person who is then an employee or Employee of the Company to leave such employ.

6.    Compensation.  Employee shall receive a salary of **annual salary in words and figures** per year, subject to deduction or withholding required by applicable law and to any other requirements of applicable law.

    (b).    In addition to Salary, Employee shall be entitled to a **commission of $$$.**

    (c)    The Company shall provide for Employee with the Company's standard health and dental program and, if the Employee elects to use the same, Employee shall pay 50% of the cost of premiums thereof.

    (d)    The Employee shall have the right to participate in the 401k plan, in accordance with the terms thereof.

    (e)    Employee may receive reimbursement for educational courses during the first year of the term hereof.  The Company will advance moneys for such courses and, if Employee remains in the employ of the Company for at least one year after the date hereof, the Employee need not reimburse the Company for payment for such courses.  In the event that the Employee terminates his employment prior to the first anniversary hereof, the Employee shall reimburse the Company for the cost of such education.

    (f)    The awarding of **#### options** to purchase common stock of EchoMail, Inc. upon approval of the Plan Administration Committee of EchoMail's Board of Directors.  The option exercise price will be **$$$$.**  By Agreement, one fourth of the options shall vest on the first anniversary from the date employment begins.  The second, third and last fourths shall vest on the second, third and fourth anniversaries, respectively, of the employment date.  This award is subject to all the terms and conditions of the Stock Option Agreement.  Receipt of this award is subject to our obtaining the Committee's approval.

    7.  Termination.    The employment of the Employee is at will and either party may terminate employment hereunder and this agreement (except as provided in Section 8) upon 14 days' notice.

3

8.  Remedies.  The agreements of Employee in Sections 3, 4 and 5 are special, unique and of an extraordinary character and the obligations of Employee shall therefore be enforceable both at law and in equity, by injunction and otherwise; and the remedies hereunder with respect thereto shall be cumulative and not alternative and shall not be exhausted by any one or more uses thereof. The agreements in Sections 3, 4 and 5 shall survive the termination of this Agreement for a period of 20 years.

9.  Conflicting Agreements. Employee represents that Employee's performance of all of the terms of this Agreement, and performance of the Duties and other terms of this Agreement, does not and will not breach any agreement to keep in confidence proprietary information acquired by the Employee in confidence or in trust prior to employment by the Company. Employee has not entered into and shall not enter into any agreement in conflict herewith.

10.  Notices.  Any notice, including but not limited to a consent or request, permitted or required hereunder shall be deemed to have been duly given if hand delivered or posted by certified mail, postage prepaid, to the parties at their addresses set forth in the introductory paragraph, or to such other address as either party may advise by notice under this section. Such notice shall be effective upon delivery if hand delivered or, if posted, upon the date stamped thereon by a postage meter (if deposited in the mails on such date) or the United States Postal Service.

11.  Assignment.   This agreements of Employee herein are personal in nature and those obligations may not be assigned without the prior consent of the Company.

12.  Separability.  If any general term or condition of this Agreement shall be invalid or unenforceable to any extent or in any application, then the remainder of this Agreement and such term or condition, except to such extent or application shall not be affected thereby, and each and every term and condition of this Agreement shall be valid and enforced to the fullest extent and in the broadest application permitted by law.

13.  Entire Agreement. This Agreement, as amended from time to time, sets forth the full and complete understanding of the parties with respect to the subject matter hereof, and may be amended only by a writing between the parties.

14.  Governing Law; Jurisdiction and Venue. This Agreement shall be governed by and construed in accordance with the laws of The Commonwealth of Massachusetts as such laws are applied to agreements

4

between residents of Massachusetts, entered into and performed entirely in Massachusetts. Any proceeding to enforce this Agreement may be brought in any appropriate state or federal court in The Commonwealth of Massachusetts. Each party hereto, hereby irrevocably waives any present and future objection to any such jurisdiction and venue and irrevocably consents and submits to the nonexclusive jurisdiction for itself and in respect of any of its property in any such court. Judgment in any such action shall be conclusive and may be enforced in any other jurisdiction by suit on the judgment, a certified or exemplified copy of which shall be conclusive evidence of the fact and/or of the amount of the obligation.

ECHOMAIL, INC.

by_____
V. A. Shiva Ayyadurai,
President

_____
**full name**

# EXHIBIT A
## PROPRIETARY INFORMATION AND INVENTIONS AGREEMENT

Effective as of _____, the following confirms an agreement between EchoMail, Inc., a Delaware corporation (the **Company**), and the individual identified on the signature page to this Agreement, which is a material part of the consideration for my employment by the Company.

1. **No Conflicts.** I have not made and agree not to make any agreement, oral or written, that is in conflict with this Agreement or my employment with the Company. I will not violate any agreement with or the rights of any third party. When acting within the scope of my employment (or otherwise on behalf of the Company), I will not use or disclose my own or any third party's confidential information or intellectual property, except as expressly authorized by the Company in writing. Further, I have not retained anything containing any confidential information of a prior employer or other third party, whether or not created by me.

2. **Inventions.**

   a. **Definitions.**

   *Assigned Invention* means any Invention that is made, conceived or reduced to practice, in whole or in part, by me during the term of my employment with the Company and which arises out of research or other activity conducted by, for or under the direction of the Company (whether or not conducted at the Company's facilities, during working hours or using Company assets), or which relates directly or indirectly to any product, service, Invention or Intellectual Property Right that is sold, leased, used or under consideration or development by the Company (collectively, **Company Interests**). The term Assigned Invention shall not include any Invention that (i) I develop entirely on my own time, (ii) without use of any Company assets and (iii) which does not relate to any Company Interest.

   *Intellectual Property Rights* means any and all patent rights, copyright rights, mask work rights, trade secret rights, *sui generis* database rights and all other intellectual and industrial property rights of any sort throughout the world (including any application therefor).

   *Invention* means any idea, discovery,

invention, development, technology, work of authorship, trade secret, software, firmware, tool, process, technique, know-how, data, plan, device, apparatus, specification, design, circuit, layout, mask work, algorithm, program, code, documentation or other material or information, tangible or intangible, whether or not it may be patented, copyrighted or otherwise protected (including all versions, modifications, enhancements and derivative works thereof).

   b. **Assignment.** To the fullest extent allowed by applicable law, the Company shall own all right, title and interest in and to all Assigned Inventions (including all Intellectual Property Rights therein or related thereto). I will promptly disclose and provide all Assigned Inventions to the Company. I hereby make and agree to make all assignments to the Company necessary to accomplish the foregoing ownership.

   c. **Assurances.** I will further assist the Company, at its expense, to further evidence, record and perfect such assignments, and to perfect, obtain, maintain, enforce, and defend any rights specified to be so owned or assigned. I hereby irrevocably designate and appoint the Company as my agent and attorney-in-fact to act for and in my behalf to execute and file any document and to do all other lawfully permitted acts to further the purposes of the foregoing with the same legal force and effect as if executed by me.

   d. **Other Inventions.** If I wish to clarify that something created by me prior to my employment that relates to the Company's actual or proposed business is not within the scope of this Agreement, I have listed it on Appendix A. If (i) I use or disclose my own or any third party's confidential information or intellectual property when acting within the scope of my employment (or otherwise on behalf of the Company), or (ii) any Assigned Invention cannot be fully made, used,

reproduced or otherwise exploited without using or violating the foregoing, I hereby grant and agree to grant to the Company a perpetual, irrevocable, worldwide royalty-free, non-exclusive, sublicensable right and license to exploit and exercise all such confidential information and Intellectual Property Rights therein.

e. **Moral Rights.** To the extent allowed by applicable law, the terms of this Section 2 include all rights of paternity, integrity, disclosure and withdrawal and any other rights that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, *Moral Rights*). To the extent I retain any such Moral Rights under applicable law, I hereby ratify and consent to any action that may be taken with respect to such Moral Rights by or authorized by the Company and agree not to assert any Moral Rights with respect thereto. I will confirm any such ratification, consent or agreement from time to time as requested by the Company.

3. **Proprietary Information.** I agree that all Assigned Inventions and all other business, technical and financial information, including the identity of and information relating to the Company's employees, Affiliates and Business Partners (as such terms are defined below), which I develop, learn or obtain during my employment that relate to the Company or the business or demonstrably anticipated business of the Company, or that are received by or for the Company in confidence, constitute *Proprietary Information*. I will hold in confidence and not disclose or, except within the scope of my employment, use any Proprietary Information. Proprietary Information will not include information that I can document is or becomes readily publicly available without restriction through no fault of mine. Upon termination of my employment, I will promptly return to the Company all items containing or embodying Proprietary Information (including all copies), except that I may keep my personal copies of (a) my compensation records, (b) materials distributed to shareholders generally and (c) this Agreement. I also recognize and agree that I have no expectation of privacy with respect to the Company's networks, telecommunications systems or information processing systems (including, without

limitation, stored computer files, electronic mail messages and voice messages), and that my activity and any files or messages on or using any of those systems may be monitored at any time without notice.

4. **Restricted Activities.** For the purposes of this Section 4, the term Company includes the Company and all other persons or entities that control, are controlled by or are under common control with the Company (*Affiliates*).

a. **Definitions.**

*Any Capacity* means to (i) be an owner, partner, shareholder, director, consultant, agent, employee or co-venturer, (ii) invest, engage or participate in, or (iii) prepare to be or do any of the foregoing or to assist any third party to do so; provided, that the term Any Capacity will not include being a holder of less than one percent (1%) of the outstanding equity of a public company.

*Business Partner* means any past, present or prospective customer, vendor, supplier, distributor or other business partner of the Company during my employment.

*Cause* means to recruit, employ, retain or otherwise solicit, induce or influence (or to attempt to do so).

*Competing Business* means any commercial activity which competes or is reasonably likely to compete with any business that the Company conducts, or demonstrably anticipates conducting, at any time during my employment.

*Restricted Period* means a period of two years immediately following the termination of my employment.

*Solicit* means to (i) service, take orders from or solicit the business or patronage of any Business Partner for myself or any other person or entity, (ii) divert, entice or otherwise take away from the Company the business or patronage of any Business Partner, or to attempt to do so, or (iii) to solicit, induce or encourage any Business Partner to terminate or reduce its relationship with the Company.

b. **As an Employee.** During my employment with the Company, I will not directly or indirectly: (i) Cause any person to

EchoMail Proprietary and Confidential. Page 2

leave their employment with the Company (other than terminating subordinate employees in the course of my duties for the Company); (ii) Solicit any Business Partner; or (iii) act in Any Capacity in or with respect to any Competing Business.

   c.   **After Termination.** During the Restricted Period, I will not directly or indirectly: (i) Cause any person to leave their employment with the Company; (ii) Solicit any Business Partner; or (iii) act in Any Capacity in or with respect to any Competing Business located within the Commonwealth of Massachusetts, the rest of the region known as New England, the rest of the United States, or anywhere else in the world.

   d.   **Enforcement.** I understand that the restrictions set forth in Section 4 are intended to protect the Company's interest in its Proprietary Information and established relationships and goodwill with employees and Business Partners, and I agree that such restrictions are reasonable and appropriate for this purpose. If at any time any of the provisions of this Section 4 are deemed invalid or unenforceable or are prohibited by the laws of the state or place where they are to be performed or enforced, by reason of being vague or unreasonable as to duration or geographic scope or scope of activities restricted, or for any other reason, such provisions shall be considered divisible and shall become and be immediately amended to include only such restrictions and to such extent as shall be deemed to be reasonable and enforceable by the court or other body having jurisdiction over this Agreement. The Company and I agree that the provisions of this Section 4, as so amended, shall be valid and binding as though any invalid or unenforceable provision had not been included.

5.   **Employment at Will.** I agree that this Agreement is not an employment contract for any particular term. I have the right to resign and the Company has the right to terminate my employment at will, at any time, for any or no reason, with or without cause. This Agreement does not purport to set forth all of the terms and conditions of my employment, and, as an employee of the Company, I have obligations to the Company which are not

described in this Agreement. However, the terms of this Agreement govern over any inconsistent terms and can only be changed by a subsequent written agreement signed by the President of the Company.

6.   **Survival.** I agree that my obligations under Sections 2, 3 and 4 of this Agreement shall continue in effect after termination of my employment, regardless of the reason, and whether such termination is voluntary or involuntary on my part, and that the Company is entitled to communicate my obligations under this Agreement to any of my potential or future employers. My obligations under Sections 2, 3 and 4 also shall be binding upon my heirs, executors, assigns, and administrators and shall inure to the benefit of the Company, its subsidiaries, successors and assigns. This Agreement may be freely assigned by the Company to any third party.

7.   **Governing Law; Remedies.** Any dispute in the meaning, effect or validity of this Agreement shall be resolved in accordance with the laws of the Commonwealth of Massachusetts without regard to the conflict of laws provisions thereof. I further agree that if one or more provisions of this Agreement are held to be illegal or unenforceable under applicable law, such illegal or unenforceable portion shall be limited or excluded from this Agreement to the minimum extent required so that this Agreement shall otherwise remain in full force and effect and enforceable. I also understand that any breach or threatened breach of this Agreement will cause irreparable harm to the Company for which damages would not be a adequate remedy, and, therefore, the Company will be entitled to injunctive relief with respect thereto (without the necessity of posting any bond) in addition to any other remedies.

EchoMail Proprietary and Confidential.   Page 3

I HAVE READ THIS AGREEMENT CAREFULLY AND I UNDERSTAND AND ACCEPT THE OBLIGATIONS WHICH IT IMPOSES UPON ME WITHOUT RESERVATION. NO PROMISES OR REPRESENTATIONS HAVE BEEN MADE TO ME TO INDUCE ME TO SIGN THIS AGREEMENT. I SIGN THIS AGREEMENT VOLUNTARILY AND FREELY, IN DUPLICATE, WITH THE UNDERSTANDING THAT ONE COUNTERPART WILL BE RETAINED BY THE COMPANY AND THE OTHER COUNTERPART WILL BE RETAINED BY ME.

ECHOMAIL, INC.                          EMPLOYEE


By:_____          _____
   Name:                                        Signature
   Title:                              Name:

# Appendix A

## PRIOR MATTERS

EMPLOYMENT AGREEMENT ("Agreement") made **Month day, year,** between EchoMail, Inc., having an address at 66 Church Street, Cambridge, Massachusetts 02138 (the "Company") and **full name** having an address **full address** ("Employee").

### WITNESSETH THAT:

WHEREAS, the Company is engaged *inter alia* in the development and sales of products, core technologies, strategies and solutions specifically for unified intelligent messaging and the application of such products, core technologies, strategies and solutions to automate or optimize the process of inbound and outbound digital relationship marketing, customer service, call center, help desk response and routing systems using the mediums of electronic mail, voice mail, pager, facsimile and other mediums, and

WHEREAS, the Company desires to employ the Employee as **title** to perform and maintain client installations (collectively, the "Duties"), and

WHEREAS, the Employee desires such engagement with the Company,

NOW, THEREFORE, in consideration of the mutual promises herein contained, the parties hereto agree as follows:

1.    Employment.  Subject to the provisions hereof, the Company hereby engages Employee to perform the Duties and as set forth in 2 below and Employee hereby accepts such engagement for a one year (unless sooner terminated) period ("Term") commencing upon the date hereof. The Term shall automatically be extended for 3 successive one year periods unless at least one month prior to the expiration of the Term, as it may be extended, either party gives notice of nonextension.

2.    Scope.  In to the Duties, Employee shall perform such services as may be designated by the Company's directors or by V. A. Shiva Ayyadurai, president of the Company.

3.    Inventions and Work.  Employee shall promptly and fully disclose to the Company any and all formulae, inventions, discoveries, developments, concepts and ideas ("Inventions," any one of such, an "Invention"), whether or not patentable and whether or not conceived, developed or reduced to practice by the Employee alone or by Employee and others during Employee's employment with the Company, whether before, during or after the Term and relating in any way to the

1

Company's business. At the Company's request, Employee shall execute assignments of Employee's full right, title and interest in any Invention to the Company (any such Inventions are deemed hereby Company property at all times). Employee shall execute any and all applications for domestic and foreign patents and shall do any and all other acts deemed necessary by the Company to be necessary for it to enjoy fully the benefits of any Invention. Any work ("Work") prepared for the Company in connection with the Duties shall be "work made for hire" owned by the Company. If any Work is determined not to be a "work made for hire" or such doctrine is not effective, Employee hereby irrevocably assigns, conveys and otherwise transfers to the Company, and its respective successors, licensees, and assigns, free and clear of all encumbrances, all right, title and interest, worldwide in and to the Work and all proprietary rights therein, including, without limitation, all copyrights, trademarks, design patents, trade secret rights, and all contract and licensing rights, and all claims and causes of action with respect to any of the foregoing, whether now known or hereafter to become known. The Employee agrees that all memoranda, notes, records, charts, formulae, reports, letters and other documents (including those related to Inventions) made, compiled, received, held or used by the Employee while employed by the Company (whether or not developed by the Employee) regarding any phase of the Company's business shall be the Company's property and shall be delivered by the Employee to the Company at the termination of the Employee's employment or at any time and from time to time upon request of the Company.

4.    Confidentiality. Any confidential or proprietary knowledge or information pertaining to the business of the Company which is obtained by Employee during the Employee's engagement by the Company will be held in Employee's strictest confidence and Employee will not, during the course of Employee's service hereunder or at any time thereafter, except as necessary in the normal course of Employee's duties hereunder, disclose the same to any person or use the same in any manner whatsoever, without the prior consent of the Company.

5.    Non Competition. During the Term, Employee will devote full time and best efforts to the business and affairs of the Company, to the exclusion of all other activities and during such period will take no action prejudicial to the financial condition, business affairs or prospects of the Company or its customers. Employee will not (i) during the Term hereof and (ii) for a period of two (2) years thereafter, compete directly or indirectly with the Company. The phrase "compete directly or indirectly with" shall be deemed to include, without limiting the generality of the same, engaging or being interested, directly or indirectly, as an owner, employee, director, partner, consultant, through stock ownership (except less than 5% of the stock of a publicly traded company), investment of

2

capital, lending of money or property, rendering of services, or otherwise, either alone or in association with others, in the ownership, operation, management or supervision of any other business enterprise in any way similar or competitive with the Company and, shall also be deemed to include engaging in any activity which is intended to attract or induce any person who is then an employee or Employee of the Company to leave such employ.

6.    Compensation.    Employee shall receive a salary of **annual salary in words and figures** per year, subject to deduction or withholding required by applicable law and to any other requirements of applicable law.

(b).    In addition to Salary, Employee shall be entitled to a **commission of $$$**.

(c)    The Company shall provide for Employee with the Company's standard health and dental program and, if the Employee elects to use the same, Employee shall pay 50% of the cost of premiums thereof.

(d)    The Employee shall have the right to participate in the 401k plan, in accordance with the terms thereof.

(e)    Employee may receive reimbursement for educational courses during the first year of the term hereof. The Company will advance moneys for such courses and, if Employee remains in the employ of the Company for at least one year after the date hereof, the Employee need not reimburse the Company for payment for such courses. In the event that the Employee terminates his employment prior to the first anniversary hereof, the Employee shall reimburse the Company for the cost of such education.

(f)    The awarding of **#### options** to purchase common stock of EchoMail, Inc. upon approval of the Plan Administration Committee of EchoMail's Board of Directors. The option exercise price will be **$$$$**. By Agreement, one fourth of the options shall vest on the first anniversary from the date employment begins. The second, third and last fourths shall vest on the second, third and fourth anniversaries, respectively, of the employment date. This award is subject to all the terms and conditions of the Stock Option Agreement. Receipt of this award is subject to our obtaining the Committee's approval.

7. Termination.    The employment of the Employee is at will and either party may terminate employment hereunder and this agreement (except as provided in Section 8) upon 14 days' notice.

3

8. <u>Remedies.</u> The agreements of Employee in Sections 3, 4 and 5 are special, unique and of an extraordinary character and the obligations of Employee shall therefore be enforceable both at law and in equity, by injunction and otherwise; and the remedies hereunder with respect thereto shall be cumulative and not alternative and shall not be exhausted by any one or more uses thereof. The agreements in Sections 3, 4 and 5 shall survive the termination of this Agreement for a period of 20 years.

9. <u>Conflicting Agreements.</u> Employee represents that Employee's performance of all of the terms of this Agreement, and performance of the Duties and other terms of this Agreement, does not and will not breach any agreement to keep in confidence proprietary information acquired by the Employee in confidence or in trust prior to employment by the Company. Employee has not entered into and shall not enter into any agreement in conflict herewith.

10. <u>Notices.</u> Any notice, including but not limited to a consent or request, permitted or required hereunder shall be deemed to have been duly given if hand delivered or posted by certified mail, postage prepaid, to the parties at their addresses set forth in the introductory paragraph, or to such other address as either party may advise by notice under this section. Such notice shall be effective upon delivery if hand delivered or, if posted, upon the date stamped thereon by a postage meter (if deposited in the mails on such date) or the United States Postal Service.

11. <u>Assignment.</u>   This agreements of Employee herein are personal in nature and those obligations may not be assigned without the prior consent of the Company.

12. <u>Separability.</u> If any general term or condition of this Agreement shall be invalid or unenforceable to any extent or in any application, then the remainder of this Agreement and such term or condition, except to such extent or application shall not be affected thereby, and each and every term and condition of this Agreement shall be valid and enforced to the fullest extent and in the broadest application permitted by law.

13. <u>Entire Agreement.</u> This Agreement, as amended from time to time, sets forth the full and complete understanding of the parties with respect to the subject matter hereof, and may be amended only by a writing between the parties.

14. <u>Governing Law; Jurisdiction and Venue.</u> This Agreement shall be governed by and construed in accordance with the laws of The Commonwealth of Massachusetts as such laws are applied to agreements

4

between residents of Massachusetts, entered into and performed entirely in Massachusetts. Any proceeding to enforce this Agreement may be brought in any appropriate state or federal court in The Commonwealth of Massachusetts. Each party hereto, hereby irrevocably waives any present and future objection to any such jurisdiction and venue and irrevocably consents and submits to the nonexclusive jurisdiction for itself and in respect of any of its property in any such court. Judgment in any such action shall be conclusive and may be enforced in any other jurisdiction by suit on the judgment, a certified or exemplified copy of which shall be conclusive evidence of the fact and/or of the amount of the obligation.

ECHOMAIL, INC.

by_____
V. A. Shiva Ayyadurai,
President

_____

**full name**

5

3

## NON-DISCLOSURE AGREEMENT

This Non-disclosure Agreement ("Agreement") is entered into effective February 28, 2001, by and between TeleTech Holdings, Inc., a Delaware corporation, with offices at 1700 Lincoln Street, 14th Floor, Denver, Colorado 80203 ("TeleTech"), and EchoMail, Inc., a Massachusetts corporation with offices at 66 Church Street, Cambridge, Massachusetts 02138 ("EchoMail") (both of whom variously will be referred to as the "Discloser" and the "Receiver"). For purposes of this Agreement, "Related Parties" shall mean, with respect to a party to this Agreement, its controlling/commonly controlled affiliates, controlled subsidiaries, officers, directors, employees, advisors and formally authorized agents,

WHEREAS, pursuant to that certain Client Services Agreement dated June 11, 1999 between TeleTech Financial Services Management (West Virginia), Inc., a TeleTech Related Party and American Express Company ("American Express") (the "TT-American Express Agreement"), TeleTech provides American Express with certain customer interaction center, agent transaction handling and other related product and services in support of American Express' Membership Banking project (the "Project").

WHEREAS, pursuant to that certain Service Agreement dated August 1999 between EchoMail and American Express (the "EchoMail-American Express Agreement"), EchoMail provides American Express with certain email application and other related products and services in support of the Project;

WHEREAS, in connection with the Project, each party will have access to other party's confidential and/or proprietary information and desire to set forth the terms for the protection thereof.

NOW, THEREFORE, for good and valuable consideration, the sufficiency and receipt of which is hereby acknowledged, both parties agree as follows:

1.     Definitions. As used herein "Information" means information or data existing and/or communicated in any form, including, but not limited to, oral, written, graphic, electronic, or electromagnetic forms, and "Proprietary Information" means that Information for which Discloser, prior to or during the term of this Agreement, develops or acquires any interest, including but not limited to, all know how, and any discoveries, inventions, improvements, and ideas relating to any process, formula, machine, device, plan or design whether patentable or not, or relating to the conduct of business by Discloser or which is clearly marked as confidential or, if disclosed orally, is notified in writing by the Discloser to the Receiver to be confidential within thirty (30) days of the date of disclosure. Proprietary Information shall not, however, include any Information which (i) was publicly known and made generally available in the public domain prior to the time of disclosure by the disclosing party; (ii) becomes publicly known and made generally available after disclosure by the disclosing party to the receiving party through no action or inaction of the receiving party; (iii) is already in the possession of the receiving party at the time of disclosure by the disclosing party as shown by the receiving party's files and records immediately prior to the time of disclosure; (iv) is obtained by the receiving party from a third party without a breach of such third party's obligations of confidentiality; (v) is independently developed by the receiving party without use of or reference to the disclosing

Approved Legal
By _Green_
Date 03·01·01

party's Proprietary Information, as shown by documents and other competent evidence in the receiving party's possession; (vi) is approved in writing for release or disclosure without restriction by Discloser; or (vii) is required by applicable law, regulation or court order to be disclosed by the receiving party, provided that the receiving party gives the disclosing party prompt written notice of such requirement prior to such disclosure and cooperates reasonably with the Discloser's efforts to contest or limit the scope of such order. Disclosures "required by applicable law, regulation or court order" shall include disclosures or filings with regulatory agencies, such as the United States Securities and Exchange Commission, or disclosures or filings required to comply with the rules of a national securities exchange or automated quotations systems such as the National Association of Securities Dealer's Automated Quotations (NASDAQ). TeleTech hereby agrees and acknowledges that all training materials, instruction manuals, computer code, and related materials disclosed to date by EchoMail directly or indirectly (e.g., by American Express) to TeleTech, in support of, or for use in connection with the Project, shall be deemed Proprietary Information.

2.    Time Period for Confidentiality.  The Receiver of Proprietary Information will treat Proprietary Information disclosed by the Discloser as confidential for a period of four (4) years after disclosure and will take at least those measures that it takes to protect its own most highly confidential information and shall maintain in force policies that require its employees and other Related Parties to treat and maintain Discloser's Proprietary Information in a confidential manner.  In addition, to the extent TeleTech provides products or services for the Project in a "shared" as opposed to a "dedicated" customer interaction center and its employees have access to EchoMail Proprietary Information in such shared customer interaction center, then TeleTech agrees to create such security and firewalling mechanisms that are reasonably necessary to protect EchoMail Proprietary Information, including without limitation, the separate staffing of the Project from other projects in such shared center.

3.    Use of Proprietary Information.  Receiver further agrees that: (i) Receiver will only use such Proprietary Information solely in connection with the provision of its products and services for the Project, and will not disclose, distribute, or disseminate Proprietary Information in any way, to anyone except as provided in this Agreement; (ii) only Receiver's Related Parties with a clear and defined need to know shall be granted access to Discloser's Proprietary Information; (iii) Discloser's Proprietary Information shall not be disclosed to any third parties without the prior written approval of Discloser; (iv) upon discovery by the Receiver of any unauthorized use or disclosure, said party shall notify the Discloser and shall endeavor to prevent further unauthorized use or disclosure; (v) permitted disclosures to third parties shall be subject to all of the provisions of this Agreement; (vi) no copies shall be made of Discloser's Proprietary Information (whether oral, written, graphic, electronic, or electromagnetic) without the prior written approval of Discloser; (vii) all approved copies shall bear appropriate legends indicating that such information is Discloser's Proprietary Information; (viii) Receiver will return to Discloser, or at Discloser's request destroy, any and all Proprietary Information immediately upon Discloser's written request, except for one copy which may be retained by the Receiver's legal department for the sole purpose of responding to any claims hereunder, and (ix) Receiver shall not make use of any of the Discloser's Proprietary Information other than for provision of its products and services for the Project.  For purposes of this Agreement, a Receiver shall be deemed to be responsible and accountable for the actions or omission of its Related Parties with respect to the receipt and use of Proprietary Information,

4.    "As Is" Basis for Disclosures.  Until the parties execute a contract or agreement that, in whole or in part, relies on any or all of the Proprietary Information, all Proprietary Information disclosed by Discloser is disclosed on an "AS IS" basis.  Discloser will not be liable for any damages arising out of use of the Proprietary Information by Receiver, and the use of such Information is at Receiver's own risk.

5.    Non-Solicitation.  During the term where both TeleTech and EchoMail are providing products or services for the Project and extending for a period of one (1) year following such term, neither party (nor its Related Parties) shall engage in any activity which is intended to solicit, attract or induce any particular person(s) or group who is then an employee(s) of the other party to leave such employ; provided however, the restriction of this sub-paragraph shall not prevent either party from advertising to the general public for employment position, and from hiring any person who response to such advertising to the general public, whether or not such person is an employee of the other party.

6.    Non-Compete Covenants.

a.    For so long as the EchoMail-American Express Agreement remains in effect for the Project, and for one (1) year thereafter, TeleTech agrees that it and its Related Parties shall not offer or provide (whether under the TeleTech-American Express Agreement or otherwise) any product or service directly or indirectly for use in the Project that competes with products or services then being provided by EchoMail or its Related Parties under the EchoMail-American Express Agreement for use in the Project.

b.    For so long as the TeleTech-American Express Agreement remains in affect for the Project, and for one (1) year thereafter, EchoMail agrees that it and its Related Parties shall not offer or provide (whether under the EchoMail-American Express Agreement or otherwise) any product or service directly or indirectly to American Express for use in the Project that competes with products or services then being provided by TeleTech or its Related Parties under the TeleTech-American Express Agreement for use in the Project.

c.    Each party acknowledges and agrees that the products and services that the other party has provided to American Express to date under the TeleTech-American Express Agreement or the EchoMail-American Express Agreement, as the case may be for use in the Project do not compete with the products or service it has provided under the TeleTech-American Express Agreement or the EchoMail-American Express Agreement, as the case by be.

7.    Rights of the Parties.  Neither this Agreement nor the disclosure of any Proprietary Information grants the Receiver any rights in or licenses to any present or future Proprietary Information or under any present or future patents, copyrights, trademarks, mask works or trade secrets.

8.    Breach.  Each party acknowledges and agrees that a breach of this Agreement by Receiver will cause Discloser irreparable harm, and further acknowledges and agrees that

Discloser is entitled to injunctive relief in any court of competent jurisdiction to prevent breach or to halt a further or continuing breach. Each party also acknowledges and agrees that such remedy is cumulative and in addition to any other remedy Discloser may have at law or in equity.

9.    Binding Obligations. This Agreement and all obligations and rights arising hereunder shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns and its provisions may be modified, amended or waived only by written agreement of the parties.

10.    Counterparts. This Agreement may be executed in two (2) or more counterparts, each of which, when executed, shall be considered an original for all purposes, provided that all counterparts shall, together, constitute one and the same document.

11.    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of West Virginia without regard to its choice of law rules.

Both parties acknowledge that they have read this Agreement, understand it and agree to be bound by its terms and further agree that this Agreement is the complete and exclusive statement of the agreement between the parties with respect to the subject matter hereof, which supersedes all proposals, and all other communications, regardless of the form thereof, between the parties relating to the subject matter of this Agreement.

        IN WITNESS WHEREOF, the undersigned have executed this Agreement as or the day first written above.

TELETECH HOLDINGS, INC.                 ECHOMAIL, INC.

By: _____            By: _____

Name: James B. Kaufman                 Name: _____

Title: Executive V.P. & General Counsel Title: _____

Date: 3/1/07                           Date: _____

**EXHIBIT 13A**

**NON-DISLOSURE AGREEMENT**

**[SEE ATTACHED]**

-63-

FEB-21-01 WED 06:08 PM   AMERICAN EXPRESS GCO        FAX NO. 2126199651        P. 03/12
JUN-16-99 WED 02:59 PM   CRAIG J. MENTO              FAX NO. 303 813 4628       P. 02



**Centurion Bank**
Member FDIC

February 23, 1999

Teletech Customer Care (West Virginia), Inc.
1700 Lincoln Street
Denver, Colorado 80203-4514
Attention:   Joseph D. Livingston
             Executive Vice President
             and Chief Operating Officer

Ladies and Gentlemen:

In connection with the consideration of a possible
transaction (the "Transaction") between Teletech Customer Care
(West Virginia), Inc. ("Teletech") and American Express Centurion
Bank ("AECB"), each party may provide information concerning it or
its subsidiaries or affiliates or licensees to the other party. As
a condition to such information being furnished by one party to
the other party and/or its subsidiaries, affiliates and its
respective directors, officers, employees, agents, advisors
(including, without limitation, attorneys, accountants,
consultants, bankers and financial advisors) and other
representatives (collectively, "Representatives"), each party in
its capacity as a recipient of information (in such capacity, a
"Receiving Party") agrees to treat in accordance with the
provisions of this letter any oral, written, electronic or other
information concerning the other party or its affiliates or
licensees (or their respective businesses) (in such capacity, a
"Disclosing Party") (whether the information is prepared by a
Disclosing Party, any of its direct or indirect subsidiaries or
affiliates (the "Subsidiaries"), its advisors or otherwise, and
irrespective of the form of communication) that has been furnished
to a Receiving Party or to its Representatives by or on behalf of
a Disclosing Party or its Subsidiaries (the "Confidential
Information"). Further, each party, in its capacity as a
Receiving Party, agrees to take or abstain from taking certain
other actions herein set forth.

The term "Confidential Information" shall be deemed to
include, in addition to the information described above, without
limitation, all notes, analyses, compilations, studies,
interpretations or other documents prepared by a Receiving Party
or its Representatives which contain, reflect or are based upon,
in whole or in part, the information furnished to a Receiving
Party or its Representatives by a Disclosing Party pursuant
hereto. The term "Confidential Information" does not include

7135741 v3 1

FEB-21-01 WED 08:09 PM   AMERICAN EXPRESS GCO         FAX NO. 2126198651              P, 04/12

JUN-18-99 WED 02:59 PM   CRAIG J. MENTO               FAX NO. 303 813 4828            P. 03

information which (i) was or becomes generally available to the public other than as a result of a disclosure by a Receiving Party or its Representatives, or (ii) is already in the possession of the Receiving Party, provided that the source of such information was not known to such Receiving Party to be bound by a confidentiality agreement with, or other contractual, legal or fiduciary obligation of confidentiality to, a Disclosing Party or any other party with respect to such information and such Receiving Party had no reasonable basis for concluding that such source may be so bound, or (iii) the Receiving Party obtains on a non-confidential basis from a source other than a Disclosing Party or its Subsidiaries, provided that such source was not known by such Receiving Party to be bound by a confidentiality agreement with or other contractual, legal or fiduciary obligation of confidentiality to such Disclosing Party or any other party with respect to such information and such Receiving Party had no reasonable basis for concluding that such source may be so bound.

Each party hereby agrees that the Confidential Information it receives will be kept confidential and will be used solely for the purpose of evaluating the Transaction (such evaluation being hereafter referred to as the "Evaluation"), and that each party and its Representatives will not disclose any of the Confidential Information in any manner whatsoever; provided, however, that (i) a Receiving Party may make any disclosure of such information to which a Disclosing Party gives its prior written consent and (ii) any of such information may be disclosed to a Receiving Party's Representatives who need to know such information for the purpose of the Evaluation and who have been advised of the confidential nature of such information. Each party further agrees to take such steps to protect and maintain the security and confidentiality of the Confidential Information it receives as it would in the case of its own confidential business information. Each party shall be responsible for any breach of this agreement by its Representatives and each party, at its sole expense, shall take all reasonable measures to restrain its Representatives from prohibited or unauthorized disclosure or use of the Confidential Information.

Without the prior written consent of a Disclosing Party, a Receiving Party will not, and will direct its Representatives not to, disclose to any person (unless such disclosure is legally compelled, subject to the provisions of the following paragraph) either the fact that the Confidential Information has been made available to such Receiving Party or that it is performing the Evaluation or that discussions or negotiations are taking place concerning a possible Transaction or the status of any of the foregoing. Such facts shall be deemed to be included in the Confidential Information provided by each party to the other for all purposes of this Agreement. The term "person" as used in this letter shall be broadly interpreted to include without limitation any corporation, entity, trust, group, company, partnership or individual.

If a Receiving Party or its Representatives are requested or required (by oral questions, interrogatories, requests for information or documents, subpoena, civil investigative demand or similar process or by rule or guideline of the New York Stock Exchange) to disclose any Confidential Information, such Receiving Party will promptly notify a Disclosing Party of such request or requirement so that such Disclosing Party may seek to avoid or minimize the required disclosure and/or to obtain an appropriate protective order or other appropriate relief to ensure that any information so disclosed is maintained in confidence to the maximum extent possible by the agency or other person receiving the disclosure, or, in the discretion of such Disclosing Party, to waive compliance with the provisions of this letter agreement. In any such case, a Receiving Party will use its reasonable efforts, in cooperation with the Disclosing Party or otherwise, to avoid or minimize the required disclosure and/or to obtain such protective order or other relief. If, in the absence of a protective order or the receipt of a waiver hereunder, a Receiving Party or its Representatives are compelled to disclose the Confidential Information or else stand liable for contempt or suffer other sanction, such Receiving Party will disclose only so much of the Confidential Information to the party compelling disclosure as it believes in good faith on the basis of advice of counsel is required by law or by rule or guideline of the New York Stock Exchange or automated quotations systems such as the National Association of Securities Dealer's Automated Quotations. Such Receiving Party shall give the Disclosing Party prior notice of the Confidential Information it believes it is required to disclose.

All documents and other materials in a Receiving Party's possession which embody any of the written Confidential Information will be returned to a Disclosing Party immediately upon the written request of such Disclosing Party, and no copies, extracts or other reproductions shall be retained by a Receiving Party or its Representatives. All documents, memoranda, notes and other writings whatsoever prepared by a Receiving Party or its Representatives based on the Confidential Information, and any and all copies thereof in a Receiving Party's possession, shall be returned to a Disclosing Party upon its written request or, at a Receiving Party's option, destroyed and such destruction shall be certified in writing to a Disclosing Party by an authorized officer supervising such destruction.

Each party acknowledges that no representation or warranty, express or implied, is made as to the accuracy or completeness of any information that is provided hereunder. Each party also agrees that none of the other party, any of such other party's Subsidiaries or any of such other party's Representatives shall have any liability to it, its subsidiaries or its Representatives relating to or resulting from the use of such information by it or its Representatives as permitted hereby. Only those representations or warranties which are made in a final definitive

9120661101                                    3

agreement regarding a Transaction, when, as and if executed, and subject to such limitations and restrictions as may be specified therein, will have any legal effect.  For the purpose of this paragraph, "information" is deemed to include all information furnished by either party to the other whether or not Confidential Information as defined herein.

The parties further acknowledge and agree that they each reserve the right, in their sole and absolute discretion, to reject any or all proposals and to terminate discussions and negotiations with, or directly or indirectly involving, the other party at any time without any liability therefor.  Unless and until a definitive agreement regarding the Transaction has been executed, neither party will be under any legal obligation of any kind with respect to the Transaction by virtue of this letter or any other written or oral expression with respect to such Transaction.

The parties agree that for a period of two (2) years from the date of this letter neither party will knowingly solicit for employment any officer or sales or professional employee of the other party whether directly or through search firms or other agents hired by such party.

No failure or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege hereunder.

All questions and communications regarding the Transaction will be submitted or directed only to the persons who sign this Agreement or such other persons designated by them.  Each party agrees that no other employees of the other party or any Subsidiary shall be contacted directly.  Each party agrees to be solely responsible for the fees and expenses of its Representatives.

The parties agree that money damages would not be a sufficient remedy for any breach of this letter agreement by a Receiving Party or its Representatives, and a Disclosing Party shall be entitled, in addition to money damages, to specific performance and injunctive relief and any other appropriate equitable remedies for any such breach.  Such remedies shall not be deemed to be the exclusive remedies for a breach of this letter agreement by a Receiving Party or its Representatives but shall be in addition to all other remedies available at law or in equity to a Disclosing Party and its Subsidiaries.

This letter agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to agreements made and to be performed within such state.

4

FEB-21-01 WED 08:11 PM   AMERICAN EXPRESS GCO        FAX NO. 2126199851        P. 07/12
     JUN-16-98 WED 03:00 PM   CRAIG J. MENTO              FAX NO. 303 813 4628        P. 06

The confidentiality and non-use obligations of this letter agreement shall continue for a period of three years from the date hereof.

If you are in agreement with the foregoing, please so indicate by signing and returning one copy of this letter, whereupon this letter will constitute our agreement with respect to the subject matter hereof.

Very truly yours,

AMERICAN EXPRESS CENTURION BANK

By: _____
       Frank L. Skillern
       Chief Executive Officer

Accepted and Agreed to:
TELETECH CUSTOMER CARE (WEST VIRGINIA), INC.

By: _____
    Name: Joseph D. Livingston
    Title: Executive Vice President
           and Chief Operating Officer

5

FEB-21-01 WED 08:11 PM    AMERICAN EXPRESS GCO        FAX NO. 2126189651        P. 08/12

EXHIBIT 13B

CONFIDENTIALITY AGREEMENT

[SEE ATACHED]

FEB-21-01 WED 06:11 PM    AMERICAN EXPRESS GCO
MAY-27-99 THU 10:22 AM    CRAIG J. MENTO

FAX NO. 2126189861
FAX NO. 303 613 4628

P. 09/12
P. 02

CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement (the "Agreement") is entered into by and between American Express Travel Related Services Company, Inc. ("Amexco") and ___Tele Tech___ with offices at ___Financial Services (West Virginia),___ ___Inc.___ ___Management___

("Service Organization")

Amexco hereby agrees to supply data (hereinafter referred to as "Files") containing proprietary information of Amexco, and/or its parent company, subsidiaries and affiliates from time to time to the Service Organization subject to the following terms and conditions.

**I.    General Conditions**

1.    Files will remain at all times the sole property of Amexco, and/or its parent company, subsidiaries and affiliates.

2.    The Service Organization acknowledges the importance of maintaining the security and confidentiality of the Files, and agrees to take whatever steps are necessary to prevent the unauthorized transfer, disclosure to, or use of the Files by any person or entity not a party to this Agreement.

3.    Service Organization agrees to ensure that the terms and conditions of this Agreement are adhered to by all of its employees and any third parties listed in Addendum A. At the request of Amexco, the Service Organization will require any third parties listed in Addendum A to sign a copy of this Agreement.

4.    Service Organization may not permanently enhance its own in-house lists or files (hereinafter referred to as "House Files") by using names, addresses, or other information, whether specified or inferred, obtained from the Files.

5.    Service Organization agrees that it will not retain after completion of any job in connection with which Files were provided, all or any portion of the Files, in any manner whatsoever, nor permit any parent, subsidiary, affiliate, third party, agent, employee or contractor, or their respective agents or employees to do so unless prior written permission is obtained from a duly authorized representative of the Data Security Department of Amexco.

6.    Amexco may monitor the Files in any manner to prevent the improper or unauthorized use of the Files and such monitoring may include, but is not limited to, on-site inspection of the entire facility at any time and the use of decoy names and addresses.

7.    Service Organization may not use any method to detect, alter, or eliminate decoy names.

8.    Service Organization may not use the Files for any purpose other than in connection with the particular job for which the Files were supplied.

1

9. To verify security procedures, Amexco reserves the right to visit, unannounced, any of the facilities used by Service Organization. Service Organization shall designate, for all operating shifts, managers on-site at each facility who shall be authorized to admit Amexco personnel to the facility for the purpose of such inspection. Service Organization agrees to comply with all reasonable recommendations from said inspections on a timely basis.

10. Service Organization agrees that it will not assign, transfer (by operation of law or otherwise), or subcontract this Agreement or any of the rights and obligations hereunder to any third party other than those third parties listed in Addendum A.

## H.   Confidentiality

Service Organization understands and agrees that information furnished through the Files shall be considered confidential, shall not be communicated to Service Organization's employees except on a "need to know" basis, shall not be used for any purpose except in connection with the specific job for which it was supplied, and shall not be disclosed for any purpose to third parties by Service Organization, other than those third parties listed in Addendum A.

Service Organization understands that all information contained in the Files must be strictly safeguarded and protected from unauthorized use or dissemination by it, its employees or any of the third parties listed in Addendum A. Accordingly, Service Organization will take all or any actions necessary to safeguard all or any data contained in the Files, and will indemnify Amexco for any loss or misuse of data by its employees or the third parties listed in Addendum A. Service Organization agrees that if there is any disclosure of the information in the Files, by its employees or the employees of any of the third parties listed in Addendum A, it will enforce for Amexco's benefit through litigation, if necessary, all rights provided under law to compensate Amexco for any damages arising out of such disclosure and to protect Amexco from additional disclosure. Service Organization also agrees to pay for all costs reasonably incurred to enforce this Agreement including, but not limited to, all attorney's fees and court costs.

Service Organization further agrees that (i) any printed material containing information from the Files, which is not returned to Amexco, will be shredded or otherwise destroyed in a manner which will prevent reconstruction; (ii) neither external nor internal labels, nor other identifiers for House Files, computer systems, or computer programs, will contain any references, abbreviated or otherwise, to American Express; (iii) all media, other than printed media, on which the Files are contained will be returned to the appropriate Amexco office within 7 business days of receipt.

Upon the completion or termination of a job, with the exception of Files specified as exceptions per the stipulations in condition 5 of this Agreement, Service Organization will immediately eliminate from its House Files all information extracted from the Files. Upon the expiration or termination of this Agreement, Service Organization will immediately eliminate from its possession all information belonging to Amexco. The method of such elimination will be at the discretion of Amexco's Data Security Department.

2

10/96 - Data Security/Vendor

FEB-23-01 WED 06:12 PM    AMERICAN EXPRESS GCO    FAX NO. 2126199851    P. 11/12
· MAY-27-99 THU 10:23 AM    CRAIG J. MENTO    FAX NO. 303 813 4828    P. 04

III.    Governing Law and Interpretation

This Agreement and the rights and obligations of the parties hereto shall be governed by and construed in accordance with the laws of the State of New York. Headings are for reference only and are not intended to affect the meaning of any terms. If any provision of this Agreement is held invalid, illegal or unenforceable, the remaining provisions will remain unimpaired.

IV.    Entire Agreement

No modification, amendment, supplement to or waiver of this Agreement or any of its provisions shall be binding upon the parties hereto unless made in writing and duly signed by both parties. This Agreement shall become effective as of 5-26-99.

ACCEPTED AND AGREED TO:

Signature: _____

Printed Name: STEVEN R. COTHKEN

Title: Senior VP & chief Financial
            Officer

> TO BE COMPLETED BY AMEXCO DATA SECURITY ONLY
>
> AMERICAN EXPRESS TRAVEL
> RELATED SERVICES COMPANY, INC.
>
> Signature: _____
>
> Printed Name: Robert J. Ferrante _____
>
> Title: _____ Senior Director - Worldwide Data Security _____

3

1996 - Data Security/Vendor

P. 04    FAX NO. 2126199851    AMERICAN EXPRESS GCO    MAY-26-99 WED 02:10 PM

FEB-21-01 WED 08:12 PM    AMERICAN EXPRESS GOO         FAX NO. 2126199651              P. 12/12
MAY-27-99 THU 10:23 AM   CRAIG J. MENTO  /            FAX NO. 303 813 4628            P. 05

## ADDENDUM A

(Please provide the name, address, contact, and telephone number for any companies listed.)

4                         1048 - Data Security/Vendor

MAY-26-99 WED 02:11 PM    AMERICAN EXPRESS GOO         FAX NO. 2126199651              P. 05

## MUTUAL NONDISCLOSURE AGREEMENT

AGREEMENT, dated APRIL 22, 2003 ("Agreement"), but effective as of April 28, 2002 (the "Effective Date"), by and between Precision Response Corporation, a Florida corporation ("PRC") with an address at 8151 Peters Road, Suite 4000, Plantation, Florida 33324, and EchoMail, Inc., a Delaware corporation with offices at 701 Concord Avenue, Cambridge, Massachusetts 02138 ("EchoMail").

### Preliminary Statement

PRC, pursuant to that certain Telemarketing Services Agreement dated as of January 1, 1998 between PRC and American Express Travel Related Services Company ("American Express") (the "PRC-American Express Agreement"), provides American Express with certain customer interaction center, agent transaction handling and other related product and services in support of American Express' ISU project (the "Project"). EchoMail, pursuant to that certain Service Agreement dated August 1999 between EchoMail and American Express (the "EchoMail-American Express Agreement"), provides American Express with certain email application and other related products and services in support of the Project. In connection with the Project, each party will have access to certain information which the other party considers confidential and/or proprietary information, including, with regard to EchoMail, trade secrets of EchoMail concerning EchoMail's business, products or services, customers and business and marketing goals, and with regard to PRC, trade secrets, of PRC concerning PRC's business, products or services, customers and business and marketing goals, software programs, methods, processes and techniques designed or developed by PRC relating to the performance of teleservices, direct marketing, placement and related services.

In addition to the Project, the parties are currently considering entering into a business relationship to explore mutual business opportunities. In connection with the evaluation by both parties of whether to enter into such business relationship, and/or to determine more specifically the nature of the business relationship, and/or the terms and conditions governing such business relationship, EchoMail may be disclosing to PRC certain confidential and proprietary information and materials, including trade secrets, of EchoMail concerning EchoMail's business, products or services, customers and business and marketing goals, and PRC may be disclosing to EchoMail certain confidential and proprietary information and materials, including trade secrets, of PRC concerning PRC's business, products or services, customers and business and marketing goals, including software programs, methods, processes and techniques designed or developed by PRC relating to the performance of teleservices, direct marketing, placement and related services for its clients (as the case may be, along with the confidential and/or proprietary information of a party in connection with the Project as described in the preceding paragraph, shall be collectively hereinafter referred to as "Confidential and Proprietary Information and Materials"). For purposes of this Agreement, a party disclosing its Confidential and Proprietary Information and Materials to the other party is sometimes referred to as "Disclosing Party," and the party to whom such information and materials is disclosed is sometimes referred to as "Recipient." The parties desire to make certain agreements concerning the protection of their respective Confidential and Proprietary Information and Materials on the terms set forth below.

NDA - EchoMail final.doc

NOW, THEREFORE, in consideration of the foregoing, the mutual promises and undertakings set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, the parties agree as follows:

1.    Preliminary Statement. The parties acknowledge that the Preliminary Statement is accurate and constitutes a part of this Agreement.

2.    Nondisclosure.

(a)    Except as set forth in subsection (b) and Section 3 below, Recipient shall not disclose to any person or entity any Confidential and Proprietary Information and Materials of Disclosing Party which is disclosed to, or is otherwise obtained by or becomes known to, Recipient. Recipient shall not use any Confidential and Proprietary Information and Materials of Disclosing Party for any purpose other than in connection with the Project or to evaluate whether to enter into a business relationship ("Permitted Uses").

(b)    Recipient may disclose the Confidential and Proprietary Information and Materials of Disclosing Party only to those employees, agents, affiliates, attorneys and advisors of Recipient who need to know such Confidential and Proprietary Information and Materials in order for Recipient to make use effectively of same for the Permitted Uses. Recipient shall be responsible for any unauthorized disclosure or use of Disclosing Party's Confidential and Proprietary Information and Materials by such employees, agents, affiliates, attorneys or advisors unless any such party has executed separately with Disclosing Party a non disclosure agreement, in which case such party shall be responsible.

(c)    Recipient shall protect and maintain the confidentiality of the Confidential and Proprietary Information and Materials of Disclosing Party using at least the same level of care (but no less than reasonable care) that Recipient uses to protect and maintain the confidentiality of its own Confidential and Proprietary Information and Materials.

(d)    As between Recipient and Disclosing Party, solely Disclosing Party owns all copyrights, trademarks, service marks, trade secrets, know-how and other intellectual property rights embodied or contained in, or constituting part of, Disclosing Party's Confidential and Proprietary Information and Materials.

(e)    At the request of Disclosing Party at any time or from time to time, Recipient shall, as promptly as practicable, deliver to Disclosing Party all Confidential and Proprietary Information and Materials of Disclosing Party then in Recipient's possession or under Recipient's control; provided, however, that, in lieu thereof, Recipient may destroy all of Recipient's copies of such Confidential and Proprietary Information and Materials and certify to Disclosing Party in writing that such destruction has been accomplished; provided further, however, in all events Recipient may retain one copy of such Confidential and Proprietary Information and Materials solely for archival purposes and which may be used only to demonstrate what was received from Disclosing Party in connection with any dispute regarding same which may arise.

3.    Exceptions.

NDA - EchoMail final.doc                                                              2

(a)    The obligations of Recipient set forth in Section 2 shall not apply to information and materials that:

(i)    are in the public domain or generally known at the time of disclosure to, or the time obtained by, Recipient, or which, other than by reason of a breach by Recipient hereunder, come into the public domain or become generally known after the time of disclosure to, or the time obtained by, Recipient;

(ii)    Recipient can demonstrate were known to it prior to commencing discussions with Disclosing Party concerning the Services;

(iii)    Recipient can demonstrate were independently developed by Recipient without use of the Confidential and Proprietary Information or prior to commencing discussions with Disclosing Party concerning the possible business transaction; or

(iv)    are disclosed to Recipient by a third party who or which is under no legal or contractual obligation or restriction not to disclose same to Recipient.

(b)    In addition, Recipient may disclose Confidential and Proprietary Information and Materials of Disclosing Party which Recipient is required by law to disclose, but only to those persons to whom disclosure is required by law and only to the extent necessary to comply with law. In any such circumstance, Recipient shall notify Disclosing Party promptly after the legal requirement of disclosure arises and becomes known to Recipient so as to afford Disclosing Party a reasonable period of time (if possible under the circumstances) to seek to obtain an appropriate protective order if one is desired and obtainable.

4.    Term. Recipient's obligations under this Agreement shall remain in effect for a period of two (2) years following the date hereof; however, if the parties enter into a written, fully-executed contract, unless otherwise provided the confidentiality and nondisclosure provisions of such contract shall govern to the extent of any conflict with this Agreement.

5.    No Obligation to Enter into a Contract. Neither party is obligated by this Agreement to enter into any contract or business relationship with the other party, and either party may at any time terminate any discussions or negotiations which may be taking place or which may subsequently occur.

6.    Remedies. In the event of a breach or imminent breach by Recipient of its obligations under this Agreement, Disclosing Party may be entitled (in addition to the recovery of any damages) to obtain from a court of competent jurisdiction injunctive relief.

7.    Attorneys' Fees. If, as a result of a breach hereunder by Recipient, Disclosing Party seeks to enforce or declare its rights and/or remedies hereunder, Disclosing Party shall be entitled to recover from Recipient (in addition to its damages and any other award or relief obtained or obtainable) all of Disclosing Party's reasonable attorneys' fees and costs, incurred before and at trial, at all tribunal levels, and whether or not suit is instituted.

8.    Successors and Assigns. This Agreement shall inure to the benefit of, and be binding upon, the parties and their respective successors and assigns.

NDA - EchoMail final.doc                                                  3

9.    Governing Law.  This Agreement shall be governed by Delaware law and venue for any disputes shall be the courts of competent jurisdiction in Delaware.

10.    Modifications: Prior Agreements; Waivers.  This Agreement contains the entire agreement of the parties concerning the subject matter hereof, and supersedes all prior and contemporaneous understandings and agreements, written or oral, concerning such subject matter.  This Agreement may only be modified by a written instrument signed by both parties. No oral waiver shall be binding.

11.    Execution.  This Agreement may be executed in counterparts, or by the execution of counterpart signature pages which may be attached to one or more counterparts, all of which together shall constitute one original instrument (or counterpart original instruments) binding upon the parties.  Further, any such counterparts or counterpart signature pages may be executed at separate locations, and delivered by facsimile transmission, and such execution and delivery, including facsimile signatures, shall be as binding and effective as original signatures delivered in person, even if original signed counterparts or counterpart signature pages are not subsequently delivered.

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date first above written.

PRC:

PRECISION RESPONSE CORPORATION

By: _____

Print Name: _MIGUEL RAMOS_
Title: _VP, Strategic Planning_

ECHOMAIL:

ECHOMAIL, INC.

By: _____

Print Name: _SONU M. ABRAHAM_
Title: _VICE PRESIDENT - OPERATIONS_
_& FINANCE_

NDA - EchoMail final.doc                                                          4



4



**"Angela M
Ramsammy"
<Angela.M.Ramsam
my@aexp.com>**

04/21/05 09:39 PM

To: Robert.Zierten@EchoMail.com
cc: "Andre G Williams" <andre.g.williams@aexp.com>, Hari@echomail.com,
    "Miguel A Rodriguez" <miguel.a.rodriguez@aexp.com>,
    Sonu@echomail.com
Subject: Re: Follow-up for Arch Review


Hi Rob:

I spoke to Hari about this last week. We will be meeting Wed. 5/4 & Thur.
5/5.
Below is our itinerary:

    Tues. 5/3 - Travel to Boston
    Wed. 5/4 - 8 AM to 6 PM Architecture Review at EchoMail
    Thur. 5/5 - 8 AM to 3 PM Architecture Review ; Travel home in evening.

Attached below is a DRAFT agenda for Wed. & Thur. Please let me know if you
need any changes. Is 8 AM too early to start? We can also plan to work
through lunch if we need to make up any time.

There will be 6 individuals from Amex coming for the review, and one via
phone.
Those attendees are:

    Janice Chai-Chang - VP, eCommunications Suite
    Miguel Rodriguez - Director, eCommunications Suite
    Angela Ramsammy - Tech Lead, eCommunications Suite
    Andre Williams - Portfolio Architect, eCommunications Suite
    Tony Bowen - Enterprise Architect
    Tony Ambrozie - Java Architect
    Marilyn Corno - Security Expert (via phone)

Last week I also confirmed with Hari we would be receiving your completed
questionnaire and diagrams on Mon. 4/25. I did not receive a response to my
email about reviewing your existing diagrams to prevent you from transferring
them to the Amex format, so I am assuming they will be Amex-style. Please let
me know if this is still on track.

Please let me know if you need any additional info. Also, did you have any
luck scheduling the ISU strategy meeting during this week?

Thanks.
-Angela

--------------------------------------------------------------------------------
--------
Angela M. Ramsammy
American Express - Enterprise Architecture & Applications
Tech Lead - eCommunications Suite
602-537-2549 desk
602-705-4638 cell
--------------------------------------------------------------------------------
--------


(See attached file: DRAFT_Agenda.doc)

```
                         Robert.Zierten@Ec
                         hoMail.com              To:      Angela M
Ramsammy/AMER/TRS/AEXP@AMEX
                                                 cc:      Andre G
williams/AMER/TRS/AEXP@AMEX, Hari@echomail.com, Miguel A
                         04/21/2005 03:29        Rodriguez@AMEX,
Sonu@echomail.com
                         PM                      Subject:  Re: Follow-up for
Arch Review
```

Hi Angela,

I am looking to confirm the dates for the on-site review.  Please let me know when we can expect your team to arrive at EchoMail and how long you will be here.

-Rob


Robert Zierten
EchoMail, Inc.
701 Concord Avenue
New Media Park
Cambridge, MA 02138
617-354-8585 ext. 253
Robert.Zierten@EchoMail.com


```
    "Angela M Ramsammy"
    <Angela.M.Ramsammy@aexp.c      To:       Sonu@echomail.com
    om>                            cc:       Hari@echomail.com,
                            Robert.Zierten@EchoMail.com, "Andre G Williams"
                            <andre.g.williams@aexp.com>, "Miguel A Rodriguez"
    04/11/05 04:19 PM       <miguel.a.rodriguez@aexp.com>
                               Subject:      Follow-up for Arch Review
```


Sonu:

Janice Chai-Chang has also stated she would like to attend this architecture review session.  However, she currently has a conflict for 4/27-28.  Can you confirm your availability for either that date, or the following week on 5/4-5?

Also, we'd like to schedule a meeting with you to initially review your diagrams & flows before attending the review session with the architecture team.  We'd like to do this on Wed. 4/20 from 3:00 - 4:00 PM EST.  Once you confirm your availability, I will send out a Notes invite.

Finally, we are tracking the costs for this review separately from our normal project efforts.  Therefore, can you provide a pro-serv estimate for EchoMail's
participating in this process (i.e. document preparation, participation in the

review sessions, etc.)?

Thanks in advance.
-Angela

----------------------------------------------------------------------
--------

Angela M. Ramsammy
American Express - Enterprise Architecture & Applications
Tech Lead - eCommunications Suite
602-537-2549 desk
602-705-4638 cell
----------------------------------------------------------------------
--------

 - DRAFT_Agenda.doc

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

EchoMail, Inc.

### DEFENDANTS

American Express Company, Inc.; IBM Corporation

**(b)** County of Residence of First Listed Plaintiff    Middlesex, MA
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    New York, NY
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Alan D. Rose, Rose & Assoc., 29 Commonwealth Ave., Boston, MA 02116, Telephone: (617) 536-0400

Attorneys (If known)
See Attachment.

05   11318 GAO

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge |
| ☒ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☐ 1 Original Proceeding
- ☒ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. Sec. 1332

Brief description of cause:
Complete diversity of citizenship and amount in controversy support removal from state to federal court.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:

Preliminary Injunction    JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE  N/A

DOCKET NUMBER  N/A

DATE    06/23/2005

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #_____    AMOUNT_____    APPLYING IFP_____    JUDGE_____    MAG. JUDGE_____

**CIVIL COVER SHEET**
(Continued)

Re:    Removal of <u>EchoMail, Inc. v. American Express Co. and IBM Corp.</u>,
       Civil Action No. 05-2477 BLS (Mass. Super. Ct.)

## I.    DEFENDANTS

Attorneys:

For American Express Company, Inc.:

Evan Georgopoulos
John F. Farraher, Jr.
GREENBERG TRAURIG LLP
One International Place
Boston, MA 02110
(617) 310-6000

For IBM Corporation:

Stephen D. Poss, P.C.
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
(617) 570-1000

05 11318 GAO

**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

1. Title of case (name of first party on each side only)_____ EchoMail, Inc. v. American Express Company, Inc._____

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

| | | |
|---|---|---|
| ☐ | I. | 160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT. |
| ☐ | II. | 195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730,  *Also complete AO 120 or AO 121<br>740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.   for patent, trademark or copyright cases |
| ☑ | III. | 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,<br>315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,<br>380, 385, 450, 891. |
| ☐ | IV. | 220, 422, 423, 430, 460, 480, 490, 510, 530, 610, 620, 630, 640, 650, 660,<br>690, 810, 861-865, 870, 871, 875, 900. |
| ☐ | V. | 150, 152, 153. |

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

    N/A

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

                                                                              YES ☐      NO ☑

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)

                                                                              YES ☐      NO ☑

    If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

                                                                              YES ☐      NO ☐

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

                                                                              YES ☐      NO ☐

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

                                                                              YES ☑      NO ☐

    A.   If yes, in which division do all of the non-governmental parties reside?

         Eastern Division   ☑         Central Division   ☐         Western Division   ☐

    B.   If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies,
         residing in Massachusetts reside?

         Eastern Division   ☐         Central Division   ☐         Western Division   ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

                                                                              YES ☑      NO ☐

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME  Evan Georgopoulos_____

ADDRESS  Greenberg Traurig LLP, One International Place, Boston, MA 02110_____

TELEPHONE NO.  (617) 310-6000_____

(CategoryForm.wpd - 5/2/05)