UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ECHOMAIL, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 05-11318-GAO |
| ) | |
| AMERICAN EXPRESS CO. ) | |
| and IBM CORP., ) | |
| ) | |
| Defendants. ) | |

PLAINTIFF ECHOMAIL, INC.'S MEMORANDUM
IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

Defendants American Express Company ("AmEx") and IBM Corporation (collectively "defendants") obtained unprecedented access to the confidential and proprietary technology of plaintiff EchoMail, Inc. ("EchoMail") by fraudulently, pretextually, and illegally using AmEx's contractual relationship with EchoMail to obtain an "architecture" review of EchoMail's cutting-edge, patented, email management system. IBM had no right whatsoever to access EchoMail's technology and proprietary information, but deceptively did so. AmEx permitted this deception to occur and violated the terms of its contract with EchoMail. The defendants will improperly use EchoMail's technology and proprietary information in the absence of judicial intervention. Injunctive relief is necessary to protect EchoMail's confidential and proprietary technology from improper use or dissemination by the defendants.

In addition to its request for injunctive relief, EchoMail brings claims for misappropriation of trade secrets, unfair competition, unfair and deceptive acts and practices, breach of contract, breach of the covenant of good faith and fair dealing, and intentional interference with contractual relations.

## Summary of Relevant Facts[1]

1. The Development of EchoMail and Its Confidential and Proprietary Technology

EchoMail's Chairman and CEO, V. A. Shiva Ayyadurai ("Shiva"), who has verified the Complaint in this case, is the principal inventor of the technology underlying EchoMail's proprietary email management, storage and on demand, web-based technology. Verified Complaint ¶¶ 6, 16.

In 1993, while he was pursuing his Ph.D. at MIT in artificial intelligence focused on pattern analysis, Shiva entered a White House sponsored contest focused on finding new and innovative ways to catalogue emails. Shiva won that contest, and the technology he developed and used became the technological foundation of EchoMail. Id. at ¶ 8.

In its early stages, from 1994 to 1999, EchoMail engaged in pioneering work by hosting web-based email applications in its Cambridge facility. Shiva also designed and developed applications that extracted and analyzed critical elements from an email so that an accurate response could be formulated. Id. at ¶ 10.

EchoMail operates in a competitive environment. It has approximately 18 employees in Cambridge and contracts for additional personnel in India. EchoMail has approximately 30 customers across an array of industries, including insurance, financial services, consumer packaged goods, retail and non-profits. Id. at ¶ 12.

EchoMail provides its customers with web-based software, hardware and services for email and electronic communications management including, though not limited to, inbound email management, outbound email management and email storage. With respect to incoming

---

[1] A full recitation of the facts is set forth in the Verified Complaint, and, therefore, this section summarizes the facts that are most relevant to the issue of injunctive relief.

email, EchoMail's proprietary web-based software technology collects and stores incoming email for EchoMail's customers; analyzes the emails for "attitude," "requests," "issues," "products" and "customer type"; proposes a response based on the analysis; and routes the email to a web-based platform where it can be viewed and worked on by EchoMail's customer's support personnel before a response is sent to the customer. Id. at ¶ 13. Exhibit 1 provides a simple visual example of EchoMail's process.

EchoMail's products are widely recognized as the industry leaders, and EchoMail has received accolades and awards for its products and services. Id. at ¶ 14.

2.   EchoMail's Relationship With AmEx

In 1998, AmEx was faced with an increasing volume of email from its customers across its multiple business units. At that time, AmEx wanted to contract with one vendor to manage its incoming email from customers for all of its business units. AmEx was aware that EchoMail was a leader in the field of managing electronic communication. In 1998, AmEx contacted Shiva and requested that EchoMail respond to AmEx's request for proposal ("RFP") seeking one vendor to manage its incoming email. Id. at ¶¶ 17, 18.

In July 1999, EchoMail was awarded the AmEx contract for managed incoming email services. From 1999 to 2004, as a result of successive contract renewals, EchoMail provided up to 11 AmEx business units with managed incoming email services. Id. at ¶¶ 19, 21.

In 2003, AmEx notified EchoMail that it was going to institute another RFP process to determine if EchoMail was still the best provider of managed incoming email services. EchoMail invested hundreds of man-hours in participating in this RFP process and provided its response in or about November 2003. In or about February 2004, EchoMail won the RFP, and, thereafter, in August 2004, executed a three-year contract for services with AmEx running from

January 1, 2005 through December 31, 2007. The relevant contractual documents are attached to the Verified Complaint, at Exhibits A (the "Master Agreement") & B (the 2005-2007 extension). Id. at ¶¶ 22, 23.

Due to the high level of service EchoMail provided to AmEx, AmEx referred to EchoMail as one of its "premium partners" or "true partners." Since 1998 and continuing though May 2005, AmEx repeatedly praised EchoMail for its products and service. By early 2005, EchoMail was successfully managing approximately 300,000 emails per month for AmEx's business units. Id. at ¶ 25.

3.   EchoMail's Dealings With IBM

IBM recognizes EchoMail as an industry leader in hosted, web-based email management software and services. Since in or about 1996, IBM has sought to learn EchoMail's confidential and proprietary technology related to hosted, web-based email management software and services. EchoMail has repeatedly refused to provide IBM with access to its confidential and proprietary technology related to EchoMail's hosted, web-based email management software and services. Id. at ¶ 26.

In or about 1996, IBM approached EchoMail seeking to host EchoMail's applications at IBM's facilities, in part, so IBM could "resell" EchoMail to other customers. EchoMail refused to allow IBM to host EchoMail's applications, since EchoMail was capable of providing the service itself.

In or about 2000, IBM approached EchoMail seeking to invest in EchoMail. EchoMail again refused. In or about 2002, IBM approached EchoMail seeking a partnership in which IBM would gain access to EchoMail's confidential and proprietary outbound email marketing technology and code. EchoMail refused to give IBM access to its confidential and proprietary

technology. In or about 2004, IBM approached EchoMail seeking to "host," or provide the hardware necessary, to run EchoMail's web-based, "on demand" software applications. EchoMail, which designed, built and developed its own hardware facility, again refused, since EchoMail, already offered its technology in a hosted, web-based model. Id. at ¶¶ 27-30.

4. AmEx Breaches its Contract with EchoMail and Misappropriates EchoMail's Technology with IBM

Despite their longstanding relationship and recent execution of the 3 year contract, AmEx breached the contract with EchoMail by canceling it in violation of its terms, and deceptively gaining access to, and permitting IBM to gain access to, EchoMail's confidential and proprietary technology. Id. at ¶ 31.

In or about mid-April 2005, AmEx began a new RFP process starting with a Request for Information ("RFI") for the same scope of services that AmEx had already contracted for with EchoMail. EchoMail received the RFI, as part of the new RFP process, only two days before its response was due. Greg Daniels, a newly assigned AmEx business manager, never informed EchoMail about the RFI. Id. at ¶ 36.

Shiva called Daniels and asked why a new RFP process was necessary given EchoMail and AmEx's existing three year contract. Daniels falsely claimed that "it was a formality" which was occurring because AmEx had "new people" involved and "EchoMail should not worry about it." Shiva told Daniels that EchoMail should not have to participate in the new RFP process because a contract already existed. Nevertheless, EchoMail responded to the RFI. Id. at ¶¶ 36-37.

Shortly thereafter, in late-April, 2005, AmEx confirmed to EchoMail that AmEx wanted to proceed with an "architecture" review of EchoMail's new, proprietary version 8.1, to which EchoMail's customers would soon upgrade. In general, an architecture review reveals the

confidential and proprietary technology, or "code," contained in hardware and/or software. AmEx falsely claimed that AmEx's desire for an architecture review was to make sure that the upgrade to version 8.1 was successful, that EchoMail and AmEx were "partners," and that AmEx wanted to help EchoMail succeed in its upgrade to the new version. Id. at ¶ 38-40.

Based on Daniels' statements, Shiva reluctantly agreed to the architecture review. Prior to the review, EchoMail provided AmEx with certain proprietary information in preparation for the review. On May 4 and 5, 2005, the architecture review occurred. At least eight employees from AmEx participated in the review either telephonically, or by coming in person to EchoMail's facility in Cambridge. The architecture review exposed to AmEx's employees EchoMail's confidential and proprietary information and technology, or "code," including the process by which EchoMail hosts its web-based, on demand technology. Id. at ¶¶ 41, 42.

AmEx surreptitiously included in the review technical personnel from IBM without disclosing this fact in advance to EchoMail. In fact, lists of personnel who would be attending the architecture review which were provided by AmEx to EchoMail did not refer to any personnel from IBM. The presence of IBM personnel would not have been disclosed to EchoMail at all, except that very late in the review process, an IBM employee participating in the review by phone stated that he worked for IBM and that he believed that the proprietary information revealed to him "created a conflict." EchoMail would not have allowed the architecture review to occur at all if EchoMail had known that personnel from IBM would be present. Id. at ¶¶ 44, 45.

On May 25, 2005, approximately three weeks after the architecture review, Daniels called EchoMail and stated that EchoMail "failed" the review, and as a result, the RFP process would continue without EchoMail. This necessarily meant that AmEx was replacing EchoMail

with a new vendor. Shiva questioned Daniels about Daniels' earlier claims that the RFP process and architecture review were unrelated. Shiva told Daniels that Daniels and AmEx were deceitful and that they had breached the contract. Although Daniels earlier told Shiva that Reena Paniker, a newly assigned AmEx customer service manager, was not involved in the new RFP process or the architecture review, on May 25, 2005, he stated to Shiva that Paniker was in fact running the new RFP process and the architecture review and that Daniels had ceded all authority over the matter to Paniker. Id. at ¶¶ 46, 47.

On or about May 26, 2005, in a conference call, Paniker initially denied that she was running the new RFP process. When EchoMail's president confronted her with Daniels' prior statement, Paniker finally admitted that she was in fact running the new RFP process and the architecture review and that they were in fact related. Paniker reiterated that AmEx's relationship with EchoMail was terminated and told EchoMail to "do what it had to do." Then she hung up the phone on EchoMail's president. Id. at ¶ 48.

5.   AmEx's Relationship With IBM

AmEx and IBM have entered into a multi-billion dollar contract under which IBM provides AmEx with computer hardware, software and services. As part of that contract, IBM commercializes AmEx's business processes through the use of AmEx's internal technology or vendor technology. The information obtained by AmEx and IBM during the EchoMail architecture review will be used to unfairly compete against EchoMail in a number of ways, including though its unauthorized use by IBM and AmEx directly, or its resale to IBM customers. Id. at ¶¶ 57, 58.

Injunctive relief is necessary to prevent IBM and AmEx from using or disseminating EchoMail's technology, or otherwise unfairly competing with EchoMail. Id. at ¶ 59.

Argument

I. ECHOMAIL IS ENTITLED TO AN INJUNCTION TO PROTECT ITS CONFIDENTIAL AND PROPRIETARY TECHNOLOGY

Under Federal law, EchoMail is entitled to an injunction upon demonstrating that (1) it is likely to succeed on the merits (2) absent the injunction, there is significant risk of irreparable harm (3) the balancing of the harms weighs in its favor and (4) the injunction will not harm the public interest. See Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir. 1996). As fully set forth below, in circumstances such as these -- AmEx has breached its contractual obligations to safe guard EchoMail's proprietary technology, deceitfully obtained an architecture review of EchoMail's proprietary technology and surreptiously included IBM in the review -- courts have not hesitated to issue injunctive relief. See e.g., Storage Technology Corp. v. Custom Hardware Eng. & Consulting, Inc., 2004 WL 1497688 (D.Mass. July 2, 2004)(defendants enjoined from using or copying plaintiff's software); TouchPoint Solutions, Inc. v. Eastman Kodak Co., 345 F. Supp.2d 23, 28 (D.Mass. 2004)(similar); Accusoft Corp. v. Palo, 923 F.Supp. 290 (D.Mass. 1996)(similar). EchoMail's claims for misappropriation of trade secrets, unfair competition and breach of contract support the entry of injunctive relief.

    A.    EchoMail Has a Substantial Likelihood of Success on the Merits of its Claims

        1.    AmEx and IBM misappropriated EchoMail's confidential and proprietary technology and engaged in unfair and deceptive acts and practices

Pursuant to Massachusetts law[2], G.L. c. 93, § 42A, "an entity is entitled to injunctive relief for misappropriation of trade secrets. Indeed, by G.L. c. 266, § 30, such a

---

[2] The contract in this case, the "Stand Alone Agreement for Consulting Services," or Master Agreement, states that "[t]his Agreement shall be construed and enforced under the

misappropriation could constitute a crime." Transkaryotic Therapies, Inc. v. Bain & Co., Inc., 2002 WL 799694, *3 (Mass. Super. 2002)(van Gestel, J.); see also N.Y. Penal Law §§ 155.00, 155.30, 156.30, 156.35 (making trade secret violations a crime). Under Massachusetts law, a trade secret is defined as "anything tangible or intangible or electronically kept or stored, which constitutes, represents, evidences or records a secret scientific, technical, merchandising, production or management information, design, process, procedure, formula, invention or improvement." M.G.L. c. 266 § 30.

In addition, the Massachusetts Consumer Protection Act, G.L. c. 93A, § 11, provides a cause of action for persons engaged in trade or commerce against another such person who engages in unfair competition or in an unfair or deceptive act or practice. Section 11 has been applied by Massachusetts courts to misappropriation of trade secrets. See, e.g., Peggy Lawton Kitchens, Inc. v. Hogan, 18 Mass. App. Ct. 937 (1984). "The standards for finding misappropriation of a trade secret provide the criteria for finding an unfair or deceptive act or practice." Prescott v. Morton International, Inc., 769 F.Supp. 404, 407 (D. Mass. 1990).

In addition, "under Massachusetts trade secret law, a third party who knowingly benefits from a trade secret which a person in a confidential relationship obtained from the plaintiff is liable to the plaintiff for misappropriation of that trade secret." Data General Corp. v. Grumman Systems Support Corp., 795 F.Supp. 501, 507 (D. Mass. 1992)(citation omitted).

---

substantive laws of the state of New York." See Verified Complaint, Ex. A at p. 9. The plain language of the contract limits the application of New York law to the construction and interpretation of the contract. Therefore, New York law should not apply to statutory and tort claims which arise outside of the contract. However, rather than argue about which law governs at this stage, this memorandum demonstrates that an injunction is appropriate under either Massachusetts or New York law. EchoMail does not concede the applicability of New York law to any of its claims.

In determining whether certain information is a "trade secret," courts focus on the time, effort and expense devoted to developing and maintaining the information, whether developing the information is difficult and whether the information is a matter of public knowledge or general knowledge in the industry. August, Inc. v. Aegis, Inc., 409 Mass. 165, 169-70 (1991); USM Corp. v. Marston Fastener Corp., 379 Mass. 90, 92-93 (1979). "For software, trade secret protection is not limited to the source code. Rather, the overall design of software can constitute a trade secret." TouchPoint, 345 F. Supp. 2d at 28 (citations omitted). New York trade secret law -- though common law as opposed to statutory -- is similar to Massachusetts.

Under New York law, "the essence of an unfair competition claim is that the defendant has misappropriated the labors and expenditures of another," including some element of bad faith. Saratoga Vichy Spring Co. v. Lehman, 625 F.2d 1037, 1044 (2d Cir. 1980). In order to establish a claim for misappropriation of trade secrets, the plaintiff must show (1) that it possesses a trade secret and (2) that the defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means. Sylmark Holdings Ltd. v. Silicone Zone International, Ltd., 5 Misc.3d 285, 783 N.Y.S.2d 758, 2004 N.Y. Slip Op. 24288 (2004).

New York courts have adopted the trade secret definition set forth in the Restatement of Torts § 757, Comment B, as "any formula pattern device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." See Ashland Mgt. Inc. v. Janien, 82 N.Y.2d 395, 407, 604 N.Y.2d 912, 624 N.E.2d 1007 (1993). Under the Restatement and New York common law, the factors considered in evaluating trade secret claims include: (1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and

others involved in the business; (3) the extent of measures taken to guard the secrecy of the information; (4) the value of the information [to the business] and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. Restatement of Tort § 757, Comment B. In general, "computer software, or programs are clearly protectable under the rubric of trade secrets, if the other elements are also proven." Q-Co Indus. Inc. v. Hoffman, 625 F.Supp. 608, 617 (S.D.N.Y.1985). Both the underlying source code, and the architecture of a computer program, may qualify as trade secrets. Fabkom, Inc. v. R.W. Smith & Assoc., Inc., 1996 WL 531873 (setting out New York trade secret law as it relates to computer software and issuing an injunction).

    a.    EchoMail has gone to extraordinary lengths to protect its technology

EchoMail's industry leading, patented, confidential and proprietary technology is certainly a "trade secret". EchoMail's software, hardware, storage technology and web-based hosting process is not known outside of select EchoMail employees, or entities in a confidential relationship with EchoMail which have contractually agreed to safeguard that information. Over the course of its existence, EchoMail has spent considerable time, money and effort on its product development and on its efforts to protect the confidentiality of its proprietary technology. Verified Complaint ¶ 52.

As a matter of course, EchoMail enters into non-disclosure and confidentiality agreements with entities which may have access, or even limited access, to any portion of EchoMail's confidential and proprietary technology. EchoMail does so with respect to its customers and prospective customers, vendors and prospective vendors, and its customers' vendors. Id. at ¶ 53.

Prior to the existence of its contractual relationship for services with AmEx, a confidentiality agreement between AmEx and EchoMail protected EchoMail's confidential and proprietary technology. The services contract between AmEx and EchoMail also protects EchoMail's confidential and proprietary technology. In addition, AmEx's other vendors, which are exposed to EchoMail's confidential and proprietary technology, are required by EchoMail to execute nondisclosure and/or confidentiality agreements. Id. at ¶ 54.

EchoMail's employees are required to execute agreements which further protect EchoMail's confidential and proprietary information. Even among its own employees, EchoMail limits disclosure of its confidential and proprietary technology. Id. at ¶ 55.

In addition to these steps, EchoMail has protected its confidential and proprietary technology by obtaining patents. On December 23, 2003, EchoMail obtained a patent protecting its overall process for managing email. On April 6, 2004, EchoMail obtained two patents protecting (a) its technology used to analyze emails and (b) its technology used to construct a response to an email. Id. at ¶ 56.

There's no question, that EchoMail has gone to great lengths to protect its confidential and proprietary technology, and "maintain [the technology's] mystery and narrow the circle of those privy to its essentials." Peggy Lawton, 18 Mass. App. Ct. at 939. EchoMail's efforts to protect its technology should also be viewed "against the conduct of the defendant in acquiring the information." USM Corp., 379 Mass. at 100. Indeed, it is only through breach of contract and deceit that the defendants were able to gain access to EchoMail's computer code. The real reason for AmEx's architecture review, which AmEx intentionally did not disclose to EchoMail, was to gain access to all details of EchoMail's confidential and proprietary technology so that AmEx and IBM could use the technology after AmEx breached its contract and severed its

relationship with EchoMail. Id. at ¶ 49. In addition, AmEx intended to use the architecture review as a pretext for (a) continuing its new RFP process without EchoMail's participation, and (b) terminating its contract with EchoMail. Id.

AmEx and IBM's conduct in this case is intolerable. "The law puts its imprimatur on fair dealing, good faith and fundamental honesty. Courts condemn conduct which fails to reflect these minimum accepted moral values by penalizing such conduct whenever it occurs." Picker International Corp. v. Imaging Equipment Services, Inc., 931 F.Supp. 18, 23 (D.Mass. 1995); USM Corp., 379 Mass. at 104.

For these reasons, EchoMail has a substantial likelihood of success on the merits of its claims for misappropriation of trade secrets and unfair and deceptive acts and practices.

    2.    AmEx Breached its Contract with EchoMail by Failing to Protect the Confidentiality of EchoMail's Proprietary Technology

To establish a breach of contract claim under either New York or Massachusetts law, the plaintiff must allege the specific terms of the contract, the consideration, the plaintiff's performance and the defendants breach of the agreement. Sylmark Holdings Ltd, 5 Misc.2d at 295, 783 N.Y.S.2d at 769. A contract to retain the confidentiality of certain matters which should be kept in confidence will be enforced by injunction. See Karpinski v. Ingrasci, 28 N.Y.2d 45, 320 N.Y.S.2d 1, 268 N.E.2d 751 (1971).

EchoMail and AmEx had a valid contract. The contract specifically provides that AmEx will "preserve as confidential all information related to the business and activities of [EchoMail]" and "hold such information in trust and confidence [] and not disclose such information to any person or enterprise, or use (directly or indirectly) any such information for its own benefit or the benefit of another party." Verified Complaint, Ex. A at p. 7.

As fully set forth above, AmEx revealed EchoMail's confidential and proprietary technology to IBM by deceiving EchoMail about IBM's participation in the architecture review, and, conducting the review on a pretext. For these reasons, EchoMail has a substantial likelihood of success on the merits of its breach of contract claim.

> B.  EchoMail Will Be Immediately and Irreparably Harmed if an Injunction Does Not Issue

EchoMail will suffer immediate and irreparable harm if an injunction does not issue. "An irreparable injury is one that cannot be addressed through a monetary award." JSG Trading Corp. v. Tray Wrap, Inc., 917 F.2d 75, 79 (2nd Cir. 1990). Under New York law, "irreparable injury is presumed, where, as here, trade secrets have been misappropriated." Sylmark Holdings Ltd., 5 Misc.2d at 299, 783 N.Y.S.2d at 772, citing Double Click, Inc. v. Henderson, 1997 WL 731413, *7 (Sup. Ct., N.Y. County 1997), and Lumex, Inc. v. Highsmith, 919 F.Supp. 624, 628 (E.D.N.Y. 1996); FMC Corp. v. Taiwan Tainan Giant Indus. Co., 730 F.2d 61, 63 (2nd Cir. 1984)("it is clear that the loss of a trade secret cannot be measured in money damages... and is thus considered irreparable harm"); Sylmark Holdings Ltd, 5 Misc.2d at 299, 783 N.Y.S.2d at 772 ("the loss of the advantage of being a pioneer and a market leader may constitute irreparable harm"), citing Lumex, Inc., 919 F.Supp. at 628.

Massachusetts courts similarly recognize that the misappropriation of trade secrets constitutes irreparable harm. See e.g., Transkaryotic Therapies, 2002 WL 799694 at *3 (finding plaintiff would suffer irreparable harm if an injunction did not protect its trade secrets); TouchPoint, 345 F. Supp. 2d at 32 (finding "the loss of a trade secret is generally found to constitute irreparable harm"); Storage Technology Corp. v. Custom Hardware Engineering & Consulting, Inc., 2004 WL 1497688, *5 (D. Mass. July 2, 2004)(finding "theft of trade secrets require no further proof of harm because harm is presumed").

The harm suffered by EchoMail is by definition irreparable -- unlawful access to its patented, industry leading technology and the potential for the use or dissemination of it without remuneration to EchoMail.

C.  A Balancing of Harms Weighs Heavily In Favor of EchoMail and the Public Interest Favors an Injunction

EchoMail's injury, if no injunction issues, will far outweigh any harm to AmEx or IBM if the injunction does issue. EchoMail faces catastrophic injury if its technology is used without remuneration, or if it is reproduced or disseminated. In addition, as demonstrated above, EchoMail has a substantial likelihood of success on the merits. The entry of an injunction will not harm the defendants at all. Simply put, there can be no harm to the defendants in being prevented from using or disseminating that to which the defendants are not entitled -- EchoMail's proprietary technology.

In this case, where the defendants have engaged in intentionally wrongful conduct, the public interest is best served by enjoining the defendants from using, for their benefit or the benefit of others, technology that they have no right to. Indeed, allowing the defendants to use or disseminate the technology will allow them to wrong EchoMail yet again.

EchoMail meets all of the standards for issuance of a preliminary injunction.

Conclusion

For the reasons set forth above, EchoMail respectfully requests that this Court allow its motion for a preliminary injunction.

Respectfully submitted,

ECHOMAIL, INC.,

By its attorneys,

Alan D. Rose (BBO#427280)
Alan D. Rose, Jr. (BBO#628871)
ROSE & ASSOCIATES
29 Commonwealth Avenue
Boston, Massachusetts 02116
617-536-0040

**CERTIFICATE OF SERVICE**
I hereby certify that on this day a true copy of the above document was served upon the attorney of record for each party by mail/by hand.
Date: 6/23/05

Date: June 23, 2005

