UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ECHOMAIL, INC.,<br><br>Plaintiff,<br><br>-v-<br><br>AMERICAN EXPRESS CO., and IBM CORP.,<br><br>Defendants. | Civil Action No. 05-11318<br><br>(NMG)<br><br>**DECLARATION OF<br>STEPHEN P. GIBBONS** |

STATE OF ARIZONA     )
                     ) ss.:
COUNTY OF PIMA       )

STEPHEN P. GIBBONS declares as follows:

1.     I am a Certified Information Systems Security Professional and currently an employee of the Global Services Division ("IGS") of International Business Machines Corporation ("IBM"). I live and work in Tucson, Arizona.

2.     In 2002, I was an employee of American Express ("AMEX") in their information technology organization. In 2002, AMEX outsourced its computer operations to IGS. At that time, I was hired by IGS to continue working in AMEX's computer operations as an Information Security Advisor.

3.     From the time of my employment by IGS through today, AMEX has been the only IGS client with whom I have worked. IGS bills AMEX for the time I work on this outsourcing engagement. I am not involved in any IBM product development, product marketing or product planning.

4.     In my capacity at IGS, part of the service I provide to AMEX is to participate in Technical Due Care reviews of outside vendors of AMEX. Technical Due

Care sessions are used by AMEX to evaluate products and services. The purpose of my participation in those sessions as an IGS employee is to advise AMEX as to whether or not existing or planned products or services offered by vendors are compatible with the security requirements and standards set by AMEX. Those standards are applied, whether the computer operations will be outsourced to IGS, retained by AMEX or managed by the vendor or by a third party.

5.    Over the course of my work with AMEX, both while employed at AMEX and now at IGS, I have participated in numerous Technical Due Care sessions involving a variety of vendors of computer products and services.

6.    In early May of 2005, I participated in a Technical Due Care session involving Echomail. The session was triggered by ongoing performance issues with Echomail's previous product offering and was to focus on new versions of Echomail's software that Echomail was offering and that AMEX was considering for its computer operations. It is typical to re-review vendors' offerings when significant changes occur, such as major software releases or fundamental architectural changes. I participated in that session by telephone from Tucson, Arizona. In addition to myself, the participants from AMEX included a number of AMEX employees and, for part of the call, Todd Seager, another IGS employee. Todd Seager was about to assume some of my responsibilities on the AMEX account and was on a portion of the call to "shadow" me as part of the orientation process.

7.    During the course of the call with Echomail, representatives of Echomail indicated that part of the architecture of the new versions of Echomail's product would be based upon and incorporate an IBM product known as Lotus Notes Domino. Since Lotus

Notes Domino is an IBM product, and impacts the type of security issues I was on the call to advise on, I stated that as an IGS employee, I could be viewed as having a conflict of interest when giving advice to AMEX concerning a product sold by IBM.

8.     Following that comment, the call continued. No one from Echomail raised any concern about my continued participation and I remained on the call. No one from Echomail asked me to sign an agreement concerning the subjects discussed on the call. At the conclusion of the call, I sent copies of my notes of the call to my colleague Todd Seager, who forwarded them on to Daniel Yong, an AMEX employee, so that they could be used to assist in the creation of a Technical Due Diligence Review Report. That report is used by AMEX as part of the decision making process it employs when considering products or services offered by computer vendors like Echomail.

9.     At no time following that call have I used any of the information presented by Echomail or discussed on the call for any purpose other than to advise AMEX on the security issues raised by the use of Echomail's products, including the security issues arising from Echomail's use of the IBM Lotus Notes Domino. At no time before, during or after the call was I provided with access to any Echomail source code or object code.

10.     It is my understanding that IGS's contractual arrangements with AMEX provide that confidential information I learn during the AMEX outsourcing engagement is to be used solely in working on the AMEX engagement.

11.     I have personal knowledge of the foregoing.  I declare under penalty of perjury that is the foregoing is true and correct.

Stephen P. Gibbons

Executed on June 27, 2005

4

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ECHOMAIL, INC.,<br><br>Plaintiff,<br><br>-v-<br><br>AMERICAN EXPRESS CO., and IBM CORP.,<br><br>Defendants. | Civil Action No. 05-11318<br><br>(NMG)<br><br>**DECLARATION OF<br>TODD SEAGER** |

STATE OF UTAH   )
                    ) ss.:
COUNTY OF     )

TODD SEAGER declares as follows:

1.     I am a computer security consultant currently employed by the Global Services Division ("IGS") of International Business Machines ("IBM"). I have been employed by IGS for approximately the last 5 years. Prior to that time, I was a consultant in the computer industry. Starting in the beginning of April 2005, I was assigned by IGS to the American Express Account ("AMEX") as a security consultant. AMEX has outsourced to IGS the operation of its computer systems pursuant to an agreement. I understand that the outsourcing agreement was entered into in 2002. In my capacity as security consultant for IGS, I have no responsibility for IBM software planning, IBM software development or IBM software marketing.

2.     As part of my duties working on the AMEX account for IGS, I regularly attend Technical Due Care meetings with vendors of computer products. Since being assigned to the AMEX account in April of this year, I have attended more than 30 such Technical Due Care sessions with various computer vendors.

3.    In or around the beginning of May, I participated in a Technical Due Care session involving an AMEX vendor named Echomail. My participation in that call was by telephone from Orem, Utah, where I live and work. Part of the purpose of my participation on that call was to "shadow" Stephen Gibbons, another IGS employee assigned to the AMEX account. At that time, I was beginning to assume some of the responsibilities for that account from Mr. Gibbons. During the call, Echomail stated that versions of their product would rely on and incorporate an IBM product known as IBM Lotus Notes Domino.

4.    During that discussion, Mr. Gibbons specifically identified himself as an IBM employee, and indicated that since Lotus Notes Domino was an IBM product that impacted security issues, he might be viewed as having a conflict of interest in advising AMEX concerning the security issues raised by the use of Lotus Notes Domino. That statement by Mr. Gibbons occurred about mid-way through an approximately 3 hour telephone conversation. Following Mr. Gibbons statements, the call continued for more than an hour. At no time following that statement did anyone from Echomail object to the participation of an IBM employee on the call or ask that Mr. Gibbons execute any form of agreement regarding the subject matter of the call.

5.    Following the call, Mr. Gibbons forwarded to me his notes on the security issues, including his concerns regarding the use of IBM Lotus Notes Domino by the Echomail product. I forwarded those notes to Daniel Young, an AMEX employee, so that they could be used to assist in creating a Technical Due Diligence Review Report. That report as I understand it is used by AMEX in evaluating products offered by computer vendors.

2

6.     At no time following that call have I made any use of the information discussed during the call for any purpose other than to advise AMEX on the security issues raised by the Echomail products.  At no time before, during or after the call was I provided with any access to any Echomail source code or object code.  I understand that as an IGS employee assigned to the AMEX account, I am subject to a non-disclosure agreement or NDA which would prevent me from sharing any information obtained from AMEX or its outside vendors with personnel at IBM.  The sole appropriate use of the information I learn during my work for the AMEX outsourcing account is to use that information to assist in the running of AMEX's computer operations.

7.     I have personal knowledge of the foregoing.  I declare under penalty of perjury that the foregoing is true and correct.

Todd Seager

Executed on June 27, 2005

3

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                          SUPERIOR COURT
                                      CIVIL ACTION NO.        -BLS

```
_____
ECHOMAIL, INC.,              )
                             )
          Plaintiff,         )
                             )
v.                           )
                             )
AMERICAN EXPRESS CO.         )
and IBM CORP.,               )
                             )
          Defendants.        )
_____)
```

## AFFIDAVIT OF V.A. SHIVA AYYADURAI

I, V.A. Shiva Ayyadurai, under oath hereby depose and state as follows:

1.   I am the founder, Chairman, and CEO of EchoMail, Inc., of Cambridge, Massachusetts.  I have personal knowledge of the facts set forth in this affidavit and I verified the facts set forth in the Verified Complaint in this matter.  I make this affidavit to bring before the Court certain true and accurate copies of relevant documents.

2.   In my capacity as Chairman and CEO of EchoMail, I am responsible for the overall direction, strategies, and business of EchoMail.  I also closely monitor all of EchoMail's dealings with its customers, particularly major customers.  American Express Company ("AmEx") was for many years the company's single largest customer.  Therefore, I have had direct, first-hand

knowledge of the company's dealings and relationship with American Express.

3.    On February 3, 2004, AmEx notified EchoMail that EchoMail won the RFI and we would proceed with an amendment to the Master Agreement for the period 2005-2007.  The contract itself is attached to the Verified Complaint as Exhibits A and B.

4.    Attached as Exhibit 1 to this affidavit are emails or correspondence indicating AmEx's satisfaction with EchoMail's work for and with AmEx.

5.    EchoMail has always maintained, and currently maintains, strict control over the use and dissemination of its proprietary technology.  EchoMail has spent thousands of hours and hundreds of thousands of dollars on developing its proprietary technology.  Attached as Exhibit 2 is a copy of EchoMail's proprietary information policy, which is applicable to all EchoMail employees.  We require all EchoMail employees to sign agreements whereby they promise not to engage in unauthorized use or dissemination of information concerning Echomail's proprietary technology.

6.    EchoMail has always required its customers to maintain the confidentiality of EchoMail's confidential or proprietary information.  AmEx is subject to such restrictions contained in

the confidentiality provision of the contract (Verified Complaint, Exhibit A, p. 7). In addition, attached as Exhibit 3 are copies of non-disclosure and confidentiality agreements applicable to AmEx's vendors working with EchoMail's technology.

7.    Before the architecture review meeting with personnel from American Express on May 4-5, 2005, EchoMail required that American Express provide EchoMail, in advance, with a list of all attendees at this telephone conference call. American Express provided such a list. The list is attached to this affidavit as Exhibit 4. The list does not identify anyone from IBM as participating in the review. If the list of attendees had identified someone from IBM as participating on the call, we would have required IBM to sign a non-disclosure or confidentiality agreement with EchoMail before its employee could participate in the call, or, if IBM were unwilling to do this, we would have told the personnel from IBM that they could not participate in the call. Under its agreement with EchoMail, American Express was not permitted to allow employees of third parties to have access to EchoMail's proprietary technology.

8.    In the May 4-5 architecture review, American Express asked for, and we revealed, our most prized technology, including our computer code, to the group on the call. When we did so, we assumed the accuracy of the list of attendees and we

- 3 -

had no knowledge, and no reason to know, that a person from IBM was on the telephone conference call.

9.    IBM has made many approaches to EchoMail over the past 9 years.  For example, IBM approached EchoMail and indicated that it wanted to become a partner of EchoMail and be a "reseller" of Echomail's system.  We declined to enter into such a relationship because it would mean revealing our code to IBM. One of the reasons I did not want to enter into a relationship with IBM is that I believed that they were already working with Kana, Inc., one of EchoMail's direct competitors.

10.    Based on the above approaches, it became clear to us that IBM wanted to learn our proprietary technology, which would enable IBM to compete against EchoMail.  Therefore, we would not have conducted the architecture review if we had known that an IBM employee was on the call.  Furthermore, if AmEx had told us in advance that an IBM employee would be on the call, we would have questioned AmEx's stated purpose in conducting the architecture review.

11.    As a result of IBM's surreptitious participation in the telephone conference call, IBM and AmEx now know EchoMail's proprietary and confidential technology, including its "code," concerning its web-based, on demand electronic communication management process.  Armed with this information they have the

- 4 -

knowledge and ability to copy our product and compete with us in the marketplace.

12.    I believe that AmEx and IBM are engaged in plans to compete with EchoMail.  The basis for my belief is the history of EchoMail's relationship with AmEx and IBM, the way in which AmEx surreptitiously included IBM in the architecture review, AmEx's sudden termination of EchoMail's contract with AmEx shortly after the call, and AmEx and IBM's cooperation in developing and making business practices software and applications.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 20th DAY OF JUNE 2005.

V. A. Shiva Ayyadurai

- 5 -

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ECHOMAIL, INC., <br><br> Plaintiff, <br><br> -v- <br><br> AMERICAN EXPRESS CO., and IBM CORP., <br><br> Defendants. | Civil Action No. 05-11318 (NMG) |

**DEFENDANT INTERNATIONAL BUSINESS CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS OPPOSITION TO PLAINTIFF ECHOMAIL, INC.'S MOTION FOR PRELIMINARY INJUNCTION**

**Dated June 28, 2005**

IBM CORPORATION,

By its attorneys,

Stephen D. Poss, P.C. (BBO # 551760)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA  02109
Tel: (617) 570-1000
Fax: (617) 523-1231

TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................1

STATEMENT OF FACTS ...............................................................................2

PRELIMINARY INJUNCTION STANDARD..................................................5

ARGUMENT ..................................................................................................5

I.    ECHOMAIL CANNOT SHOW A "LIKELIHOOD OF SUCCESS" ON THE
      MERITS...............................................................................................5

      A.    Trade Secret Misappropriation ..................................................5

      B.    Unfair Trade Practices ...............................................................9

      C.    Unfair Competition ..................................................................10

II.   ECHOMAIL PLAINTIFF HAS NOT ESTABLISHED IRREPARABLE HARM.11

III.  THE BALANCING OF THE EQUITIES AND THE PUBLIC INTEREST
      FAVORS IBM. ..................................................................................14

CONCLUSION..............................................................................................14

## TABLE OF AUTHORITIES

<u>Page</u>

<u>Am. Sci. and Eng'g Inc. v. Kelly</u>, 69 F. Supp. 2d 227 (D. Mass. 1999) ............................6

<u>Bayshore Group Ltd. v. Bay Shore Seafood Brokers, Inc.</u>, 762 F. Supp. 404 (D. Mass. 1991) ............................................................................................................................10, 11

<u>Bl(a)ck Tea Society v. City of Boston</u> 378 F.3d 8 (1st Cir. 2004) .....................................5

<u>Cambridge Internet Solutions, Inc. v. Avicon Group</u>, No. 99-1841, 1999 WL 959673 (Mass. Super. Sept. 21, 1999). ............................................................................................6

<u>CollaGenex Pharms., Inc. v. Ivax Corp.</u>, No. 04CV4253(SLT)(VVP), 2005 WL 1430373 (E.D.N.Y. June 15, 2005) ................................................................................................11

<u>Corning, Inc. v. Picvue Elec., Ltd.</u>, 365 F.3d 156 (2d Cir. 2004).......................................7

<u>CVD, Inc. v. Raytheon Co.</u>, Civ. Action No. 81-2216-S, 1981 WL 2162 (D. Mass. Dec. 3, 1981)................................................................................................................6

<u>Datatrend, Inc. v. Jabil Circuit, Inc.</u>, 3 F. Supp. 2d 66 (D. Mass. 1998). ...........................9

<u>DB Riley, Inc. v. AB Eng'g Corp.</u>, 977 F. Supp. 84  (D. Mass. 1997) ...............5, 6, 11, 12

<u>Dupont v. Dubois</u>, Nos. 97-1167, 97-1786, 97-2134, 1998 WL 1085819  (1st Cir. July 15, 1998) .............................................................................................................................5

<u>Flexcon Co., Inc. v. McSherry</u>, 123 F. Supp. 2d 42 (D. Mass. 2000) ...............................12

<u>Freedom Holdings, Inc. v. Spitzer</u>, 408 F.3d 112 (2nd Cir. 2005) ....................................12

<u>Genesee Brewing Co. v. Stroh Brewing Co.</u>, 124 F.3d 137 (2d Cir. 1997) .....................10

<u>Geritrex Corp. v. Dermarite Indus., LLC</u>, 910 F. Supp. 955 (S.D.N.Y. 1996)...................6

<u>Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.</u>, 920 F.2d 171 (2d Cir. 1990). ...............................................................................................................................6

<u>Kenda Corp., Inc. v. Pot O'Gold Money Leagues, Inc.</u>, 329 F.3d 216 (1st Cir. 2003)9

<u>Lanier Prof'l Servs., Inc. v. Ricci</u>, 192 F.3d 1 (1st Cir. 1999)............................................5

Mass. Coalition of Citizens with Disabilities v. Civil Defense Agency & Office of Emergency Preparedness, 649 F.2d 71 (1st Cir. 1981).......................................................12

New Comm Wireless Servs. Inc. v. Sprintcom, Inc., 287 F.3d 1 (1st Cir. 2002)...............5

Prescott v. Morton Int'l, Inc., 769 F. Supp. 404 (D. Mass. 1990) .......................................8

Touchpoint Solution, Inc. v. Eastern Kodak Company, 345, F. Supp. 2d 23 (D. Mass. 2004) (Gorton J.)5

Other Authorities

13 James Wm. Moore et. al., Moore's Fed. P. § 65.20, at 65-29 (3d ed. 1998)...................5

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

International Business Machines Corporation ("IBM") respectfully submits this memorandum of law in opposition to plaintiff EchoMail, Inc.'s ("EchoMail") Motion for a Preliminary Injunction.

## <u>PRELIMINARY STATEMENT</u>

EchoMail's motion for a preliminary injunction against IBM is, we respectfully submit, both factually and legally deficient. EchoMail has failed to establish any of the four elements required for a preliminary injunction. EchoMail's papers make it clear that its claims are grounded on nothing more than unfounded suspicions:

- EchoMail has not specified any allegedly misappropriated trade secrets;

- EchoMail has not shown, nor even alleged, that IBM has improperly "used" any EchoMail proprietary information or in any way acted in an unfair or deceptive way;

- EchoMail has not established that it has taken reasonable steps to protect its alleged trade secrets. Indeed, on the telephone call where those trade secrets were allegedly disclosed to IBM, EchoMail does not dispute that the IBM employee identified himself and his employer during the call. Notwithstanding that disclosure, EchoMail continued the call with the IBM employee participating;

- EchoMail waited over 45 days from the date of the alleged misappropriation by IBM before filing its suit. Following the alleged disclosure of information to IBM, EchoMail made no effort to contact IBM to determine whether any information disclosed by EchoMail was being used by IBM or even whether the IBM employees involved were subject to nondisclosure agreements with AMEX.[1]

---

[1] Consequently, plaintiff failed to include any certification pursuant to Local Rule 7.1(A)(2) here -- nor could it -- as neither EchoMail or its counsel contacted IBM or its counsel prior to filing this motion before this Court.

Because, EchoMail has not satisfied any of the requirements for securing a preliminary injunction, its request for a preliminary injunction should de denied.

## STATEMENT OF FACTS

Pursuant to a 2002, agreement, American Express ("AMEX") outsourced its computer operations to the Global Services Division ("IGS") of IBM. Gibbons Decl. ¶¶ 1, 2; Seager Decl. ¶ 2. Under that agreement, confidential information learned during the AMEX outsourcing engagement was to be used by IBM solely in its work on the AMEX engagement. Gibbons Decl. ¶ 10; Seager Decl. ¶ 6.

In 2002, Stephen Gibbons was an employee of AMEX in their information technology organization, and was then hired by IGS to continue working in AMEX's computer operations as an Information Security Advisor. Gibbons Decl. ¶ 2. In the beginning of April 2005, Todd Seager was assigned by IGS to the AMEX as a security consultant. Seager Decl. ¶ 1.

Gibbons was not involved in any IBM product development, product marketing or product planning. Gibbons Decl. ¶ 3. Similarly, Seager has no responsibility for IBM software planning, IBM software development or IBM software marketing. Seager Decl. ¶ 1.

As part of their duties, Gibbons and Seager regularly participate in Technical Due Care meetings with outside vendors of AMEX. Gibbons Decl. ¶ 5; Seager Decl. ¶ 2. Indeed, over the course of their work with AMEX, both Gibbons and Seager have participated in numerous Technical Due Care sessions involving a variety of vendors of computer products and services. Gibbons Decl. ¶ 5; Seager Decl. ¶ 2. Technical Due Care sessions are used by AMEX to evaluate products and services.

Gibbons Decl. ¶ 4.  The purpose of Gibbons' and Seager's participation in those sessions as IGS employees is to advise AMEX as to whether or not existing or planned products or services offered by vendors are compatible with the security requirements and standards set by AMEX.  Gibbons Decl. ¶ 4.

In early May 2005, both Gibbons and Seager participated in a Technical Due Care session involving EchoMail.  Gibbons Decl. ¶ 6; Seager Decl. ¶ 3.  The session was triggered by ongoing performance issues with EchoMail's previous product offering and was to focus on new versions of EchoMail's software that AMEX was considering for its computer operations.  Gibbons Decl. ¶ 6.  It is typical to re-review vendors' offerings when significant changes occur, such as major software releases or fundamental architectural changes.  Id.  Gibbons participated in that session by telephone from Tucson, Arizona and, for part of the call, Seager participated by telephone from Orem, Utah.  Gibbons Decl. ¶ 6; Seager Decl. ¶ 3.  AMEX employees participated as well.  Gibbons Decl. ¶ 6.  Part of the purpose of Seager's participation on that call was to "shadow" Gibbons as Seager was beginning to assume some of the responsibilities for the AMEX account from Gibbons.  Gibbons Decl. ¶ 6; Seager Decl. ¶ 3.

On the call, Gibbons specifically identified himself as an IBM employee.  Seager Decl. ¶ 4.  During the discussion, representatives of EchoMail stated that versions of their product would rely on and incorporate into its architecture an IBM product known as IBM Lotus Notes Domino.  Gibbons Decl. ¶ 7; Seager Decl. ¶ 4.  Because Lotus Notes Domino is an IBM product, and impacts the type of security issues on which Gibbons was responsible to advise, Gibbons stated that as an IGS employee, he could be

viewed as having a conflict of interest when giving advice to AMEX concerning a product sold by IBM like Lotus Notes Domino.  Gibbons Decl. ¶ 7; Seager Decl. ¶ 4.

Following Gibbons' statements, the call continued for more than an hour. Seager Decl. ¶ 4.  At no time following that statement did anyone from EchoMail object to the participation of an IBM employee on the call or ask that Gibbons execute any form of agreement regarding the subject matter of the call.  Gibbons Decl. ¶ 8; Seager Decl. ¶ 4.  Gibbons remained on the call.  Gibbons Decl. ¶ 8; Seager Decl. ¶ 4.

At the conclusion of the call, Gibbons sent Seager copies of his notes of the call, which focused on security issues, including Gibbons' concerns regarding the use of IBM Lotus Notes Domino by the EchoMail product.  Seager forwarded them on to Daniel Yong, an AMEX employee, so that they could be used to assist in the creation of a Technical Due Diligence Review Report.  Gibbons Decl. ¶ 8; Seager Decl. ¶ 5.  That report is used by AMEX as part of the decision making process it employs when considering products or services offered by computer vendors like EchoMail.  Gibbons Decl. ¶ 8; Seager Decl. ¶ 5.

At no time following that call have Gibbons or Seager used any of the information presented by EchoMail or discussed on the call for any purpose other than to advise AMEX on the security issues raised by the use of EchoMail's products, including the security issues arising from EchoMail's use of IBM Lotus Notes Domino.  Gibbons Decl. ¶ 9; Seager Decl. ¶ 6.  At no time before, during or after the call were Gibbons or Seager provided with access to any EchoMail source code or object code.  Gibbons Decl. ¶ 9; Seager Decl. ¶ 6.

## PRELIMINARY INJUNCTION STANDARD

"[A] preliminary injunction is an extraordinary remedy that may be granted only by a clear demonstration by a plaintiff of the merits of such a request." Dupont v. Dubois, Nos. 97-1167, 97-1786, 97-2134, 1998 WL 1085819, at *1 (1st Cir. July 15, 1998) (quoting 13 James Wm. Moore et. al., Moore's Fed. Prac. § 65.20, at 65-29 (3d ed. 1998) (footnotes omitted)). To merit a preliminary injunction, a plaintiff is required to show: "(1) it is substantially likely to succeed on the merits of its claim; (2) absent the injunction there is a significant risk of irreparable harm; (3) the balance of hardships weighs in its favor; and (4) the injunction will not harm the public interest." Lanier Prof'l Servs., Inc. v. Ricci, 192 F.3d 1, 3 (1st Cir. 1999); see also, Touchpoint Solution, Inc. v. Eastern Kodak Company, 345, F. Supp. 2d 23, 27, (D. Mass. 2004) (Gorton J.)

## ARGUMENT

## I.    ECHOMAIL CANNOT SHOW A "LIKELIHOOD OF SUCCESS" ON THE MERITS.

"[L]ikelihood of success is an essential prerequisite for the issuance of a preliminary injunction." Bl(a)ck Tea Society v. City of Boston 378 F.3d 8, 15 (1st Cir. 2004); see also New Comm Wireless Servs. Inc. v. Sprintcom, Inc., 287 F.3d 1, 9 (1st Cir. 2002). EchoMail has failed to put forth sufficient evidence to show likelihood of success on any of its claims.

### A.    Trade Secret Misappropriation

To prevail on a claim of misappropriation of trade secrets either under Massachusetts statutory law or New York common law, a plaintiff must prove: "(1) information in question is a trade secret, (2) [plaintiff] took reasonable steps to preserve

the secrecy of information, and (3) [the defendant] 'used improper means, in breach of [a] confidential relationship, to acquire and use the trade secret'". <u>DB Riley, Inc. v. AB Eng'g Corp.</u>, 977 F. Supp. 84, 89-90 (D. Mass 1997) (internal citations omitted); <u>see also</u> <u>Geritrex Corp. v. Dermarite Indus., LLC</u>, 910 F. Supp. 955, 961 (S.D.N.Y. 1996) (plaintiff must allege "(1) it possessed a trade secret, and (2) [defendants are] using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means") (<u>quoting</u> <u>Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.</u>, 920 F.2d 171, 173 (2d Cir. 1990)).  EchoMail cannot satisfy any element of this claim and is unlikely to succeed on the merits.

        "A plaintiff has no cognizable trade secret claim until it has adequately identified the specific trade secrets that are at issue." <u>Cambridge Internet Solutions, Inc. v. Avicon Group</u>, No. 99-1841, 1999 WL 959673, at * 2 (Mass. Super. Ct. Sept. 21, 1999).  In other words, plaintiff must demonstrate a factual basis for its claim and, where possible, identify its trade secrets with some specificity.  <u>Id.</u>  "After a thorough review of [plaintiff's complaint, memorandum of law and accompanying affidavit, IBM] is still unclear as to exactly what 'trade secrets' were allegedly misappropriated." <u>Am. Sci. and Eng'g Inc. v. Kelly</u>, 69 F. Supp. 2d 227, 238-239 (D. Mass. 1999) (denying preliminary injunction where plaintiff failed to prove likelihood of success on the merits).  Indeed, "nowhere in [its] supporting papers do[es] [plaintiff] identify the trade secrets which [the Court is] to enjoin [IBM] from using". <u>CVD, Inc. v. Raytheon Co.</u>, Civ. Action No. 81-2216-S, 1981 WL 2162, at * 1 (D. Mass. Dec. 3, 1981).

        Instead of specifying the allegedly misappropriated trade secrets, EchoMail offers the Court nothing more than opaque references to "confidential and

proprietary information and technology or 'code' contained in hardware and/or software".[2]  Compl. ¶¶ 39, 42.  Surely, if Echomail was disclosing its trade secrets, it must have detailed records of the information it presented, whether in the form of presentation notes, talking points or otherwise.  However, EchoMail has deliberately chosen not to identify a single specific trade secret it allegedly communicated to AMEX and IBM.  EchoMail cannot prevail on any trade secret claim merely by asserting that it has some unidentified trade secrets that were disclosed.  Under the controlling authority, this Court is entitled to more when it is being asked to grant injunctive relief.  Pursuant to Fed. R. Civ. P. 65(d), "[e]very order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained . . . ."  The lack of specifics EchoMail offer this Court simply cannot provide the basis for a sustainable order for preliminary injunction according to Rule 65(d).  Similarly, based on the information provided by plaintiff, if IBM could not "ascertain from the four corners of [any] order precisely what acts are forbidden, [IBM] would have to resort extrinsic documents to comply with the order's commands".  Corning, Inc. v. Picvue Elec., Ltd., 365 F.3d 156, 158 (2d Cir. 2004).

Moreover, EchoMail has conceded that its email system is not a trade secret.  According to the complaint, "EchoMail has protected its confidential and proprietary technology by obtaining patents", one protecting its "overall process for managing email" and the second protecting "its technology used to analyze emails [and]

---

[2] Significantly, both Gibbons and Seager attest that they were not given access to any EchoMail source code or object code.  Gibbons Decl. ¶ 9; Seager Decl. ¶ 6.

to construct a response to a customer's email". Compl. ¶ 56. "The issuance of the patent gives notice to the world that the patentee claims exclusive ownership of the information. The trade secret is destroyed completely." See, e.g., Prescott v. Morton Int'l, Inc., 769 F. Supp. 404, 407 (D. Mass. 1990). Because EchoMail patented the information in question, it is no longer afforded trade secret protection as a matter of law.

Next, EchoMail has failed to show that it took reasonable steps to preserve the secrecy of its trade secrets. EchoMail has failed to show that it has taken even the most basic and reasonable steps -- let alone gone to the "extraordinary lengths" it claims -- to preserve the secrecy of its alleged confidential information. After being notified that an IBM employee was privy to information that potentially created a "conflict of interest" during its early May 2005 conference call, EchoMail continued the call for more than an hour, without so much as asking the IBM employee to leave the call, much less requiring the IBM employee to sign an agreement regarding the subject-matter discussed. Gibbons Decl. ¶ 8. Following the call in early May of 2005, EchoMail never contacted IBM following the call to seek any assurances concerning the information discussed on that call. Plaintiff then waited some 45 days before commencing this action, again without ever conferring with IBM or its counsel before bringing on this motion seeking a preliminary injunction.

Finally, EchoMail has not alleged nor is there any evidence to show that IBM has "used" the alleged trade secrets at issue. EchoMail simply alleges its belief without factual support that "defendants will improperly use EchoMail's technology and proprietary information". Pl. Mem. at 1. However, the only evidence is that any information obtained in the call has only been used to advise AMEX. EchoMail can

8

point to no facts that IBM plans to act differently in the future.  Gibbons Decl. ¶ 6; Seager

Decl. ¶ 9.  EchoMail's failure to show otherwise is fatal to any claim of trade secret

misappropriation.  Moreover, the IBM personnel participating in the telephone

conference call that forms the basis of this lawsuit are part of IBM's IGS division, which

handles outsourced computer facilities.  Their sole job responsibilities involve supporting

American Express, and they have no role in any potential competition with EchoMail, are

bound by confidentiality agreements, and have not improperly disclosed whatever

information they may have learned during the conference call with EchoMail.  Gibbons

Decl. ¶ 9-10; Seager Decl. ¶ 6.

        **B.      Unfair Trade Practices**

        To prevail on a claim of unfair and deceptive acts and practices under

Mass. Gen. Law Ann. ch. 93A, §11, a plaintiff must prove (1) unfair or deceptive acts or

practices occurred; (2) those acts or practices occurred primarily and substantially in

Massachusetts; and (3) the plaintiff suffered a loss of money or property as a result of

defendant's unfair or deceptive acts.  Datatrend, Inc. v. Jabil Circuit, Inc., 3 F. Supp. 2d

66, 77 (D. Mass. 1998).

        As a threshold matter, EchoMail cannot prove that IBM engaged in any

unfair or deceptive acts.  A practice is unfair "if it is within the penumbra of some

common-law, statutory, or other established concept of unfairness; is immoral, unethical,

oppressive, or unscrupulous; and causes substantial injury to other businessmen."  Kenda

Corp., Inc. v. Pot O'Gold Money Leagues, Inc., 329 F.3d 216, 234 (1st Cir. 2003)

(internal citations omitted).  EchoMail does not allege, nor can it hope to establish, that

IBM acted in an immoral, unethical, oppressive, or unscrupulous manner.  According to

EchoMail's own complaint, "an IBM employee participating in the review by phone

stated that he worked for IBM". Compl. ¶ 44. Not only did Gibbons disclose that he

worked for IBM's Global Services, he also informed EchoMail that he "could be viewed

as having a conflict of interest when giving advice to AMEX concerning a product sold

by IBM". Gibbons Decl. ¶ 7; Compl. ¶ 44. Nonetheless, after Gibbon's disclosure,

EchoMail continued the call for more than an hour with Gibbons continuing to

participate. Gibbons Decl. ¶ 8.

       Plaintiff asks this Court to infer improper motives and improper conduct

on the part of IBM based on the fact that "IBM has made many approaches to EchoMail

of over the past 9 years". Ayyadurai Decl. ¶ 9. This allegation, even if true, is

insufficient to show the requisite conduct. EchoMail offers no evidence of actual unfair

practices by IBM or evidence of intent to act unfairly in the future. Rather, EchoMail's

Founder, Chairman and CEO baldly "believe[s] that AMEX and IBM are engaged in plan

to compete with EchoMail." Ayyaddurai Decl. ¶ 12. Such a "belief" is not enough to

allow plaintiff to prevail on the merits.

    **C.**     **Unfair Competition**

       Under both Massachusetts and New York law, "common law unfair

competition claims closely resemble Lanham Act claims except insofar as the state law

claim may require an additional element of bad faith or intent".  Genesee Brewing Co. v.

Stroh Brewing Co., 124 F.3d 137, 149 (2d Cir. 1997); see, e.g., Bayshore Group Ltd. v.

Bay Shore Seafood Brokers, Inc., 762 F. Supp. 404, 415 (D. Mass. 1991). Thus, to

establish a common law unfair competition claim, a plaintiff must allege, among other

things, defendants' use of its information in a manner which is likely to cause confusion

or to deceive purchasers concerning the origin of the goods or services. See Bayshore,

762 F. Supp. at 415. EchoMail fails to do so here.

As discussed in Section I.A., <u>supra</u>, EchoMail has not alleged, and cannot show, that IBM has <u>used</u> any of EchoMail's alleged trade secrets other than to advise AMEX.  <u>See</u> Gibbons Decl. ¶ 9; Seager Decl. ¶ 6.  Because EchoMail cannot establish that IBM in fact "used" any of EchoMail's its information, it is impossible for EchoMail to show that any possibility that there exists a "likelihood of confusion" as a result of the alleged misappropriation of it trade secrets.   For this reason alone plaintiff is not likely to succeed on the merits of this claim.

In addition, there is absolutely no evidence of bad faith on the part of IBM.  At all times IBM's conduct remained above board.  During the call Gibbons identified himself as an IBM employee and even went so far as to point out the potential for the appearance of a conflict.  Gibbons Decl. ¶ 8.  It was EchoMail that failed to terminate the call or to report that IBM representatives to sign a nondisclosure agreement.  EchoMail's failure to act simply cannot amount to bad faith on the part of IBM and the claim will likely fail accordingly.

## II.    ECHOMAIL PLAINTIFF HAS NOT ESTABLISHED IRREPARABLE HARM.

"Because [the] likelihood of success on the merits of the claim for trade secret misappropriation claim has not been shown, irreparable harm is not presumed." <u>DB Riley, Inc. v. AB Eng'g Corp.</u>, 977 F. Supp. 84, 92 (D. Mass. 1997); <u>see also</u> <u>CollaGenex Pharms., Inc. v. Ivax Corp.</u>, No. 04CV4253(SLT)(VVP), 2005 WL 1430373, at *2 (E.D.N.Y. June 15, 2005) ("Having failed at showing a likelihood of success on the merits, [p]laintiffs are not entitled to the presumption of irreparable harm").

EchoMail has not and cannot establish that it faces a significant risk of irreparable harm if a preliminary injunction is not issued.  <u>First</u>, EchoMail's arguments

"are inadequate to show current irreparable harm". <u>DB Riley</u>, 977 F. Supp. at 92.  At

best, plaintiff's allegations "suggest the possibility of "irreparable harm if certain events

transpire in the future . . . ." <u>Id.</u>  Irreparable harm, is not however, demonstrated for the

purpose of satisfying one of the prerequisites for injunctive relief, by what an adversary

might possibly do in the future to violation the movant's rights." <u>Id</u>.  A plaintiff must

establish an injury that is not a mere possibility, but rather, is a "presently existing, actual

threat" in order to prove irreparable harm.  <u>See</u> <u>Mass. Coalition of Citizens with</u>

<u>Disabilities v. Civil Defense Agency & Office of Em.Preparedness</u>, 649 F.2d 71, 74 (1st

Cir. 1981); <u>see also</u> <u>Freedom Holdings, Inc. v. Spitzer</u>, 408 F.3d 112 (2d Cir. 2005)

("[P]laintiffs must demonstrate that absent a preliminary injunction they will suffer 'an

injury that is neither remote nor speculative, but actual and imminent', and one that

cannot be remedied "if a court waits until the end of trial to resolve the harm") (internal

citations omitted).  EchoMail has failed to do so.

       In this case, "[Gibbons] states in his affidavit that he will not disclose any

confidential information or trade secret information of [EchoMail]". <u>Flexcon Co., Inc. v.</u>

<u>McSherry</u>, 123 F. Supp. 2d 42, 45 (D. Mass. 2000) (denying preliminary injunction,

based in part, on lack of irreparable harm).  Moreover, "[t]he affidavits of [Gibbons and

Seager] indicate that . . . [Gibbons and Seager] will not disclose any confidential

information [they] might retain in [their] head[s]". <u>Id.</u>  In addition, EchoMail intended to

disclose the information to AMEX for use by AMEX.  There is simply no basis to

conclude that the information would be used for any other purpose or disseminated

elsewhere.  Indeed, IBM "remains under a contractual and a general duty not to disclose

any confidential or trade secret information" it learns during its work with AMEX. <u>Id.</u>;

see Gibbons Decl. ¶ 10 ("It is my understanding that IGS's contractual arrangements with AMEX provide that confidential information I learn during the AMEX outsourcing engagement is to be used solely in working on the AMEX engagement.").

Second, EchoMail's failure to discontinue the conference call after learning that an IBM employee was in attendance belies any argument that it will suffer irreparable harm. According to the affidavit of EchoMail Founder, Chairman and CEO, V.A. Shiva Ayyadurai, EchoMail "would not have conducted the architecture review if it had known that an IBM employee was on the call" and that EchoMail "would have required IBM to sign a non-disclosure agreement with EchoMail before its employee could participate in the call, or, if IBM were unwilling to do this, we would have told the personnel from IBM that they would not participate in the call". Ayyadurai Decl. ¶¶ 10, 7. , attached as Exhibit I. However, at no time after learning that an IBM employee was on the call, was the call terminated by EchoMail nor was Gibbons ever asked to sign a non-disclosure agreement. Gibbons Decl. ¶ 8; Seager Decl. ¶ 4. Quite the opposite, the call continued for more than an hour without objection by EchoMail. Id. Plaintiff's conduct begs the question: why didn't EchoMail make every effort to protect its trade secrets from further disclosure at the time of the alleged misappropriation? It defies common sense to conclude that plaintiff will be irreparably harmed if the Court does not act to protect the same information that plaintiffs did not see fit to protect themselves.

Third, plaintiff has simply provided the Court with insufficient evidence upon which to conclude that it will suffer irreparable injury. Nowhere in plaintiff's complaint, motion or supporting affidavit does plaintiff identify with any specificity what

trade secrets IBM allegedly misappropriated.  Without such information, the Court

deprived of any basis to find irreparable harm.

### III.     THE BALANCING OF THE EQUITIES AND THE PUBLIC INTEREST FAVORS IBM.

IBM through its Global Services Division ("IGS") has engaged in

outsourcing of computer operators from companies throughout the world.  As part of that

business, IBM's IGS personnel regularly interact with third party vendors on behalf of

their outsourcing clients.  To the extent that a plaintiff can secure injunctive relief against

IBM because its IGS employees -- who have agreed to be bound by nondisclosure

agreements -- participate in interactions with third party vendors, the harm to IBM's

outsourcing business would be immeasurable.

Similarly, we respectfully submit, that it is not in the public interest for a

plaintiff who alleges trade secret misappropriation and unfair competition without

specifying the trade secrets at issue or being able to point to any actual competition to be

nonetheless able to secure injunctive relief on the type of record now before this Court.

That is particularly true where, as here, plaintiff waited 45 days from the event at issue

and never attempted to resolve the issue with IBM prior to filing this motion.

### CONCLUSION

For the foregoing reasons, defendant IBM respectfully requests that

plaintiff's motion for preliminary injunction be denied.

Respectfully submitted,

IBM CORPORATION,

By its attorneys,

_/s/ Stephen D. Poss_____
Stephen D. Poss, P.C. (BBO # 551760)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA  02109
Tel: (617) 570-1000
Fax: (617) 523-1231