UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ECHOMAIL, INC.,

        Plaintiff,

v.

AMERICAN EXPRESS CO. and
IBM CORP.,

        Defendants.

CIVIL ACTION NO. 05-11318

DECLARATION OF COLLEEN DECHON
IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

COLLEEN DECHON hereby declares as follows:

1. I am a Manager, Interactive Development for American Express Travel Related Services Company, Inc. ("AXP"). In that position, I am responsible for providing inbound e-mail servicing support for multiple business units within AXP. I was responsible for managing the relationship between AXP and EchoMail, Inc. ("EchoMail") from April 2004 until EchoMail stopped performing services for AXP on May 27, 2005. As such, I have personal knowledge of the facts set forth herein.

2. AXP entered into a Stand Alone Agreement for Consulting Services with General Interactive, Inc., a predecessor of EchoMail, effective July 9, 1999 (as amended and supplemented, "Master Agreement"). Per an Amendment to the Master Agreement executed in August 2004 ("Amendment"), the Master Agreement was to remain effective until December 31, 2005. The Amendment further provided that the Master Agreement would automatically renew for two additional 12-month terms unless AXP terminated by written notice at least 60 days prior to year end. Only AXP had the right to terminate. Thus, EchoMail was required to perform

through the end of 2007, but AXP had the contractual right to end the relationship at the end of 2005 or 2006.

3.  Per the Master Agreement, EchoMail provided e-mail services for AXP. In general terms, EchoMail was required to receive and filter e-mails that were sent to AXP by its customers, and then either respond to the e-mail via an auto-reply message or indicate that further manual intervention was required by an AXP customer service representative.

4.  In September 2004, EchoMail upgraded to version 7.3 of its product. Significant problems immediately followed. Some of the problems concerned basic functionality, such as searches not being performed properly, appropriate responses not appearing, and signatures and salutations missing. These issues should have been noticed by EchoMail with proper monitoring and testing, but instead had to be raised by the Interactive Servicing Unit ("ISU") of AXP.

5.  After the upgrade, the EchoMail system functioned extremely slowly. AXP raised its concerns about the slowness of the system repeatedly with EchoMail. The problem became more severe over time, with the backlog of e-mails growing. EchoMail was unable to solve the problem. The situation reached a critical point in February 2005 when the system effectively went down for two days. During that time, AXP representatives were unable to access and respond to customer e-mails.

6.  AXP also was concerned that EchoMail did not have the resources to respond to the problems that continued to appear. EchoMail was not acting proactively, but instead leaving it to AXP to raise and elevate all of the issues that were surfacing.

7. On March 30, 2005, AXP and EchoMail personnel met to discuss the numerous problems with the EchoMail system that arose after the upgrade. At the meeting, EchoMail recognized the numerous problems with its system, and proposed some corrective measures that it contended may help.

8. In light of the significant and uncorrected problems with the EchoMail system, on April 15, 2005, AXP released a Request for Information ("RFI") to four other vendors relating to the services performed at that time by EchoMail. AXP provided the RFI to EchoMail as well. On April 21, 2005, EchoMail provided AXP with formal notice that it would participate in the RFI. EchoMail responded to the RFI on May 12, 2005.

9. On May 4 and 5, 2005, AXP performed a Technical Due Care Review ("Review"), which related to the anticipated release by EchoMail of version 8.1 of its product. The Review revealed critical weaknesses in EchoMail's version 8.1 and raised significant questions regarding EchoMail's ability to deliver a robust platform to address availability, scalability, reliability, and security requirements for AXP.

10. On May 24, 2005, AXP and EchoMail personnel participated in a conference call. From the AXP side, I participated, along with Greg Daniel and Janice Chai-Chang. In the call, AXP advised EchoMail of the results of the review, stated that it wanted to postpone the upgrade to 8.1, and indicated that AXP intended to move to a Request for Proposal ("RFP"). EchoMail CEO V.A. Shiva responded in a confrontational manner, and objected to the RFP process. In response, AXP agreed to hold off on issuing an RFP until AXP personnel visited EchoMail at its facility on June 6, 2005, for an e-mail management meeting and a technical exchange had occurred between EchoMail and AXP regarding the findings of the Review.

11. During the May 24 call, Mr. Shiva mentioned that an IBM representative had participated via conference call in the Review. This was the first instance in which EchoMail ever raised any concern with the consulting services that IBM provided to AXP.

12. As reflected by its decision to meet with EchoMail on June 6, AXP had not made any decision regarding termination of the Master Agreement at the end of the year, and in no way indicated that it sought to terminate the Master Agreement immediately. Based on the significant problems with EchoMail's performance, AXP began evaluating the other options available in the marketplace. However, AXP had recently spent $800,000 in hardware upgrades in an effort to improve the EchoMail system, and replacing EchoMail with a new vendor would have significant start-up costs.

13. The meeting scheduled for June 6 never occurred because, per a letter dated May 26, 2005, EchoMail purported to terminate the Master Agreement. Mr. Shiva of EchoMail wrote to Kenneth I. Chenault, the Chief Executive Officer of American Express Company, and stated as follows: "As Chairman and CEO of EchoMail, Inc., I am writing this letter to notify you of our decision to terminate the relationship with American Express effective 5PM on May 27, 2005." (A copy of the letter is attached hereto as Exhibit A). Mr. Shiva explained that EchoMail's action "is a result of the abusive treatment that my staff has suffered under Reena Panikar, an American Express employee." Id. On May 27, 2005, Mr. Shiva wrote a follow-up letter to Mr. Chenault, which stated as follows: "Pursuant to my letter of termination on May 26, 2005, EchoMail has stopped accepting any further E-Mail from American Express to our mail servers for processing as of 5PM today, May 27, 2005. It is, once again unfortunate that EchoMail has been forced to terminate the relationship." (A copy of the letter is attached hereto as Exhibit B).

14. EchoMail did not notify any AXP personnel involved with EchoMail about EchoMail's "decision to terminate the relationship." Instead, on May 28, 2005, AXP's technical staff became aware that EchoMail had stopped providing services to AXP, and that EchoMail no longer was receiving any e-mails.

15. On May 31, 2005, AXP wrote to EchoMail and advised that it considered EchoMail to be in breach of the Master Agreement. (A copy of the letter is attached hereto as Exhibit C). AXP demanded the immediate payment of $487,335, for prepaid services that EchoMail refused to provide. AXP also demanded the immediate return of its confidential information, including archived tapes, as well as AXP owned servers and a network router. EchoMail never responded to this letter.

16. The services provided by EchoMail supported 12 AXP business units. After EchoMail refused to continue to provide services to AXP, most of the business units, including the larger units, no longer could process e-mails from customers. A few smaller units were able to manually respond to e-mails. As of today, most of the business units continue to lack the ability to receive and process inbound e-mails due to the refusal of EchoMail to perform under the Master Agreement. This has caused and continues to cause tremendous damage to AXP.

17. In response to the situation, AXP has moved forward with the RFP process. The services that EchoMail provided to AXP are currently available from several other companies. IBM is not a participant in the RFP. The participating companies are competitors of EchoMail, with their own technology to perform the e-mail filtering function.

18.  AXP is not engaged in plans to compete with EchoMail. As described above, AXP's response to EchoMail's refusal to perform has been to replace EchoMail with another vendor, not to try to develop a similar product for use by AXP or any other entity.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 27, 2005.

_____
COLLEEN DECHON

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail-hand on 6/28/05



May 26, 2005

V.A. Shiva
Chairman and CEO
EchoMail, Inc.
701 Concord Avenue
Cambridge, MA 02138

Kenneth I. Chenault
Chairman and CEO
American Express Corporation
World Financial Center
200 Vessey Street
New York, NY 10285

Dear Ken,

As Chairman and CEO of EchoMail, Inc., I am writing this letter to notify you of our decision to terminate our relationship with American Express effective 5PM on May 27, 2005. This action is a result of the abusive treatment that my staff has suffered under Reena Panikar, an American Express employee, and the unfair business practices precipitated by her recent actions.

Since 1999, we had a very close and respected Partnership of trust and openness. Recent machinations, led by Ms. Panikar have destroyed that trust and goodwill. What is ironic and disheartening is that we have been forced to take this decision in spite of the re-awarding of another three (3) year contract effective January 2005, which was based on an extensive RFI conducted in 2004.

We respect the American Express brand; however, Ms. Panikar's actions and wrongfully laying blame threatens our well-established and respected brand. For your knowledge, attached are two (2) E-Mails from one of your business unit leaders, as early as the beginning of this month, sharing the value of EchoMail to his business unit.

Kindly contact me if you would like any clarification.

Best regards,

V.A. Shiva

RECEIVED
MAY 27 2005
KENNETH CHENAULT

EchoMail, Inc.
701 Concord Avenue
New Media Park
Cambridge, Mass.
02138-1057

tel: 617-354-8585
fax: 617-354-8899
www.echomail.com



May 27, 2005

V.A. Shiva
Chairman and CEO
EchoMail, Inc.
701 Concord Avenue
Cambridge, MA 02138

Kenneth I. Chenault
Chairman and CEO
American Express Corporation
World Financial Center
200 Vessey Street
New York, NY 10285

Re: Termination Notice Sent by EchoMail to American Express on May 26, 2005

Dear Ken,

Pursuant to my letter of termination on May 26, 2005, EchoMail has stopped accepting any further E-Mail from American Express to our mail servers for processing as of 5PM today, May 27, 2005.

It is, once again unfortunate that EchoMail has been forced to terminate the relationship. To ensure that any E-Mail received prior to 5PM EST of May 27, 2005, does not go unprocessed, we are offering you continued full access to our software product. However, such access will be decommissioned by 5PM EST, June 3, 2005.

Kindly contact me if you would like any clarification.

Best regards,

V.A. Shiva

**RECEIVED**

MAY 3 1 2005

**KENNETH CHENAULT**

EchoMail, Inc.
701 Concord Avenue
New Media Park
Cambridge, Mass.
02138-1057

tel: 617-354-8585
fax: 617-354-8899
www.echomail.com



May 31, 2005

Interactive Services
and New Businesses

American Express
American Express Headquarters
200 Vesey Street
WFC
New York, NY 10285

**VIA OVERNIGHT MAIL**
Mr. V. A. Shiva, President and C.E.O.
EchoMail, Inc.
701 Concord Avenue
New Media Park
Cambridge, MA 02138-1057

Re: EchoMail, Inc. ("EchoMail") Breach of E-Mail Services Consulting Agreement Entered into with American Express Travel Services Company, Inc. ("Amex") as of July 9, 1999, as amended (the "Agreement")

Dear Mr. Shiva:

Amex considers EchoMail in breach of the Agreement due to the discontinuance, as of May 27, 2005, by EchoMail of the services it was required to perform under the Agreement. Amex reserves all rights in conjunction with this breach.

Further, Amex requires immediate payment by EchoMail of all monies due to Amex, including, but not limited to, the following amounts that were prepaid to EchoMail:
- $320,000 for Hardware Leasing and Hosting Services
- $133,000 for Hosting and Maintenance
- $34,335 for Security Services

The listed amounts represent pro rated totals based on the provision of services for only 5 out of 12 months.

EchoMail must also return immediately all of the items due to and/or owned by Amex, including, but not limited to, the following:
- all Amex Confidential Information, including archived tapes, full and incremental;
- any Amex-Purchased Servers (six business intelligence servers, five application servers, two test servers);
- an Amex owned Database Server; and
- an Amex owned Network Router.

All items returned should be returned by commercially secure means and methods. Amex reserves the further right to provide specific instructions as to all items that are to be returned, and shall hold EchoMail responsible for maintaining its duty of confidentiality going forward.

Finally, please immediately remove all mention of Amex from your Website, marketing collateral and press releases.

Sincerely,

Richard Quigley,
Senior Vice President, American Express Interactive

American Express Travel Related
Services Company, Inc.