UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ECHOMAIL, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 05-11318-NMG |
| ) | |
| AMERICAN EXPRESS CO. ) | |
| and IBM CORP., ) | |
| ) | |
| Defendants. ) | |

FIRST SUPPLEMENTAL
AFFIDAVIT OF V. A. SHIVA AYYADURAI

I, V.A. Shiva Ayyadurai, hereby depose and states as follows:

1. I am the founder, Chairman, and CEO of EchoMail. I verified the facts set forth in the Verified Complaint in this matter and filed an affidavit in support of the motion for a preliminary injunction now pending before the Court. I have had an opportunity to review the submissions made to this Court by AmEx and IBM in opposition to the motion for preliminary injunction. I have personal knowledge of the facts set forth in this affidavit.

2. AmEx and IBM are arguing that we do not have protectable trade secrets because we obtained patents. While I will leave the legal analysis to others, much of EchoMail's confidential and proprietary technology including its business practices is not patented. At the risk of over-simplifying, our patents cover discrete aspects of our computer technology. Those patents, as partially set forth in paragraph 56 of the Verified Complaint, protect (i) the algorithm we use to analyze and categorize an email; (ii) the technology we use to formulate a response to an email, and (iii) the itemization of our components that contribute to our overall process. Our confidential and proprietary technology includes business practices, encompassing our overall methodology, which are not patented and are confidential and proprietary. These business

practices include, among others:

> (a) the way in which an email travels through the EchoMail system,
> (b) what hardware we use,
> (c) how our hardware is linked together,
> (d) how our data center operates,
> (e) how we train on the use of our products,
> (f) how we secure our systems,
> (g) how we go about the release of new versions of our products,
> (h) how we protect our source code,
> (i) how we handle data privacy,
> (j) how we develop our new products,
> (k) how our systems are monitored, and
> (l) how we position ourselves against our competition.

It is these and other confidential and proprietary technologies and practices—many of which took years to develop—that were the subject of AmEx's architecture review. It is this technology (which is not patented) that we seek to protect. It is also these same business practices that I believe are covered by our agreement with AmEx which protects EchoMail's confidential information.

3. Only yesterday did I find out there were two IBM employees on the phone in the architecture review, not one. In other words, despite the fact that after the review we asked AmEx to reveal to us who from IBM was on the call they have always concealed that information from us. It is only though IBM's submission yesterday that we learned the true identity of the first IBM participant and that the second IBM participant existed at all. Apparently IBM takes issue with the fact that we never contacted them directly about their presence on the calls. Why would we contact IBM? We have no relevant relationship with them. Our relationship was with AmEx. We did ask AmEx why they included IBM personnel without telling us and they never responded.

4. The Declaration of Colleen Dechon makes a number of false and misleading statements.

  (a) In paragraphs 4 and 5 she states that "significant problems" followed our upgrade. Ms. Dechon knows that this is not true. The only problem that existed after September 2004 concerned AmEx's use of our product in India and it was not related to our upgrade. The problem to which Ms. Dechon refers was created solely by AmEx's use of untrained personnel misusing the product. This caused a back log of unprocessed emails to build up over time. It's important to note that this lone problem—slowness—existed only with respect to Ms. Panikar's unit not the other business units serviced by EchoMail. Furthermore her contention that we were unable to solve the problem is false. We did solve it, as she well knows, even though they had refused to properly train their personnel in India to correctly use the product.

  (b) Ms. Dechon's statement in paragraph 8 of her declaration is also false. There were no significant and uncorrected problems with the EchoMail system. Moreover, we were told that the RFP was unrelated to EchoMail. Mr. Daniel told us that it was a "formality" because of new AmEx personnel.

  (c) In paragraph 10 of her Declaration Ms. Dechon states that AmEx agreed to hold off on the RFP process until after a June 6 meeting. Although Mr. Daniel suggested this, he was overruled by Ms. Chai-Chang who stated that "AmEx would be moving forward without EchoMail." Ms. Dechon was on the phone and she knows exactly what Chai-Chang said. Moreover, we had already been advised of the results of the architecture review on May 4 and 5, 2005. AmEx's architecture team told us that we had done well and that AmEx looked forward to working with us.

  (d) The entirety of paragraph 12 of Ms. Dechon's Declaration is contradicted by the fact that we were previously told that EchoMail would not be part of the RFP process. Also, Ms. Dechon never addresses Ms. Panikar's conversation with Sonu Abraham in which Ms. Panikar terminated the relationship.

  (e) Once again, paragraph 16 is false and misleading. We wrote to each business unit asking them if they wanted us to continue to process their emails.

  (f) Ms. Dechon cannot even keep her facts straight. Paragraph 17 of her declaration ("In response to the situation, AXP moved forward with the RFP process") contradicts what she stated in paragraph 10 (the RFP was necessary because of the results of the architecture review).

  (g) Finally, Ms. Dechon's statement that IBM is not involved in the RFP process is absurd on its face. IBM participated in the entire architecture review and they now know our confidential and proprietary information. IBM is involved in the process as AmEx's consultant and IBM's partners (Kana, Legato and Zantaz) are EchoMail's direct competitors. Based on what IBM and AmEx learned in the architecture review they are in a position to review, modify and upgrade our competitors' products for AmEx and other business.

5. The declaration of Greg Daniel also contains false and misleading statements.

      (a)    Daniel states the RFP process was initiated because of "significant problems" and that he so advised me. That is not what he told me. Daniel told me "not to worry," that AmEx was initiating the RFP only because AmEx had new people involved and that it was a formality.

      (b)    Daniel states that he never ceded responsibility for the RFP process. This is not so. That is exactly what he said and Panikar confirmed it after her earlier denials.

   6.    The declaration of Angela Ramsammy also contains false and misleading statements.

      (a)    Ramsammy wants the Court to believe that the architecture review was a run of the mill "Technical Due Care Review." Yet, Ramsammy's own correspondence on the review refers to it as an "architecture review."

      (b)    Ramsammy attempts to down play the significance of the review by calling it "conceptual level only" regarding the features of the upgrade. She knows this false and misleading. The review went far beyond version 8.1 and was anything but "conceptual… only." The very TEQ referred by Ramsammy characterizes EchoMail's information as "confidential, trade secret, proprietary and/or sensitive" and states that AmEx would "receive and maintain the information provided in trust." That document makes perfectly clear the broad scope of the architectural review—as Ramsammy called it.

      (c)    Ramsammy states that AmEx did not receive copies of documents at the meeting. Yet, for two days, Ramsammy took copious notes on her laptop, as did others.

      (d)    Ramsammy states that EchoMail knew of IBM's relationship with AmEx and that IBM's work is provided for AmEx exclusively. While this may or may not be true, it masks the real issue which Ramsammy fails to address. IBM had never been involved, in any way, with EchoMail's relationship with AmEx.

      (e)    Ramsammy states that the IBM participant identified himself on the first day of the architecture review. This is false. The IBM person identified himself on the second day and only with approximately one hour remaining on the two day architecture review.

I also must point out that Ramsammy contradicts another declarant concerning the reason for the architecture review. Ramsammy states that the review was triggered by the upgrade to version 8.1. Yet, IBM's declarant Stephen P. Gibbons states that the review was triggered by ongoing performance problems. In other words, Gibbons contradicts AmEx's oft-repeated assertion that there was no link between the RFP process and the architecture review. This confirms EchoMail's assertion that (despite AmEx's denials) the architecture review and the RFP were in fact linked and the architecture review was a pretext for gaining access to EchoMail's confidential and proprietary technology and terminating the contract—which is exactly what happened.

   7.    I am shocked that AmEx is arguing that the information EchoMail provided to it

does not rise to the level of trade secret and that the information was only "conceptual." It is not true. Before the architecture review, AmEx provided us with a 30 page Technology Review Questionnaire. That questionnaire expressly recognizes that our responses are "confidential, trade secret, proprietary and/or sensitive" and that AmEx would "receive and maintain the information provided in trust." The questionnaire demonstrates some (though certainly not all) of the considerable detail of the architecture review. I do not understand how AmEx can now argue to the Court that our information is not a trade secret.

8. The defendants also argue that I should have done something immediately when the IBM employee revealed himself. Certainly I wish now, with the benefit of hindsight, that I had stopped the architecture review immediately upon learning of IBM's participation. But consider the circumstances at that time. AmEx was our largest customer and we were finishing a two day architecture review that the AmEx personnel told us was extremely successful. I directed one of my employees to find out who "Steven" was so we could determine what to do about it, but AmEx refused to provide us with that information. It was only after AmEx kicked us out of the RFP process entirely and terminated the contract that it became clear to me what the defendants were up to. The Court should also not lose sight of the fact that we asked AmEx to reveal who would be participating in the architecture review. AmEx intentionally omitted the IBM employees.

9. AmEx argues that it never terminated the relationship with EchoMail and that termination was brought about only through my letter to Ken Chenault. This is not true. Why would I unilaterally terminate our contract with our single largest customer? I wouldn't and I didn't. It became clear to me that we had been mislead by AmEx, that AmEx had provided our information to IBM, that we were excluded from the RFP process, that the architecture review

- 6 -

was a pretext to gain access to our most confidential and proprietary information and that Punikar had terminated the contract (in violation of its terms) with EchoMail after being given responsibility for the RFP process. Based on all of these factors, I had no choice but to send the letter to Mr. Chenault.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 29th DAY OF JUNE 2005.

_____
V. A. Shiva Ayyadurai

**CERTIFICATE OF SERVICE**

I hereby certify that on this day a true copy of the above document was served upon the attorney of record for each party by ~~mail~~/by hand.

Date: 6.29.2005    Alan D Rose

- 6 -