MAS-20030912
guen

**Commonwealth of Massachusetts**
SUFFOLK SUPERIOR COURT
Case Summary
Civil Docket

06/23/2005
02:23 PM

## SUCV2005-02477
## Echomail Inc v American Express Co et al

| | | | | | |
|---|---|---|---|---|---|
| **File Date** | 06/20/2005 | **Status** | Disposed: transfered to other court (dtrans) | | |
| **Status Date** | 06/23/2005 | **Session** | BLS - CtRm 1309, 3 Pemberton Square, Boston | | |
| **Origin** | 1 | **Case Type** | BD2 - Proprietary or trade secrets | | |
| **Lead Case** | | **Track** | B | | |

| | | | |
|---|---|---|---|
| **Service** | **Answer** | | **Rule12/19/20** |
| **Rule 15** | **Discovery** | | **Rule 56** |
| **Final PTC** | **Disposition** | | **Jury Trial** Yes |

### PARTIES

**Plaintiff**
Echomail Inc
Active 06/20/2005

**Private Counsel 427280**
Alan D Rose
Rose & Associates (Alan D)
29 Commonwealth Avenue
Boston, MA 02116
Phone: 617-536-0040
Fax: 617-536-4400
Active 06/20/2005 Notify

**Private Counsel 628871**
Alan D Rose Jr
Rose & Associates (Alan D)
29 Commonwealth Avenue
Boston, MA 02116
Phone: 536-0040
Fax: 536-4400
Active 06/20/2005 Notify

**Defendant**
American Express Co
Service pending 06/20/2005

**Private Counsel 568194**
John F Farraher Jr
Greenberg Traurig
1 International Place
3rd floor
Boston, MA 02110-
Phone: 617-310-6000
Fax: 617-310-6001
Active 06/23/2005 Notify

**Private Counsel 628480**
Evan Georgopoulos
Greenberg Traurig
1 International Place
20th Floor
Boston, MA 02110
Phone: 617-310-6000
Fax: 617-310-6001
Active 06/23/2005 Notify

MAS-20030312

guen

**Commonwealth of Massachusetts**
SUFFOLK SUPERIOR COURT
Case Summary
Civil Docket

06/23/2005
02:23 PM

## SUCV2005-02477
### Echomail Inc v American Express Co et al

| Defendant | Private Counsel 551760 |
|---|---|
| IBM Corp<br>Service pending 06/20/2005 | Stephen D Poss<br>Goodwin Procter<br>53 State Street<br>Exchange Place<br>Boston, MA 02109-2881<br>Phone: 617-570-1000<br>Fax: 617-570-1498<br>Active 06/23/2005 Notify |

### ENTRIES

| Date | Paper | Text |
|---|---|---|
| 06/20/2005 | 1.0 | Complaint (Business) filed & jury demand on complaint (all issues) |
| 06/20/2005 | | Origin 1, Type BD2, Track B. |
| 06/20/2005 | 2.0 | Civil action cover sheet filed |
| 06/20/2005 | 3.0 | Notice of acceptance into the business litigation session |
| 06/20/2005 | 4.0 | Plffs motion for preliminary injunctive relief upon short order of notice |
| 06/20/2005 | 5.0 | Plffs motion for an order requiring the defendants to preserve documents computerized data and materials |
| 06/20/2005 | | Notice ordered issued re: preliminary injunction returnable Thursday June 23, 2005 in room 1309 at 2:00PM (vanGestel J)  Summons and order of notice issued  See P#1 |
| 06/23/2005 | | Cerified copy of petition for removal ot U. S. Dist. Court of Defts. American Express Company Inc., and IBN Corp., U. S. Dist.#(05-11318GAO). |
| 06/23/2005 | | Case REMOVED this date to US District Court of Massachusetts |

### EVENTS

| Date | Session | Event | Result |
|---|---|---|---|
| 06/23/2005 | CtRm 1309, 3 Pemberton | Motion/Hearing: order of notice<br>P I | |

I HEREBY ATTEST AND CERTIFY ON

JUNE 24, 2005, THAT THE

FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: _____

ASSISTANT CLERK.

*Suffolk Superior Civil #05-2477*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**05 11318 GAO**

ECHOMAIL, INC.,

        Plaintiff,

        v.

AMERICAN EXPRESS COMPANY,
INC., and IBM CORP.,

        Defendants.

Civil Action No.



I hereby certify on _____ that the foregoing document is a true and correct copy of the
☐ electronic docket in the captioned case
☐ electronically filed original filed on
☒ original filed in my office on ____ 6/23/2005
Sarah A. Thornton
Clerk, U.S. District Court
District of Massachusetts
By: _____
Deputy Clerk

## NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1441 and 1446, defendants American Express

Company, Inc. ("American Express") and IBM Corporation ("IBM"), by their

undersigned attorneys, submit this Notice of Removal and respectfully state as follows:

## NATURE OF THE ACTION

1.      On or about June 20, 2005, plaintiff EchoMail, Inc. ("EchoMail")

filed a Complaint (the "Complaint") in the Commonwealth of Massachusetts, Suffolk

Superior Court, entitled EchoMail, Inc. v. American Express Co. and IBM Corp., Civil

Action No. 05-2477 BLS (the "State Court Action") purporting to allege claims against

both American Express and IBM for misappropriation of trade secrets under Mass. Gen.

L. ch. 93 and New York law, unfair competition, and unfair and deceptive trade

practices in violation of ch. 93A, § 11. In addition, EchoMail asserts claims against

American Express alone for breach of contract, breach of the covenant of good faith and

fair dealing, and interference with contractual relations.

2.      A true and correct copy of the Complaint and all records and

proceedings filed before the Superior Court are attached hereto as Exhibit A.

## TIMELINESS OF THIS NOTICE

3.    On June 21, 2005 defendants American Express and IBM received copies of the initial pleading in the State Court Action setting forth the causes of action upon which the suit is based. This Notice of Removal is therefore timely under 28 U.S.C. § 1446(b).

## PARTIES

4.    According to the Complaint, plaintiff EchoMail is a Delaware corporation, and maintains its headquarters and principal place of business at 701 Concord Avenue, Cambridge, Massachusetts.

5.    Defendant American Express is now, and was at the time of the filing of the Complaint and at all times intervening, a corporation organized and existing under the laws of the State of New York with its principal place of business in the State of New York.

6.    Defendant IBM is now, and was at the time of the filing of the Complaint and at all times intervening, a corporation organized and existing under the laws of the State of New York with its principal place of business in the State of New York.

## **JURISDICTION**

### **Diversity of Citizenship**

7.      Complete diversity of citizenship exists within the meaning of 28 U.S.C. § 1332, as plaintiff is a citizen of the Commonwealth of Massachusetts and defendants are citizens of the State of New York.

### **Jurisdictional Amount**

8.      The matter in controversy in this civil action exceeds the sum or value of $75,000.00, exclusive of interest and costs, within the meaning of 28 U.S.C. § 1332.

## **REMOVAL PROCEDURES**

9.      This action is now removable pursuant to 28 U.S.C. § 1441(a). This Notice of Removal is being timely filed.

10.     This Notice of Removal is being filed within thirty (30) days of the defendants' receipt of the initial pleading setting forth the claim for relief upon which this action is based.

11.     The United States District Court for the District of Massachusetts embraces the place where the State Court Action is currently pending.

12.     Written notice of the filing of this Notice of Removal will be given to plaintiff, and a copy of this Notice will be filed in the appropriate state court, as required by 28 U.S.C. § 1446(d).

3

Doc #:NY6:964142.1

14.    By filing this Notice of Removal, defendants do not waive any

defense that may be available to any of them, including, but not limited to, the right to

challenge personal jurisdiction or the validity of service of process, and do not concede

that the allegations in the Complaint state a valid claim under applicable law.

15.    Pursuant to Local Rule 81.1(a), defendants shall request from the

clerk of the Suffolk County Superior Court certified or attested copies of all records and

proceedings in the state court, and certified or attested copies of all docket entries

therein, including a copy of this Notice of Removal, and will file the same with this

Court within thirty (30) days after the filing of this Notice of Removal.

WHEREFORE, defendants American Express and IBM respectfully

request that the above-captioned action now proceeding against them in the Trial Court

of the Commonwealth of Massachusetts, be removed therefrom and proceed in this

Court as an action duly removed.

Dated: June 23, 2005

Respectfully submitted,

AMERICAN EXPRESS
COMPANY, INC.
By its attorney,

John F. Farrah, Jr. (BBO # 568194)
Evan Georgopoulos (BBO # 628480)
GREENBERG TRAURIG LLP
One International Place
Boston, MA 02110
Tel: (617) 310-6000
Fax: (617) 310-6001

IBM CORPORATION
By its attorneys,

Stephen D. Poss, P.C. (BBO # 551760)
GOODWIN PROCTER LLP
Exchange Place
53 State Street
Boston, MA 02109
Tel: (617) 570-1000
Fax: (617) 523-1231

4

Doc #:NY6:964142.1

CERTIFICATE OF SERVICE

     I, Evan Georgopoulos, hereby certify that on the 23rd day of January, 2005, I caused to served by hand a copy this Notice of Removal to the following counsel of record:

             Alan D. Rose, Jr.
             Rose & Associates
             29 Commonwealth Avenue
             Boston, MA 02116

             Evan Georgopoulos

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                                SUPERIOR COURT
                                                            CIVIL ACTION
                                                            NO. 05-2477 BLS

|  |  |
|---|---|
| ECHOMAIL, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| AMERICAN EXPRESS CO. and | ) |
| IBM CORP., | ) |
| | ) |
| Defendants. | ) |

## NOTICE OF FILING OF NOTICE OF REMOVAL

PLEASE TAKE NOTICE that defendants American Express Company, Inc. and

IBM Corporation filed the attached Notice of Removal with the United States District

Court for the District of Massachusetts on June 23, 2005.

Dated: June 23, 2005                            Respectfully submitted,

AMERICAN EXPRESS COMPANY, INC.          IBM CORPORATION
By its attorneys,                                By its attorney,

John F. Farraher, Jr.(BBO # 568194)      Stephen D. Poss, P.C. (BBO #551760)
Evan Georgopoulos (BBO # 628480)         GOODWIN PROCTER LLP
GREENBERG TRAURIG LLP                    Exchange Place
One International Place                   53 State Street
Boston, MA 02110                         Boston, MA 02109
Tel: (617) 310-6000                      Tel: (617) 570-1000
Fax: (617) 310-6001                      Fax: (617) 523-1231

CERTIFICATE OF SERVICE

I, Evan Georgopoulos, hereby certify that on the 23rd day of January, 2005, I caused to served by hand a copy this Notice of Filing of Notice of Removal to the following counsel of record:

Alan D. Rose, Jr.
Rose & Associates
29 Commonwealth Avenue
Boston, MA 02116

Evan Georgopoulos

bos-srv01\166597v01

2

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                         SUPERIOR COURT
                                     CIVIL ACTION NO.          -BLS

ECHOMAIL, INC.,                )
                               )
            Plaintiff,         )
                               )
v.                             )
                               )
AMERICAN EXPRESS CO.           )
and IBM CORP.,                 )
                               )
            Defendants.        )
_____)

VERIFIED COMPLAINT

Introduction

1.    Defendants American Express Company ("AmEx") and IBM
Corporation (collectively "defendants") obtained unprecedented
access to the confidential and proprietary technology of
plaintiff EchoMail, Inc. ("EchoMail") by fraudulently,
pretextually, and illegally using AmEx's contractual
relationship with EchoMail to obtain an "architecture" review of
EchoMail's cutting-edge, patented, email management system.   IBM
had no right whatsoever to access EchoMail's technology and
proprietary information, but deceptively did so.   AmEx permitted
this deception to occur.   The defendants will improperly use
EchoMail's technology and proprietary information in the absence
of judicial intervention.   Injunctive relief is necessary to

protect EchoMail's technology from improper use and
dissemination by the defendants.

2. In addition to its request for injunctive relief,
EchoMail brings this complaint for misappropriation of trade
secrets, unfair competition, unfair and deceptive acts and
practices, breach of contract, breach of the covenant of good
faith and fair dealing, and intentional interference with
contractual relations.

### Parties and Jurisdiction

3. Plaintiff EchoMail is incorporated in the State of
Delaware, and maintains its headquarters and principal place of
business at 701 Concord Avenue, Cambridge, Massachusetts.
EchoMail is a leading provider of electronic mail management
services, software and hardware.

4. Defendant American Express Company is incorporated in
the State of New York, and maintains its principal place of
business at 200 Vesey Street, New York, New York. AmEx is a
world-wide, financial services company doing business in
Massachusetts, and is subject to the jurisdiction of this Court
under the Massachusetts Long-Arm Statute, G.L. c. 223A, §3.

5. Defendant IBM Corporation is incorporated in the State
of New York, and maintains its principal place of business at 1
Orchard Road, Armonk, New York. IBM is a world-wide,
information technology company which does business in

Massachusetts, and is subject to the jurisdiction of this Court
under the Massachusetts Long-Arm Statute, G.L. c. 223A, §3.

### Facts

#### The Development of EchoMail and Its
#### Confidential and Proprietary Technology

6.    V. A. Shiva Ayyadurai ("Shiva"), who has verified this
Complaint, is the principal inventor of the technology
underlying EchoMail's proprietary email management, storage and
web-based technology.

7.    In 1977, when he was 14 years old, Shiva obtained
copyrights for the first email system. For his groundbreaking
work in the email technology field, Shiva was honored by the
Westinghouse Science Awards Committee for meritorious work in
scientific research which supported his entrance to the
Massachusetts Institute of Technology ("MIT"). In 1986, Shiva
obtained a bachelor of science in electrical engineering and
computer science from MIT. In 1989 and 1990, after working in
high-tech for many years, Shiva received dual master's degrees
from the MIT Media Lab and the MIT Department of Mechanical
Engineering.

8.    In 1993, while he was pursuing his Ph.D. at MIT in
artificial intelligence focused on pattern analysis, Shiva
entered a White House sponsored contest focused on finding new
and innovative ways to catalogue emails. Shiva won that

- 3 -

contest, and the technology he developed and used became the early technological foundation of EchoMail.

9.     EchoMail incorporated and began to operate in 1994 under the name Information Cybernetics, Inc., and later merged with Millennium Productions in 1996 to become General Interactive, Inc., with its leading product being called EchoMail. In or about 2000, General Interactive renamed itself EchoMail, Inc. In 1994, A T & T became the first customer to use the EchoMail product.

10.     In its early stages, from 1994 to 1999, EchoMail engaged in pioneering work by hosting web-based email applications in its Cambridge facility.  Shiva also designed and developed applications that extracted and analyzed critical elements from an email so that an accurate response could be formulated.

11.     Until approximately 1998, EchoMail had no more than 7 employees.

### EchoMail Today

12.     EchoMail currently operates in a competitive environment.  It has approximately 18 employees in Cambridge and contracts for additional personnel in India.  EchoMail has approximately 30 customers across an array of industries, including insurance, financial services, consumer packaged goods, retail and non-profits.

- 4 -

13. EchoMail provides its customers with web-based software, hardware and services for email and electronic communications management, including, but not limited to, inbound email management, outbound email management and email storage. With respect to incoming email, EchoMail's proprietary web-based software technology collects and stores incoming email for EchoMail's customers; analyzes the emails for "attitude," "requests," "issues," "products" and "customer type"; proposes a response based on the analysis; and routes the email to a web-based platform where it can be viewed and worked on by the customer's support personnel before a response is sent to the customer.

14. EchoMail's products are widely recognized as the industry leaders, and EchoMail has received accolades and awards for its products and services.

15. EchoMail is in the final stages of developing version 8.1 of its product, an integrated email solution suite designed to provide its three core services (inbound, outbound and storage) to its customers in one integrated web-based application.

16. Shiva serves as EchoMail's Chairman and CEO. Mathew "Sonu" Abraham serves as EchoMail's President and runs its day-to-day operations, including personnel and customer support.

- 5 -

## EchoMail's Relationship With AmEx

17. In 1998, AmEx was faced with an increasing volume of email from its customers across its multiple business units. At that time, AmEx wanted to contract with one vendor to manage its incoming email from customers for all of its business units.

18. AmEx was aware that EchoMail was a leader in the field of managing electronic communication. In 1998, AmEx contacted Shiva and requested that EchoMail respond to AmEx's request for proposal ("RFP") seeking one vendor to manage its incoming email.

19. In July 1999, despite the fact that the competition included large consulting companies, EchoMail was awarded the AmEx contract for managed incoming email services. Exhibit A.

20. In or about 2000, AmEx sought to invest in EchoMail. Over the course of EchoMail and AmEx's continuing relationship, AmEx continued to attempt to invest in EchoMail. EchoMail repeatedly refused.

21. From 1999 to 2004, as a result of successive contract renewals, EchoMail provided up to 11 AmEx business units with EchoMail for managed incoming email services.

22. In 2003, AmEx notified EchoMail that it was going to institute another RFP process to determine if EchoMail was still the best provider of managed incoming email services. EchoMail

- 6 -

invested hundreds of man-hours in participating in this RFP
process and provided its response in or about November 2003.

23.   In or about February 2004, EchoMail won the RFP, and,
thereafter, in August 2004, executed a three-year contract for
services with AmEx running from January 1, 2005 through December
31, 2007.   Exhibit B.   Under that contract, in addition to
providing its web-based software and services, EchoMail also
provided the hardware necessary to manage AmEx's incoming email.
AmEx had previously supplied its own hardware to EchoMail.

24.   EchoMail has invested substantial amounts of capital
in its hardware and software in order to support AmEx.  Much of
that investment was done at no cost to AmEx in reliance on
AmEx's good faith in honoring its contract with EchoMail.

25.   Due to the high level of service EchoMail provided to
AmEx, AmEx referred to EchoMail as one of its "premium partners"
or "true partners."  Since 1998 and continuing though May 2005,
AmEx repeatedly praised EchoMail for its products and service.
By early 2005, EchoMail was successfully processing
approximately 300,000 emails per month for AmEx's business
units.

### EchoMail's Dealings With IBM

26.   IBM recognizes EchoMail as an industry leader in
hosted, web-based email management software and services.  Since
in or about 1996, IBM has sought to learn EchoMail's

- 7 -

confidential and proprietary technology related to hosted, web-based email management software and services. EchoMail has repeatedly refused to provide IBM access to confidential and proprietary technology related to EchoMail's hosted, web-based email management software and services.

27. In or about 1996, IBM approached EchoMail seeking to host EchoMail's applications at IBM's facilities so IBM could "resell" EchoMail to other customers. EchoMail refused to allow IBM to host EchoMail's applications, since EchoMail was capable of providing the service itself.

28. In or about 2000, IBM approached EchoMail seeking to invest in EchoMail. EchoMail again refused.

29. In or about 2002, IBM approached EchoMail seeking a partnership in which IBM would gain access to EchoMail's confidential and proprietary outbound email marketing technology and code. EchoMail refused to give IBM access to its confidential and proprietary technology.

30. In or about 2004, IBM approached EchoMail seeking to "host," or provide the hardware necessary, to run EchoMail's web-based, "on demand" software applications. EchoMail, which designed, built and developed its own hardware facility, again refused, since EchoMail already offered its technology in a hosted web-based model.

- 8 -

AmEx Breaches its Contract
with EchoMail and Misappropriates
EchoMail's Technology with IBM

31.  Despite their longstanding relationship and recent
execution of the 3 year contract, AmEx breached the contract
with EchoMail by canceling it in violation of its terms, and
deceptively gaining access to, and permitting IBM to gain access
to, EchoMail's confidential and proprietary technology.

32.  In December, 2004, after execution of its contract
with EchoMail, AmEx replaced several of its key managers for
electronic communication and customer support.

33.  In or about September 2004, AmEx relocated from Tampa,
Florida to Gurgaon, India one of its electronic customer support
centers, or "call centers."  This required that AmEx's personnel
in India use and operate the EchoMail system.  AmEx refused
EchoMail's offer to assist in coordinating part of the move and
training the new personnel.  AmEx then failed to properly train
and supervise its personnel in India and failed to properly
store, retain and process its email using EchoMail.

34.  Reena Paniker was a newly assigned AmEx employee in
early 2005, responsible for coordinating the AmEx call center
relocation to India, including the use of EchoMail.  Paniker was
insufficiently familiar with EchoMail.  Paniker failed to
properly educate and train herself and her employees on the
proper use of EchoMail's products and services.

- 9 -

35.  On or about April 4, 2005, after AmEx's mismanagement of the relocation and misuse of EchoMail's product, AmEx finally requested that EchoMail provide personnel in Gurgaon, India to identify and solve the problems AmEx had created at its call center.  That very day, EchoMail sent one of its key employees to India to assist AmEx.  AmEx's misuse of EchoMail through untrained employees had created a backlog of unprocessed email, causing the system to slow.  AmEx's processing rate was 300% slower than that of the typical EchoMail customer because AmEx had refused the necessary training and assistance from EchoMail. From April 4 to 7, 2005, EchoMail's staff worked to rectify the problems at the call center in Gurgaon, India.

36.  In or about mid-April 2005, AmEx began a new RFP process starting with a Request for Information ("the new RFP process") for the same scope of services that AmEx had already contracted for with EchoMail.  EchoMail received the RFI only two days before its response was due.  Greg Daniels, an AmEx business manager who was newly assigned to manage AmEx's relationship with EchoMail, never informed EchoMail about the RFI.

37.  Shiva called Daniels and asked why the new RFP process was necessary, given EchoMail and AmEx's existing three year contract commencing in January, 2005.  Daniels falsely claimed that "it was a formality" which was occurring because AmEx had

- 10 -

"new people" involved and "EchoMail should not worry about it." Shiva told Daniels that EchoMail should not have to participate in the new RFP process because a contract already existed. Nevertheless, EchoMail responded to the RFI.

38.  Shortly thereafter, in late-April, 2005, AmEx confirmed to EchoMail that AmEx wanted to proceed with an "architecture" review of EchoMail's new, proprietary, version 8.1, to which EchoMail's customers would soon upgrade.

39.  In general, an architecture review reveals the confidential and proprietary technology, or "code," contained in hardware and/or software.

40.  AmEx falsely claimed that AmEx's desire for an architecture review was to make sure that the upgrade to version 8.1 was successful, that EchoMail and AmEx were "partners," and that AmEx wanted to help EchoMail succeed in its upgrade to the new version.

41.  Based on Daniels' statements, Shiva reluctantly agreed to the architecture review. Prior to the review, EchoMail provided AmEx with certain proprietary information in preparation for the review. On May 4 and 5, 2005, the architecture review occurred. At least eight employees from AmEx participated in the review, either telephonically or by coming in person to EchoMail's facility in Cambridge.

- 11 -

42. The architecture review exposed to AmEx's employees EchoMail's confidential and proprietary information and technology, or "code," including the process by which EchoMail hosts its web-based, on demand technology.

43. During the review, AmEx technical personnel praised EchoMail's product and service and stated that the review was a success, that EchoMail "did well," and that they were favorably impressed with EchoMail and version 8.1 and the many capabilities EchoMail had to offer beyond just its incoming email management technology that AmEx was then using. AmEx employees stated that they wanted to use additional products and services offered by EchoMail.

44. In fact, AmEx surreptitiously included in the review technical personnel from IBM without disclosing this fact in advance to EchoMail. This violated the terms of the contract between AmEx and EchoMail. In fact, lists of personnel who would be attending the architecture review which were provided by AmEx to EchoMail had not referred to any personnel from IBM. In fact, the presence of IBM personnel would not have been disclosed to EchoMail at all, except that very late in the review process, an IBM employee participating in the review by phone stated that he worked for IBM and that he believed that the information revealed to him "created a conflict."

- 12 -

45.  EchoMail would not have allowed the architecture review to occur at all if EchoMail had known that personnel from IBM would be present.  Since the time of the review, and despite EchoMail's requests, AmEx has refused to provide any information to EchoMail concerning IBM's participation.

46.  On May 25, 2005, approximately three weeks after the architecture review, Daniels called EchoMail and stated that EchoMail "failed" the review, and as a result, the new RFP process would continue without EchoMail.  This necessarily meant that AmEx was replacing EchoMail with a new vendor.  Shiva questioned Daniels about Daniels' earlier claims that the new RFP process and architecture review were unrelated.  Shiva told Daniels that Daniels and AmEx were deceitful and that they had breached the contract.

47.  Although Daniels earlier told Shiva that Paniker was not involved in the new RFP process or the architecture review, on May 25, 2005, Daniels stated to Shiva that Paniker was in fact running the new RFP process and the architecture review and that Daniels had ceded all authority over the matter to Paniker.

48.  On or about May 26, 2005, in a conference call, Paniker initially denied that she was running the new RFP process.  When Abraham confronted her with Daniels' prior statement, Paniker finally admitted that she was in fact running the new RFP process and the architecture review and that they

- 13 -

were in fact related. Paniker reiterated that AmEx's relationship with EchoMail was terminated and told EchoMail to "do what it had to do" and hung up the phone on Abraham. Thereafter, on May 26, 2005, and only in response to Paniker's termination of the Contract, Shiva notified AmEx of termination.

49. In fact, the real reason for AmEx's architecture review, which AmEx intentionally did not disclose to EchoMail, was to gain access to all details of EchoMail's confidential and proprietary technology so that AmEx and IBM could use the technology after AmEx breached its contract and severed its relationship with EchoMail. In addition, AmEx intended to use the architecture review as a pretext for (a) continuing its RFP process without EchoMail's participation, and (b) terminating its contract with EchoMail.

50. In addition to its other contract and tort damages (which are considerable), EchoMail currently has invoices based on the contract of approximately $600,000.

51. "New Co." is an independent business that was formed through AmEx's spin-off of two of its business entities serviced by EchoMail. "New Co." had selected EchoMail as its managed email services provider. At or about the time of its breach of the agreement with EchoMail, AmEx caused "New Co." to stop doing business with EchoMail.

- 14 -

EchoMail Has Gone to Great
Lengths to Protect its Confidential
and Proprietary Information

52.   EchoMail's software, hardware, and storage technology,
and web-based hosting process is confidential and proprietary
and is not generally known outside of select EchoMail employees,
or entities in a confidential relationship with EchoMail which
have contractually agreed to safeguard that information.  Over
the course of its existence, EchoMail has spent considerable
time, money and effort on its product development and on its
efforts to protect the confidentiality of its proprietary
technology, as fully set forth above.

53.   As a matter of course, EchoMail enters into non-
disclosure and confidentiality agreements with entities which
may have access, or even limited access, to any portion of
EchoMail's confidential and proprietary technology.  EchoMail
does so with respect to its customers and prospective customers,
vendors and prospective vendors, and its customers' vendors.

54.   Prior to the existence of its contractual relationship
for services with AmEx, a confidentiality agreement between AmEx
and EchoMail protected EchoMail's confidential and proprietary
technology.  The services contract between AmEx and EchoMail
also protects EchoMail's confidential and proprietary
technology.  In addition, AmEx's other vendors, which are
exposed to EchoMail's confidential and proprietary technology,

- 15 -

are required by EchoMail to execute nondisclosure and/or confidentiality agreements.

55. EchoMail's employees are required to execute agreements which further protect EchoMail's confidential and proprietary information. Even among its own employees, EchoMail limits disclosure of its confidential and proprietary technology.

56. In addition to these steps, EchoMail has protected its confidential and proprietary technology by obtaining patents. On December 23, 2003, EchoMail obtained a patent protecting its overall process for managing email. On April 6, 2004, EchoMail obtained two patents protecting (a) its technology used to analyze emails, and (b) its technology used to construct a response to a customer's email.

## AmEx's Relationship With IBM

57. Upon information and belief, AmEx and IBM have entered into a multi-billion dollar contract under which IBM provides AmEx with computer hardware, software and services. As part of that contract, IBM commercializes AmEx business processes through the use of AmEx's internal technology or vendor technology.

58. Upon information and belief, the information obtained by AmEx and IBM during the EchoMail architecture review will be used to unfairly compete against EchoMail in a number of ways,

- 16 -

including though its unauthorized use by IBM and AmEx directly or its resale to IBM customers.

59.   Injunctive relief is necessary to prevent IBM and AmEx from using or disseminating EchoMail's technology, or otherwise unfairly competing with EchoMail.

Claims

Count I
Misappropriation of Trade
Secrets in Violation of
Mass. G.L. c. 93, §42 and New York Law
(Against Both Defendants)

60.   EchoMail incorporates, as if fully set forth herein, the allegations contained in paragraphs 1 through 59.

61.   IBM and AmEx, through the conduct described above, misappropriated, with the intent to convert to their own use, EchoMail's confidential and proprietary technology.

62.   IBM and AmEx have no rightful claim of interest in EchoMail's confidential and proprietary technology.

63.   The actions of IBM and AmEx are causing irreparable harm to EchoMail which is not compensable through money damages.

64.   EchoMail has a substantial likelihood of success on the merits of its claims.

65.   Through injunctive relief, no harm will accrue to IBM and AmEx as they have no rightful claim to EchoMail's confidential and proprietary technology.

- 17 -

66.   IBM and AmEx's actions have damaged EchoMail.  IBM and
AmEx are liable in tort to EchoMail, including double damages.

Count II
Unfair Competition
(Against Both Defendants)

67.   EchoMail incorporates, as if fully set forth herein,
the allegations contained in paragraphs 1 through 59.

68.   As set forth above, IBM and AmEx have engaged in
unfair competition.

69.   Such unfair competition has caused and will continue
to cause damage to EchoMail.

Count III
Unfair and Deceptive
Acts and Practices in
Violation of G.L. c. 93A, §11
(Against Both Defendants)

70.   EchoMail incorporates, as if fully set forth herein,
the allegations contained in paragraphs 1 through 59.

71.   As set forth above, the actions of IBM and AmEx, which
occurred primarily and substantially in Massachusetts,
constitute unfair and deceptive acts and practices unrelated to
the contract at issue in this matter.

72.   As a result of the unfair and deceptive acts and
practices engaged in by IBM and AmEx, EchoMail has suffered
damages and is entitled to recover treble damages, costs and
attorneys' fees.

- 18 -

Count IV
Breach of Contract
(Against AmEx)

73. EchoMail incorporates, as if fully set forth herein, the allegations contained in paragraphs 1 through 59.

74. EchoMail performed under the contract. By its actions, as set forth above, AmEx has materially breached its contract with EchoMail.

75. Through AmEx's breach EchoMail has been harmed and will continue to be harmed.

Count V
Breach of the Covenant of Good Faith
and Fair Dealing
(Against AmEx)

76. EchoMail incorporates, as if fully set forth herein, the allegations contained in paragraphs 1 through 59.

77. By its actions, as set forth above, AmEx breached the covenant of good faith and fair dealing that was incorporated into its contract with EchoMail.

78. AmEx's breach has caused damage to EchoMail.

Count VI
Interference with Contractual Relations
(Against AmEx)

79. EchoMail incorporates, as if fully set forth herein, the allegations contained in paragraphs 1 through 59.

80. AmEx was aware of the contractual and/or business relationship between New Co. and EchoMail.

- 19 -

81.  By its actions as set forth above, AmEx interfered, through the use of improper means and motives, with EchoMail's relationship with New Co.

82.  AmEx's interference has caused damage to EchoMail.

WHEREFORE, EchoMail seeks the following remedies and relief against the defendants American Express Company and IBM:

(a)  injunctive relief as set forth in EchoMail's motion for injunctive relief filed herewith;

(b)  judgment on counts I through VI;

(c)  damages, including multiple damages, in an amount to be determined at trial;

(d)  costs and reasonable attorneys' fees; and

(e)  such other relief as this Court deems just and proper.

PLAINTIFF ECHOMAIL HEREBY RESPECTFULLY DEMANDS A TRIAL BY JURY FOR ALL COUNTS SO TRIABLE.

Respectfully submitted,

ECHOMAIL, INC.,

By its attorneys,

Alan D. Rose ($BO#42$280)
Alan D. Rose, Jr. (BBO#628871)
ROSE & ASSOCIATES
29 Commonwealth Avenue
Boston, Massachusetts 02116
617-536-0040

*[handwritten annotations:]*
June 20, 2005
BLS Session - Covetrom 1309
on Thursday, June 23, 2005
on the 13
Floor @
2:00pm
should not be granted
By the Court van Gestel, J.J.
ATTEST:
Assistant Clerk.

June 20, 2005
Summons and order of notice issued.

**I HEREBY ATTEST AND CERTIFY ON**
**JUNE 24, 2005** **THAT THE**
**FOREGOING DOCUMENT IS A FULL,**
**TRUE AND CORRECT COPY OF THE**
**ORIGINAL ON FILE IN MY OFFICE,**
**AND IN MY LEGAL CUSTODY.**

**MICHAEL JOSEPH DONOVAN**
**CLERK / MAGISTRATE**
**SUFFOLK SUPERIOR CIVIL COURT**
**DEPARTMENT OF THE TRIAL COURT**
BY:

ASSISTANT CLERK.

- 20 -

## VERIFICATION

I, V. A. Shiva Ayyadurai, Chairman and CEO of EchoMail, Inc., hereby verify that I have reviewed the facts set forth in this complaint, and that the facts set forth herein are true and correct to the best of my knowledge and belief.

V. A. Shiva Ayyadurai,
Chairman and CEO,
EchoMail, Inc.

June 20, 2005

- 21 -

$EX A$

Stand Alone Agreement for Consulting Services

Consultant:                          Agreement No.:PHX-07/09/99-RLG1
**General Interactive**              Effective Date:July 9, 1999
66 Church St. Harvard Square
Cambridge, MA  02138-3730

This Stand Alone Agreement for Consulting Services ("Agreement")
is made and entered into as of the Effective Date above, between
American Express Travel Related Services Company, Inc., having an
office at American Express Tower, World Financial Center, New
York, NY 10285 ("Amexco"), and the Consultant specified above.

1. **Scope of Services** - Consultant shall provide, under the
provisions of this Agreement, the services that are mutually
agreed upon and described on attachments to this Agreement,
substantially in the form of the attached <u>Exhibit 1 - Sample</u>
("Schedule").    Each Schedule shall be effective, incorporated
into, and form a part of this Agreement when duly executed by both
parties.    If there is a conflict between this Agreement and any
Schedule, the terms of the Schedule will govern the provision of
the services involved.

2. **Schedules** - Both time and materials and fixed price Schedules
may be entered into hereunder.   Schedules should be numbered for
identification and must include a complete description of services
to be performed, deliverables or other materials to be produced,
the schedule for completion of each of the foregoing, the
applicable fixed price or time and materials charges, and any
additional terms the parties mutually agree to include.   Amexco,
its parent, subsidiaries and affiliated companies (each, an
"Amexco Entity") may enter into Schedules with Consultant and for
purposes of any such Schedule shall be considered "Amexco" as that
term is used herein.

3. **Work Policy/Personnel** - For each Schedule, each party will
designate a Project Manager to serve as the main contact between
them.   The scope and specific conduct of Consultant's services,
consistent with the Schedule, must be coordinated with Amexco's
Project Manager at all times.    Consultant will use its best
efforts to ensure the continuity of Consultant's employees
assigned to perform services under any Schedule.   There will be no
charge to Amexco for any replacement personnel assigned by
Consultant until Amexco and Consultant agree that each such
replacement has acquired the necessary orientation and background
to make a productive contribution.

On a periodic basis, as specified on the Schedule, Consultant will
submit written status reports describing its activities during the
preceding period, including:   the current status of activities

# 96555                               1

(with an explanatory narrative when appropriate); resources used since the last report, with a cumulative total to date; and identification of any problems and actions taken to resolve them. Upon request, Consultant will meet with Amexco management to review the status of Consultant's activities.

Consultant personnel will observe and comply with Amexco's security procedures, rules, regulations, policies, working hours and holiday schedules. Consultant will use its best efforts to minimize any disruption to Amexco's normal business operations at all times. Amexco will only provide working space, resources and materials if specified on the Schedule. If any Consultant employee performing services is found to be unacceptable to Amexco for any reason, Amexco shall notify Consultant and Consultant shall immediately take appropriate corrective action. Amexco shall be the sole judge as to performance capability hereunder. Unless otherwise agreed to in writing, neither party will hire or solicit the employment of the other party's personnel during the term of each Schedule and for a period of six (6) months thereafter.

Consultant agrees and represents that it is an independent contractor and its personnel are not Amexco's agents or employees for federal tax purposes or any other purposes whatsoever, and are not entitled to any Amexco employee benefits. Consultant assumes sole and full responsibility for their acts and Consultant and its personnel have no authority to make commitments or enter into contracts on behalf of, bind or otherwise obligate Amexco in any manner whatsoever. Consultant, and not Amexco, is solely responsible for the compensation of personnel assigned to perform services hereunder, and payment of worker's compensation, disability and other income and other similar benefits, unemployment and other similar insurance and for withholding income and other taxes and social security.

4. **Acceptance** - Each deliverable shall be subject to a verification of acceptability by Amexco to ensure that such deliverable meets acceptance criteria as defined in each schedule and/or statement of work.. If any deliverable is not acceptable, Amexco shall notify Consultant specifying its reasons in reasonable detail, and Consultant will, at no additional cost (provided such deliverable was created on a fixed fee basis), conform such deliverable to Amexco's requirements. If, within thirty (30) days of such Amexco notification, any deliverable is still not acceptable, Amexco may at any time thereafter, at its option and without obligation or liability of any kind(except for the payment of services already performed), terminate the Schedule involved. When any deliverable is acceptable to Amexco, Amexco will promptly notify Consultant in writing of its acceptance.

2

5. **Ownership** –
The parties agree that certain Services may consist of modifications of licensed Consultant's Software, creating a derivative work, including all materials, products, reports, computer programs (source and object code), documents, deliverables and inventions related to such derivative work developed or prepared for Amexco by Consultant ("Consultant Work Product"), while providing Services to Amexco. With respect to the creation of derivative works of Consultant's Software in the process of providing Services hereunder, Amexco agrees that Consultant retains all right, title and interest in such Consultant Work Product. Amexco hereby assigns to Consultant all right, title and interest in such copyrights, patents and other proprietary rights, and agrees to take all actions deemed necessary by Consultant to perfect Consultant's rights in said materials. Consultant Work Product shall not include any software licensed from any third party. Except as specifically set forth in writing and signed by both Amexco and Consultant on an exception basis in a Schedule(s) hereunder, Consultant shall have all copyright and patent rights with respect to all materials developed in the course of performing the Services under this Agreement or Schedules hereunder, and Amexco is hereby granted a non-exclusive license to use and employ such materials for internal use within Amexco's business.

Nothing herein shall be construed to restrict, impair or deprive Consultant of any of its rights or proprietary interest in technology or products that existed prior to and independent of the performance of services or provision of materials under this Agreement or any Schedule.

6. **Charges and Terms of Payment** – The applicable fixed prices and/or time and materials charges shall be specified on the Schedule. In no event shall any charges exceed Consultant's applicable standard published rates. For services performed on a time and materials basis, any hours worked in excess of eight (8) in any one day or on Saturdays, Sundays or holidays, shall be at no additional cost unless specifically authorized in advance. Amexco also agrees to pay for reasonable out-of-pocket costs and expenses required and actually incurred in performing services, provided that Consultant has: (i) obtained Amexco's prior written consent; (ii) detailed them on a form acceptable to Amexco and approved them in accordance with Amexco's own expense policies, written copies of which shall be furnished to Consultant concurrently with the execution hereof; and (iii) submitted supporting documentation satisfactory to Amexco.

Amexco will pay all taxes levied against or upon the services provided hereunder, or arising out of this Agreement, exclusive, however, of taxes based on Consultant's income, which shall be

paid by Consultant. Amexco agrees to pay directly any tax for which it is responsible or will reimburse Consultant upon receipt of proof of payment.

Unless other payment terms are specified on the Schedule, Consultant shall invoice Amexco: (i) upon Amexco's written acceptance of any deliverables, products or work performed on a fixed price basis; or (ii) monthly in arrears, for services provided on a time and materials basis and for out-of-pocket expenses. All invoices, except for amounts disputed by Amexco, shall be payable within thirty (30) days of receipt. Any disputed amounts shall not affect payment of non-disputed charges and expenses.

Consultant will maintain complete and accurate accounting records in connection with services performed and materials provided hereunder, in accordance with generally accepted accounting principles, to substantiate its charges. Consultant will provide Amexco access to such records for audit purposes for one (1) year from the date of final payment under each Schedule.

7. **Warranties** - Consultant warrants that: (i) it has the authority and the right to enter into this Agreement and each Schedule, to perform services and provide materials, information and deliverables hereunder, and that its obligations hereunder are not in conflict with any other Consultant obligations; (ii) each of its employees has the proper skill, training and background necessary to accomplish their assigned tasks; (iii) all services will be performed in a competent and professional manner, by qualified personnel and will conform to Amexco's requirements hereunder; (iv) neither any deliverables, information, or materials, nor the performance of any services by Consultant infringe upon or violate the rights of any third party and (v) at the time of acceptance, each deliverable will conform to its specifications and Amexco's requirements and that for ninety (90) days following Amexco's acceptance, Consultant shall correct and repair, at no cost to Amexco, any defect, malfunction or non-conformity that prevents such deliverable from conforming and performing as warranted.

GII warrants that any Software provided by GII shall conform to GII's then current documentation therefor. In the event any Software does not so conform to such documentation, GII shall undertake reasonable commercial efforts to correct such non-conformity. Such correction shall constitute Company's sole remedy and GII's sole liability in the event of any breach of such warranty by GII.

THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE ARE HEREBY EXPRESSLY EXCLUDED.

GII shall defend, indemnify and hold harmless Company from all costs, expenses, damages, suits and other proceedings incurred by Company, its officers, directors, employees or agents in connection with any claim that the Software infringes any patent, copyright, trade secret or other proprietary rights of any third party, provided that (a) Company promptly informs GII of the existence of any matter Company asserts to be covered by this Section 13.1, and (b) Company furnishes to GII all information and assistance in connection therewith which may be reasonably requested by GII from time to time.  GII shall have the sole right to settle, defend, or otherwise handle any such claim.  In the event the use of any Software is enjoined, GII shall, at its option, either (a) procure for Company the right to continue to use such Software, (b) replace or modify the same to make it non-infringing, or (c) terminate the agreement and provide a pro rata refund to Company of all amounts paid by Company for the allegedly infringing Software to GII hereunder, based upon a five (5) year life of such Software.
GII's obligations under this Section shall be only for the benefit of Company.  GII shall not be obligated to defend or to be liable under this Section to the extent the infringement asserted arises out of (a) compliance with specifications originating with Company; (b) use or combination of Software with items not provided by GII to the extent such infringement would not have occurred but for such use or combination with such other items; (c) use of other than the latest unmodified version of Software if such infringement would have been avoided by the use of such later version; or (d) modification of Software other than by GII.

This Section states the exclusive remedy of Company and the entire liability of GII with respect to infringement of any patent, copyright, or other proprietary rights of third parties by items furnished by GII hereunder.

EXCEPT AS EXPRESSLY PROVIDED HEREIN, GII SHALL HAVE NO LIABILITY UNDER THIS AGREEMENT, WHETHER FOR BREACH OF WARRANTY OR CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, UNLESS AND UNTIL THE AGGREGATE AMOUNT OF ANY CLAIMS HEREUNDER EXCEEDS $25,000, AND THEN ONLY TO THE EXTENT OF ANY SUCH EXCESS UP TO AN AGGREGATE MAXIMUM OF $1,000,000 FOR SOFTWARE AND/OR SERVICES WHICH ALLEGEDLY DAMAGED COMPANY.  IN NO EVENT SHALL GII HAVE ANY LIABILITY FOR INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES OF ANY KIND, WHETHER UNDER THIS AGREEMENT OR OTHERWISE, EVEN IF GII HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS.

To the extent that Consultant licenses to and/or develops software for Amexco, Consultant further warrants that the software has been

# 96555

tested and is fully capable of providing accurate results using data having date ranges spanning the twentieth (20th) and twenty first (21st) centuries (e.g., years 1900-2100). Without limiting the generality of the foregoing, Consultant warrants that all software licensed from and/or developed by Consultant shall (a) manage and manipulate data involving all dates from the 20th and 21st centuries without functional or data abnormality related to such dates; (b) manage and manipulate data involving all dates from the 20th and 21st centuries without inaccurate results related to such dates; (c) have user interfaces and data fields formatted to distinguish between dates from the 20th and 21st centuries; and (d) represent all data related to include indications of the millennium, century, and decade as well as the actual year.

Consultant further warrants that Consultant's work product will be tested and will be fully capable of providing accurate results using data having date ranges spanning the twentieth (20th) and twenty first (21st) centuries (e.g., years 1900-2100). Without limiting the generality of the foregoing, Consultant warrants that all systems that are worked on by Consultant shall (a) manage and manipulate data involving all dates from the 20th and 21st centuries without functional or data abnormality related to such dates; (b) manage and manipulate data involving all dates from the 20th and 21st centuries without inaccurate results related to such dates; (c) have user interfaces and data fields formatted to distinguish between dates from the 20th and 21st centuries; and (d) represent all data related to include indications of the millennium, century, and decade as well as the actual year.

Consultant shall ensure adequate Anti-Virus software is installed to prevent damages to Company. Consultant has not and shall not insert any code which would have the affect of disabling or otherwise shutting down all or any portion of any program or network of company. Consultant shall use its best efforts to ensure that no viruses or similar items are coded or introduced in any program or network of the company.

EXCEPT AS SPECIFICALLY PROVIDED IN THIS AGREEMENT, THERE ARE NO OTHER WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

8.    **General**

**Term & Termination:**    This Agreement shall commence as of the Effective Date and shall continue in full force and effect thereafter unless and until terminated as provided hereunder. Notwithstanding anything herein to the contrary, After an initial one (1) -year period, Amexco may terminate this Agreement and/or any Schedule upon thirty (30) days' prior written notice. Amexco

# 96555

6

agrees to pay Consultant for services performed up to the effective date of termination, at the agreed upon rates. Notice of termination of any Schedule shall not be considered notice of termination of this Agreement unless specifically stated in the notice.

**Material Breach**: Subject to the above termination language, in the event of any material breach of this Agreement by one party and after giving effect to any applicable cure periods herein prescribed, the other party may (reserving cumulatively all other remedies and rights under this Agreement and in law and in equity) terminate the Schedule(s) involved, in whole or in part, by giving thirty (30) days' written notice thereof; provided, however, that any such termination shall not be effective if the party in breach has cured the breach of which it has been notified prior to the expiration of said thirty (30) days.

**Limitation of Liability**: In no event will either party be liable, one to the other, for special, indirect, or consequential damages or losses in connection with or arising out of this Agreement.

**Intellectual Property Infringement**:  Consultant, at its own expense, will defend and/or handle any claim or action against any Amexco Entity for actual or alleged infringement of any patent, copyright, intellectual or industrial property right or any other similar right (including, but not limited to, misappropriation of trade secrets) based on any deliverables, information, materials and/or any services furnished to or obtained by Amexco or the use thereof by Amexco. Consultant agrees to give Amexco prompt written notice of any threat, warning or notice of any such claim or action that could have an adverse impact on Amexco's use or possession of same. Consultant shall have the right to conduct the defense of any such claim or action and consistent with Amexco's rights hereunder, all negotiations for its settlement; provided, however, that Amexco may participate in such defense or negotiations to protect its interests. Consultant further agrees to indemnify and hold each Amexco Entity harmless from and against any and all liabilities, losses, damages, costs and expenses (including reasonable attorneys' fees) associated with any such claim or action.

**Confidential Information**:  Consultant and Amexco agree to regard and preserve as confidential all information related to the business and activities of any Amexco Entity and Consultant , their respective clients, suppliers and other entities with whom such Amexco Entity and Consultant do business, that may be obtained by Consultant and Amexco from any source or may be developed as a result of this Agreement.   Amexco and Consultant agree to hold such information in trust and confidence for Amexco and Consultant and not to disclose such information to any person, firm or enterprise, or use (directly or indirectly) any such information for its own benefit or the benefit of any other party,

# 96555

7

unless authorized by Amexco or Consultant  in writing, and even then, to limit access to and disclosure of such confidential information to Consultant's employees on a "need to know" basis only. Information shall not be considered confidential to the extent, but only to the extent, that such information is:  (i) already known to the receiving party free of any restriction at the time it is obtained from the other party; (ii) subsequently learned from an independent third party free of any restriction and without breach of this Agreement; (iii) is or becomes publicly available through no wrongful act of either party; (iv) is independently developed by one party without reference to any Confidential Information of the other; or (v) required to be disclosed pursuant to a requirement of a governmental agency or law so long as the parties provide each other with timely written prior notice of such requirements.

To the extent this provision is applicable to and specified on a Schedule, Consultant acknowledges that services performed for Amexco may relate to past, present or future strategies, plans, business activities, methods, processes and/or information which afford Amexco certain competitive or strategic advantages.  To further ensure the protection of Amexco's interests in this regard, upon written notice by Amexco to Consultant of Amexco's intention to invoke Consultant's noncompetition obligation as set forth in this paragraph, and upon terms and conditions to be mutually agreed upon by the parties hereto on a Schedule-by-Schedule basis, Consultant agrees that during the term of any Schedule and for a period of six (6) months thereafter (unless a shorter time period is mutually agreed upon and specified on the applicable Schedule), Consultant shall not assign or utilize (directly or indirectly) any individual assigned to perform services for Amexco in connection with any Schedule hereunder, for or in support of any Competitive Project.  For purposes of this Section, ░ Competitive Project" is defined as any task or work effort by any person, firm or enterprise conducting a business or providing or supporting a product or service in the payment instrument (including charge card, credit and debt card), consumer lending, travelers cheques or travel-related business whose intent or result is or will be substantially similar to any contemplated by a Schedule.  If there is any doubt whether any task or work effort is deemed a "Competitive Project," Consultant shall obtain Amexco's advance written approval (not to be unreasonably withheld), which decision shall be deemed final and controlling for all purposes hereunder.

Consultant shall, upon request by Amexco, require each employee assigned to perform services under any Schedule and each employee who obtains or is in a position to obtain any Amexco information or materials required by the terms of this Agreement to be kept confidential, to execute a Non-Disclosure Agreement in the form attached hereto as Exhibit 2, which forms a part hereof. Consultant will provide Amexco with a true copy of each such

8

Agreement upon request.    Consultant further agrees to take any other steps reasonably required and/or appropriate to ensure compliance with the obligations set forth herein.

Consultant acknowledges and agrees that, in the event of a breach or threatened breach of any of the foregoing provisions, Amexco will have no adequate remedy in damages and, accordingly, shall be entitled to injunctive relief against such breach or threatened breach; provided, however, that no specification of a particular legal or equitable remedy shall be construed as a waiver, prohibition or limitation of any legal or equitable remedies in the event of a breach hereof.

**Excusable Delay**:    Neither party will be liable to the other for any delay or failure to perform due to causes beyond its control and without its fault or negligence.

**Advertising**:    Neither party will use the other party's name or marks, refer to or identify the other party in any advertising or publicity releases or promotional or marketing correspondence to others without such other party's written approval.

**Governing Law & Interpretation**:    This Agreement shall be construed and enforced under the substantive laws of the State of New York. Headlines are for reference only and shall not affect the meaning of any terms.  If any provision of this Agreement is held invalid, illegal or unenforceable, the remaining provisions will continue unimpaired.

**Insurance**:  Throughout the term of this Agreement and Schedules thereto, Consultant must maintain adequate workers compensation, liability, disability, unemployment and, automobile insurance as required under law for the Consultant and each of its employees performing Services under this Agreement and any Schedules.

Consultant must also maintain throughout the term of this Agreement and any Schedules thereto, the following types of insurance coverage at, or above the minimum policy amounts set out below.  All insurance companies must have and maintain an AM Best rating of A- or better.

The Consultant shall provide verification of its insurance coverage by providing a valid certificate of insurance to Amexco upon request.  All certificates of insurance must provide that Amexco will be notified thirty (30) days before cancellation. Consultant's insurance shall be primary and non-contributory with any insurance maintained by Amexco.

| Type of coverage | Coverage as broad as | Policy Minimums | Amexco as Additional insured |
|---|---|---|---|
| Workers Compensation | Statutory Requirements | Statutory requirements | No |
| Employers' Liability | Combined with workers compensation policy | Each accident, $1,000,000<br><br>Disease police limit, $1,000,000<br>Disease each employee, $1,000,000 | No |
| Commercial General Liability and Personal Injury | ISO Form CG0001 | General aggregate, $2,000000<br>Completed ops products, $2,000,000<br>Each occurrence, $2,000,000<br>Personal injury, $2,000,000 | Yes |
| Commercial Auto, Including Employer's Non-Owned auto | ISO Form CA0001 | Combined single limit, $2,000,000 | No |
| Commercial Umbrella Liability | Underlying EL, GL and Auto | May, if necessary, be used in any combination with the primary policy limit to fulfill the above limit requirements. | Yes |
| Professional Liability | N/A | Minimum policy limits of $1,000,000. Increased amounts subject to Amexco's discretion | Yes |

**Assignment:**  Neither party may assign, transfer or subcontract the performance  of  its  services,  or  any  of  its  rights  and/or obligations, without the other party's prior written consent, and any attempt to do so shall be void.  Amexco may assign this Agreement, any Schedule and/or any of its rights or obligations to any Amexco Entity, without Consultant's consent and upon written notice to Consultant, provided that such entity agrees in writing to the terms of this agreement.

**Subcontracting:**  Consultant may subcontract its responsibilities and obligations under this Agreement upon first obtaining Amexco's written  consent  to  do  so  and  to  specific  firms  or  entities mutually agreed upon by the parties.  Consultant shall require its subcontractors performing services for Amexco hereunder to execute the Non-Disclosure Agreement in the form attached hereto as Exhibit 2. Consultant shall be solely responsible for all its obligations and responsibilities hereunder notwithstanding such subcontracting.

# 96555

10

<u>Notices</u>:  All notices shall be in writing and delivered personally or properly mailed, first class mail, to the addresses of the parties set forth at the beginning of this Agreement, to the attention of the undersigned, and, as to any Schedule, with a copy to the signatories of the Schedule involved, at the same address, or to such other address or addressee as either party may designate by written notice.  Any such notice shall be deemed given on the date delivered or when placed in the mails as specified.

<u>Entirety</u>:  This Agreement, together with the Exhibits, Schedules and attachments hereto, contains the entire agreement between the parties and supersedes any prior or inconsistent agreements, negotiations, representations and promises, written or oral.  No modification to this Agreement nor any failure or delay in enforcing any term, exercising any option or requiring performance shall be binding or construed as a waiver unless agreed to in writing by the parties hereto.

AMERICAN EXPRESS TRAVEL
RELATED SERVICES COMPANY, INC.

By: _____

Name: _____
        (Type or Print)

Title: _____

Date: _____8/30/99_____

GENERAL INTERACTIVE, INC.

By: _____

Name: _____RoLand Westgate____
              (Type or Print)

Title: Director of Technical Affairs

Date: _____8/20/99_____

# 96555

11

GII Schedule # PHX-8/24/99-WJG-01

## SCHEDULE

Consultant:
General Interactive, Inc.
66 Church Street
Cambridge, MA 94063

Schedule No.: PHX-08/24/99-WJG-01
Agreement No.: PHX-07/09/99-RLG1
Effective Date: July 16,1999
Date: August 24, 1999

This Schedule is issued pursuant to the above-referenced Master Agreement for Consulting Services between American Express Travel Related Services Company, Inc. and the above-named Consultant. Any term not otherwise defined herein, shall have the meaning specified in the Agreement.

| Amexco Project Managers | Consultant Location |
| --- | --- |
| Angel M. Rodriguez | New York City, NY |
| Gavin M Berg | |

| Consultant Project Manager | Status Reports are required: |
| --- | --- |
| Ray Billings | Weekly |

See Attachment A (S.O.W. titled E-Mail Servicing dated August 19, 1999) for a complete description of the services, deliverables and/or other tasks to be accomplished, the milestone or implementation schedule, the charges and/or rates applicable to this Schedule and any other mutually agreeable information.
SPECIAL TERMS AND CONDITIONS:

A. PRICING: The following line item prices are awarded in this schedule (the total dollar amount is a not-to-exceed amount of $ 820,025 which includes the Firm Fixed Price and Not-To-Exceed amounts). All not-to-exceed amounts are not to be exceeded with prior written approval from one of the Project Managers listed above:

1. Secure Email Integration Costs: Not-To-Exceed price of $28,700 based upon a Not-To-Exceed maximum of 270 person-hours (Reference S.O.W. dated August 19, 1999, page 30, para. 9.2.5.1a-c).

2. Hardware/Software Costs (Reference S.O.W. dated August 19, 1999, page 31, para 9.2.6.a-e):
   a. Intrusion Detection Systems as specified in Exodus document Intrusion Detection Service: Not-To-Exceed amount of $28,950 ($1,930/mo X 15mos).
   b. Firewall Detection Systems as specified in Exodus document labeled Exodus Communications Firewall Service: Not-To-Exceed amount of $44,625 ($2,975/mo X 15mos).
   c. One-time, Firm Fixed Price of $155,000 for Initial Implementation.
   d. An exercizable option to upgrade to High End SUN (E450) replacement for the Data Server at a Firm Fixed Price of $100,000.
   e. An exercisable option to setup up to six (6) Additional Business Units at a Not-To-Exceed price of $150,000. This is based on a one-time, Firm Fixed Price setup cost of $25,000 for each Additional Business Unit.

3. Email Transaction Costs (Reference S.O.W. dated August 19, 1999, page 32, paragraph 9.2.6.f-j):
   a. Confirmation Email to senders on receipt: Unlimited Number of Confirmation Emails at No-Cost.
   b. Simple routing of Email to other American Express domains: Not-To-Exceed price of $6,000 (maximum of 20,000Emails/mo X 15mos X $0.02/Email).
   c. Routing to Groups accessing Echomail and servicing within the system: Not-To-Exceed price of $112,500 (maximum of 30,000Emails/mo X 15mos X $0.25/Email).
   d. Automation: Not-To-Exceed price of $93,750 (maximum of 5,000Emails/mo X 15mos X $1.25/Email).
   e. Emails incorrectly answered due to classification software malfunction: Unlimited Number of Incorrectly answered Emails at No-Cost.

1

www.echomail.com
10-JFW-DGᴇᴄᴏ@echomail.com

3. Consulting/Training costs Not-To-Exceed $100,000 based upon hourly rates on S.O.W. page 33, paragraph 9.2.6.k.

4. Additional User Fees: Each Additional User over thirty (30) covered in XT1 configuration or Business Unit Setup fee shall be a fixed price each of $250 (one time fee). This shall not exceed a maximum of two users for an amount Not-To-Exceed of $500. (Reference paragraph 9.2.6.l).

5. Down Time Chargeback: Down Time for ISU shall be used to calculate breach of service chargeback (rebate). This shall be at $520/per downtime hour. Refer to paragraph 9.2.4 and definition of downtime for additional details in this regard. (Reference paragraph 9.2.6.m).

B. PAYMENT TERMS: Payments are as identified in the attached SOW, paragraph 10.

C. PERIOD OF PERFORMANCE:   This contract is effective from contract award including options through 09/01/2002. Amex reserves the right to terminate the contract after one year from award with a 60 day notice requirement.

D. PURCHASE ORDER # PHX039044 AND CHANGE ORDER #1: This Schedule incorporates the pricing in and replaces P.O. # PHX039044 and Change Order #1.

AMERICAN EXPRESS TRAVEL
RELATED SERVICES COMPANY, INC.

By: _____
Name _____
    (Type or Print)
Title: __Director__
Date: __9/24/99__

GENERAL INTERACTIVE, INC.

By: _____
Name: __Roland Westgate__
    (Type or Print)
Title: __Secretary__
Date: __25 Aug 99__

®echomail)))

GII SOW Dated 8/19/1999

*Excerpts from 50*

# EMAIL SERVICING

# STATEMENT OF WORK

## American Express Co
## &
## General Interactive, Inc

Interactive Technologies

American Express, Co.

August 19, 1999

GII SOW Dated 8/19/1999

# Table of Contents

1    REPRESENTATIVE INFORMATION ........................................................................................ 2

2    INTRODUCTION ........................................................................................................................ 2

3    GOLD SERVICE LEVEL AGREEMENT FROM GENERAL INTERACTIVE, INC. ............ 3

4    REQUIREMENTS FOR GOLD SERVICE LEVEL AGREEMENT ........................................ 3

    4.1   REQUIREMENTS FROM AMERICAN EXPRESS RFI .......................................................... 3
        4.1.1    Auto Response Requirements ................................................................................ 3
        4.1.2    End User Administration ....................................................................................... 4
    4.2   ENTERPRISE-WIDE FUNCTIONALITY ........................................................................... 4
    4.3   SECURITY/PRIVACY/AUDITING .................................................................................. 5
    4.4   REPORTING/COMMUNICATION ................................................................................... 5
    4.5   WORKFLOW REQUIREMENTS ..................................................................................... 7

5    INFORMATION INTEGRITY REQUIREMENTS .................................................................. 13

    5.1   ADDITIONS/CLARIFICATIONS TO GOLD SERVICE LEVEL AGREEMENT ......................... 19

6    PROFESSIONAL SERVICES OVERVIEW ............................................................................. 23

    6.1   INTEGRATION WITH SECURE EMAIL: MODIFICATION REQUIREMENTS FROM INTERACTIVE TECHNOLOGIES ... 23
    6.2   CONSULTING SERVICES COVERED BY GENERAL INTERACTIVE .................................... 24
    6.3   ASSUMPTIONS FOR PROFESSIONAL SERVICES OVERVIEW ......................................... 24

7    FUTURE DEPLOYMENT ........................................................................................................ 26

    7.1   MULTI-LINGUAL SUPPORT ........................................................................................ 26

8    DELIVERY SCHEDULE MILESTONES ................................................................................. 27

9    FINANCIAL AND COSTING INFORMATION ...................................................................... 29

    9.1   PERIOD OF PERFORMANCE ........................................................................................ 29
    9.2   FIXED PRICE AMOUNTS ............................................................................................ 29
        9.2.1    Security Design Review Items .............................................................................. 29
        9.2.2    Network Design Review Items .............................................................................. 29
        9.2.3    Physical Review items .......................................................................................... 29
        9.2.4    Breaches of Service – Charge back calculation ................................................... 29
        9.2.5    Secure Email Integration Costs ........................................................................... 30
        9.2.6    Hardware / Software Costs .................................................................................. 31

10   METHOD AND FREQUENCY OF PAYMENT ...................................................................... 34

    10.1   SECURE EMAIL INTEGRATION .................................................................................. 34
    10.2   SECURE EMAIL ACCEPTANCE CRITERIA ................................................................... 34
    10.3   HARDWARE / SOFTWARE SETUP CRITERIA ............................................................... 35
    10.4   HARDWARE/SOFTWARE ACCEPTANCE CRITERIA ...................................................... 35
    10.5   PER TRANSACTION COSTS AND ACCEPTANCE LEVELS ............................................... 36

11   SEVERITY DEFECT(S) DEFINITION .................................................................................... 37

12   DEFINITION OF TERMS, ACRONYMS AND ABBREVIATIONS ....................................... 38

13   ATTACHMENT I – SECURITY DESIGN REVIEW (ECDR) FINDINGS ............................. 45

GII SOW Dated 8/19/1999

# 9  Financial and Costing Information

## 9.1  Period of Performance

The period of performance for the entire contract extends from the date contract is signed through 9/01/2002. Amex reserves the right to terminate the contract after one year with 60 day notice to GI.

## 9.2  Fixed Price Amounts

9.2.1  Security Design Review Items

1) General Interactive, Inc. will address all issues reported in SDR, Attachment (1), at no cost to American Express. These issues represent industry accepted standards to address widely known data and service integrity threats. GI will deliver corrections to American Express per the schedule outlined previously.

9.2.2  Network Design Review Items

1) General Interactive, Inc. will address all issues reported in the physical site and network review at no cost to American Express. These issues represent industry standards to address widely known data and service integrity threats. Exceptions to this include additional network line encryption requested by American Express using American Express approved hardware / software.

9.2.3  Physical Review items

1) General Interactive, Inc. will address issues found during the physical facility review at no cost to American Express. Findings represent industry accepted standards not available at the hosting facility

9.2.4  Breaches of Service – Charge back calculation

1) Per-transaction costs of non-executed transactions during the down time, plus hourly business unit operational costs multiplied by the down time. Business unit operational costs will vary per business unit and will be agreed at Business Unit set up time. These costs will be deducted from the monthly per-transaction fees charged to American Express (See definition of "down time"). No deductions are to be applied to the ongoing costs if the minimum availability of 98.5% up time is met. Refer to the definition of downtime for complete calculation.



08/24/99

9.2.5    Secure Email Integration Costs

1) Assumptions
   a) A maximum of 270 person-hours of time (NTE) will be utilized for the execution of the Professional Services outlined in Section 6 of this Statement of Work. Additional hours require both parties to sign a new Statement of Work and will be charged at the rates specified herein.

   b) Project Manager will submit written status and participate in weekly status and time/material meetings throughout the development and roll out of the effort.

   c) Any additional resource costs incurred over the proposed budget of 270 person-hours will be paid by General Interactive, Inc., unless written consent is provided by the American Express project manager

   d) American Express will be invoiced with the actual hours spent implementing the Secure Email per the schedule outlined later in this section

   e) The following is an estimate of the implementation provided by GI as a base line for the NTE amount. Additional efforts in a given category required by American Express that exceed these numbers will be provided at the rate used in the following table.

| Resource Skill Level | Estimated Hours | Cost |
|---|---|---|
| Project Manager | 30 | $ 2,100 |
| Systems Architect | 30 | $ 6,000 |
| Principal Engineer | 80 | $ 9,600 |
| Senior Engineer | 80 | $ 8,000 |
| QA Tester | 50 | $ 3,000 |
| TOTAL | 270 | $ 28,700 |

*(handwritten annotations next to table:)* — $70    —$200    — $120    — $100    — $60

08/24/99

### 9.2.6  Hardware / Software Costs

All hardware & base software (e.g. OS, IIS, and SQL Server) will be owned by American Express Company.  General Interactive retains ownership of the Echomail and CC products that are to configured and instaled on these workstations.

| Description | Cost |
| --- | --- |
| a.  Intrusion Detection Systems as specified in Exodus document  Intrusion Detection Service | $1,930 per Month |
| b.  Firewall Detection Systems as specified in Exodus document labeled Exodus Communications Firewall Service | $2,975 per month |
| c.  One-time setup cost for Initial implementation Includes:<br>XT1 Setup<br>  • 1 Server configured to operational status<br>  • 3 additional NT boxes @ $15K each<br>  • 4 additional NT TEST boxes @ $15K each<br>  • 1 Day of On-Site Training for 30 Users<br>  • 30 Initial Business Users<br>  • 10 Initial Technical Users<br>  • 110 categories<br>    • Up to 50 categories at setup<br>    • 5 additional categories per month<br><br>Hardware purchase (Intel Based), setup and maintenance (Per Server), in addition to server included in XT1 setup. This price includes hardware/software for deployment and completion of the 3-tier architecture as depicted in Attachment (5).  All h/w will be the sole property of American Express. | $155,000 |



08/24/99

| | |
|---|---|
| d. Contract Option:<br>Should American Express determine that volumes warrant an upgrade to the data server the following option may be exercised:<br>• High End SUN (E450) replacement for the Data Server. Not Oracle based.<br><br>Rate defined is good until September 1, 2000. There- after the option can be exercised for up to three years with a maximum increase of 5% per year. | $100,000 |
| e. Contract Option:<br>One-time setup cost per Additional Business Unit Includes:<br>• 1 Day of On-Site Training for up to 30 additional Users<br>• 30 additional users granted access<br>• 110 categories<br>   • Up to 50 categories at setup<br>   • 5 additional categories per month<br><br>Rate defined is good until September 1, 2000. There- after the option can be exercised for up to three years with a maximum increase of 5% per year. | $25,000 |

f.    Confirmation Email to senders on receipt

| Number of Emails | $/Email |
|---|---|
| Unlimited | Free |

g.    Per Transaction Costs ( simple routing of email to other American Express domains)

| Number of Emails | $/Email |
|---|---|
| Unlimited | $0.02 |

h.    Per Transaction Costs ( Routing to Groups accessing Echomail and servicing within the system)

| Number of Emails | $/Email |
|---|---|
| 30,000 | $0.25 |
| 50,000 | 0.20 |
| 100,000 | 0.17 |
| 500,000 | 0.14 |
| 2,000,000 | 0.10 |



08/24/99

| i.    Per Transaction Costs ( Automation ) | |
|---|---|
| Number of Emails | $/Email |
| 10,000 | $1.25 |
| 20,000 | 1.15 |
| 50,000 | 0.88 |
| 200,000 | 0.48 |
| 1,000,000 | 0.27 |
| j. Emails incorrectly answered to due to classification software malfunction ( see definition of "successfully automated email" in "Definition of terms" section | Free |
| k.   Consulting Fees | $200/hr |
| Additional Training costs not part of XT1 configuration or Business Unit setup | $150/hr |
| l.    Each Additional User over the thirty (30) covered in XT1 configuration or Business Unit Setup | $250 one time fee |
| m.  Amex Fees: Down Time Costs for ISU to be used to calculate breach of service charge back. Refer to 9.2.4 and definition of down time for additional details. | $320/hr |

Email Servicing – Statement of Work

33

GII SOW Dated 8/19/1999

# 10 Method and Frequency of Payment

## 10.1 Secure Email Integration

| Percentage | Payment Amount ($) | Date | Method | Billing/Delivery Conditions |
|---|---|---|---|---|
| 30% | 8,610 | 7/22 | Purchase Order | Completed |
| 30% | 8,610 | 8/5 | Purchase Order | Completed |
| 40% | Invoice | | | Two weeks after Production Deployment and no pending Sev 1 or 2 items for 30 days following implementation. Invoice must include total number of hours by resource type spent on the effort. |
| NTE Total Payments | 28,700 | | | |

## 10.2 Secure Email Acceptance Criteria

The application interfaces will be accepted by American Express following complete installation and verification of operation in both the Production and Testing environments. The application changes are expected to be have as documented in this Statement of Work. The backup/recovery process will also be validated prior to making final payment.

08/24/99

**10.3**

### 10.4 Hardware / Software Setup Criteria

| % | Payment Amount ($) | Date | Method | Acceptance/Billing Conditions |
|---|---|---|---|---|
| 10% | 16,390 | 7/22/99 | Purchase Order | Acceptance of 3-tier architecture requirements and initiation of h/w order (Complete) |
| 10% | 16,390 | 8/5/99 | Purchase Order | Hardware installed and ready to be used by American Express (Complete) |
| 50% | 77,500 | 8/31/99 | Invoice | Network/Physical configuration reviewed and approved by American Express. All Training Conducted |
| 30% | 44,720 | | Invoice | Routing Rules and Knowledge base ready for System Testing. Initial testing completed (network traffic/communication validated) Two weeks after Production Deployment |
| | | | | No Severity 1 or 2 issues are present |
| | 155,000 | | | |

### 10.5 Hardware/Software Acceptance Criteria

The hardware and software acceptance criteria are based on two factors. 1) The physical network and site review and 2) Verification of behaviors documented in section 4 of this SOW. All features associated with this effort must behave as advertised/demonstrated during the RFP process. All items detailed for correction during the physical site review must be corrected or have mutual agreement to the disposition of the discrepancy identified. The physical site reviews will also verify Intrusion Detection and Firewall systems. Ongoing billing for the two services will be provided with the monthly billing for the transactional costs attributed to the Echomail service (see next section).

Email Servicing – Statement of Work

35



08/24/99

## 10.6 Per Transaction Costs and Acceptance Levels

The following process will be utilized when determining the costs associated with the variable portions of this contract.

a) All reports utilized to create the invoice are either a part of the standard General Interactive product suite or will be developed at no additional cost to American Express. All reports will be made available to both companies so that the companies can track current month expenditures (this will require ad-hoc report support as well as end of month reports).

b) The individual per transaction costs will be applied in the first full month following implementation. This is primarily to disassociate testing of the auto reply/auto-suggested email as they are fully integrated into production.

c) A part of the General Interactive, Inc., Gold agreement is to provide Quality Assurance and Semantic Network requests. Since American Express also plays a part in helping the automation engine to achieve the 40% automation goal. Proper training and professional advice must be provided to reach and maintain at least 40% automation, every calendar month, at no additional cost.

d) Performance less than 90% availability in a given month is to result in no transactional fees to be paid for that month. Availability over the 90% threshold will dictate the amount to be charged to American Express for the transactional fees. Refer to the definition of DOWNTIME for a complete description of how the available number is to be calculated. Fees associated with the performance are to be calculated as follows; Total Transaction Fees for the month minus (downtime in hours times the American Express Downtime rate).

Email Servicing – Statement of Work

GII Schedule # PHX-8/24/99-WJG-01

## SCHEDULE

Consultant:
General Interactive, Inc.
66 Church Street
Cambridge, MA 94063

Schedule No.: PHX-08/24/99-WJG-01
Agreement No.: PHX-07/09/99-RLGI
Effective Date: July 16,1999
Date: August 24, 1999

This Schedule is issued pursuant to the above-referenced Master Agreement for Consulting Services between American Express Travel Related Services Company, Inc. and the above-named Consultant. Any term not otherwise defined herein, shall have the meaning specified in the Agreement.

| Amexco Project Managers | Consultant Location |
| --- | --- |
| Angel M. Rodriguez<br>Gavin M Berg | New York City, NY |

| Consultant Project Manager | Status Reports are required: |
| --- | --- |
| Ray Billings | Weekly |

See Attachment A (S.O.W. titled E-Mail Servicing dated August 19, 1999) for a complete description of the services. deliverables and or other tasks to be accomplished, the milestone or implementation schedule, the charges and/or rates applicable to this Schedule and any other mutually agreeable information.

SPECIAL TERMS AND CONDITIONS:

A. PRICING: The following line item prices are awarded in this schedule (the total dollar amount is a not-to-exceed amount of S 820,025 which includes the Firm Fixed Price and Not-To-Exceed amounts). All not-to-exceed amounts are not to be exceeded with prior written approval from one of the Project Managers listed above:

1. Secure Email Integration Costs: Not-To-Exceed price of S28,700 based upon a Not-To-Exceed maximum of 270 person-hours (Reference S.O.W. dated August 19, 1999, page 30, para. 9.2.5.1a-e).

2. Hardware/Software Costs (Reference S.O.W. dated August 19, 1999, page 31, para 9.2.6.a-e):
   a. Intrusion Detection Systems as specified in Exodus document Intrusion Detection Service: Not-To-Exceed amount of $28,950 ($1,930/mo X 15mos).
   b. Firewall Detection Systems as specified in Exodus document labeled Exodus Communications Firewall Service: Not-To-Exceed amount of $44,625 ($2,975/mo X 15mos).
   c. One-time, Firm Fixed Price of $155,000 for Initial Implementation.
   d. An exercizable option to upgrade to High End SUN (E450) replacement for the Data Server at a Firm Fixed Price of $100,000.
   e. An exercisable option to setup up to six (6) Additional Business Units at a Not-To-Exceed price of $150,000. This is based on a one-time, Firm Fixed Price setup cost of $25,000 for each Additional Business Unit.

3. Email Transaction Costs (Reference S.O.W. dated August 19, 1999, page 32, paragraph 9.2.6.f-j):
   a. Confirmation Email to senders on receipt: Unlimited Number of Confirmation Emails at No-Cost.
   b. Simple routing of Email to other American Express domains: Not-To-Exceed price of $6,000 (maximum of 20,000Emails/mo X 15mos X $0.02/Email).
   c. Routing to Groups accessing Echomail and servicing within the system: Not-To-Exceed price of $112,500 (maximum of 30,000Emails/mo X 15mos X $0.25/Email).
   d. Automation: Not-To-Exceed price of $93,750 (maximum of 5,000Emails/mo X 15mos X $1.25/Email).
   e. Emails incorrectly answered due to classification software malfunction: Unlimited Number of Incorrectly answered Emails at No-Cost.

. GII Schedule # PHX-8/24/99-WJG-01

3. Consulting/Training costs Not-To-Exceed $100,000 based upon hourly rates on S.O.W. page 33, paragraph 9.2.6.k.
4. Additional User Fees: Each Additional User over thirty (30) covered in XT1 configuration or Business Unit Setup fee shall be a fixed price each of $250 (one time fee). This shall not exceed a maximum of two "sers for an amount Not-To-Exceed of $500 (Reference paragraph 9.2.6.l).
5. Down Time Chargeback: Down Time for ISU shall be used to calculate breach of service chargeback (rebate). This shall be at $320/per downtime hour. Refer to paragraph 9.2.4 and definition of downtime for additional details in this regard. (Reference paragraph 9.2.6.m).

B. PAYMENT TERMS: Payments are as identified in the attached SOW, paragraph 10.

C. PERIOD OF PERFORMANCE:    This contract is effective from contract award including options through 09/01/2002. Amex reserves the right to terminate the contract after one year from award with a 60 day notice requirement.

D. PURCHASE ORDER # PHX039044 AND CHANGE ORDER #1: This Schedule incorporates the pricing in and replaces P.O. # PHX039044 and Change Order #1.

AMERICAN EXPRESS TRAVEL
RELATED SERVICES COMPANY, INC.

By:

Name:
(Type or Print)

Title:

Date:

GENERAL INTERACTIVE, INC.

By:

Name:
(Type or Print)

Title:

Date:



**G E N E R A L**
**I N T E R A C T I V E**
» T h e  E - M a i l  C o m p a n y «

# Statement of Work

Job Number: P0011

Customer: American Express
Project Title: AEFA - Brokerage
Project Type: EchoMail CC/BI Installation
Date: January 1, 2000

## Overview

This document delineates the work and costs associated with the installation of
EchoMail CC/BI for the Brokerage business unit of American Express Financial
Advisors. The Project will be divided three two steps:

1. Sign off on this Statement of Work
2. Tasks as outlined below
3. Payment as detailed in Schedule A

## Tasks

- Strategic Planning
- EchoMail CC Implementation
    o EchoMail Software Set-up
    o EchoMail Client Configuration
- EchoMail BI Implementation
- On-Site Business Analysis
- Routing Plan Creation
- Client Training and Set-up
- EchoMail Pilot
    o Alpha Phase
    o Beta Phase
    o Gold Phase
- Testing in Live Environment

## Team Members

The following is a list of contact names, titles, and contact information for the Project:

### GII Team

- Account Manager:          Paul Smith
                            Phone: (617) 354-8585 x 263
                            e-mail: psmith@interactive.com

### Customer Team

- Project Manager           Jonna Costello
                            Phone:
                            e-mail: jonna.m.Costello@aexp.com

© 1999 General Interactive, Inc.
Proprietary and Confidential.

## Project Schedule
The *estimated* Project Schedule is

| as follows: | Start | End |
| --- | --- | --- |
| Strategic Planning | Week 1 | Week 1 |
| EchoMail CC Implementation | Week 1 | Week 1 |
| EchoMail Software Set-up | Week 1 | Week 1 |
| EchoMail Client Configuration | Week 1 | Week 1 |
| EchoMail BI Implementation | Week 2 | Week 2 |
| On-Site Business Analysis | Week 2 | Week 2 |
| Routing Plan Creation | Week 2 | Week 2 |
| Client Training and Set-up | Week 3 | Week 3 |
| EchoMail Pilot | Week 3-5 | Week 3-5 |
| Alpha Phase | Week 3 | Week 3 |
| Beta Phase | Week 4 | Week 4 |
| Gold Phase | Week 5 | Week 5 |
| Testing in Live Environment | Week 6 | Week 6 |

### Project Cost

| Item | One-time | Monthly |
| --- | --- | --- |
| EchoMail CC/BI Installation | $25,000 | N/a |
| | | |

Both parties below acknowledge and agree to execute the above items:

General Interactive, Inc.                    Customer

By: _____          By: _____

Print: _____          Print: _____

Title: _____          Title: _____

Date: _____          Date: _____

© 1999 General Interactive, Inc.
Proprietary and Confidential.



G E N E R A L
I N T E R A C T I V E
» T h e   E - M a i l   C o m p a n y «

# Statement of Work

Job Number: P0012

Customer:  American Express
Project Title: AEFA – Retirement Services
Project Type:  EchoMail CC/BI Installation
Date: January 1, 2000

## Overview

This document delineates the work and costs associated with the installation of
EchoMail CC/BI for the Brokerage business unit of American Express Financial
Advisors. The Project will be divided three two steps:

1. Sign off on this Statement of Work
2. Tasks as outlined below
3. Payment as detailed in Schedule A

## Tasks

- Strategic Planning
- EchoMail CC Implementation
    - EchoMail Software Set-up
    - EchoMail Client Configuration
- EchoMail BI Implementation
- On-Site Business Analysis
- Routing Plan Creation
- Client Training and Set-up
- EchoMail Pilot
    - Alpha Phase
    - Beta Phase
    - Gold Phase
- Testing in Live Environment

## Team Members

The following is a list of contact names, titles, and contact information for the Project:

### GII Team

- Account Manager:     Paul Smith
  Phone: (617) 354-8585 x 263
  e-mail: psmith@interactive.com

### Customer Team

- Project Manager     Jonna Costello
  Phone:
  e-mail:  jonna.m.Costello@aexp.com

© 1999 General Interactive, Inc.
Proprietary and Confidential.

## Project Schedule

The *estimated* Project Schedule is as follows:

| | Start | End |
|---|---|---|
| Strategic Planning | Week 1 | Week 1 |
| EchoMail CC Implementation | Week 1 | Week 1 |
| EchoMail Software Set-up | Week 1 | Week 1 |
| EchoMail Client Configuration | Week 1 | Week 1 |
| EchoMail BI Implementation | Week 2 | Week 2 |
| On-Site Business Analysis | Week 2 | Week 2 |
| Routing Plan Creation | Week 2 | Week 2 |
| Client Training and Set-up | Week 3 | Week 3 |
| EchoMail Pilot | Week 3-5 | Week 3-5 |
| Alpha Phase | Week 3 | Week 3 |
| Beta Phase | Week 4 | Week 4 |
| Gold Phase | Week 5 | Week 5 |
| Testing in Live Environment | Week 6 | Week 6 |

Project Cost

| Item | One-time | Monthly |
|---|---|---|
| EchoMail CC/BI Installation | $25,000 | N/a |
| | | |

Both parties below acknowledge and agree to execute the above items:

General Interactive, Inc.                Customer

By: _____            By: _____

Print: _____           Print: _____

Title: _____           Title: _____

Date: _____           Date: _____

© 1999 General Interactive, Inc.
Proprietary and Confidential.

# Statement of Work

Job Number: P0011

Customer: American Express Co.
Project Title: TBASS
Project Type: Customer Service Review
Date: January 25, 2000

## Overview

This document delineates the work and costs associated with the execution of the TBASS project.
The Project will be divided into two steps:
1. Sign off on this Statement of Work
2. Tasks as outlined below

## Tasks

- Pull 1,000 closed E-mails from database ( from prior 2 weeks)
- Create Microsoft Access file: Ticket Number, Message, Response,
  Date e-mail responded to, E-mail address of sender

## Team Members

The following is a list of contact names, titles, and contact information for the Project:

### EchoMail, Inc. Team
- Account Managers:

Paige Brown, Paul Smith
Phone: (617) 354-8585 x 205
E-mail: pbrown@interactive.com

### Customer Team
- Project Manager:

Karin Madsen
Phone: (602) 766-3742
E-mail: Karin.Madsen@aexp.com

## Project Schedule

The Project Schedule is
as follows:                    Start: 1/25/00          End: 1/31/00

## Project Cost

| Item | January Fee: | |
|------|-------------|--|
| TBASS | $3,840 | |

© 1999 General Interactive, Inc.

Both parties below acknowledge and agree to execute the above items:

EchoMail, Inc.

By: _____

Print: _Roland Westgate_

Title: _Corp Secretary_

Date: _7-31-2000_

American Express

By: _____

Print: _James Shalom_

Title: _DEVELOPMENT VENDOR_

Date: _1/31/00_

© 1999 General Interactive, Inc.
Proprietary and Confidential.

2





## Amendment of Master Agreement & Schedule: PHX-07/09/99-RLG1

American Express Co ("Amexco") with principal place of business at American Express Tower, World Financial Center, New York, NY 10285 and EchoMail, Inc. ("Consultant"), formerly known as General Interactive, Inc. ("GII"), with principal place of business at 701 Concord Avenue, Cambridge, MA 02138 entered into a business agreement with effect from July 9, 1999 subject to the terms of certain Master Agreement and Schedule: PHX-07/09/99-RLG1 ("Master Agreement").

This Amendment modifies the Master Agreement with respect to the terms described herein. Amexco and EchoMail represent that there are no other changes to Master Agreement. This Amendment is incorporated by reference and becomes a part of the Master Agreement.

The parties agree to modify the following provisions of the Master Agreement.

(1) **Name and address of Consultant:**
Name of Consultant shall be revised as: EchoMail, Inc. ("EchoMail")
Address of Consultant shall be revised as: 701 Concord Avenue, Cambridge, MA 02138

(2) **Reference to "General Interactive, Inc.", "General Interactive", "GII", & "GI" to describe the name of Consultant:**
All references to "General Interactive, Inc.", "General Interactive", "GII", & "GI" shall be referred to as "EchoMail" to describe the name of Consultant

(3) **Pricing for Use of Licenses, Infrastructure, Hosting, Maintenance and Professional Services:**
All pricing shall be revised as per the terms of Schedule RR subject to the Effective Term of Schedule RR, attached herewith as Exhibit A.

(4) **Effective Term of the Master Agreement:**
Effective Term of the Master Agreement shall be effective from July 15, 2004 until December 31, 2005. The Master Agreement shall automatically renew for an additional 12-month term from January 1 2006 to December 31, 2006 unless Amexco terminates by written notice to Consultant at least sixty (60) days prior to December 31, 2005. If the Master Agreement has been renewed for second term, it shall automatically renew for third term from January 1 2007 to December 31, 2007 unless Amexco terminates by written notice to Consultant at least sixty (60) days prior to December 31, 2006. In the event Amexco terminates Schedule RR, the Master Agreement shall become automatically terminated.

(5) **Effective Term of Schedule RR:**
Effective Term of Schedule RR shall be effective from January 1, 2005 for a period of 12 months. Schedule RR shall automatically renew for an additional 12-month term from January 1 2006 to December 31, 2006 unless Amexco terminates by written notice to Consultant at least sixty (60) days prior to December 31, 2005. If Schedule RR has been renewed for second term, it shall automatically renew for third term from January 1 2007 to December 31, 2007 unless Amexco terminates by written notice to Consultant at least sixty (60) days prior to December 31, 2006. In the event Amexco terminates Schedule RR, the Master Agreement shall become automatically terminated.

EchoMail, Inc.
701 Concord Avenue
New Media Park
Cambridge, Mass.
02138-1057

tel: 617-354-8585
fax: 617-354-8899
www.echomail.com

(6) **Reference to "Exodus" and "Exodus Communications":**
All references to "Exodus" and "Exodus Communications" shall be considered removed. Consultant shall define and provide all services enlisted as defined and provided by "Exodus" and "Exodus Communications".

(7) **Business Continuity Plan Requirements:**
Consultant shall take reasonable efforts to conform to the requirements of Business Continuity Plan requirements attached hereto as Exhibit A.

(8) **E-Mail Processing Time Commitment:**
Consultant agrees to the following terms for E-Mail Processing Time Commitment.
   a. 100% of the E-Mails received by Mail servers at EchoMail will be processed and made available on the web-based user interface of EchoMail Customer Care software in four (4) hours, calculated on a per E-Mail basis
   b. 70% of the E-Mails received by Mail servers at EchoMail will be processed and made available on the web-based user interface of EchoMail Customer Care software in One and half (1.5) hours, calculated on a per E-Mail basis
   c. Amexco will not be billed by EchoMail Customer Care and Business Intelligence processing license fees for those E-Mails that took more time to process than the limits defines above.
   d. Above processing time commitment excludes any and all issues that are outside the scope of EchoMail Hosting Center including without limitation, problems of the internet, problems with telecommunication lines, devices not controlled by EchoMail, human errors or delays caused by staff not employed by EchoMail.

(9) Security Patch Upgrade Commitment:
Consultant agrees to the following terms for Security Patch Upgrade Commitment.
   a. All non-critical patches shall be installed once in a quarter
   b. All security related critical patches shall be installed within 12 days of issuance of such patches by the patch issuer
   c. Identification of patch as critical patch shall be designated by the issuer

Amexco and Consultant execute this Amendment, in their respective corporate names by their duly authorized representatives on this 13th day of August 2004.

_____          8 - 13 - 2004
EchoMail, Inc.                               Date
Authorized Representative

_____          8/20/04
American Express Co                          Date
Authorized Representative

# Exhibit A

## Schedule RR

**Customer Name:** American Express ("Customer")

**Customer Address:** American Express Tower, World Financial Center, New York, NY 10285

**Account Manager:** Bruce Thomann

**Effective Term:** January 1, 2005 – December 31, 2007[1]

**Description:** EchoMail will provide the following services for the business units currently being supported as of the start of the Effective Term:
1. Hardware for the EchoMail Application. In addition EchoMail will provide all necessary hardware to maintain 50% CPU capacity of servers for EchoMail v7.3 and EchoMail v8.x
2. Hardware Maintenance
3. Third Party Software Maintenance
4. EchoMail Software Licenses
5. Professional Services as required
6. Hosting Services
7. Security
8. Gold Service Level Agreement

Pricing Schedule

| Part Number | Part Description | Units | Unit Price | Expiration Date | (Monthly) | One Time |
|---|---|---|---|---|---|---|
| | Licenses | | | | | |
| CC-LI-User | EchoMail Customer Care User Licenses for additional users (units in users) | 1 | $ 275.00[2] | N/A | $ 0.00 | Number of Users to be decided |

Effective Term of this Schedule shall be effective from January 1, 2005 for a period of 12 months. Schedule RR shall automatically renew for an additional 12-month term from January 1 2006 to December 31, 2006 unless Amexco terminates by written notice to Consultant at least sixty (60) days prior to December 31, 2005. If Schedule RR has been renewed for second term, it shall automatically renew for third term from January 1 2007 to December 31, 2007 unless Amexco terminates by written notice to Consultant at least sixty (60) days prior to December 31, 2006.

[2] Additional users license fees will increase in uncompounded increments of 5% per year of agreement starting January 1, 2006 to reflect a 5%, and 10% increase over revised cost of $275.00 that is effective from January 1, 2005. Additional users are any users beyond eight hundred and thirteen (813) users already purchased as of start of effective date, not including users that belong to EchoMail, up to six (6) Admin users that belong to American Express Technology group and up to 30 additional users for each new business unit added per the following rate card:

| Transaction Costs | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|
| User Licenses | Current | 0% | 5% | 10% |
| First 10,000 | 262.50 | 275.00 | 288.75 | 302.50 |

Any additional users purchased over the original 30 users are transferable across business units.



| | | | | | Sub-Total | See Payment Terms | See Payment Terms |
|---|---|---|---|---|---|---|---|
| CC-LI-Advanced | EchoMail Customer Care (CC) Processing Licenses for workflow | 1 | See Note[3] | N/A | TBD | $ | 0.00 |
| BI-LI-Advanced | EchoMail Business Intelligence (BI) Processing Licenses for analysis | 1 | See Note[4] | N/A | TBD | $ | 0.00 |
| | **Hosting and Maintenance** | | | | | | |
| HDW-SRVR-Leasing | EchoMail Hosting Services for the business units currently being supported as of the start of the Effective Term including - EchoMail Enterprise Hardware Infrastructure for 50% CPU capacity of servers for EchoMail CCBI v7.3 and EchoMail v8.x for business units currently being supported at start of effective date[5] Includes currently existing servers for Antivirus, Test installations and Production installations (units in years) if Customer opt to not terminate this Schedule for second and third years, lease shall extend @ $200,000 for second and third years | 1 | $ 800,000.00 | N/A | $ 800,000.00 | S | 0.00 |
| HDW-SRVR-Hosting | EchoMail Hosting Services for the business units currently being supported as of the start of the Effective Term including - Power, | 12 | $ 19,000.00 | N/A | $ 19,000.00 | S | 0.00 |

---

[3] Customer Care Licenses will be billed monthly per the following rate card fees and will increase in uncompounded increments of 5% per year of agreement starting January 1, 2005 to reflect a 5%, 10% and 15% increase over original cost:

| Transaction Costs | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|
| CC Transactions | 0% | 5% | 10% | 15% |
| First 30,000 | 0.25 | 0.26 | 0.28 | 0.29 |
| 30,000 - 50,000 | 0.2 | 0.21 | 0.22 | 0.23 |
| 50,000 - 100,000 | 0.17 | 0.18 | 0.19 | 0.20 |
| 100,000 - 500,000 | 0.14 | 0.15 | 0.15 | 0.16 |
| 500,000 - 2,000,000 | 0.1 | 0.11 | 0.11 | 0.12 |

Above License volume totals are calculated monthly across all business units of Customer

"Heartbeat' monitoring e-mails sent by Customer, test e-mails sent by EchoMail and all test e-mails sent by Customer prior to handing over production installation to new business unit will not be considered for billing.

[4] Business Intelligence Licenses will be billed monthly per the following rate card and will increase in uncompounded increments of 5% per year of agreement starting January 1, 2005 to reflect a 5%, 10% and 15% increase over original cost:

| Transaction Costs | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|
| BI Transactions | 0% | 5% | 10% | 15% |
| First 10,000 | 1.25 | 1.31 | 1.38 | 1.44 |
| 10,000 - 20,000 | 1.17 | 1.23 | 1.29 | 1.35 |
| 20,000 - 50,000 | 0.88 | 0.92 | 0.97 | 1.01 |
| 50,000 - 200,000 | 0.48 | 0.50 | 0.53 | 0.55 |

Above License volume totals are calculated monthly across all business units of Customer

"Heartbeat' monitoring e-mails sent by Customer, test e-mails sent by EchoMail and all test e-mails sent by Customer prior to handing over production installation to new business unit will not be considered for billing.

BI Processing License fees for E-Mails incorrectly classified by Business Intelligence software will not be charged. Incorrectly classified E-Mails are identified as E-Mails on which user performed "Select" operation in EchoMail CC application. Incorrectly classified E-Mails are defined as E-Mails on which user performed "Select" operation to change more than 1 out 4 categories.
[5] In the event Customer adds new business units, Hardware for additional business units will be added for a fee of $25,000.00/business unit.



| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | UPS, Generator, Floor Space, Video Monitoring, Environmental Monitoring, Air Conditioning, Fire Suppression, N+1, Physical Security, and Telecommunications, and data archival services and storage Includes currently existing servers for Antivirus, Test installations and Production installations (units in months) | | | | | | |
| EM-SCTY-MAINT | EchoMail Security Services including Intrusion Detection and Firewall (units in months) | 12 | $  4,905.00 | N/A | $  4,905.00 | $ | 0.00 |
| HDW-TPS-MAINT | EchoMail Third Party Software Maintenance for hosted severs (units in years) | - | Included | N/A | $  0.00 | $ | 0.00 |
| HDW-SRVR-MAINT | EchoMail Server Hardware Maintenance for hosted servers (units in years) | - | Included | N/A | $  0.00 | $ | 0.00 |
| MT-SLA-Gold | EchoMail Gold Service Level Agreement including 10 hours of professional services (units in months) | 1 | Included | N/A | $  0.00 | $ | 0.00 |
| | | | | Sub-Total | See Payment Terms | $ | 0.00 |
| | Professional Services | | | | | | |
| | EchoMail Implementation Services for New Business Units[6], if Customer adds new Business Units | 1 | $  25,000.00 | N/A | $  0.00 | $ | 25,000.00 |
| EM-PS-Consulting | EchoMail Professional Services | 1 | See Note[7] | N/A | TBD | $ | 0.00 |
| | | | | Sub-Total | See Payment Terms | $ | 25,000.00 |
| | | | | Net Due | See Payment Terms | $ 915,000.00 |

---

[6] Hosting fees for additional business units will be added for a fee of $1,700.00/business unit.

[7] Professional Services will be billed monthly per the following rate card and will increase in uncompounded increments of 5% per year of agreement starting January 1, 2005 to reflect a 5%, 7% and 9% increase over original cost:

| Transaction Costs | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|
| | 0% | 5% | 7% | 9% |
| Professional Services | $ 157.50 | $ 165.38 | $ 168.53 | $ 171.68 |
| Project Management | $ 210.00 | $ 220.50 | $ 224.70 | $ 228.90 |
| Consulting | $ 265.00 | $ 278.25 | $ 283.55 | $ 288.85 |



**Payment Schedule:**
Customer agrees to pay according to the following payment schedule:

**Year One**

Timing
March 1, 2005

Monthly

Amount
$1,086,860.00 (Infrastructure Leasing, Year One Software and Hardware Maintenance fees, Year One Hosting Fees, and Year One Security Fees)
EchoMail will accept payment in whole or in part anytime during the period August 16, 2004 to March 1, 2005
Professional Services, BI Licenses, and CC Licenses

**Year Two**

Timing
March 1, 2006

Monthly

Amount
$486,860.00 (Infrastructure Leasing, Year One Software and Hardware Maintenance fees, Year One Hosting Fees, and Year One Security Fees)
Professional Services, BI Licenses, and CC Licenses

**Year Three**

Timing
March 1, 2007

Monthly

Amount
$486,860.00 (Infrastructure Leasing, Year One Software and Hardware Maintenance fees, Year One Hosting Fees, and Year One Security Fees)
Professional Services, BI Licenses, and CC Licenses

Additional charges shall apply at the Unit Price set forth above in the event that quantity of use of the foregoing licensed software and services exceeds purchased amounts hereunder. EchoMail reserves the right to audit license usage of customer on a monthly basis. Such additional charges shall be billed directly to Customer on a monthly basis. EchoMail, Inc. shall issue no credits to Customer for any licenses not used by Customer on the Expiration Date, and unused licenses may not be carried over into subsequent periods.

Subject to customers pre-approval costs for shipping, telecommunications (including cell and phone costs), mailing costs, and out-of-pocket expenses incurred by EchoMail, Inc. in its performance of this Schedule and the Statement(s) of Work attached hereto and made a part hereof are not included herein, and will be billed directly to Customer on a monthly basis. If Customer requires EchoMail to travel on behalf of Customer for execution of this Schedule or associated Statement of Work, and such travel is pre-approved by Customer, then Customer agrees to administrate travel including ticket purchase, hotel, and car. If EchoMail administers the travel, a thirty-percent (30%) processing fee will be charged.

This Schedule is governed by the attached Terms and Conditions and/or the Master Agreement. Payment or PO# is due prior to start of work. Both parties below acknowledge and agree to the foregoing as of this $13^{TR}$ day of August 2004, and to execute their respective performance obligations as set forth in the Statement(s) of Work attached hereto and made a part hereof.

EchoMail, Inc.

By: _A. Ayyadurai_

Print: V. Ayyadurai

Title:  Chief Administration Officer

Customer

By: _Russell Coplen_

Print: _____    8/20/04

Title: _____RUSSELL K. COPLEN_
_SR. MANAGER_
_TECHNOLOGY CONTRACTS_
PO#: _____



## EXHIBIT A

### Section:  Business Continuity Plan

Throughout the term of the Agreement, Vendor shall maintain a Business Continuity Plan (the "Business Continuity Plan") and the capacity to execute such a plan; which, at a minimum, shall conform to generally accepted BCP/DR industry standards.

The requirements for Vendor's Business Continuity Plan are included in Schedule A.

Prior to implementing any change to the Business Continuity Plan that will materially alter the standards of performance (i.e., recovery time objectives) such that Vendor would not be able to meet the standards of performance described in ScheduleA, Vendor will provide sixty (60) days' prior written notice to AXP in order that AXP may review the changes and provide Vendor with a list of concerns. Vendor will use reasonable commercial efforts to provide a written response that addresses AXP's concerns within ten (10) business days following receipt of such list.

As part of the Services, Vendor shall (1) maintain Business Continuity Plans for all service locations, (2) update and confirm the operability of the BCP in effect at that time on an annual basis at minimum or when material changes occur, (3) certify to AXP in writing that the BCP is fully operatiònal, at minimum, once per year. and (3) within two (2) hours of a Disaster, or as soon as reasonably possible, provide AXP with notice of a Disaster and implement the BCP upon the occurrence of a Disaster at a Vendor Service Location (as defined in the services agreement between Vendor and AXP) or otherwise affecting the provisions or receipt of the Services. For purposes hereof, a "Disaster" shall mean any Force Majeure (see below), as well as any other occurrence that results in Vendor being unable to provide all or substantially all the Services at any single Vendor Service Location for a period in excess of 120 minutes. Vendor shall abide by the RTO requirements set forth in Schedule A. In the event Vendor provides the Services from a business recovery center for more than 30 days, AXP may terminate this Agreement immediately for cause upon notice to Vendor and without regard to Section . In the event of a Disaster, Vendor shall not increase its charges under this Agreement or charge AXP usage fees in addition to the Fees. Further. in the event of a Disaster, Vendor shall consider providing the Services to AXP to be the primary priority of Vendor, such priority being greater than, or at least equal to, the services Vendor must provide to itself.

Force Majeure: Neither AXP nor Vendor shall be liable for any delay in the performance of its obligations pursuant to this Agreement (1) provided that such delay (a) could not have been prevented by commercially reasonable precautions and (b) cannot be circumvented by the non-performing party through the use of commercially reasonable alternate sources, work-around plans or other means, and (2) if and to the extent such delay is caused, directly or indirectly, by fire, flood, earthquake, elements of nature or acts of God, acts of war, terrorism, riots, civil disorders, rebellions or revolutions, or any other similar cause beyond the reasonable control of such party or agent thereof (each, a "Force Majeure Event"). Upon the occurrence of a Force Majeure Event, the non-performing party shall be excused from any further performance of those of its obligations pursuant to this Agreement (other than Vendor's obligation to provide either normal recovery procedures or any other Business Continuation Services as described in Section ) affected by the Force Majeure Event for as long as (a) such Force Majeure Event continues and (b) such party continues to use commercially reasonable efforts to recommence performance whenever and to whatever extent possible without delay; provided, however, that Vendor shall be relieved of the Service Level requirements for no longer than 30 days from the occurrence of such Force Majeure Event. The party delayed by a Force Majeure Event to such party shall immediately

notify the other party of the occurrence of a Force Majeure Event and describe in reasonable detail the nature of the Force Majeure Event. If any Force Majeure Event prevents Vendor's performance of the Services for more than 120 hours, AXP may terminate this Agreement as of the date specified by AXP without regard to Section . The occurrence of a Force Majeure Event with respect to another customer of Vendor shall not constitute a Force Majeure Event under this Agreement.

Allocation of Resources: Whenever a Force Majeure Event or a Disaster causes Vendor to allocate limited resources between or among Vendor customers and affiliates, AXP shall receive no lower priority than Vendor itself or any other customer or affiliate of Vendor.

**Below is the BCP schedule that service providers should adhere to. This should also be a part of the contract as an exhibit or schedule - a separate attachment to the contract with this additional detail, including the Interactive Vendor BCP Requirements.**

Schedule A
*Vendor* Business Continuity Plan

## BCP Term Definitions

*Business Continuation Planning (BCP) Program* The policies, standards, organizations, and management processes by which American Express, and/or third party providers, creates and maintains plans for continuation of critical business functions and plans for recovery of work environments. This includes all the requirements and supporting plans (e.g. disaster recovery plans) to ensure *continuation of the critical business functions*. It also includes work environment requirements (office space requirements, equipment, people, band/level info, etc.) for *recovery of all business functions to an alternate site.*

*Business Interruption* An event that disrupts access to a company's facilities, customers, or information or threatens the health or safety of employees and visitors of a company. Business continuation plans are not designed to mitigate the effects of routine events that can be resolved through normal problem resolution practices.

*Disaster Recovery Planning (DRP)* The policies, standards, organizations, and management processes by which a company creates and maintains plans for recovery of technology, including hardware, network connectivity, telecommunications and system and application software.

*Plan Maintenance Scheduled* and *Unscheduled* Plan updates and changes including but not limited to business functions, technology, contact lists, tasks, equipment, recovery requirements, etc.

*Recovery Objective (RO)* The level of recovery and the time to resume a process or function based on regulatory requirements and/or an assessment of the financial, operational and brand damage resulting from a business interruption. This includes:



*Maximum Allowable Outage (MAO)* – The maximum amount of time a business process can be unavailable before significant impact (financial, customer, regulatory) is felt.

*Recovery Point Objective (RPO)*– The currency of the data you are recovering. Varies from the last good backup, which may be 24 - 48 hours old (traditional recovery), up to the last recorded transaction before the disaster (Rapid Recovery).

*Recovery Time Objective (RTO)*– The time taken to restore user access to the applications and data.

*Vital Records* Any information that is essential for the continuation or restoration of any business process or computer operation that supports AXP. Examples include: tape media, diskettes, CD ROM, microfilm or fiche, any electronic data, hardcopy files, manuals, books, special forms, engineering drawings, facility inventories, vendor lists, supplier lists, desk reference and procedure manuals

### *Vendor* Business Continuity Plan Requirements

Vendor must perform an initial self-assessment of Vendor's Business Continuity Plan against the American Express Interactive Vendor Business Continuity Requirements listed below.

| Req # | Res | NC | Requirement |
|---|---|---|---|
| 1 | | | Vendor will complete and maintain a Business Continuity Plan for its business, which will include a plan for all systems and operations it supports for AXP. |
| 2 | | | Vendor Business Continuation Roles & Responsibilities are clearly defined. |
| 3 | | | Recovery Profile (priorities, recovery time and point objectives, assumptions, strategies, and resources needed) for your Business and the services that you provide AXP are documented and implemented, including all technology that impacts AXP, and meets AXP function/process requirements. Recovery time objectives will be mutually agreed to by AXP and the vendor based on the following: |
| | | | - Definition of critical processes that support AXP, as defined by the AXP Business Impact Analysis (BIA). |
| | | | - Recovery prioritization of those critical processes. |
| | | | - Business impact to AXP of a service disruption. |
| | | | Recovery time objectives will be reviewed at least every two years by vendor and AXP as the BIA is refreshed or significant changes take place. |
| 4 | | | For each technical function critical to AXP, vendor has documented Disaster Recovery plan that contains the following (as applicable): |
| | | | - All above requirements as pertaining to AXP BCP. |
| | | | - Ownership is clearly defined for all components that impact AXP. |
| | | | - Technology and Operational Process to support BCP Strategy (e.g. switching to an |



Vendor BCP Map
IED Business Continuity Planning 

| | | | |
|---|---|---|---|
| | | | with appropriate contact information for AXP for communication in the event of a disruption. Integrated communications testing will take place annually. |
| 12 | | | Upon execution of a plan, post incident reporting is to be provided to AXP by the vendor within fourteen (14) days of the end of such an event. During any time that the Business Continuity Plans are executed, service level measurement and reporting are to continue. |
| 13 | | | A contingency plan is in place to address the loss of any key people assigned to operating the utility/software that supports any AXP function, such as cross-training initiatives. |
| 14 | | | Single points of failure for recovery of the critical business function have been identified and eliminated. If not, a work plan for implementing a recovery strategy for these components must be in place, accompanied by written acknowledgement signed by all affected parties. Redundancy does not ensure recovery. Redundancy at the same location is not an acceptable recovery strategy. |
| 15 | | | In the event of a loss of a data center or building, the ability to process required transaction volume with sufficient processing time for the anticipated workload should be in place and tested.<br><br>- Alternate sites allow the use of the facility until a full recovery of the affected entity's own facilities (defined in the BC Strategy).<br><br>- Alternate sites provide for physical and data security.<br><br>- Work requirements are met (space, equipment, office supplies, technology) |
| 16 | | | As applicable, all critical vital records related to AXP are stored using an agreed upon method and at an agreed upon location.<br><br>- Process for retrieval is clearly understood by authorized personnel.<br><br>- Frequency of updates is documented.<br><br>- Vital records include key operating procedures. |
| 17 | | | A Call Center Disaster Recovery plan is in place, as applicable, that supports AXP will include the following elements:<br><br>- Defined procedures for redirecting inbound calls (Carrier's offer services).<br><br>- Strategy supports AXP recovery point/time objectives.<br><br>- Interim call handling strategy defined (Voice response unit message).<br><br>- Alternate call center is defined (Internal or External).<br><br>- A plan for the Re-establishment of Agents is defined- e.g. internal/alternate site, external/vendor, combination?<br><br>- Work area Recovery Requirements: Database access recovery procedure has been defined. |




*Vendor* and AXP will mutually create applicable detail to those items listed above as Vendor Business Continuity Plan requirements. Vendor will deliver to AXP, not later than the commencement of the first Project Schedule, Vendor's completed self-assessment of above requirements and Vendor's Business Continuity Plan for review and approval.

AXP and Vendor will mutually address any deficiencies identified within Vendor Business Continuity Plan within sixty (60) days after launch. AXP may alter the above Business Continuity Plan Requirements, at any time during the term of this contract. Any changes to the Business Continuity Plan Requirements may be negotiated with the Vendor.

CIVIL ACTIONS
COVER SHEET
DOCKET NO.(S)
B.L.S. 05-2477
Trial Court of Massachusetts
Superior Court Department
County: SUFFOLK

| PLAINTIFF(S) | DEFENDANT(S) |
|---|---|
| EchoMail, Inc. | American Express Company IBM Corporation |

ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE
Alan D. Rose; Alan D. Rose, Jr.
Rose & Associates, 29 Commonwealth Ave.
Board of Bar Overseers number Boston, MA 02116 (BBO#427280; 628871)

ATTORNEY (if known)

**Origin Code**

**Original Complaint**

**TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)**

CODE NO.     TYPE OF ACTION (specify)   TRACK     IS THIS A JURY CASE?

Misappropriation of trade

D.2.   secrets; breach of contract)   ( X )Yes   ( ) No

**The following is a full and detailed statement of the facts on which plaintiff relies to determine eligibility in to The Business Litigation Session.**

Defendants American Express Company ("AmEx") and IBM Corporation (collectively "defendants") obtained unprecedented access to the confidential and proprietary technology of plaintiff EchoMail, Inc. ("EchoMail") by fraudulently, pretextually, and illegally using AmEx's contractual relationship with EchoMail to obtain an "architecture" review of EchoMail's cutting-edge, patented, email management system. IBM had no right whatsoever to access EchoMail's technology and proprietary information, but deceptively did so. AmEx permitted this deception to occur. The defendants will improperly use EchoMail's technology and proprietary information in the absence of judicial intervention. Injunctive relief is necessary to protect EchoMail's technology from improper use and dissemination by the defendants.

In addition to its request for injunctive relief, EchoMail brings this complaint for misappropriation of trade secrets, unfair competition, unfair and deceptive acts and practices, breach of contract, breach of the covenant of good faith and fair dealing, and intentional interference with contractual relations.

*A Special Tracking Order shall be created by the Presiding Justice of the Business Litigation Session at the Rule 16 Conference.

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."

Signature of Attorney of Record _____   DATE: 6 2 05

AOTC-6 mtc005-11/99
A O S C 1-2000

I HEREBY ATTEST AND CERTIFY ON

JUNE 24, 2005   THAT THE

FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: _____

ASSISTANT CLERK.

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
CIVIL ACTION
NO. 05-2477 BLS
(Judge van Gestel)

### ECHOMAIL, INC.

vs.

### AMERICAN EXPRESS CO. and IBM CORP.

### NOTICE OF ACCEPTANCE INTO BUSINESS LITIGATION SESSION

This matter has been accepted into the Suffolk Business Litigation Session. It has been assigned to Judge Allan van Gestel.

Hereafter, as shown above, all parties must include the initials "BLS" at the end of the docket number on all filings. Also, Judge van Gestel's name must be included.

Counsel for the plaintiff(s) is hereby advised that within seven (7) days of the filing of an appearance, answer, motion or other response to the complaint by or on behalf of the defendant(s) which has been served with process within the time limitation of Mass. R. Civ. P. Rule 4(j), or such other time as may be modified by the Court, he or she shall send notice thereof to Judge van Gestel's Session Clerk, Courtroom 1309, Suffolk Superior Court, Three Pemberton Square, Boston, MA 02108.

Upon receipt of such notice, the Court will issue a Notice of Initial Rule 16 Conference for purposes of meeting with all counsel to plan for the litigation and resolution of this matter. If possible, the Court requests counsel for the plaintiff(s) to confer with counsel for the defendant(s) and to suggest to the Court a range of dates available for all parties for this purpose and to include those dates in the notice. The Court, however, retains the discretion to schedule the hearing at a time that fits within its own schedule.

DATED:     June 20, 2005

Allan van Gestel, Presiding Justice
Business Litigation Session

I HEREBY ATTEST AND CERTIFY ON

JUNE 24, 2005, THAT THE

FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY:

ASSISTANT CLERK.

**4**

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                      SUPERIOR COURT
                                                 CIVIL ACTION NO.    -BLS

ECHOMAIL, INC.,                    )
                                   )
            Plaintiff,             )                  05-2477-BLS
                                   )
v.                                 )
                                   )
AMERICAN EXPRESS CO.               )
and IBM CORP.,                     )
                                   )
            Defendants.            )
_____)

PLAINTIFF ECHOMAIL, INC.'S MOTION
FOR PRELIMINARY INJUNCTIVE RELIEF
UPON SHORT ORDER OF NOTICE

     Pursuant to Mass. R. Civ. P. 65 and Mass. G.L. c. 93, § 42A,
plaintiff EchoMail, Inc. ("EchoMail") hereby moves that this
Court grant a preliminary injunction on short order of notice
against defendants American Express Company and IBM Corporation
(collectively "defendants"). EchoMail asks that this matter be
heard after no more than 48 hours notice to defendants. EchoMail
has already suffered and will continue to suffer great and
irreparable harm that cannot adequately be measured by monetary
damages. This harm includes, among other things, loss of income,
goodwill, and the misappropriation of its confidential
technology. Moreover, EchoMail has no adequate remedy at law.

     EchoMail seeks the following relief pending the adjudication
of this case:

     1.   The defendants, and all persons acting for or on their
behalf or in concert with them, are restrained and enjoined as
follows:

(a)   from using, in any way, EchoMail's confidential
and proprietary technology, or any part thereof;

(b)   from disseminating, in any way, EchoMail's
confidential and proprietary technology, or any part thereof;

(c)   from altering, destroying, or discarding
EchoMail's confidential and proprietary technology, or any part
thereof.

2.   The defendants, and all persons acting for or on their
behalf or in concert with them, are temporarily restrained from
failing to:

(a)   immediately return to EchoMail all of EchoMail's
confidential and proprietary technology, related information, and
all parts thereof;

(b)   immediately provide to EchoMail any and all notes,
emails, memoranda, recording or electronic compilation setting
forth the proprietary information or technology derived from the
"architecture review" and telephonic conference held on May 4-5,
2005.

3.   Such other and further relief as the Court deems just
and proper.

In support of this Motion, EchoMail respectfully refers this

Court to its Verified Complaint, Affidavit of V.A. Shiva

Ayyadurai, and EchoMail's Memorandum of Law.

- 2 -

WHEREFORE, for all of the reasons stated in its Verified
Complaint, the Affidavit, and Memorandum of Law, EchoMail
respectfully requests that this motion be granted.

Respectfully submitted,

ECHOMAIL, INC.,

By its attorneys,

Alan D. Rose (BBO#427280)
Alan D. Rose, Jr. (BBO#628871)
ROSE & ASSOCIATES
29 Commonwealth Ave
Boston, Massachusetts 02116
Tel: 617-536-0040
Fax: 617-536-4400

June 20, 2005

I HEREBY ATTEST AND CERTIFY ON
JUNE 24, 2005 , THAT THE

FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY

ASSISTANT CLERK.

- 3 -

5

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                          SUPERIOR COURT
                                      CIVIL ACTION NO.

ECHOMAIL INC.,                     )
                                   )
            Plaintiff,             )
                                   )
v.                                 )
                                   )
AMERICAN EXPRESS CO.               )
and IBM CORP.,                     )
                                   )
            Defendants.            )
_____)

### PLAINTIFF ECHOMAIL, INC.'S MOTION FOR AN
### ORDER REQUIRING THE DEFENDANTS TO PRESERVE
### DOCUMENTS, COMPUTERIZED DATA AND MATERIALS

Plaintiff EchoMail Inc., ("EchoMail"), brings this motion

seeking an Order that defendants American Express Company

("AmEx") and IBM Corporation ("IBM") (collectively,

"defendants") be required to preserve and maintain all relevant

documents until the conclusion of this action. EchoMail

requests that the Order extend to all information in any form,

electronic or otherwise, regardless of where it is stored or how

it is maintained. EchoMail requests that this Order apply to

all documents concerning:

(1) AmEx's contract(s) with EchoMail;

(2) IBM's participation in the architecture review
    referred to in the Verified Complaint;

(3) each of AmEx's RFP processes referred to in the
    Verified Complaint;

(4)  EchoMail's performance under its contract with AmEx;

(5)  AmEx's decision to undertake the architecture review;

(6)  AmEx's decision to terminate its contract with EchoMail;

(7)  all communications between AmEx employees and/or IBM employees concerning EchoMail;

(8)  all communications between and among AmEx's employees concerning EchoMail;

(9)  all communications between and among IBM's employees concerning EchoMail;

(10) AmEx's decision to award contracts (and contract renewals) to EchoMail;

(11) AmEx and/or IBM's design and/or development of electronic communication management systems or processes; and

(12) all documents concerning EchoMail or AmEx's use or dissemination of EchoMail's technology.

In support of this Motion, EchoMail respectfully refers this Court to its Verified Complaint, and states that EchoMail reasonably believes that the requested relief is necessary to preserve evidence in this action. See also Takesian v. Kelleher, C.A. No. 01-1973 BLS, *Findings, Rulings and Order for Judgment on Complaint for Contempt* (Mass. Super. Ct. July 24, 2001)(violation of preservation order constituted contempt of court).

Respectfully submitted,

ECHOMAIL, INC.,

By its attorneys,

Alan D. Rose (BBO#427280)
Alan D. Rose, Jr. (BBO#628871)
ROSE & ASSOCIATES
29 Commonwealth Ave
Boston, Massachusetts 02116
Tel: 617-536-0040
Fax: 617-536-4400

June 20, 2005

**I HEREBY ATTEST AND CERTIFY ON**
JUNE 24, 2005
———————, THAT THE

**FOREGOING DOCUMENT IS A FULL,**
**TRUE AND CORRECT COPY OF THE**
**ORIGINAL ON FILE IN MY OFFICE,**
**AND IN MY LEGAL CUSTODY.**

**MICHAEL JOSEPH DONOVAN**
**CLERK / MAGISTRATE**
**SUFFOLK SUPERIOR CIVIL COURT**
**DEPARTMENT OF THE TRIAL COURT**

BY:

ASSISTANT CLERK.

- 3 -