UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ECHOMAIL, INC., | CIVIL ACTION NO. 05-11318 |
| Plaintiff, | |
| v. | |
| AMERICAN EXPRESS CO. and IBM CORP., | |
| Defendants. | |

**DECLARATION OF ANGELA RAMSAMMY IN SUPPORT OF
DEFENDANT AMERICAN EXPRESS' MOTION FOR SUMMARY
JUDGMENT AS TO COUNT THREE OF ITS COUNTERCLAIM**

ANGELA RAMSAMMY, hereby declares as follows:

1.     I am a Lead Programmer Analyst for American Express Travel Related Services Company, Inc. ("AXP").  I served as the technical lead for AXP in connection with the relationship with EchoMail, Inc. ("EchoMail").  Based on personal involvement with EchoMail and my review of documents relating to EchoMail, I have personal knowledge of the facts set forth herein.

2.     In July 1999, AXP hired EchoMail to process e-mails from AXP customers received through either AXP's web sites or directly from AXP customers' e-mail accounts.  To that end, the parties entered into a Stand Alone Agreement for Consulting Services.  The Stand Alone Agreement, an incorporated Schedule and selected provisions of a Statement of Work, and an amendment to the agreement dated August 20, 2004 (collectively, the "Agreement") are attached hereto as Exhibit A.

3.     In the typical scenario, a customer would visit an AXP web site and log on to their account using their unique user name and password.  Additional security measures were

also employed by AXP.  Once secured on the site, a customer would send an e-mail to AXP through AXP's "Secure Message Center" (which previously had been known as "Secure Message Utility") or other secure AXP webforms.  The customer's account numbers, Social Security number and other personal information would typically be included.  EchoMail would receive, manage, categorize, filter, analyze, and ultimately suggest responses to the e-mail.

4.    AXP paid for computer equipment to be used by EchoMail in servicing AXP's account, including without limitation, a SUN E450 database server (the "AXP Database Server").  As provided for in Section 9.2.6 of the Statement of Work, the computer equipment, including the AXP Database Server, was the property of AXP.

5.    EchoMail was required to copy and store all the AXP customer e-mail messages and the responding e-mails ("AXP's Confidential Information") on the AXP Database Server.

6.    EchoMail also was required to back up AXP's Confidential Information on computer tape archives.  The archive tapes include both "full back-ups" (i.e., complete copies of all the customer email, response and other confidential information) and "incremental back-ups" (i.e., only new information stored on the AXP Database Server from a prior incremental backup), dating back to July, 1999.

7.    I understand that AXP is required to maintain a complete set of its customer e-mails and related responses and that it be secure.

8.    AXP does not have in its possession a complete set of AXP's Confidential Information.  Only EchoMail currently has that information.

9.    The Confidential Information is extremely valuable to AXP, and contains nonpublic, confidential information relating to AXP's customers.

2

10.    In a letter dated May 26, 2005, a copy of which is attached as Exhibit B, EchoMail informed AXP that it would be terminating its relationship with AXP effective the next day.

11.    In a letter dated May 27, 2005, a copy of which is attached as Exhibit C, EchoMail reaffirmed this position and in fact stopped performing all services for AXP.

12.    In a letter dated May 31, 2005, a copy of which is attached as Exhibit D, AXP demanded the return of, among other things, the AXP Database Server and AXP's Confidential Information.

13.    To date, EchoMail has not returned the AXP Database Server or AXP's Confidential Information.

14.    EchoMail is no longer performing any services for AXP and thus has no reason to continue to retain the AXP Database Server or AXP's Confidential Information.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on September 23, 2005.

_____
ANGELA RAMSAMMY

nj-srv01\62356v02

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail/hand on 9/29/05

3

# Exhibit A

## Stand Alone Agreement for Consulting Services

Consultant:                          Agreement No.:PHX-07/09/99-RLG1
**General Interactive**              Effective Date:July 9, 1999
66 Church St. Harvard Square
Cambridge, MA 02138-3730

This Stand Alone Agreement for Consulting Services ("Agreement") is made and entered into as of the Effective Date above, between American Express Travel Related Services Company, Inc., having an office at American Express Tower, World Financial Center, New York, NY 10285 ("Amexco"), and the Consultant specified above.

1. <u>Scope of Services</u> - Consultant shall provide, under the provisions of this Agreement, the services that are mutually agreed upon and described on attachments to this Agreement, substantially in the form of the attached <u>Exhibit 1 - Sample</u> ("Schedule"). Each Schedule shall be effective, incorporated into, and form a part of this Agreement when duly executed by both parties. If there is a conflict between this Agreement and any Schedule, the terms of the Schedule will govern the provision of the services involved.

2. <u>Schedules</u> - Both time and materials and fixed price Schedules may be entered into hereunder. Schedules should be numbered for identification and must include a complete description of services to be performed, deliverables or other materials to be produced, the schedule for completion of each of the foregoing, the applicable fixed price or time and materials charges, and any additional terms the parties mutually agree to include. Amexco, its parent, subsidiaries and affiliated companies (each, an "Amexco Entity") may enter into Schedules with Consultant and for purposes of any such Schedule shall be considered "Amexco" as that term is used herein.

3. <u>Work Policy/Personnel</u> - For each Schedule, each party will designate a Project Manager to serve as the main contact between them. The scope and specific conduct of Consultant's services, consistent with the Schedule, must be coordinated with Amexco's Project Manager at all times. Consultant will use its best efforts to ensure the continuity of Consultant's employees assigned to perform services under any Schedule. There will be no charge to Amexco for any replacement personnel assigned by Consultant until Amexco and Consultant agree that each such replacement has acquired the necessary orientation and background to make a productive contribution.

On a periodic basis, as specified on the Schedule, Consultant will submit written status reports describing its activities during the preceding period, including:  the current status of activities

1

# 96555

(with an explanatory narrative when appropriate); resources used since the last report, with a cumulative total to date; and identification of any problems and actions taken to resolve them. Upon request, Consultant will meet with Amexco management to review the status of Consultant's activities.

Consultant personnel will observe and comply with Amexco's security procedures, rules, regulations, policies, working hours and holiday schedules. Consultant will use its best efforts to minimize any disruption to Amexco's normal business operations at all times. Amexco will only provide working space, resources and materials if specified on the Schedule. If any Consultant employee performing services is found to be unacceptable to Amexco for any reason, Amexco shall notify Consultant and Consultant shall immediately take appropriate corrective action. Amexco shall be the sole judge as to performance capability hereunder. Unless otherwise agreed to in writing, neither party will hire or solicit the employment of the other party's personnel during the term of each Schedule and for a period of six (6) months thereafter.

Consultant agrees and represents that it is an independent contractor and its personnel are not Amexco's agents or employees for federal tax purposes or any other purposes whatsoever, and are not entitled to any Amexco employee benefits. Consultant assumes sole and full responsibility for their acts and Consultant and its personnel have no authority to make commitments or enter into contracts on behalf of, bind or otherwise obligate Amexco in any manner whatsoever. Consultant, and not Amexco, is solely responsible for the compensation of personnel assigned to perform services hereunder, and payment of worker's compensation, disability and other income and other similar benefits, unemployment and other similar insurance and for withholding income and other taxes and social security.

4. <u>Acceptance</u> - Each deliverable shall be subject to a verification of acceptability by Amexco to ensure that such deliverable meets acceptance criteria as defined in each schedule and/or statement of work.. If any deliverable is not acceptable, Amexco shall notify Consultant specifying its reasons in reasonable detail, and Consultant will, at no additional cost (provided such deliverable was created on a fixed fee basis), conform such deliverable to Amexco's requirements. If, within thirty (30) days of such Amexco notification, any deliverable is still not acceptable, Amexco may at any time thereafter, at its option and without obligation or liability of any kind(except for the payment of services already performed), terminate the Schedule involved. When any deliverable is acceptable to Amexco, Amexco will promptly notify Consultant in writing of its acceptance.

5. <u>Ownership</u> -
The parties agree that certain Services may consist of
modifications of licensed Consultant's Software, creating a
derivative work, including all materials, products, reports,
computer programs (source and object code), documents,
deliverables and inventions related to such derivative work
developed or prepared for Amexco by Consultant ("Consultant Work
Product"), while providing Services to Amexco. With respect to
the creation of derivative works of Consultant's Software in the
process of providing Services hereunder, Amexco agrees that
Consultant retains all right, title and interest in such
Consultant Work Product. Amexco hereby assigns to Consultant all
right, title and interest in such copyrights, patents and other
proprietary rights, and agrees to take all actions deemed
necessary by Consultant to perfect Consultant's rights in said
materials. Consultant Work Product shall not include any
software licensed from any third party. Except as specifically
set forth in writing and signed by both Amexco and Consultant on
an exception basis in a Schedule(s) hereunder, Consultant shall
have all copyright and patent rights with respect to all
materials developed in the course of performing the Services
under this Agreement or Schedules hereunder, and Amexco is hereby
granted a non-exclusive license to use and employ such materials
for internal use within Amexco's business.

Nothing herein shall be construed to restrict, impair or deprive
Consultant of any of its rights or proprietary interest in
technology or products that existed prior to and independent of
the performance of services or provision of materials under this
Agreement or any Schedule.

6. <u>Charges and Terms of Payment</u> - The applicable fixed prices
and/or time and materials charges shall be specified on the
Schedule. In no event shall any charges exceed Consultant's
applicable standard published rates. For services performed on a
time and materials basis, any hours worked in excess of eight (8)
in any one day or on Saturdays, Sundays or holidays, shall be at
no additional cost unless specifically authorized in advance.
Amexco also agrees to pay for reasonable out-of-pocket costs and
expenses required and actually incurred in performing services,
provided that Consultant has: (i) obtained Amexco's prior written
consent; (ii) detailed them on a form acceptable to Amexco and
approved them in accordance with Amexco's own expense policies,
written copies of which shall be furnished to Consultant
concurrently with the execution hereof; and (iii) submitted
supporting documentation satisfactory to Amexco.

Amexco will pay all taxes levied against or upon the services
provided hereunder, or arising out of this Agreement, exclusive,
however, of taxes based on Consultant's income, which shall be

3

paid by Consultant.   Amexco agrees to pay directly any tax for which it is responsible or will reimburse Consultant upon receipt of proof of payment.

Unless other payment terms are specified on the Schedule, Consultant shall invoice Amexco:     (i) upon Amexco's written acceptance of any deliverables, products or work performed on a fixed price basis; or (ii) monthly in arrears, for services provided on a time and materials basis and for out-of-pocket expenses.   All invoices, except for amounts disputed by Amexco, shall be payable within thirty (30) days of receipt.   Any disputed amounts shall not affect payment of non-disputed charges and expenses.

Consultant will maintain complete and accurate accounting records in connection with services performed and materials provided hereunder, in accordance with generally accepted accounting principles, to substantiate its charges.   Consultant will provide Amexco access to such records for audit purposes for one (1) year from the date of final payment under each Schedule.

7.   <u>Warranties</u> – Consultant warrants that:     (i) it has the authority and the right to enter into this Agreement and each Schedule, to perform services and provide materials, information and deliverables hereunder, and that its obligations hereunder are not in conflict with any other Consultant obligations; (ii) each of its employees has the proper skill, training and background necessary to accomplish their assigned tasks; (iii) all services will be performed in a competent and professional manner, by qualified personnel and will conform to Amexco's requirements hereunder;   (iv) neither any deliverables, information, or materials, nor the performance of any services by Consultant infringe upon or violate the rights of any third party and (v) at the time of acceptance, each deliverable will conform to its specifications and Amexco's requirements and that for ninety (90) days following Amexco's acceptance, Consultant shall correct and repair, at no cost to Amexco, any defect, malfunction or non-conformity that prevents such deliverable from conforming and performing as warranted.

GII warrants that any  Software provided by GII shall conform to GII's then current documentation therefor.   In the event any Software does not so conform to such documentation, GII shall undertake reasonable commercial efforts to correct such non-conformity.   Such correction shall constitute Company's sole remedy and GII's sole liability in the event of any breach of such warranty by GII.

THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE ARE HEREBY EXPRESSLY EXCLUDED.

1 96555                                   4

GII shall defend, indemnify and hold harmless Company from all costs, expenses, damages, suits and other proceedings incurred by Company, its officers, directors, employees or agents in connection with any claim that the Software infringes any patent, copyright, trade secret or other proprietary rights of any third party, provided that (a) Company promptly informs GII of the existence of any matter Company asserts to be covered by this Section 13.1, and (b) Company furnishes to GII all information and assistance in connection therewith which may be reasonably requested by GII from time to time.  GII shall have the sole right to settle, defend, or otherwise handle any such claim.  In the event the use of any Software is enjoined, GII shall, at its option, either (a) procure for Company the right to continue to use such Software, (b) replace or modify the same to make it non-infringing, or (c) terminate the agreement and provide a pro rata refund to Company of all amounts paid by Company for the allegedly infringing Software to GII hereunder, based upon a five (5) year life of such Software.  GII's obligations under this Section shall be only for the benefit of Company.  GII shall not be obligated to defend or to be liable under this Section to the extent the infringement asserted arises out of (a) compliance with specifications originating with Company; (b) use or combination of Software with items not provided by GII to the extent such infringement would not have occurred but for such use or combination with such other items; (c) use of other than the latest unmodified version of Software if such infringement would have been avoided by the use of such later version; or (d) modification of Software other than by GII.

This Section states the exclusive remedy of Company and the entire liability of GII with respect to infringement of any patent, copyright, or other proprietary rights of third parties by items furnished by GII hereunder.

EXCEPT AS EXPRESSLY PROVIDED HEREIN, GII SHALL HAVE NO LIABILITY UNDER THIS AGREEMENT, WHETHER FOR BREACH OF WARRANTY OR CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, UNLESS AND UNTIL THE AGGREGATE AMOUNT OF ANY CLAIMS HEREUNDER EXCEEDS $25,000, AND THEN ONLY TO THE EXTENT OF ANY SUCH EXCESS UP TO AN AGGREGATE MAXIMUM OF $1,000,000 FOR SOFTWARE AND/OR SERVICES WHICH ALLEGEDLY DAMAGED COMPANY.  IN NO EVENT SHALL GII HAVE ANY LIABILITY FOR INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES OF ANY KIND, WHETHER UNDER THIS AGREEMENT OR OTHERWISE, EVEN IF GII HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS.

To the extent that Consultant licenses to and/or develops software for Amexco, Consultant further warrants that the software has been

# 96555                              5

tested and is fully capable of providing accurate results using data having date ranges spanning the twentieth (20th) and twenty first (21st) centuries (e.g., years 1900-2100). Without limiting the generality of the foregoing, Consultant warrants that all software licensed from and/or developed by Consultant shall (a) manage and manipulate data involving all dates from the 20th and 21st centuries without functional or data abnormality related to such dates; (b) manage and manipulate data involving all dates from the 20th and 21st centuries without inaccurate results related to such dates; (c) have user interfaces and data fields formatted to distinguish between dates from the 20th and 21st centuries; and (d) represent all data related to include indications of the millennium, century, and decade as well as the actual year.

Consultant further warrants that Consultant's work product will be tested and will be fully capable of providing accurate results using data having date ranges spanning the twentieth (20th) and twenty first (21st) centuries (e.g., years 1900-2100). Without limiting the generality of the foregoing, Consultant warrants that all systems that are worked on by Consultant shall (a) manage and manipulate data involving all dates from the 20th and 21st centuries without functional or data abnormality related to such dates; (b) manage and manipulate data involving all dates from the 20th and 21st centuries without inaccurate results related to such dates; (c) have user interfaces and data fields formatted to distinguish between dates from the 20th and 21st centuries; and (d) represent all data related to include indications of the millennium, century, and decade as well as the actual year.

Consultant shall ensure adequate Anti-Virus software is installed to prevent damages to Company. Consultant has not and shall not insert any code which would have the affect of disabling or otherwise shutting down all or any portion of any program or network of company. Consultant shall use its best efforts to ensure that no viruses or similar items are coded or introduced in any program or network of the company.

EXCEPT AS SPECIFICALLY PROVIDED IN THIS AGREEMENT, THERE ARE NO OTHER WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

8.     General

Term & Termination: This Agreement shall commence as of the Effective Date and shall continue in full force and effect thereafter unless and until terminated as provided hereunder. Notwithstanding anything herein to the contrary, After an initial one (1) -year period, Amexco may terminate this Agreement and/or any Schedule upon thirty (30) days' prior written notice. Amexco

96555                     6

agrees to pay Consultant for services performed up to the effective date of termination, at the agreed upon rates. Notice of termination of any Schedule shall not be considered notice of termination of this Agreement unless specifically stated in the notice.

<u>Material Breach</u>: Subject to the above termination language, in the event of any material breach of this Agreement by one party and after giving effect to any applicable cure periods herein prescribed, the other party may (reserving cumulatively all other remedies and rights under this Agreement and in law and in equity) terminate the Schedule(s) involved, in whole or in part, by giving thirty (30) days' written notice thereof; provided, however, that any such termination shall not be effective if the party in breach has cured the breach of which it has been notified prior to the expiration of said thirty (30) days.

<u>Limitation of Liability</u>: In no event will either party be liable, one to the other, for special, indirect, or consequential damages or losses in connection with or arising out of this Agreement.

<u>Intellectual Property Infringement</u>: Consultant, at its own expense, will defend and/or handle any claim or action against any Amexco Entity for actual or alleged infringement of any patent, copyright, intellectual or industrial property right or any other similar right (including, but not limited to, misappropriation of trade secrets) based on any deliverables, information, materials and/or any services furnished to or obtained by Amexco or the use thereof by Amexco. Consultant agrees to give Amexco prompt written notice of any threat, warning or notice of any such claim or action that could have an adverse impact on Amexco's use or possession of same. Consultant shall have the right to conduct the defense of any such claim or action and consistent with Amexco's rights hereunder, all negotiations for its settlement; provided, however, that Amexco may participate in such defense or negotiations to protect its interests. Consultant further agrees to indemnify and hold each Amexco Entity harmless from and against any and all liabilities, losses, damages, costs and expenses (including reasonable attorneys' fees) associated with any such claim or action.

<u>Confidential Information</u>: Consultant and Amexco agree to regard and preserve as confidential all information related to the business and activities of any Amexco Entity and Consultant , their respective clients, suppliers and other entities with whom such Amexco Entity and Consultant do business, that may be obtained by Consultant and Amexco from any source or may be developed as a result of this Agreement. Amexco and Consultant agree to hold such information in trust and confidence for Amexco and Consultant and not to disclose such information to any person, firm or enterprise, or use (directly or indirectly) any such information for its own benefit or the benefit of any other party,

B 96555                                7

unless authorized by Amexco or Consultant in writing, and even then, to limit access to and disclosure of such confidential information to Consultant's employees on a "need to know" basis only. Information shall not be considered confidential to the extent, but only to the extent, that such information is: (i) already known to the receiving party free of any restriction at the time it is obtained from the other party; (ii) subsequently learned from an independent third party free of any restriction and without breach of this Agreement; (iii) is or becomes publicly available through no wrongful act of either party; (iv) is independently developed by one party without reference to any Confidential Information of the other; or (v) required to be disclosed pursuant to a requirement of a governmental agency or law so long as the parties provide each other with timely written prior notice of such requirements.

To the extent this provision is applicable to and specified on a Schedule, Consultant acknowledges that services performed for Amexco may relate to past, present or future strategies, plans, business activities, methods, processes and/or information which afford Amexco certain competitive or strategic advantages. To further ensure the protection of Amexco's interests in this regard, upon written notice by Amexco to Consultant of Amexco's intention to invoke Consultant's noncompetition obligation as set forth in this paragraph, and upon terms and conditions to be mutually agreed upon by the parties hereto on a Schedule-by-Schedule basis, Consultant agrees that during the term of any Schedule and for a period of six (6) months thereafter (unless a shorter time period is mutually agreed upon and specified on the applicable Schedule), Consultant shall not assign or utilize (directly or indirectly) any individual assigned to perform services for Amexco in connection with any Schedule hereunder, for or in support of any Competitive Project. For purposes of this Section, "Competitive Project" is defined as any task or work effort by any person, firm or enterprise conducting a business or providing or supporting a product or service in the payment instrument (including charge card, credit and debt card), consumer lending, travelers cheques or travel-related business whose intent or result is or will be substantially similar to any contemplated by a Schedule. If there is any doubt whether any task or work effort is deemed a "Competitive Project," Consultant shall obtain Amexco's advance written approval (not to be unreasonably withheld), which decision shall be deemed final and controlling for all purposes hereunder.

Consultant shall, upon request by Amexco, require each employee assigned to perform services under any Schedule and each employee who obtains or is in a position to obtain any Amexco information or materials required by the terms of this Agreement to be kept confidential, to execute a Non-Disclosure Agreement in the form attached hereto as Exhibit 2, which forms a part hereof. Consultant will provide Amexco with a true copy of each such

# 96555                                  8

Agreement upon request.  Consultant further agrees to take any other steps reasonably required and/or appropriate to ensure compliance with the obligations set forth herein.

Consultant acknowledges and agrees that, in the event of a breach or threatened breach of any of the foregoing provisions, Amexco will have no adequate remedy in damages and, accordingly, shall be entitled to injunctive relief against such breach or threatened breach; provided, however, that no specification of a particular legal or equitable remedy shall be construed as a waiver, prohibition or limitation of any legal or equitable remedies in the event of a breach hereof.

**Excusable Delay:**  Neither party will be liable to the other for any delay or failure to perform due to causes beyond its control and without its fault or negligence.

**Advertising:**  Neither party will use the other party's name or marks, refer to or identify the other party in any advertising or publicity releases or promotional or marketing correspondence to others without such other party's written approval.

**Governing Law & Interpretation:**  This Agreement shall be construed and enforced under the substantive laws of the State of New York. Headlines are for reference only and shall not affect the meaning of any terms.  If any provision of this Agreement is held invalid, illegal or unenforceable, the remaining provisions will continue unimpaired.

**Insurance:** Throughout the term of this Agreement and Schedules thereto, Consultant must maintain adequate workers compensation, liability, disability, unemployment and, automobile insurance as required under law for the Consultant and each of its employees performing Services under this Agreement and any Schedules.

Consultant must also maintain throughout the term of this Agreement and any Schedules thereto, the following types of insurance coverage at, or above the minimum policy amounts set out below.  All insurance companies must have and maintain an AM Best rating of A- or better.

The Consultant shall provide verification of its insurance coverage by providing a valid certificate of insurance to Amexco upon request.  All certificates of insurance must provide that Amexco will be notified thirty (30) days before cancellation. Consultant's insurance shall be primary and non-contributory with any insurance maintained by Amexco.

# 96555

| Type of coverage | Coverage as broad as | Policy Minimums | Amexco as Additional insured |
|---|---|---|---|
| Workers Compensation | Statutory Requirements | Statutory requirements | No |
| Employers' Liability | Combined with workers compensation policy | Each accident, $1,000,000<br><br>Disease police limit, $1,000,000<br>Disease each employee, $1,000,000 | No |
| Commercial General Liability and Personal Injury | ISO Form CG0001 | General aggregate, $2,000000<br>Completed ops products, $2,000,000<br>Each occurrence, $2,000,000<br>Personal injury, $2,000,000 | Yes |
| Commercial Auto, Including Employer's Non-Owned auto | ISO Form CA0001 | Combined single limit, $2,000,000 | No |
| Commercial Umbrella Liability | Underlying EL, GL and Auto | May, if necessary, be used in any combination with the primary policy limit to fulfill the above limit requirements. | Yes |
| Professional Liability | N/A | Minimum policy limits of $1,000,000. Increased amounts subject to Amexco's discretion | Yes |

**Assignment:**  Neither party may assign, transfer or subcontract the performance of its services, or any of its rights and/or obligations, without the other party's prior written consent, and any attempt to do so shall be void.  Amexco may assign this Agreement, any Schedule and/or any of its rights or obligations to any Amexco Entity, without Consultant's consent and upon written notice to Consultant, provided that such entity agrees in writing to the terms of this agreement.

**Subcontracting:**  Consultant may subcontract its responsibilities and obligations under this Agreement upon first obtaining Amexco's written consent to do so and to specific firms or entities mutually agreed upon by the parties.  Consultant shall require its subcontractors performing services for Amexco hereunder to execute the Non-Disclosure Agreement in the form attached hereto as Exhibit 2.  Consultant shall be solely responsible for all its obligations and responsibilities hereunder notwithstanding such subcontracting.

<u>Notices</u>: All notices shall be in writing and delivered personally or properly mailed, first class mail, to the addresses of the parties set forth at the beginning of this Agreement, to the attention of the undersigned, and, as to any Schedule, with a copy to the signatories of the Schedule involved, at the same address, or to such other address or addressee as either party may designate by written notice. Any such notice shall be deemed given on the date delivered or when placed in the mails as specified.

<u>Entirety</u>: This Agreement, together with the Exhibits, Schedules and attachments hereto, contains the entire agreement between the parties and supersedes any prior or inconsistent agreements, negotiations, representations and promises, written or oral. No modification to this Agreement nor any failure or delay in enforcing any term, exercising any option or requiring performance shall be binding or construed as a waiver unless agreed to in writing by the parties hereto.

AMERICAN EXPRESS TRAVEL
RELATED SERVICES COMPANY, INC.

By: _____

Name: _____
(Type or Print)

Title: TECHNOLOGY CONTRACTS

Date: 8/30/99

GENERAL INTERACTIVE, INC.

By: _____

Name: Roland Westgate
(Type or Print)

Title: DIRECTOR OF EEC MAIL Admin.

Date: 8/20/99

GII Schedule # PHX-8/24/99-WJG-01

## SCHEDULE

Consultant:
General Interactive, Inc.
66 Church Street
Cambridge, MA 94063

Schedule No.: PHX-08/24/99-WJG-01
Agreement No.: PHX-07/09/99-RLG1
Effective Date: July 16, 1999
Date: August 24, 1999

This Schedule is issued pursuant to the above-referenced Master Agreement for Consulting Services between American Express Travel Related Services Company, Inc. and the above-named Consultant. Any term not otherwise defined herein, shall have the meaning specified in the Agreement.

| Amexco Project Managers | Consultant Location |
| --- | --- |
| Angel M. Rodriguez | New York City, NY |
| Gavin M Berg | |

| Consultant Project Manager | Status Reports are required: |
| --- | --- |
| Ray Billings | Weekly |

See Attachment A (S.O.W. titled E-Mail Servicing dated August 19, 1999) for a complete description of the services, deliverables and/or other tasks to be accomplished, the milestone or implementation schedule, the charges and/or rates applicable to this Schedule and any other mutually agreeable information.

SPECIAL TERMS AND CONDITIONS:

A.   PRICING: The following line item prices are awarded in this schedule (the total dollar amount is a not-to-exceed amount of $820,025 which includes the Firm Fixed Price and Not-To-Exceed amounts). All not-to-exceed amounts are not to be exceeded with prior written approval from one of the Project Managers listed above:

1.   Secure Email Integration Costs: Not-To-Exceed price of $28,700 based upon a Not-To-Exceed maximum of 270 person-hours (Reference S.O.W. dated August 19, 1999, page 30, para 9.2.5.1a-c).

2.   Hardware/Software Costs (Reference S.O.W. dated August 19, 1999, page 31, para 9.2.6.a-e):
  a.   Intrusion Detection Systems as specified in Exodus document Intrusion Detection Service: Not-To-Exceed amount of $28,950 ($1,930/mo X 15mos).
  b.   Firewall Detection Systems as specified in Exodus document labeled Exodus Communications Firewall Service: Not-To-Exceed amount of $44,625 ($2,975/mo X 15mos).
  c.   One-time, Firm Fixed Price of $155,000 for Initial Implementation.
  d.   An exercisable option to upgrade to High End SUN (E450) replacement for the Data Server at a Firm Fixed Price of $100,000.
  e.   An exercisable option to setup up to six (6) Additional Business Units at a Not-To-Exceed price of $150,000. This is based on a one-time, Firm Fixed Price setup cost of $25,000 for each Additional Business Unit.

3.   Email Transaction Costs (Reference S.O.W. dated August 19, 1999, page 32, paragraph 9.2.6.f-j):
  a.   Confirmation Email to senders on receipt: Unlimited Number of Confirmation Emails at No-Cost.
  b.   Simple routing of Email to other American Express domains: Not-To-Exceed price of $6,000 (maximum of 20,000Emails/mo X 15mos X $0.02/Email).
  c.   Routing to Groups accessing Echomail and servicing within the system: Not-To-Exceed price of $112,500 (maximum of 30,000Emails/mo X 15mos X $0.25/Email).
  d.   Automation: Not-To-Exceed price of $93,750 (maximum of 5,000Emails/mo X 15mos X $1.25/Email).
  e.   Emails incorrectly answered due to classification software malfunction: Unlimited Number of Incorrectly answered Emails at No-Cost.

1

info@echomail.com
www.echomail.com
10-info@echomail-WJG-01

3. Consulting/Training costs Not-To-Exceed $100,000 based upon hourly rates on S.O.W. page 33, paragraph 9.2.6.k.
4. Additional User Fees: Each Additional User over thirty (30) covered in XT1 configuration or Business Unit Setup fee shall be a fixed price each of $250 (one time fee). This shall not exceed a maximum of two users for an amount Not-To-Exceed of $500. (Reference paragraph 9.2.6.l).
5. Down Time Chargeback: Down Time for ISU shall be used to calculate breach of service chargeback (rebate). This shall be at $320/per downtime hour. Refer to paragraph 9.2.4 and definition of downtime for additional details in this regard. (Reference paragraph 9.2.6.m).

B. PAYMENT TERMS: Payments are as identified in the attached SOW, paragraph 10.

C. PERIOD OF PERFORMANCE:    This contract is effective from contract award including options through 09/01/2002. Amex reserves the right to terminate the contract after one year from award with a 60 day notice requirement.

D. PURCHASE ORDER # PHX039044 AND CHANGE ORDER #1: This Schedule incorporates the pricing in and replaces P.O. # PHX039044 and Change Order #1.

AMERICAN EXPRESS TRAVEL
RELATED SERVICES COMPANY, INC.

By: _____

Name: _JAMES A ROTH_
        (Type or Print)

Title: _Director_

Date: _9/24/99_

GENERAL INTERACTIVE, INC.

By: _____

Name: _ROLAND WESTGATE_
        (Type or Print)

Title: _SECRETARY_

Date: _25 Aug '99_

2

echomail®)))

GII SOW Dated 8/19/1999

*Excerpts from SO*

# EMAIL SERVICING
# STATEMENT OF WORK

## American Express Co
## &
## General Interactive, Inc

Interactive Technologies

American Express, Co.

August 19, 1999

GII SOW Dated 8/19/1999

# Table of Contents

1 REPRESENTATIVE INFORMATION ................................................................. 2

2 INTRODUCTION ................................................................................................ 2

3 GOLD SERVICE LEVEL AGREEMENT FROM GENERAL INTERACTIVE, INC. ......... 3

4 REQUIREMENTS FOR GOLD SERVICE LEVEL AGREEMENT ......................... 3

  4.1 REQUIREMENTS FROM AMERICAN EXPRESS RFI ..................................... 3

    4.1.1 Auto Response Requirements ............................................................. 3

    4.1.2 End User Administration ..................................................................... 3

  4.2 ENTERPRISE-WIDE FUNCTIONALITY ......................................................... 3

  4.3 SECURITY/PRIVACY/AUDITING ................................................................ 4

  4.4 REPORTING/COMMUNICATION ................................................................. 4

  4.5 WORKFLOW REQUIREMENTS ................................................................... 5

5 INFORMATION INTEGRITY REQUIREMENTS .................................................. 7

  5.1 ADDITIONS/CLARIFICATIONS TO GOLD SERVICE LEVEL AGREEMENT ....... 13

6 PROFESSIONAL SERVICES OVERVIEW .......................................................... 19

  6.1 INTEGRATION WITH SECURE EMAIL: MODIFICATION REQUIREMENTS FROM INTERACTIVE TECHNOLOGIES ... 23

  6.2 CONSULTING SERVICES COVERED BY GENERAL INTERACTIVE ... 23

  6.3 ASSUMPTIONS FOR PROFESSIONAL SERVICES OVERVIEW ......................... 24

7 FUTURE DEPLOYMENT .................................................................................. 24

  7.1 MULTI-LINGUAL SUPPORT ...................................................................... 26

8 DELIVERY SCHEDULE MILESTONES .............................................................. 26

9 FINANCIAL AND COSTING INFORMATION ................................................... 27

  9.1 PERIOD OF PERFORMANCE ..................................................................... 29

  9.2 FIXED PRICE AMOUNTS ......................................................................... 29

    9.2.1 Security Design Review Items ............................................................ 29

    9.2.2 Network Design Review Items ........................................................... 29

    9.2.3 Physical Review items ....................................................................... 29

    9.2.4 Breaches of Service – Charge back calculation ................................. 29

    9.2.5 Secure Email Integration Costs ......................................................... 29

    9.2.6 Hardware / Software Costs ............................................................... 30

10 METHOD AND FREQUENCY OF PAYMENT ................................................... 31

  10.1 SECURE EMAIL INTEGRATION ............................................................... 34

  10.2 SECURE EMAIL ACCEPTANCE CRITERIA ................................................ 34

  10.3 HARDWARE / SOFTWARE SETUP CRITERIA ............................................ 34

  10.4 HARDWARE/SOFTWARE ACCEPTANCE CRITERIA .................................... 35

  10.5 PER TRANSACTION COSTS AND ACCEPTANCE LEVELS ........................... 35

11 SEVERITY DEFECT(S) DEFINITION ............................................................... 36

12 DEFINITION OF TERMS, ACRONYMS AND ABBREVIATIONS ...................... 37

13 ATTACHMENT I – SECURITY DESIGN REVIEW (ECDR) FINDINGS ............... 45

GII SOW Dated 8/19/1999

# 9  Financial and Costing Information

## 9.1  Period of Performance

The period of performance for the entire contract extends from the date contract is signed through 9/01/2002. Amex reserves the right to terminate the contract after one year with 60 day notice to GI.

## 9.2  Fixed Price Amounts

### 9.2.1  Security Design Review Items

1) General Interactive, Inc. will address all issues reported in SDR, Attachment (1), at no cost to American Express. These issues represent industry accepted standards to address widely known data and service integrity threats. GI will deliver corrections to American Express per the schedule outlined previously.

### 9.2.2  Network Design Review Items

1) General Interactive, Inc. will address all issues reported in the physical site and network review at no cost to American Express. These issues represent industry standards to address widely known data and service integrity threats. Exceptions to this include additional network line encryption requested by American Express using American Express approved hardware / software.

### 9.2.3  Physical Review items

1) General Interactive, Inc. will address issues found during the physical facility review at no cost to American Express. Findings represent industry accepted standards not available at the hosting facility

### 9.2.4  Breaches of Service – Charge back calculation

1) Per-transaction costs of non-executed transactions during the down time, plus hourly business unit operational costs multiplied by the down time. Business unit operational costs will vary per business unit and will be agreed at Business Unit set up time. These costs will be deducted from the monthly per-transaction fees charged to American Express (See definition of "down time"). No deductions are to be applied to the ongoing costs if the minimum availability of 98.5% up time is met. Refer to the definition of downtime for complete calculation.



### 9.2.5   Secure Email Integration Costs

08/24/99

1) Assumptions

a) A maximum of 270 person-hours of time (NTE) will be utilized for the execution of the Professional Services outlined in Section 6 of this Statement of Work. Additional hours require both parties to sign a new Statement of Work and will be charged at the rates specified herein.

b) Project Manager will submit written status and participate in weekly status and time/material meetings throughout the development and roll out of the effort.

c) Any additional resource costs incurred over the proposed budget of 270 person-hours will be paid by General Interactive, Inc., unless written consent is provided by the American Express project manager

d) American Express will be invoiced with the actual hours spent implementing the Secure Email per the schedule outlined later in this section

e) The following is an estimate of the implementation provided by GI as a base line for the NTE amount. Additional efforts in a given category required by American Express that exceed these numbers will be provided at the rate used in the following table.

| Resource Skill Level | Estimated Hours | Cost |
|---|---|---|
| Project Manager | 30 | $ 2,100 |
| Systems Architect | 30 | $ 6,000 |
| Principal Engineer | 80 | $ 9,600 |
| Senior Engineer | 80 | $ 8,000 |
| QA Tester | 50 | $ 3,000 |
| TOTAL | 270 | $ 28,700 |

— $70
— $200
— $120
— $100
— $60

Email Servicing – Statement of Work

30



08/24/99

9.2.6  Hardware / Software Costs

All hardware & base software (e.g. OS, IIS, and SQL Server) will be owned by American Express Company.  General Interactive retains ownership of the Echomail and CC products that are to configured and installed on these workstations.

| Description | Cost |
|---|---|
| a.  Intrusion Detection Systems as specified in Exodus document  Intrusion Detection Service | $1,930 per Month |
| b.  Firewall Detection Systems as specified in Exodus document labeled Exodus Communications Firewall Service | $2,975 per month |
| c.  One-time setup cost for Initial implementation Includes:<br><br>XT1 Setup<br><br>• 1 Server configured to operational status<br>• 3 additional NT boxes @ $15K each<br>• 4 additional NT TEST boxes @ $15K each<br>• 1 Day of On-Site Training for 30 Users<br>• 30 Initial Business Users<br>• 10 Initial Technical Users<br>• 110 categories<br>    • Up to 50 categories at setup<br>    • 5 additional categories per month<br><br>Hardware purchase (Intel Based), setup and maintenance (Per Server), in addition to server included in XT1 setup. This price includes hardware/software for deployment and completion of the 3-tier architecture as depicted in Attachment (5).  All h/w will be the sole property of American Express. | $155,000 |



| d.  Contract Option: | 08/24/99 |
|---|---|
| Should American Express determine that volumes warrant an upgrade to the data server the following option may be exercised:<br><br>• High End SUN (E450) replacement for the Data Server.  Not Oracle based.<br><br>Rate defined is good until September 1, 2000. There- after the option can be exercised for up to three years with a maximum increase of 5% per year. | $100,000 |
| e.  Contract Option:<br>One-time setup cost per Additional Business Unit Includes:<br><br>• 1 Day of On-Site Training for up to 30 additional Users<br>• 30 additional  users granted access<br>• 110 categories<br>• Up to 50 categories at setup<br>• 5 additional categories per month<br><br>Rate defined is good until September 1, 2000. There- after the option can be exercised for up to three years with a maximum increase of 5% per year. | $25,000 |

**f.    Confirmation Email to senders on receipt**

| Number of  Emails | $/Email |
|---|---|
| Unlimited | Free |

**g.    Per Transaction Costs ( simple routing of email to other American Express domains)**

| Number of  Emails | $/Email |
|---|---|
| Unlimited | $0.02 |

**h.    Per Transaction Costs ( Routing to Groups accessing Echomail and servicing within the system)**

| Number of  Emails | $/Email |
|---|---|
| 30,000 | $0.25 |
| 50,000 | 0.20 |
| 100,000 | 0.17 |
| 500,000 | 0.14 |
| 2,000,000 | 0.10 |

Email Servicing – Statement of Work



| i. Per Transaction Costs ( Automation ) | | 08/24/99 |
|---|---|---|
| Number of Emails | | $/Email |
| 10,000 | | $1.25 |
| 20,000 | | 1.15 |
| 50,000 | | 0.88 |
| 200,000 | | 0.48 |
| 1,000,000 | | 0.27 |
| j. Emails incorrectly answered to due to classification software malfunction ( see definition of "successfully automated email" in "Definition of terms" section | | Free |
| k. Consulting Fees | | $200/hr |
| Additional Training costs not part of XT1 configuration or Business Unit setup | | $150/hr |
| l. Each Additional User over the thirty (30) covered in XT1 configuration or Business Unit Setup | | $250 one time fee |
| m. Amex Fees: Down Time Costs for ISU to be used to calculate breach of service charge back. Refer to 9.2.4 and definition of down time for additional details. | | $320/hr |

Email Servicing – Statement of Work

33

GII SOW Dated 8/19/1999

# 10 Method and Frequency of Payment

## 10.1 Secure Email Integration

| Percentage | Payment Amount ($) | Date | Method | Billing/Delivery Conditions |
|---|---|---|---|---|
| 30% | 8,610 | 7/22 | Purchase Order | Completed |
| 30% | 8,610 | 8/5 | Purchase Order | Completed |
| 40% | Invoice | | | Two weeks after Production Deployment and no pending Sev 1 or 2 items for 30 days following implementation. Invoice must include total number of hours by resource type spent on the effort. |
| NTE Total Payments | 28,700 | | | |

## 10.2 Secure Email Acceptance Criteria

The application interfaces will be accepted by American Express following complete installation and verification of operation in both the Production and Testing environments. The application changes are expected to be have as documented in this Statement of Work. The backup/recovery process will also be validated prior to making final payment.

Email Servicing – Statement of Work 8/19/99

34

08/24/99

**10.3**

## 10.4 Hardware / Software Setup Criteria

| % | Payment Amount ($) | Date | Method | Acceptance/Billing Conditions |
|---|---|---|---|---|
| 10% | 16,390 | 7/22/99 | Purchase Order | Acceptance of 3-tier architecture requirements and initiation of h/w order (Complete) |
| 10% | 16,390 | 8/5/99 | Purchase Order | Hardware installed and ready to be used by American Express (Complete) |
| 50% | 77,500 | 8/31/99 | Invoice | Network/Physical configuration reviewed and approved by American Express. All Training Conducted |
| 30% | 44,720 | | Invoice | Routing Rules and Knowledge base ready for System Testing. Initial testing completed (network traffic/communication validated) |
| | 155,000 | | | Two weeks after Production Deployment. No Severity 1 or 2 issues are present |

## 10.5 Hardware/Software Acceptance Criteria

The hardware and software acceptance criteria are based on two factors. 1) The physical network and site review and 2) verification of behaviors documented in section 4 of this SOW. All features associated with this effort must behave as advertised/demonstrated during the RFP process. All items detailed for correction during the physical site review must be corrected or have mutual agreement to the disposition of the discrepancy identified. The physical site reviews will also verify Intrusion Detection and Firewall systems. Ongoing billing for the two services will be provided with the monthly billing for the transactional costs attributed to the Echomail service (see next section).

Email Servicing -- Statement of Work

35

AMERICAN EXPRESS

08/24/99

### 10.6 Per Transaction Costs and Acceptance Levels

The following process will be utilized when determining the costs associated with the variable portions of this contract.

a) All reports utilized to create the invoice are either a part of the standard General Interactive product suite or will be developed at no additional cost to American Express. All reports will be made available to both companies so that the companies can track current month expenditures (this will require ad-hoc report support as well as end of month reports).

b) The individual per transaction costs will be applied in the first full month following implementation. This is primarily to disassociate testing of the auto reply/auto-suggested email as they are fully integrated into production.

c) A part of the General Interactive, Inc., Gold agreement is to provide Quality Assurance and Semantic Network requests. Since American Express also plays a part in helping the automation engine to achieve the 40% automation goal, Proper training and professional advice must be provided to reach and maintain at least 40% automation, every calendar month, at no additional cost.

d) Performance less than 90% availability in a given month is to result in no transactional fees to be paid for that month. Availability over the 90% threshold will dictate the amount to be charged to American Express for the transactional fees. Refer to the definition of DOWNTIME for a complete description of how the available number is to be calculated. Fees associated with the performance are to be calculated as follows; Total Transaction Fees for the month minus (downtime in hours times the American Express Downtime rate).

Email Servicing – Statement of Work



<u>Amendment of Master Agreement & Schedule: PHX-07/09/99-RLG1</u>

American Express Co ("Amexco") with principal place of business at American Express Tower, World Financial Center, New York, NY 10285 and EchoMail, Inc. ("Consultant"), formerly known as General Interactive, Inc. ("GII"), with principal place of business at 701 Concord Avenue, Cambridge, MA 02138 entered into a business agreement with effect from July 9, 1999 subject to the terms of certain Master Agreement and Schedule: PHX-07/09/99-RLG1 ("Master Agreement").

This Amendment modifies the Master Agreement with respect to the terms described herein. Amexco and EchoMail represent that there are no other changes to Master Agreement. This Amendment is incorporated by reference and becomes a part of the Master Agreement.

The parties agree to modify the following provisions of the Master Agreement.

(1) Name and address of Consultant:
Name of Consultant shall be revised as: EchoMail, Inc. ("EchoMail")
Address of Consultant shall be revised as: 701 Concord Avenue, Cambridge, MA 02138

(2) Reference to "General Interactive, Inc.", "General Interactive", "GII", & "GI" to describe the name of Consultant:
All references to "General Interactive, Inc.", "General Interactive", "GII", & "GI" shall be referred to as "EchoMail" to describe the name of Consultant

(3) Pricing for Use of Licenses, Infrastructure, Hosting, Maintenance and Professional Services:
All pricing shall be revised as per the terms of Schedule RR subject to the Effective Term of Schedule RR, attached herewith as Exhibit A.

(4) Effective Term of the Master Agreement:
Effective Term of the Master Agreement shall be effective from July 15, 2004 until December 31, 2005. The Master Agreement shall automatically renew for an additional 12-month term from January 1 2006 to December 31, 2006 unless Amexco terminates by written notice to Consultant at least sixty (60) days prior to December 31, 2005. If the Master Agreement has been renewed for second term, it shall automatically renew for third term from January 1 2007 to December 31, 2007 unless Amexco terminates by written notice to Consultant at least sixty (60) days prior to December 31, 2006. In the event Amexco terminates Schedule RR, the Master Agreement shall become automatically terminated.

(5) Effective Term of Schedule RR:
Effective Term of Schedule RR shall be effective from January 1, 2005 for a period of 12 months. Schedule RR shall automatically renew for an additional 12-month term from January 1 2006 to December 31, 2006 unless Amexco terminates by written notice to Consultant at least sixty (60) days prior to December 31, 2005. If Schedule RR has been renewed for second term, it shall automatically renew for third term from January 1 2007 to December 31, 2007 unless Amexco terminates by written notice to Consultant at least sixty (60) days prior to December 31, 2006. In the event Amexco terminates Schedule RR, the Master Agreement shall become automatically terminated.

EchoMail, Inc.
701 Concord Avenue
New Media Park
Cambridge, Mass.
02138-1057

tel: 617-354-8585
fax: 617-354-8899
www.echomail.com



(6) Reference to "Exodus" and "Exodus Communications":
All references to "Exodus" and "Exodus Communications" shall be considered removed. Consultant shall define and provide all services enlisted as defined and provided by "Exodus" and "Exodus Communications".

(7) Business Continuity Plan Requirements:
Consultant shall take reasonable efforts to conform to the requirements of Business Continuity Plan requirements attached hereto as Exhibit A.

(8) E-Mail Processing Time Commitment:
Consultant agrees to the following terms for E-Mail Processing Time Commitment.
   a. 100% of the E-Mails received by Mail servers at EchoMail will be processed and made available on the web-based user interface of EchoMail Customer Care software in four (4) hours, calculated on a per E-Mail basis
   b. 70% of the E-Mails received by Mail servers at EchoMail will be processed and made available on the web-based user interface of EchoMail Customer Care software in One and half (1.5) hours, calculated on a per E-Mail basis
   c. Amexco will not be billed by EchoMail Customer Care and Business Intelligence processing license fees for those E-Mails that took more time to process than the limits defines above.
   d. Above processing time commitment excludes any and all issues that are outside the scope of EchoMail Hosting Center including without limitation, problems of the internet, problems with telecommunication lines, devices not controlled by EchoMail, human errors or delays caused by staff not employed by EchoMail.

(9) Security Patch Upgrade Commitment:
Consultant agrees to the following terms for Security Patch Upgrade Commitment.
   a. All non-critical patches shall be installed once in a quarter
   b. All security related critical patches shall be installed within 12 days of issuance of such patches by the patch issuer
   c. Identification of patch as critical patch shall be designated by the issuer

Amexco and Consultant execute this Amendment, in their respective corporate names by their duly authorized representatives on this 13th day of August 2004.


_____          8 - 13 - 2004
EchoMail, Inc.                            Date
Authorized Representative


_____          8/20/04
American Express Co                       Date
Authorized Representative




# Exhibit B



May 26, 2005

V.A. Shiva
Chairman and CEO
EchoMail, Inc.
701 Concord Avenue
Cambridge, MA 02138

Kenneth I. Chenault
Chairman and CEO
American Express Corporation
World Financial Center
200 Vessey Street
New York, NY 10285

Dear Ken,

As Chairman and CEO of EchoMail, Inc., I am writing this letter to notify you of our decision to terminate our relationship with American Express effective 5PM on May 27, 2005. This action is a result of the abusive treatment that my staff has suffered under Reena Panikar, an American Express employee, and the unfair business practices precipitated by her recent actions.

Since 1999, we had a very close and respected Partnership of trust and openness. Recent machinations, led by Ms. Panikar have destroyed that trust and goodwill. What is ironic and disheartening is that we have been forced to take this decision in spite of the re-awarding of another three (3) year contract effective January 2005, which was based on an extensive RFI conducted in 2004.

We respect the American Express brand; however, Ms. Panikar's actions and wrongfully laying blame threatens our well-established and respected brand. For your knowledge, attached are two (2) E-Mails from one of your business unit leaders, as early as the beginning of this month, sharing the value of EchoMail to his business unit.

Kindly contact me if you would like any clarification.

Best regards,

V.A. Shiva

RECEIVED

MAY 2 7 2005

KENNETH CHENAULT

EchoMail, Inc.
701 Concord Avenue
New Media Park
Cambridge, Mass.
02138-1057

tel: 617-354-8585
fax: 617-354-8899
www.echomail.com

# Exhibit C





May 27, 2005

V.A. Shiva
Chairman and CEO
EchoMail, Inc.
701 Concord Avenue
Cambridge, MA 02138

*Ted Linville*
*Barbar R.*

Kenneth I. Chenault
Chairman and CEO
American Express Corporation
World Financial Center
200 Vessey Street
New York, NY 10285

Re: Termination Notice Sent by EchoMail to American Express on May 26, 2005

Dear Ken,

Pursuant to my letter of termination on May 26, 2005, EchoMail has stopped accepting any further E-Mail from American Express to our mail servers for processing as of 5PM today, May 27, 2005.

It is, once again unfortunate that EchoMail has been forced to terminate the relationship. To ensure that any E-Mail received prior to 5PM EST of May 27, 2005, does not go unprocessed, we are offering you continued full access to our software product. However, such access will be decommissioned by 5PM EST, June 3, 2005.

Kindly contact me if you would like any clarification.

Best regards,

V.A. Shiva

RECEIVED

MAY 3 1 2005

KENNETH CHENAULT

EchoMail, Inc.
701 Concord Avenue
New Media Park
Cambridge, Mass.
02138-1057

tel: 617-354-8585
fax: 617-354-8899
www.echomail.com

# Exhibit D

May 31, 2005



**Interactive Services
and New Businesses**

American Express
American Express Headquarters
200 Vesey Street
WFC
New York, NY 10286

<u>VIA OVERNIGHT MAIL</u>
Mr. V. A. Shiva, President and C.E.O.
EchoMail, Inc.
701 Concord Avenue
New Media Park
Cambridge, MA 02138-1057

Re: EchoMail, Inc. ("EchoMail") Breach of E-Mail Services Consulting Agreement Entered into with
     American Express Travel Services Company, Inc. ("Amex") as of <u>July 9, 1999, as amended (the
     "Agreement")</u>

Dear Mr. Shiva:

Amex considers EchoMail in breach of the Agreement due to the discontinuance, as of May 27, 2005, by
EchoMail of the services it was required to perform under the Agreement. Amex reserves all rights in
conjunction with this breach.

Further, Amex requires immediate payment by EchoMail of all monies due to Amex, including, but not
limited to, the following amounts that were prepaid to EchoMail:
* $320,000 for Hardware Leasing and Hosting Services
* $133,000 for Hosting and Maintenance
* $34,335 for Security Services
The listed amounts represent pro rated totals based on the provision of services for only 5 out of 12 months.

EchoMail must also return immediately all of the items due to and/or owned by Amex, including, but not
limited to, the following:
* all Amex Confidential Information, including archived tapes, full and incremental;
* any Amex-Purchased Servers (six business intelligence servers, five application servers, two test servers);
* an Amex owned Database Server; and
* an Amex owned Network Router.
All items returned should be returned by commercially secure means and methods. Amex reserves the further
right to provide specific instructions as to all items that are to be returned, and shall hold EchoMail
responsible for maintaining its duty of confidentiality going forward.

Finally, please immediately remove all mention of Amex from your Website, marketing collateral and press
releases.

Sincerely,

Richard Quigley,
Senior Vice President, American Express Interactive