UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ECHOMAIL, INC.,                          )
                                         )
                    Plaintiff,           )
                                         )
v.                                       )        Civil Action No. 05-11318-NMG
                                         )
AMERICAN EXPRESS CO.                     )
and IBM CORP.,                           )
                                         )
                    Defendants.          )

**PLAINTIFF ECHOMAIL, INC.'S OPPOSITION TO DEFENDANT
AMERICAN EXPRESS COMPANY'S MOTION FOR SUMMARY
JUDGMENT AS TO COUNT III OF ITS COUNTERCLAIM**

Defendant American Express Company ("AmEx" or "the Company") has moved for

summary judgment as to Count III of its counterclaim for replevin. Specifically, AmEx demands

the immediate return from plaintiff EchoMail, Inc. ("EchoMail") of a database server and

computer tapes that contain e-mails from AmEx customers ("Confidential Customer

Information" or the "Information"). AmEx asserts that the emails in question contain "highly

sensitive, confidential information, including the customer's account numbers and Social

Security number." Def.'s Mem. in Support of Mot. For Summ. J. at 1. In its motion, AmEx

erroneously, and misleadingly, argues that EchoMail has "absolutely no legitimate reason to

continue to hold" AmEx's Confidential Customer Information, and that despite demand having

been made, EchoMail has failed to return these materials to AmEx.

AmEx's motion for summary judgment as to its counterclaim for replevin should be

denied because AmEx has not, and indeed cannot, demonstrate that it is the sole and exclusive

owner of the information presently stored on the Database Server and archived back-up tapes at

EchoMail's facility. Furthermore, as AmEx is well-aware, EchoMail has agreed to return

AmEx's Confidential Customer Information as soon as AmEx remits payment for the professional services associated with converting this Information to Flat File format.

## STATEMENT OF FACTS

In July 1999, American Express Company ("AmEx" or "the Company") and EchoMail entered into a contract (the so-called "Stand Alone Agreement for Consulting Services" or "Master Agreement") whereby EchoMail would manage incoming emails to AmEx from its customers. From 1999 to 2004, as a result of successive contract renewals, EchoMail provided several AmEx business units with managed incoming email services. In August 2004, EchoMail executed a three-year contract for services with AmEx, running from January 1, 2005 through December 31, 2007. The Amendment of Master Agreement & Schedule is attached to the Affidavit of Sonu Mathew Abraham ("Abraham Aff.") as Exhibit A.[1]

Pursuant to the Master Agreement, when an AmEx customer entered one of the Company's websites and logged onto his or her account using a unique user name and password, the customer could send an email to AmEx through the Company's "Secure Message Center" or through another secure AmEx webform. The customer's account numbers and other personal information ("Confidential Customer Information" or "Information") would typically be included in the email. Abraham Aff. at ¶ 3.

Using its confidential proprietary web-based software technology, EchoMail would collect and store emails from AmEx customers, manage, categorize and filter the emails, and then analyze them for "attitude," "requests," "issues," "products," and "customer type." Based on this analysis, EchoMail would then propose a response and route each email to a web-based

---

[1]  In Attachment A to the Declaration of Angela Ramsammy, AmEx included the "Amendment of Master Agreement," but neglected to include the accompanying "Schedule."

platform where it could be viewed and worked on by AmEx's customer support personnel before sending a response to the customer.  Abraham Aff. at ¶ 4.

Pursuant to Section 5 "Information Integrity Requirements" in the Email Servicing Statement of Work attached to the Master Agreement, EchoMail was required to archive AmEx's data on a semi-quarterly basis, with AmEx providing storage for the records.[2]  Abraham Aff. at ¶ 5 and Attachment B.

At approximately 6:00 p.m. on May 26, 2005, Ms. Reena Paniker of AmEx terminated the Company's relationship with EchoMail in a telephone conference with three senior members of EchoMail.  Abraham Aff. at ¶ 6.  Following this telephone conference, EchoMail notified AmEx via letter sent by Federal Express that beginning on May 27, 2005 at 5:00 p.m., EchoMail would no longer receive new inbound email from the business units represented by Ms. Paniker. Notwithstanding this business decision, EchoMail nevertheless allowed AmEx to access existing email until June 3, 2005 at 5:00 p.m.  Abraham Aff. at ¶ 7.  Thereafter, in a letter dated May 31, 2005 from Senior Vice President Richard Quigley, AmEx demanded the return of, among other things AmEx's Confidential Customer Information and a SUN E450 database server (the "Database Server") on which some of this information is stored.  Abraham Aff. at ¶ 8.

The Confidential Customer Information AmEx seeks is currently stored on database servers and backup tapes located in EchoMail's data center.  It is EchoMail's normal business practice to back-up such information.  Abraham Aff. at ¶ 9.

The format in which the Confidential Customer Information is stored in the Database Server and on the back-up tapes is specific to the databases in which the Information is stored.

---

[2]  With respect to the Email Servicing Statement of Work attached to the Master Agreement, AmEx included only Section 9. "Financial and Costing Information," and did not provide Sections 1 through 8 or 10 through 13 as part of Attachment A to the Declaration of Angela Ramsammy.  For the Court's convenience, EchoMail has provided the Email Servicing Statement of Work in its entirety as Exhibit B to the Abraham Aff..

EchoMail designed and developed the databases used to store this Information—known as the "Data Schema"—and it is proprietary to EchoMail. Abraham Aff. at ¶ 10. EchoMail has never provided its Data Schema to any customer. Abraham Aff. at ¶ 11.

Data Schema is a highly confidential component of any computer software application. The Data Schema lays the foundation of how various data elements are stored in a database. In an application such as EchoMail, which is comprised of various software components integrated to work together, each software component accesses the database to insert or update different data elements. Abraham Aff. at ¶ 12. In most cases, data inserted or updated by one software component is accessed by or relied on by one or more other software components, which in turn may insert the same or other data elements. For this constantly changing system to function efficiently, the data elements must be organized in an efficient manner. Abraham Aff. at ¶ 13.

The process of developing an efficient design for a database requires a great deal of skill and experience, and an improperly designed Data Schema can paralyze a system. The design of a Data Schema must consider, among other things, the type of data stored (e.g., text, numbers, dates, images), the size of the data item, which data items can be grouped together, the relationship between different groups of data elements, how inserting or updating a data element in one group impacts other data elements or groups, and the quickest and most efficient way to access the data in each group or across different groups. Abraham Aff. at ¶ 14. To avoid disclosing the Data Schema when making stored information available to customers such as AmEx, information technology organizations, including EchoMail, typically generate a common readable text format called the "Flat File" format. Abraham Aff. at ¶ 15.

EchoMail is prepared to return AmEx's Confidential Customer Information to the Company in Flat File format. Providing such Information in Flat File format is standard practice

in the industry and is consistent with EchoMail's past practices with its customers. Abraham Aff. at ¶ 16. However, to extract EchoMail's proprietary Data Schema and generate the Flat Files for nearly six (6) years of data, EchoMail anticipates that it will have to expend 480 professional service hours. The process of extracting the Data Schema from AmEx's Confidential Customer Information involves four steps: EchoMail must (1) develop a program code and procedure to extract the Data Schema and generate Flat Files; (2) reload information from previous years onto the Database Server; (3) run the procedure on all backup tapes to generate the Flat Files; and (4) pack and ship to AmEx the media with the Flat Files containing its Confidential Customer Information. Abraham Aff. at ¶ 17. EchoMail's standard hourly rate for these professional services is $250 per hour. EchoMail requires its customers, including AmEx, to pay the cost of professional services before the services are performed. AmEx is well-aware of this requirement and has complied with it in the past. Abraham Aff. at ¶18.

The professional services associated with extracting EchoMail's Data Schema and generating Flat Files of AmEx's Confidential Customer Information was discussed by the parties as early as 1999. Abraham Aff. at ¶ 19. During conversations regarding specific deliverables in the initial years of the EchoMail-AmEx relationship, James Shelby, AmEx's then-Director of Technology, and Mr. Abraham discussed an arrangement whereby AmEx would provide blank tapes so that EchoMail could generate Flat Files of AmEx's Confidential Customer Information on a quarterly basis and then ship the tapes to a storage location designated by AmEx. AmEx understood that a professional services fee would be associated with this work. Abraham Aff. at ¶ 20.

EchoMail and AmEx discussed the issue of EchoMail providing back-up tapes to AmEx again in 2004, while negotiating the Amendment to the Master Agreement & Schedule. Over the

course of these negotiations, Mr. Abraham explained to Paul Murphy, AmEx's Director of Interactive Enterprise Delivery, and Angela Ramsammy, AmEx's Lead Programmer Analyst, that EchoMail was currently warehousing AmEx's data. To compensate EchoMail for this service, the Amendment to the Master Agreement & Schedule, executed in August 2004, included a $19,000 per month increase in professional services fees. Abraham Aff. at ¶ 22 and Exhibit A at 4 ("HDW-SRVR-Hosting"). AmEx did not, at any time, provide blank tapes or designated a storage location as required by Section 5 of the Email Servicing Statement of Work. Abraham Aff. at ¶ 21.

Had AmEx provided EchoMail with blank tapes and paid for the professional services associated with extracting EchoMail's proprietary Data Schema from AmEx's Confidential Customer Information, EchoMail would have performed these services on a quarterly basis beginning in 1999. AmEx thus would have (with the exception of the last quarter) the Information it now seeks. Instead, EchoMail has born the cost of the blank tapes that have been used to back-up AmEx's Customer Information. Abraham Aff. at ¶ 23.

AmEx was well-aware of the procedures required to remove EchoMail's proprietary Data Schema and generate Flat Files of the Company's Confidential Customer Information, and further knew that it would be billed for the professional services associated with performing this work. AmEx and EchoMail negotiated the cost of performing these professional services. Abraham Aff. at ¶ 24. In fact, EchoMail explained to AmEx that whenever it sought the return of information, it would only be sent after EchoMail received payment for the professional services required to remove the proprietary Data Schema, and generated the data in Flat File format. Abraham Aff. at ¶ 25.

Upon receipt of payment from AmEx, EchoMail can complete the project in sixty (60) business days and provide AmEx with both Flat Files of its Confidential Customer Information and the Sun E450 Database Server, but without any data stored in EchoMail's confidential Data Schema. Abraham Aff. at ¶ 26. After generating Flat Files, EchoMail will destroy all of AmEx's Confidential Customer Information and agrees that it will not retain any copies of this Information, except to the extent required by law. Abraham Aff. at ¶ 27.

Though counsel, EchoMail has already agreed to return both the Confidential Customer Information in Flat File format and the Database Server to AmEx. Abraham Aff. at ¶ 28. Nevertheless, AmEx filed its motion for summary judgment.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When ruling on a motion for summary judgment, the court must view the entire record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. See Lee-Crespo v. Schering-Plough Del Caribe Inc., 354 F.3d 34, 37 (1st Cir. 2003) (citing Rivera v. P.R. Agueduct & Sewers Auth., 331 F.3d 183, 185 (1st Cir. 2003)). An issue is "genuine" for purposes of summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Hayes v. Douglas Dynamics, Inc., 8 F.3d 88, 90 (1st Cir. 1993) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A fact is "material" if it "might affect the outcome of the suit under the governing law." Id.

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact in the record. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If that burden is met, the nonmoving party must "produce evidence on which a

reasonable finder of fact . . . could base a verdict for it." Ayala-Gerena v. Bristol Myers-Squibb

Co., 95 F.3d 86, 94 (1st Cir. 1996) (citation omitted). Here, AmEx has failed to demonstrate that

there are no genuine issues of material fact and is therefore not entitled to summary judgment as

to its claim for replevin.

## ARGUMENT

### I.    AmEx Is Not Entitled to Immediate Possession of *All* The Information Stored On The Database Server and Archived Back-up Tapes

Under New York law, in a replevin action, the issue "is strictly whether plaintiff or

defendant has the superior possessory right."[3] Honeywell Information Sys., Inc. v. Demographic

Sys., Inc., 396 F. Supp. 273, 275 (S.D.N.Y. 1975) (citing Practice Commentary, CPLR § 7101

(McKinney 1963)).    Some courts applying New York law further require a claimant to

demonstrate a demand for the return of the property and refusal of the demand if the preliminary

possession was itself lawful.[4]  See Martha Graham Sch. & Dance Found., Inc. v. Martha

Graham, 224 F. Supp. 2d 567, 603 (S.D.N.Y. 2003), *vacated on other grounds*, 380 F.3d 624 (2d

Cir. 2004).

Similarly, in Massachusetts, the party seeking replevin must set forth sufficient facts

demonstrating:  (1) that the property in question has a value greater than twenty dollars; (2) the

property was unlawfully taken or detained; and (3) the owner or person entitled to possession has

---

[3]   As EchoMail explained in its June 23, 2005 Memorandum in Support of Its Motion for Preliminary Injunction, the plain language of the contract in this case, the "Stand Alone Agreement for Consulting Services," or Master Agreement, limits the application of New York law to the construction and interpretation of the contract. Hence, New York law should not apply to statutory or tort claims which arise outside the contract, and EchoMail does not concede that applicability of New York law to any of its claim or AmEx's counterclaims. Even so, this memorandum demonstrates that AmEx is not entitled to replevin under either New York or Massachusetts law.

[4]   AmEx does not argue that EchoMail's preliminary possession of the Database Server and the Confidential Customer Information was unlawful.

been deprived of the property.[5]  See Evergreen Marine Corp. v. Six Consignments of Frozen

Scallops, 806 F. Supp. 291, 295 (D. Mass. 1992) (citing Mass. Gen. L. c. 247, § 7), vacated on

other grounds, 4 F.3d 90 (1st Cir. 1993); 17A Mass. Prac. § 49.3 (5th ed.) ("[I]t is necessary for

the plaintiff to sustain the burden of proving his general or special title to the property and his

right to immediate possession of it at the time of the commencement of the action.").  Moreover,

the party seeking replevin must also demonstrate that it is the sole and exclusive owner of the

property.  Bray v. Raymond, 166 Mass. 146, 150-51 (1896).  AmEx has failed to meet this

burden and therefore is not entitled to summary judgment as to its counterclaim for replevin.

AmEx argues that it has satisfied the elements of its replevin claim by asserting:  (1) that

EchoMail came into possession of the Database Server and AmEx's Confidential Customer

Information solely as a result of the services it was providing to AmEx; (2) that because AmEx

paid for the Database Server, it remained the Company's property at all times; (3) that EchoMail

only received AmEx's Confidential Customer Information through the services it was providing

on behalf of the Company; and (4) that EchoMail is no longer performing any services for

AmEx.  From these statements, AmEx concludes that EchoMail "has no right or legitimate

reason to continue to maintain possession" of the Database Server and the Company's

Confidential Customer Information.  AmEx's conclusion is wrong as a matter of law and is

factually misleading.

A.    AmEx Is Not The Sole And Exclusive Owner of The Database Server or
        Archived Back-Up Tapes Nor Is AmEx Entitled To Immediate Possession

There is no provision in the Master Agreement, or in any other express or implicit

agreement between the parties, that entitles AmEx to either possession or ownership of

---

[5]  AmEx cites to decisions from federal courts in New York, New Jersey, and Maryland, and state courts
in New York and Delaware, for the proposition that computer-related equipment and electronic
information are the type of property that can be the subject of a replevin action.  EchoMail does not
dispute this proposition.

EchoMail's Data Schema.  Moreover, AmEx knows that EchoMail's storage technology and web-based hosting process, developed over several years, is highly confidential and that EchoMail has spent considerable time, money, and effort to develop its products and to protect the confidentiality of this proprietary technology, including the Data Schema.  AmEx thus cannot reasonably argue that it has any ownership right to or possessory interest in EchoMail's Data Schema contained on the archived tapes and the server.

Pursuant to the Master Agreement, EchoMail was under contract to utilize its confidential and proprietary web-based software technology to collect, store, manage, categorize, filter, and analyze emails from AmEx customers.  Based on its analysis, EchoMail would propose a response to each email and then route it to a web-based platform where it could be viewed and worked on by AmEx customer support personnel before a response was sent to the customer.  To accomplish this complex, multifaceted analysis and recommend an appropriate response quickly and efficiently, EchoMail has developed a unique format to store Confidential Customer Information.  The unique design and development of the databases that EchoMail uses to store this Information, known as the Data Schema, is itself highly confidential, proprietary software technology.

Although AmEx may be the sole and exclusive owner of the Database Server and owns its Confidential Customer Information, that Information is currently stored using the proprietary Data Schema owned solely and exclusively by EchoMail.  Accordingly, AmEx has not, and indeed cannot, establish that it is the *sole* and *exclusive* owner, or that it is entitled to *immediate* possession, of the Database Server and the information contained on the archived back-up tapes in their current form.  See Martha Graham School of Dance, 224 F. Supp. 2d at 603; Corcoran v. White, 146 Mass. 329, 330 (1888)(citing Hart v. Fitzgerald, 2 Mass. 509 (1807) for the

proposition that in a replevin action, the plaintiff's right must be <u>exclusive</u> in order to warrant delivery of the property to him). In its current form, AmEx's Confidential Customer Information is inextricably intertwined with EchoMail's Data Schema, effectively making AmEx and EchoMail joint owners of the information. AmEx therefore cannot establish that its own possessory interest in the information contained on the Database Server and archived back-up tapes is superior to EchoMail's possessory interest. See <u>Leonard v. Whitney</u>, 109 Mass. 265, 269 (1872) (explaining that "[i]t is always a good defence in an action of replevin, that the defendant is tenant in common of the property with the plaintiff, and therefore has a right equally with him to possession of the whole"); <u>DaSilva v. The Coffee Connection, Inc.</u>, 1994 WL 879508, at *1 (Mass. Super. Nov. 17, 1994) (noting that in a replevin action, the plaintiff must have the right to "immediate, exclusive and unqualified possession of the property" as against the defendant).

AmEx is well-aware that EchoMail is willing to return both the Confidential Customer Information and the Database Server, but only after AmEx's Information is extracted from EchoMail's proprietary Data Schema, the Information is converted to the common readable Flat File format, and the the proprietary Data Schema is removed. Moreover, AmEx knows that it is standard practice among information technology organizations to provide such information as Flat Files and that it is required to pay for the professional services associated with extracting the Data Schema and generating the Flat Files. Consequently, this procedure (and payment of the associated fees) is the preliminary action that must be performed before AmEx can legitimately claim an unqualified and exclusive right of possession to the information on the Database Server and archived tapes. <u>DaSilva</u>, 1994 WL 879508, at *1. The Court should thus deny AmEx's

attempt to gain illegitimate and unlawful access to EchoMail's proprietary Data Schema software.

**B.**    **AmEx Knows That It Is Required to Pay EchoMail Professional Services Fees To Convert The Data to Flat File Format**

As early as 1999, EchoMail and AmEx discussed an arrangement by which AmEx would provide blank tapes so that, on a quarterly basis, EchoMail could back-up AmEx's Confidential Customer Information, extract its proprietary Data Schema, and generate Flat Files of the Information and ship the tapes to a storage location designated by AmEx. Throughout these discussions, AmEx understood that it would be required to pay a professional services fee to perform this work as it had done in other instances and as is common industry practice. However, AmEx never provided the tapes to EchoMail or otherwise requested the quarterly return of its Confidential Customer Information, nor did it ever pay for the services associated with extracting the Data Schema and generating Flat Files. Abraham Aff. at ¶ 23.

AmEx now seeks to avoid paying for professional services that were clearly contemplated by the parties by arguing that EchoMail has "absolutely no legitimate reason to hold this information." As explained above, EchoMail is justified in holding this information in its current form in order to protect its proprietary Data Schema technology unless and until AmEx pays for the professional services necessary to extract the Data Schema, reformat the Database Serve, and generate Flat Files. See DaSilva, 1994 WL 879508, at *1; Cf. Cooper v. Kipp, 65 N.Y.S. 379, 380 (N.Y. App. Div. 1900) (holding that where plaintiff brought replevin action to recover a wagon in possession of defendant and defendant asserted counterclaim for money due from plaintiff for repairs made to the wagon at plaintiff's request, judgment should provide for return of property after payment to defendant of the amount due for repairs). The

Court should therefore deny AmEx's thinly-veiled attempt to avoid paying EchoMail for these services.

**II.    EchoMail Will Return The Confidential Customer Information After AmEx Pays For The Required Professional Services Fee**

Through counsel, EchoMail has already agreed to return to AmEx both the Confidential Customer Information in Flat File format and the Database Server.  In a letter dated July 18, 2005, EchoMail's attorney Alan Rose, Jr. explained to AmEx's counsel, Louis Smith, that EchoMail would reformat the Database Server to remove EchoMail's confidential Data Schema from, download AmEx's Confidential Customer onto tapes in Flat File format, and return these tapes and the Database Server to AmEx.  See July 18, 2005 letter from Alan D. Rose, Jr. to Louis Smith, attached hereto as Exhibit 1.  Mr. Rose also assured Mr. Smith that through the reformatting process, EchoMail would destroy all of AmEx's information and would not retain any other copies of it, except as necessary to protect its claims.  Mr. Rose made it clear, however, that AmEx would be charged EchoMail's standard hourly rate—as agreed to by AmEx—to perform the work associated with generating the Flat Files and reformatting the Database Server.  By filing the instant motion for summary judgment as to its counterclaim for replevin, AmEx has rejected EchoMail's attempt to resolve this issue in a manner that best protects the rights and interests of both parties.

## CONCLUSION

For the reasons set forth above, EchoMail respectfully requests that this Court deny American Express Company's motion for summary judgment as to Count III of its counterclaim for replevin.

Respectfully submitted,

ECHOMAIL, INC.,

By its attorneys,

_____
Alan D. Rose (BBO#427280)
Alan D. Rose, Jr. (BBO#628871)
Lisa A. Tenerowicz (BBO#654188)
ROSE & ASSOCIATES
29 Commonwealth Avenue
Boston, Massachusetts 02116
617-536-0040

Date: October 13, 2005