UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ECHOMAIL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-11318-NMG |
| | ) | |
| AMERICAN EXPRESS CO. | ) | |
| and IBM CORP., | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF SONU MATHEW ABRAHAM

I, Sonu Mathew Abraham, hereby depose and state as follows:

1.      I am currently the president of EchoMail.  I have worked for EchoMail for approximately eight years.  As president I am responsible for running many of the day-to-day operations of EchoMail, including customer service with respect to EchoMail's major customers. I have personal knowledge of the facts set forth in this declaration.

2.      In July 1999, American Express Company ("AmEx" or "the Company") and EchoMail entered a contract (the so-called "Stand Alone Agreement for Consulting Services" or "Master Agreement") whereby EchoMail would manage incoming emails to AmEx from its customers.  From 1999 to 2004, as a result of successive contract renewals, EchoMail provided several AmEx business units with managed incoming email services.  In August 2004, EchoMail executed a three-year renewal contract for services with AmEx, running from January 1, 2005 through December 31, 2007.  The Amendment of the Master Agreement & Schedule is attached hereto as Exhibit A.

3.      Pursuant to the Master Agreement, when an AmEx customer entered one of the Company's websites and logged onto his or her account using a unique user name and password,

the customer could send an email to AmEx through the Company's "Secure Message Center" or through another secure AmEx webform. The customer's account numbers and other personal information ("Confidential Customer Information" or "Information") would typically be included in the email.

4.      Using its confidential proprietary web-based software technology, EchoMail would collect and store emails from AmEx customers, manage, categorize and filter the emails, and then analyze them for "attitude," "requests," "issues," "products," and "customer type." Based on this analysis, EchoMail would then propose a response and route each email to a web-based platform where it could be viewed and worked on by AmEx's customer support personnel before sending a response to the customer.

5.      Pursuant to Section 5. "Information Integrity Requirements" in the Email Servicing Statement of Work attached to the Master Agreement, EchoMail was required to archive AmEx's data on a semi-quarterly basis, with AmEx providing storage for the records. The Master Agreement and attached Email Servicing Statement of Work are attached hereto as Exhibit B.

6.      At approximately 6:00 p.m. on May 26, 2005, Ms. Reena Paniker of AmEx terminated the Company's relationship with EchoMail in a telephone conference with three senior members of EchoMail.

7.      Following this telephone conference, EchoMail notified AmEx via letter sent by Federal Express that beginning on May 27, 2005 at 5:00 p.m., EchoMail would no longer receive new inbound email from the business units represented by Ms. Paniker. Notwithstanding this business decision, EchoMail nevertheless allowed AmEx to access existing email until June 3, 2005 at 5:00 p.m.

8.      In a letter dated May 31, 2005 from Senior Vice President Richard Quigley, AmEx demanded the return of, among other things, AmEx's Confidential Customer Information and a SUN E450 database server (the "Database Server") on which some of this information is stored.

9.      The Confidential Customer Information AmEx seeks is currently stored on database servers and backup tapes located in EchoMail's data center. It is EchoMail's normal business practice is to back-up such information.

10.      The format in which the Confidential Customer Information is stored in the Database Server and on the back-up tapes is specific to the databases in which the Information is stored. The design of the databases that EchoMail uses to store this Information is proprietary to EchoMail. This proprietary design is known as the "Data Schema."

11.      EchoMail has never provided information such as this to any customer because in order for the customer to extract its own information, EchoMail would be forced to reveal its confidential Data Schema.

12.      Data Schema is a highly confidential component of any computer software application. The Data Schema lays the foundation of how various data elements are stored in a database. In an application such as EchoMail, which is comprised of various software components integrated to work together, each software component accesses the database to insert or update different data elements.

13.      In most cases, data inserted or updated by one software component is accessed by or relied on by one or more other software components, which in turn may insert the same or other data elements. For this constantly changing system to function efficiently, the data elements must be organized in an efficient manner.

the services are performed. AmEx is well-aware of this requirement and has complied with it in the past.

19.    The professional services associated with extracting EchoMail's Data Schema and generating Flat Files of AmEx's Confidential Customer Information were discussed by the parties as early as 1999.

20.    During conversations regarding specific deliverables in the initial years of EchoMail-AmEx relationship, James Shelby, AmEx's then-Director of Technology, and I discussed an arrangement whereby AmEx would provide blank tapes so that EchoMail could generate Flat Files of AmEx's Confidential Customer Information on a quarterly or semi-quarterly basis and then ship the tapes to a storage location designated by AmEx. AmEx understood that professional services fees and shipping costs would be associated with this work.

21.    AmEx never provided blank tapes or designated a storage location.

22.    EchoMail and AmEx discussed this proposal again in 2004, while negotiating the Amendment to the Master Agreement & Schedule. Over the course of these negotiations, I explained to Paul Murphy, AmEx's Director of Interactive Enterprise Delivery, and Angela Ramsammy, AmEx's Lead Programmer Analyst, that EchoMail was currently archiving AmEx's data. To compensate EchoMail for various hosting services, including archival of AmEx's data, the Amendment to the Master Agreement & Schedule, executed in August 2004, included a $19,000 per month EchoMail Hosting Services fees which includes professional services fees. See Exhibit A at 4 ("HDW-SRVR-Hosting").

22.    Had AmEx provided EchoMail with blank tapes and paid for the professional services associated with extracting EchoMail's proprietary Data Schema from AmEx's Confidential Customer Information, EchoMail would have performed these services on a

14.     The process of developing an efficient design for a database requires a great deal of skill and experience, and an improperly designed Data Schema can paralyze a system. The design of a Data Schema must consider, among other things, the type of data stored (e.g., text, numbers, dates, images), the size of the data item, which data items can be grouped together, the relationship between different groups of data elements, how inserting or updating a data element in one group impacts other data elements or groups, and the quickest and most efficient way to access the data in each group or across different groups.

15.     To avoid disclosing the Data Schema when making stored information available to customers such as AmEx, information technology organizations, including EchoMail, typically generate a common readable text format called the "Flat File" format.

16.     EchoMail is prepared to return AmEx's Confidential Customer Information to the Company in Flat File format. Providing such Information in Flat File format is standard practice in the industry and is consistent with EchoMail's past practices with its customers.

17.     However, to extract EchoMail's proprietary Data Schema and generate the Flat Files for nearly six (6) years of data, EchoMail anticipates that it will have to expend 480 professional service hours. The process of extracting the Data Schema from AmEx's Confidential Customer Information involves four steps: EchoMail must (1) develop a program code and procedure to extract information from the Data Schema and generate Flat Files; (2) reload information from previous years onto the Database Server; (3) run the procedure on all backup tapes to generate the Flat Files; and (4) pack and ship to AmEx the media with the Flat Files containing its Confidential Customer Information.

18.     EchoMail's standard hourly rate for these professional services is $250 per hour. EchoMail requires its customers, including AmEx, to pay the cost of professional services before

quarterly or semi-quarterly basis beginning in 1999.  AmEx thus would have (with the exception

of the last quarter) the Information it now seeks.  Instead, EchoMail has borne the cost of the

blank tapes that have been used to back-up AmEx's Customer Information.

     23.     AmEx was well-aware of the procedures required to remove EchoMail's

proprietary Data Schema and generate Flat Files of the Company's Confidential Customer

Information, and further knew that it would be billed for the professional services associated

with performing this work.  AmEx and EchoMail negotiated the cost of performing  professional

services.

     24.     EchoMail explained to AmEx that any time it sought the return of information,

the information would only be sent after EchoMail performed the professional services required

to remove the proprietary Data Schema.  EchoMail further explained to AmEx that the

information would be returned in Flat File format.

     25.     Upon receipt of payment from AmEx, EchoMail can complete the project in sixty

(60) business days and provide AmEx with both Flat Files of its Confidential Customer

Information and the Sun E450 Database Server, but without any data stored in EchoMail's

confidential Data Schema.

     26.     After generating Flat Files, EchoMail will destroy all of AmEx's Confidential

Customer Information and agrees that it will not retain any copies of this Information, except as

required by law, if any.

     27.     As I understand it, through counsel EchoMail already agreed to return this

Information in Flat File format and return the Database Server.  Nonetheless, AmEx has filed its

papers with the Court.  AmEx should not be able to avoid professional services fees and obtain

our proprietary Data Schema.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 13th DAY OF OCTOBER, 2005.

_____
Sonu Mathew Abraham

# EXHIBIT

# A



<u>Amendment of Master Agreement & Schedule: PHX-07/09/99-RLG1</u>

American Express Co ("Amexco") with principal place of business at American Express Tower, World Financial Center, New York, NY 10285 and EchoMail, Inc. ("Consultant"), formerly known as General Interactive, Inc. ("GII"), with principal place of business at 701 Concord Avenue, Cambridge, MA 02138 entered into a business agreement with effect from July 9, 1999 subject to the terms of certain Master Agreement and Schedule: PHX-07/09/99-RLG1 ("Master Agreement").

This Amendment modifies the Master Agreement with respect to the terms described herein. Amexco and EchoMail represent that there are no other changes to Master Agreement. This Amendment is incorporated by reference and becomes a part of the Master Agreement.

The parties agree to modify the following provisions of the Master Agreement.

(1) **Name and address of Consultant:**
Name of Consultant shall be revised as: EchoMail, Inc. ("EchoMail")
Address of Consultant shall be revised as: 701 Concord Avenue, Cambridge, MA 02138

(2) **Reference to "General Interactive, Inc.", "General Interactive", "GII", & "GI" to describe the name of Consultant:**
All references to "General Interactive, Inc.", "General Interactive", "GII", & "GI" shall be referred to as "EchoMail" to describe the name of Consultant

(3) **Pricing for Use of Licenses, Infrastructure, Hosting, Maintenance and Professional Services:**
All pricing shall be revised as per the terms of Schedule RR subject to the Effective Term of Schedule RR, attached herewith as Exhibit A.

(4) **Effective Term of the Master Agreement:**
Effective Term of the Master Agreement shall be effective from July 15, 2004 until December 31, 2005, The Master Agreement shall automatically renew for an additional 12-month term from January 1 2006 to December 31, 2006 unless Amexco terminates by written notice to Consultant at least sixty (60) days prior to December 31, 2005. If the Master Agreement has been renewed for second term, it shall automatically renew for third term from January 1 2007 to December 31, 2007 unless Amexco terminates by written notice to Consultant at least sixty (60) days prior to December 31, 2006. In the event Amexco terminates Schedule RR, the Master Agreement shall become automatically terminated.

(5) **Effective Term of Schedule RR:**
Effective Term of Schedule RR shall be effective from January 1, 2005 for a period of 12 months. Schedule RR shall automatically renew for an additional 12-month term from January 1 2006 to December 31, 2006 unless Amexco terminates by written notice to Consultant at least sixty (60) days prior to December 31, 2005. If Schedule RR has been renewed for second term, it shall automatically renew for third term from January 1 2007 to December 31, 2007 unless Amexco terminates by written notice to Consultant at least sixty (60) days prior to December 31, 2006. In the event Amexco terminates Schedule RR, the Master Agreement shall become automatically terminated.

EchoMail, Inc.
701 Concord Avenue
New Media Park
Cambridge, Mass.
02138-1057

tel: 617-354-8585
fax: 617-354-8899
www.echomail.com



**(6) Reference to "Exodus" and "Exodus Communications":**
All references to "Exodus" and "Exodus Communications" shall be considered removed. Consultant shall define and provide all services enlisted as defined and provided by "Exodus" and "Exodus Communications".

**(7) Business Continuity Plan Requirements:**
Consultant shall take reasonable efforts to conform to the requirements of Business Continuity Plan requirements attached hereto as Exhibit A.

**(8) E-Mail Processing Time Commitment:**
Consultant agrees to the following terms for E-Mail Processing Time Commitment.
   a.  100% of the E-Mails received by Mail servers at EchoMail will be processed and made available on the web-based user interface of EchoMail Customer Care software in four (4) hours, calculated on a per E-Mail basis
   b.  70% of the E-Mails received by Mail servers at EchoMail will be processed and made available on the web-based user interface of EchoMail Customer Care software in One and half (1.5) hours, calculated on a per E-Mail basis
   c.  Amexco will not be billed by EchoMail Customer Care and Business Intelligence processing license fees for those E-Mails that took more time to process than the limits defines above.
   d.  Above processing time commitment excludes any and all issues that are outside the scope of EchoMail Hosting Center including without limitation, problems of the internet, problems with telecommunication lines, devices not controlled by EchoMail, human errors or delays caused by staff not employed by EchoMail.

**(9) Security Patch Upgrade Commitment:**
Consultant agrees to the following terms for Security Patch Upgrade Commitment.
   a.  All non-critical patches shall be installed once in a quarter
   b.  All security related critical patches shall be installed within 12 days of issuance of such patches by the patch issuer
   c.  Identification of patch as critical patch shall be designated by the issuer

Amexco and Consultant execute this Amendment, in their respective corporate names by their duly authorized representatives on this 13th day of August 2004.


_A. AppaaDurai_                              _8-13-2004_
EchoMail, Inc.                               Date
Authorized Representative


_Russell Ogden_                              _8/20/04_
American Express Co                          Date
Authorized Representative



## Exhibit A

### Schedule RR

**Customer Name:**     American Express ("Customer")

**Customer Address:**  American Express Tower, World Financial Center, New York, NY 10285

**Account Manager:**   Bruce Thomann

**Effective Term:**    January 1, 2005 – December 31, 2007[1]

**Description:**       EchoMail will provide the following services for the business units currently being supported as of the start of the Effective Term:
1. Hardware for the EchoMail Application. In addition EchoMail will provide all necessary hardware to maintain 50% CPU capacity of servers for EchoMail v7.3 and EchoMail v8.x
2. Hardware Maintenance
3. Third Party Software Maintenance
4. EchoMail Software Licenses
5. Professional Services as required
6. Hosting Services
7. Security
8. Gold Service Level Agreement

Pricing Schedule

| Part Number | Part Description | Units | Unit Price | Expiration Date | (Monthly) | One Time |
|---|---|---|---|---|---|---|
| | Licenses | | | | | |
| CC-LI-User | EchoMail Customer Care User Licenses for additional users (units in users) | 1 | $    275.00[2] | N/A | $    0.00 | Number of Users to be decided |

Effective Term of this Schedule shall be effective from January 1, 2005 for a period of 12 months. Schedule RR shall automatically renew for an additional 12-month term from January 1 2006 to December 31, 2006 unless Amexco terminates by written notice to Consultant at least sixty (60) days prior to December 31, 2005. If Schedule RR has been renewed for second term, it shall automatically renew for third term from January 1 2007 to December 31, 2007 unless Amexco terminates by written notice to Consultant at least sixty (60) days prior to December 31, 2006.

[2] Additional users license fees will increase in uncompounded increments of 5% per year of agreement starting January 1, 2006 to reflect a 5%, and 10% increase over revised cost of $275.00 that is effective from January 1, 2005. Additional users are any users beyond eight hundred and thirteen (813) users already purchased as of start of effective date, not including users that belong to EchoMail, up to six (6) Admin users that belong to American Express Technology group and up to 30 additional users for each new business unit added per the following rate card:

| Transaction Costs | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|
| User Licenses | Current | 0% | 5% | 10% |
| First 10,000 | 262.50 | 275.00 | 288.75 | 302.50 |

Any additional users purchased over the original 30 users are transferable across business units.



| | | | | | See Payment Terms | See Payment Terms |
|---|---|---|---|---|---|---|
| CC-LI-Advanced | EchoMail Customer Care (CC) Processing Licenses for workflow | 1 | See Note[3] | N/A | TBD | $ 0.00 |
| BI-LI-Advanced | EchoMail Business Intelligence (BI) Processing Licenses for analysis | 1 | See Note[4] | N/A | TBD | $ 0.00 |
| | | | | Sub-Total | | |
| | **Hosting and Maintenance** | | | | | |
| HDW-SRVR-Leasing | EchoMail Hosting Services for the business units currently being supported as of the start of the Effective Term including - EchoMail Enterprise Hardware Infrastructure for 50% CPU capacity of servers for EchoMail CCBI v7.3 and EchoMail v8.x for business units currently being supported at start of effective date[5] Includes currently existing servers for Antivirus, Test installations and Production installations (units in years) If Customer opt to not terminate this Schedule for second and third years, lease shall extend @ $200,000 for second and third years | 1 | $ 800,000.00 | N/A | $ 800,000.00 | $ 0.00 |
| HDW-SRVR-Hosting | EchoMail Hosting Services for the business units currently being supported as of the start of the Effective Term including - Power, | 12 | $ 19,000.00 | N/A | $ 19,000.00 | $ 0.00 |

---

[3] Customer Care Licenses will be billed monthly per the following rate card fees and will increase in uncompounded increments of 5% per year of agreement starting January 1, 2005 to reflect a 5%, 10% and 15% increase over original cost:

| Transaction Costs | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|
| CC Transactions | 0% | 5% | 10% | 15% |
| First 30,000 | 0.25 | 0.26 | 0.28 | 0.29 |
| 30,000 - 50,000 | 0.2 | 0.21 | 0.22 | 0.23 |
| 50,000 - 100,000 | 0.17 | 0.18 | 0.19 | 0.20 |
| 100,000 - 500,000 | 0.14 | 0.15 | 0.15 | 0.16 |
| 500,000 - 2,000,000 | 0.1 | 0.11 | 0.11 | 0.12 |

Above License volume totals are calculated monthly across all business units of Customer
"Heartbeat' monitoring e-mails sent by Customer, test e-mails sent by EchoMail and all test e-mails sent by Customer prior to handing over production installation to new business unit will not be considered for billing.

[4] Business Intelligence Licenses will be billed monthly per the following rate card and will increase in uncompounded increments of 5% per year of agreement starting January 1, 2005 to reflect a 5%, 10% and 15% increase over original cost:

| Transaction Costs | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|
| BI Transactions | 0% | 5% | 10% | 15% |
| First 10,000 | 1.25 | 1.31 | 1.38 | 1.44 |
| 10,000 - 20,000 | 1.17 | 1.23 | 1.29 | 1.35 |
| 20,000 - 50,000 | 0.88 | 0.92 | 0.97 | 1.01 |
| 50,000 - 200,000 | 0.48 | 0.50 | 0.53 | 0.55 |

Above License volume totals are calculated monthly across all business units of Customer
"Heartbeat' monitoring e-mails sent by Customer, test e-mails sent by EchoMail and all test e-mails sent by Customer prior to handing over production installation to new business unit will not be considered for billing.
BI Processing License fees for E-Mails incorrectly classified by Business Intelligence software will not be charged. Incorrectly classified E-Mails are identified as E-Mails on which user performed "Select" operation in EchoMail CC application. Incorrectly classified E-Mails are defined as E-Mails on which user performed "Select" operation to change more than 1 out 4 categories.
[5] In the event Customer adds new business units, Hardware for additional business units will be added for a fee of $25,000.00/business unit.




| | | | | | | |
|---|---|---|---|---|---|---|
| | UPS, Generator, Floor Space, Video Monitoring, Environmental Monitoring, Air Conditioning, Fire Suppression, N+1, Physical Security, and Telecommunications, and data archival services and storage Includes currently existing servers for Antivirus, Test installations and Production installations (units in months) | | | | | |
| EM-SCTY-MAINT | EchoMail Security Services including Intrusion Detection and Firewall (units in months) | 12 | $ 4,905.00 | N/A | $ 4,905.00 | $ 0.00 |
| HDW-TPS-MAINT | EchoMail Third Party Software Maintenance for hosted severs (units in years) | - | Included | N/A | $ 0.00 | $ 0.00 |
| HDW-SRVR-MAINT | EchoMail Server Hardware Maintenance for hosted servers (units in years) | - | Included | N/A | $ 0.00 | $ 0.00 |
| MT-SLA-Gold | EchoMail Gold Service Level Agreement including 10 hours of professional services (units in months) | 1 | Included | N/A | $ 0.00 | $ 0.00 |
| | | | | Sub-Total | See Payment Terms | $ 0.00 |
| | **Professional Services** | | | | | |
| | EchoMail Implementation Services for New Business Units[6], if Customer adds new Business Units | 1 | $ 25,000.00 | N/A | $ 0.00 | $ 25,000.00 |
| EM-PS-Consulting | EchoMail Professional Services | 1 | See Note[7] | N/A | TBD | $ 0.00 |
| | | | | Sub-Total | See Payment Terms | $ 25,000.00 |
| | | | | Net Due | See Payment Terms | $ 915,000.00 |

---

[6] Hosting fees for additional business units will be added for a fee of $1,700.00/business unit.

[7] Professional Services will be billed monthly per the following rate card and will increase in uncompounded increments of 5% per year of agreement starting January 1, 2005 to reflect a 5%, 7% and 9% increase over original cost:

| Transaction Costs | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|
| | 0% | 5% | 7% | 9% |
| Professional Services | $ 157.50 | $ 165.38 | $ 168.53 | $ 171.68 |
| Project Management | $ 210.00 | $ 220.50 | $ 224.70 | $ 228.90 |
| Consulting | $ 265.00 | $ 278.25 | $ 283.55 | $ 288.85 |



**Payment Schedule:**
Customer agrees to pay according to the following payment schedule:

| | |
|---|---|
| **Year One** | |
| Timing | Amount |
| March 1, 2005 | $1,086,860.00 (Infrastructure Leasing, Year One Software and Hardware Maintenance fees, Year One Hosting Fees, and Year One Security Fees) |
| | EchoMail will accept payment in whole or in part anytime during the period August 16, 2004 to March 1, 2005 |
| Monthly | Professional Services, BI Licenses, and CC Licenses |
| **Year Two** | |
| Timing | Amount |
| March 1, 2006 | $486,860.00 (Infrastructure Leasing, Year One Software and Hardware Maintenance fees, Year One Hosting Fees, and Year One Security Fees) |
| Monthly | Professional Services, BI Licenses, and CC Licenses |
| **Year Three** | |
| Timing | Amount |
| March 1, 2007 | $486,860.00 (Infrastructure Leasing, Year One Software and Hardware Maintenance fees, Year One Hosting Fees, and Year One Security Fees) |
| Monthly | Professional Services, BI Licenses, and CC Licenses |

Additional charges shall apply at the Unit Price set forth above in the event that quantity of use of the foregoing licensed software and services exceeds purchased amounts hereunder. EchoMail reserves the right to audit license usage of customer on a monthly basis. Such additional charges shall be billed directly to Customer on a monthly basis. EchoMail, Inc. shall issue no credits to Customer for any licenses not used by Customer on the Expiration Date, and unused licenses may not be carried over into subsequent periods.

Subject to customers pre-approval costs for shipping, telecommunications (including cell and phone costs), mailing costs, and out-of-pocket expenses incurred by EchoMail, Inc. in its performance of this Schedule and the Statement(s) of Work attached hereto and made a part hereof are not included herein, and will be billed directly to Customer on a monthly basis. If Customer requires EchoMail to travel on behalf of Customer for execution of this Schedule or associated Statement of Work, and such travel is pre-approved by Customer, then Customer agrees to administrate travel including ticket purchase, hotel, and car. If EchoMail administers the travel, a thirty-percent (30%) processing fee will be charged.

This Schedule is governed by the attached Terms and Conditions and/or the Master Agreement. Payment or PO# is due prior to start of work. Both parties below acknowledge and agree to the foregoing as of this __13th__ day of __August__ 2004, and to execute their respective performance obligations as set forth in the Statement(s) of Work attached hereto and made a part hereof.

EchoMail, Inc.                                    Customer

By: _A. Ayyadurai_                               By: _Russell K Coplen_

Print: V. Ayyadurai                              Print: _____  8/20/04

Title: Chief Administration Officer              Title: _RUSSELL K. COPLEN_
                                                        _SR. MANAGER_
                                                        _TECHNOLOGY CONTRACTS_
                                                 PO#: _____



# EXHIBIT B

(Part 1 of 2)

## Stand Alone Agreement for Consulting Services

Consultant:
**General Interactive**
66 Church St. Harvard Square
Cambridge, MA  02138-3730

Agreement No.:PHX-07/09/99-RLG1
Effective Date:July 9, 1999

This Stand Alone Agreement for Consulting Services ("Agreement") is made and entered into as of the Effective Date above, between American Express Travel Related Services Company, Inc., having an office at American Express Tower, World Financial Center, New York, NY 10285 ("Amexco"), and the Consultant specified above.

1. **Scope of Services** - Consultant shall provide, under the provisions of this Agreement, the services that are mutually agreed upon and described on attachments to this Agreement, substantially in the form of the attached <u>Exhibit 1 - Sample</u> ("Schedule").  Each Schedule shall be effective, incorporated into, and form a part of this Agreement when duly executed by both parties.  If there is a conflict between this Agreement and any Schedule, the terms of the Schedule will govern the provision of the services involved.

2. **Schedules** - Both time and materials and fixed price Schedules may be entered into hereunder.  Schedules should be numbered for identification and must include a complete description of services to be performed, deliverables or other materials to be produced, the schedule for completion of each of the foregoing, the applicable fixed price or time and materials charges, and any additional terms the parties mutually agree to include.  Amexco, its parent, subsidiaries and affiliated companies (each, an "Amexco Entity") may enter into Schedules with Consultant and for purposes of any such Schedule shall be considered "Amexco" as that term is used herein.

3. **Work Policy/Personnel** - For each Schedule, each party will designate a Project Manager to serve as the main contact between them.  The scope and specific conduct of Consultant's services, consistent with the Schedule, must be coordinated with Amexco's Project Manager at all times.  Consultant will use its best efforts to ensure the continuity of Consultant's employees assigned to perform services under any Schedule.  There will be no charge to Amexco for any replacement personnel assigned by Consultant until Amexco and Consultant agree that each such replacement has acquired the necessary orientation and background to make a productive contribution.

On a periodic basis, as specified on the Schedule, Consultant will submit written status reports describing its activities during the preceding period, including:  the current status of activities

# 96555

(with an explanatory narrative when appropriate); resources used since the last report, with a cumulative total to date; and identification of any problems and actions taken to resolve them. Upon request, Consultant will meet with Amexco management to review the status of Consultant's activities.

Consultant personnel will observe and comply with Amexco's security procedures, rules, regulations, policies, working hours and holiday schedules. Consultant will use its best efforts to minimize any disruption to Amexco's normal business operations at all times. Amexco will only provide working space, resources and materials if specified on the Schedule. If any Consultant employee performing services is found to be unacceptable to Amexco for any reason, Amexco shall notify Consultant and Consultant shall immediately take appropriate corrective action. Amexco shall be the sole judge as to performance capability hereunder. Unless otherwise agreed to in writing, neither party will hire or solicit the employment of the other party's personnel during the term of each Schedule and for a period of six (6) months thereafter.

Consultant agrees and represents that it is an independent contractor and its personnel are not Amexco's agents or employees for federal tax purposes or any other purposes whatsoever, and are not entitled to any Amexco employee benefits. Consultant assumes sole and full responsibility for their acts and Consultant and its personnel have no authority to make commitments or enter into contracts on behalf of, bind or otherwise obligate Amexco in any manner whatsoever. Consultant, and not Amexco, is solely responsible for the compensation of personnel assigned to perform services hereunder, and payment of worker's compensation, disability and other income and other similar benefits, unemployment and other similar insurance and for withholding income and other taxes and social security.

4.  **Acceptance** - Each deliverable shall be subject to a verification of acceptability by Amexco to ensure that such deliverable meets acceptance criteria as defined in each schedule and/or statement of work.. If any deliverable is not acceptable, Amexco shall notify Consultant specifying its reasons in reasonable detail, and Consultant will, at no additional cost (provided such deliverable was created on a fixed fee basis), conform such deliverable to Amexco's requirements. If, within thirty (30) days of such Amexco notification, any deliverable is still not acceptable, Amexco may at any time thereafter, at its option and without obligation or liability of any kind(except for the payment of services already performed), terminate the Schedule involved. When any deliverable is acceptable to Amexco, Amexco will promptly notify Consultant in writing of its acceptance.

2

5. **Ownership** –
The parties agree that certain Services may consist of modifications of licensed Consultant's Software, creating a derivative work, including all materials, products, reports, computer programs (source and object code), documents, deliverables and inventions related to such derivative work developed or prepared for Amexco by Consultant ("Consultant Work Product"), while providing Services to Amexco.  With respect to the creation of derivative works of Consultant's Software in the process of providing Services hereunder, Amexco agrees that Consultant retains all right, title and interest in such Consultant Work Product. Amexco hereby assigns to Consultant all right, title and interest in such copyrights, patents and other proprietary rights, and agrees to take all actions deemed necessary by Consultant to perfect Consultant's rights in said materials.   Consultant Work Product shall not include any software licensed from any third party. Except as specifically set forth in writing and signed by both Amexco and Consultant on an exception basis in a Schedule(s) hereunder, Consultant shall have all copyright and patent rights with respect to all materials developed in the course of performing the Services under this Agreement or Schedules hereunder, and Amexco is hereby granted a non-exclusive license to use and employ such materials for internal use within Amexco's business.

Nothing herein shall be construed to restrict, impair or deprive Consultant of any of its rights or proprietary interest in technology or products that existed prior to and independent of the performance of services or provision of materials under this Agreement or any Schedule.

6. **Charges and Terms of Payment** – The applicable fixed prices and/or time and materials charges shall be specified on the Schedule.   In no event shall any charges exceed Consultant's applicable standard published rates.   For services performed on a time and materials basis, any hours worked in excess of eight (8) in any one day or on Saturdays, Sundays or holidays, shall be at no additional cost unless specifically authorized in advance. Amexco also agrees to pay for reasonable out-of-pocket costs and expenses required and actually incurred in performing services, provided that Consultant has:   (i) obtained Amexco's prior written consent; (ii) detailed them on a form acceptable to Amexco and approved them in accordance with Amexco's own expense policies, written copies of which shall be furnished to Consultant concurrently with the execution hereof; and (iii) submitted supporting documentation satisfactory to Amexco.

Amexco will pay all taxes levied against or upon the services provided hereunder, or arising out of this Agreement, exclusive, however, of taxes based on Consultant's income, which shall be

3

# 96555

paid by Consultant.  Amexco agrees to pay directly any tax for which it is responsible or will reimburse Consultant upon receipt of proof of payment.

Unless other payment terms are specified on the Schedule, Consultant shall invoice Amexco:  (i) upon Amexco's written acceptance of any deliverables, products or work performed on a fixed price basis; or (ii) monthly in arrears, for services provided on a time and materials basis and for out-of-pocket expenses.  All invoices, except for amounts disputed by Amexco, shall be payable within thirty (30) days of receipt.  Any disputed amounts shall not affect payment of non-disputed charges and expenses.

Consultant will maintain complete and accurate accounting records in connection with services performed and materials provided hereunder, in accordance with generally accepted accounting principles, to substantiate its charges.  Consultant will provide Amexco access to such records for audit purposes for one (1) year from the date of final payment under each Schedule.

7.  **Warranties** - Consultant warrants that:  (i) it has the authority and the right to enter into this Agreement and each Schedule, to perform services and provide materials, information and deliverables hereunder, and that its obligations hereunder are not in conflict with any other Consultant obligations; (ii) each of its employees has the proper skill, training and background necessary to accomplish their assigned tasks; (iii) all services will be performed in a competent and professional manner, by qualified personnel and will conform to Amexco's requirements hereunder; (iv) neither any deliverables, information, or materials, nor the performance of any services by Consultant infringe upon or violate the rights of any third party and (v) at the time of acceptance, each deliverable will conform to its specifications and Amexco's requirements and that for ninety (90) days following Amexco's acceptance, Consultant shall correct and repair, at no cost to Amexco, any defect, malfunction or non-conformity that prevents such deliverable from conforming and performing as warranted.

GII warrants that any  Software provided by GII shall conform to GII's then current documentation therefor.  In the event any Software does not so conform to such documentation, GII shall undertake reasonable commercial efforts to correct such non-conformity.  Such correction shall constitute Company's sole remedy and GII's sole liability in the event of any breach of such warranty by GII.

THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE ARE HEREBY EXPRESSLY EXCLUDED.

# 96555

4

GII shall defend, indemnify and hold harmless Company from all costs, expenses, damages, suits and other proceedings incurred by Company, its officers, directors, employees or agents in connection with any claim that the Software infringes any patent, copyright, trade secret or other proprietary rights of any third party, provided that (a) Company promptly informs GII of the existence of any matter Company asserts to be covered by this Section 13.1, and (b) Company furnishes to GII all information and assistance in connection therewith which may be reasonably requested by GII from time to time. GII shall have the sole right to settle, defend, or otherwise handle any such claim. In the event the use of any Software is enjoined, GII shall, at its option, either (a) procure for Company the right to continue to use such Software, (b) replace or modify the same to make it non-infringing, or (c) terminate the agreement and provide a pro rata refund to Company of all amounts paid by Company for the allegedly infringing Software to GII hereunder, based upon a five (5) year life of such Software. GII's obligations under this Section shall be only for the benefit of Company. GII shall not be obligated to defend or to be liable under this Section to the extent the infringement asserted arises out of (a) compliance with specifications originating with Company; (b) use or combination of Software with items not provided by GII to the extent such infringement would not have occurred but for such use or combination with such other items; (c) use of other than the latest unmodified version of Software if such infringement would have been avoided by the use of such later version; or (d) modification of Software other than by GII.

This Section states the exclusive remedy of Company and the entire liability of GII with respect to infringement of any patent, copyright, or other proprietary rights of third parties by items furnished by GII hereunder.

EXCEPT AS EXPRESSLY PROVIDED HEREIN, GII SHALL HAVE NO LIABILITY UNDER THIS AGREEMENT, WHETHER FOR BREACH OF WARRANTY OR CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, UNLESS AND UNTIL THE AGGREGATE AMOUNT OF ANY CLAIMS HEREUNDER EXCEEDS $25,000, AND THEN ONLY TO THE EXTENT OF ANY SUCH EXCESS UP TO AN AGGREGATE MAXIMUM OF $1,000,000 FOR SOFTWARE AND/OR SERVICES WHICH ALLEGEDLY DAMAGED COMPANY. IN NO EVENT SHALL GII HAVE ANY LIABILITY FOR INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES OF ANY KIND, WHETHER UNDER THIS AGREEMENT OR OTHERWISE, EVEN IF GII HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS.

To the extent that Consultant licenses to and/or develops software for Amexco, Consultant further warrants that the software has been

5

# 96555

tested and is fully capable of providing accurate results using data having date ranges spanning the twentieth (20th) and twenty first (21st) centuries (e.g., years 1900-2100). Without limiting the generality of the foregoing, Consultant warrants that all software licensed from and/or developed by Consultant shall (a) manage and manipulate data involving all dates from the 20th and 21st centuries without functional or data abnormality related to such dates; (b) manage and manipulate data involving all dates from the 20th and 21st centuries without inaccurate results related to such dates; (c) have user interfaces and data fields formatted to distinguish between dates from the 20th and 21st centuries; and (d) represent all data related to include indications of the millennium, century, and decade as well as the actual year.

Consultant further warrants that Consultant's work product will be tested and will be fully capable of providing accurate results using data having date ranges spanning the twentieth (20th) and twenty first (21st) centuries (e.g., years 1900-2100). Without limiting the generality of the foregoing, Consultant warrants that all systems that are worked on by Consultant shall (a) manage and manipulate data involving all dates from the 20th and 21st centuries without functional or data abnormality related to such dates; (b) manage and manipulate data involving all dates from the 20th and 21st centuries without inaccurate results related to such dates; (c) have user interfaces and data fields formatted to distinguish between dates from the 20th and 21st centuries; and (d) represent all data related to include indications of the millennium, century, and decade as well as the actual year.

Consultant shall ensure adequate Anti-Virus software is installed to prevent damages to Company. Consultant has not and shall not insert any code which would have the affect of disabling or otherwise shutting down all or any portion of any program or network of company. Consultant shall use its best efforts to ensure that no viruses or similar items are coded or introduced in any program or network of the company.

EXCEPT AS SPECIFICALLY PROVIDED IN THIS AGREEMENT, THERE ARE NO OTHER WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

8.    <u>General</u>

<u>Term & Termination:</u>    This Agreement shall commence as of the Effective Date and shall continue in full force and effect thereafter unless and until terminated as provided hereunder. Notwithstanding anything herein to the contrary, After an initial one (1) -year period, Amexco may terminate this Agreement and/or any Schedule upon thirty (30) days' prior written notice. Amexco

6

# 96555

agrees to pay Consultant for services performed up to the effective date of termination, at the agreed upon rates. Notice of termination of any Schedule shall not be considered notice of termination of this Agreement unless specifically stated in the notice.

**Material Breach**:   Subject to the above termination language, in the event of any material breach of this Agreement by one party and after giving effect to any applicable cure periods herein prescribed, the other party may (reserving cumulatively all other remedies and rights under this Agreement and in law and in equity) terminate the Schedule(s) involved, in whole or in part, by giving thirty (30) days' written notice thereof; provided, however, that any such termination shall not be effective if the party in breach has cured the breach of which it has been notified prior to the expiration of said thirty (30) days.

**Limitation of Liability**:  In no event will either party be liable, one to the other, for special, indirect, or consequential damages or losses in connection with or arising out of this Agreement.

**Intellectual Property Infringement**:    Consultant, at its own expense, will defend and/or handle any claim or action against any Amexco Entity for actual or alleged infringement of any patent, copyright, intellectual or industrial property right or any other similar right (including, but not limited to, misappropriation of trade secrets) based on any deliverables, information, materials and/or any services furnished to or obtained by Amexco or the use thereof by Amexco.  Consultant agrees to give Amexco prompt written notice of any threat, warning or notice of any such claim or action that could have an adverse impact on Amexco's use or possession of same.  Consultant shall have the right to conduct the defense of any such claim or action and consistent with Amexco's rights hereunder, all negotiations for its settlement; provided, however, that Amexco may participate in such defense or negotiations to protect its interests.  Consultant further agrees to indemnify and hold each Amexco Entity harmless from and against any and all liabilities, losses, damages, costs and expenses (including reasonable attorneys' fees) associated with any such claim or action.

**Confidential Information**:  Consultant and Amexco agree to regard and preserve as confidential all information related to the business and activities of any Amexco Entity and Consultant , their respective clients, suppliers and other entities with whom such Amexco Entity and Consultant do business, that may be obtained by Consultant and Amexco from any source or may be developed as a result of this Agreement.  Amexco and Consultant agree to hold such information in trust and confidence for Amexco and Consultant and not to disclose such information to any person, firm or enterprise, or use (directly or indirectly) any such information for its own benefit or the benefit of any other party,

7

# 96555

unless authorized by Amexco or Consultant in writing, and even then, to limit access to and disclosure of such confidential information to Consultant's employees on a "need to know" basis only. Information shall not be considered confidential to the extent, but only to the extent, that such information is: (i) already known to the receiving party free of any restriction at the time it is obtained from the other party; (ii) subsequently learned from an independent third party free of any restriction and without breach of this Agreement; (iii) is or becomes publicly available through no wrongful act of either party; (iv) is independently developed by one party without reference to any Confidential Information of the other; or (v) required to be disclosed pursuant to a requirement of a governmental agency or law so long as the parties provide each other with timely written prior notice of such requirements.

To the extent this provision is applicable to and specified on a Schedule, Consultant acknowledges that services performed for Amexco may relate to past, present or future strategies, plans, business activities, methods, processes and/or information which afford Amexco certain competitive or strategic advantages. To further ensure the protection of Amexco's interests in this regard, upon written notice by Amexco to Consultant of Amexco's intention to invoke Consultant's noncompetition obligation as set forth in this paragraph, and upon terms and conditions to be mutually agreed upon by the parties hereto on a Schedule-by-Schedule basis, Consultant agrees that during the term of any Schedule and for a period of six (6) months thereafter (unless a shorter time period is mutually agreed upon and specified on the applicable Schedule), Consultant shall not assign or utilize (directly or indirectly) any individual assigned to perform services for Amexco in connection with any Schedule hereunder, for or in support of any Competitive Project. For purposes of this Section, "Competitive Project" is defined as any task or work effort by any person, firm or enterprise conducting a business or providing or supporting a product or service in the payment instrument (including charge card, credit and debt card), consumer lending, travelers cheques or travel-related business whose intent or result is or will be substantially similar to any contemplated by a Schedule. If there is any doubt whether any task or work effort is deemed a "Competitive Project," Consultant shall obtain Amexco's advance written approval (not to be unreasonably withheld), which decision shall be deemed final and controlling for all purposes hereunder.

Consultant shall, upon request by Amexco, require each employee assigned to perform services under any Schedule and each employee who obtains or is in a position to obtain any Amexco information or materials required by the terms of this Agreement to be kept confidential, to execute a Non-Disclosure Agreement in the form attached hereto as Exhibit 2, which forms a part hereof. Consultant will provide Amexco with a true copy of each such

8

# 96555

Agreement upon request.  Consultant further agrees to take any other steps reasonably required and/or appropriate to ensure compliance with the obligations set forth herein.

Consultant acknowledges and agrees that, in the event of a breach or threatened breach of any of the foregoing provisions, Amexco will have no adequate remedy in damages and, accordingly, shall be entitled to injunctive relief against such breach or threatened breach; provided, however, that no specification of a particular legal or equitable remedy shall be construed as a waiver, prohibition or limitation of any legal or equitable remedies in the event of a breach hereof.

**Excusable Delay**:  Neither party will be liable to the other for any delay or failure to perform due to causes beyond its control and without its fault or negligence.

**Advertising**:  Neither party will use the other party's name or marks, refer to or identify the other party in any advertising or publicity releases or promotional or marketing correspondence to others without such other party's written approval.

**Governing Law & Interpretation**:  This Agreement shall be construed and enforced under the substantive laws of the State of New York.  Headlines are for reference only and shall not affect the meaning of any terms.  If any provision of this Agreement is held invalid, illegal or unenforceable, the remaining provisions will continue unimpaired.

**Insurance**: Throughout the term of this Agreement and Schedules thereto, Consultant must maintain adequate workers compensation, liability, disability, unemployment and, automobile insurance as required under law for the Consultant and each of its employees performing Services under this Agreement and any Schedules.

Consultant must also maintain throughout the term of this Agreement and any Schedules thereto, the following types of insurance  coverage at, or above the minimum policy amounts set out below.  All insurance companies must have and maintain an AM Best rating of A- or better.

The Consultant shall provide verification of its insurance coverage by providing a valid certificate of insurance to Amexco upon request.  All certificates of insurance must provide that Amexco will be notified thirty (30) days before cancellation. Consultant's insurance shall be primary and non-contributory with any insurance maintained by Amexco.

9

| Type of coverage | Coverage as broad as | Policy Minimums | Amexco as Additional insured |
|---|---|---|---|
| Workers Compensation | Statutory Requirements | Statutory requirements | No |
| Employers' Liability | Combined with workers compensation policy | Each accident, $1,000,000<br><br>Disease police limit, $1,000,000<br>Disease each employee, $1,000,000 | No |
| Commercial General Liability and Personal Injury | ISO Form CG0001 | General aggregate, $2,000000<br>Completed ops products, $2,000,000<br>Each occurrence, $2,000,000<br>Personal injury, $2,000,000 | Yes |
| Commercial Auto, Including Employer's Non-Owned auto | ISO Form CA0001 | Combined single limit, $2,000,000 | No |
| Commercial Umbrella Liability | Underlying EL, GL and Auto | May, if necessary, be used in any combination with the primary policy limit to fulfill the above limit requirements. | Yes |
| Professional Liability | N/A | Minimum policy limits of $1,000,000. Increased amounts subject to Amexco's discretion | Yes |

**Assignment**: Neither party may assign, transfer or subcontract the performance of its services, or any of its rights and/or obligations, without the other party's prior written consent, and any attempt to do so shall be void. Amexco may assign this Agreement, any Schedule and/or any of its rights or obligations to any Amexco Entity, without Consultant's consent and upon written notice to Consultant, provided that such entity agrees in writing to the terms of this agreement.

**Subcontracting**: Consultant may subcontract its responsibilities and obligations under this Agreement upon first obtaining Amexco's written consent to do so and to specific firms or entities mutually agreed upon by the parties. Consultant shall require its subcontractors performing services for Amexco hereunder to execute the Non-Disclosure Agreement in the form attached hereto as Exhibit 2. Consultant shall be solely responsible for all its obligations and responsibilities hereunder notwithstanding such subcontracting.

# 96555

10

**Notices**:  All notices shall be in writing and delivered personally or properly mailed, first class mail, to the addresses of the parties set forth at the beginning of this Agreement, to the attention of the undersigned, and, as to any Schedule, with a copy to the signatories of the Schedule involved, at the same address, or to such other address or addressee as either party may designate by written notice.  Any such notice shall be deemed given on the date delivered or when placed in the mails as specified.

**Entirety**:  This Agreement, together with the Exhibits, Schedules and attachments hereto, contains the entire agreement between the parties and supersedes any prior or inconsistent agreements, negotiations, representations and promises, written or oral.  No modification to this Agreement nor any failure or delay in enforcing any term, exercising any option or requiring performance shall be binding or construed as a waiver unless agreed to in writing by the parties hereto.

AMERICAN EXPRESS TRAVEL
RELATED SERVICES COMPANY, INC.

By: _____

Name: _____
         (Type or Print)

Title: _____

Date: _____8/30/99_____

GENERAL INTERACTIVE, INC.

By: _____

Name: ___Roland Westgate_____
         (Type or Print)

Title: _DIRECTOR OF ECMAIL_____

Date: ___8/20/99_____

# 96555

GII Schedule # PHX-8/24/99-WJG-01

# SCHEDULE

Consultant:
General Interactive, Inc.
66 Church Street
Cambridge, MA 94063

Schedule No.: PHX-08/24/99-WJG-01
Agreement No.: PHX-07/09/99-RLG1
Effective Date:  July 16,1999
Date:  August 24, 1999

This Schedule is issued pursuant to the above-referenced Master Agreement for Consulting Services between American Express Travel Related Services Company, Inc. and the above-named Consultant.  Any term not otherwise defined herein, shall have the meaning specified in the Agreement.

| Amexco Project Managers | Consultant Location |
|---|---|
| Angel M. Rodriguez<br>Gavin M Berg | New York City, NY |

| Consultant Project Manager | Status Reports are required: |
|---|---|
| Ray Billings | Weekly |

See Attachment A (S.O.W. titled E-Mail Servicing dated August 19, 1999) for a complete description of the services, deliverables and/or other tasks to be accomplished, the milestone or implementation schedule, the charges and/or rates applicable to this Schedule and any other mutually agreeable information.

SPECIAL TERMS AND CONDITIONS:

A.  PRICING: The following line item prices are awarded in this schedule (the total dollar amount is a not-to-exceed amount of  $ 820,025 which includes the Firm Fixed Price and Not-To-Exceed amounts). All not-to-exceed amounts are not to be exceeded with prior written approval from one of the Project Managers listed above:

1.  Secure Email Integration Costs:  Not-To-Exceed price of $28,700 based upon a Not-To-Exceed maximum of 270 person-hours (Reference S.O.W. dated August 19, 1999, page 30, para. 9.2.5.1a-c).

2.  Hardware/Software Costs (Reference S.O.W. dated August 19, 1999, page 31, para 9.2.6.a-e):
    a.  Intrusion Detection Systems as specified in Exodus document Intrusion Detection Service:  Not-To-Exceed amount of $28,950 ($1,930/mo X 15mos).
    b.  Firewall Detection Systems as specified in Exodus document labeled Exodus Communications Firewall Service:  Not-To-Exceed amount of $44,625 ($2,975/mo X 15mos).
    c.  One-time, Firm Fixed Price of $155,000 for Initial Implementation.
    d.  An exercizable option to upgrade to High End SUN (E450) replacement for the Data Server at a Firm Fixed Price of $100,000.
    e.  An exercisable option to setup up to six (6) Additional Business Units at a Not-To-Exceed price of $150,000.  This is based on a one-time, Firm Fixed Price setup cost of  $25,000 for each Additional Business Unit.

3.  Email Transaction Costs (Reference S.O.W. dated August 19, 1999, page 32, paragraph 9.2.6.f-j):
    a.  Confirmation Email to senders on receipt: Unlimited Number of Confirmation Emails at No-Cost.
    b.  Simple routing of Email to other American Express domains: Not-To-Exceed price of $6,000 (maximum of 20,000Emails/mo X 15mos X $0.02/Email).
    c.  Routing to Groups accessing Echomail and servicing within the system: Not-To-Exceed price of $112,500 (maximum of 30,000Emails/mo X 15mos X $0.25/Email).
    d.  Automation: Not-To-Exceed price of $93,750 (maximum of 5,000Emails/mo X 15mos X $1.25/Email).
    e.  Emails incorrectly answered due to classification software malfunction: Unlimited Number of Incorrectly answered Emails at No-Cost.

1

info@echomail.com
www.echomail.com
...9-WJG-01

3. Consulting/Training costs Not-To-Exceed $100,000 based upon hourly rates on S.O.W. page 33, paragraph 9.2.6.k.

4. Additional User Fees: Each Additional User over thirty (30) covered in XT1 configuration or Business Unit Setup fee shall be a fixed price each of $250 (one time fee). This shall not exceed a maximum of two users for an amount Not-To-Exceed of $500. (Reference paragraph 9.2.6.l).

5. Down Time Chargeback: Down Time for ISU shall be used to calculate breach of service chargeback (rebate). This shall be at $320/per downtime hour. Refer to paragraph 9.2.4 and definition of downtime for additional details in this regard. (Reference paragraph 9.2.6.m).

**B. PAYMENT TERMS:** Payments are as identified in the attached SOW, paragraph 10.

**C. PERIOD OF PERFORMANCE:** This contract is effective from contract award including options through 09/01/2002. Amex reserves the right to terminate the contract after one year from award with a 60 day notice requirement.

**D. PURCHASE ORDER # PHX039044 AND CHANGE ORDER #1:** This Schedule incorporates the pricing in and replaces P.O. # PHX039044 and Change Order #1.

AMERICAN EXPRESS TRAVEL
RELATED SERVICES COMPANY, INC.

By: _____

Name: _____
        (Type or Print)

Title: _Director_____

Date: _9/24/99_____

GENERAL INTERACTIVE, INC.

By: _____

Name: _ROLAND WESTGATE_
        (Type or Print)

Title: _SECRETARY_____

Date: _25 Aug '99_____

echomail ®

GII SOW Dated 8/19/1999

# EMAIL SERVICING

# STATEMENT OF WORK

## American Express Co
## &
## General Interactive, Inc

**Interactive Technologies**

**American Express, Co.**

August 19, 1999

GII SOW Dated 8/19/1999

# Table of Contents

1    REPRESENTATIVE INFORMATION .................................................................................... 2

2    INTRODUCTION .............................................................................................................. 2

3    GOLD SERVICE LEVEL AGREEMENT FROM GENERAL INTERACTIVE, INC. ........................... 3

4    REQUIREMENTS FOR GOLD SERVICE LEVEL AGREEMENT ............................................... 3

    4.1    REQUIREMENTS FROM AMERICAN EXPRESS RFI ........................................................... 3
        4.1.1    Auto Response Requirements .......................................................................... 3
        4.1.2    End User Administration ................................................................................ 4
    4.2    ENTERPRISE-WIDE FUNCTIONALITY .............................................................................. 4
    4.3    SECURITY/PRIVACY/AUDITING ..................................................................................... 5
    4.4    REPORTING/COMMUNICATION ..................................................................................... 5
    4.5    WORKFLOW REQUIREMENTS ......................................................................................... 7

5    INFORMATION INTEGRITY REQUIREMENTS .................................................................. 13

    5.1    ADDITIONS/CLARIFICATIONS TO GOLD SERVICE LEVEL AGREEMENT ............................. 19

6    PROFESSIONAL SERVICES OVERVIEW ........................................................................... 23

    6.1    INTEGRATION WITH SECURE EMAIL: MODIFICATION REQUIREMENTS FROM INTERACTIVE TECHNOLOGIES ... 23
    6.2    CONSULTING SERVICES COVERED BY GENERAL INTERACTIVE ........................................ 24
    6.3    ASSUMPTIONS FOR PROFESSIONAL SERVICES OVERVIEW .............................................. 24

7    FUTURE DEPLOYMENT ................................................................................................. 26

    7.1    MULTI-LINGUAL SUPPORT ........................................................................................... 26

8    DELIVERY SCHEDULE MILESTONES .............................................................................. 27

9    FINANCIAL AND COSTING INFORMATION ..................................................................... 29

    9.1    PERIOD OF PERFORMANCE .......................................................................................... 29
    9.2    FIXED PRICE AMOUNTS .............................................................................................. 29
        9.2.1    Security Design Review Items ....................................................................... 29
        9.2.2    Network Design Review Items ....................................................................... 29
        9.2.3    Physical Review items .................................................................................. 29
        9.2.4    Breaches of Service – Charge back calculation ............................................. 29
        9.2.5    Secure Email Integration Costs .................................................................... 30
        9.2.6    Hardware / Software Costs ........................................................................... 31

10   METHOD AND FREQUENCY OF PAYMENT ...................................................................... 34

    10.1    SECURE EMAIL INTEGRATION ..................................................................................... 34
    10.2    SECURE EMAIL ACCEPTANCE CRITERIA ....................................................................... 34
    10.3    HARDWARE / SOFTWARE SETUP CRITERIA ................................................................... 35
    10.4    HARDWARE/SOFTWARE ACCEPTANCE CRITERIA .......................................................... 35
    10.5    PER TRANSACTION COSTS AND ACCEPTANCE LEVELS .................................................. 36

11   SEVERITY DEFECT(S) DEFINITION ................................................................................ 37

12   DEFINITION OF TERMS, ACRONYMS AND ABBREVIATIONS ............................................ 38

13   ATTACHMENT 1 – SECURITY DESIGN REVIEW (ECDR) FINDINGS ................................... 45



08/24/99

# 1   Representative Information

1) Supplier Legal Name: General Interactive, Inc.
2) Supplier Address: 66 Church Street, Cambridge, MA 94063
3) Supplier Point of Contact/Phone Number: Ray Billings,  (617) 354-8585
4) American Express Project Manager/Phone/Email: Angel M Rodriguez, (602) 766-3846, Angel.M.Rodriguez@aexp.com
5) Supplier Project Manager/Phone/Email: Bram de Veer, (617) 354-8585, bram@interactive.com

# 2   Introduction

This Statement of Work (SOW) describes the requirements for work to be performed under a contract, between General Interactive, Inc. and American Express Company, stand alone Agreement for Consulting Services # PHX-07/09/99-RLG1.  American Express' Interactive Technologies group represents American Express Company for the terms and conditions of this agreement. This contract implements American Express requirements in the following areas: additions / changes to the proposed Gold Service Level Agreement from General Interactive, Inc, and enhancements to integrate EchoMail® with American Express' Secure Email initiative.

Attachments
    (1) SWAT (American Express Security Assessment of the Echomail implementation and product architecture)
    (2) Gold Level Service Agreement offered by General Interactive
    (3) Echomail version 3.0 technical description of services
        (a) The Echomail/CC 3.0 Users Guide
        (b) EchoMail/CC 3.0 Administrators Guide
    (4) General Interactive evidence of technical review and performance verification of year 2000 readiness (Y2K letters).
    (5) Proposed Network Diagram



08/24/99

## 3   Gold Service Level Agreement from General Interactive, Inc.

See Attachment (2).

## 4   Requirements for GOLD Service Level Agreement

### 4.1   *Requirements from American Express RFI*

This content is added to provide additional clarity to how American Express interprets the services offered in Echomail version 3.0.  Based on Echomail's marketing presentation's made during American Express' Request for Proposal (RFP) process the following requirements were stated to be provided by the Echomail and "CC" products.  These interpretations are to be utilized to add clarity to the services offered in the General Interactive production description in Attachment (3)

#### 4.1.1   Auto Response Requirements

1.  Identify topics of an email
    - Categorize email topics automatically
    - Match topics to responses
    - Generate responses automatically
2.  Provide the Amex rep with suggested responses for email that the tool cannot answer
3.  Analyze both formatted fields and free form text when auto-selecting a canned response, category, or routing (e.g., user selects Membership Rewards for the Subject line. However, Membership Rewards is not included in the body of the email. .^ search will be performed on both the body and formatted fields)
4.  Provide one knowledge base for the email automation tool and Amex reps to access
5.  Ability to predefine rules that will enable automatic forwarding of email back to American Express representatives.  In addition rules can be customized to improve tools ability to recognize, route emails and auto suggest/reply to email.
6.  Recognize all second requests (re: emails) and route to appropriate American Express representative.



08/24/99

### 4.1.2  End User Administration

#### 4.1.2.1  Ability to make changes/customize software as needed

1. Set a baseline confidence level or minimum level of accuracy associated with routing rules. (E.g. multiple category matches).
2. Ability to classify email based on a number of contexts (tone, subject matter, etc.). Ideally the application will allow email to be processed by the inference engines with a high degree of success and accuracy.
3. Enable business end user (Amex rep) to define rules
4. Enable Amex rep to modify (add/delete/reject) suggested responses
5. Modify canned responses real time or with suggested schedule (suggested by the tool)
6. Rank and limit the amount of suggested canned responses
7. Enable business end user to modify and add categories
8. Enable knowledge base administrator to modify the canned responses

### 4.2  Enterprise-Wide Functionality

Flexible infrastructure that can be used across all business units

1. Route email to other business units
2. Enable business end user to set various levels of access based on business unit/function (i.e., read only, read and respond, etc.)
3. Support standard email software packages (SwiftMail, Lotus Notes)
4. Recognize different languages and route email to appropriate knowledge base (Spanish, French, German, Italian, Japanese, English, Portuguese)
5. The application must be extendible by having standard interfaces that can be leveraged by other American Express initiatives.  An example of this would be a generic COM interface that allows for easy ASP form processing.  American Express expects that as additional interfaces are developed for interaction with the classification tool (as currently defined) that they will be made available to American Express at no additional charge.



08/24/99

### 4.3  Security/Privacy/Auditing

Ensure confidentiality of CardMember data; review accuracy/speed of responses

1. Identify sensitive data on all outbound emails and be able to prioritize/route accordingly.
2. Generate a canned response suggesting the customer not send sensitive data and return the original request devoid of the sensitive data.
3. Store and retrieve inbound and outbound emails by customer's email. Ability to access "conversations" between customer and American Express.
   - Review all or a percentage of Amex rep canned responses prior to the email being sent out (via QA process)
4. Track knowledge base changes (by administrator)
   - Capture text, who changed, why, date, time


### 4.4  Reporting/Communication

Furnish MIS as needed to include root cause analysis to further refine automation effectiveness. The Echomail tool comes with a number of predefined reports available to its customers. American Express expects to have access to all of the reports defined within the product specification documentation provided in Attachment (3). At a minimum the following reports are needed by American Express.

1. Capture process information (categories)
   - Capture categories of emails
   - Number of emails by category and subcategories, the number of emails auto responded to, auto suggested to and the number of emails that are unidentifiable.
   - Frequency: daily, weekly, monthly, YTD
2. Trend Analysis
   - Sort by categories and subcategories
   - Month to month comparison
   - Rolling 12 months
   - Number of emails received
   - Number of auto responses
   - Number of Amex rep responses
3. Tool Accuracy Report
   - Number of emails correctly categorized by Echomail product.
   - Frequency: daily, weekly, monthly, YTD
4. Detailed Categories and Accuracy Levels (report will be used to determine whether new categories and/or canned responses need to be created)
   - Select by percentage or range
   - Ability to sort emails by an assortment of fields. At a minimum by Subject Matter, and email address.
   - Frequency: monthly or ad hoc



08/24/99

5. Daily reporting – Used by American Express to track inbound traffic over the last 24 and 48 hours.  Ideally American Express will be able to provide the time boundaries, however, at a minimum the 24 and 48 time slots must be provided.
6. Administrative
   - Number of rules
   - Provide the ability to track knowledge base changes (by administrator)
   - Capture text, who changed, why, date, time



08/24/99

### 4.5 WorkFlow Requirements

Items tagged with a "N" answer are not expected to be provided by General Interactive and instead are provided to aid General Interactive with understanding on additional needs and services of interest to American Express. Based on the presentations made during the RFP process it is American Express's expectation that all of the services with a "Y" are offered by the solution being purchased and will be utilized as conditions in the terms of product acceptance.

| No. | FUNCTIONALITY | DESCRIPTION | Currently Available (Y/N) |
|---|---|---|---|
| | **FRONT-END TASKS** | | |
| 1 | Pre processing | Solution has been design to integrate either a GI or American Express agent to preprocess inbound email traffic. (e.g. plug in) American Express must be able to remove/edit private information from email prior to processing/auto replying with private data. | Y |
| 2 | Addressing by categories | Send emails to predetermined categories. | Y |
| 3 | Auto Mail Dispatcher | Automatic rerouting of messages based on key words, phrase, or address. Instead of being worked email is forwarded to an appropriate email address. | Y |
| 4 | Prioritize email | Ability to prioritize email by date or other field as determined by American Express. (e.g. Existence of customized field) | Y |
| 5 | Duplicate emails | Email platform should identify and mark all duplicate emails, route to appropriate area. | N |
| | **BACK-END TASKS** | | |
| 1 | Send Validation | Provide a confirmation/notification when an email is returned as undeliverable. | Y |
| 2 | Auto Save of email & responses | Save email request and response automatically together. | Y |

Email Servicing – Statement of Work

7

08/24/99

| 3 | Edit email message | Ability to edit sender's email to delete secure information (e.g., sender's account number, address) | N |
|---|---|---|---|
| | **USER INTERFACE** | | |
| 1 | URL in email message | Activate URL if included in sender's email message. | Y |
| 2 | Formatted Response | Ability to cut and paste Canned Responses to the body of the email. | Y |
| 3 | Advance text editing | Ability to format email text (like a word processor). | Y |
| 4 | Canned Responses | Ability to store, categorize, sort, edit, and delete text for easy retrieval and input to reply emails. | Y |
| 5 | Database Sharing | Ability to extend information with other American Express solutions (e.g. database sharing of letters, address, etc.) | N |
| 6 | Delete Message | Provide the ability to archive/delete messages | Y |
| 7 | Email printing | Printing capability should include the response field along with the message. | Y |
| 8 | Generic Sender address | Ability to reply with a standard email address defined at the group level. | Y |
| 9 | History view | Ability to view a history of messages sent to a customer. | Y |
| 10 | Retrieve CSR email by Date Range | Provide the ability to a CSR to search for email answered by that CSR over a given range of dates. (may be manual – not form initiated) | Y |
| 11 | Search Capability | Ability to search archives for previous emails by customer, rep, date etc. | Y |
| 12 | Administration of the tool | Ability to make case notes regarding actions and research completed on each email. | Y |
| 13 | Administration of the tool | Items available to a user (e.g. Access Control List) do not require re-authentication and are dynamically available. | Y |
| 14 | Administration of the tool | Ability to have all reps access any one bucket at a given time. | Y |
| 15 | Administration of the tool | Ability to retrieve emails by parameter (e.g., date, email address, etc.)  Search capabilities are sufficient for this need. | Y |

8

08/24/99

| | | | |
|---|---|---|---|
| 16 | Send Confirmation | Provide a 2nd checkpoint to the rep to ensure the email should be sent (e.g., Are you sure you want to send this email?). | N |
| 17 | Retrieve Emails Sent | Provide the ability to unsend an email. | Y |
| 18 | Ability to CC | Respond to a CM and also send a CC to another party. | Y |
| 19 | Ability to forward email | Ability to forward to another email address. | Y |
| 20 | Capturing email addresses | Ability to associate multiple email addresses with a single customer. | N |
| 21 | Search Feature | Ability to search email volume by subject, indexes, or key word for both handling and reporting. | Y |
| **AUDITING/SECURITY** | | | |
| 1 | Audit Trail Feature | Feature would capture events like deleting and forwarding an email. | Y |
| 2 | Encryption Algorithm | Messages are encrypted. | N |
| 3 | Quality Control Sample | Provide the ability to pull a QC sample of emails; sorted by date, rep, etc. Ability to search data repository meets this need. | Y |
| 4 | Secure transmissions | Provide secure transmissions of email responses. | N |
| 5 | Statistics window | Displays the number of emails in the queue and an aging report that updates real time. | Y |
| 6 | Inventory Control | Ability to show status of email as requiring a reply, awaiting additional information, pending review for email waiting to be worked. Worked email can also be accessed to facilitate email answering. | Y |
| 7 | Quality Review | Ability to route emails so that they can be reviewed before sent to the CM. | Y |
| 8 | Grammar Checks | Grammar checking of responses. | N |
| **ADMINISTRATION** | | | |
| 1 | Authority Levels | Provide authority (ACL) levels to identify beginner CS reps. | N (may be in next version) |
| 2 | Logout timer | Log users off after fifteen minutes of no activity. | N – expect by 10/15/1999 |

9

Email Servicing – Statement of Work

08/24/99

| | | | |
|---|---|---|---|
| 3 | Knowledgebase admin | Provide business user the ability to add, modify, delete, categorize canned responses within their business unit as desired. | Y |
| 4 | Address Book | Address book, which store email addresses to be used to forward email for handling. | N |
| 5 | Category Access | Control categories access privileges. | Y |
| 6 | News Flash | Provide the ability to flash important messages within AMEX. | N |
| 7 | Administration of the tool | Ability to restrict access to a bucket from particular reps. | Y |
| **ENTERPRISE-WIDE FUNCTIONALITY** | | | |
| 1 | Forwarding Emails | Ability to forward email responses to a separate business unit and provide a means to ensure the email response was sent to the customer as long as all users are using the application. | Y |
| 2 | Multilingual Spell Check | Check spelling in different languages. | N |
| 3 | Multilingual Support | Application can support email routing in different languages. | Y |
| 4 | Multiple Users | Ability to have multiple users accessing the platform and responding to different emails. | Y |
| 5 | Outgoing mail view | Allow all reps to view outgoing mail processed by other reps. | Y |
| 6 | Spell check | Provide spell check of responses. | Y |
| 7 | Knowledge base update | Utilize same canned response database for email automation. | Y |
| 8 | Email storage | Ability to archive email requests, responses, and audit trails for 7 years. | Y |
| 9 | Customer Survey | Ability to conduct a customer satisfaction survey and review responses. | N |
| 10 | Multilingual Thesaurus | Provide a thesaurus in different languages. | N |
| 11 | Multimedia Capabilities | Email can hold voice messages, etc. | N |
| **REPORTING** | | | |
| 1 | Service Level Report | Number of emails completed per 8, 16, 24, and 48 hour intervals. | Y |
| 2 | Root Cause Tracking | Reports sorted by different types of email. (based on inbound | N |

Email Servicing – Statement of Work

10

08/24/99

| | | | |
|---|---|---|---|
| | | path e.g. Web Form, SMTP, etc.) | |
| 3 | AHT Reporting | Calculate Average Handling Time/Units per Hour for emails. | Y |
| 4 | Productivity Reporting | Email statistics with number of emails completed at the associate level, Team Leader level, and department level. | Y |
| 5 | Forwarded email | Number of emails forwarded to a different business unit per day. | Y |
| 6 | Archive access | Ability to access a customer's archives by query. | Y |
| 7 | Audit Trail | Ability to identify who has routed an email from one email bucket to another within the application | Y |
| 8 | Audit Trail history | Ability to maintain the original receipt date of the email. | Y |
| 9 | Audit Trail History | Ability to make notes on an email of interim actions taken before the email is actually closed. | Y |
| 10 | Audit Trail History | Ability to capture the date the email was answered. | Y |
| 11 | Reporting | Capture the time a rep signs on/off to do email. | N – may be in by 10/15/1999 |
| 12 | Reporting | Capture the number of emails answered by a rep. | Y |
| 13 | Reporting | Ability to review the steps taken to resolve an email. | Y |
| 14 | Reporting | Capture the number of emails received be department. | Y |
| 15 | Reporting | Capture the daily aging and location of emails, e.g., 1 day, 2 day …5day + aging. | Y |
| 16 | Reporting | Ability to view by the system who is currently signed on to email. | N |
| 17 | Reporting | Distinction between emails which have and have not been actioned. | Y |
| 18 | Reporting | Ability to run queries and run our own adhoc reports through a predefined set of report forms. | Y |
| 19 | Reporting | Provide productivity reporting by category and by associate. | Y |
| 20 | Email Volume Report | Show the number of emails that came in daily on each email bucket. | Y |
| 21 | Administration of the tool | Provide a mechanism where the reps can log time away from email (time meetings, nurse times, one on ones). | N |

Email Servicing – Statement of Work

11

08/24/99

| 22 | Sign on Report | Lists who is signed on and productive. Be able to log time for breaks and calculate unproductive time and availability. | N |
| 23 | Audit Trail History | Allow more than one reason for closing the email; email sent, email routed, email no longer requires answering. Expectation is that email can be closed (not answered) and reason captured. | Y |

Email Servicing – Statement of Work

12

# EXHIBIT B

(Part 2 of 2)

GII SOW Dated 8/19/1999

# 5  Information Integrity Requirements

The requirements that follow are provided by American Express' Information Integrity group.  This group is responsible for providing direction and identification of risks associated with the handling of American Express data.

**General**
1) Separate the American Express data from other clients' data
2) Separate the boxes that belongs to American Express.
3) Network diagrams must be evaluated, reviewed and approved by Information Integrity
4) Appropriate security controls such as firewalls and Intrusion Detection Systems must be in place and reviewed by Information Integrity
5) Network Security assessments can be conducted on a periodic basis and allowed onsite visits.
6) Non-Disclosure Agreements must be signed by Tech Support personnel servicing American Express systems.

Vendor shall allow both scheduled and unscheduled on-site inspections by Amex. Vendor agrees to comply with all reasonable recommendations that result from such inspections.  Recommendations will be provided in writing and it is the American Express and GI teams responsibility to disposition any items that are raised within five business days.  American Express will attempt to include members of General Interactive in the review process and if any inspection needs to occur that is expected to impact the application or its availability at least 72 hours notice must be provided.

Vendor shall maintain a level of physical security controls consistent with industry accepted standards for the banking community.  These controls include, but are not limited to, appropriate alarm systems, access controls (including off-hours controls), visitor access procedures, security guard force, fire suppression, video surveillance, and staff egress searches for proper authority to add or remove physical property.

Vendor shall maintain a level of data security controls consistent with industry accepted standards for the banking community. These controls include but are not limited to, logical access controls including user sign-on identification and authentication, data access controls. (E.g. password protection of Amex applications, data files, and libraries), accountability tracking, anti-virus software, secured printers, restricted download to disk capability, and provision for system backup.

Vendor shall maintain a level of controls in configuring and operating voice systems, especially as regards fraudulent use of 800 numbers, PBX switches, and other voice networks.  (N/A for this agreement)

Vendor shall maintain an adequately secured and environmentally controlled computer room facility, with access restricted to only approved staff.





08/24/99

Vendor shall document and provide to Amex copies of all internal security policies (e.g. Code of Conduct) and standards (including escalation procedures for non-compliance) for American Express review upon execution of this contract or amendment.

Vendor shall provide to Amex a copy of the most recent third party data security audit or review, as conducted by the Vendor's external auditors for the Exodus facility – if one exists. In addition, Vendor shall provide to Amex copies of any related data processing audits from their internal auditors.

As required by the Amex Customer Privacy Principles, vendor acknowledges that it has been advised of same and agrees to adopt those particular rules and practices that are jointly deemed appropriate by Amex and Vendor.

Vendor shall have a sensitive trash disposal program at locations that require American Express customer data to be destroyed. Sensitive trash is defined as any material that contains Amex proprietary data/information including, but not limited to, cardmember and service establishment data/information. The Vendor is responsible for ensuring that all American Express sensitive data is properly disposed of at its work locations.

Vendor shall ensure at each site that no shared environments exist with other businesses for all WANs, LANs, network connections, dial-up connections, DASD, distributed systems, or any other computer systems and that appropriate data controls are implemented.

Vendor shall maintain a set retention period for all security data or events (i.e., reports) General Interactive will archive data on a semi-quarterly basis with American Express providing storage for the records. Storage items are to be sent to the American Express Project Manager.

Vendor shall provide to Amex a copy of its disaster recovery plan for each location handling Amex business, including the location of its recovery sites. In the case of Echomail Exodus maintains its own disaster recovery plan for the physical site elements (e.g. power). General Interactive will provide American Express with its plan for data recovery and hardware failover/replacement upon execution of this contract. All critical applications supporting Amex business, as jointly determined by Amex and Vendor, will undergo a valid and documented test of the disaster recovery plan at least annually. Vendor shall provide a summary of the results of these tests to Amex.

Vendor agrees to cooperate fully with Amex in any investigations of possible fraudulent activity by Vendor's employees.

**Vendor Access To Amex Systems**
Each Vendor employee who is granted direct access to any Amex system(s) shall sign both the confidentiality agreement and the workstation rules and regulations document

Email Servicing – Statement of Work                                             14



08/24/99

attached hereto and abide by all terms contained therein prior to providing support to American Express systems. General Interactive is responsible for retaining this records and will make them available upon request to American Express. There is to be no dial up access permitted to the Exodus system for American Express.

Vendor employees may only access and make maintenance changes to American Express accounts required by their job. With the exception of production support investigation or testing, GI Employees must follow the following:

1. They may not access their own account for any reason.

2. They may not access another Vendor employee's account if they have personal knowledge that the account holder is a Vendor employee.

3. They may not access an account held by anyone they know outside of work.

4. They may not access any account that they are not required to access as part of their job responsibility.

Vendor management shall retain sole responsibility for granting access to Amex systems ("Vendor Security Administrators") for all Vendor employees and users.

Vendor Security Administrators shall be authorized and approved by Amex.

Vendor Security Administrators shall document all procedures for user ID requests, transaction authorization, and system use.

Vendor Security Administrators shall review all violation reports and take action as necessary to prevent unauthorized access and use of Amex systems.

Vendor agrees that all of its employees who are users of any Amex system will be fully informed of, and monitored for adherence to, all information security requirements listed in this addendum.

Vendor will encourage its employees to report suspected violations of access to Amex systems or of any of the Customer Privacy Principles to their management for investigation and shall take any remedial action it deems in it's sole and exclusive discretion to be necessary upon completion of such investigation.

Vendor agrees that user IDs and passwords for Amex systems will be controlled as follows:
1. Unique ("single user") ownership of user ID.
2. No "generic" or group user ID.
3. Immediate revocation or deletion of all access rights for any terminated, leave of absence, or transferred Vendor employee.

Email Servicing – Statement of Work                                                    15



08/24/99

4. Access rights to systems, transactions, screens, or data on a "need to know", job function basis.
5. If a user ID is revoked, re-authentication and positive identification of the user must occur before the user ID can be reactivated.
6. The principle of segregation of duties must be enforced.

Vendor understands that all access to Amex systems may be monitored at will by Amex for compliance with these information security requirements.

Vendor agrees to document consequence management policies for violations of these information security requirements.

Vendor shall ensure all workstations which allow access to American Express data are segregated and are equipped with; appropriate access control, including password protection and time-out after 15 minutes or less of non-use; data backup procedures; virus protection; and are software compliant. This requirement is consistent with banking industry standards and must be a component of each hardware device supporting an American Express solution. A screen saver requiring entry of a password is required for all PC workstations that are capable of displaying American Express data and is an acceptable alternative to logging the user off the system. Where possible all such PCs must be positioned to face away from any common areas of the facility.



08/24/99

## Confidentiality Agreement

The nature of your work at _____ ("_____") for American Express Travel Related Services Company, Inc., and its affiliates (collectively the "Company") involves your access to trade secrets, confidential information, files, records and forms of the Company (collectively "Confidential Information"). Confidential Information includes, but is not limited to, any information relating to the Company organizational structure, marketing philosophy and objectives, project plans, data models, strategy and vision statements, business initiatives, business requirements, systems design, methodologies, processes, competitive advantages and disadvantages, financial results, product features, systems, operations, technology, customer lists, customer account information, products development, advertising or sales programs and any other information which would give the Company an opportunity to obtain an advantage over its competitors or which the Company is ethically obligated to protect from unauthorized sources. None of such information shall be deemed to be in the public domain.

The Company desires to protect its Confidential Information and therefore requires that you agree, as a condition of your performing services for the Company pursuant to the Company's agreement with _____ to safeguard all Confidential Information and not to reveal Confidential Information to any third party (including, without limitation, at conferences, seminars, meetings of professional organizations or by publication in journals or granting of interviews to journalists and other members of the news media) or use Confidential Information for your own benefit or the benefit of any third party, except to the extent necessarily required for the performance of your services.

You agree not to discuss Confidential Information of the Company in public places.

You agree that any work product produced or developed by you in the performance of your services for the Company shall be Confidential Information subject to this Agreement and such work product is, and shall remain, the property of the Company.

You also agree to help safeguard the Company's customers' expectations of privacy by exercising diligence and care in the handling of Confidential Information relating to them.

By signing below, you indicate that you understand the above terms and that, as a condition of performing services for the Company, you agree to adhere to them.

_____
Your Signature

_____
Printed Name

_____
Date

Email Servicing – Statement of Work

17

08/24/99

## Workstation Rules And Regulations

As a part of your job, you will have access to various Amex Cardmember accounts. Following are the rules and regulations that govern that access; these must be followed in detail by every employee who is granted access.

A.  ACCESS TO AMEX CARDMEMBER ACCOUNT DATA or ACCOUNT NUMBERS
1.  You may not access your own account for any reason.

2.  You may not access another employee's account if you have personal knowledge that the account holder is an employee.

3.  You may not access an account held by anyone you know outside of work.

4.  You may not access any account that you are not required to access as part of your job responsibility.

B.  USE OF YOUR PASSWORD AND IDENTIFICATION NUMBER
You are not to give your password to any person and you are not to use another employee's password or identification number.

You are to sign off when you leave your workstation and sign back on when you return.  This applies to time away from your desk for breaks, lunch, meetings, etc.

This is for your protection.  Your password identifies you to the system.  The computer system tracks all entries that are made by the person who makes them.  If your password were to be used by anyone in a manner that results in errors or fraud, you would be held accountable for the error or fraud.

C.  MONITORING
All terminals are subject to monitoring and terminal monitoring may occur simultaneously with telephone monitoring.  In addition, you should understand that all transactions in the system are recorded by the computer.  Printouts listing all transactions by employee identification number and password are monitored on a regular basis.

These rules are extremely important.  Any employee who willfully disregards these rules and regulations is subject to discipline, up to and including discharge from employment.

I have read and understand the above regulations and agree to comply with them.

_____        _____        _____
Employee Signature                        Printed Name                            Date

Email Servicing – Statement of Work                                                    18



08/24/99

### 5.1    Additions/Clarifications  to Gold Service Level Agreement

1) Hosting Services ( Items 1-4 in Gold Service Level Agreement )
   a) Successful completion of physical site reviews to be performed by American Express
   b) Successful completion of network penetration tests to be performed by American Express
   c) Items found in the Security Design Review ( See attachment 1 ) are corrected to reflect American Express standards.
   d) Successful completion of server setup review to be conducted by American Express before turning environment to a Production state
   e) American Express will conduct periodic reviews to the server configurations and periodic network penetration tests. Should deviations to standards be discovered, proper escalation procedures for a Severity One will be executed

1) Exodus – General Interactive – American Express Relationship Management

   a) GII will provide Monthly "Health of the System" Monitoring Reports Hardware and line services are tracked in the Managed Monitoring Service (MMS) system provided by Exodus.  Application down times must be tracked independently by General Interactive.
      i) Monthly Service Availability Report
         (1) Hardware down time(s): causes, resolution and preventive measures
         (2) Software down time(s): causes, resolution and preventive measures
         (3) Communication line down time(s), resolution and preventive measures

   b) The escalation procedures:
      i) The criticality of the services being provided by General Interactive to American Express, 24 x 7 support is required. It is required that General Interactive support group contact the American Express help desk within severity guidelines as described in Severity Definition section.
      ii) The American Express help desk will continue to be the very first point of contact within American Express. Escalation procedures implemented by Exodus and General Interactive must include the help desk as the primary American Express contact for this service.  This will provide needed tracking of service calls at a centralized location, as well a widely known process within American Express. The help desk also needs to be involved in the problem solving activities to close the open ticket/problem when appropriate:

      i) Escalation Procedure Flow:

         (1) American Express internal customer calls American Express help desk to report problem

Email Servicing – Statement of Work                                    19



08/24/99

(2) Help desk researches to see if there is an open ticket to report issue
(3) Help desk opens problem ticket to track issue
(4) Help desk calls next point of contact (General Interactive Support Pager/Cellular) and describes issue. At this point, the customer that initiated might take part of the call to allow further clarification
(5) Help desk documents scheduled resolution date of issue
(6) Vendor solves issue and calls the American Express help desk to advise of resolution
(7)  Help desk contacts call initiator
(8) Call initiator verifies that issue has been solved
(9) Call initiator authorizes help desk to close issue
(10) American express informs vendor of any SLA breaches of contract and appropriate corrective measures are taken
(11) It should be noted that the American Express help desk is manned on a 24x7 basis and when proper communications are used (problem assignment group, project name etc.) will not cause a delay in servicing to the end user.

i)   Down time management

(1) General Interactive, Inc. is responsible for replacing/re-configuring faulty hardware that is causing and could cause interruptions of service. American Express has no financial responsibility for any additional costs associated with replacement/reconfiguration of hardware to satisfy Service Level Agreement

(2) General Interactive, Inc. is responsible for scheduling upgrades to the EchoMail software, operating system patches, and security patches. General Interactive must notify American Express' Project Manager at least five to seven days before these scheduled upgrades are to be performed. Both parties will then identify and agree on what is the best time for the scheduled outage. Exceptions (Unscheduled changes) to this rule are emergency security patches or fixes that fall under the SEV 1 category.

a)   SLA management
American Express will conduct periodic SLA performance reviews and inform General Interactive, Inc., of identified gaps between agreed service and actual performance.

i)   Availability

Email Servicing – Statement of Work

20



08/24/99

It is expected that the customer experience associated with Email Servicing must be available at a 99.5% level of availability. Customer Service representatives experience must attain a 98.5% level of ability. Both items are to be measured on a calendar-month basis. Refer to the definition of DOWN TIME for a complete formula to calculate the availability number

1) Copyright to training materials and the right to use training materials
   a) As part of the implementation, the vendor offers training sessions and materials. American Express will use the train-the-trainer model and so the following items are required.
      i) That American Express will make copies of the training material provided by the vendor
      ii) That American Express will modify the training material to suit internal needs
      iii) That American Express will make use of the original/modified training material
      iv) That American Express expects to receive, for free, soft copies of the updated training material
      v) If for any reason the relationship with American Express terminates, all training material must be returned to General Interactive and American Express must take action for the destruction of all in-house notes, extracts, etc. Written certification of the event by a recognized American Express representative (Director or higher) is also required. The exception being retention of a single copy of said documents to satisfy any legal requirements required of American Express for compliance related reasons.

1) Hardware / Software environments ( See attachment (5) for physical layout )

| Physical Server Type | Environment | |
| --- | --- | --- |
| | Test | Production |
| Mail Server | 1 | 1 |
| Web Server | 1 | 1 |
| Data Server | 1 | 1 |
| Classification Server | 1 | 1 |

1) Server Hardware specifications
   a) NT (Intel Based)
      DELL 2300 series
      Two 400 Mhz PII processors
      512 MB RAM
      Two 4.5GB SCSI mirrored system drives
      Three 9 GB SCSI RAID  5 data drives

Email Servicing – Statement of Work

21



08/24/99

10/100 ethernet card
Two SCSI controllers, one for the mirror and one for the RAID 5

GII SOW Dated 8/19/1999

# 6   Professional Services Overview

## 6.1   *Integration with Secure Email: Modification requirements from Interactive Technologies*

(b)  In addition to standard fields (i.e. subject, From, To, etc., specified as part of the core functionality of <u>EchoMail®</u>) accept and store customer defined fields that will be later used as an input parameters to Secure Email API to be provided by American Express. These fields are for American Express internal use and are NOT to ever be sent to the external customer as part of any form of communication with the external customer.

a)  Add two radio buttons to the Customer Service Representative interface used to service customer inquiries. These buttons, mutually exclusive, will allow the Customer Service Representative to select if email is to be sent using secure or via unsecure communication channels. The Secure Email button will only be enabled if the custom fields described in bullet #1 are present.

   (b)  If the CSR chooses the unsecure channel, then the message will follow the standard <u>EchoMail®</u> flow, store the response on the repository and send the response to the customer.

   (c)  If the CSR chooses the secure channel, then

   (a)  A call to the Secure Email COM object will be made and the custom field described in bullet #1, along with the standard fields to compose the response ( CSR  response, customer email address, etc.) are to be passed to the COM. At that point, the Secure Email application is responsible for getting the notification to the customer

   (b)  The response will also be stored in the <u>EchoMail®</u> repository for tracking purposes, but nothing is to be sent to the external customer since the Secure Email application will perform this function in this particular situation

   (c)  Should the COM object interface fail the message will be required to be resent at a future time not to exceed 24 hours.  Appropriate functionality should be delivered to resend any emails that could not be sent when the representative selected the Secure Email option.

(b)  A rule for the outbound responses needs to be set up so we can analyze the CSR response and determine if the response should have been sent using Secure Email.  Specifications for the outbound rule include, but are not limited to Account Numbers, passwords (standard rule setting should handle this type of analysis). If the outbound analysis determines that sensitive information is contained in the response and the CSR did not select the secure channel, then a



08/24/99

call to the Secure Email API will be launched on behalf of the CSR to send the information using Secure Email. The data should flow in the same manner as specified in 2b. In addition, a message should be presented to the CSR advising of the action taken.  If the custom field to be passed to the Secure Email API is not present, then the CSR will be prompted and advised that this response cannot be sent to the customer.

(c)  Error Recovery / Monitoring for Secure Email Integration

    a)  The COM object will write errors to the NT Event Log in addition to returning a general use error.   American Express may request that the event log be forwarded to American Express to aid in troubleshooting.  It is expected that this support will be provided to American Express as a part of its monitoring process.

### 6.2   Consulting Services covered by General Interactive

    i)   Finalize Project Plan and Cost
    ii)  Review and sign-off on the Project Plan
    iii) Development
    iv)  Quality Assurance Testing
    v)   Field Testing

### 6.3   Assumptions for Professional Services Overview

    a)  General Interactive, Inc., as part of initial implementation, will supply American Express with COM (Microsoft Common Object Model) object that converts web format to SMTP. Documentation on how to manipulate this object will also be provided. This is an advertised data capture feature of Echomail, therefore, upgrades to this object are to be covered by General Interactive, Inc.

    b)  Subsequent upgrades to the core software will support integration with Secure Email at no cost to American Express

    c)  The proposed budget represents an estimate of the number of hours and costs of proposed modifications. Progress will be reviewed at least once a week and any hours not consumed will not be billed back to American Express

    d)  Integration with Secure Email activities are not considered complete until American Express has tested modifications and verified that specified requirements are met. Formal sign-off on the completion of the integration will be provided by the American Express Project Manager.



08/24/99

e) Complete COM details have been provided to General Interactive along with the second Purchase Order titled July 16th – Aug 16th work.

CONTRACT OPTION:

Should American Express require an additional Customer Service GUI interface to be constructed (e.g. additional languages) and need to have the Secure Email interface added to that GUI, that American Express can exercise this option at a cost of $5,000 plus a rate of inflation amount of 5% per year if the option is invoked any time after July 1st, 2000 for a period of up to three years.

GII SOW Dated 8/19/1999

# 7 Future Deployment

## 7.1 Multi-lingual Support

a) Knowledge base / software setup:

i) Support for additional reasonable languages, offered as a core capability of Echomail, will be provided at no cost other than the costs associated with setting up the new business unit. It is expected that General Interactive will provide the common, "no frills" CSR and Knowledge administrator interfaces in additional languages as a part of their core service and setup costs. Costs and resources needed to translate verbiage in responses provided to the external customer or the CSR will be covered by American Express.

ii) Multi-lingual knowledge bases will be added and/or merged in all installed servers, and American Express will not incur in additional expenditures to support its international customers in this aspect of support. All servers, regardless of physical location, must support all deployed languages. For example:

   (1) International customers accessing a U.S. based server should receive answers in the same language in which the request was sent to American Express. English will not be the only language supported in U.S. based servers

   (2) Development of classification server knowledge base will be treated as if deploying another business unit. It is assumed that American Express will incur costs associated with development of the modules needed to support the multilingual auto suggest and auto response features. However, the core components that enable this behavior on the standard US version are expected to be developed and paid for by General Interactive as the end products will support other deployments of their application to other customers. (e.g. base language concepts – tone, education level, etc.)

   (3) It is expected that the CC product can and will provide automatic routing of email in it current state. (e.g. Using simple routing rules email can be read, and answered, or automatically forwarded to a given address "out of the box").



08/24/99

## 8  Delivery Schedule Milestones

| Milestone | Date | Responsible | Status |
|---|---|---|---|
| Security Design Review Issues sent to GII | 7/1 | Amex | Complete |
| Hardware installation | When | Who | What |
| • Hardware Ordered | • 7/26 | • GI | • Received |
| • Hardware Configured | • 8/3 | • GI | • Complete |
| • GI Products Installed | • 8/5 | • GI | • Pending |
| • IP Addresses Provided to Amex | • 8/10 | • GI | • Pending |
| • Hardware Installed at Exodus | • 8/11 | • GI | • Scheduled |
| • Access Granted to American Express | • 8/11 | • GI | • Scheduled |
| • Frame-Relay Installed | • 8/18 | • Amex/GI | • Pending |
| • Firewall Ordered | • 8/16 | • GI | • Issue |
| • Firewall Installed | • 8/30 | • Exodus | • Issue |
| • Intrusion Detection Ordered | • 8/16 | • GI | • Issue |
| • Intrusion Detection Installed | • 8/30 | • Exodus | • Issue |
| • Site Review | • 8/16 | • Amex | • Scheduled |
| • Review Items to GI | • 8/18 | • Amex | • Scheduled |
| • GI Disposition/Correction | • 8/25 | • GI | • Scheduled |
| • Penetration Attack Completed | • 9/7 | • Amex | • Issue |
| Secure Email Integration | When | Who | What |
| • Web/GUI behavior provided to GI | • 7/21 | • Amex | • Complete |
| • COM specifications provided to GI | • 8/5 | • Amex | • Complete |
| • COM DLL's/SW delivered to GI | • 8/11 | • Amex | • Pending |
| • GI workflow completed and delivered to Amex  (error recovery, etc.) | • 8/14 | • GI | • In Work |
| • Web interface available for testing | • 8/23 | • GI | • In Work |
| • COM interface available for testing | • 8/23 | • GI | • In Work |
| • Secure Email testing completed | • 8/31 | • Amex | • Scheduled |
| GI COM Component (ASP to GI) | When | Who | What |
| • Specifications for COM to Amex | • 8/9 | • GI | • Incomplete |
| • COM DLL's/SW to Amex | • 8/12 | • GI | • Scheduled |
| • COM installation at Exodus | • 8/16 | • GI | • Scheduled |
| • Web interface available for testing | • 8/13 | • Amex | • Issue |
| • COM available for testing | • 8/18 | • GI | • Scheduled |
| • COM to GI testing complete | • 8/27 | • Amex | • Scheduled |



08/24/99

| Echomail Workflow / Setup | When | Who | What |
|---|---|---|---|
| • Email Sample sent to GI | • 7/23 | • Amex | • Complete |
| • Knowledge Administrator Identified | • 7/25 | • Amex | • Complete |
| • Initial email to pilot identified | • 7/20 | • Amex | • Complete |
| • Web pages identified | • 7/20 | • Amex | • Complete |
| • Web pages changed | • 8/3 | • Amex | • Issue |
| • Web pages tested (dev) | • 8/18 | • Amex | • Scheduled |
| • Web pages tested (qa) | • 8/25 | • Amex | • Scheduled |
| • Web pages tested (itest) | • 8/31 | • Amex | • Scheduled |
| • Canned answers identified | • 8/14 | • Amex | • In Work |
| • Access to system available | • 8/11 | • GI | • Scheduled |
| • Canned answers implemented | • 8/14-8/26 | • Amex/GI | • Scheduled |
| • Auto-suggest tested | • 8/27 | • Amex/GI | • Scheduled |
| • Auto-reply tested | • 8/27 | • Amex/Gi | • Scheduled |
| • Context/Knowledge move to Prod | • 9/7 | • GI | • Scheduled |
| • Web pages installed into Prod | • 9/7 | • Amex | • Scheduled |
| Miscellaneous Items | When | Who | What |
| • Train the trainer | • 8/17 | • GI | • Scheduled |
| • Train the CSRs | • 8/24 | • GI | • Scheduled |
| • Setup of CSR ids | • 8/11-8/18 | • GI | • Scheduled |
| • Documentation of escalation procedures | • 8/24 | • GI | • Scheduled |
| • Test of Help Desk/escalation | • 8/31 | • GI/Amex | • Scheduled |
| • Access documentation & change procedures for Exodus provided to Amex | • 8/24 | • GI | • Scheduled |
| • Training Materials Provided to Amex | • 8/9 | • GI | • Overdue |
| SAS 70 Report delivered to American Express | • 7/23 | • GII | • Pending |
| Major issues from SDR corrected | When | Who | Status |
| • Item 1 Id/Password access | • 10/15/99 | • GI | • Scheduled |
| • Item 2 Password encryption | • 10/15/99 | • GI | • Scheduled |
| | | | • |

GII SOW Dated 8/19/1999

# 9   Financial and Costing Information

## 9.1   Period of Performance

The period of performance for the entire contract extends from the date contract is signed through 9/01/2002.  Amex reserves the right to terminate the contract after one year with 60 day notice to GI.

## 9.2   Fixed Price Amounts

### 9.2.1   Security Design Review Items

1) General Interactive, Inc. will address all issues reported in SDR, Attachment (1), at no cost to American Express. These issues represent industry accepted standards to address widely known data and service integrity threats.  GI will deliver corrections to American Express per the schedule outlined previously.

### 9.2.2   Network Design Review Items

1) General Interactive, Inc. will address all issues reported in the physical site and network review at no cost to American Express. These issues represent industry standards to address widely known data and service integrity threats. Exceptions to this include additional network line encryption requested by American Express using American Express approved hardware / software.

### 9.2.3   Physical Review items

1) General Interactive, Inc. will address issues found during the physical facility review at no cost to American Express. Findings represent industry accepted standards not available at the hosting facility

### 9.2.4   Breaches of Service – Charge back calculation

1) Per-transaction costs of non-executed transactions during the down time, plus hourly business unit operational costs multiplied by the down time. Business unit operational costs will vary per business unit and will be agreed at Business Unit set up time. These costs will be deducted from the monthly per-transaction fees charged to American Express (See definition of "down time").  No deductions are to be applied to the ongoing costs if the minimum availability of 98.5% up time is met. Refer to the definition of downtime for complete calculation.



08/24/99

## 9.2.5   Secure Email Integration Costs

1) Assumptions
  a) A maximum of 270 person-hours of time (NTE) will be utilized for the execution of the Professional Services outlined in Section 6 of this Statement of Work. Additional hours require both parties to sign a new Statement of Work and will be charged at the rates specified herein.

  b) Project Manager will submit written status and participate in weekly status and time/material meetings throughout the development and roll out of the effort.

  c) Any additional resource costs incurred over the proposed budget of 270 person-hours will be paid by General Interactive, Inc., unless written consent is provided by the American Express project manager

  d) American Express will be invoiced with the actual hours spent implementing the Secure Email per the schedule outlined later in this section

  e) The following is an estimate of the implementation provided by GI as a base line for the NTE amount. Additional efforts in a given category required by American Express that exceed these numbers will be provided at the rate used in the following table.

| Resource Skill Level | Estimated Hours | Cost |
|---|---|---|
| Project Manager | 30 | $ 2,100 |
| Systems Architect | 30 | $ 6,000 |
| Principal Engineer | 80 | $ 9,600 |
| Senior Engineer | 80 | $ 8,000 |
| QA Tester | 50 | $ 3,000 |
| **TOTAL** | **270** | **$ 28,700** |

Email Servicing – Statement of Work



08/24/99

9.2.6   Hardware / Software Costs

All hardware & base software (e.g. OS, IIS, and SQL Server) will be owned by American Express Company.  General Interactive retains ownership of the Echomail and CC products that are to configured and instaled on these workstations.

| Description | Cost |
|---|---|
| a.  Intrusion Detection Systems as specified in Exodus document  Intrusion Detection Service | $1,930 per Month |
| b.  Firewall Detection Systems as specified in Exodus document labeled Exodus Communications Firewall Service | $2,975 per month |
| c.  One-time setup cost for Initial implementation Includes:<br>XT1 Setup<br>• 1 Server configured to operational status<br>• 3 additional NT boxes @ $15K each<br>• 4 additional NT TEST boxes @ $15K each<br>• 1 Day of On-Site Training for 30 Users<br>• 30 Initial Business Users<br>• 10 Initial Technical Users<br>• 110 categories<br>  • Up to 50 categories at setup<br>  • 5 additional categories per month<br><br>Hardware purchase (Intel Based), setup and maintenance (Per Server), in addition to server included in XT1 setup. This price includes hardware/software for deployment and completion of the 3-tier architecture as depicted in Attachment (5).  All h/w will be the sole property of American Express. | $155,000 |

Email Servicing – Statement of Work



08/24/99

| | |
|---|---|
| **d. Contract Option:**<br>Should American Express determine that volumes warrant an upgrade to the data server the following option may be exercised:<br>• High End SUN (E450) replacement for the Data Server. Not Oracle based.<br><br>Rate defined is good until September 1, 2000. There- after the option can be exercised for up to three years with a maximum increase of 5% per year. | $100,000 |
| **e. Contract Option:**<br>One-time setup cost per Additional Business Unit Includes:<br>• 1 Day of On-Site Training for up to 30 additional Users<br>• 30 additional users granted access<br>• 110 categories<br>  • Up to 50 categories at setup<br>  • 5 additional categories per month<br><br>Rate defined is good until September 1, 2000. There- after the option can be exercised for up to three years with a maximum increase of 5% per year. | $25,000 |

f.     Confirmation Email to senders on receipt

| Number of  Emails | $/Email |
|---|---|
| Unlimited | Free |

g.     Per Transaction Costs ( simple routing of email to other American Express domains)

| Number of  Emails | $/Email |
|---|---|
| Unlimited | $0.02 |

h.     Per Transaction Costs ( Routing to Groups accessing Echomail and servicing within the system)

| Number of  Emails | $/Email |
|---|---|
| 30,000 | $0.25 |
| 50,000 | 0.20 |
| 100,000 | 0.17 |
| 500,000 | 0.14 |
| 2,000,000 | 0.10 |

Email Servicing – Statement of Work



08/24/99

| i. | Per Transaction Costs ( Automation ) | |
|---|---|---|
| | Number of Emails | $/Email |
| | 10,000 | $1.25 |
| | 20,000 | 1.15 |
| | 50,000 | 0.88 |
| | 200,000 | 0.48 |
| | 1,000,000 | 0.27 |
| j. Emails incorrectly answered to due to classification software malfunction ( see definition of "successfully automated email" in "Definition of terms" section | | Free |
| k.   Consulting Fees | | $200/hr |
| Additional Training costs not part of  XT1 configuration or Business Unit setup | | $150/hr |
| l.    Each Additional User over the thirty (30) covered in XT1 configuration or Business Unit Setup | | $250 one time fee |
| m.  Amex Fees: Down Time Costs for ISU to be used to calculate breach of service charge back. Refer to 9.2.4 and definition of down time for additional details. | | $320/hr |

Email Servicing – Statement of Work

GII SOW Dated 8/19/1999

# 10 Method and Frequency of Payment

## 10.1 Secure Email Integration

| Percentage | Payment Amount ($) | Date | Method | Billing/Delivery Conditions |
|---|---|---|---|---|
| 30% | 8,610 | 7/22 | Purchase Order | Completed |
| 30% | 8,610 | 8/5 | Purchase Order | Completed |
| 40% | Invoice | | | Two weeks after Production Deployment and no pending Sev 1 or 2 items for 30 days following implementation. Invoice must include total number of hours by resource type spent on the effort. |
| NTE Total Payments | 28,700 | | | |

## 10.2 Secure Email Acceptance Criteria

The application interfaces will be accepted by American Express following complete installation and verification of operation in both the Production and Testing environments.  The application changes are expected to be have as documented in this Statement of Work.  The backup/recovery process will also be validated prior to making final payment.

08/24/99



**10.3**

**10.4 Hardware / Software Setup Criteria**

| % | Payment Amount ($) | Date | Method | Acceptance/Billing Conditions |
|---|---|---|---|---|
| 10% | 16,390 | 7/22/99 | Purchase Order | Acceptance of 3-tier architecture requirements and initiation of h/w order (Complete) |
| 10% | 16,390 | 8/5/99 | Purchase Order | Hardware installed and ready to be used by American Express (Complete) |
| 50% | 77,500 | 8/31/99 | Invoice | Network/Physical configuration reviewed and approved by American Express. All Training Conducted |
| 30% | 44,720 | | Invoice | Routing Rules and Knowledge base ready for System Testing, Initial testing completed (network traffic/communication validated) Two weeks after Production Deployment No Severity 1 or 2 issues are present |
| | 155,000 | | | |

**10.5 Hardware/Software Acceptance Criteria**

The hardware and software acceptance criteria are based on two factors. 1) The physical network and site review and 2) Verification of behaviors documented in section 4 of this SOW. All features associated with this effort must behave as advertised/demonstrated during the RFP process. All items detailed for correction during the physical site review must be corrected or have mutual agreement to the disposition of the discrepancy identified. The physical site reviews will also verify Intrusion Detection and Firewall systems. Ongoing billing for the two services will be provided with the monthly billing for the transactional costs attributed to the Echomail service (see next section).

Email Servicing – Statement of Work

35

08/24/99



### 10.6 Per Transaction Costs and Acceptance Levels

The following process will be utilized when determining the costs associated with the variable portions of this contract.

a) All reports utilized to create the invoice are either a part of the standard General Interactive product suite or will be developed at no additional cost to American Express. All reports will be made available to both companies so that the companies can track current month expenditures (this will require ad-hoc report support as well as end of month reports)

b) The individual per transaction costs will be applied in the first full month following implementation. This is primarily to disassociate testing of the auto reply/auto-suggested email as they are fully integrated into production.

c) A part of the General Interactive, Inc., Gold agreement is to provide Quality Assurance and Semantic Network requests. Since American Express also plays a part in helping the automation engine to achieve the 40% automation goal. Proper training and professional advice must be provided to reach and maintain at least 40% automation, every calendar month, at no additional cost.

d) Performance less than 90% availability in a given month is to result in no transactional fees to be paid for that month. Availability over the 90% threshold will dictate the amount to be charged to American Express for the transactional fees. Refer to the definition of DOWNTIME for a complete description of how the available number is to be calculated. Fees associated with the performance are to be calculated as follows; Total Transaction Fees for the month minus (downtime in hours times the American Express Downtime rate).

Email Servicing – Statement of Work



08/24/99

37

## 11 Severity Defect(s) Definition

| Severity Defect Level | Severity Defect Level Definition | Resolution Time |
|---|---|---|
| SEV 1 | Major show stoppers<br><br>• functional problems, incorrect data returned, security flaws, bad links, obvious typos, and incorrect data are examples of problems of this type.<br><br>• In addition excessive response times typically over 30 seconds, as determined by benchmarking monitors that include access from several areas within the US, for Customer Service Representatives reps using the web interface over T1 internet access also fall into this category | • Acknowledgment from Support Group within ½ hour.<br><br>• Resources are immediately assigned to ascertain nature of the problem. Updates are provided every 2 hours.<br><br>• Resolution issued and implemented within 4 hour timeframe of identification of a solution. |
| SEV 2 | Not major show stoppers,<br><br>• formatting problems, bad links, corrupt graphics, incorrect data on sub pages.<br><br>• Improper behavior where work arounds can be implemented, | • Acknowledgment from Support Group within 2 hour timeframe.<br><br>• Resources identified to locate cause of the problem within 48 hours.<br><br>• Resolution and implementation within next 48 hours of identification of a solution |
| SEV 3 | Minor typos and basic formatting problems. | Resolved per agreement. |

Email Servicing – Statement of Work

08/24/99

# 12 Definition of Terms, Acronyms and Abbreviations

1) Business Unit
   An organization within American Express, Co., and subsidiaries, that focuses on a specific line of business (i.e. Financial Services, Cards, and Merchant Services). Additionally International versions of a business unit are also classified as a separate business unit for the sake of this SOW. (e.g. Cards – Japan, Cards – Germany, etc.)

2) RAID ( Redundant Array of Inexpensive Disks )
   Allows for the failure of one drive and the other additional drives taking over for the failed drive (industry standard)

3) Secure Email (Tumbleweed application)
   Application hosted at American Express that allows content-sensitive responses to be made available to American Express customers

4) Critical Email Servicing Solution Components

   a) Echomail Mail Server(s) (Amex servers hosted at Exodus)
      Servers that receive customer inquires to be processed by the EchoMail Classification/Application Server(s)

   a) Echomail Web Server(s) (Amex servers hosted at Exodus)
      Server(s) that American Express employees access to perform administrative functions and answer customer inquiries

   a) EchoMail Data Server(s) (Amex servers hosted at Exodus)
      Server(s) that will store customer inquires, routing rules and knowledge base

   a) Echomail Classification/Application Server(s) (Amex servers hosted at Exodus)

      Servers used to classify / route customer inquiries. These servers also serve as an access bridge between the Echomail Web Server(s) and EchoMail Data Server(s)

   a) EchoMail Router(s) (Hosted at Exodus)

Email Servicing – Statement of Work

38

08/24/99

Hardware approved by American Express' Information Integrity, installed at hosting location that directs American Express network traffic to and from dedicated servers

a) Firewall (Hosted at Exodus)

Hardware/software approved by American Express' Information Integrity, installed at hosting location that protects American Express servers from malicious network attacks.

a) EchoMail - to- Secure Email Application Programming Interface (Software hosted at Exodus)

Customization to EchoMail graphical user interface to send content sensitive responses to Secure Email

a) System Software (Software hosted at Exodus)
Operating system software, Database Management System software, Utilities installed on hardware placed at hosting location

2) Application Response Time
Elapsed time from the instant the end user submits a request and the time appropriate response to the request is presented to the user



Email Servicing – Statement of Work

39

08/24/99

## 3) Down Time

When one or more components of the Email Servicing solution components listed above is not available or operating at levels in accordance with manufacturer's specifications that disrupt normal operations. There are two formulas presented here. The first is meant to measure down time from a customer's (Amex) point of view in the ability to send in an email to American Express. The second formula represents how availability is to be measured by American Express for terms outlined in this contract.

American Express Client Availability for a given month is based on the result of the calculation of the following table divided by the total number of hours in the month.

|  | Total Hours for Month |
|------|------------------------|
| less | # of hours American Express Internet Access (Main Router) unavailability |
| less | # of hours American Express Proxy Server (www6) unavailable |
| less | # of hours Web Servers 10 & 14 availability (divided by two) |
| less | # of hours Application Servers APP01 and APP02 (divided by two) |
| less | # of hours Leased Line to Exodus unavailable and access American Express Sybase Server unavailable |
| less | # of hours SMTP server or router at Exodus and American Express Sybase Server unavailable |
| plus | Scheduled down time (actual hours) for the month. |

Email Servicing – Statement of Work

40

08/24/99

American Express and GI's availability Calculations for Echomail for a given month is based on the result of the calculation of the following table divided by the total number of hours in the month.

| | Total Hours for Month |
|---|---|
| less | # of hours American Express Proxy Server (8.20) unavailable **and** Exodus Leased Line unavailable (American Express CSR Availability calculation only) |
| less | # of hours Exodus Production Web Server unavailable |
| less | # of hours Exodus Production SMTP server unavailable |
| less | # of hours Exodus Production Classification Server unavailable |
| less | # of hours the Echomail/CC products do not function properly. Specifically problems like; preventing access, email routing, and email answering. (exception of Secure Email interface) SEV 1 items |
| less | # of hours Exodus Data server is unavailable |
| plus | Scheduled (actual) down times for maintenance and database tuning. |



Email Servicing – Statement of Work

41

08/24/99

1) Normal Operations
   All hardware / software components operation at peak level in accordance with licensor or manufacturer's specifications

2) Hardware malfunctions
   a) System software not operating at peak levels as defined in manufacturer's documentation
   b) Application Software not operating at peak level as defined in licensor's documentation

3) Software malfunctions (as defined in Echomail documentation)
   a) No communication between Secure Email and Echomail
   b) Classification errors
   c) Auto Response errors
   d) Suggested Response errors

7) Setup - Installation, configuration and purchase of all hardware and software components which are required to create an operational EchoMail environment.

8) User - An individual designated by Amex to have access to the EchoMail environment. User access is controlled at three levels: Administrative (super user), Manager, and CSR.

9) EchoMail/CC - The "Customer Care" Module which performs routing, response, workflow management, reporting and other administrative functions.

10) EchoMail/BI - The "Business Intelligence" Module which analyses and classifies inbound email according to rules and categories which comprise the Semantic Network.

11) Successful BI transaction - Email which has been correctly categorized across each of the 5 dimensions by the EchoMail/BI Module and the correct response(s) has been forwarded to the CSR.

12) Successful CC transaction - Email which has been properly routed and generally handled by the EchoMail/CC workflow.

Email Servicing – Statement of Work

42



43

08/24/99

13) Standard Category - A category from GII's catalog of 2600+ existing categories which can be incorporated without significant customization into the customer's Semantic Network.

14) Custom Category - A category which has been created specifically for the customer.

Email Servicing – Statement of Work

08/24/99

44



| ADC | Advanced Development Center |
|---|---|
| AEPM | American Express Project Management |
| AET | American Express Technologies |
| COM | Component Object Model |
| DB | Database |
| DBMS | Data Base Management System |
| DL | Development Leader |
| DO | Distributed Operations |
| DRR | Development Resource Request |
| IS | Interactive Services |
| IT | Interactive Technologies |
| NT | New Technology |
| MLRB | Minimum Level to Run the Business |
| MSE | Minor Site Enhancement |
| IDC | Internet Development Center |
| PDP | Project Definition & Planning [Method /1 Stage or Milestone] |
| PDR | Project Definition Report |
| QA | Quality Assurance (testing environment) |
| SLA | Service Level Agreement |
| SOR | Statement of Requirements |
| SOW | Statement of Work |
| TO | Task Order |
| PILOT | The business unit that we are using for the initial implementation |
| ROLLOUT | Production |

Email Servicing – Statement of Work

GII SOW Dated 8/19/1999

# 13 Attachment 1 – Security Design Review (ECDR) Findings

This document outlines the conclusions from the Electronic Commerce Design Review (ECDR) of EchoMail. Echo Mail provides an automated mechanism to manage electronic customer service. Echo Mail automatically reads, classifies, routes, responds, tracks and centrally manages incoming e-mail to a web site utilizing business intelligence. This review represents a follow-up to the original review performed on December 4, 1998.

As usual for these reviews, the issues identified by the team have been categorized into Major, Medium & Minor groupings. These categories are followed by Project Action Items and Project Recommendations, which are either not related to a specific issue or the design has not yet been finalized in these areas.

Items that appear in the Major category must be addressed before the product is deployed in production. Items that appear in the Medium category should be addressed as soon as possible, but production implementation does not necessarily need to be delayed – as long as a risk memo has been accepted by the appropriate business partner. Items in the Minor category should be addressed expeditiously, but there is no specific timetable around when this must occur.

Project Action Items are equivalent to Major Issues, and must be included in the design or completed prior to implementation. Recommendations are considered to be important to the EC Security Team, but are not required for implementation. Observations are included for informational purposes.

It is the role of the EC Design Review team to provide technical expertise and guidance on AET Security and Architecture Standards, AXP Guiding Principles, and industry best practices. It is the responsibility of the project team to follow-up and implement the necessary changes or recommendations. The EC Design Review team has no authority to approve standards exceptions that may be identified during the review process. In these cases, the project team should work with Information Integrity, Enterprise Architecture or AETO operations groups independently to resolve specific issues identified.

Email Servicing – Statement of Work 8/19/99

45

## Conclusions from the Follow-up ECDR of EchoMail

| Issue Number | Major Security Issues | Policy | Suggested Change – Suitable alternatives permitted. |
|---|---|---|---|
| 1 | The Domino (web) server uses basic authentication. The end user id and password is stored in a hidden form field on the web page. This information is then passed to the web server with every request, thus re-authenticating the end user with each request. The use of hidden form fields could result in malicious users exploiting vulnerabilities presented by hidden form fields to perform a session hijack. | The American Express Web standards disapprove the use of hidden form fields for authentication and session management purposes. | The Project Team, in coordination with the vendor, should investigate solutions that will provide the needed functionality without the use of hidden form fields. This may include the use of cookies with adequate access controls to perform authentication and maintain session. Note that as an alternative, the vendor may provide support for client-side certificates and SSL 3.0 with 128-bit encryption. **General Interactive Disposition To be corrected by 10/15/1999** |

| Issue Number | Medium Security Issues | Policy | Suggested Change – Suitable alternatives permitted. |
|---|---|---|---|
| 2 | The Domino (web) server stores ODBC user IDs and passwords unencrypted in a Notes database. | American Express Minimum Security Baseline (MSB) requires that the web server store no critical data or configuration information locally. This includes passwords and user IDs of systems such as database servers. | The Project Team, in coordination with the vendor, should ensure that the Notes database containing the ODBC user id and password is encrypted. **General Interactive Disposition To be corrected by 10/15/1999** |

American Express CONFIDENTIAL and PROPRIETARY information. Unauthorized release of this information will cause irreparable harm and injury to American Express. This is not to be disclosed to any non-American Express employee or any person not under non-disclosure without the prior written consent of American Express.

## Conclusions from the Follow-up ECDR of EchoMail

| Issue Number | Medium Security Issues | Policy | Suggested Change – Suitable alternatives permitted. |
|---|---|---|---|
| 3 | The Domino (web) server does not provide a facility to time out a session. | American Express (MSB) requires that all applications be protected by a configurable session time out. The maximum allowable period of inactivity is 30 minutes. | The Project Team, in coordination with the vendor, should configure sessions to time out after 30 minutes using screen savers or other alternative methods. Any exceptions will need to be approved by Information Integrity. The vendor noted that a screen blanking mechanism is being implemented in the next release. **General Interactive Disposition To be corrected by 10/15/1999** |
| 4 | This product currently supports a two-tier architecture with the Web and application services located on one machine. The Domino web server connects directly to the database (file) server. | American Express guiding principles require that all systems that access to confidential data follow a three-tier architecture. These standards demand that all database connections be from application servers, not Web servers. | The Project Team, in coordination with the vendor, to segregate the Domino (web) server and application component to follow American Express' three-tier architecture. This issue is classified as a medium security issue as the deployment is limited to the Intranet. The vendor noted that this issue will be addressed in the next version release and intends to work closely with the Project Team to develop an acceptable solution. **General Interactive Disposition To be implemented in the initial install.** |

American Express CONFIDENTIAL and PROPRIETARY information. Unauthorized release of this information will cause irreparable harm and injury to American Express. This is not to be disclosed to any non-American Express employee or any person not under non-disclosure without the prior written consent of American Express.

## Conclusions from the Follow-up ECDR of EchoMail

| Issue Number | Medium Security Issues | Policy | Suggested Change – Suitable alternatives permitted. |
|---|---|---|---|
| 5 | Echo Mail software is not currently third-party escrowed. | American Express guiding principles require that the firm be protected from a potential vendor failure. | The Project Team should request that the vendor third party escrow their source code.  The vendor noted that they are willing to escrow their source code.<br>**General Interactive Disposition**<br>**To be implemented by 9/15/1999 or product launch, which ever is sooner.** |

| Issue Number | Minor Security Issues | Policy | Suggested Change – Suitable alternatives permitted. |
|---|---|---|---|
| ----- | -----None noted. | | |

### Project Team Action Items

The vendor noted that they intend to implement Domino R/5.  The Project Team should request that an Electronic Commerce Design Review of the R/5 version of the product be completed prior to being placed into production.

The Project Team noted that there is a possibility for this product to be hosted at a third-party hosting company, as such the Project Team should ensure that a physical site review and a network security review is performed of the hosting site prior to launch.

The Project Team should request that the third party hosting company to provide their SAS 70 Service Auditor's Report.  If this report is not available, the project team should request the hosting company to have a SAS 70 type review performed.

The Project Team should ensure that American Express' data housed at the third-party hosting company is logically and physically segmented from other customer's data.

### Project Team Recommendations

American Express CONFIDENTIAL and PROPRIETARY information. Unauthorized release of this information will cause irreparable harm and injury to American Express.  This is not to be disclosed to any non-American Express employee or any person not under non-disclosure without the prior written consent of American Express.

## Conclusions from the Follow-up ECDR of EchoMail

None noted.

**Observations**
None not

American Express CONFIDENTIAL and PROPRIETARY information. Unauthorized release of this information will cause irreparable harm and injury to American Express. This is not to be disclosed to any non-American Express employee or any person not under non-disclosure without the prior written consent of American Express.