# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ECHOMAIL, INC.,<br><br>      Plaintiff,<br><br>  v.<br><br>AMERICAN EXPRESS CO. and<br>INTERNATIONAL BUSINESS<br>MACHINES, CORP.,<br><br>      Defendants. | Civil Action No. 05-11318-<br>NMG |

**DEFENDANT INTERNATIONAL BUSINESS MACHINES CORPORATION'S
MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR
JUDGMENT ON THE PLEADINGS**


Dated:  December 7, 2005

IBM CORPORATION,

By its attorneys,

Stephen D. Poss, P.C.
GOODWIN PROCTER LLP
Exchange Place
53 State Street
Boston, MA 02109
(617) 570-1000

and

Thomas G. Rafferty
Rowan D. Wilson
(both admitted *pro hac vice*)
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

# TABLE OF CONTENTS

<u>Page</u>

Table of Authorities .................................................................................................1

Preliminary Statement.............................................................................................1

Nature and Stage of the Proceedings .....................................................................2

Statement of Facts...................................................................................................3

Standard for A Motion for Judgment on the Pleadings ..........................................3

Argument .................................................................................................................4

I.  PLAINTIFF FAILS TO PLEAD "MISAPPROPRIATION OF TRADE
    SECRETS" UNDER EITHER MASSACHUSETTS OR NEW YORK LAW..................4

II. PLAINTIFF FAILS TO PLEAD COMMON LAW "UNFAIR COMPETITION"
    UNDER EITHER MASSACHUSETTS OR NEW YORK LAW. .....................................7

III. PLAINTIFF'S UNFAIR AND DECEPTIVE ACTS AND PRACTICES CLAIM
     FAILS TO SATISFY THE PLEADING REQUIREMENTS OF MASS. GEN.
     LAWS ANN. 93A §11.........................................................................................8

Conclusion .............................................................................................................10

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

Am. Telephone & Telegraph Co., v. IMR Capital Corp., 888 F. Supp. 21 (D. Mass. 1995) ............................................................................................................... 8

Atkinson v. Rosenthal, 33 Mass. App. Ct. 219 (1992) .................................................. 10

Bayshore Group Ltd. v. Bay Shore Seafood Brokers, Inc., 762 F. Supp. 404 (D. Mass. 1991) ............................................................................................................. 8

Bowers v. Baystate Tech., Inc., 101F. Supp.2d 53 (D. Mass. 2000) ............................ 10

Datatrend, Inc. v. Jabil Circuit, Inc., 3 F. Supp. 2d 66 (D. Mass. 1998) ........................ 9

DB Riley, Inc. v. AB Eng'g Corp., 977 F. Supp. 84 (D. Mass 1997) ............................. 4

Echomail, Inc. v. Am. Express Co., et al., 378 F. Supp. 2d 1 (D. Mass. 2005)........................ 3, 7

F & D Tool Co., Inc. v. Sloan Valve Co., Inc., 2002 WL 31371963 (*3 D. Mass. 2002) ............................................................................................................... 10

Genesee Brewing Co. v. Stroh Brewing Co., 124 F.3d 137 (2d Cir. 1997) ................... 8

Geritrex Corp. v. Dermarite Indus., LLC, 910 F. Supp. 955 (S.D.N.Y. 1996)............... 5

Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc., 920 F.2d 171 (2d Cir. 1990) ........................................................................................................... 5

Levings v. Forbes & Wallace, Inc., 8 Mass. App. Ct. 498 (1979)................................. 10

Mass. School of Law at Andover, Inc. v. Amer. Bar Ass'n, 142 F.3d 26 (1st Cir. 1998) ........................................................................................................... 4, 11

Muthig v. Brant Point Nantucket, Inc., 838 F.2d 600 (1st Cir. 1988) .......................... 11

Petricca v. City of Gardner, 2002 WL 563367 (D. Mass. 2002) ................................... 4

Prescott v. Morton Int'l, Inc., 769 F. Supp. 404 (D. Mass. 1990) .................................. 5

Saint-Gobain Indus. Ceramics, Inc. v. Wellons, Inc., 246 F.3d 64 (1st Cir. 2001) ...................... 10

Swartz v. Schering-Plough Corp., 53 F. Supp. 2d 95 (D. Mass. 1999) ....................... 4, 9

Watterson v. Page, 987 F.2d 1 (1st Cir. 1993)............................................................... 6

ii

**Statutes**

15 U.S.C. § 1125(a). .......................................................................................... 7

28 U.S.C. § 1441 ............................................................................................... 2

28 U.S.C. § 1446 ............................................................................................... 2

Fed. R. Civ. P. 12(c) ......................................................................................... 1

M.G.L.A. 93A § 11 ......................................................................................... 2, 8

Mass. Gen. Laws ch. Ann, § 93A ................................................................. 2, 8

## MEMORANDUM OF POINTS AND AUTHORITIES

International Business Machines Corporation ("IBM") respectfully submits, pursuant to Federal Rule of Civil Procedure 12(c), this memorandum of law in support of its motion for judgment on the pleadings of plaintiff EchoMail, Inc.'s ("EchoMail") Verified Complaint ("Complaint").

## PRELIMINARY STATEMENT

Plaintiff began this litigation with an allegedly emergency hearing on a preliminary injunction motion based entirely on unsupported speculation that IBM might in the future try to use some of Plaintiff's alleged trade secrets or confidential information. See, e.g., Tab A, Compl. ¶ 49.[1]  In bringing this action and pressing its preliminary injunction motion, Plaintiff ignored both its lack of factual basis for its claims -- beyond its own speculation -- and a pre-existing confidentiality agreement between IBM and Plaintiff.[2]  Nonetheless, in order to resolve any possible dispute and to obviate the need to impose on this Court, IBM agreed to enter into an additional confidentiality agreement with EchoMail covering the alleged trade secret and confidential information that EchoMail referred to in its complaint -- information discussed on a teleconference on May 4 and 5, 2005.[3]  Inexplicably, despite IBM's acquiescence to Plaintiff's demand to enter into yet another confidentiality agreement, Plaintiff has not dismissed IBM from

---

[1] Citations to the June 23, 2005, Complaint are given as "Compl. ¶ __". Citations to IBM's Answer to Plaintiff's complaint, filed on July 11, 2005, are given as "IBM Ans. ¶ __". Copies are included for the Court's convenience in the accompanying appendix at Tabs A and C, respectively.

[2] In April, 2002 IBM and EchoMail entered into a confidential disclosure agreement regarding the disclosure of confidential information by EchoMail to IBM. The document was included as Exhibit A to IBM's Answer. Tab C, IBM Ans. ¶ 29, Ex. A.

[3] This agreement between IBM and EchoMail was filed with the court in a Joint Statement by Plaintiff and both Defendants on July 12, 2005 ("Joint Statement") as Exhibit A. A copy of the Joint Statement and its exhibits, is included in the accompanying appendix at Tab D.

this suit.  In refusing to do so, Plaintiff asks this Court to ignore -- as Plaintiff, itself, does -- the

existence of two confidentiality agreements between IBM and Plaintiff covering the information

in question, including one agreed upon in response to this litigation, and the lack of any facts or

allegations that IBM has breached either of those agreements by any "improper" use of the

information.  IBM's participation as a party in this lawsuit is unnecessary and unwarranted; all

claims against IBM should be dismissed in their entirety.

## NATURE AND STAGE OF THE PROCEEDINGS

On June 20, 2005, plaintiff EchoMail sued both American Express Co.

("AMEX") and IBM in state court for (1) misappropriation of trade secrets under Mass. Gen.

Laws Ann. 93A § 11 and New York common law, (2) unfair competition, and (3) unfair and

deceptive trade practices in violation of Mass. Gen. Laws Ann. 93A § 11.[4]  Plaintiff's claims

against IBM were based entirely on the fact that employees of IBM's Global Services division

had participated on a teleconference on May 4 and 5, 2005, (the "Teleconference") between

Plaintiff and AMEX, a client of IBM.  See, e.g., Tab A, Compl. ¶ 44.  Plaintiff alleges that

during that Teleconference some of its alleged trade secrets or confidential information of were

discussed.  Id. at 42.  On June 23, 2005, defendants American Express and IBM removed this

matter to the United States District Court for the District of Massachusetts pursuant to 28 U.S.C.

§ 1441 and 1446.  Shortly thereafter, on July 12, 2005, IBM and Plaintiff entered into a new

Confidential Disclosure Agreement specifically regarding the trade secret and confidential

information allegedly discussed on the Teleconference underlying Plaintiff's complaint.  Tab D,

Joint Statement, Ex. A.  That agreement, as this Court held, mooted Plaintiff's request for a

preliminary injunction against IBM.  See Echomail, Inc. v. Am. Express Co., et al., 378

---

4 In addition, EchoMail asserted a number of other claims solely against AMEX.

2

F.Supp.2d 1 (D. Mass. 2005) (order denying preliminary injunction). It also should have caused Plaintiff to drop IBM from this lawsuit.

## STATEMENT OF FACTS

IBM is a world wide information technology corporation. Tab A, Compl. ¶ 5, Tab C, IBM Ans. ¶ 5. In April 2002, IBM and Plaintiff entered into a Confidential Disclosure Agreement ("CDA") that fully addressed the disclosure of confidential information between the parties. Tab C, IBM Ans. ¶ 29, Ex. A. In early May 2005, Gibbons, an IBM employee, participated on a technical review Teleconference involving Plaintiff. Tab A, Compl. ¶ 44, Tab C, IBM Ans. ¶ 44. On the call, Gibbons identified himself as an IBM employee and cautioned Plaintiff that the information being disclosed in the Teleconference could create "a conflict." Tab A, Compl. ¶ 44, Tab C, IBM Ans. ¶ 44. At no time after Gibbons made Plaintiff aware of his presence did anyone from plaintiff EchoMail object to an IBM employee being on the call, much less seek to designate the subject matter of the call as confidential under the existing CDA between IBM and Plaintiff. Tab A, Compl. ¶ 44, Tab C, IBM Ans. ¶ 44. Following the filing of this action, Plaintiff and IBM entered into a negotiated confidentiality agreement specifically covering the information disclosed during the May 4 and 5 2005 teleconference. Tab D, Joint Statement, Ex. A.

## STANDARD FOR A MOTION FOR JUDGMENT ON THE PLEADINGS

"The standard for evaluating a motion for judgment on the pleadings is 'essentially the same as the standard for evaluating a 12(b) (6) motion'". Petricca v. City of Gardner, 194 F. Supp. 2d 1, 4 (D. Mass. 2002) (Gorton J.). Accordingly, the court must accept all factual averments in the complaint as true and draw all reasonable inferences in the plaintiff's favor. Id. "Notwithstanding the generous contours of this standard, a reviewing court need not

3

swallow plaintiff's invective hook, line, and sinker; bald assertions unsupportable conclusions,

periphrastic circumlocutions and the like need not be credited". Mass. Sch. of Law at Andover,

Inc. v. Am. Bar Ass'n, 142 F.3d 26, 40 (1st Cir. 1998) (internal citations omitted).

## ARGUMENT

I.    **PLAINTIFF FAILS TO PLEAD "MISAPPROPRIATION OF TRADE SECRETS" UNDER EITHER MASSACHUSETTS OR NEW YORK LAW.**

To plead misappropriation of trade secrets under Massachusetts law, a plaintiff

must allege that: the "(i) [information in question] is a trade secret, (ii) [plaintiff] took reasonable

steps to preserve [the information's] confidentiality, and (iii) [defendant] utilized improper

means, or participated in their own or another's breach of a confidential relationship, to acquire

and use the trade secret". Swartz v. Schering-Plough Corp., 53 F. Supp. 2d 95, 100 (D. Mass.

1999); see also DB Riley, Inc. v. AB Eng'g Corp., 977 F. Supp. 84, 89-90 (D. Mass 1997).

Similarly, under New York law, a plaintiff seeking relief on grounds of misappropriation of trade

secrets must allege that "(1) it possessed a trade secret, and (2) [defendants are] using that trade

secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper

means". Geritrex Corp. v. Dermarite Indus., LLC, 910 F. Supp. 955, 961 (S.D.N.Y. 1996)

(quoting Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc., 920 F.2d 171, 173 (2d

Cir. 1990)).[5]

---

[5] Furthermore, according to the complaint, "EchoMail has protected its confidential and proprietary technology by obtaining patents" protecting its "overall process for managing email" and "its technology used to analyze emails [and] to construct a response to a customer's email". Compl. ¶ 56. Because Plaintiff patented the information in question, it is no longer afforded trade secret protection as a matter of law. "The issuance of the patent gives notice to the world that the patentee claims exclusive ownership of the information. The trade secret is destroyed completely…." Prescott v. Morton Int'l, Inc., 769 F. Supp. 404, 407 (D. Mass. 1990).

4

After being notified that an IBM employee was on the teleconference in May 2005 and that the employees presence on the call may create "a conflict", Plaintiff continued the call without so much as asking the IBM employee to leave the call, much less requiring the IBM employee to sign a new agreement regarding the subject-matter discussed. Tab A, Compl. ¶ 44, Tab C, IBM Ans. ¶ 44. Notwithstanding the allegations of its complaint, Plaintiff's CEO claims that "if the list of attendees had identified someone from IBM as participating on the call, we would have required IBM to sign a non-disclosure or confidentiality agreement with EchoMail". Tab B, Ayyadurai Decl. ¶ 7.[6] That statement by Plaintiff's CEO does not explain why, once it discovered that there was an IBM employee on the call, it did not seek to terminate the call, issue a Supplement pursuant to the existing CDA between IBM and Plaintiff, or ask that the IBM employee leave the call. Moreover, it also demonstrates that once IBM agreed to treat confidential any trade secret or confidential information discussed during the May 2005 teleconference, the entire basis of Plaintiff's complaint is rendered moot.

In addition, to the extent that Plaintiff disclosed any protectible trade secret or confidential information during the May 4 and 5 teleconference, pursuant to the existing CDA between IBM and EchoMail there existed a procedure to maintain the confidentiality of disclosed information. Tab C, IBM Ans. ¶ 29, Ex. A. Section 1.0 of the existing CDA provides that in order to maintain the confidentiality of the information disclosed, either party disclosing its confidential information to the other shall, prior to the disclosure, issue a "Supplement for Disclosure" ("Supplement") describing the information disclosed. Id. at Section 1.0 Disclosure.

---

[6] Since Plaintiff can hardly contest the authenticity of an affidavit of its own CEO, which Plaintiff submitted to this Court, the affidavit may be considered on a Rule 12 motion. See, e.g., Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993).

5

The CDA expressly provides that the failure to issue a Supplement renders the disclosed information non-confidential. Id. at Section 2.0 Exceptions.[7]

Moreover, Plaintiff has not claimed -- because it cannot -- that IBM has, in fact, "used" any of the alleged trade secrets or confidential information at issue. In denying EchoMail's request for a Preliminary Injunction, this Court held that EchoMail's complaint does not include allegations that either defendant has used EchoMail's trade secrets or confidential information.[8] Echomail, 378 F.Supp.2d at 3 (order denying preliminary injunction). Without factual support, Plaintiff simply states its belief that at some point in the future "defendants will improperly use EchoMail's technology and proprietary information". Tab A, Compl. ¶ 1. Plaintiff can point to no facts that would indicate that IBM plans to act differently in the future. On the contrary, IBM's July 12, 2005, agreement with Plaintiff demonstrates that IBM did not and does not intend to "improperly" use any of the information obtained during the Teleconference. See Tab D, Joint Statement, Ex. A. Plaintiff's failure to allege otherwise is fatal to its' claim of trade secret misappropriation.

---

[7] The CDA by its own terms remains in full force and effect: it contains no expiration date, and terminates only "upon one month's written notice" by the terminating party. Tab C, IBM Ans. ¶ 29, Ex. A at Section 4.0 General. Neither IBM nor Plaintiff has given notice of termination. At no time during, or after the May 4 and 5, 2005 Teleconference did Plaintiff issue the Supplement required under the agreement. Id. at Section 1.0 Disclosure. Accordingly, by the terms of the April 2002 CDA, the information shared by Plaintiff during the May 4 and 5, 2005 teleconference was no longer confidential under that agreement and, thus, cannot be deemed either a trade secret or confidential. See id. at Section 2.0 Exceptions.

[8] Specifically, the Court held that "EchoMail's complaint and memorandum in support of its motion for preliminary injunction allege that the defendants 'will improperly use EchoMail's technology and proprietary information in the absence of judicial intervention' but neither pleading includes allegations that either defendant has used this information." Echomail, 378 F.Supp.2d at 3 (order denying preliminary injunction).

6

## II.    PLAINTIFF FAILS TO PLEAD COMMON LAW "UNFAIR COMPETITION" UNDER EITHER MASSACHUSETTS OR NEW YORK LAW.

Plaintiff's claim of "unfair competition" under Massachusetts and New York common law is deficient on its face.  Under both Massachusetts and New York law "common law unfair competition claims closely resemble Lanham Act claims except insofar as the state law claim may require an additional element of bad faith or intent".  Genesee Brewing Co. v. Stroh Brewing Co., 124 F.3d 137, 149 (2d Cir. 1997); See e.g., Bayshore Group Ltd. v. Bay Shore Seafood Brokers, Inc., 762 F. Supp. 404, 415 (D. Mass. 1991) ("Similar to a claim under the Lanham Act, a claim under [an unfair competition] common law theory requires a finding of likelihood of confusion".).  Accordingly, "[t]he gravamen of an unfair competition claim is the likelihood of consumer confusion as to the source of . . . goods or services".  Am. Tel. & Tel. Co., v. IMR Capital Corp., 888 F. Supp. 221, 246 (D. Mass. 1995).  Thus, to establish a common law unfair competition claim, a plaintiff must allege, among other things, defendant's use of its information in a manner likely to deceive or cause confusion among consumers concerning the origin of the goods or services.  See Bayshore Group Ltd., 762 F. Supp. at 415.

As discussed above, Plaintiff has not alleged, and cannot show, that IBM has used any of Plaintiff's alleged trade secrets or confidential information at all -- let alone with the consuming public.  As a result, "this Court cannot reach a likelihood of confusion analysis because there is nothing to confuse.  Without an allegation of present competition, there can be no claim for unfair competition." Swartz, 53 F.Supp.2d at 102.

Finally, there is no evidence of bad faith on the part of IBM.  On the contrary, IBM acted in good faith throughout the events forming the basis for Plaintiff's complaint.  Plaintiff's complaint concedes that during the call Gibbons identified himself as an IBM employee and that he notified those on the Teleconference that information being discussed

7

could create a potential conflict.  Tab A, Compl. ¶ 44, Tab C, IBM Ans. ¶ 44.   It was Plaintiff

that failed to terminate the call or to issue a supplement under its CDA with IBM.  Plaintiff's

failure to act cannot transform IBM's good faith into bad; thus, Plaintiff's claim must fail.

**III.    PLAINTIFF'S UNFAIR AND DECEPTIVE ACTS AND PRACTICES CLAIM
FAILS TO SATISFY THE PLEADING REQUIREMENTS OF MASS. GEN.
LAWS ANN. 93A §11.**

As a threshold matter, Plaintiff cannot prove that IBM engaged in any unfair or

deceptive acts under Mass. Gen. Laws Ann. 93A § 11.  To prevail on a claim of unfair and

deceptive acts and practices under Mass. Gen. Laws Ann. 93A § 11, a plaintiff must prove (1)

unfair or deceptive acts or practices occurred; (2) those acts or practices occurred primarily and

substantially in Massachusetts; and (3) the plaintiff suffered a loss of money or property as a

result of defendant's unfair or deceptive acts.  Datatrend, Inc. v. Jabil Circuit, Inc., 3 F. Supp. 2d

66, 77 (D. Mass. 1998) (internal quotations omitted).

A practice is unfair if it falls "'within at least the penumbra of some common-law,

statutory, or other established concept of unfairness,' or is otherwise 'immoral, unethical,

oppressive, or unscrupulous'."  Bowers v. Baystate Tech., Inc., 101F. Supp.2d 53, 54 (D. Mass.

2000) (Gorton J.).  To meet that test, a plaintiff must show that the defendant's actions were so

objectionable as to "attain a level of rascality that would raise an eyebrow of someone inured to

the rough and tumble of the world of commerce," or had a "rancid flavor of unfairness."  F & D

Tool Co., Inc. v. Sloan Valve Co., Inc., 2002 WL 31371963, *3 (D. Mass. 2002) (quoting

Levings v. Forbes & Wallace, Inc., 8 Mass.App.Ct. 498, 504 (1979) and Atkinson v. Rosenthal,

33 Mass.App.Ct. 219, 226 (1992)).  While "whether a particular set of acts, in their factual

setting, is unfair or deceptive is a question of fact, the boundaries of what may qualify for

consideration as a c. 93A violation is a question of law".  Saint-Gobain Indus. Ceramics, Inc. v.

Wellons, Inc., 246 F.3d 64, 73 (1st Cir. 2001) (affirming district court's dismissal of Chapter 93A claim).

        Here the Plaintiff's complaint does not even approach those boundaries. Plaintiff does not allege, nor can it hope to establish, that IBM acted in an "immoral, unethical, oppressive, or unscrupulous" manner such as to meet the "level of rascality" required to state a claim under Chapter 93A. On the contrary, according to Plaintiff's own complaint, "an IBM employee participating in the review by phone stated that he worked for IBM" and that his presence could create "a conflict," thereby notifying Plaintiff -- which would have otherwise had no idea about the IBM employee's participation in the call. Tab A, Compl. ¶ 44, Tab C, IBM Ans. ¶ 44. Nowhere does the complaint allege that after Gibbon's disclosure Plaintiff terminated the call or requested that IBM sign a new non-disclosure agreement, which plaintiff's own CEO has testified would have been sufficient. See Tab B, Ayyadurai Decl. ¶ 7. Plaintiff has not and cannot dispute that the call continued with IBM's participation having been disclosed. Tab A, Compl. ¶ 44, Tab C, IBM Ans. ¶ 44.

        In addition, Plaintiff's failure to allege how it suffered a cognizable economic harm as a result of the information disclosed during the May 4 and 5 teleconference involving IBM is, "[i]n itself, [] a fatal flaw." Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 43 (1st Cir. 1998) (granting motion to dismiss on Chapter 93A claim because complainant did not show any cognizable economic harm to it as a result of the use of an unfair method of competition or an unfair or deceptive act or practice). "Without proof of caused harm, the claim[] of fraud and deceptive trade practices [is] legally meritless." See Muthig v. Brant Point Nantucket, Inc., 838 F.2d 600, 605 (1st Cir. 1988) (emphasis in original); see also Bowers, 101 F. Supp.2d at 64 ("To prevail in a Section 11 action, a claimant must prove that a person

9

who is engaged in trade or business committed an unfair or deceptive trade practice and that the claimant suffered a loss of money or property as a result.").

## CONCLUSION

This is a dispute between a company and its client -- EchoMail and AMEX. It is a dispute in which IBM has no stake. More importantly, without any factual basis for asserting that IBM improperly used Plaintiff's technology or proprietary information, Plaintiff has no viable claim against IBM. For all of the foregoing reasons, judgment should be entered in IBM's favor against Plaintiff on its complaint.

Respectfully submitted,

IBM CORPORATION,

By its attorneys,

/s/ Stephen D. Poss
Stephen D. Poss, P.C.
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
(617) 570-1000

and

Thomas G. Rafferty
Rowan D. Wilson
(both admitted *pro hac vice*)
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Dated:  December 7, 2005        (212) 474-1000

10

# TAB A

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                         SUPERIOR COURT
                                     CIVIL ACTION NO.        -BLS

———————————————————
ECHOMAIL, INC.,                )
                               )
            Plaintiff,         )
                               )
v.                             )
                               )
AMERICAN EXPRESS CO.           )
and IBM CORP.,                 )
                               )
            Defendants.        )
———————————————————)

05-2477-*BLS*

VERIFIED COMPLAINT

Introduction

1.    Defendants American Express Company ("AmEx") and IBM
Corporation (collectively "defendants") obtained unprecedented
access to the confidential and proprietary technology of
plaintiff EchoMail, Inc. ("EchoMail") by fraudulently,
pretextually, and illegally using AmEx's contractual
relationship with EchoMail to obtain an "architecture" review of
EchoMail's cutting-edge, patented, email management system.  IBM
had no right whatsoever to access EchoMail's technology and
proprietary information, but deceptively did so.  AmEx permitted
this deception to occur.  The defendants will improperly use
EchoMail's technology and proprietary information in the absence
of judicial intervention.  Injunctive relief is necessary to

protect EchoMail's technology from improper use and dissemination by the defendants.

2.    In addition to its request for injunctive relief, EchoMail brings this complaint for misappropriation of trade secrets, unfair competition, unfair and deceptive acts and practices, breach of contract, breach of the covenant of good faith and fair dealing, and intentional interference with contractual relations.

## Parties and Jurisdiction

3.    Plaintiff EchoMail is incorporated in the State of Delaware, and maintains its headquarters and principal place of business at 701 Concord Avenue, Cambridge, Massachusetts. EchoMail is a leading provider of electronic mail management services, software and hardware.

4.    Defendant American Express Company is incorporated in the State of New York, and maintains its principal place of business at 200 Vesey Street, New York, New York. AmEx is a world-wide, financial services company doing business in Massachusetts, and is subject to the jurisdiction of this Court under the Massachusetts Long-Arm Statute, G.L. c. 223A, §3.

5.    Defendant IBM Corporation is incorporated in the State of New York, and maintains its principal place of business at 1 Orchard Road, Armonk, New York. IBM is a world-wide, information technology company which does business in

Massachusetts, and is subject to the jurisdiction of this Court
under the Massachusetts Long-Arm Statute, G.L. c. 223A, §3.

### Facts

#### The Development of EchoMail and Its
#### Confidential and Proprietary Technology

6.    V. A. Shiva Ayyadurai ("Shiva"), who has verified this
Complaint, is the principal inventor of the technology
underlying EchoMail's proprietary email management, storage and
web-based technology.

7.    In 1977, when he was 14 years old, Shiva obtained
copyrights for the first email system.  For his groundbreaking
work in the email technology field, Shiva was honored by the
Westinghouse Science Awards Committee for meritorious work in
scientific research which supported his entrance to the
Massachusetts Institute of Technology ("MIT").  In 1986, Shiva
obtained a bachelor of science in electrical engineering and
computer science from MIT.  In 1989 and 1990, after working in
high-tech for many years, Shiva received dual master's degrees
from the MIT Media Lab and the MIT Department of Mechanical
Engineering.

8.    In 1993, while he was pursuing his Ph.D. at MIT in
artificial intelligence focused on pattern analysis, Shiva
entered a White House sponsored contest focused on finding new
and innovative ways to catalogue emails.  Shiva won that

- 3 -

contest, and the technology he developed and used became the early technological foundation of EchoMail.

9.    EchoMail incorporated and began to operate in 1994 under the name Information Cybernetics, Inc., and later merged with Millennium Productions in 1996 to become General Interactive, Inc., with its leading product being called EchoMail.  In or about 2000, General Interactive renamed itself EchoMail, Inc.  In 1994, A T & T became the first customer to use the EchoMail product.

10.    In its early stages, from 1994 to 1999, EchoMail engaged in pioneering work by hosting web-based email applications in its Cambridge facility.  Shiva also designed and developed applications that extracted and analyzed critical elements from an email so that an accurate response could be formulated.

11.    Until approximately 1998, EchoMail had no more than 7 employees.

### EchoMail Today

12.    EchoMail currently operates in a competitive environment.  It has approximately 18 employees in Cambridge and contracts for additional personnel in India.  EchoMail has approximately 30 customers across an array of industries, including insurance, financial services, consumer packaged goods, retail and non-profits.

- 4 -

13. EchoMail provides its customers with web-based software, hardware and services for email and electronic communications management, including, but not limited to, inbound email management, outbound email management and email storage. With respect to incoming email, EchoMail's proprietary web-based software technology collects and stores incoming email for EchoMail's customers; analyzes the emails for "attitude," "requests," "issues," "products" and "customer type"; proposes a response based on the analysis; and routes the email to a web-based platform where it can be viewed and worked on by the customer's support personnel before a response is sent to the customer.

14. EchoMail's products are widely recognized as the industry leaders, and EchoMail has received accolades and awards for its products and services.

15. EchoMail is in the final stages of developing version 8.1 of its product, an integrated email solution suite designed to provide its three core services (inbound, outbound and storage) to its customers in one integrated web-based application.

16. Shiva serves as EchoMail's Chairman and CEO. Mathew "Sonu" Abraham serves as EchoMail's President and runs its day-to-day operations, including personnel and customer support.

- 5 -

### EchoMail's Relationship With AmEx

17.  In 1998, AmEx was faced with an increasing volume of
email from its customers across its multiple business units.  At
that time, AmEx wanted to contract with one vendor to manage its
incoming email from customers for all of its business units.

18.  AmEx was aware that EchoMail was a leader in the field
of managing electronic communication.  In 1998, AmEx contacted
Shiva and requested that EchoMail respond to AmEx's request for
proposal ("RFP") seeking one vendor to manage its incoming
email.

19.  In July 1999, despite the fact that the competition
included large consulting companies, EchoMail was awarded the
AmEx contract for managed incoming email services.  Exhibit A.

20.  In or about 2000, AmEx sought to invest in EchoMail.
Over the course of EchoMail and AmEx's continuing relationship,
AmEx continued to attempt to invest in EchoMail.  EchoMail
repeatedly refused.

21.  From 1999 to 2004, as a result of successive contract
renewals, EchoMail provided up to 11 AmEx business units with
EchoMail for managed incoming email services.

22.  In 2003, AmEx notified EchoMail that it was going to
institute another RFP process to determine if EchoMail was still
the best provider of managed incoming email services.  EchoMail

- 6 -

invested hundreds of man-hours in participating in this RFP
process and provided its response in or about November 2003.

23.  In or about February 2004, EchoMail won the RFP, and,
thereafter, in August 2004, executed a three-year contract for
services with AmEx running from January 1, 2005 through December
31, 2007.  Exhibit B.  Under that contract, in addition to
providing its web-based software and services, EchoMail also
provided the hardware necessary to manage AmEx's incoming email.
AmEx had previously supplied its own hardware to EchoMail.

24.  EchoMail has invested substantial amounts of capital
in its hardware and software in order to support AmEx.  Much of
that investment was done at no cost to AmEx in reliance on
AmEx's good faith in honoring its contract with EchoMail.

25.  Due to the high level of service EchoMail provided to
AmEx, AmEx referred to EchoMail as one of its "premium partners"
or "true partners."  Since 1998 and continuing though May 2005,
AmEx repeatedly praised EchoMail for its products and service.
By early 2005, EchoMail was successfully processing
approximately 300,000 emails per month for AmEx's business
units.

### EchoMail's Dealings With IBM

26.  IBM recognizes EchoMail as an industry leader in
hosted, web-based email management software and services.  Since
in or about 1996, IBM has sought to learn EchoMail's

- 7 -

confidential and proprietary technology related to hosted, web-based email management software and services. EchoMail has repeatedly refused to provide IBM access to confidential and proprietary technology related to EchoMail's hosted, web-based email management software and services.

27. In or about 1996, IBM approached EchoMail seeking to host EchoMail's applications at IBM's facilities so IBM could "resell" EchoMail to other customers. EchoMail refused to allow IBM to host EchoMail's applications, since EchoMail was capable of providing the service itself.

28. In or about 2000, IBM approached EchoMail seeking to invest in EchoMail. EchoMail again refused.

29. In or about 2002, IBM approached EchoMail seeking a partnership in which IBM would gain access to EchoMail's confidential and proprietary outbound email marketing technology and code. EchoMail refused to give IBM access to its confidential and proprietary technology.

30. In or about 2004, IBM approached EchoMail seeking to "host," or provide the hardware necessary, to run EchoMail's web-based, "on demand" software applications. EchoMail, which designed, built and developed its own hardware facility, again refused, since EchoMail already offered its technology in a hosted web-based model.

- 8 -

### AmEx Breaches its Contract
### with EchoMail and Misappropriates
### EchoMail's Technology with IBM

31.   Despite their longstanding relationship and recent execution of the 3 year contract, AmEx breached the contract with EchoMail by canceling it in violation of its terms, and deceptively gaining access to, and permitting IBM to gain access to, EchoMail's confidential and proprietary technology.

32.   In December, 2004, after execution of its contract with EchoMail, AmEx replaced several of its key managers for electronic communication and customer support.

33.   In or about September 2004, AmEx relocated from Tampa, Florida to Gurgaon, India one of its electronic customer support centers, or "call centers." This required that AmEx's personnel in India use and operate the EchoMail system. AmEx refused EchoMail's offer to assist in coordinating part of the move and training the new personnel. AmEx then failed to properly train and supervise its personnel in India and failed to properly store, retain and process its email using EchoMail.

34.   Reena Paniker was a newly assigned AmEx employee in early 2005, responsible for coordinating the AmEx call center relocation to India, including the use of EchoMail. Paniker was insufficiently familiar with EchoMail. Paniker failed to properly educate and train herself and her employees on the proper use of EchoMail's products and services.

- 9 -

35.  On or about April 4, 2005, after AmEx's mismanagement
of the relocation and misuse of EchoMail's product, AmEx finally
requested that EchoMail provide personnel in Gurgaon, India to
identify and solve the problems AmEx had created at its call
center.  That very day, EchoMail sent one of its key employees
to India to assist AmEx.  AmEx's misuse of EchoMail through
untrained employees had created a backlog of unprocessed email,
causing the system to slow.  AmEx's processing rate was 300%
slower than that of the typical EchoMail customer because AmEx
had refused the necessary training and assistance from EchoMail.
From April 4 to 7, 2005, EchoMail's staff worked to rectify the
problems at the call center in Gurgaon, India.

36.  In or about mid-April 2005, AmEx began a new RFP
process starting with a Request for Information ("the new RFP
process") for the same scope of services that AmEx had already
contracted for with EchoMail.  EchoMail received the RFI only
two days before its response was due.  Greg Daniels, an AmEx
business manager who was newly assigned to manage AmEx's
relationship with EchoMail, never informed EchoMail about the
RFI.

37.  Shiva called Daniels and asked why the new RFP process
was necessary, given EchoMail and AmEx's existing three year
contract commencing in January, 2005.  Daniels falsely claimed
that "it was a formality" which was occurring because AmEx had

- 10' -

"new people" involved and "EchoMail should not worry about it." Shiva told Daniels that EchoMail should not have to participate in the new RFP process because a contract already existed. Nevertheless, EchoMail responded to the RFI.

38.  Shortly thereafter, in late-April, 2005, AmEx confirmed to EchoMail that AmEx wanted to proceed with an "architecture" review of EchoMail's new, proprietary, version 8.1, to which EchoMail's customers would soon upgrade.

39.  In general, an architecture review reveals the confidential and proprietary technology, or "code," contained in hardware and/or software.

40.  AmEx falsely claimed that AmEx's desire for an architecture review was to make sure that the upgrade to version 8.1 was successful, that EchoMail and AmEx were "partners," and that AmEx wanted to help EchoMail succeed in its upgrade to the new version.

41.  Based on Daniels' statements, Shiva reluctantly agreed to the architecture review.  Prior to the review, EchoMail provided AmEx with certain proprietary information in preparation for the review.  On May 4 and 5, 2005, the architecture review occurred.  At least eight employees from AmEx participated in the review, either telephonically or by coming in person to EchoMail's facility in Cambridge.

- 11 -

42. The architecture review exposed to AmEx's employees EchoMail's confidential and proprietary information and technology, or "code," including the process by which EchoMail hosts its web-based, on demand technology.

43. During the review, AmEx technical personnel praised EchoMail's product and service and stated that the review was a success, that EchoMail "did well," and that they were favorably impressed with EchoMail and version 8.1 and the many capabilities EchoMail had to offer beyond just its incoming email management technology that AmEx was then using. AmEx employees stated that they wanted to use additional products and services offered by EchoMail.

44. In fact, AmEx surreptitiously included in the review technical personnel from IBM without disclosing this fact in advance to EchoMail. This violated the terms of the contract between AmEx and EchoMail. In fact, lists of personnel who would be attending the architecture review which were provided by AmEx to EchoMail had not referred to any personnel from IBM. In fact, the presence of IBM personnel would not have been disclosed to EchoMail at all, except that very late in the review process, an IBM employee participating in the review by phone stated that he worked for IBM and that he believed that the information revealed to him "created a conflict."

- 12 -

45. EchoMail would not have allowed the architecture review to occur at all if EchoMail had known that personnel from IBM would be present. Since the time of the review, and despite EchoMail's requests, AmEx has refused to provide any information to EchoMail concerning IBM's participation.

46. On May 25, 2005, approximately three weeks after the architecture review, Daniels called EchoMail and stated that EchoMail "failed" the review, and as a result, the new RFP process would continue without EchoMail. This necessarily meant that AmEx was replacing EchoMail with a new vendor. Shiva questioned Daniels about Daniels' earlier claims that the new RFP process and architecture review were unrelated. Shiva told Daniels that Daniels and AmEx were deceitful and that they had breached the contract.

47. Although Daniels earlier told Shiva that Paniker was not involved in the new RFP process or the architecture review, on May 25, 2005, Daniels stated to Shiva that Paniker was in fact running the new RFP process and the architecture review and that Daniels had ceded all authority over the matter to Paniker.

48. On or about May 26, 2005, in a conference call, Paniker initially denied that she was running the new RFP process. When Abraham confronted her with Daniels' prior statement, Paniker finally admitted that she was in fact running the new RFP process and the architecture review and that they

- 13 -

were in fact related.  Paniker reiterated that AmEx's
relationship with EchoMail was terminated and told EchoMail to
"do what it had to do" and hung up the phone on Abraham.
Thereafter, on May 26, 2005, and only in response to Paniker's
termination of the Contract, Shiva notified AmEx of termination.

49.  In fact, the real reason for AmEx's architecture
review, which AmEx intentionally did not disclose to EchoMail,
was to gain access to all details of EchoMail's confidential and
proprietary technology so that AmEx and IBM could use the
technology after AmEx breached its contract and severed its
relationship with EchoMail.  In addition, AmEx intended to use
the architecture review as a pretext for (a) continuing its RFP
process without EchoMail's participation, and (b) terminating
its contract with EchoMail.

50.  In addition to its other contract and tort damages
(which are considerable), EchoMail currently has invoices based
on the contract of approximately $600,000.

51.  "New Co." is an independent business that was formed
through AmEx's spin-off of two of its business entities serviced
by EchoMail.  "New Co." had selected EchoMail as its managed
email services provider.  At or about the time of its breach of
the agreement with EchoMail, AmEx caused "New Co." to stop doing
business with EchoMail.

- 14 -

EchoMail Has Gone to Great
Lengths to Protect its Confidential
and Proprietary Information

52.  EchoMail's software, hardware, and storage technology,
and web-based hosting process is confidential and proprietary
and is not generally known outside of select EchoMail employees,
or entities in a confidential relationship with EchoMail which
have contractually agreed to safeguard that information.  Over
the course of its existence, EchoMail has spent considerable
time, money and effort on its product development and on its
efforts to protect the confidentiality of its proprietary
technology, as fully set forth above.

53.  As a matter of course, EchoMail enters into non-
disclosure and confidentiality agreements with entities which
may have access, or even limited access, to any portion of
EchoMail's confidential and proprietary technology.  EchoMail
does so with respect to its customers and prospective customers,
vendors and prospective vendors, and its customers' vendors.

54.  Prior to the existence of its contractual relationship
for services with AmEx, a confidentiality agreement between AmEx
and EchoMail protected EchoMail's confidential and proprietary
technology.  The services contract between AmEx and EchoMail
also protects EchoMail's confidential and proprietary
technology.  In addition, AmEx's other vendors, which are
exposed to EchoMail's confidential and proprietary technology,

- 15 -

are required by EchoMail to execute nondisclosure and/or
confidentiality agreements.

    55.  EchoMail's employees are required to execute
agreements which further protect EchoMail's confidential and
proprietary information.  Even among its own employees, EchoMail
limits disclosure of its confidential and proprietary
technology.

    56.  In addition to these steps, EchoMail has protected its
confidential and proprietary technology by obtaining patents.
On December 23, 2003, EchoMail obtained a patent protecting its
overall process for managing email.  On April 6, 2004, EchoMail
obtained two patents protecting (a) its technology used to
analyze emails, and (b) its technology used to construct a
response to a customer's email.

<u>AmEx's Relationship With IBM</u>

    57.  Upon information and belief, AmEx and IBM have entered
into a multi-billion dollar contract under which IBM provides
AmEx with computer hardware, software and services.  As part of
that contract, IBM commercializes AmEx business processes
through the use of AmEx's internal technology or vendor
technology.

    58.  Upon information and belief, the information obtained
by AmEx and IBM during the EchoMail architecture review will be
used to unfairly compete against EchoMail in a number of ways,

- 16 -

including though its unauthorized use by IBM and AmEx directly
or its resale to IBM customers.

59.   Injunctive relief is necessary to prevent IBM and AmEx
from using or disseminating EchoMail's technology, or otherwise
unfairly competing with EchoMail.

<u>Claims</u>

Count I
Misappropriation of Trade
Secrets in Violation of
<u>Mass. G.L. c. 93, §42 and New York Law</u>
(Against Both Defendants)

60.   EchoMail incorporates, as if fully set forth herein,
the allegations contained in paragraphs 1 through 59.

61.   IBM and AmEx, through the conduct described above,
misappropriated, with the intent to convert to their own use,
EchoMail's confidential and proprietary technology.

62.   IBM and AmEx have no rightful claim of interest in
EchoMail's confidential and proprietary technology.

63.   The actions of IBM and AmEx are causing irreparable
harm to EchoMail which is not compensable through money damages.

64.   EchoMail has a substantial likelihood of success on
the merits of its claims.

65.   Through injunctive relief, no harm will accrue to IBM
and AmEx as they have no rightful claim to EchoMail's
confidential and proprietary technology.

- 17 -

66.  IBM and AmEx's actions have damaged EchoMail.  IBM and AmEx are liable in tort to EchoMail, including double damages.

Count II
Unfair Competition
(Against Both Defendants)

67.  EchoMail incorporates, as if fully set forth herein, the allegations contained in paragraphs 1 through 59.

68.  As set forth above, IBM and AmEx have engaged in unfair competition.

69.  Such unfair competition has caused and will continue to cause damage to EchoMail.

Count III
Unfair and Deceptive
Acts and Practices in
Violation of G.L. c. 93A, §11
(Against Both Defendants)

70.  EchoMail incorporates, as if fully set forth herein, the allegations contained in paragraphs 1 through 59.

71.  As set forth above, the actions of IBM and AmEx, which occurred primarily and substantially in Massachusetts, constitute unfair and deceptive acts and practices unrelated to the contract at issue in this matter.

72.  As a result of the unfair and deceptive acts and practices engaged in by IBM and AmEx, EchoMail has suffered damages and is entitled to recover treble damages, costs and attorneys' fees.

- 18 -

Count IV
Breach of Contract
(Against AmEx)

73. EchoMail incorporates, as if fully set forth herein, the allegations contained in paragraphs 1 through 59.

74. EchoMail performed under the contract. By its actions, as set forth above, AmEx has materially breached its contract with EchoMail.

75. Through AmEx's breach EchoMail has been harmed and will continue to be harmed.

Count V
Breach of the Covenant of Good Faith
and Fair Dealing
(Against AmEx)

76. EchoMail incorporates, as if fully set forth herein, the allegations contained in paragraphs 1 through 59.

77. By its actions, as set forth above, AmEx breached the covenant of good faith and fair dealing that was incorporated into its contract with EchoMail.

78. AmEx's breach has caused damage to EchoMail.

Count VI
Interference with Contractual Relations
(Against AmEx)

79. EchoMail incorporates, as if fully set forth herein, the allegations contained in paragraphs 1 through 59.

80. AmEx was aware of the contractual and/or business relationship between New Co. and EchoMail.

- 19 -

81.  By its actions as set forth above, AmEx interfered, through the use of improper means and motives, with EchoMail's relationship with New Co.

82.  AmEx's interference has caused damage to EchoMail.

WHEREFORE, EchoMail seeks the following remedies and relief against the defendants American Express Company and IBM:

(a)  injunctive relief as set forth in EchoMail's motion for injunctive relief filed herewith;

(b)  judgment on counts I through VI;

(c)  damages, including multiple damages, in an amount to be determined at trial;

(d)  costs and reasonable attorneys' fees; and

(e)  such other relief as this Court deems just and proper.

PLAINTIFF ECHOMAIL HEREBY RESPECTFULLY DEMANDS A TRIAL BY JURY FOR ALL COUNTS SO TRIABLE.

Respectfully submitted,

ECHOMAIL, INC.,

By its attorneys,

Alan D. Rose (BBO#42280)
Alan D. Rose, Jr. (BBO#628871)
ROSE & ASSOCIATES
29 Commonwealth Avenue
Boston, Massachusetts 02116
617-536-0040

June 20, 2005

*Summons and order of notice issued.*

I HEREBY ATTEST AND CERTIFY ON
JUNE 24, 2005, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY
ASSISTANT CLERK.

- 20 -

## VERIFICATION

I, V. A. Shiva Ayyadurai, Chairman and CEO of EchoMail, Inc., hereby verify that I have reviewed the facts set forth in this complaint, and that the facts set forth herein are true and correct to the best of my knowledge and belief.

V. A. Shiva Ayyadurai
Chairman and CEO,
EchoMail, Inc.

June 20, 2005

- 21 -

# TAB B

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                          SUPERIOR COURT
                                      CIVIL ACTION NO.        -BLS

```
_____
ECHOMAIL, INC.,          )
                         )
          Plaintiff,     )
                         )
v.                       )
                         )
AMERICAN EXPRESS CO.     )
and IBM CORP.,           )
                         )
          Defendants.    )
_____)
```

<u>AFFIDAVIT OF V.A. SHIVA AYYADURAI</u>

I, V.A. Shiva Ayyadurai, under oath hereby depose and state as follows:

1.   I am the founder, Chairman, and CEO of EchoMail, Inc., of Cambridge, Massachusetts. I have personal knowledge of the facts set forth in this affidavit and I verified the facts set forth in the Verified Complaint in this matter. I make this affidavit to bring before the Court certain true and accurate copies of relevant documents.

2.   In my capacity as Chairman and CEO of EchoMail, I am responsible for the overall direction, strategies, and business of EchoMail. I also closely monitor all of EchoMail's dealings with its customers, particularly major customers. American Express Company ("AmEx") was for many years the company's single largest customer. Therefore, I have had direct, first-hand

knowledge of the company's dealings and relationship with American Express.

3.    On February 3, 2004, AmEx notified EchoMail that EchoMail won the RFI and we would proceed with an amendment to the Master Agreement for the period 2005-2007.  The contract itself is attached to the Verified Complaint as Exhibits A and B.

4.    Attached as Exhibit 1 to this affidavit are emails or correspondence indicating AmEx's satisfaction with EchoMail's work for and with AmEx.

5.    EchoMail has always maintained, and currently maintains, strict control over the use and dissemination of its proprietary technology.  EchoMail has spent thousands of hours and hundreds of thousands of dollars on developing its proprietary technology.  Attached as Exhibit 2 is a copy of EchoMail's proprietary information policy, which is applicable to all EchoMail employees.  We require all EchoMail employees to sign agreements whereby they promise not to engage in unauthorized use or dissemination of information concerning Echomail's proprietary technology.

6.    EchoMail has always required its customers to maintain the confidentiality of EchoMail's confidential or proprietary information.  AmEx is subject to such restrictions contained in

- 2 -

the confidentiality provision of the contract (Verified

Complaint, Exhibit A, p. 7).  In addition, attached as Exhibit 3

are copies of non-disclosure and confidentiality agreements

applicable to AmEx's vendors working with EchoMail's technology.

     7.   Before the architecture review meeting with personnel

from American Express on May 4-5, 2005, EchoMail required that

American Express provide EchoMail, in advance, with a list of

all attendees at this telephone conference call.  American

Express provided such a list.  The list is attached to this

affidavit as Exhibit 4.  The list does not identify anyone from

IBM as participating in the review.  If the list of attendees

had identified someone from IBM as participating on the call, we

would have required IBM to sign a non-disclosure or

confidentiality agreement with EchoMail before its employee

could participate in the call, or, if IBM were unwilling to do

this, we would have told the personnel from IBM that they could

not participate in the call.  Under its agreement with EchoMail,

American Express was not permitted to allow employees of third

parties to have access to EchoMail's proprietary technology.

     8.   In the May 4-5 architecture review, American Express

asked for, and we revealed, our most prized technology,

including our computer code, to the group on the call.  When we

did so, we assumed the accuracy of the list of attendees and we

had no knowledge, and no reason to know, that a person from IBM was on the telephone conference call.

9.   IBM has made many approaches to EchoMail over the past 9 years. For example, IBM approached EchoMail and indicated that it wanted to become a partner of EchoMail and be a "reseller" of Echomail's system. We declined to enter into such a relationship because it would mean revealing our code to IBM. One of the reasons I did not want to enter into a relationship with IBM is that I believed that they were already working with Kana, Inc., one of EchoMail's direct competitors.

10.  Based on the above approaches, it became clear to us that IBM wanted to learn our proprietary technology, which would enable IBM to compete against EchoMail. Therefore, we would not have conducted the architecture review if we had known that an IBM employee was on the call. Furthermore, if AmEx had told us in advance that an IBM employee would be on the call, we would have questioned AmEx's stated purpose in conducting the architecture review.

11.  As a result of IBM's surreptitious participation in the telephone conference call, IBM and AmEx now know EchoMail's proprietary and confidential technology, including its "code," concerning its web-based, on demand electronic communication management process. Armed with this information they have the

- 4 -

knowledge and ability to copy our product and compete with us in the marketplace.

12. I believe that AmEx and IBM are engaged in plans to compete with EchoMail. The basis for my belief is the history of EchoMail's relationship with AmEx and IBM, the way in which AmEx surreptitiously included IBM in the architecture review, AmEx's sudden termination of EchoMail's contract with AmEx shortly after the call, and AmEx and IBM's cooperation in developing and making business practices software and applications.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 20th DAY OF JUNE 2005.

V. A. Shiva Ayyadurai

- 5 -

# TAB C

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ECHOMAIL, INC.,<br><br>                                 Plaintiff,<br><br>       vs.<br><br>AMERICAN EXPRESS, CO. and<br>INTERNATIONAL BUSINESS MACHINES,<br>CORP.,<br><br>                             Defendants. | Civil Action No. 05-11318-NMG<br><br>ANSWER TO COMPLAINT |

Defendant International Business Machines, Corp. ("IBM"), by its undersigned attorneys for its Answer to the Complaint of EchoMail, Inc. ("EchoMail") herein, on personal knowledge as to its own actions and upon information and belief as to the actions of others, states as follows:

## INTRODUCTION

1.      Denies the averments of paragraph 1.

2.      Denies the averments of paragraph 2, except admits that EchoMail purports to bring a complaint for misappropriation of trade secrets, unfair competition, unfair and deceptive acts and practices, breach of contract, breach of the covenant of good faith and fair dealing, and intentional interference with contractual relations.

## PARTIES AND JURISDICTION

3.      IBM admits that EchoMail, a Delaware Corporation with its headquarters in Cambridge, Massachusetts is a provider of electronic mail management services, software and hardware.

4.    IBM admits that Defendant American Express is a New York Corporation with its principal place of business in New York City and is engaged in the financial services business. IBM further states that it is lacking information sufficient to form a belief as to the truth of the remainder of the averments of paragraph 4.

5.    IBM admits that IBM is a New York Corporation with its principal place of business in Armonk, New York and is a world wide information technology corporation. The remainders of the averments of paragraph 5 are legal conclusions for which no response is required.

## FACTS

6.    States that it is lacking information sufficient to form a belief as to the truth of the averments of paragraph 6.

7.    States that it is lacking information sufficient to form a belief as to the truth of the averments of paragraph 7.

8.    States that it is lacking information sufficient to form a belief as to the truth of the averments of paragraph 8.

9.    States that it is lacking information sufficient to form a belief as to the truth of the averments of paragraph 9.

10.    States that it is lacking information sufficient to form a belief as to the truth of the averments of paragraph 10.

11.    States that it is lacking information sufficient to form a belief as to the truth of the averments of paragraph 11.

12.    States that it is lacking information sufficient to form a belief as to the truth of the averments of paragraph 12.

2

13.    Denies the averments of paragraph 13, except admits that EchoMail provides software and hardware services relating to email management to its customers.

14.    States that it is lacking information sufficient to form a belief as to the truth of the averments of paragraph 14.

15.    States that it is lacking information sufficient to form a belief as to the truth of the averments of paragraph 15.

16.    States that it is lacking information sufficient to form a belief as to the truth of the averments of paragraph 16.

17.    States that it is lacking information sufficient to form a belief as to the truth of the averments of paragraph 17.

18.    States that it is lacking information sufficient to form a belief as to the truth of the averments of paragraph 18.

19.    States that it is lacking information sufficient to form a belief as to the truth of the averments of paragraph 19.

20.    States that it is lacking information sufficient to form a belief as to the truth of the averments of paragraph 20.

21.    States that it is lacking information sufficient to form a belief as to the truth of the averments of paragraph 21.

22.    States that it is lacking information sufficient to form a belief as to the truth of the averments of paragraph 22.

23.    States that it is lacking information sufficient to form a belief as to the truth of the averments of paragraph 23.

3

24.    States that it is lacking information sufficient to form a belief as to the truth of the averments of paragraph 24.

25.    States that it is lacking information sufficient to form a belief as to the truth of the averments of paragraph 25.

26.    Denies the averments of paragraph 26.

27.    At this time, despite a diligent inquiry, IBM is unable to admit or deny the averments of paragraph 27.

28.    At this time, despite a diligent inquiry, IBM is unable to admit or deny the averments of paragraph 28.

29.    IBM denies the averments of paragraph 29, except admits that EchoMail and IBM entered into a "Confidential Disclosure Agreement" ("CDA") in April 2002, attached along with supplements hereto as Exhibit A.  Pursuant to a Supplement for Disclosure to that CDA, IBM, at EchoMail's request, was given access to the source code and documentation for EchoMail Direct for the purpose of evaluating the cost of having IBM convert that software to a JAVA based application.  Following IBM's evaluation of the EchoMail source code, IBM made a proposal to perform the conversion work requested by EchoMail.  At that time, EchoMail declined to proceed with the project.  Following that decision by EchoMail, IBM destroyed the copies of the EchoMail source code and documentation it had been given by EchoMail.

30.    At this time, despite a diligent inquiry, IBM is unable to admit or deny the averments of paragraph 30.

31.    Denies the averments of paragraph 31.

4

32.    States that it is lacking information sufficient to form a belief as to the truth of the averments of paragraph 32.

33.    States that it is lacking information sufficient to form a belief as to the truth of the averments of paragraph 33.

34.    States that it is lacking information sufficient to form a belief as to the truth of the averments of paragraph 34.

35.    States that it is lacking information sufficient to form a belief as to the truth of the averments of paragraph 35.

36.    States that it is lacking information sufficient to form a belief as to the truth of the averments of paragraph 36.

37.    States that it is lacking information sufficient to form a belief as to the truth of the averments of paragraph 37.

38.    States that it is lacking information sufficient to form a belief as to the truth of the averments of paragraph 38.

39.    Denies the averments of paragraph 39.

40.    States that it is lacking information sufficient to form a belief as to the truth of the averments of paragraph 40.

41.    States that it is lacking information sufficient to form a belief as to the truth of the averments of paragraph 41, except admits an architecture review occurred on May 4 and 5, 2005.

42.    Denies the averments of paragraph 42.

43.    States that it is lacking information sufficient to form a belief as to the truth of the averments of paragraph 43.

[[NYLIT:2335548v2:4144D:07/11/05--05:05 p]]

44.    States that it is lacking information sufficient to form a belief as to the truth of the averments of paragraph 44, except states that the participation of IBM personnel in the technical review was announced to EchoMail by Stephen Gibbons, an IBM employee. Following that announcement, the technical review continued with Mr. Gibbon's participation. EchoMail voiced no objection to IBM being on the call and did not seek to designate the subject matter of the call as confidential under the CDA between IBM and EchoMail.

45.    Denies the allegations of paragraph 45.

46.    States that it is lacking information sufficient to form a belief as to the truth of the averments of paragraph 46.

47.    States that it is lacking information sufficient to form a belief as to the truth of the averments of paragraph 47.

48.    States that it is lacking information sufficient to form a belief as to the truth of the averments of paragraph 48.

49.    Denies the averments of paragraph 49.

50.    Denies averments of paragraph 50, except lacks information sufficient to form a belief regarding EchoMail's invoices.

51.    States that it is lacking information sufficient to form a belief as to the truth of the averments of paragraph 51.

52.    Denies the averments of paragraph 52.

53.    States that it is lacking information sufficient to form a belief as to the truth of the averments of paragraph 53, except admits EchoMail has entered into a

[[NYLIT:2335548v2:4144D:07/11/05--05:05 p]]

1

"Confidential Disclosure Agreement" with IBM, attached along with supplements hereto as Exhibit A.

54.    Denies the averments of paragraph 54, except admits AmEx and EchoMail entered into a confidentiality agreement.

55.    States that it is lacking information sufficient to form a belief as to the truth of the averments of paragraph 55.

56.    Denies the averments of paragraph 56, except admits EchoMail has obtained patents on December 23, 2003 and April 6, 2004.

57.    Admits that IBM and American Express have entered into an outsourcing contract pursuant to which IBM provides certain products and services and denies the remainder of the averments of paragraph 57.

58.    Denies the averments of paragraph 58.

59.    Denies the averments of paragraph 59.

## CLAIMS

## COUNT I

### Misappropriation of Trade Secrets in Violation of
### Mass. G.L. c. 93, § 42 and New York Law
(Against Both Defendants)

60.    Includes its responses to paragraphs 1 through 59.

61.    Denies the averments of paragraph 61.

62.    Denies the averments of paragraph 62.

63.    Denies the averments of paragraph 63.

64.    Denies the averments of paragraph 64.

65.    Denies the averments of paragraph 65.

7

66.    Denies the averments of paragraph 66.

## COUNT II

### Unfair Competition
**(Against Both Defendants)**

67.    Includes its responses to paragraphs 1 through 59.

68.    Denies the averments of paragraph 68.

69.    Denies the averments of paragraph 69.

## COUNT III

### Unfair and Deceptive Practices in Violation of G.L. c. 93A, § 11
**(Against Both Defendants)**

70.    Includes its responses to paragraphs 1 through 59.

71.    Denies the averments of paragraph 71.

72.    Denies the averments of paragraph 72.

## COUNT IV

### Breach of Contract
**(Against AmEx)**

73.    States no response required as paragraph 73 is not asserted against

IBM.

74.    States no response required as paragraph 74 is not asserted against

IBM.

75.    States no response required as paragraph 75 is not asserted against

IBM.

## COUNT V

### Breach of Covenant of Good Faith and Fair Dealing
**(Against AmEx)**

76.   States no response required as paragraph 76 is not asserted against

IBM.

77.   States no response required as paragraph 77 is not asserted against

IBM.

78.   States no response required as paragraph 78 is not asserted against

IBM.

## COUNT VI

### Interference with Contractual Relations
### (Against AmEx)

79.   States no response required as paragraph 79 is not asserted against

IBM.

80.   States no response required as paragraph 80 is not asserted against

IBM.

81.   States no response required as paragraph 81 is not asserted against

IBM.

82.   States no response required as paragraph 82 is not asserted against

IBM.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

83.   Plaintiff fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

84.   Plaintiff's claims are barred because IBM has not engaged in any

unlawful or unfair acts or practices.

9

### Third Affirmative Defense

85.    Plaintiff's claims are barred because they are based on ideas, processes, facts, information and/or materials that are not protected trade secrets.

### Fourth Affirmative Defense

86.    Plaintiff has suffered no injury, no injury-in-fact, no damages and/or is not entitled to the relief it seeks.

### Fifth Affirmative Defense

87.    Plaintiff's claims are barred because IBM has not used the allegedly disclosed information.

### Sixth Affirmative Defense

88.    Plaintiff's claims are barred by the doctrine of laches, waiver and estoppel.

### Seventh Affirmative Defense

89.    Plaintiff's claims are barred by the doctrine of unclean hands.

### Eighth Affirmative Defense

90.    Plaintiff's claims are barred by the doctrine of estoppel.

### Ninth Affirmative Defense

91.    Plaintiff's claims are barred by the contractual rights provisions agreed to by the parties in their Confidential Disclosure Agreement, dated April 10, 2002.

### Tenth Affirmative Defense

92.    Plaintiff's claims under Mass. G.L. c 93A § 11 (Count III) are barred to the extent they did not take place in Massachusetts.

IBM CORPORATION,

10

By its attorneys,


 /s/ Stephen D. Poss
Stephen D. Poss, P.C. (BBO # 551760)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA  02109
(617) 570-1000

and

Rowan D. Wilson, Esq.
Thomas G. Rafferty, Esq.
(both admitted *pro hac vice*)
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY  10019-7475
(212) 474-1000

Dated:  July 11, 2005

[[NYLIT:2335548v2:4144D:07/11/05--05:05 p]]

**EXHIBIT A**

EchoMail Inc;                    617 354 6699;          Apr-11-02 12:26PM;        Page 3/3

## CONFIDENTIAL DISCLOSURE AGREEMENT                    Agreement # TORM2046

This Agreement will provide protection for information to be exchanged between us which we do not wish to become public ("information") while maximizing our ability to conduct our respective business activities. Each of us agrees that the following terms will apply when one of us or its Affiliate ("Discloser") discloses information to the other or its Affiliate ("Recipient") under this Agreement. "Affiliate" means entities that control, are controlled by, or are under common control with a party to this Agreement.

**1.0 DISCLOSURE:** Each time Discloser wishes to disclose specific information to Recipient, or wishes to engage in multiple disclosures relating to a specific subject matter, Discloser will issue a supplement to this Agreement ("Supplement") before disclosure. The Supplement will contain initial and final disclosure dates, a non-registered description of the information to be disclosed and any addendum of different terms and conditions. That Supplement must be signed by the Discloser and the Recipient. Information may be disclosed by: (i) presentations; (ii) delivery; (iii) authorized access, such as to a data base; or (iv) any other express means. Information must be identified as confidential only or in writing at the time of disclosure, and all materials containing information must have a restrictive marking. The Discloser will not disclose any information not described in a signed Supplement or which Discloser does not have the right to disclose to the Recipient. For two (2) years after the date of disclosure, the Recipient will use the same care and discretion to avoid disclosure of the Discloser's information as the Recipient uses with its own similar information which it does not wish to disclose. Subject to this obligation, the Recipient may use Discloser's information for any purpose.

**2.0 EXCEPTIONS:** The Recipient may disclose Discloser's information to: (i) its employees and contractors, and employees and contractors of an Affiliate, who have a need to know; and (ii) any other party with the Discloser's prior written consent. Upon request of the Recipient, the Discloser may enable disclosures directly to such parties on behalf of the Recipient. Prior to any such disclosure or such request by Recipient, the Recipient must have an appropriate agreement with any such party sufficient to require the party to treat information in accordance with this Agreement. The Recipient may disclose information to the extent required by law, but must give the Discloser reasonable prior notice to allow the Discloser a reasonable opportunity to obtain a protective order. Notwithstanding the foregoing, no obligation will apply to information that is: (i) already rightfully in the Recipient's possession or rightfully received by the Recipient without a nondisclosure obligation; (ii) developed independently by the Recipient; (iii) publicly available when received, or thereafter becomes publicly available through no fault of the Recipient; (iv) disclosed by the Discloser without a similar disclosure; (v) required to be disclosed as required by Section 1; or (v) disclosed by Discloser to a third party without a nondisclosure obligation. No such disclosure of ideas, concepts, know-how or techniques contained in Discloser's information by Recipient in the course, discloses, or marketing of any product or service shall not be deemed to be in violation of Recipient's obligations under Section 1 above.

**3.0 DISCLAIMER:** The DISCLOSER PROVIDES INFORMATION SOLELY ON AN "AS IS" BASIS. Neither this Agreement, nor any disclosure of information hereunder, in any way: (i) grants to either of us or our Affiliates any right or license under any copyright, patent, mask work or trademark now or hereafter owned or controlled by the other; (ii) obligates either of us or our Affiliates to disclose or receive any information, perform any work, enter into any license, business engagement or other agreement; (iii) limits either of us or our Affiliates from developing, manufacturing or marketing products or services which may be competitive with those of the other; (iv) limits either of us or our Affiliates from entering into any business relationship with any other party; (v) creates any joint venture or similar officer of us or our Affiliates to act or speak on behalf of the other; or (vi) limits either of us or our Affiliates from entering into any business relationship with any other parties.

**4.0 GENERAL:** Neither of us may assign or otherwise transfer its rights or delegate its duties or obligations under this Agreement without the prior written consent of the other. Any attempt to do so will be void. The Recipient must comply with all applicable Government export and import laws and regulations. Only a written agreement signed by both of us can modify this Agreement. Either party may terminate this Agreement by providing one month's written notice to the other. Any provisions of this Agreement which by their nature extend beyond the termination remain in effect until fulfilled and apply to our respective successors and authorized assigns. If there is a conflict between the terms of this Agreement and a Supplement, those of the Supplement will prevail for that disclosure. This Agreement is governed by the laws of the country in which the disclosure occurs, except: (i) in Australia, the Agreement is governed by the laws of the State or Territory in which the disclosure occurs; (ii) in the United Kingdom, this Agreement is governed by the laws of England; (iii) in Bulgaria, Croatia, Czech Republic, Hungary, Poland, Romania, Slovakia and Slovenia (collectively, "Central Europe"), this Agreement will be governed by the laws of Austria; (iv) in Estonia, Latvia, and Lithuania, Russia's law will apply; (v) in Canada, the laws of the Province of Ontario govern this Agreement; and (vi) in the United States (including if any part of the disclosure is performed within the United States or if the information is of United States origin) and Puerto Rico, and People's Republic of China, the laws of the State of New York govern this Agreement. Each party hereby agrees to waive its rights to a jury trial.

This Agreement and its Supplements are the complete and exclusive agreement regarding our disclosures of information, and replace any prior oral or written communications between us. By signing below for our respective enterprises, each of us agrees to the terms of this Agreement. Once signed, any reproduction of this Agreement made by reliable means (for example, photocopy or facsimile) is considered an original.

ACCEPTED AND AGREED TO:                              ACCEPTED AND AGREED TO:

**IBM Canada Ltd.**                                  **EchoMail, Inc.**
1200 Warden Avenue, Markham, Ontario, Canada L6G 1C7  44 Church Street, Cambridge, MA, USA 02138

Signature: _(signature)_                             Signature: _(signature)_

Printed Name: __R. FULLER__                          Printed: __V. A. SHIVA AYYADURAI__

Title: __CONTRACT ADMINISTRATOR__                    Title: __PRESIDENT / CEO__

Date: __April 11, 2002__                             Date: __APRIL 11, 2002__

EchoMail_CDA_2002-04-10.fm

EchoMail, Inc;          617 354 8609;          Apr-11-02 12:28PM;          Page 2/3

## SUPPLEMENT FOR DISCLOSURE  # PF1

With respect to the Information identified below, the terms and conditions in Confidential Disclosure Agreement # TOR02046 ("referenced Agreement", as modified by any terms and conditions identified below, will apply to disclosures hereunder:

Disclosure   Yes   IBM         Yes   You

Initial disclosure date:   April 11, 2002         Final disclosure date:   July 30, 2002

IBM's Point of Contact:   Vinay Mayoni         905-413-4037         vmayoni@ca.ibm.com
                          Name               Telephone #         e-mail

Your Point of Contact:    Alisha Simmons      617-354-8585 x 245   alisha.simmons@echomail.com
                          Name               Telephone #         e-mail

Non-conditional descriptions of Information to be disclosed:

By IBM:  Business plans and architectural overview of an unannounced IBM WebSphere product

By EchoMail: Business plans and application software that may be hosted using an unannounced IBM product

Additional or different terms and conditions (if any):

The final sentence of section 2.0 in the referenced Agreement shall not apply to IBM's Information disclosed under this Supplement; accordingly there is no exception for inherent disclosure of IBM's Information.

This Supplement and the referenced Agreement are the complete and exclusive Agreement regarding disclosures hereunder.

ACCEPTED AND AGREED TO:                    ACCEPTED AND AGREED TO:
IBM Canada Ltd.                            EchoMail, Inc.
3300 Warden Avenue, Markham, Ontario, Canada L6G 1C7   66 Church Street, Cambridge, MA, USA 02138

Signature:                                 Signature:

Printed Name:   R. MILLER                  Name:   V. A. SHIVA AYYADURAI

Title:   Contract Administrator            Title:   PRESIDENT / CEO

Date:    APRIL 10, 2002                    Date:   APRIL 11, 2002


EchoMail_CDA_2002-04-10a.wp

JUL 23 '02 15:23 FR                    9195431119 TO 91   3548899      P.02/04

### Confidential Disclosure Agreement
Supplement for Disclosure

Referenced Agreement (CDA) # 4982887-G
Old Contract # TOR6246
Supplement to CDA 4982887-G44

With respect to the Information identified below, the terms and conditions in the referenced Agreement, as modified by any terms and conditions identified below, will apply to disclosures hereunder:

Discloser: _____ IBM   X   EchoMail, Inc

Initial disclosure date:   The Execution Date by the Last Party

Final disclosure date:   12/31/2002

IBM Point of Contact:   Tony Finch        919-303-7195      tonyfinch@us.ibm.com
                        Name              Telephone #       e-mail

EchoMail Point of Contact:  Hariharan Subramanian  617-354-8585   hari@echomail.com
                            Name                   Telephone #    e-mail

Non-confidential description of Information to be disclosed:

EchoMail may disclose Information regarding EchoMail Direct (EMD) application e.g., uses, terms, architecture diagrams, source code, technical information, future product plans, and documentation.

Additional or different terms and conditions (if any):

None.

This Supplement and the referenced agreement are the complete and exclusive Agreement regarding disclosures hereunder.

ACCEPTED AND AGREED TO:                ACCEPTED AND AGREED TO:
IBM                                    EchoMail, Inc.
By: _____ 23 July 2002         By: _____ July 28, 2002
Signature          Date               Signature          Date
Kimble McEachern                       SHIVA AYYADURAI
Printed Name                          Printed Name
Global Customer Solution and General Procurement   CEO
Title & Organization                   Title & Organization

Address:                               Address:
3039 Cornwallis Road                   701 Concord Ave.
Research Triangle Park, NC 27709       Cambridge, MA 02138
USA                                    USA

Form Title: Supplement for Disclosure        Form Release 9/00
Form Owner: Global Procurement (procurem@us.ibm.com)    1 of 1    Revision 1.00

**TAB D**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ECHOMAIL, INC.,

            Plaintiff,

     v.

AMERICAN EXPRESS, CO. and
INTERNATIONAL BUSINESS MACHINES,
CORP.,

            Defendants.

Civil Action No. 05-11318-NMG

## JOINT STATEMENT

In response to this Court's Order of June 30, 2005, EchoMail, Inc., American Express

Co., and International Business Machines Corporation ("IBM") hereby submit the following

Joint Statement:

### STATEMENT OF ECHOMAIL, INC.

In response to the Court's June 30, 2005 Order, EchoMail and IBM came to terms on a

Confidential Disclosure Agreement which is attached hereto as Exhibit A.  However, EchoMail

and AmEx were unable to reach agreement.  On Wednesday, July 6, 2005, EchoMail's counsel

submitted to counsel for the defendants a draft Confidentiality and Nondisclosure Agreement.

(Exhibit B).  Neither IBM nor AmEx proposed changes to this draft.  Rather, on Monday, July

11, 2005, AmEx and IBM each submitted a draft agreement for EchoMail's consideration.

AmEx's draft agreement (Exhibit C) is unacceptable to EchoMail because it merely refers back

to the earlier July 9, 1999 agreement and does not contain provisions concerning what

information is confidential (specifically the information provided at the architecture review on

May 4 and 5, 2005), or define how that information is protected from use or disclosure. AmEx was unwilling to consider provisions such as those set forth in paragraphs 1-5 of EchoMail's draft agreement (Exhibit B) which defined the confidential information and protected the information from use or disclosure. EchoMail believes that AmEx's conduct further demonstrates AmEx's intention to use EchoMail's confidential and proprietary information and requires judicial intervention in the form of an injunction. IBM's draft agreement provided the framework for the final agreement (Exhibit A) between IBM and EchoMail.

STATEMENT OF AMERICAN EXPRESS, CO.

The Stand Alone Agreement for Consulting Services between American Express Travel Related Services Company, Inc. ("AXP") and EchoMail, Inc. ("EchoMail") (as amended and supplemented, "Stand Alone Agreement") contains a provision restricting the use of confidential information. Under the Stand Alone Agreement, information is not considered confidential if it is "(i) already known to the receiving party free of any restriction at the time it is obtained from the other party; (ii) subsequently learned from an independent third party free of any restriction and without breach of this Agreement; (iii) is or becomes publicly available through no wrongful act of either party; (iv) is independently developed by one party without reference to any Confidential Information of the other." Despite that language, and in response to the Court's Order dated June 30, 2005 ("Order"), AXP offered to enter into an agreement pursuant to which all information disclosed by EchoMail to AXP during the Technical Due Care Review (the so-called "Architectural Review") on May 4 and 5, 2005, would be considered confidential under the Stand Alone Agreement. A copy of that proposed agreement is attached hereto as Exhibit C.

EchoMail rejected AXP's offer. EchoMail insisted that the agreement include numerous provisions from a proposed agreement that EchoMail circulated previously, including those

- 2 -

addressing the information disclosed at the Review and the use and dissemination of that information. However, AXP offered to consider as confidential under the Stand Alone Agreement <u>all</u> information disclosed at the Review. Moreover, the Stand Alone Agreement already addresses the use and dissemination of confidential information, and thus AXP believes that it is neither appropriate nor necessary to address those areas again.

We understand that EchoMail and IBM have entered into a nondisclosure agreement. Thus, EchoMail now indisputably has agreements in place with both defendants that restrict the disclosure of confidential information. The thrust of EchoMail's preliminary injunction application was that IBM improperly obtained access to confidential information regarding EchoMail. Specifically, the basis of EchoMail's breach of contract claim was its contention that AXP improperly provided IBM with confidential information regarding EchoMail. By entering into an agreement with IBM, any concern that EchoMail may have had has been fully addressed. While EchoMail at the outset fell far short in carrying its burden for a preliminary injunction, in light of its agreements with all defendants, such relief is clearly not warranted at this time. Indeed, in light of EchoMail's decision to enter into an agreement with IBM, the preliminary injunction motion and the underlying claims are effectively moot.

<u>STATEMENT OF IBM</u>

IBM has reached an agreement with EchoMail regarding the non-disclosure of information disclosed at the Architectural Review on May 4 and 5, 2005. Attached hereto as Exhibit A is a copy of the agreement. This agreement renders moot EchoMail's request for a preliminary injunction against IBM and, in IBM's view, also renders its position as a defendant in this action superfluous and unnecessary.

- 3 -

Respectfully submitted,

ECHOMAIL, INC.

By its attorneys,


/s/ Alan D. Rose, Jr.
Alan D. Rose (BBO # 427280)
Alan D. Rose, Jr. (BBO # 628871)
ROSE & ASSOCIATES
29 Commonwealth Avenue
Boston, Massachusetts 02116
(617) 536-0040


AMERICAN EXPRESS COMPANY,

By its attorneys,

/s/ John F. Farraher, Jr.
John F. Farraher, Jr. (BBO # 568194)
GREENBERG TRAURIG, LLP
One International Place
Boston, MA 02110
(617) 310-6000


/s/ Louis Smith
Louis Smith (admitted *pro hac vice*)
GREENBERG TRAURIG, LLP
200 Campus Drive, PO Box 677
Florham, Park, NJ
(973) 360-7915

- 4 -

IBM CORPORATION,

By its attorneys,

/s/ Stephen D. Poss, P.C.
Stephen D. Poss, P.C. (BBO # 551760)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
(617) 570-1000

and

Rowan D. Wilson, Esq.
Thomas G. Rafferty, Esq.
(both admitted *pro hac vice*)
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
(212) 474-1000

Date: July 12, 2005

LIBA/1565408.1

- 5 -

# EXHIBIT A

[Without Prejudice]

## CONFIDENTIAL DISCLOSURE AGREEMENT

This Agreement between International Business Machines Corporation ("Recipient") and EchoMail ("Discloser") is effective as of May 4, 2005 and will provide protection for the information claimed as confidential by EchoMail (the "Information") in EchoMail Inc. v. American Express Company and IBM. Corp., Civ. No. 05-11318, Dist. of Mass. (N.M.G.)(the "Litigation"). Each of us agrees that the following terms will apply to us or our Affiliates with respect to the Information listed in the attached Supplement. "Affiliates" means entities that control, are controlled by, or are under common control with a party to this Agreement. Our mutual objective under this Agreement is to provide protection for confidential information while maintaining our ability to conduct our respective business activities, including IBM's provision of consulting services to AMEX.

1.0   DISCLOSURE:   The Information covered by this Agreement is listed in the Supplement to this Agreement ("Supplement") and includes all information disclosed at the May 4-5, 2005 architecture review. The Supplement contains initial and final disclosure dates, and a non-confidential description of the Information disclosed. The Discloser has not disclosed any Information not described in the Supplement or which Discloser does not have the right to disclose to the Recipient. For three (3) years after the date of disclosure, the Recipient will (i) use the same care and discretion to avoid disclosure of the Discloser's Information as the Recipient uses with its own similar information which it does not wish to disclose; and (ii) use the Discloser's information for the purpose for which it was disclosed or otherwise for the benefit of the Discloser. Subject to this obligation, the Recipient may use Discloser's Information for any purpose.

2.0   EXCEPTIONS:   The Recipient may disclose Discloser's Information to: (i) its employees and Affiliates who have a need to know; and (ii) any other party with the Discloser's prior written consent. Prior to any such disclosure or such request by Recipient, the Recipient must have an appropriate agreement with any such party sufficient to require the party to treat Information in accordance with this Agreement. The Recipient may disclose Information to the extent require by law; but must give the Discloser reasonable prior notice to allow the Discloser a reasonable opportunity to obtain a protective order. Notwithstanding the foregoing, no obligation will apply to Information that is: (i) already rightfully in the Recipient's possession or rightfully received by the Recipient without a nondisclosure obligation; (ii) developed independently by the Recipient; (iii) publicly available when received, or thereafter becomes publicly available through no fault of the Recipient; (iv) disclosed by the Discloser without a signed Supplement as required by Section 1; or (v) disclosed by Discloser to a third party without a nondisclosure obligation.

[NYLIT2336326v1:41.90D:07/12/05-04:14 p]

3.0    DISCLAIMERS:    THE DISCLOSER PROVIDES INFORMATION
SOLELY ON AN 'AS IS' BASIS.  Neither this Agreement, nor any disclosure of
Information hereunder, in any way: (i) grants to either of us or our Affiliates any
right or license under any copyright, patent, mask work or trademark now or
hereafter owned or controlled by the other; (ii) obligates either of us or our
Affiliates to disclose or receive any Information, perform any work, enter into any
license, business engagement or other agreement; (iii) limits either of us or our
Affiliates from developing, manufacturing or marketing products or services
which may be competitive with those of the other; (iv) limits either of us or our
Affiliates from assigning or reassigning its employees in any way; (v) creates any
joint relationship or authorizes either of us or our Affiliates to act or speak on
behalf of the other; or (vi) limits either of us or our Affiliates from entering into
any business relationship with any other parties.

4.0    GENERAL:   Neither party may assign or otherwise transfer its rights or delegate
its duties or obligations under this Agreement without the prior written consent of
the other.  Any attempt to do so will be void.  The Recipient must comply with all
applicable government export and import laws and regulations.  Only a written
agreement signed by both of us can modify this Agreement.  Any provisions of
this Agreement which by their nature extend beyond its termination remain in
effect until fulfilled and apply to our respective successors and authorized assigns.
If there is a conflict between the terms of this Agreement and a Supplement, those
of the Supplement will prevail for that disclosure.  This Agreement is governed by
the laws of the country in which the disclosure occurs, except: (i) in Australia, this
Agreement will be governed by the laws of the State or Territory in which the
disclosure occurs; (ii) in the United Kingdom, this Agreement will be governed
by the laws of England; (iii) in Bulgaria, Croatia, Czech Republic, Hungary,
Poland, Romania, Slovakia and Slovenia (collectively, "Central Europe"), this
Agreement will be governed by the laws of Austria; (iv) in Estonia, Latvia and
Lithuania, Finnish law will apply; (v) in Canada, the laws of the Province of
Ontario govern this Agreement; and (vi) in the United States (including if any part
of the disclosure is performed within the United States or if the information is of
United States origin) and Puerto Rico, and people's Republic of China, the laws
of the State of New York.  Each party hereby agrees to waive its rights to a jury
trial.

This Agreement and its Supplement  do not supercede or replace any other prior
agreements that may exist between the parties and shall not be used, in this or any other
litigation as evidence proving the existence, nonexistence, continuation or termination of
any prior agreement between the parties.  By signing below for our respective clients,
each of us agrees that our clients have agreed to the terms of this

Agreement.  Once signed, any reproduction of this Agreement made by reliable means
(for example, photocopy or facsimile) is considered an original.

**ACCEPTED AND AGREED TO:**
International Business Machines Corp.

by _____

    Name: NARK J. RIMGOS

    Title: ASSOCIATE GENERAL COUNSEL IBM GLOBAL SERVICES

**ACCEPTED AND AGREED TO:**
EchoMail, Inc.

by _____

    Name:

    Title:

It by: MIT MECHANICAL                  0983;              07/12/05  5:00PM;Jetfax  #903;Page 3/4

Agreement.  Once signed, any reproduction of this Agreement made by reliable means
(for example, photocopy or facsimile) is considered an original.

ACCEPTED AND AGREED TO:
International Business Machines Corp.

by _____
     Name:
     Title:

ACCEPTED AND AGREED TO:
EchoMail, Inc.

by _____
     Name: *SHUN* *ANGADURAI*
     Title: *PRESIDENT & CEO*

## SUPPLEMENT FOR DISCLOSURE #PF1

With respect to the information identified below, the terms and conditions of the attached
Confidential Disclosure Agreement will apply to disclosures hereunder:

Discloser:    EchoMail

Initial disclosure date:    May 4, 2005        Final disclosure date: May 5, 2005

Case 1:05-cv-11318-NMG    Document 28-2    Filed 07/12/2005    Page 6 of 13

Non-confidential description of information disclosed:

By EchoMail: Information to the extent disclosed at the May 4-5, 2005 architecture
review to Stephen Gibbons and Todd Seager of IBM's Global Services Division, (or any
other IBM employee who may have participated in that review), including, without
limitation, (i) EchoMail's business model for generating revenue through email business
process management; (ii) EchoMail's long-term business strategy for growth and
expansion; (iii) EchoMail's evaluation of the industry and its competitors;
(iv) EchoMail's process for hiring employees and training its customers; (v) EchoMail's
core technologies and systems architecture; (vi) EchoMail's process flow for managing
in-bound and out-bound email; (vii) EchoMail's security practices for data storage and on
demand hosting; (viii) EchoMail's methods and procedures for hosting and monitoring
on demand services; (ix) EchoMail's operational practices and procedures; and
(x) EchoMail's software development processes and procedures.

# EXHIBIT B

### CONFIDENTIALITY
### AND NONDISCLOSURE AGREEMENT

EchoMail, Inc., on behalf of itself, and its current and former officers, directors, and employees ("EchoMail"), American Express Company, on behalf of itself, and its current and former officers, directors, and employees ("AmEx"), and IBM Corporation, on behalf of itself, and its current and former officers, directors, and employees ("IBM")(collectively, the "parties"), hereby enter into the following agreement effective as of July ___, 2005:

Case 1:05-cv-11318-NMG    Document 28-2    Filed 07/12/2005    Page 8 of 13

WHEREAS, EchoMail and AmEx are parties to an agreement dated July 9, 1999; and

WHEREAS, IBM and AmEx are parties to an agreement for services dated _____; and

WHEREAS, employees of EchoMail, AmEx, and IBM attended or participated in an Architecture Review of EchoMail's products on May 4-5, 2005, which was held telephonically and in person at EchoMail's offices in Cambridge, Massachusetts; and

WHEREAS, AmEx's employees have received information concerning EchoMail; and

WHEREAS, IBM's employees have received information concerning EchoMail in connection with its agreement to provide services to AmEx; and

WHEREAS, the parties to this agreement wish to clarify their respective rights, obligations and responsibilities;

NOW, THEREFORE, the parties hereby agree as follows:

1.     EchoMail provides technology and services in email business process management including, in relevant part, (a) in-bound email management, (b) out-bound email management, and (c) email storage and compliance management.   During the Architecture Review on May 4 and 5, 2005, the following information was disclosed and reviewed:

      (i)     EchoMail's business model for generating revenue through email business process management;

      (ii)     EchoMail's long-term business strategy for growth and expansion;

      (iii)     EchoMail's evaluation of the industry and its competitors;

      (iv)     EchoMail's process for hiring employees and training its customers;

      (v)     EchoMail's core technologies and systems architecture;

      (vi)     EchoMail's process flow for managing in-bound and out-bound email;

(vii)    EchoMail's security practices for data storage and on demand hosting;

(viii)    EchoMail's methods and procedures for hosting and monitoring on demand services;

(ix)    EchoMail's operational practices and procedures; and

(x)    EchoMail's software development processes and procedures.

2.    AmEx and IBM will not use or disclose information provided by EchoMail to AmEx and/or IBM, including, without limitation, items of information within the categories set forth above at paragraph 1(i) through 1(x).

3.    IBM will not use or disclose information provided by AmEx concerning EchoMail, including, without limitation, items of information within the categories set forth above at paragraph 1(i) through 1(x).

4.    For purposes of this agreement, the term "use" will mean, among other things, draw upon, rely on, or incorporate the information provided by EchoMail to AmEx and IBM into any product that competes with EchoMail's products. By way of example only, this means that AmEx will not, in the course of discussions with competitors of EchoMail, disclose to such competitors of EchoMail's information concerning EchoMail, and means that AmEx will not do or say anything to cause such competitors to modify their products to incorporate features of EchoMail's products. By way of further example only, this means that IBM, whether for itself, its customers, clients, or partners will not draw upon, rely on, or incorporate the information provided by EchoMail to AmEx or IBM in developing its own email management system or parts thereof, or in providing consulting services to its customers who are engaged in the email management business.

5.    For purposes of this agreement, "disclose" means to impart, directly or indirectly, the information or the substance of the information provided by EchoMail to AmEx and/or IBM.

6.    For purposes of this agreement "information" means anything tangible or intangible or electronically kept or stored, which constitutes, represents, evidences or records a secret scientific, technical, merchandising, production or management information, design, process, procedure, formula, invention or improvement.

7.    The term "information" shall exclude such information which (i) is otherwise independently learned by or known to AmEx or IBM without an obligation of confidence to EchoMail or without breach of this agreement; (ii) becomes publicly available through no breach of this agreement; (iii) is rightfully received by AmEx or IBM from a third party without obligation of confidentiality with respect to such information; or (iv) is independently developed by AmEx or IBM without breach of this or other applicable agreements.

- 2 -

8.    Nothing contained in this agreement will be deemed to affect the provisions contained in the agreement between EchoMail and AmEx dated July 9, 1999, which will remain in effect.

9.    Nothing contained in this agreement will be deemed to preclude the parties hereto from consulting with their attorneys for purposes of the litigation, EchoMail, Inc. v. American Express Company and IBM Corporation, Civil Action No. 05-11318-NMG (D. Mass.).

10.    Nothing contained in this agreement shall limit the obligations imposed upon the parties by law or by prior agreement.

11.    This agreement is to be incorporated into an order of the court, and will remain in effect until further order of the Court.

12.    The parties signing below represent that they have the authority and capacity to enter into this agreement.

EchoMail, Inc.,


By: _____

Title:


IBM Corporation,


By: _____

Title:


American Express Company,


By: _____

Title:

- 3 -

# EXHIBIT C

# AGREEMENT

**WHEREAS** American Express Company ("AXP") and EchoMail, Inc. ("EchoMail") are parties to a Stand Alone Agreement for Consulting Services, with an effective date of July 9, 1999 (as amended and supplemented, the "Stand Alone Agreement"); and

**WHEREAS** a Technical Due Care (or Architecture) Review ("Review") was conducted on May 4 and 5, 2005, telephonically and in person at EchoMail's facility in Cambridge, Massachusetts; and

**WHEREAS** representatives of IBM Corporation ("IBM") participated telephonically in a portion of the Review; and

**WHEREAS** EchoMail filed a lawsuit against AXP and IBM (<u>EchoMail, Inc. v. American Express Company and IBM Corporation, Civil Action No. 05-11318</u> (NMG), United States District Court, District of Massachusetts) raising claims relating to the Review ("Litigation"); and

**WHEREAS** EchoMail filed a motion seeking a preliminary injunction against AXP and IBM relating to information that EchoMail disclosed during the Review; and

**WHEREAS** the Honorable Nathaniel M. Gorton entered an Order dated June 30, 2005, directing the parties to confer in good faith and attempt to negotiate a nondisclosure agreement with respect to information disclosed during the Review;

**NOW, THEREFORE** the parties hereby agree as follows:

1.    AXP and EchoMail shall consider any information relating to EchoMail that was disclosed by EchoMail to AXP during the Review as confidential information under the Stand Alone Agreement.

2.    In connection with any information relating to EchoMail that was disclosed to IBM during the Review, IBM shall be bound by the confidentiality provisions of the Stand Alone Agreement. IBM and EchoMail shall consider any information relating to EchoMail that was disclosed to IBM during the Review as confidential information under the Stand Alone Agreement.

3.    Nothing in this agreement shall be construed as an admission of liability on the part of AXP or IBM in connection with the claims asserted by EchoMail in the Litigation.

4.    This agreement shall become effective upon the signing by an authorized representative of each party, and shall only apply prospectively.

5.    This agreement does not supercede or replace the Stand Alone Agreement or any other prior agreement that may exist between the parties.

EchoMail, Inc.

_____

By:

Title:

Date:

IBM Corporation

_____

By:

Title:

Date:

American Express Company

_____

By:

Title:

Date: