# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ECHOMAIL, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 05-11318-NMG |
| ) | |
| AMERICAN EXPRESS CO. ) | |
| and IBM CORP., ) | |
| ) | |
| Defendants. ) | |

## PLAINTIFF ECHOMAIL, INC.'S MEMORANDUM IN OPPOSITION TO DEFENDANT INTERNATIONAL BUSINESS MACHINE CORPORATION'S MOTION FOR JUDGMENT ON THE PLEADINGS

Plaintiff EchoMail, Inc. ("EchoMail") submits this memorandum in opposition to the motion for judgment on the pleadings filed by Defendant International Business Machine Corporation ("IBM"). IBM's motion, a last ditch effort to avoid discovery, must be denied because it is legally and factually flawed. First, in order to even present its motion, IBM holds EchoMail's claims up to the wrong legal standard. Second, IBM simply ignores facts plainly set forth in the Verified Complaint—facts which demonstrate that EchoMail has more than met its pleading obligations. Hence, the question of whether IBM misappropriated EchoMail's confidential information, engaged in unfair competition, and violated Mass. Gen. Laws. ch. 93A is fact intensive and is inappropriate for resolution on a motion pursuant to Fed. R. Civ. P 12(c).

## FACTUAL BACKGROUND

### I.    EchoMail's Relationship With IBM

Beginning in or about 1996, IBM has repeatedly sought to gain access to EchoMail's confidential and proprietary email management technology, despite EchoMail's refusal to grant such access. (Compl. ¶ 26).[1]  For instance, in 1996, and again in 2000, IBM approached EchoMail seeking to host EchoMail's applications at IBM's facilities so IBM could "resell" EchoMail to other customers. (Compl. ¶¶ 27-28).  EchoMail refused both requests. (Compl. ¶¶ 27-28).  Two years later, IBM proposed a partnership with EchoMail in which IBM would be given access to EchoMail's confidential and proprietary outbound email marketing technology and code. (Compl. ¶ 29).  EchoMail declined the offer and refused to give IBM access to its technology. (Compl. ¶ 29).  Apparently undeterred, in 2004 IBM again approached EchoMail, this time offering to provide the hardware necessary to run EchoMail's web-based software applications. (Compl. ¶ 30).  As it had with each prior overture from IBM, EchoMail refused. (Compl. ¶ 30).

### II.    IBM's Secret Participation in the Architecture Review

In late April 2005, AmEx notified EchoMail that it wanted to proceed with an Architecture Review ("Review") of the newest version of EchoMail's confidential and proprietary technology, version 8.1. (Compl. ¶ 38).  As both EchoMail and AmEx knew, an Architecture Review generally reveals the confidential and proprietary "code" contained in the hardware and/or software. (Compl. ¶ 39).

The Architecture Review took place at EchoMail's facility in Cambridge, Massachusetts on May 4 and 5, 2005. (Compl. ¶ 41).  At least eight employees from AmEx participated in the Review, either in person or telephonically. (Compl. ¶ 41).  Over the course of the two-day

---

[1]    Citations to EchoMail's Verified Complaint are provided as "Compl. ¶ __."

Review, all participants were exposed to EchoMail's confidential and proprietary "code," including the process by which EchoMail hosts its web-based technology. (Compl. ¶42). However, without EchoMail knowledge, AmEx had surreptitiously included technical personnel from its consultant, IBM, in the Review's teleconference.[2] (Compl. ¶ 44). At no time prior to the Review did anyone from either IBM or AmEx notify EchoMail that IBM employees would be permitted to participate in the Review. (Compl. ¶ 44). In fact, the presence of IBM personnel at the Review would not have been disclosed to EchoMail at all, except that very late in the Review process Stephen Gibbons, an IBM employee participating by telephone, identified himself as an IBM employee and stated that he believed that the information revealed "created a conflict." (Compl. ¶ 44). Rather, prior to the Review, AmEx provided EchoMail with a list of personnel who would be participating—no one from IBM was included on the list. If EchoMail had known that personnel from IBM would be permitted to participate in the Review, EchoMail would not have allowed the Review to take place. (Compl. ¶ 45). To date, both IBM and AmEx have refused to provide any information to EchoMail concerning IBM's participation in the Review. (Compl. ¶ 45).

## STANDARD OF REVIEW

A motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) is decided under the same standard as a motion to dismiss. *Pasdon v. City of Peabody*, 417 F.3d 225, 226 (1st Cir. 2005). When considering a motion for judgment on the pleadings, the "court must accept all of the nonmoving party's well-pleaded factual averments as true and draw all reasonable inferences in [its] favor." *Feliciano v. Rhode Island*, 160 F.3d 780, 788 (1st Cir. 1998). Judgment on the

---

[2] Only one of the two **known** IBM employees who were participating in the Review identified himself during the telephone call. Despite participating in the Review, Todd Seager, an IBM computer security consultant, never identified himself to EchoMail. Curiously, IBM makes no mention of Seager's role in the Review.

pleadings is not appropriate "'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle her to relief.'" *Santiago de Castro v. Morales Medina*, 943 F.2d 129, 130 (1st Cir. 1991) (quoting *Rivera-Gomez v. DeCastro*, 843 F.2d 631, 635 (1st Cir. 1988)).

## ARGUMENT

I.    **EchoMail Has Properly Pleaded Its Misappropriation of Trade Secrets Claim (Count I)**

To plead misappropriation of trade secrets under Massachusetts law, a plaintiff must allege that: (1) the information in question is a trade secret; (2) plaintiff took reasonable steps to preserve the confidentiality of the information; and (3) defendant utilized improper means, or participated in their own or another's breach of a confidential relationship to acquire and use the trade secret.[3] *See TouchPoint Solutions, Inc. v. Eastman Kodak Co.*, 345 F. Supp.2d 23, 27 (D. Mass. 2004); *J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.*, 357 Mass. 728, 736 (1970).

There is no dispute that the information in question is a trade secret, and IBM does not argue otherwise in its motion. Rather, IBM argues that this claim should be dismissed because EchoMail failed to take reasonable steps to preserve the information's confidentiality by not terminating the telephone conference upon discovering that Stephen Gibbons, an IBM employee, had been participating or asking the IBM employee to leave the call.[4] (IBM's Mem. at 5). This argument reflects both a misunderstanding of the law and a distortion of the facts.

---

[3] The standard under New York law is similar. The plaintiff must show (1) that it possessed a trade secret and (2) that the defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means. *See Sylmark Holdings Ltd. V. Silicone Zone Int'l, Ltd.*, 5 Misc.3d 285, 783 N.Y.S.2d 758, 2004 N.Y. Slip Op. 24288 (2004); *Ez-Tixz, Inc. v. Hit-Tix, Inc.*, 919 F. Supp. 728, 737 (S.D.N.Y. 1996) (internal quotations omitted).
[4] IBM also attempts to argue that EchoMail's confidential and proprietary information is not entitled to trade secret protection because it has obtained patents for that information. (IBM's Mem. at 4 n.5). This argument is unavailing, however, because EchoMail's patents are narrow and protect only a fraction of its confidential and proprietary information. The unpatented information remains entitled to trade secret protection.

Where, as in this case, a plaintiff has actively sought to protect its trade secrets,[5] the question is whether the security precautions taken are reasonable. In determining whether a plaintiff has taken reasonable precautions to maintain the secrecy of its confidential information, "a court should consider the relationship and the conduct of the parties" and "balance a plaintiff's conduct in maintaining its security measures against the conduct of a defendant in acquiring the information." *USM Corp. v. Marson Fastener Corp.*, 379 Mass. 90, 98-99 (1979) (citing the Restatement of Torts § 757, Comment b (1939), which states that "a substantial element of secrecy must exist, so that, except by the use of improper means, there would be difficulty in acquiring the information"). However, "[h]eroic measures to ensure secrecy are not essential." *CVD, Inc. v. Raytheon Co.*, 769 F.2d 842, 851-52 (1st Cir. 1985).

EchoMail's conduct prior to the May 4 and 5, 2005 Architecture Review demonstrates that it had taken reasonable precautions to preserve the secrecy of its confidential proprietary information and it had clearly and decisively rebuffed each and every attempt by IBM to gain access to this information. Significantly, neither IBM nor AmEx ever notified EchoMail that defendants had entered into a contractual relationship in which IBM would serve as, among other things, AmEx's consultant in the Architecture Review of EchoMail's products and services. Moreover, at no time prior to the Architecture Review did either AmEx or IBM notify EchoMail that IBM employees would be participating via telephone. Instead, at least one IBM employee surreptitiously joined the call and failed to notify EchoMail of his participation until very late in the Review process. When he finally did identify himself, a significant amount of EchoMail's

---

[5] EchoMail has gone to great lengths to protect its confidential and proprietary information, "and maintain [the technology's] mystery and narrow the circle of those privy to its essentials." *Peggy Lawton Kitchens, Inc. v. Hogan*, 18 Mass. App. Ct. 937, 939 (1984). For example, EchoMail requires its employees to execute non-disclosure agreements, and enters nondisclosure agreements with entities that have even limited access to any portion of its proprietary technology. (Compl. ¶¶ 52-53, 55). In addition, EchoMail's vendors, including AmEx, are required to enter nondisclosure agreements, and EchoMail's confidential and proprietary information was further protected by the services contract with AmEx. (Compl. ¶ 54).

confidential and proprietary information, including its "code," had already been disclosed. Consequently, even the immediate termination of the call would not have prevented IBM from unlawfully gaining access to EchoMail's confidential information. The horse was already out of the barn. From these facts and from its prior relationship with EchoMail, it is thus reasonable to infer that IBM learned of the Review through improper means and participated in AmEx's breach of a confidential relationship to acquire EchoMail's trade secrets.

Furthermore, without discovery, EchoMail has no way of knowing exactly how many IBM employees participated in the Architecture Review, what documents were prepared by IBM prior to the Review, or whether or not IBM has discussed the information disclosed during the Review with AmEx or anyone else. Nor can EchoMail know for sure what other confidential information or other documentation AmEx disclosed to IBM prior to and after the Review, who else from IBM, other than Gibbons and Seager, has been provided this information, and how IBM, in its role as a consultant for AmEx, used the information, including with respect to the evaluation of other vendors.[6] IBM appears desperate to avoid discovery into these issues. Because EchoMail has sufficiently alleged that it took reasonable precautions to protect its confidential and proprietary information and that IBM used improper means to acquire that information, the misappropriation of trade secrets claim should not be dismissed.

IBM next argues that EchoMail's failure to issue a "Supplement for Disclosure" pursuant to the April 2002 Confidential and Disclosure Agreement ("CDA") between the parties renders destroyed the confidentiality of EchoMail's proprietary information disclosed during the Review.

---

[6] IBM would have EchoMail and this Court believe that Stephen Gibbons and Todd Seager, IBM's technical personnel who participated in the May 4 and 5 Review, were the only IBM employees exposed to EchoMail's confidential and proprietary information. This seems highly improbable. Gibbons and Seager did not enter into the consulting relationship with AmEx on their own; they were undoubtedly assigned the task of participating in the Review by one or more senior IBM employees who likely had learned of the Review from AmEx. It is thus disingenuous for IBM to now argue that EchoMail's confidential information has not been disseminated beyond Gibbons and Seager.

The Court should reject this argument. It is nothing more than an after-the-fact rationalization for unlawful conduct invented by IBM's lawyers as a means to attempt to justify what happened. IBM knows (1) that it routinely executes multiple CDA's with the same company when it enters into more than one transaction or potential business opportunity; and (2) this was always the practice followed when IBM and EchoMail transacted business.

Finally, IBM contends that the misappropriation of trade secrets claim should be dismissed because the Complaint does not include allegations that it has used EchoMail's trade secrets or confidential information. (IBM Mem. at 6 & n.8). This argument should be rejected. IBM is asking the Court to evaluate its motion for judgment on the pleadings by using the standard of review applicable to preliminary injunctions under Fed. R. Civ. P. 65(a). Plainly, the preliminary injunction standard is more rigorous than the standard under Fed. R. Civ. P. 12(c), and EchoMail's inability to demonstrate irreparable harm at the preliminary injunction stage should not be fatal to its claims at this stage. Rather, at the pleading stage, EchoMail need only allege, as it has, that IBM has used its confidential and proprietary information in its role assisting AmEx in the evaluation of outside vendors.

## II.    EchoMail Has Sufficiently Pleaded Its Common Law Unfair Competition Claim (Count II)

Likewise, despite IBM's argument to the contrary, EchoMail has properly pleaded its common law unfair competition claim. Under New York law, "the essence of an unfair competition claim is that the defendant has misappropriated the labors and expenditures of another." *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980), and cases cited. Central to this notion is some element of bad faith. *Id.* IBM charges that EchoMail "has not alleged, and cannot show, that IBM has <u>used</u> any of [its] alleged trade secrets or confidential

information," and that there is no evidence of bad faith on IBM's part.  (IBM Mem. at 7 (emphasis in original)).

First, EchoMail **has alleged** IBM's "use" of its confidential and proprietary information. As the Verified Complaint makes clear, IBM has already used EchoMail's confidential and proprietary technology in connection with its consulting work for AmEx.[7]  What remains unknown at this time, however, is the extent to which EchoMail's confidential information has been used.

Second, as discussed above, EchoMail **has alleged** IBM's bad faith.  In particular, EchoMail has alleged that:  (1) for nearly nine years, IBM sought access to EchoMail's confidential and proprietary information; (2) for nearly nine years EchoMail was unwavering in its refusal to grant IBM access to this information; (3) IBM never notified EchoMail that it was serving as AmEx's consultant and was evaluating outside vendors; (4) IBM never notified AmEx that at least one member of IBM's technical team planned to participate in the May 4 and 5 Architecture Review of EchoMail's products and services; (5) the IBM employees participating in the Review failed to identify themselves at the beginning of the teleconference and instead waited until EchoMail's confidential information had been disclosed before IBM's Gibbons identified himself; and (6) IBM has refused, and continues to refuse, to provide EchoMail with any information concerning its participation in the Review.  These allegations demonstrate that EchoMail has more than met its obligation to plead that IBM's attempt to acquire EchoMail's confidential information—through illegitimate and deceptive means—was in bad faith.

---

[7]   The Declarations of Stephen P. Gibbons and Todd Seager, submitted to this Court with IBM's Memorandum of Law In Support of Its Opposition to EchoMail, Inc.'s Motion for Preliminary Injunction, concede as much.  Gibbons states that in his capacity at the Global Services Division of IBM, he participates in reviews of outside vendors for AmEx, and that these reviews are used to evaluate products and services.  (Gibbons Decl. ¶ 4).  Gibbons stated that his role is to advise AmEx as to whether particular products or services offered by vendors are compatible with AmEx's security requirements.  (Gibbons. Decl. ¶ 4).  Seager's work is substantially similar.  (*See* Seager Decl. ¶¶ 102).

Finally, EchoMail need not "show" anything at this embryonic stage of the litigation, except that under the applicable standard the following inferences can—and must—be drawn in its favor:

- Because EchoMail refused IBM's repeated requests to access to EchoMail's confidential and proprietary information, IBM improperly accessed this information through its role as AmEx's consultant;

- IBM and AmEx have unlawfully exchanged information and documentation concerning EchoMail's confidential and proprietary technology;

- IBM has used EchoMail's confidential information in its role as AmEx's consultant without EchoMail's authorization;

- In evaluating outside vendors on behalf of AmEx, IBM has undoubtedly compared EchoMail's products and services to those of other vendors;

- In comparing the products of various vendors, IBM has gained knowledge concerning the development of EchoMail's confidential technology and software that it otherwise would not have had.

Furthermore, the Complaint adequately alleges that IBM has misappropriated EchoMail's labors and expenditures. EchoMail has invested more than ten years, countless hours, and a great deal of money developing and perfecting its web-based software and hardware for email and electronic communications management technology. IBM gained access to EchoMail's confidential and proprietary technology not through a legitimate business relationship, but through deceitful conduct and improper means. These allegations are sufficient to sustain the claim at this stage of the nascent litigation.

### III.    EchoMail Has Satisfied the Pleading Requirements of Mass. Gen. Laws ch. 93A, § 11 (Count III)

Finally, EchoMail's claim under the Massachusetts unfair and deceptive trade practices act, Mass. Gen. Laws ch. 93A, § 11, should not be dismissed. Massachusetts courts have applied § 11 to the misappropriation of trade secrets, *see, e.g.*, *Peggy Lawton*, 18 Mass. App. Ct. 937,

and "[t]he standards for finding misappropriation of a trade secret provide the criteria for finding an unfair or deceptive act." *Prescott v. Morton Int'l, Inc.*, 769 F. Supp. 404, 407 (D. Mass. 1990). In addition, "under Massachusetts trade secret law, a third party who knowingly benefits from a trade secret in which a person in a confidential relationship obtained from the plaintiff is liable to the plaintiff for misappropriation of that trade secret." *Data General Corp. v. Grumman Sys. Support Corp.*, 795 F. Supp. 501, 507 (D. Mass. 1992).

EchoMail has sufficiently alleged that IBM's surreptitious participation in the Architecture Review falls squarely within the "penumbra" of an "established concept of unfairness" and is "immoral, unethical, oppressive" and "unscrupulous." *Linkage Corp v. Trustees of Boston University*, 425 Mass. 1, 27 (1997). Because EchoMail need not produce actual evidence of unfair and deceptive conduct at this stage of the litigation, its allegations concerning IBM's deceptive and unlawful conduct in misappropriating EchoMail's confidential and proprietary information—including knowingly benefiting from a trade secret obtained through its partnership with AmEx—are sufficient to sustain the ch. 93A claim at this early stage.

## CONCLUSION

For the reasons set forth above, IBM's Motion for Judgment on the Pleadings should be denied.

Respectfully submitted,
ECHOMAIL, INC.
By its attorneys,

_____
Alan D. Rose (BBO #427280)
Alan D. Rose, Jr. (BBO#628871)
Lisa A. Tenerowicz (BBO#654188)
ROSE & ASSOCIATES
29 Commonwealth Ave.
Boston, MA 02116
Tel: 617-536-0040
Fax: 617-536-4400

Date:  January 11, 2006


## Certificate of Service

I, Lisa A. Tenerowicz, do hereby certify that on January 11, 2006 I served a true and accurate copy of the above Opposition to Defendant IBM's Motion for Judgment on the Pleadings to counsel for IBM:  by hand to the office of Stephen D. Poss, Goodwin Procter LLP, Exchange Place, Boston, MA 02109, and by overnight mail to the office of Thomas G. Rafferty, Cravath, Swaine & Moore, LLP, Worldwide Plaza, 825 Eighth Avenue, New York, NY 10019 and to counsel for American Express:  by hand to the office of John F. Farraher, Jr., Greenberg Traurig, LLP, One International Place, Boston, MA 02110 and by overnight mail to Louis Smith, Greenberg Traurig, LLP, 200 campus Drive, P.O. Box 677, Florham Park, NJ 07932.

_____
Lisa A. Tenerowicz