UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ECHOMAIL, INC., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>AMERICAN EXPRESS CO. )<br>and IBM CORP., )<br>)<br>Defendants. )<br> | Civil Action No. 05-11318-NMG |

**PLAINTIFF ECHOMAIL, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR RECONSIDERATION OF THE COURT'S JULY 14, 2006 MEMORANDUM AND ORDER GRANTING AMERICAN EXPRESS COMPANY'S MOTION FOR SUMMARY JUDGMENT AS TO ITS REPLEVIN COUNTERCLAIM**

Plaintiff EchoMail, Inc. ("EchoMail") respectfully submits this Memorandum in support of its Motion for Reconsideration of the Court's July 14, 2006 Memorandum and Order granting Defendant American Express Company's ("AmEx") Motion for Summary Judgment as to its Counterclaim for replevin of a SUN E450 database server and email communications from AmEx customers which contain Confidential Customer Information.

**INTRODUCTION**

In granting AmEx's motion, the Court concluded that AmEx was entitled to summary judgment because it "provided persuasive evidence that it is entitled to possession of the server and confidential information" and because "EchoMail has not shown that AmEx's property is incapable of being extracted from EchoMail's database." Order at 9. The Court added that AmEx would not be required to pay the cost of extracting AmEx's Confidential Customer Information from EchoMail's confidential and proprietary data schema for two reasons: first, because "it was EchoMail's decision to store AmEx's property in a proprietary database" and

second, because "EchoMail has not proved that it is entitled to retain AmEx's property unless and until AmEx pays for the extraction." Id.

In reaching this result, the Court did not consider that storing confidential information in this way is standard practice in the information technology industry, or that payment for the fees associated with extracting EchoMail's confidential and proprietary data schema and converting AmEx's Confidential Customer Information into Flat File format was contemplated by the parties over the course of their contractual relationship. Hence, as EchoMail explained in its October 15, 2005 Opposition, AmEx should not be entitled to replevin at all, let alone on summary judgment, of the database server or the Confidential Customer Information unless and until AmEx remits payment for the professional service fees associated with converting AmEx's customer information to Flat File format -- fees that were contemplated by the parties over the course of their contractual relationship and that are consistent with standard practice in the email management system industry. Moreover, the parties always contemplated that the information would be stored just as it is.

## ARGUMENT

In its Order, the Court recognized that the Confidential Customer Information belonging to AmEx is "imbedded (in both the server and the back-up tapes) in a proprietary database owned by EchoMail." Order at 8. The Court further recognized that in order for EchoMail to return the database server and the customer information to AmEx "without compromising the confidentiality of its database, it would need to extract and transfer the confidential information into a different, 'flat file' format." Id. The Court then concluded that "the present dispute between the parties, which is unaddressed by their contractual relationship, is less about AmEx's entitlement to the server and confidential information than about which party should pay the cost

(at least initially) of returning that property." Id.  However, in determining that EchoMail should bear the cost of converting AmEx's customer information into flat file format, the Court did not consider the evidence, set forth in EchoMail's opening papers, concerning the course of conduct between the parties and the standard practice in the information technology industry.

**I.      EchoMail has Demonstrated that it is Entitled to Retain AmEx's Property Until AmEx Pays for the Extraction.**

In its Order, the Court held that "EchoMail has not proved that it is entitled to retain AmEx's property unless and until AmEx pays for the extraction." Order at 9. As an initial matter, in opposition to a motion for summary the non-moving party, in this case EchoMail, is not required to prove anything. To the contrary, the party seeking summary judgment, AmEx, bears the initial burden of demonstrating the absence of a genuine issue of material fact in the record. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party meets that burden, the nonmoving party then must "produce evidence on which a reasonable finder of fact . . . could base a verdict for it." Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 94 (1st Cir. 1996) (citation omitted). Hence, summary judgment is appropriate only if the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Moreover, when ruling on a motion for summary judgment, the court must view the entire record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. See Lee-Crespo v. Schering-Plough Del Caribe Inc., 354 F.3d 34, 37 (1st Cir. 2003). An issue is "genuine" for purposes of summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Hayes v. Douglas Dynamics, Inc., 8 F.3d 88, 90 (1st Cir. 1993) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A fact is "material" if it "might affect the outcome of the suit under the governing law." Id.

Here, even assuming that AmEx has met its initial burden, EchoMail has produced sufficient evidence on which a reasonable finder of fact could base a verdict for it.  See Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 94 (1st Cir. 1996) (citation omitted).  Through the pleadings and Affidavits EchoMail has produced more than enough evidence to demonstrate that AmEx is required to compensate EchoMail for the required professional services.  On the other hand, AmEx has not provided any evidence whatsoever that it is entitled to the conversion to Flat File free of charge.  The Court should therefore vacate its Order and require AmEx to pay EchoMail for these necessary and foreseeable services before EchoMail returns AmEx's Confidential Customer Information.

**II.     Standard Industry Practice is to Store Information in a Proprietary Database and Return Information in Flat File Format**

In its Order, the Court also determined that AmEx will not be required to pay the cost of converting its confidential customer information into Flat File format in part because "it was EchoMail's decision to store AmEx's property in a proprietary database."  Order at 9.  This is not so.  In fact, the information was stored in precisely the way AmEx intended that it would be stored.  In addition, the Court did not consider that providing such information in Flat File format is standard practice in the industry and is consistent with EchoMail's past practices with its customers, including AmEx.  Affidavit of Sonu Abraham at ¶ 16 ("Abraham Aff.").  AmEx, however, is well-aware that it is standard practice among information technology organizations to provide such information as Flat Files and that it is required to pay for the professional services associated with extracting the Data Schema and generating the Flat Files.  Consequently, this procedure -- as well as payment of the associated fees -- is the preliminary action that must be performed before AmEx is entitled to the return of the Database Server and its Confidential Customer Information stored on the archived tapes.  DaSilva v. The Coffee

- 4 -

Connection, Inc., 1994 WL 879508, at *1 (Mass. Super. Nov. 17, 1994).  Furthermore, as AmEx is aware, it is EchoMail's normal business practice to back-up such information and store it in a proprietary format that is specific to the databases in which the information is stored.  Abraham Aff. at ¶¶ 9-10.

### III. AmEx Knew that It was Required to Pay a Professional Services Fee for Extraction of AmEx's Customer Information from EchoMail's Proprietary Database Format

Finally, EchoMail requires its customers -- including AmEx -- to pay the cost of such professional services *before the services are performed*.  Not only is AmEx well-aware of this requirement, it had complied with it in the past.  Abraham Aff. at ¶18.  Moreover, as early as 1999, the parties discussed the professional services associated with extracting EchoMail's Data Schema and generating Flat Files of AmEx's Confidential Customer Information.  Abraham Aff. at ¶ 19.  Indeed, nothing in AmEx's motion for summary judgment is to the contrary.  During conversations in the first few years of the EchoMail-AmEx relationship, James Shelby, AmEx's then-Director of Technology, and Sonu Abraham of EchoMail discussed an arrangement whereby AmEx would provide blank tapes so that EchoMail could generate Flat Files of AmEx's Confidential Customer Information on a quarterly basis and then ship the tapes to a storage location designated by AmEx.  AmEx understood that this was within the scope of work that EchoMail was providing to AmEx and it also understood that a professional services fee would be associated with this work.  Abraham Aff. at ¶ 20.

EchoMail and AmEx discussed the issue of EchoMail providing back-up tapes to AmEx again in 2004, while negotiating the Amendment to the parties' Master Agreement & Schedule.  Over the course of these negotiations, Mr. Abraham explained to Paul Murphy, AmEx's Director of Interactive Enterprise Delivery, and Angela Ramsammy, AmEx's Lead Programmer Analyst, that EchoMail was currently warehousing AmEx's data.  In fact, to compensate EchoMail for

this service, the Amendment to the Master Agreement & Schedule, executed in August 2004, included a $19,000 per month increase in professional services fee. Abraham Aff. at ¶ 22 and Exhibit A at 4 ("HDW-SRVR-Hosting"). Notwithstanding this knowledge, AmEx now seeks to avoid paying for a service that was an implicit part of the parties' business relationship.

## CONCLUSION

AmEx now seeks to avoid paying for professional services that were clearly contemplated by the parties by arguing that EchoMail has "absolutely no legitimate reason to hold this information." As explained above and in its opening papers, EchoMail is justified in holding this information in its current form in order to protect its proprietary Data Schema technology unless and until AmEx pays for the professional services necessary to extract the Data Schema, reformat the Database Serve, and generate Flat Files. See DaSilva, 1994 WL 879508, at *1. This is exactly what the parties contemplated and there is no basis whatsoever for EchoMail to be required to provide 480 hours of professional services to AmEx without being paid up front as per the parties' agreement.

For the reasons set forth above and for those set forth in its opening papers, EchoMail respectfully requests that this Court vacate its July 14, 2006 decision and deny AmEx's motion for summary judgment as to Count III of its counterclaim for replevin.

        Respectfully submitted,

        ECHOMAIL, INC.,

        By its attorneys,


        /s/ Lisa A. Tenerowicz
        _____
        Alan D. Rose (BBO#427280)
        Alan D. Rose, Jr. (BBO#628871)
        Lisa A. Tenerowicz (BBO#654188)
        ROSE, CHINITZ & ROSE
        29 Commonwealth Avenue
        Boston, Massachusetts 02116
        617-536-0040

Date: July 24, 2006