UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

ECHOMAIL, INC.,

Plaintiff,

v.

AMERICAN EXPRESS CO. and
INTERNATIONAL BUSINESS
MACHINES CORP.,

Defendants.

Civil Action No. 05-11318-
NMG

**DEFENDANT INTERNATIONAL BUSINESS MACHINES CORPORATION'S
MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION TO EXTEND
DISCOVERY DEADLINES**

October 27, 2006

IBM CORPORATION,

By its attorneys,

Stephen D. Poss
GOODWIN PROCTER LLP
Exchange Place
53 State Street
Boston, MA 02109
(617) 570-1000

and

Thomas G. Rafferty
Rowan D. Wilson
(both admitted *pro hac vice*)
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

# TABLE OF CONTENTS

Page

**Preliminary Statement**...........................................................................................................1

**Statement Of Facts**...............................................................................................................2

**Argument** ............................................................................................................................6

I.      PLAINTIFF FAILS TO OFFER ANY EVIDENCE THAT WOULD JUSTIFY
ITS REQUEST TO EXTEND DISCOVERY DEADLINES. ..........................................6

II.     PLAINTIFF'S DILATORY CONDUCT THROUGHOUT THE DISCOVERY
PERIOD UNDERMINES ITS CLAIM THAT IT HAS NOT HAD SUFFICIENT
TIME TO OBTAIN EVIDENCE TO SUPPORT ITS SPECULATIVE
ALLEGATIONS....................................................................................................13

III.    EXTENSION OF THE SCHEDULE FOR FACT DISCOVERY WOULD
UNFAIRLY PREJUDICE IBM....................................................................................14

**Conclusion** ........................................................................................................................16

## PRELIMINARY STATEMENT

In accordance with the previous three-month extension of the fact discovery cutoff requested by plaintiff EchoMail, Inc. ("EchoMail") and ordered by the Court, fact discovery in this matter was to end on Monday, October 16, 2006. The previous Friday evening, October 13, EchoMail moved once again to extend the discovery deadlines so that it could launch an entire new wave of depositions, document requests, and a motion to compel further answers to interrogatories which had been answered more than six months ago. IBM opposes EchoMail's last-minute motion to again extend the discovery schedule in this case. As set forth in detail below, IBM has good reason to do so:

- IBM has provided each of the IBM deponents requested by EchoMail for depositions on or before the dates requested by EchoMail, and those depositions have been completed;

- IBM has produced documents and responded to all of EchoMail's discovery requests, including interrogatories, in a timely fashion, and EchoMail has taken no action concerning them until now;

- EchoMail let this case languish and consistently has failed to move its own case forward unless and until faced with imminent court-ordered deadlines;

- The testimony of all witnesses to date, including EchoMail's own officers, has confirmed that there is absolutely no basis for EchoMail's purported claim against IBM;

- The new discovery EchoMail seeks to take is so impermissibly overbroad and far afield from its claims that it would, if served following an additional extension of the discovery schedule, lead to discovery disputes and motion practice on issues that could and should have been raised and resolved during the previous discovery periods set by this Court. EchoMail did neither; and

- EchoMail's request for another extension to launch a new fishing expedition in the hope of finding some basis for a claim which EchoMail had no reasonable basis for filing, and now at the close of discovery has found no evidence supporting, will prejudice IBM and prevent the reasonable and expeditious conclusion of this action.

As we discuss below in detail, EchoMail has had more than an adequate opportunity to take discovery relevant to its claims and has offered no legitimate basis for extending discovery yet again.  Given the marked absence from Plaintiff's motion of any evidence to suggest that there is good reason to believe that with more time Plaintiff will find evidence to support its initial speculative conjecture that IBM has used its alleged trade secrets, as well as its dilatory conduct throughout both the original and the extended discovery periods, there are no valid grounds for an extension of the discovery deadline.  At some point, "enough is enough."  We have reached that point.  IBM is now entitled to have this case resolved on the merits.  For these reasons, we respectfully urge the Court to deny plaintiffs' motion in its entirety.  We turn first to a brief chronology and statement of the facts pertinent to EchoMail's motion.

## STATEMENT OF FACTS

On May 5, 2005, pursuant to a consulting arrangement with AmEx, two employees of IBM's Global Services division, Stephen Gibbons ("Gibbons") and Todd Seager ("Seager"), participated on a technical review teleconference involving EchoMail and Defendant American Express Co. ("AmEx") (the "Teleconference").  On the call, Gibbons identified himself as an IBM employee.[1]  Compl. ¶ 44, IBM Ans. ¶ 44.  At no time after Gibbons made Plaintiff aware of his presence and his status as an IBM employee did anyone from plaintiff EchoMail object to an IBM employee being on the call, much less terminate the call or seek to designate the subject matter of the call as confidential under the existing Confidentiality Agreement ("CDA") between IBM and Plaintiff.  Compl. ¶ 44, IBM Ans. ¶ 44.

---

[1] Citations to the June 23, 2005, Complaint are given as  "Compl. ¶ __".  Citations to IBM's Answer to Plaintiff's complaint, filed on July 11, 2005, are given as "IBM Ans. ¶ __".

2

Nonetheless, more than six weeks later, on June 20, 2005, plaintiff EchoMail brought this action on an emergency basis against both AmEx and IBM[2] for: (1) misappropriation of trade secrets; (2) unfair competition; and (3) unfair and deceptive trade practices in violation of Mass. Gen. Laws Ann. 93A § 11.[3] Plaintiff's claims against IBM are based entirely on (a) the presence of two employees of IBM's Global Services Division on the Teleconference, (b) during which EchoMail alleges that its trade secrets, including its computer code, were disclosed to IBM (c) which EchoMail claims IBM is using to compete with it. See, e.g., Compl. ¶¶ 42, 44, 58.

IBM, in order to address EchoMail's concerns, offered to enter into a new nondisclosure agreement with EchoMail, and on June 30, 2005, the Court directed the parties to attempt to negotiate a mutually satisfactory nondisclosure agreement with respect to any information that was disclosed during the Teleconference. On July 12, 2005, IBM and EchoMail entered into a new Confidential Disclosure Agreement specifically regarding the purported trade secret and confidential information allegedly discussed on the Teleconference underlying Plaintiff's complaint.[4] Accordingly, on July 15, 2005, given that EchoMail had "already received assurances from both defendants that they will treat as confidential the information disclosed during the Architecture Review," the Court denied plaintiff's motion for a preliminary

---

[2] On June 23, 2005, defendants AmEx and IBM removed this matter to this Court pursuant to 28 U.S.C. § 1441 and 1446.

[3] In addition, EchoMail asserted a number of other contract-based claims solely against AmEx.

[4] The agreement was filed as Exhibit A to a Joint Statement by Plaintiff and both Defendants ("Joint Statement"). Prior to this date, in April 2002, IBM and Plaintiff had already entered into a Confidential Disclosure Agreement ("CDA") that addressed the disclosure of confidential information between the parties. IBM Ans. ¶ 29, Ex. A.

3

injunction. See EchoMail, Inc. v. Am. Express Co., et al., 378 F.Supp.2d 1, 9 (D. Mass. 2005). Plaintiff was content to take no discovery of IBM for the next six months.

Finally, on December 7, 2005, IBM filed a motion for judgment on the pleadings wherein IBM argued that based on its having signed two confidentiality agreements (one directly addressing the Teleconference) and Plaintiff's failure to offer any evidence whatsoever to support its speculations, IBM should be dismissed from the lawsuit. On December 12, 2005, EchoMail requested and IBM agreed to an extension of time to oppose the motion—the first of what would become many such requests for extensions from Plaintiff.

Subsequently, on January 19, 2006, EchoMail served its first request for production of documents and on February 9, 2006 its first set of interrogatories. IBM served its responses and objections to Plaintiff's interrogatories on March 27, 2006, more than six months ago. (IBM served simple contention interrogatories on EchoMail on April 21, 2006, seeking to learn the basis for EchoMail's claims, which EchoMail failed to answer until June 15, 2006, three weeks after they were due, only one month before the original discovery deadline, and following three requests for extensions by EchoMail, to each of which IBM courteously assented.)

Notwithstanding its own failures to advance discovery, on June 27, 2006, EchoMail made a motion to extend discovery deadlines. At the time it served the motion, EchoMail was the only party to this action that had not produced a single page of documents. In contrast, both IBM and American Express had produced documents requested by plaintiffs by that date. Indeed, while EchoMail made a small production on June 29, 2006, it was not until July, August, and September that EchoMail would make its principal productions of documents to IBM.

4

On July 17, 2006, Plaintiff's motion to extend discovery deadlines was granted, establishing the current October 16, 2006 deadline. Once again, plaintiff did nothing for months, other than to serve notices requesting the depositions of three IBM employees (Gibbons, Seager, and Angela Poletis) to take place on October 4, 5, and 9, 2006. Despite the fact that these individuals were all located in far away jurisdictions (Arizona and Utah), at EchoMail's request IBM voluntarily brought all three of the noticed IBM employees to New York for depositions on or before the dates originally noticed by EchoMail. The depositions were taken by EchoMail and completed on October 4, 5, and 6. During the previously extended discovery period, Plaintiff has had the opportunity to depose anyone it wishes and it has deposed all of the IBM employees who had any direct involvement with the Teleconference. In addition, it has deposed and continues to depose numerous American Express employees.

On October 16, 2006, the final day of the deadline it had only months before proposed, Plaintiff brought this motion to extend discovery deadlines yet again. In its motion, Plaintiff requests more discovery of a general nature from IBM, since it has no facts that would enable it to make more specific and directed requests. Plaintiff requests a 30(b)(6) witness from IBM in the hopes that IBM will do what they could not, identify an individual that might offer at least some testimonial evidence upon which to base their claims. In addition, Plaintiff resubmits its interrogatories to IBM; notably, Plaintiff does so over 6 months after IBM timely answered these interrogatories, March 27, 2006, during which time it made no effort to resubmit its interrogatories to IBM.

## ARGUMENT

**I.    PLAINTIFF FAILS TO OFFER ANY EVIDENCE THAT WOULD JUSTIFY ITS REQUEST TO EXTEND DISCOVERY DEADLINES.**

Plaintiff offers no evidence to suggest that if provided with more time for discovery it might find evidence sufficient to support its allegations against IBM. To the contrary, discovery to date from both IBM and EchoMail has demonstrated conclusively that there is not – and never was – any basis for EchoMail's claim that IBM is using any of the allegedly trade secret information disclosed on the Teleconference.

First, both Gibbons and Seager, the only two IBM employees even alleged by EchoMail to have received trade secret information on the Teleconference, have each testified that they work for IBM Global Services ("IGS") in a group dedicated solely to providing computer security consulting to American Express and that has no relation to the rest of the IBM company, that neither of them ever disclosed any information they learned on the Teleconference to anyone else within IBM, and that neither of them has ever used any of the information learned on the Teleconference other than in the course of providing security consulting services to American Express pursuant to IGS's contract with American Express. See, e.g., Declarations of Stephen P. Gibbons and Todd Seager, filed as Exhibits B and C to IBM's Memorandum of Law in Support of Its Opposition to Plaintiff EchoMail, Inc.'s Motion for Preliminary Injunction, June 28, 2005. Both Gibbons and Seager have been fully deposed by EchoMail, as has Poletis, the IBM employee who scheduled their participation in the Teleconference and who similarly testified that she neither participated in the Teleconference nor learned anything that transpired during it.

6

Second, the testimony of IBM's employees is supported rather than contradicted by the testimony of EchoMail. IBM has deposed each of EchoMail's officers. Each of these EchoMail officers has testified that he is not aware of any disclosure by Gibbons or Seager to anyone else at IBM or otherwise of anything learned during the Teleconference. Each of the EchoMail officers has testified that he is not aware of any use by IBM of any information IBM may have learned on the Teleconference. Each of EchoMail's officers has testified that he is not aware of any products IBM is developing based on any information learned during the Teleconference. And indeed, EchoMail's officers have testified that no computer code at all was disclosed to IBM on the Teleconference (with the exception of Mr. Shiva who, despite founding and running EchoMail for years, professed not to know what "code" means other than that it could mean virtually anything, contrary to the understanding of his own employees and virtually everyone else in the computer industry).

For example, Gene Deans, EchoMail's Chief Technology Office and Vice President of Infrastructure and Operations (one of EchoMail's two Vice Presidents), testified:

Q. Has IBM, to your knowledge, developed any products or applications based upon any proprietary or confidential information IBM learned from EchoMail during the May, 2005 architectural review?

A. To my knowledge, no.

Q. Is IBM using any proprietary or trade secret or confidential information IBM obtained from EchoMail during the May, 2005 architectural review?

A. To my knowledge, no.

Q. Are you aware of any economic harm or damage to EchoMail caused by IBM using any proprietary or confidential or trade secret information IBM obtained from EchoMail during the May, 2005 architecture review?

A. I don't know.

Q.  So I take it your answer is, no?

A.  I said I do not know if there has been any damage or not.

(Exhibit A, 112:24-113:19)


Q.  To your knowledge, has Mr. Gibbons or Mr. Seager disclosed to anyone, other than American Express, anything they learned during the May 5, 2005 architecture review?

A.  I am not aware of any information that those two gentlemen have disclosed to anyone.

Q.  To your knowledge, has Mr. Gibbons or Mr. Seager disclosed to anyone else within IBM anything that they learned during the May, 2005 architecture review?

A.  I'm not aware of any such information transfer.

(Exhibit A, 114:20-115:7)


    Sonu Abraham, EchoMail's President, testified:

Q.  Is IBM using any proprietary, trade secret  or confidential information that IBM may have obtained from EchoMail during the May, 2005 architectural review?

A.  I do not know.

Q.  You testified earlier that you found out that two people from IBM had been on the telephone at some point during the May, 2005 architectural review.  Do you recall that testimony?

A.  Yes.

Q.  Have either of those two IBM employees who were on the phone during the May, 2005 architectural review, disclosed to anyone, other than American Express, anything they learned during the May, 2005 architectural review?

A.  I'm not aware of any disclosures that those individuals made.

Q.  Has either of the two IBM employees who were on the phone during part of the May, 2005 architectural review disclosed to anyone else within IBM anything that they learned during the May, 2005 architectural review?

A.  I'm not aware of any disclosures that those individuals made.

Q.  Prior to the May, 2005 architectural review meeting that you've testified about today or that's been the subject of testimony today, were you ever informed by anyone at EchoMail of any concerns EchoMail had regarding IBM?

A.  I cannot remember specifically of any concerns prior to May, 2005.

(Exhibit B, 209:3-210:19)


Q.  Is anyone at IBM engaged in the process of writing code using any confidential or proprietary or trade secret information that was disclosed during the May, 2005 architecture review meeting?

A.  I wouldn't know whether IBM is writing code or not.

Q.  So you're not aware of any such writing of code at IBM?

A.  I'm not aware of any writing of code at IBM.

(Exhibit B, 215:20-216:5)


Further, Robert Zierten, EchoMail's Vice President of Customer Relations, testified:


Q.  Is IBM using any proprietary, trade secret or confidential information that IBM may have learned from EchoMail during the May, 2005 architecture review meeting?

A.  Not that I know of.

Q.  Has any IBM employee, who was on the phone during the May, 2005 architecture review meeting, disclosed to anyone, other than American Express, anything they learned during that May, 2005 phone call?

A.  Not that I'm aware.

Q.  Has any IBM employee who was on the phone during the May, 2005 architecture review meeting disclosed to anyone else within IBM anything they may have learned from EchoMail during that May, 2005 meeting?

A.  Not that I'm aware, no.

Q.  Is anyone at IBM engaged in the process of writing any code, making use of any confidential or proprietary or trade secret information that was disclosed to IBM during the May, 2005 architecture review meeting?

9

A.  I'm not aware of them using any code.

Q.  Has IBM developed any products or applications, based upon any confidential, proprietary or trade secret information that EchoMail may have disclosed to IBM during the May, 14 2005 architecture review meeting?

A.  I'm not aware of them developing any products.

(Exhibit C, 173;9-174:17)


Similarly, Roman Zavolly, EchoMail's Manager of Production Hosting and the engineer

responsible for the entire hardware infrastructure at EchoMail, testified:

Q. Has anybody from EchoMail indicated to you that you should be concerned in connection with dealing with personnel from IBM?

MS. TENEROWICZ:  Objection.

A.  No, I don't remember that being mentioned at all.

Q.  That's never been mentioned to you at any point in time?

A.  Not to my recollection, no.

(Exhibit D, 83:23-84:7)


Q.  To your knowledge, has IBM developed any products or applications based on EchoMail proprietary information?

A.  Not to my knowledge, no.

(Exhibit D, 96:8-11)


Finally, V.A. Shiva, the founder of EchoMail and the man who both verified EchoMail's

complaint in this action and who executed the affidavit supporting EchoMail's motion for a

preliminary injunction, testified:

10

Q.  Do you have any firsthand direct knowledge that following that May, 2005 call, up to the present, that anyone at IBM has been actually writing code using the information that was disclosed on that call?

A.  I don't know if IBM has been writing code.

(Exhibit E, 266:23-267:5)

Q.  So you don't know whether anyone at IBM is writing code based on information learned during that May, 2005 call?

***

A.  Right.  I just do not want to contradict what I said earlier.  So I'm being very precise in answering your question.

Q. So the answer is no, you don't know of anyone at IBM between May of 2005 and today who is actually writing code using the information –

A. I don't personally know anyone who is doing that at IBM.

(Exhibit E, 268:6-17)

Q. Do you know of anyone at EchoMail who claims to know somebody at IBM who is actually sitting down writing code based upon the information learned during the May, 2005 review?

A.  Do I know of anyone at EchoMail?

Q.  Does anyone at EchoMail claim to know that?

A.  I don't know about that.

(Exhibit E, 271:4-10)

In sum, no one at EchoMail has any knowledge of any disclosure by Gibbons or Seager to anyone other than American Express of anything they learned on the Teleconference, nor of any use by IBM of any such information.  Both Gibbons and Seager testified that they had not disclosed that information to anyone at IBM.  Moreover, in EchoMail's answers to IBM's

11

interrogatories, EchoMail similarly failed to provide any evidence of disclosure or use of any alleged trade secrets by IBM. Rather than confront these facts, EchoMail is reduced to complaining in the instant motion that IBM failed to answer several of its interrogatories six months ago and that EchoMail is dissatisfied with the answers given by IBM's witnesses. Similarly, in paragraph 8 of its motion, EchoMail contends that "[b]ased on IBM's questioning of EchoMail's witnesses and IBM's earlier responses to EchoMail's interrogatories, EchoMail has determined that additional information is needed from IBM." None of these contentions are justification for an extension of the discovery deadline.

First, Plaintiff has had ample time to address any dissatisfaction with IBM's responses to its interrogatories, as IBM responded to Plaintiff's interrogatories on March 27, 2006. That Plaintiff has waited more than six months and allowed two discovery deadlines to pass before expressing its concerns cannot justify extending discovery yet again. With respect to Plaintiff's dissatisfaction with the answers of IBM's witnesses, this is also not grounds for extended discovery. IBM offered and EchoMail has already deposed all of the IBM employees who had any involvement with the Teleconference EchoMail alleges as the basis for its claims. Moreover, EchoMail's unhappiness with IBM's answers to interrogatories and with the depositions taken to date appears to be that IBM's employees have testified under oath that IBM has neither used nor disclosed any of the information conveyed to EchoMail on the Teleconference and that none of EchoMail's officers or employees with knowledge has any evidence to the contrary. Thus, in effect, EchoMail is asking for an extension of discovery based on the following theory:

> (1)   IBM has testified it neither disclosed nor used any information IBM learned on the Teleconference;

12

(2)    no one at EchoMail has any information to the contrary; and

(3)    therefore, if EchoMail could only get some unlimited additional discovery, perhaps it could dig around and find some basis for the complaint EchoMail filed in this case well over a year ago.

In addition, nowhere in EchoMail's June 15, 2006 answers to IBM's interrogatories does it provide any basis for its contention that IBM "will use" any information it has obtained from Plaintiff, much less that IBM is using such information. Instead, Plaintiff describes benign business interactions it has had with IBM and without any factual support imbues them with its own nefarious reasoning. For example, Plaintiff asserts that IBM "will improperly use EchoMail's technology and proprietary information." Complaint, ¶ 1. Its stated basis for that contention is that as a result of the presence of IBM employees on the Teleconference, IBM was "enabled...to use this information with its business partners". Of course, despite Plaintiff's apparent belief, the ability to use information is not the same as actually using it.

## II.    PLAINTIFF'S DILATORY CONDUCT THROUGHOUT THE DISCOVERY PERIOD UNDERMINES ITS CLAIM THAT IT HAS NOT HAD SUFFICIENT TIME TO OBTAIN EVIDENCE TO SUPPORT ITS SPECULATIVE ALLEGATIONS.

Throughout the discovery period Plaintiff has failed to use the time this Court has granted for discovery. Instead, despite demanding an emergency hearing at the commencement of this action, EchoMail subsequently has relied on repeated extensions of time from the parties and this Court to move at its own leisurely pace. An example of this is demonstrated by the time EchoMail required to respond to IBM's simple contention interrogatories. IBM served its interrogatories on April 21, 2006, requesting only that Plaintiff "state the basis" for certain of the allegations in Plaintiff's complaint. Since EchoMail was required to have a basis for the allegations in its complaint before filing it, it should have had no difficulty in responding. Yet, May 22, 2006, the deadline upon which the answers were due, came and went with no answers

13

or communication of any kind from EchoMail. Ten days later EchoMail's lawyers belatedly contacted IBM to request a 15-day extension of time to respond, making the deadline June 6, 2006. IBM, as a courtesy to counsel, agreed. On June 5, 2006, the day before Plaintiff's extension expired, Plaintiff requested a second extension of time to respond to IBM's contention interrogatories, this time until June 13, 2006. IBM again agreed. On June 13, 2006, Plaintiff sought a third extension of time to respond. IBM agreed—for a third time. Finally, EchoMail served its answers to IBM's interrogatories on June 15, eight weeks after IBM had served them, three weeks after they were originally due and only one month before the original discovery deadline set by this Court. It is noteworthy that nowhere in EchoMail's interrogatory answers did EchoMail provide any facts to support its conclusory allegation that IBM is somehow "using" any alleged trade secrets purportedly disclosed to IBM on the Teleconference.

## III.    EXTENSION OF THE SCHEDULE FOR FACT DISCOVERY WOULD UNFAIRLY PREJUDICE IBM.

On Friday evening, October 13, prior to the expiration of the discovery period on Monday, October 16, EchoMail served (and subsequently withdrew pending resolution of this motion) additional discovery requests, including a notice of taking a Rule 30(b)(6) deposition of IBM and a motion to compel answers to interrogatories IBM already answered in March.[5] It is clear from these requests that EchoMail is going to use the requested extension for an unfounded fishing expedition that will delay resolution of this action and unfairly and without any basis increase IBM's costs and the disruption to IBM's employees in this lawsuit.

---

[5] Whereas EchoMail sought additional documents from American Express, it indicated that it sought no more documents from IBM.

The notice of taking deposition pursuant to Rule 30(b)(6) EchoMail served (and later withdrew) on October 13 demonstrates both the fishing expedition on which EchoMail seeks to embark as well as EchoMail's utter lack of justification for extending the discovery schedule. (A copy of the notice is attached as Exhibit F hereto.) One topic of the notice seeks an IBM witness to testify pursuant to Rule 30(b)(6) concerning "the representation in IBM's answer." (Id., Topic No. 6.) Yet IBM's answer was served on July 11, 2005, well over a year before EchoMail belatedly sought a 30(b)(6) deponent concerning it. The Rule 30(b)(6) notice would require IBM to produce again witnesses it has already produced and flown to New York at IBM's expense when that could have been avoided if EchoMail had timely served its 30(b)(6) notice and therefore provided IBM an opportunity to designate individuals to testify in response. In addition, Topics 1 through 3 of the belated 30(b)(6) notice seek to expand this lawsuit, which was premised on IBM's employees participating in a single telephone conference call, to all contracts or agreements that any division of IBM worldwide may have had with a host of other businesses. Yet EchoMail has failed to come up with a shred of evidence that IBM has ever disclosed to, or communicated with, concerning, or used with or concerning any other business, any of the allegedly trade secret information EchoMail claims to have disclosed on the Teleconference. Should the Court grant EchoMail's motion and extend the discovery period, and should EchoMail reserve this 30(b)(6) deposition notice, IBM intends to move for a protective order to seek protection from this overbroad and harassing deposition notice.

For well over a year, IBM has endured a lawsuit in which EchoMail made conclusory allegations, first that IBM had somehow obtained access to EchoMail's computer code and other "trade secrets" on a telephone call, and second that IBM is unlawfully using those trade secrets. IBM has denied receiving any code from EchoMail. IBM has denied making any disclosure or

15

use of whatever it may have learned from EchoMail. Nonetheless, EchoMail persisted with one emergency motion after another. Now EchoMail's own witnesses have conceded under oath that EchoMail never provided any computer code to IBM during the Teleconference and that EchoMail has no facts at all in its possession to support its conclusory allegation that IBM is using anything IBM learned from EchoMail on the Teleconference. To expose IBM to continued expense and the disruption of the time of its skilled employees for a further fishing expedition by EchoMail is unjustified, unwarranted, and unduly prejudicial to IBM. IBM requests a prompt conclusion of the discovery in this case so that IBM may proceed with a motion for summary disposition of this baseless action.

## CONCLUSION

Extending the time for discovery will not establish what does not exist. IBM has provided Plaintiff the information responsive to Plaintiff's discovery requests. That EchoMail was unable to find any evidence to support its allegations does not mean that the discovery provided was somehow inadequate or that EchoMail is entitled to more time. For all of the foregoing reasons, IBM respectfully requests that Plaintiff's motion for extension of discovery deadlines be denied.

Respectfully submitted,

IBM CORPORATION,

By its attorneys,

/s/ Stephen D. Poss
Stephen D. Poss
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
(617) 570-1000

16

and

Thomas G. Rafferty
Rowan D. Wilson
(both admitted *pro hac vice*)
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
October 27, 2006                                        (212) 474-1000


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the
registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies
will be sent to those indicated as non-registered participants on October 27, 2006.


                              /s/ Stephen D. Poss


LIBA/1740724.3

17

# Exhibit A

I

VOLUME: I

PAGES: 1-122

EXHIBITS: 7-13

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - x

ECHOMAIL, INC.

         Plaintiff,

   V.                Civil Action

AMERICAN EXPRESS COMPANY and      No. 05-11318-NMG

IBM CORPORATION,

         Defendant.

- - - - - - - - - - - - - - - - - - x

DEPOSITION of GENE A. DEANS

October 9, 2006

12:01 p.m.

Rose, Chinitz & Rose

29 Commonwealth Avenue

Boston, Massachusetts

Reporter: Michael D. O'Connor, RPR

112

1    to about three weeks ago when Sonu Mathew told you

2    to be here on October 9th?

3      A.  Yes.

4      Q.  What were you told about this lawsuit prior

5    to that conversation that you've testified about?

6      A.  What I remember right now is some statement

7    that we had to return some equipment, some computer

8    equipment to American Express, and we had to return

9    data in flat file format.  That's what I remember.

10   So during that time, I think that was around June or

11   so time frame, June, July, of this past summer,

12   2006.

13     Q.  Prior to hearing about the return of

14   equipment and data in a flat file format in or about

15   June of 2006, had you heard anything of this

16   lawsuit?

17     A.  I don't recall hearing anything about the

18   lawsuit before that time.

19     Q.  Have you ever been given any instructions

20   or direction by anyone at EchoMail to take any

21   special care or precautions in dealing with IBM?

22     MR. ROSE:  Objection.

23     A.  No.

24     Q.  Has IBM, to your knowledge, developed any

113

1    products or applications based upon any proprietary

2    or confidential information IBM learned from

3    EchoMail during the May, 2005 architectural review?

4        A.  To my knowledge, no.

5        Q.  Is IBM using any proprietary or trade

6    secret or confidential information IBM obtained from

7    EchoMail during the May, 2005 architectural review?

8        A.  To my knowledge, no.

9        Q.  Are you aware of any economic harm or

10   damage to EchoMail caused by IBM using any

11   proprietary or confidential or trade secret

12   information IBM obtained from EchoMail during the

13   May, 2005 architecture review?

14       MR. ROSE:  Objection.

15   A.  I don't know.

16       Q.  So I take it your answer is, no?

17       MR. ROSE:  Objection.

18       A.  I said I do not know if there has been any

19   damage or not.

20       Q.  Last week were you present at the

21   depositions of Angela Poletis, Todd Seager and

22   Steven Gibbons of IBM?

23       A.  Yes.

24       Q.  To your knowledge, did Ms. Poletis testify

114

1   **falsely during her deposition at any point?**

2        MR. ROSE:  Objection.

3        A.  I don't know if she testified falsely or

4   not.

5        **Q.  So you're not aware of anything Ms. Poletis**

6   **said in her deposition that was not true; is that**

7   **correct?**

8        MR. ROSE:  Objection.

9        A.  That's correct.

10       **Q.  Are you aware of anything Mr. Seager said**

11   **in his deposition that was not true?**

12       MR. ROSE:  Objection.

13       A.  I'm not aware of anything that he said

14   that's not true.

15       **Q.  Are you aware of anything that Mr. Gibbons**

16   **said in his deposition that was not true?**

17       MR. ROSE:  Objection.

18       A.  I'm not aware of anything that he said

19   that's not true.

20       **Q.  To your knowledge, has Mr. Gibbons or Mr.**

21   **Seager disclosed to anyone, other than American**

22   **Express, anything they learned during the May 5,**

23   **2005 architecture review?**

24       A.  I am not aware of any information that

Gene A. Deans

10/09/2006

115

1    those two gentlemen have disclosed to anyone.

2        **Q.  To your knowledge, has Mr. Gibbons or Mr.**

3    **Seager disclosed to anyone else within IBM anything**

4    **that they learned during the May, 2005 architecture**

5    **review?**

6        A.  I'm not aware of any such information

7    transfer.

8        **Q.  If you could turn back to Exhibit AXP 7**

9    **that was marked earlier today, Mr. Deans.  If you**

10   **look at the page stamped 01090, which is the first**

11   **page, do you see that?**

12       A.  Yes.

13       **Q.  This invitation that you testified about**

14   **earlier to a meeting in August of 2004, was this**

15   **meeting open to the public?**

16       A.  I don't believe so, based on the

17   invitations that are listed here.

18       **Q.  So this wasn't a meeting where someone**

19   **could just walk in off the street and participate**

20   **even if they had no relationship with American**

21   **Express or EchoMail?**

22       A.  I believe that's correct.

23       **Q.  Did you have any discussions with anyone**

24   **else at EchoMail concerning IBM's participation in**

# Exhibit B

1011ABRA.txt

1

1                                              VOLUME: I

2                                              PAGES: 1-

3                                              EXHIBITS: 30-

4

5                    UNITED STATES DISTRICT COURT

6                    DISTRICT OF MASSACHUSETTS

7    - - - - - - - - - - - - - - - - - - x

8    ECHOMAIL, INC.

9                           Plaintiff,

10        v.                            Civil Action

11   AMERICAN EXPRESS COMPANY and       No. 05-11318-NMG

12   IBM CORPORATION,

13                           Defendant.

14   - - - - - - - - - - - - - - - - - - x

15

16              DEPOSITION of SONU MATHEW ABRAHAM

17                    October 11, 2006

18                       10:06 a.m.

19                    Rose, Chinitz & Rose

20                    29 Commonwealth Avenue

21                    Boston, Massachusetts

22

23

24         Reporter: Michael D. O'Connor, RPR

                    LEGALINK BOSTON
                    (617) 542-0039

2

1    APPEARANCES:

2

                        Page 1

1011ABRA.txt

8    Q.   Does EchoMail have copies of those

9   agreements with Millennium Software in its offices

10  in Massachusetts?

11   A.   I believe they will be.

12   Q.   When you say "they will be," are they

13  presently?

14   A.   I haven't looked at it, but I'm sure there

15  are copies.

16          MR. SMITH:  That's all the questions I have

17  at this time.  Thank you very much.

18                  CROSS EXAMINATION

19  BY MR. POSS:

20   Q.   Good afternoon, sir.  My name is Steve

21  Poss, and I'm one of the lawyers for IBM, which is

22  one of the Defendants in this lawsuit.  I will now

23  be asking you a few questions in this deposition.

24          Do you understand that you remain under

LEGALINK BOSTON
(617) 542-0039

209

1   oath in this deposition?

2    A.   I do understand.

3    Q.   Is IBM using any proprietary, trade secret

4   or confidential information that IBM may have

5   obtained from EchoMail during the May, 2005

6   architectural review?

7    A.   Can you repeat the question, please.

8    Q.   Is IBM using any proprietary, trade secret

9   or confidential information that IBM may have

10  obtained from EchoMail during the May, 2005

11  architectural review?

                Page 182

1011ABRA.txt

12    A.    I do not know.

13    Q.    You testified earlier that you found out

14  that two people from IBM had been on the telephone

15  at some point during the May, 2005 architectural

16  review.  Do you recall that testimony?

17         MR. ROSE:  Objection.

18    A.    Yes.

19    Q.    Have either of those two IBM employees who

20  were on the phone during the May, 2005 architectural

21  review, disclosed to anyone, other than American

22  Express, anything they learned during the May, 2005

23  architectural review?

24    A.    I'm not aware of any disclosures that those

LEGALINK BOSTON
(617) 542-0039

210

1   individuals made.

2     Q.    Has either of the two IBM employees who

3   were on the phone during part of the May, 2005

4   architectural review disclosed to anyone else within

5   IBM anything that they learned during the May, 2005

6   architectural review?

7          MR. ROSE:  Objection.

8     A.    I'm not aware of any disclosures that those

9   individuals made.

10    Q.    Prior to the May, 2005 architectural review

11  meeting that you've testified about today or that's

12  been the subject of testimony today, were you ever

13  informed by anyone at EchoMail of any concerns

14  EchoMail had regarding IBM?

15         MR. ROSE:  Can I have that question read

Page 183

1011ABRA.txt

16  back.

17          (Reporter read back pending question)

18      A.    I cannot remember specifically of any

19  concerns prior to May, 2005.

20      Q.    I believe you testified earlier today that

21  American Express used only one EchoMail product, and

22  that it concerned inbound e-mail; do you recall

23  that?

24      A.    Yes.

LEGALINK BOSTON
(617) 542-0039

211

1       Q.    What is the name of that product?

2       A.    EchoMail customer care/business

3   intelligence.  EchoMail CC/BI.

4       Q.    If I refer to that, to shorten it up a

5   little bit, as the customer care product, will you

6   understand that I'm talking about the product you

7   just mentioned?

8       A.    Yes.

9       Q.    Does EchoMail's customer care product

10  consist of hardware, software or a combination?

11          MR. ROSE:  Objection.

12      A.    Can you repeat the question, please.

13      Q.    Does EchoMail's customer care product

14  consist of software, hardware or does it include

15  both software and hardware?

16          MR. ROSE:  Objection.

17      A.    The solution as provided to customers

18  include hardware and software.

19      Q.    Now, speaking about the software that
                        Page 184

1011ABRA.txt

4    about ten questions in a row about the May, 2005

5    architecture review meeting.

6              MR. ROSE:  He said he wasn't there.

7              MR. POSS:  If you want to keep testifying,

8    we'll put you under oath, sir.

9              MR. ROSE:  I'm not testifying.

10             MR. POSS:  Let me direct my question to the

11   witness.

12        Q.   When you just answered all of those

13   questions concerning the May, 2005 architecture

14   review meeting, did you understand the meeting to

15   which I referred?

16        A.   Yes.  I clarified the architecture review

17   meeting, yes.

18        Q.   You knew what meeting I was talking about?

19        A.   The May, 2005 architecture review meeting.

20        Q.   Is anyone at IBM engaged in the process of

21   writing code using any confidential or proprietary

22   or trade secret information that was disclosed

23   during the May, 2005 architecture review meeting?

24        A.   I wouldn't know whether IBM is writing code

LEGALINK BOSTON
(617) 542-0039


                                                    216


1    or not.

2        Q.   So you're not aware of any such writing of

3    code at IBM?

4        A.   I'm not aware of any writing of code at

5    IBM.

6        Q.   You testified earlier today that you became

7    president of EchoMail in 2004.  Do you recall that?

Page 188

# Exhibit C

1

VOLUME: I

PAGES: 1-213

EXHIBITS: 48-58


UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - x

ECHOMAIL, INC.

       Plaintiff,

  V.              Civil Action

AMERICAN EXPRESS COMPANY and      No. 05-11318-NMG

IBM CORPORATION,

       Defendant.

- - - - - - - - - - - - - - - - - x


DEPOSITION of ROBERT A. ZIERTEN

October 13, 2006

9:58 a.m.

Rose, Chinitz & Rose

29 Commonwealth Avenue

Boston, Massachusetts


Reporter: Michael D. O'Connor, RPR



173

1    questions I have at this time.  Thank you very much.

2             CROSS EXAMINATION

3    BY MR. POSS:

4        Q.   My name is Steve Poss, and I'm one of the

5    lawyers representing IBM in this lawsuit.  I will be

6    asking you a few questions this afternoon.  Do you

7    understand you remain under oath in this deposition?

8        A.   Yes, I do.

9        Q.   Is IBM using any proprietary, trade secret

10   or confidential information that IBM may have

11   learned from EchoMail during the May, 2005

12   architecture review meeting?

13           MR. ROSE:  Objection.

14       A.   Not that I know of.

15       Q.   Has any IBM employee, who was on the phone

16   during the May, 2005 architecture review meeting,

17   disclosed to anyone, other than American Express,

18   anything they learned during that May, 2005 phone

19   call?

20       A.   Not that I'm aware.

21       Q.   Has any IBM employee who was on the phone

22   during the May, 2005 architecture review meeting

23   disclosed to anyone else within IBM anything they

24   may have learned from EchoMail during that May, 2005

Robert A. Zierten

10/13/2006

174



1    meeting?

2    A.  Not that I'm aware, no.

3    **Q.  Is anyone at IBM engaged in the process of**

4    **writing any code, making use of any confidential or**

5    **proprietary or trade secret information that was**

6    **disclosed to IBM during the May, 2005 architecture**

7    **review meeting?**

8    MR. ROSE:  Objection.

9    A.  I'm not aware of them using any code.

10   **Q.  Has IBM developed any products or**

11   **applications, based upon any confidential,**

12   **proprietary or trade secret information that**

13   **EchoMail may have disclosed to IBM during the May,**

14   **2005 architecture review meeting?**

15   MR. ROSE:  Objection.

16   A.  I'm not aware of them developing any

17   products.

18   **Q.  During your employment with EchoMail,**

19   **you've had the occasion to communicate with IBM,**

20   **have you not?**

21   A.  Yes, I have.

22   **Q.  And in what context have those**

23   **communications occurred?**

24   A.  I've communicated with them briefly in

# Exhibit D

1012ZAVO.txt

1

1                                    VOLUME: I

2                                    PAGES: 1-99

3                                    EXHIBITS: 45

4

5              UNITED STATES DISTRICT COURT

6              DISTRICT OF MASSACHUSETTS

7      - - - - - - - - - - - - - - - - - x

8    ECHOMAIL, INC.

9                          Plaintiff,

10      v.                              Civil Action

11    AMERICAN EXPRESS COMPANY and      No. 05-11318-NMG

12    IBM CORPORATION,

13                          Defendant.

14    - - - - - - - - - - - - - - - - - x

15

16              DEPOSITION of ROMAN E. ZAVOLLY

17                   October 12, 2006

18                    10:06 a.m.

19                 Rose, Chinitz & Rose

20              29 Commonwealth Avenue

21              Boston, Massachusetts

22

23

24        Reporter: Michael D. O'Connor, RPR

                    LEGALINK BOSTON
                    (617) 542-0039

2

1   APPEARANCES:

2

                         Page 1

1012ZAVO.txt

12    processing?

13        MS. TENEROWICZ:  Objection.

14    A.    I think we stopped e-mail processing at

15    some point.  I don't remember when.

16    Q.    Do you know why?

17    A.    I don't remember the details, no.

18    Q.    Were you involved in any conversations in

19    which the topic of the termination of the

20    relationship between American Express and EchoMail

21    was discussed?

22    A.    No.

23    Q.    Has anybody from EchoMail indicated to you

24    that you should be concerned in connection with

                    LEGALINK BOSTON
                    (617) 542-0039


                                                84

1    dealing with personnel from IBM?

2        MS. TENEROWICZ:  Objection.

3    A.    No, I don't remember that being mentioned

4    at all.

5    Q.    That's never been mentioned to you at any

6    point in time?

7    A.    Not to my recollection, no.

8    Q.    Now, you're aware that at a certain point

9    in time EchoMail no longer accepted e-mails from

10    American Express for processing; is that correct?

11    A.    At one point, I remember that we stopped

12    doing that.

13    Q.    Were you involved in any way in the actual

14    process of stopping the flow of those e-mails?

15    A.    Well, because I actually oversee the
                    Page 73

# Exhibit E

1010ayya.txt

0001
```
 1                                  VOLUME: I
 2                                  PAGES: 1-279
 3                                  EXHIBITS: 14-30
 4
 5              UNITED STATES DISTRICT COURT
 6              DISTRICT OF MASSACHUSETTS
 7     - - - - - - - - - - - - - - - - x
 8     ECHOMAIL, INC.
 9                          Plaintiff,
10       v.                              Civil Action
11     AMERICAN EXPRESS COMPANY and      No. 05-11318-NMG
12     IBM CORPORATION,
13                          Defendant.
14     - - - - - - - - - - - - - - - - x
15
16            DEPOSITION of V.A. SHIVA AYYADURAI
17                   October 10, 2006
18                     10:01 a.m.
19                 Rose, Chinitz & Rose
20                29 Commonwealth Avenue
21                 Boston, Massachusetts
22
23
24         Reporter: Michael D. O'Connor, RPR
```
0002
```
 1     APPEARANCES:
 2
 3         ROSE, CHINITZ & ROSE
 4         By Alan D. Rose, Jr., Esq.
 5         29 Commonwealth Avenue
 6         Boston, Massachusetts 02116
 7         (617)536-0040
 8         For the Plaintiff.
 9
10         GREENBERG TRAURIG, LLP
11         By Louis Smith, Esq. and
12         Clark Russell, Esq.
13         200 Park Avenue
14         Florham Park, New Jersey 07932
15         (973)360-7915
16         For American Express Company.
17
18         CRAVATH, SWAINE & MOORE, LLP
19         By Thomas G. Rafferty, Esq. and
20         Chelsea W. Teachout, Esq.
21         825 Eighth Avenue
22         New York, New York 10019
23         (212)474-1837
24         For IBM Corporation.
```
0003
```
 1                      I N D E X
 2     Deposition of:      Direct  Cross  Redirect  Recross
 3     V.A. SHIVA AYYADURAI
 4     By Mr. Smith           5              273
 5     By Mr. Rafferty              216
 6
 7                   E X H I B I T S
 8     No.                                    Page
 9     14   Verified Complaint                  31
10     15   Confidentiality Agreement           36
11     16   Document entitled, "Stand-Alone Agreement
12          For Consulting Services"            41
```

Page 1

1010ayya.txt

15    Q.    To the best of your recollection as you sit
16 here today, sir, how much longer did the call go on
17 in terms of minutes?
18    A.    I don't remember in terms of minutes.  I
19 remember this was a two-day meeting, we were winding
20 up stuff, and people stayed, hung out for an hour,
21 there may have been side conversations.  From our
22 perspective, this was a meeting to get to know the
23 new management at IBM.  It was never presented as,
24 you know, a diligence of our architecture or any of
0266
1 that.
2    Q.    To be entirely fairly, I think you said to
3 get to know the new management at IBM, and I don't
4 think that's what you intended.
5    A.    At American Express.  I'm sorry.
6    Q.    Don't be sorry.  It's late in the day.
7 Now, you also mentioned that in your judgment, the
8 design and the requirements that were disclosed
9 during this May call were 80 percent of the work
10 involved in creating a product?
11    MR. ROSE:  Objection.  You can answer.
12    Q.    Well, do you recall testifying to that
13 effect earlier today?
14    MR. ROSE:  Objection.
15    A.    I recall testifying that what we discussed
16 at this call, most of it was not related to the
17 patent.  It was related to how we implement our
18 tool, the requirements, the architecture, our
19 service agreements, business process, all of those
20 items that were listed, A through L or A through J
21 items.  That was essentially a good part of this
22 review, architecture review.
23    Q.    Do you have any firsthand direct knowledge
24 that following that May, 2005 call, up to the
0267
1 present, that anyone at IBM has been actually
2 writing code using the information that was
3 disclosed on that call?
4    A.    I don't know if IBM has been writing code.
5    Q.    Okay.  Do you know whether anyone -- same
6 question for American Express.  From the May call
7 through the afternoon today that brings us together,
8 do you have firsthand direct knowledge that anyone
9 at American Express is actually writing code based
10 on information learned on that call?
11    A.    You said based on the earlier testimony.
12 The earlier testimony was someone developing.  You
13 are asking about writing code.  Writing code is one
14 part of a long process that's in a development
15 process.  So you referred to the earlier question.
16 Are you changing your question to limit it to just
17 code writing versus development?
18    Q.    I was trying to break it -- I'm not talking
19 about development and I'm not talking about the
20 collection of requirements.  What I'm asking you,
21 and I think the record is already clear, that from
22 the May, 2005 call, the two-day call that we have
23 been talking about, through today, do you, Mr.
24 Shiva, have any firsthand direct knowledge that
0268
1 anyone in American Express is actually writing code
2 based on the information learned during that call?
                              Page 106

1010ayya.txt

```
 3        A.   I don't know if anyone is actually writing
 4   code in the development process, no.
 5        Q.   Maybe I'm being too complicated.  I'm
 6   trying to ask you simple questions.  So you don't
 7   know whether anyone at IBM is writing code based on
 8   information learned during that May, 2005 call?
 9             MR. ROSE:  Objection.
10        A.   Right.  I just do not want to contradict
11   what I said earlier.  So I'm being very precise in
12   answering your question.
13        Q.   So the answer is, no, you don't know of
14   anyone at IBM between May of 2005 and today who is
15   actually writing code using the information --
16        A.   I don't personally know anyone who is doing
17   that at IBM.
18        Q.   Has anyone at EchoMail told you that
19   someone at AmEx is actually sitting and writing code
20   based on the information disclosed in the May, 2005
21   call?
22        A.   Has anyone at EchoMail told me someone at
23   IBM is doing that?
24        Q.   No.  I know you have been here a long day,
0269
 1   sir.  If you want to get a cup of coffee -- I'm
 2   almost done.
 3             I think we've established that with respect
 4   to anyone at AmEx writing code or anyone at IBM
 5   writing code, based on the information learned
 6   during the May, 2005 call, you don't know personally
 7   of anyone engaged in such activities?
 8             MR. ROSE:  Objection.
 9        Q.   Is that correct?
10             MR. ROSE:  This is the fourth time we've
11   gone over this.
12        A.   I don't know what you mean, "such
13   activities"?
14        Q.   Writing code.  Based on information
15   disclosed by EchoMail during the May, 2005 call.
16             MR. ROSE:  Objection.
17        A.   Could you define what you mean by writing
18   code.
19        Q.   Source code for a program.
20        A.   Could you define what's involved in that
21   process.  I don't know what you mean.
22        Q.   You don't know what it is to write source
23   code?
24        A.   No.  I don't want to contradict my earlier
0270
 1   testimony.  It seems like you're using "developing,"
 2   and I don't want to contradict my earlier testimony.
 3        Q.   I'm not talking about architectural
 4   drawings, I'm not talking about schematics.  I'm
 5   talking about actually sitting down in C++ or in
 6   whatever language you're using and writing the code
 7   that will ultimately be compiled and will form the
 8   basis of a software program.
 9        A.   No, I do not have access to people at IBM.
10   I'm not in communication with someone at IBM, to be
11   very precise, who is sitting down taking the
12   information that they learned from our architecture
13   review, all the requirements and all the documents,
14   and all of that, and some engineer at IBM who is in
15   the midst of writing code.  I don't have access to
```

Page 107

1010ayya.txt

16  that engineer right now.
17       Q.   Is it true with respect to American
18  Express, you don't have any access to any
19  information that someone at American Express is
20  sitting down in the process of writing code
21  following the development requirements?
22       A.   I don't have access to an engineer at
23  American Express who I know personally who is
24  actually in the development process of requirements
0271
1   which we gave them the design but in the process of
2   writing code.
3        Q.   I'm really close to the end.  So let me see
4   if I can keep it simple.  Do you know of anyone at
5   EchoMail who claims to know somebody at IBM who is
6   actually sitting down writing code based upon the
7   information learned during the May, 2005 review?
8        A.   Do I know of anyone at EchoMail?
9        Q.   Does anyone at EchoMail claim to know that?
10       A.   I don't know about that.
11       Q.   Is the same true for American Express, you
12  don't know about that?
13       A.   I don't know if anyone at EchoMail knows
14  whether or not someone is writing code or not.
15       Q.   No one has told you that?
16       A.   Again, I don't know what you mean no one
17  has told me that.
18       Q.   No one at EchoMail has either sent you an
19  e-mail, picked up the phone or bumped into you for
20  the few hours you were there and said, Mr. Shiva,
21  it's come to my attention that someone at American
22  Express, using the information we gave them in 2005,
23  is actually sitting down writing code for a program
24  to compete with us?
0272
1            MR. ROSE:  Objection.  You can answer.
2        A.   That's a tough question, because I don't
3   know what you mean by writing code.  People at
4   EchoMail have expressed that it's somewhat patent
5   that given all the information that we gave, we've
6   essentially given people quite a bit of knowledge,
7   but they don't -- and certain people have access to
8   this information.  It could be designing, building,
9   laying architecture for it.  So that's been
10  discussed.  But do we know or has anyone at EchoMail
11  know the actual person doing that, no.
12       Q.   Or whether there is such a person doing it?
13       A.   I don't think people at EchoMail know
14  there's such a person doing that at IBM.
15       Q.   Have you either directly or through counsel
16  hired an investigator to try to determine whether
17  anyone at AmEx or EchoMail is in the code-writing
18  process of developing a program based upon the
19  information disclosed during the 2005 telephone
20  call?
21           MR. ROSE:  Objection.  You can answer.
22       A.   I don't know if EchoMail -- if they have
23  hired an investigator for that.
24       Q.   As you sit here, you don't know?
0273
1        A.   I don't.
2            MR. RAFFERTY:  That's all I have.  I thank
3   you for your patience.  I'm sorry if it was somewhat
Page 108

# Exhibit F

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ECHOMAIL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-11318-NMG |
| | ) | |
| AMERICAN EXPRESS CO. | ) | |
| and IBM CORP., | ) | |
| | ) | |
| Defendants. | ) | |

## NOTICE OF TAKING DEPOSITION

To:    Thomas G. Rafferty
       Cravath Swaine & Moore LLP
       Worldwide Plaza
       825 Eighth Avenue
       New York, NY 10019

Please take notice that pursuant to Rules 30 and 45 of the Federal Rules of Civil

Procedure, on Friday, November 10, 2006, at 10:00 a.m., at the offices of Rose, Chinitz & Rose,

29 Commonwealth Avenue, Boston, Massachusetts, the Plaintiff in this action, by its attorneys,

will take the deposition upon oral examination of the individual and/or individuals designated by

defendant IBM Corporation, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure,

who will testify on defendant IBM's behalf regarding the topics listed in Schedule A, attached

hereto, before a Notary Public or other officer authorized by law to administer oaths. The

deposition will continue from day to day until completed. You are invited to attend and cross

examine.

Respectfully submitted,

ECHOMAIL, INC.

By its attorneys,

Alan D. Rose (BBO #427280)
Alan D. Rose, Jr. (BBO#628871)
Lisa A. Tenerowicz (BBO#654188)
ROSE, CHINITZ & ROSE
29 Commonwealth Ave.
Boston, MA 02116
Tel: 617-536-0040

Date:  October 13, 2006

## SCHEDULE A

Pursuant to Fed. R. Civ. P. 30(b)(6), defendant IBM Corporation is required to designate one or more officers, directors, or managing agents, or other person(s) who consent to testify on its behalf, with regard to the matters specifically designated below to appear at the deposition referenced in the accompanying Notice of Deposition and testify, under oath, regarding those areas.

## DEFINITIONS

1.      "IBM," "you," or "your" shall mean defendant, International Business Machines Corporation and its agents, affiliates, subsidiaries and employees, and any predecessor or related entities.

2.      "EchoMail" or "plaintiff" shall mean plaintiff EchoMail, Inc. and its agents, affiliates, subsidiaries and employees, and any predecessor or related entities.

3.      "American Express" shall mean defendant American Express Company, its agents, affiliates, subsidiaries and employees.

4.      "Email response management system" shall mean any system, process or application that enables enterprises to receive, filter, track, route, respond to, and customer email communications.

## TOPICS FOR EXAMINATION

1.      All contracts or agreements between IBM and KANA, including without limitation, statements of work, invoices, and schedules.

2.      All contracts or agreements between IBM and any other business or enterprise that provides an email response management system, including without limitation, RightNow, eGain, iPhrase, Seibel, Talisma, and ATG,.

3

3.     All contracts or agreements between AmEx and IBM, including without limitations,
statements of work, invoices, and Schedules to the Services Agreement, identified by Bates
Stamp Numbers IBM 000001 – IBM 000113.

4.     All proposals, offers to provide services, and offers to host applications from IBM to
EchoMail between 1996 and 2004.

5.     All confidentiality and non-disclosure agreements executed between IBM and EchoMail.

6.     The representations in IBM's Answer.