## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| ECHOMAIL, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 05-11318-NMG |
| | ) |
| AMERICAN EXPRESS COMPANY | ) |
| and IBM CORPORATION | ) |
| | ) |
| Defendants. | ) |

_____)

### PLAINTIFF ECHOMAIL INC.'S REPLY TO DEFENDANTS AMERICAN EXPRESS COMPANY'S AND IBM COPORATION'S OPPOSTIONS TO ECHOMAIL'S MOTION TO EXTEND DISCOVERY DEADLINES

Plaintiff EchoMail, Inc. ("EchoMail") submits this Reply to defendants American Express Company's ("AmEx") and IBM Corporation's ("IBM") (collectively, "the Defendants") Oppositions to the EchoMail's Motion to Extend Discovery Deadlines (Docket Nos. 64 & 65). This Reply highlights for the Court the many mischaracterizations and factual misstatements contained in the Defendants' submissions.

### ARGUMENT

In their Oppositions to EchoMail's motion to extend the discovery deadlines AmEx, and especially IBM, have charged EchoMail with delaying discovery throughout the case. IBM also argues that the discovery in this case to date demonstrates conclusively that there is no basis for EchoMail's claim that IBM is using any of EchoMail's confidential and proprietary information that was disclosed prior to and during the May 4-5, 2005 Architecture Review. However, IBM's recitation of the history of discovery in this case is both misleading and selective, and IBM's own submissions and discovery material demonstrate that IBM has already used EchoMail's

information in its consulting work for AmEx.

## I.    IBM HAS MISCHARACTERIZED THE PROGRESSION OF DISCOVERY

### A.    IBM is Responsible for Delaying Discovery Prior to July 15

In its Opposition, IBM charges EchoMail with "dilatory conduct throughout the discovery period," and points specifically to EchoMail's request for an extension of time to answer IBM's interrogatories, served on April 21, 2006.  (IBM Opp'n, 13.)  Not surprisingly, IBM has failed to mention its own dilatory conduct during the discovery period.  For instance, on February 17, 2006, nearly one month after EchoMail served its requests for the production of documents on January 19, 2006, IBM's counsel wrote to counsel for EchoMail and AmEx and stated that IBM would not produce any documents in response to EchoMail's requests until a suitable protective order had been entered.[1]  Notwithstanding IBM's earlier demand for a protective order, on April 24, 2006, nearly three months after EchoMail served its document requests and in response to an inquiry from EchoMail's counsel on April 21, 2006, counsel for IBM indicated that the proposed protective order -- upon which IBM had insisted -- "had become lost in the shuffle," and asked EchoMail to circulate a signed copy of the protective order.  Following the filing of the protective order on May 10, 2006 (see Docket # 50), IBM finally produced its first set of responsive documents on June 23, 2006, nearly *five months* after EchoMail served its original document requests and *six weeks* after the entry of the protective order and only *three weeks* before the close of discovery.[2]

---

[1] On January 19, 2006, EchoMail also served its First Request for the Production of Documents on AmEx and then served interrogatories on both AmEx and IBM on February 9, 2006, before either AmEx or IBM had served any discovery requests.  Accordingly, IBM's contention that EchoMail has made no effort to advance discovery is erroneous.

[2] In its Opposition, IBM notes that EchoMail made a small production of documents on June 29, 2006, and made its principal productions of documents in July, August, and September.  Specifically, EchoMail produced documents on June 29, July 6, July 10, July 17, August 15, and September 29.  Similarly, AmEx made its principal productions on June 15, July 20, and September 6.  As EchoMail's counsel explained to AmEx's counsel in a letter dated June 29,

On June 27, 2006, after a review of IBM's first production of documents, counsel for EchoMail wrote to counsel for IBM pointing out the various deficiencies in IBM's original production.  IBM responded to that letter on July 21, 2006 and enclosed approximately 90 pages of additional responsive documents.  Counsel for IBM added that it expected to receive a small number of additional documents in the next few days and would produce those documents in the next week.  Hence, IBM itself has played a significant role in delaying discovery in this case.

Furthermore, despite IBM's recitations to the contrary, IBM did not timely answer EchoMail's interrogatories that were served on February 9, 2006.  The response date for those interrogatories was March 13, 2006, but that date came and went without so much as a word from IBM or any request from its counsel for an extension of time to respond.  As IBM concedes in its Opposition, it did not serve its responses and objections until March 27, 2006 -- two weeks *after* the due date.  (IBM Opp'n, 4 & 5).  IBM's claim that it has not contributed to discovery delays is therefore disingenuous and misleading.  In fact, IBM's conduct leading up to the July 15, 2006 discovery deadline was undoubtedly designed to pin EchoMail up against the original discovery deadlines and prevented EchoMail from taking any depositions at an earlier stage in the case.

---

2006, to meet its discovery obligations and identify the documents responsive to AmEx's requests -- which included 52 separate categories of documents -- EchoMail had to sift through many thousands of documents, both in paper files and in several electronic databases.  This involved a multi-step process that is both time consuming and labor intensive:  First, EchoMail had to restore archived e-mails and identify those EchoMail personnel whose archived emails were to be reviewed.  The restored e-mails were then filtered and segregated to extract those e-mails concerning AmEx.  Then the collected e-mails were reviewed to determine whether each message was responsive to AmEx's requests.  After a "collection" (i.e. a subset of emails responsive to AmEx's requests) was identified, it was exported to a text format and any attachments were saved.  The exported e-mails and corresponding attachments were then converted to files that were printed for review prior to production.

## II.    IBM HAS USED ECHOMAIL'S CONFIDENTIAL INFORMATION[3]

### A.    IGS is A Part of IBM

IBM's attempts to convince the Court that the discovery thus far demonstrates that there is no basis for EchoMail's claim that IBM is using any of EchoMail's confidential and proprietary information disclosed prior to and during the May 4-5, 2005 Architecture Review.  In fact, the contrary is true.  IBM's own submissions and discovery materials reveal that IBM has already used EchoMail's information in its consulting work for AmEx.  The additional discovery sought by EchoMail is necessary to determine the full nature of IBM's use of EchoMail's confidential material.

As an initial matter, as IBM points out in its Opposition, the two IBM employees who participated in the May 4-5, 2005 Architecture Review, Stephen Gibbons and Todd Seager, work for "IBM Global Services ("IGS") in a group dedicated solely to providing computer security consulting to American Express."[4]  (IBM Opp'n, 6.)  IBM then boldly claims -- without any basis whatsoever to do so -- that this group "has no relation to the rest of the IBM company." (Id.)  This statement -- a classic oxymoron -- simply underscores EchoMail's point.  First, neither Mr. Gibbons nor Mr. Seager (nor Angela Poletis for that matter) have denied that they are employed by IBM.  In addition, neither Mr. Gibbons nor Mr. Seager ever testified that their group within IGS has no relation to the rest of IBM.  To the contrary, Mr. Gibbons testified that he works for IGS, IBM Global Services, which he explained is part of the larger IBM.  (See

---

[3] IBM suggests that the information disclosed at the Architecture Review must not be entitled to trade secret protection because upon discovering that an IBM employee had been surreptitiously participating in the Architecture Review by telephone, no one from EchoMail sought to designate the subject matter of the Review as confidential under the existing Confidentiality Agreement ("CDA") between IBM and EchoMail.  (IBM's Opp'n at 2.)  This argument is unavailing.  As IBM well knows, there was **no** CDA governing the Architecture Review.

[4] Prior to the Deposition of IBM employee Angela Poletis on October 4, 2006, EchoMail had no idea how the IBM employees were notified of the May 4-5, 2005 Architecture Review or what role IBM representatives play in Project Governance Board reviews.

Exhibit A, 17:13-18.)   Mr. Gibbons further testified that at some time during the May 4-5, 2005

Architecture review, he raised an issue with respect to what he called a conflict of interest.

Specifically, Mr. Gibbons testified as follows:

> Q.  Do you recall during the EchoMail TDC raising an issue with respect to what
> you called a conflict of interest?
>
> A.  I do recall that.
>
> Q.  What do you recall about that?
>
> A.  What I remember is that it became apparent that part of the solution that was
> being reviewed included technology from Lotus, a division of IBM, known as
> Domino.  At that time Domino had some security issues that I was aware of.  I
> wanted to make it clear to American Express that despite my paycheck having an
> IBM logo on it and despite the inclusion of IBM technology there might be an
> appearance of a conflict of interest.  That was -- that was the purpose of my
> statement.
>
> Q.  Do you recall at that time identifying that you were an IBM employee?
>
> A.  I do.

(Exhibit A, 78:18-79:13.)

It thus taxes the imagination to conclude, as IBM now insists, that the group at IGS for which

Mr. Gibbons and Mr. Seager worked has no relation to the rest of the IBM.  Plainly, if Mr.

Gibbons did not believe that in his position as a security consultant with IGS he was a part of

IBM, he would not have raised the issue of a conflict of interest with respect to an IBM product

during the Architecture Review, as he in fact did do.

### B.    Gibbons and Seager Had Access to Information AmEx Had Designated As Confidential and Proprietary

At his deposition, Mr. Seager testified that the information provided by EchoMail to

AmEx prior to the May 4-5, 2005 Architecture Review was stored on the AmEx Project

Governance Board ("PGB") database that was accessible not only to Mr. Seager and Mr.

Gibbons, but also to other members of their group, including those who purportedly did not

participate in the EchoMail Architecture Review.  (<u>See</u> Exhibit B, 26:16-27:14.)  That

information was designated as confidential and proprietary by AmEx.  In particular, prior to the

Architecture Review, EchoMail was asked to complete a Technical Evaluation Questionnaire

("TEQ") which, according to its instructions is required to help the AmEx Technologies team

develop an agenda for the Architecture Review.  (Exhibit C.)  This document had been marked

by AmEx as "Confidential" and contains the following notation at the bottom of each page:

> CONFIDENTIALITY:  The information contained herein is considered
> confidential, trade secret, proprietary and/or sensitive, and shall not be copied,
> printed, or otherwise reproduced without the express written permission of
> American Express.  American Express agrees to receive and maintain the
> information received in trust and confidence, and will not disclose this
> information to any person, firm or enterprise, or use this information for the
> benefit of American Express or others (directly or indirectly) without first
> obtaining the vendor's written consent.

(Exhibit C.)  AmEx unmistakably considered the information contained in the TEQ to be

confidential and proprietary.  And, as IBM employees Mr. Gibbons and Mr. Seager both

testified, they had access to the entire TEQ that EchoMail completed prior to the Architecture

Review, not only the security portion of that document for which they were responsible.  (<u>See</u>

Exhibit A, 35:21-37:9; Exhibit B, 37:6-39:15.)  Notably, EchoMail also marked the TEQ as

"Confidential" prior to submitting it to AmEx.

In addition, Mr. Seager testified that upon accessing the AmEx database, the information

contained therein could be viewed, saved, and printed.  (<u>See</u> Exhibit B, 26:16-28:25.)   Although

Mr. Seager testified that he has not printed any of the information available on the PGB database,

he conceded that he does not know if anyone else has printed this information, in part because he

works remotely from his home in Utah.  (<u>See</u> Exhibit B, 28:16-29:5.)

C.    **Gibbons and Seager Did Not Identify Themselves As IBM Employees At the Start of the May 4-5, 2005 Architecture Review**

In its Opposition, IBM contends that during the May 4-5, 2005 Architecture Review, Mr. Gibbons, who participated in the Review by telephone, identified himself as an IBM employee. (IBM Opp'n, 2.)  While it is true that Mr. Gibbons *eventually* identified himself as an IBM employee, he did not do so at the beginning of the call.  To the contrary, as AmEx employee Angela Ramsammy testified at her deposition on October 18, 2006, Mr. Gibbons and Mr. Seager did not identify themselves as IBM employees when they joined the call.  Specifically, Ms. Ramsammy testified:

> Q.  Do you know if the initiation of the IBM participants joined in the call they identified themselves by name?
>
> A.  Yes.
>
> Q.  They did identify themselves by name?
>
> A.  Yes.
>
> Q.  Do you know if they identified themselves by company?
>
> A.  I don't believe so.
>
> Q.  Why do you not believe so?
>
> A.  I -- I remember them naming their group that they represented but not their company name because they were representing an American Express group or a group on behalf of American Express.
>
> Q.  And what would that group be?
>
> A.  I think it was Security Services or something similar to that.

(Exhibit D, 154:8-155:2.)[5]

In fact, it was not until the teleconference had been going on for many hours (and most likely for

---

[5] Mr. Gibbons testified at deposition that he did not remember how he introduced himself during the May 4-5, 2005 Architecture Review nor did he have any recollection of Mr. Seager introducing himself.  (See Exhibit A, 74:10-75:8.)

more than a day and a half) that Mr. Gibbons raised the issue of a potential conflict and identified himself as an IBM employee.  (See Exhibit A, 78:18-79:13.)

### III.    AMERICAN EXPRESS CONTRIBUTED TO THE DISCOVERY DELAYS

Like IBM, AmEx charges EchoMail with a failure to proceed diligently with regard to discovery.  (AmEx Opp'n, ¶ 1.)  However, while its conduct has not been nearly as lax as IBM's conduct has been, AmEx has also played a role in the discovery delays in this case.  For example, EchoMail served its first set of interrogatories on AmEx on February 9, 2006.  AmEx served its answers and objections to these interrogatories on April 5, 2006, nearly two months after they were served.  In addition, after the protective order was filed on May 10, 2006, AmEx produced its first set of documents on June 15, 2006 -- over one month later.  Following a review of AmEx's initial production, counsel for EchoMail wrote to counsel for AmEx on June 27, 2006, and pointed out the various deficiencies in AmEx's original document production.  In that letter, EchoMail's counsel explained that EchoMail could not productively take and conclude any depositions of AmEx personnel, or permit any EchoMail representatives to be deposed, until AmEx rectified the issues raised and produced additional responsive documents.  AmEx finally responded to EchoMail's letter on July 20, 2006 and produced a second set of documents. AmEx then produced nearly 2000 additional pages on September 6, 2006 -- only five weeks before discovery was set to end.  AmEx's third production of documents contained critically important discoverable material that AmEx failed to produce until long after it should have revealed this information.  Consequently, only after receiving AmEx's third production of documents on September 6, 2006 did EchoMail finally begin to get a clearer picture of the pivotal events in this case, and a sharper understanding of the relationships between and among the key players.

Finally, as EchoMail explained in its opening motion, in the interest of fairness to the parties, after AmEx could not locate a former EchoMail employee now living out of state, and whose deposition AmEx noticed on September 26, 2006,  EchoMail agreed to accept service on this witness' behalf and make her available for a deposition.  EchoMail produced that witness and AmEx took her deposition on October 16, 2006 in Boston.  However, in its Opposition, AmEx states that on September 19, 2006, the parties agreed to a total of thirteen depositions (three IBM, five AmEx, and five EchoMail) (AmEx Opp'n, ¶ 5) and later complains that on September 27, 2006, EchoMail served another deposition notice for a sixth AmEx witness. (AmEx Opp'n, ¶ 7).  AmEx has conveniently failed to mention that the deposition notice it served on September 26, 2006 -- for a sixth EchoMail witness -- was also outside the scope of the parties' original agreement.

## CONCLUSION

For the reasons set forth above, and for the reasons discussed in EchoMail's opening papers, the Court should grant EchoMail's motion to extend fact discovery until December 15, 2006.  Notwithstanding the assertions by IBM and AmEx to the contrary, EchoMail will not seek any additional discovery or file any further discovery motions without the Court's approval.

Respectfully submitted,

ECHOMAIL, INC.

By their attorneys,

/s/ Alan D. Rose, Jr.

_____
Alan D. Rose (BBO# 427280)
Alan D. Rose, Jr. (BBO#628871)
Lisa A. Tenerowicz (BBO#654188)
ROSE, CHINITZ & ROSE

29 Commonwealth Avenue
Boston, MA  02116
Tel: 617-536-0040
Fax: 617-536-4400

Date: November 1, 2006

## Certificate of Service

I hereby certify that this document filed through the ECF system on this 1st day of November, 2006, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on November 1, 2006.

/s/ Alan D. Rose, Jr.

_____

Alan D. Rose, Jr.

# EXHIBIT A

Stephen P. Gibbons

Page 1

1
2

         UNITED STATES DISTRICT COURT
3             DISTRICT OF MASSACHUSETTS
4

ECHOMAIL, INC.,                    )
5                                  )
              Plaintiff,     )
6                                  )
         vs.                       ) No. 05-11318-NMG
7                                  )
AMERICAN EXPRESS CO. and )
8 IBM CORP.,                       )
                                   )
9              Defendants.   )
- - - - - - - - - - - - - - - - - - - - - - - - -
10
11
12
13      DEPOSITION OF STEPHEN P. GIBBONS
14           New York, New York
15        Thursday, October 5, 2006
16
17
18
19
20
21
   Reported by:
22 NICOLE AMENEIROS, RPR
   JOB NO. 188165
23
24
25

Stephen P. Gibbons

Page 17

```
 1                    Gibbons
 2        Q.    And that's your current employer?
 3        A.    Correct.
 4        Q.    And has been your employer since
 5  2002?
 6        A.    Correct.
 7        Q.    Has your title changed in those
 8  years, 2002 to the present?
 9        A.    My title is now information
10  security advisor.  I'm currently working on
11  the Ameriprise Financial Incorporated
12  account.
13        Q.    So you're an IBM employee assigned
14  to work on the Ameriprise account for
15  American Express?
16        A.    Specifically I work with then IGS,
17  IBM Global Services, part of the larger IBM
18  working on the Ameriprise account, yes.
19        Q.    Are there also teams of IBM or IGS
20  personnel who perform architecture reviews?
21              MR. POSS:  Objection.
22        A.    Again, architecture review is a
23  broad term that does not refer to a specific
24  process that I'm aware of that's used at
25  American Express.
```

Stephen P. Gibbons

Page 35

1                    Gibbons

2      Q.    What was Javier Diaz's role within

3 your group in the spring of 2005?

4           MR. POSS:  Objection.

5      A.    Again, I don't recall whether

6 Javier was part of the team at that time.

7 His role when he did join the team would have

8 been similar to mine.

9      Q.    What was Bill Blaney's role?

10     A.    Same response.

11     Q.    What was Mr. Pierson's role?

12     A.    Same response.

13     Q.    And in the spring of 2005

14 Mr. Seager was preparing to play that same

15 role; is that correct?

16     A.    That is correct.

17     Q.    Did your team provide any services

18 to American Express which were not security

19 related?

20     A.    No.

21     Q.    What materials generally did you

22 review during the period of 2002 to 2005 in

23 preparing to do a technical due care review?

24     A.    As time permitted I would review

25 the -- let me back up.  Typically what was

Stephen P. Gibbons

Page 74

1                    Gibbons

2        Q.    Do you know how long Mr. Seager was

3  on the phone for?

4        A.    I don't.

5        Q.    Was there ever a time during the

6  TDC when Mr. Seager was on the phone and you

7  were not on the phone?

8        A.    I don't know.  It was 15 months

9  ago.

10       Q.    Do you typically identify yourself

11  when you're dialing in to a TDC?

12       A.    I do.

13       Q.    Do you identify yourself by name?

14       A.    I do.

15       Q.    Do you identify yourself by

16  company?

17       A.    Sometimes, mostly.

18       Q.    Mostly?

19       A.    Not always.

20       Q.    Not always.

21             And do you remember introducing

22  yourself during the Echomail TDC?

23       A.    I don't.

24       Q.    Do you remember that you didn't

25  introduce yourself or you have no memory of

**Stephen P. Gibbons**

Page 75

1                    Gibbons

2 whether or not you did?

3      A.   I have no recollection of the

4 introduction of a particular TDC given the

5 number I deal with.

6      Q.   Do you recall Mr. Seager

7 introducing himself when he called in?

8      A.   I don't recall.

9      Q.   Do you typically get an agenda for

10 a TDC prior to it beginning?

11      A.   The agenda, such as it is, is

12 fairly fixed, and -- I believe one of the

13 database entries may have a section for

14 agenda.  I think it's fairly short.  It's not

15 complex enough that I have to refer to an

16 agenda to know what's going on.

17      Q.   So a TDC follows a typical format

18 with respect to the Amex related work that

19 you perform?

20      A.   Correct.

21      Q.   But with respect to the information

22 that Amex maintains that you can link in to

23 there's an agenda in there with respect to

24 specific TDCs?

25      A.   I believe there is.  I believe it's

Stephen P. Gibbons

Page 78

```
 1                    Gibbons
 2 had another obligation you could have gotten
 3 off before the two-hour block ended or stayed
 4 on after the two-hour block ended?
 5      A.    Those are both alternatives, yes.
 6      Q.    Do you remember whether either one
 7 of those things happened with respect to
 8 Echomail?
 9      A.    I don't.
10      Q.    And to the best of your knowledge
11 you only participated in the Echomail TDC on
12 one day; is that correct?
13      A.    That's correct.
14      Q.    And I believe you said earlier
15 you're not sure whether or not Mr. Seager
16 participated on another day?
17      A.    I have no knowledge.
18      Q.    Do you recall during the Echomail
19 TDC raising an issue with respect to what you
20 called a conflict of interest?
21      A.    I do recall that.
22      Q.    What do you recall about that?
23      A.    What I remember is that it became
24 apparent that part of the solution that was
25 being reviewed included technology from
```

**Stephen P. Gibbons**

Page 79

1                    Gibbons

2 Lotus, a division of IBM, known as Domino.

3 At that time Domino had some security issues

4 that I was aware of.  I wanted to make it

5 clear to American Express that despite my

6 paycheck having an IBM logo on it and despite

7 the inclusion of IBM technology there might

8 be an appearance of a conflict of interest.

9 That was -- that was the purpose of my

10 statement.

11      Q.   Do you recall at that time

12 identifying that you were an IBM employee?

13      A.   I do.

14      Q.   What did you say?

15      A.   I don't recall specifically.

16      Q.   Did you identify yourself by name?

17      A.   I may have.

18      Q.   Do you recall speaking at any other

19 times during the review?

20      A.   I must have.

21      Q.   Is it typical that you participate

22 in the TDC in an active way?

23      A.   Yes.

24      Q.   Do you recall specifically

25 participating in the Echomail TDC with

# EXHIBIT B

Page 1

```
 1
 2
                   UNITED STATES DISTRICT COURT
 3              DISTRICT OF MASSACHUSETTS
 4
    ECHOMAIL, INC.,                )
 5                                 )
                  Plaintiff,       )
 6                                 )
                  vs.             ) No. 05-11318-NMG
 7                                 )
    AMERICAN EXPRESS CO. and       )
 8  IBM CORP.,                     )
                                   )
 9                Defendants.     )
    ---------------------------
10
11
12
13            DEPOSITION OF TODD SEAGER
14               New York, New York
15            Friday, October 6, 2006
16
17
18
19
20
21
    Reported by:
22  NICOLE AMENEIROS, RPR
    JOB NO. 188166
23
24
25
```

**Todd Seager**

Page 26

1                          **Seager**

2        A.    No.   I normally just go to -- go to

3    the PGB scheduling calendar --

4        **Q.    And how would you access that?**

5        A.    -- and just look at that.

6              Access that by going to an American

7    Express database and pulling that up.

8        **Q.    Was that database**

9    **access-controlled?**

10       A.    Yes, it was.   The scheduling

11   portion I don't believe -- the scheduling

12   portion can be seen by -- by those who -- who

13   schedule their reviews.   As far as getting

14   into the documents, that's absolutely

15   access-controlled.

16       **Q.    So to your knowledge who has access**

17   **to those documents?**

18       A.    The -- there are -- well, there are

19   several different databases for the reviews

20   that we do.   I'm assuming you're asking about

21   the technical due care database.

22       **Q.    I am.**

23       A.    Okay.   That is controlled by

24   American Express.   They have explained to us

25   that the only people that have access is my

**Todd Seager**

Page 27

1                    Seager

2 core team and the reviewers at American

3 Express.

4        Q.   **Would any member of your core team**

5 **be able to access the documents available for**

6 **a particular technical due care review?**

7        A.   Yes, they can access them, but that

8 usually does not occur.  We're just so busy

9 we -- we act on those -- it does need to be

10 made available in case someone is not

11 available for a review.  For example, if I'm

12 pulled off one that I'm scheduled for someone

13 needs to fill in, someone needs to have

14 access to those documents.

15        Q.   **Once you've accessed those**

16 **documents can you read them on-line?**

17        A.   I'm not sure what you're asking.

18        Q.   **Let me rephrase the question.  Once**

19 **you get into this access-controlled database**

20 **what can you do?**

21        A.   We can open documents and view

22 them.

23        Q.   **Can you save them to your system?**

24        A.   Yes, we can save them on our

25 system.

**Todd Seager**

Page 28

1                    Seager

2        Q.    Could you then distribute them,

3 forward them to other people?

4        A.    We could, but we're prohibited from

5 doing so.

6        Q.    But it's possible that you could

7 send them to anybody inside IBM?

8        A.    Yes, that is possible.  It's --

9 there are many things that are possible, and

10 being an expert in security these are things

11 that we're well-aware of.  And -- and there

12 are certain things that to a certain extent

13 you can protect, and if you go too far then

14 -- then people find ways to work around them.

15 It becomes less secure.

16       Q.    Can you print any of these

17 documents that are on these databases?

18       A.    I could print them.

19       Q.    Okay.

20       A.    But I -- I never have printed any

21 personally.

22       Q.    Okay.  Do you know of anybody who

23 has ever printed any?

24       A.    I don't know of anybody, but I work

25 remotely so it -- it would just be myself.

**Todd Seager**

Page 29

1            Seager

2      Q.    **Where do you work from?**

3      A.    I work from my home office.

4      Q.    **And where is that located?**

5      A.    It's in Orem, Utah.

6      Q.    **Okay.  What role does your core**

7 **team typically play in a technical due care**

8 **review?**

9      A.    We -- we act as co-reviewer with

10 American Express.  So they have technical due

11 care reviewers, and then we conduct the --

12 well, we assist them in doing that review as

13 we assist with other reviews.

14      Q.    **How do you assist them?**

15      A.    We assist them by -- by reading the

16 documents that are prepared by the -- by the

17 companies that we review, the TEQ

18 questionnaire.

19      Q.    **What is a TEQ questionnaire?**

20      A.    TEQ questionnaire is a standard

21 form that's given to third parties by

22 American Express for them to fill out and --

23 and -- and basically attest to -- well, not

24 attest, that's maybe a legal term.  But

25 basically they -- they represent what they

**Todd Seager**

Page 37

1                    Seager

2      A.    No.  With third parties American

3  Express contracts with -- with Foundstone and

4  Price Waterhouse Coopers to -- to conduct

5  those.

6      Q.    Okay.  When you're invited to

7  participate in a technical -- in the spring

8  of 2005 when you were invited to participate

9  in a technical due care review what

10  information would you typically be given

11  prior to the review?

12     A.    We're given the TEQ typically and

13  possibly associated diagrams, possibly

14  security policy and then sometimes an odd

15  assortment of things that the vendor throws

16  in that we usually don't -- don't evaluate.

17     Q.    What would that -- what would be

18  included in your description of an odd

19  assortment of things?

20     A.    Oh, anything from marketing

21  brochures to -- to, you know, client

22  recommendations to mostly marketing material.

23     Q.    Okay.  And those materials that you

24  -- that you would be given typically before a

25  technical due care review --

**Todd Seager**

Page 38

```
 1                    Seager
 2      A.    Uhm-hum.
 3      Q.    -- were those available to you on
 4 an American Express database or were they
 5 sent to you?
 6      A.    It occurs both ways.
 7      Q.    What -- what materials are
 8 typically sent to you?
 9      A.    The -- well, a must have is the TEQ
10 questionnaire.  That's something that all
11 companies give, and then we also need network
12 diagrams to help us evaluate the security.
13      Q.    And in the spring of 2005 were
14 those documents sent to you by American
15 Express?
16      A.    At that point in time, no.  We
17 would pull them from the database if the --
18 if the vendor supplier would give them to us
19 in time or give them to American Express in
20 time.  If they did not give them to them in
21 time and -- they would be sent to either the
22 American Express reviewer directly and he'd
23 forward them to us, for example, Danny Yong,
24 or it would be sent to the American Express
25 project manager and then they would be
```

**Todd Seager**

Page 39

 1                    Seager

 2 forwarded on to us.

 3       Q.   And at some point -- at some point

 4 in time did that practice change?

 5       A.   No, that is still how it's done.

 6       Q.   Okay.  When you were invited to

 7 participate in a technical due care review in

 8 the spring of 2005 were you ever given an

 9 agenda for the TDC call?

10       A.   No.  The -- the only agenda, so to

11 speak, is the TEQ.  We basically follow the

12 questions.  If we've had time to review it

13 before we will have just -- just written down

14 a list of questions, and -- and then we just

15 basically ask them during the call.

16       Q.   Okay.  And would you ever be given

17 a list of invitees to the TDC?

18       A.   Yes.  We're given a list of the TDC

19 reviewer and the security services rep, but

20 sometimes that's not filled in or the person

21 doesn't show up or the TDC reviewer has been

22 changed.  You know, it's hard to tell.

23 Sometimes if they don't show up it causes

24 some panic because we can't continue the

25 review.

# EXHIBIT C



AxP
EXHIBIT NO. 16
10/9/06
M.D. O'CONNOR

CONFIDENTIAL

# Technology Evaluation Questionnaire (TEQ)

This information will help the American Express Technologies team develop an agenda for the appropriate technical review. This review can consist of either an onsite visit to the company site or a phone call to clarify the answers found in this document.

A Non-Disclosure Agreement (NDA) between American Express and your organization is required prior to completing and submitting this questionnaire. If you have not completed an NDA with American Express, please contact your primary American Express contact immediately to do so.

Your company will need to provide Physical and Logical diagrams in addition to the completed TEQ. The diagrams should not include any specifics (such as IP Addresses) that would significantly compromise your security. American Express should receive these documents no later than two business days prior to the scheduled meeting.

Generally, most questions do not require lengthy answers. However, please note that only answering, "Yes" or "No", without any additional clarification, is usually not helpful. Some questions, particularly in the first couple of sections, might require a few paragraphs. If you want to refer to SEC filings, feel free to do so, but it is helpful if you cut and paste the specific paragraph(s) you are referring to.

If there are areas that you consider too confidential to describe in a written response of this type, please feel free to indicate that in the appropriate question. However, in general we will still wish to discuss the topic in the meeting.

Sections 1 through 9 of this document are required and must be completed unless the project falls into one of the special conditions below:

• If your company is providing a product that is being evaluated for Integration *within* American Express, only complete sections 1, 5, 6, 7, and 9 (questions 9.1 through 9.3 only).

• If your company is being reviewed as part of a process management / data sharing arrangement, complete sections 1 (questions 1.1 through 1.4 only), 3, 5, 6, 7, 8, 9

• If your company is providing a web-based service and hosting the site outside of American Express, complete ALL sections (1 through 10).

American Express Company TEQ V5 1/18/05
CONFIDENTIAL: The information contained herein is considered confidential, trade secret, proprietary and/or sensitive, and shall not be copied, printed, or otherwise reproduced without the express written permission of American Express. American Express agrees to receive and maintain the information provided in trust and confidence and will not disclose this information to any person, firm or enterprise, or use this information for the benefit of American Express or others (directly or indirectly) without first obtaining the vendor's written consent.

-1-

CONFIDENTIAL



# Returning this form:

You can return the completed form via encrypted e-mail, or other means. If sending with PGP, please call to request our public key and it will be emailed to you. If you are unable to encrypt the files and send through e-mail, please mail a copy on a floppy disk, zip disk or CD-R to the street address below. You can also password protect your file and send in email but please be sure to send the password in a separate email.

**Send Email to:**

Cheryl.Zodrow@AEXP.COM

**Address:**

American Express
Cheryl Zodrow
Mail Code 75-02-01
2401 West Behrend Drive, Suite 55
Phoenix, AZ 85027

**Phone:**    Cheryl Zodrow 602-537-3796 (Ofc)    If you have any questions, please feel free to contact me.



\*\*\* Cheryl Zodrow encryption key  Cheryl.L.Zodrow.e

American Express Company PRO v5 1/18/05
CONFIDENTIALITY: The information contained herein is considered confidential, trade secret, proprietary and/or sensitive, and shall not be copied, printed, or otherwise reproduced without the express written permission of American Express. American Express agrees to receive and maintain the information provided in trust and confidence, and will not disclose this information to any person, firm or enterprise, or use this information for the benefit of American Express or others (directly or indirectly) without first obtaining the vendor's written consent.

- 2 -

CONFIDENTIAL



OWNERSHIP OF INFORMATION: Any information provided by EchoMail, Inc. is the property of EchoMail, Inc. and EchoMail, Inc. owns all rights, title and ownership of such information. EchoMail, Inc. shall have sole authority to further disseminate information specific to EchoMail, Inc. contained herein, as long as such information does not include any specific information of American Express.

# 1. Contacts, Product Name, Escrow

1.1 Company name

EchoMail, Inc. (hereafter referred to as "EchoMail")

1.2 Please give contact names, phone numbers and e-mail addresses of all people completing these questions, so that we may contact you if clarification is needed.

Sonu Mathew Abraham
617-354-8585 x 247
sonu@echomail.com

Hariharan Subramanian
617-354-8585 x 212
hari@echomail.com

Gene Deans
732-521-3441
gene.deans@echomail.com

1.3 Explain what products or services the company offers.
EchoMail provides the following services to Fortune 1000, mid-sized and small companies:
  a. Inbound Customer Care Electronic Communication Management including patented Business Intelligence module
  b. Outbound E-Mail Marketing Communication Management
  c. Storage of current and historic E-Mail complying with regulations including SEC, NASD, HIPAA etc.
  d. Secured Hosting Services for above solutions
  e. Engineering and creative services for E-Mail communication management, data management and reporting

American Express Company PEO V5 1/1805
CONFIDENTIALITY: The information contained herein is considered confidential, trade secret, proprietary and/or sensitive, and shall not be copied, printed, or otherwise reproduced without the express written permission of American Express. American Express agrees to receive and maintain the information provided in trust and confidence, and will not disclose this information to any person, firm or enterprise, or use this information for the benefit of American Express or others (directly or indirectly) without first obtaining the vendor's written consent.    -3-

CONFIDENTIAL



**a. Inbound Customer Care Electronic Communication Management including patented Business Intelligence module**

EchoMail Customer Care ("CC")™ automatically receives, manages, routes, tracks and responds to inbound E-Mail originating from a web site or an Internet address. It is used by customer service departments and call centers to increase the quality and speed of service to their most valuable asset – their customers. EchoMail CC provides powerful workflow functionality to support complex routing, queuing, reporting, and security and allows for integration with other EchoMail applications.

EchoMail Business Intelligence (BI)™ is based on XIVA.TM a proprietary technology process for analyzing E-Mail. EchoMail BI examines and automatically categorizes each message by attitude, issue, request, sender type and product or service. Once E-Mails are categorized, EchoMail BI can be used in conjunction with EchoMail CC, EchoMail DW, EchoMail LM and EchoMail DM, it can instinctively calculate and send responses, integrate E-Mail categorization with existing customer data, automatically route leads and perform intelligent targeted outbound mailings. EchoMail BI is also designed to act as a standalone application for monitoring all inbound and outbound E-Mail to report important trends.

**b. Outbound E-Mail Marketing Communication Management**

EchoMail DM™ is a direct marketing platform for managing mailing lists and executing outbound E-Mail campaigns. EchoMail DM seamlessly integrates mailing lists and campaign copy to communicate with customers on a one-to-one basis. It enables marketing departments to target customers and build programs to secure and enhance loyalty, as well as generate new e-commerce revenue.

**c. Storage of current and historic E-Mail complying with regulations including SEC, NASD, HIPAA etc.**

EchoMail's security features extend compliance and satisfy regulatory requirements mandated by international and federal law. These include compliance regulations under:

- The Gramm-Leach-Bliley Act (GLBA),
- Health Insurance Portability and Accountability Act (HIPAA),
- SEC Rule 17-CFR 270.17a-4 (SEC 17a-4), SEC 17a-3
- NASD 3010(d),
- European Union Directive on the Protection of Personal Data (EU Directive),
- The US Patriot Act,
- The Sarbanes-Oxley Act (Sarbox or SOA), and
- The New Basel Accords (Basel II).
- Safe Harbor

**d. Secured Hosting Services for above solutions.**

EchoMail has proved its ability to deliver the above solutions in an outsourced model to large Fortune 500 companies meeting their needs for scalability and security. EchoMail has N+1 redundancy as well as fail over methods for all critical components. In addition, capacity is tracked each week using numerous monitoring tools for short and long term capacity planning. There is formal guide of Hosting and Operations, which details our entire strategy and tactics. In ASP hosted model, EchoMail product support engineers will perform maintenance and performance tuning on periodic basis.

American Express Company TRD V5 1/18/05
CONFIDENTIALITY: The information contained herein is considered confidential, trade secret, proprietary and/or sensitive, and shall not be copied, printed, or otherwise reproduced without the express written permission of American Express. American Express agrees to receive and maintain the information provided in trust and confidence, and will not disclose this information to any person, firm or enterprise, or use this information for the benefit of American Express or others (directly or indirectly) without first obtaining the vendor's written consent.

- 4 -

**CONFIDENTIAL AXP 01229**

CONFIDENTIAL



e.  **Engineering and creative services for E-Mail communication management, data management and reporting**

**Engineering Services**
The Engineering Services team handles requests to develop customer specific web-based assets such as web forms, web pages, web sites and HTML-based E-Mails. This team also provides customizations of reports, layouts and user interface.

**Creative Services**
EchoMail has a Creative Content Development Team that is an experienced group of creative content professionals that can quickly develop and implement customized graphic design solutions for client-specific projects.

1.4  Explain what product or service is being reviewed here.
Inbound Customer Care Electronic Communication Management including patented Business Intelligence module

1.5  Are you agreeable to having your proprietary code held in escrow?  If no, why?
Yes, EchoMail is agreeable to having EchoMail's proprietary code held in escrow based on (yet to be) mutually agreed terms of escrow agreement.

1.6  If you have one, describe the third-party escrow arrangement for your source code.
EchoMail does not make its own third-party escrow arrangement. EchoMail is willing to work with American Express to develop a mutually agreeable escrow arrangement.

## 2. Company / Product / Services Information

2.1  Explain the company's revenue or monetization model.
EchoMail is a privately help company that maintains its financial information confidential.  EchoMail has adopted conservative revenue recognition methods recommended by US GAAP.

2.2  Tell us about your long-term strategy for the company.
Are there plans for expansion and/or additional products/services?

EchoMail's Research and Development team is always enhancing its offering by providing features and functionality that meet the requirements of ts customers.  All development is focused on solutions for mangement of E-Mail and Internet-based customer communication. EchoMail recently expanded its product offering to include compliant storage of ALL electronic communication, as a specialized solution for financial services companies.

American Express Company TEQ V5 1/18/05
CONFIDENTIALITY: The information contained herein is considered confidential, trade secret, proprietary and/or sensitive, and shall not be copied, printed, or otherwise reproduced without the express written permission of American Express. American Express agrees to receive and maintain the information provided in trust and confidence and will not disclose this information to any person, firm or enterprise, or use this information for the benefit of American Express or others (directly or indirectly) without first obtaining the vendor's written consent.

-5-

CONFIDENTIAL



2.3 Who are your primary competitors? How do you differentiate yourselves from them? How do you expect to beat them in today's marketplace? EchoMail's primary competitors include Kana Systems, eGain and RightNow Technologies. EchoMail differentiates itself from its competitors via the following key four (4) key strengths:

1. Proven Application Service Provider (ASP) for E-Mail Based Customer Relationship Management for Fortune 1000 Companies and Major Brands
2. Truly Holistic Solution for Management of both Inbound and Outbound E-Mail Management
3. Full Suite of Production and Engineering Services Dedicated to E-Mail Based Marketing and Customer Care
4. Web Architected

Relative to Strength (1) above, many are now speaking the words of 'ASP' and outsourcing; however, since 1995, starting with AT&T, EchoMail has proven its ability to deliver in an outsourced model to larger Fortune 500 companies meeting their needs for scalability and security. No other company has such a proven history. Moreover, our Service Level Agreements distinguish us in the industry with performance-based measures. In addition, our software has been architected from 1995 to support the ASP model. This is very important since, most other companies are promoting the erroneous view that one can overnight take their shrink-wrapped software and offer it in an ASP model. Our competitors, therefore, are due for major delivery and service level issues. Our seven (7) year rich history in delivering as an ASP, in conclusion, provides you with a proven platform, where you will not be the test bed for our ASP ventures.

Relative to Strength (2) above, again since 1995, EchoMail has had the vision to create common software architecture to handle both inbound and outbound E-Mail management. In our vision, we never separated Customer Care from Direct Marketing. In building our platform. Thus, from inception, the EchoMail platform has been architected to support both Customer Care applications and Direct Marketing applications in one common software and data model. Why is this important? Our competitors have typically purchased other companies to build a similar "holistic" solution; however, that approach is flawed and moreover will not match the technological holism offered by a core development approach taken by EchoMail, since 1995.

Relative to Strength (3) above, in addition to the technology strengths of (1) and (2), which clearly demonstrate EchoMail as a leading research and software development company, EchoMail also operates as a unique "advertising agency" relative to its services for E-Mail based marketing and production. The combined fusion of EchoMail as an R&D company and as an Agency, which uses its own tools, provides us with a unique perspective on client needs. Furthermore, the creative agency division of EchoMail constantly serves to give the R&D division constant feedback to improve our product suite.

Relative to Strength (4) above, EchoMail has been web-architected from its inception. This means that all one needs to use any of or of the EchoMail products is a web-browser. Again, our vision in developing all aspects of our application for web-based use has given EchoMail as significant lead in research and development. Other competitors have only recently developed the applications in a web-architected platform.

Thus, relative to our strengths, the key theme of EchoMail's is proven. EchoMail has proven its technology, ASP-model, web-architected platform and its full suite of production and engineering services to major Fortune 500 companies since 1995. No other competitor comes close to matching our capabilities across these fused strengths.

American Express Company FAQ V3 1/18/05
CONFIDENTIALITY. The information contained herein is considered confidential, trade secret, proprietary and/or sensitive, and shall not be copied, printed, or otherwise reproduced without the express written permission of American Express. American Express agrees to recieve and maintain the information provided in trust and confidence, and will not disclose this information to any person, firm or enterprise, or use this information for the benefit of American Express or others (directly or indirectly) without first obtaining the vendor's written consent.

- 6 -

CONFIDENTIAL



What is also unique about EchoMail is that we are profitable as a business. EchoMail also has significant assets and cash reserves to continue to fund research and development unperturbed without any need for additional financing for the next thirty-six months. That assumes an unprofitable model. Thus, EchoMail is not under pressures from a volatile public market to direct our future. EchoMail continues to do what is right for our future growth and our customers, irrespective of market pressures.

A comparison chart showing some of the key differentiators in our solution are listed in the table below:

| | | | | | |
|---|---|---|---|---|---|
| Intelligent Spam Filtering | Outstanding | Average | Average | Good | Average |
| User Friendly Interface | Outstanding | Average | Average | Good | Average |
| Multi-Dimensional Analysis of E-Mail by Attribute, Issue Request, Product and Customer | Yes | Not available | Not available | Not available | Not available |
| | | | | | |
| Sophisticated Batch Processing | Yes | No | No | No | No |
| | | | | | |
| Solution Delivery Model: Software or Hosted | Both | Software | Both | Both | Hosted |
| | | | | | |
| Ability to Integrate with In-house Legacy Data and or Internal systems | Easy | Unknown | Unknown | Unknown | Unknown |
| | | | | | |
| Integrated FAQ for Web Site Publishing | Yes | No | Yes | Yes | Yes |

EchoMail maintains its lead among the competition through various methods. EchoMail works with Advisory Board consisting of Industry and technology experts including experts from renowned institution such as MIT. Usability Review committee periodically reviews actual usability

American Express Company TBD V3 1/18/05
CONFIDENTIAL: The information contained herein is considered confidential, trade secret, proprietary and/or sensitive, and shall not be copied, printed or otherwise reproduced without the express written permission of American Express. American Express agrees to receive and maintain the information provided in trust and confidence, and will not disclose this information to any person, firm or enterprise, or use this information for the benefit of American Express or others (directly or indirectly) without first obtaining the vendor's written consent.

-7-

CONFIDENTIAL AXP 01232

CONFIDENTIAL



of product. EchoMail staff visits customers site to observe product usage pattern and to obtain first-hand feedback from day-to-day users of EchoMall product. Close relationship is maintained with research firms to access scientific comparison and analysis charts.

2.4 Are you a publicly traded company?
If yes, on which stock exchange?
If yes, skip to 2.6. If no, go to 2.5.
No, EchoMall, Inc. is not a publicly traded company

2.5 Do you have adequate funding to cover your operations for the next three months?
Have you had to defer significant hardware or software acquisitions due to funding or budgetary shortfalls?
Yes, EchoMall has adequate funding to cover its operations for more that next three months. EchoMall is self-sufficient in generating enough revenue to run its operations without requiring external funding. In additional, EchoMall has reserves available to cover its operation for more than twelve months.
No, EchoMall did not have to defer to significant hardware or software acquisitions due to funding or budgetary shortfall. EchoMall recently invested in significant hardware and and software acquisitions without any external funding.

2.6 With which companies do you have strategic partnerships/relationships (please include any prior names these companies have had as well)?
How long have these companies been in business?
EchoMail has technology and marketing partnerships with IBM USA, Lotus, and Websphere as well as a long-term relationship with agencies including Wieden-Kennedy, market research companies including NFO Worldwide, and small medium business providers including B3 & Metavante.

EchoMall provides its E-Mail products and services through other channel partners and private labels the offerings as needed.  EchoMall establishes its partner relationships based on strong commitment to EchoMall training as well as financial cash commitments to future business.

2.7 Have the companies listed in question 2.5 or any of their subsidiaries ever filed for bankruptcy protection in the last five years?
No, EchoMall or its subsidiaries has never filed for bankruptcy protection

2.8 What external Board seats do any of your "C" level managers or Board of Director's occupy?
Lawrence Weber, Director - Mr. Weber serves on the board of several leading institutions and emerging organizations including Chairman of the Board of Directors of the Massachusetts Interactive Media Council (MIMC), Chairman of the Board of Trustees of The Computer Museum, member of the Board of Directors of Curl Corporation, member of the Board of Councilors of the Integrated Media Systems Center at the University of Southern California, and on the editorial board of Lawrence Ragan Communications PR Journal.

Edward Fredkin, Director - Director of the MIT Laboratory of Computer Science

American Express Company TEQ V3. 1/1803
CONFIDENTIALITY. The information contained herein is considered confidential, trade secret, proprietary and/or sensitive, and shall not be copied, printed, or reproduced without the express written permission of American Express. American Express agrees to receive and maintain the information provided in trust and confidence, and will not disclose this information to any person, firm or enterprise, or use this information for the benefit of American Express or others (directly or indirectly) without first obtaining the vendor's written consent.

- 8 -

CONFIDENTIAL



Theodore Johnson, Director – Member of the Board of Directors for Gensym Corporation, Candela Corporation, Neogenesis as well as several non-profit corporations, including the New England Conservatory and the Computer Museum.

## 3. Intellectual Property Protection

3.1 Have you filed for any US or International patents?
Yes, EchoMail has not only filed, but obtained three (3) US patents in the field of electronic communication management.

3.2 Is your patent strategy primarily offensive or defensive?
EchoMail has not initiated any offensive activities as part of its patent strategy. EchoMail's interest in obtaining patents were to defend its intellectual property. However, this strategy may change in future.

3.3 Have you ever performed patent searches to ensure that your implementation does not infringe upon any other patents?
If not, why not?
If you have performed such patent searches, did you just do so once or do you do so at periodic intervals?

EchoMail has contracted a reputed legal firm with expertise in intellectual property protection for its patent requirements. We have not encountered any infringement until now. EchoMail will continue to perform patent searches in future at periodic intervals to ensure that EchoMail solution does not infringement upon any patents

3.4 Have you registered variations of your domain name (to ensure that misspelled URLs still reach your site, and to prevent someone else from doing so)?
If so, please describe.
No, EchoMail has not registered variations of our domain name. EchoMail has scheduled registration of variations of domain name for second quarter of year 2005.

3.5 Do you have a process in place to ensure that your domain registrations do not expire accidentally?
Yes, EchoMail's Infrastructure Operations team has a process in place that ensures domain registrations do not expire accidentally.

3.6 Are any components used in your product considered public domain or open source?
If yes, how is it supported, by your company or American Express?
No, all components used in EchoMail solution is developed by EchoMail and not considered public domain or open source.

### a. Organization / Hiring

4.1 Please give high-level description of your company's organizational structure.

American Express Company FEQ V3 1/18/05
CONFIDENTIALITY: The information contained herein is considered confidential, trade secret, proprietary and/or sensitive, and shall not be copied, printed, or otherwise reproduced without the express written permission of American Express. American Express agrees to receive and maintain the information provided in trust and confidence, and will not disclose this information to any person, firm or enterprise, or use this information for the benefit of American Express or others (directly or indirectly) without first obtaining the vendor's written consent.
- 9 -

CONFIDENTIAL



In the technology group as a whole, please advise the number of web designers, programmers, QA testers, database administrators and system administrators, etc.

Do you feel the organization is currently understaffed to any degree in any significant area?

Are you actively hiring in specific groups, and if so, which ones?

Diagramtic representation og high level organization chart is included

| Job Role | Number of employees |
|---|---|
| Web designers | 7 |
| Programmers | 28 |
| QA Testers | 6 |
| Database Administrators | 5 |
| System Administrators | 7 |
| Hosting Monitoring engineers | 8 |
| Production Support engineers | 8 |
| Infrastructure Operations engineers | 7 |

While the organization is not understaffed, our policy is to have at least N+2 redundancy and are always looking to hire candidates with good technical background

EchoMall is currently actively hiring in following technical areas:
1. JAVA programming
2. C++ programming
3. Lotus Notes programming
4. Quality Assurance
5. Knowledgebase engineers

4.2 Are any of the products/services that the company is providing to American Express outsourced?
(Please note that this is distinct from contractor utilization, which is covered in 4.3 below.)
If the product /services are outsourced, please provide company name, description of products/services, and length of time that this has been outsourced.
If you use contractors, what is the ratio of FTEs to contractors?
Do you single-source through one agency, or do you have multiple vendors?
EchoMall has not outsources any of the product or services provided to American Express.

4.3 When you hire FTEs or contractors for the technology group, what are the principles you use to select staff?
Please describe the selection and interviewing process you follow.

American Express Company TEQ V3 1/18/03
CONFIDENTIAL  The information contained herein is considered confidential, trade secret, proprietary and/or sensitive, and shall not be copied, printed, or otherwise reproduced without the express written permission of American Express. American Express agrees to receive and maintain the information provided in trust and confidence, and will not disclose this information to any person, firm or enterprise, or use this information for the benefit of American Express or others (directly or indirectly) without first obtaining the vendor's written consent.    - 10 -

CONFIDENTIAL



EchoMail has not hired contractors for the technology group. While hiring FTEs, EchoMail make attempts to ensure that selected candidates are intelligent, have good problem solving skills and have good knowledge of the area of their expertise. The selection process include following steps:

(1) Resume is reviewed to ensure that candidate's profile match the job role
(2) Candidates shortlisted from step 1 are invited for written aptitude test which includes test of reasoning, logical development among other tests
(3) Candidates shortlisted from step 2 are invited for written test in the area of expertise of the candidate
(4) Candidates shortlisted from step 3 are called for technical interviews. This includes verification of candidates stated expertise and experience, review of answers provided by candidate during written tests and assessment of candidate's response to specific scenarios
(5) Step 3 includes multiple interviews by different managers in technolgy team
(6) Candidates shortlisted from steps 4 & 5 are called for management interviews which may be conducted at multiple levels
(7) Educational Certificates and references are checked for candidates shortlisted from step 6.
(8) Offer is extended to those candidates whose references and educational certificates are verified successfully and accurately,

4.4 In your country/region is there a permissible screening methodology for certain positions (e.g., background checks)?
If yes, what screening methodology do you use?
Reference checks, verification of education and criminal background checks are the screening methodologies used

4.5 If any employee is terminated, what are the processes to get them off the system?
When an employee leave the company or is terminated following steps are taken:
(1) Person is called for a exit interview and asked to provide passwords, return company documents and disclose work status
(2) Person's access control / entry card / entry card and keys are taken back and access control / entry card/s is/are disabled
(3) Person's desktop is either taken off the company network or network is changed
(4) Person's e-mail account password is changed and e-mail account re-routed to the team leader or designated alternate employee
(5) Passwords to access any and all systems used by the person is changed and new password is communicated to rest of the team
(6) If the person had voice mail, voice mail password is changed and new password given to designated alternate employee or team leader
(7) Team is instructed not to have communication with the terminated person

American Express Company TEQ V5 1/1X05
CONFIDENTIALITY: The information contained herein is considered confidential, trade secret, proprietary and/or sensitive, and shall not be copied, printed, or otherwise reproduced without the express written permission of American Express. American Express agrees to receive and maintain the information provided in trust and confidence, and will not disclose this information to any person, firm or enterprise, or use this information for the benefit of American Express or others (directly or indirectly) without first obtaining the vendor's written consent.    -11-

CONFIDENTIAL



## b. Data Confidentiality    (required only when a website is involved with project)

This section is not applicable, since EchoMail web site is not part of EchoMail application provided to American Express.

5.1 Does your web site have a privacy statement?  If it does, please attach a copy or provide the url.

5.2 Is it accessible from all pages of the site?

5.3 Does it accurately describe what you do with the data?

5.4 Does it give users an "opt-out", "opt-in" or both provisions?  Do you have a specific opt-out option for email?
    Do you have any plans for your service to be P3P compliant (if applicable)?

5.5 Has your site (and privacy statement) been validated by any of the leading "seal" programs, such as BBBOnline or TrustE?

5.6 Is there a notice of terms and conditions of use and prosecution statement on your website?

5.7 How are confidentiality and integrity of data maintained?

American Express Company TEQ V5  1/18/03
CONFIDENTIALITY:  The information contained herein is considered confidential, trade secret, proprietary and/or sensitive, and shall not be copied, printed, or otherwise reproduced without the express written permission of American Express. American Express agrees to receive and maintain the information provided in trust and confidence, and will not disclose this information to any person, firm or enterprise, or use this information for the benefit of American Express or others (directly - 12 - or indirectly) without first obtaining the vendor's written consent.

CONFIDENTIAL

## c. Application Architecture

Please include Physical (network) and Logical diagrams as appropriate to help explain this section. The diagrams should not include any specifics (such as IP Addresses) that would significantly compromise your security. If applicable, please also include in your diagrams any proposed or existing interfaces to American Express systems, or other American Express-specific aspects of your product.

6.1 Give an overview, describing the end-to-end application data flow of your product or service.
EchoMail CC® automatically receives, manages, routes, tracks and responds to inbound E-Mail originating from a web site or an Internet address. It is used by customer service departments and call centers to increase the quality and speed of service to their most valuable asset – their customers. EchoMail CC provides powerful workflow functionality to supports complex routing, queuing, reporting, and security and allows for integration with other EchoMail applications.

EchoMail BI® is based on XIVA.TM™ a proprietary technology process for analyzing E-Mail. EchoMail BI examines and automatically categorizes each message by attitude, issue, request, sender type and product or service. Once E-Mails are categorized, EchoMail BI can be used in conjunction with EchoMail CC, EchoMail DW, EchoMail DM, EchoMail LM and EchoMail DM, it can instinctively calculate and send responses. Integrate E-Mail categorization with existing customer data, automatically route leads and perform intelligent targeted outbound mailings. EchoMail BI is also designed to act as a standalone application for monitoring all inbound and outbound E-Mail to report important trends.

6.2 Describe the logical components that make up your application.
Presentation layer – This is where users log in to respond to customer e-mails. Administrators log in to view repots and configure the system (e.g. Routing rules, Response Library, Users etc.)
Application Layer – E-Mail tagging, duplicate removal, pre-filtering (spam etc.), categorization, response selection, routing rules application etc. happen here.
Database Layer – E-Mail data and categorization, routing information, along with information required for reporting stored in EchoMail schema.

6.3 Describe how these components are laid out across the physical servers in the production complex.
See diagram Amex@EMI Inrastructure.jpg

6.4 List the various types of hardware supporting the system, including servers, routers, load balancers, switches, etc.
See diagram Amex@EMI Infrastructure.jpg

6.5 Describe any integration with a mainframe, backend system, 3rd party.

Secure E-Mail responses going out from EchoMail are sent to American Express Secure Messaging Server. EchoMail uses a Secure Messaging Client library provided by American Express that uses MQ Series to send messages to the American Express Secure Messaging Server.

American Express Company TEQ V5 1/18/05
CONFIDENTIALITY: The information contained herein is considered confidential, trade secret, proprietary and/or sensitive, and shall not be copied, printed, or otherwise reproduced without the express written permission of American Express. American Express agrees to receive and maintain the information provided in trust and confidence, and will not disclose this information to any person, firm or enterprise, or use this information for the benefit of American Express or others (directly or indirectly) without first obtaining the vendor's written consent.

.13.

CONFIDENTIAL



6.6. List the various software products supporting the system, including operating system, web server, TP monitor, DBMS, ORB, etc.

Domino Enterprise Server    6.5.3
Lotus Enterprise Integrator 6.5.3
WebSphere Network Deployment 5.1
Oracle Enterprise RDBMS 9.2
Java 1.4.2_07

6.7 Describe the protocols used to communicate between the various application components and whether they are proprietary or based on industry standards.
HTTP/SOAP. No proprietary protocols used.

6.8 What application-specific services, if any, are used on each tier?
Not applicable.

6.9 Can components be replicated? Yes, components can be replicated independent of each other.

6.10 Please describe the user registration process for this service or product.
Installation process includes creating an Administrator ID. Using this Administrator ID, other users – of type Administrator, Manager, CSR Level 1 to Level 5, QA Manager, Proof Reader, Read Only User – can be created from the web interface for the product.

6.11 Explain your log-on function.
When users go to the URL for the product, they are prompted for user name and password. Upon entering a valid username and password, they will be given access to the product pages, based on their level of access as specified in User Setup section.

6.12 Is the logon protected using SSL (HTTPS)?
Yes, however, it is currently not enforced.

6.13 What controls exist within the system to ensure that a customer can access their data, and only their data?
There are two levels of security – physical and logical. A customer's data is stored in its own physical table space. In addition, access restrictions exist for that data to be accessible only using usernames for that Customer.

6.14 Are the authentication and access control built into the application system itself, or provided via a third party package (e.g., Netegrity, enCommerce or Securant)?
Authentication is provided by IBM Lotus Domino. Access control is built into the application as well as leveraged out of Domino Access Control mechanisms.

6.15 Are you prepared to make minor system modifications in order to enable integration with our single sign-on security framework (provided by a sub-component of Netegrity's Site Minder)?
This can be considered.

American Express Company TEQ V5 1/16/05
CONFIDENTIAL -- The information contained herein is considered confidential, trade secret, proprietary and/or sensitive, and shall not be copied, printed, or otherwise reproduced without the express written permission of American Express. American Express agrees to receive and maintain the information provided in trust and confidence, and will not disclose this information to any person, firm or enterprise, or use this information for the benefit of American Express or others directly    - 14 -
or indirectly) without first obtaining the vendor's written consent.

CONFIDENTIAL



6.16 How are user HTTP sessions managed? (e.g. non-persistent cookies, in the database, by URL)
Non-persistent cookies.

6.17 How is the session token constructed (i.e. what data elements is it comprised of), and what steps have been taken to ensure that it is effectively non-forgeable? If encryption is used, explain which algorithm is used, and what the key length is.
Session token is constructed out of the user name and encrypted password. Encryption is managed by IBM Lotus Domino.

6.18 Is there a session table that's used to manage sessions? If so, does it exist in memory on the web server, or is it stored further back in the system hierarchy? Does it contain passwords (either plain text or encrypted)?
This is managed in memory by Domino server.

6.19 Where are the user ids and password stored? How are they protected? i.e., encrypted, or hashed? If password is hashed, is a salt used? Is separate salt used for separate users? What algorithms are used?
User id's and passwords are stored in Domino directory. They are protected by Access Control to the Domino Directory. Passwords are hashed. Details regarding algorithms and salt are proprietary to IBM Lotus Domino.

6.20 How does the user connect to the application? How would Amex connect to the application?
Users and Amex connect to the application via a web browser over an Intranet.

6.21 If a user forgets his or her password, how is this situation handled? Explain both the automated (system) aspects, as well as any manual steps (either customer or CSR initiated). Please include steps for customer self-resetting passwords and secret phrases as applicable.
If a user forgets his or her password, they should contact the system administrator to have the password reset.

American Express Company TEQ V5 1/0805
CONFIDENTIALITY: The information contained herein is considered confidential, trade secret, proprietary and/or sensitive, and shall not be copied, printed, or otherwise reproduced without the express written permission of American Express. American Express agrees to receive and maintain the information provided in trust and confidence, and will not disclose this information to any person, firm or enterprise, or use this information for the benefit of American Express or others (directly or indirectly) without first obtaining the vendor's written consent.

-15-

CONFIDENTIAL



6.22 Does the system have two-factor authentication? If so, please describe.
No, two-factor authentication is not used.

6.23 Are there controls on passwords a customer may use? If so, please describe.
Passwords must be at least 6 characters in length; they should contain at least one numeral; there cannot be more than two same consecutive characters.

6.24 Are there controls that periodically force a customer to change passwords?
No.

6.25 Are there controls on repeated attempts to log on? If so, please describe.
Repeated invalid log on attempts will result in the account being locked for a fixed period of time. The number of attempts and the period of lock out are configurable by EchoMail.

6.26 Are there session management controls to limit how long a customer may not use the system before he or she is automatically logged off? If so, what are the time limit thresholds?
Yes, after a fixed period of inactivity, the system will log the users off. Time limit is normally 60 minutes, and this threshold is configurable by EchoMail.

6.27 Are there any specific browser version requirements? Does the system utilize JavaScript if a customer's browser supports it? Does the system degrade gracefully to pure HTML if the customer's browser doesn't support it (or the customer has disabled it)?
IE Version 5.0 and above and Netscape Version 6.0 and above are supported. Javascript is required.

American Express Company TEQ V5 1/18/05
CONFIDENTIALITY: The information contained herein is considered confidential, trade secret, proprietary and/or sensitive, and shall not be copied, printed, or otherwise reproduced without the express written permission of American Express. American Express agrees to receive and maintain the information provided in trust and confidence, and will not disclose this information to any person, firm or enterprise, or use this information for the benefit of American Express or others (directly - 16 - or indirectly) without first obtaining the vendor's written consent.

CONFIDENTIAL



6.28 Are there any client-side components needed, such as Java applets, Java applications, Netscape plug-ins or ActiveX controls? Support for Java applets required for utilizing Spell Check functionality and for certain reporting charts.

6.29 Please explain what types of reporting is generated in relation to this product or service. Are the reports shared with American Express? If so what transport mechanism is used (e.g., FTP, sFTP, etc.)? Please describe any other uses for the reports outside of American Express. Reporting is available and accessed via the web interface.
EchoMail Reporting module provides the following types of reports:
- Summary — Query all inbound E-Mail based on a selected date range for categorization and processing information.
- Performance — User configurable report that can be used to analyze all in-bound e-mails along two different data points.
- Print Selection — Print fields from result set that satisfy criteria you specify. Multiple ways to specify the result set.
- 1D Analysis — Create detailed reports based on a wide variety of criteria, and analyze this data using one criterion dimension.
- 2D Analysis — Select multiple categories and refine your report by setting restrictions. Run reports for different categories, restricted by date.
- CSR Statistics — Create reports for statistics on inquiries handled by 'representatives'.
- Aging Report — Report on volume of e-mails received and aging over a period of time
- Service Level — Report on number of E-Mails that are processed within a specified timeframe indicating high or low service level. Reports can be restricted by division, department, or users.

6.30 Please describe any two-way communication required by your application (such as dedicated lines, secure FTP, batch processing, etc.). A dedicated line is not required, but is implemented to provide additional security for Amex users to access the product's web interface. No other two-way communication is required.

American Express Company TEQ V3  1/18/05
CONFIDENTIALITY:  The information contained herein is considered confidential, trade secret, proprietary and/or sensitive, and shall not be copied, printed, or otherwise reproduced without the express written permission of American Express.  American Express agrees to receive and maintain the information provided in trust and confidence, and will not disclose this information to any person, firm or enterprise, or use this information for the benefit of American Express or others (directly  -17- or indirectly) without first obtaining the vendor's written consent.

CONFIDENTIAL



6.31 Does installing your software require root access to the system?
No.

6.32 Would your entire system self-start after a reboot?
Yes.

6.33 Is buffer overrun checking performed?
Scripts that are accessible to users do not have this vulnerability.

6.34 How is the initial logon to the database performed?
When users go to the URL for the product, they are prompted for user name and password. Upon entering a valid username and password, they will be given access to the product pages, based on their level of access as specified in User Setup section.

6.35 Under federal banking rules, all our partners must ensure that our data is logically segregated from other corporations. How would that be accomplished?
There are two levels of security – physical and logical. A customer's data is stored in its own physical table space. In addition, access restrictions exist for that data to be accessible only using usernames for that Customer.

6.36 Did you customize any open source code?

No.

6.37 Who provides support for the open source code?

N.A.

## d. Security Practices

7.1 Please describe the location, encryption (as applicable) and contents of any configuration files.

Configuration files for other application components are either stored in system folders not accessible by users, or are maintained in Domino NSF files with access control restrictions.

7.2 What type of data is stored in a database? Which stored data is encrypted? What type of encryption is used?
Types of data stored in database include e-mail information, customer information, categorization information, routing information etc. Data is not encrypted.

American Express Company TEQ V5 1/18/05
CONFIDENTIALITY: The information contained herein is considered confidential, trade secret, proprietary and/or sensitive, and shall not be copied, printed, or otherwise reproduced without the express written permission of American Express. American Express agrees to receive and maintain the information provided in trust and confidence, and will not disclose this information to any person, firm or enterprise, or use this information for the benefit of American Express or others (directly or indirectly) without first obtaining the vendor's written consent.    -18-

CONFIDENTIAL



7.3 How are confidentiality and integrity of data maintained?
Restricting users to access the product interface via a dedicated intranet connection protects confidentiality of data.

7.4 Who is responsible for these firewalls? (i.e., which individual[s] can update the rules?)
Firewalls are maintained by the Infrastructure Operations Team only.

7.5 Is all confidential data protected using SSL? What is the SSL version? 3
SSL is available, not enforced. SSL Version 3

7.6 What kind of digital certificate is used to protect each web server - a simple SSL certificate, or a Global Server ID certificate? (Note - Global Server IDs are also sometimes known as Server Gated Cryptography or International Step Up). Which CA (Verisign, Thawte, GTE Cybertrust, etc.) do you use? Do you deploy SSL with public and private keys?
Global Server Certificate. CA is Verisign. Only Public Keys are used.

7.7 Do you take any steps to ensure that all users and/or SSL sessions connect to the system at 128 bit strength, or do you rely solely on the browser? If so, are export-grade browsers blocked at the login page, or are Global Server IDs used?
Secure Site Pro certificate from Verisign is used that provides 128-bit or 256-bit encryption support to most browser types

7.8 Do you use any hardware accelerators to improve SSL performance?
No.

7.9 Do you use any public or private keys?
If so, what precautions do you take to ensure that your private keys are not stolen?
Where are they stored, how are they distributed?
If they are revoked, expired or compromised, how are they renewed?
Private Keys are not used.

7.10 Do you have any kind of dedicated Intrusion Detection System (e.g., Real Secure, Net Ranger, etc.)?
Do you run any software on your web servers, such as Tripwire, Intruder Alert, etc., to detect unauthorized configuration?
We're in the process of implementing this technology now.

7.11 If you have web pages, how do you protect from a possible defacement by an intruder?
Security patches/upgrades released for web servers are closely followed and applied as appropriate. In addition, we undergo ethical hacks by third-parties regularly and address vulnerabilities in web pages/servers as appropriate.

7.12 Do your administrators subscribe to the relevant security alert mailing lists for your platforms, as well as general industry ones (e.g., CERT)?

Yes, and in addition EchoMail maintains premium support agreement levels with its security platform vendors.

American Express Company TEC V5 1/18/05
CONFIDENTIALITY. The information contained herein is considered confidential, trade secret, proprietary and/or sensitive, and shall not be copied, printed, or confidential reproduced without the express written permission of American Express. American Express agrees to receive and maintain the information provided in trust and confidence, and will not disclose this information to any person, firm or enterprise, or use this information for the benefit of American Express or others (directly or indirectly) without first obtaining the vendor's written consent.

- 19 -

CONFIDENTIAL AXP 01244

CONFIDENTIAL



7.13 When a severe security problem is announced, what process do you use to decide when to implement it? What is your target timeframe from announcement to fix?

In case of severe security problems/fixes being announced, the Production and R&D teams discuss together to decide on the appropriateness and timeframe for the fix. If the fix is readily available and decided to be applied, then it may be applied to production servers on same day after business hours, or immediately if the threat is intense. (based on approval from client for any downtime as may be necessary)

7.14 Have you ever performed a Vulnerability Threat Assessment (VTA) (also called Attack & Penetration) against your own production servers? If so, did you do this yourself, or hire one of the recognized companies that offer "ethical hacking" services? If you have done this, was it a one-time review, or do you do it periodically?

Such ethical hacks are instituted by our clients periodically. This is typically done by engaging third-party companies that provide this service.

7.15 Are you prepared to work with us in sponsoring a VTA (Virtual Threat Assessment)?

EchoMail has undergone security audits with American Express in the past and is open to undergo a VTA initiated by American Express.

7.16 Is there an Information Security Officer or dedicated Director of Security? Is this a full-time position, or a part-time responsibility?

Yes we do and its his part time responsibility.

7.17 Are there documented security procedures? If there are, do they cover the production systems, or all employees, or both?

Yes we do and they cover both.

7.18 How do you handle a situation where the open source distribution has known security vulnerability? What is your turnaround time for correcting the situation?

EchoMail currently does not use any open-source distribution.

e. Customer Service

Please complete this section if your company's Customer Service department will be utilized by American Express as part of your offering.

8.1 Please describe what actions a Customer Service Representative can perform.

American Express Company TRQ V5 1/1805
CONFIDENTIALITY: The information contained herein is considered confidential, trade secret, proprietary and/or sensitive, and shall not be copied, printed, or otherwise reproduced without the express written permission of American Express. American Express agrees to receive and maintain the information provided in trust and confidence, and will not disclose this information to any person, firm or enterprise, or use this information for the benefit of American Express or others (directly or indirectly) without first obtaining the vendor's written consent.                                                          -20-

CONFIDENTIAL



Can a CSR log in as a customer or otherwise mimic a customer's experience? Please explain.
Can a CSR perform actions that appear (in system logs, for example) to have been issued by the customer?

Yes, EchoMail CSR's team can log in as the customer, provided the customer is willing to disclose the password associated with his/her user id.

8.2 What controls exist within the system to manage a customer service representative's actions?
Can a CSR retrieve a customer's password?
When Passwords cannot be retrieved, however EchoMail CSR's can reset passwords on request.

8.3 What audit trails does the system generate?
Where are they stored? For how long?
Audit trails are generated for actions performed by users over the web interface. They are stored in a Domino NSF file. Typically they are stored for a period of 7 days.

8.4 If an audit trail is generated are all updates logged?
Are all CSR inquiries logged?
Are all customer inquiries logged?
Are logons and logoffs (both customer & CSR) logged?
Who has access to the audit trail?

Audit trails are generated for each inquiry initiated by customers into EchoMail Tech support. All discussion between EchoMail and customer can be logged, in addition to the status of the inquiry. They are also available for access to customers as well as EchoMail.

American Express Company TEQ V5 1/18/03
CONFIDENTIALITY: The information contained herein is considered confidential, trade secret, proprietary and/or sensitive, and shall not be copied, printed, or otherwise reproduced without the express written permission of American Express. American Express agrees to receive and maintain the information provided in trust and confidence, and will not disclose such information to any person, firm or enterprise, or use this information for the benefit of American Express or others (directly    .21.
or indirectly) without first obtaining the vendor's written consent.

CONFIDENTIAL

8.5 Is CSR access to the system provided by an HTML interface or by some other mechanism (a thick client, for example)?
If it is HTML based, is it accessible over the Internet, or has the system been designed & built so that these functions can only be provisioned over the corporate Intranet?
CSR access to the system is via an HTML Interface. Access is available via corporate Intranet, though it is currently not restricted.

## f.  Operational Practices and Procedures

9.1 How is traffic distributed across multiple servers within a single site?
Do you use hardware or software load balancers?
If so, please describe which products you use and how you have configured them.

Load balancers are not used.

9.2 Have you performed stress or load testing on your service or application? If so, what were the results?
Such testing has been performed from time to time and results have been shared with Amex. They can be provided upon specific request.

9.3 Describe any on-going technical support provided. (Documents supplied, 7/24 call-in number, etc.)
Attached definition document of service level agreement describes technical support provided

9.4 Do you have Service Level Agreements (SLA's) signed with all of your 3rd party providers for any connections, products, or open source code?
Yes, EchoMail has SLA's with Internet connectivity providers, server hardware providers, and hardware maintenance service providers.
EchoMail does not use any open source code.

9.5 Describe the physical security of any development, data and corporate environment(s) that houses Level 3 and /or Level 4 data.
Is there a single entrance, protected either by a receptionist/guard or by a badge reader?
Do employees have badges, and are they required to display them at all times?
Are there smoke/fire detectors/alarms, and is there a sprinkler system?
Do the exterior windows open, and are they locked?
Is there any kind of video surveillance, especially at the entrance or outside the premises?
There are two video surveillance systems. One system covers the entrances to the building and the other system covers the entrances to the data center. In general, we do not reveal the details of our security systems. Note that EchoMail recently passed a security audit conducted by American express ("Bill Reaman").



American Express Company TEQ V3 1/18/03
CONFIDENTIALITY. The information contained herein is considered confidential, trade secret, proprietary and/or sensitive, and shall not be copied, printed, or otherwise reproduced without the express written permission of American Express. American Express agrees to receive and maintain the information provided in trust and confidence, and will not disclose this information to any person, firm or enterprise, or use this information for the benefit of American Express or others (directly    -22-
or indirectly) without first obtaining the vendor's written consent.

CONFIDENTIAL



9.6 Where is the production system hosted:
- At a tier I co-location service (Exodus, Qwest, Level 3, etc.)?
- At a second tier ISP?
- At your development, data and/or corporate environment(s)?

The production system is hosted at EchoMall's data center.

9.7 If it is at your own development, data and/or corporate environments, please describe the server room including how it is secured and protected from fire.

The data center is secured by card key access control and monitored by surveillance cameras. It is protected from fire hazard by an FM200 fire suppression system.

9.8 If the production system is located in your corporate office, please describe the redundancy in these services. For example, would your service still operate if there were an outage due to basic service failures (network, power, etc.), or to a physical disaster (earthquake, fire)?

How is network bandwidth provisioned?

The data center uses redundant UPS and AC systems and there is a backup diesel generator. The ISP service is a 10 mbps line burstable to 45 mbps. The ISP uses a redundant network.

9.9 If your production servers are hosted at a co-location service, who has access to the servers?

If your production servers are hosted at your own facilities, what physical access controls do you use?

NA

9.10 If your production servers are hosted at your own facilities, what physical access controls do you use?

There is a card key access control system.

9.11 Has the environment where your production servers are hosted ever been through a SAS70 review?

If so, are you able to share the conclusions of the report with us?

No

9.12 Who manages the administration of the production servers?  Your own staff?

Or Is this a service provided by the co-location provider or some other 3rd party?

The production servers are managed by internal staff.

9.13 Do your administrators subscribe to the relevant security alert mailing lists for your platforms, as well as general industry ones (e.g. CERT)?

American Express Company TEQ V5 1/18/05
CONFIDENTIAL: The information contained herein is considered confidential, trade secret, proprietary and/or sensitive, and shall not be copied, printed, or otherwise reproduced without the express written permission of American Express. American Express agrees to receive and maintain the information provided in trust and confidence, and will not disclose this information to any person, firm or enterprise, or use this information for the benefit of American Express or others (directly or indirectly) without first obtaining the vendor's written consent.                                          .23.

CONFIDENTIAL



Administrators subscribe to CERT as well as proactively search third party vendors support databases to identify potential security deficiencies.

9.14 Who is responsible for the firewalls? (i.e., which individual(s) can update the rules?).
How is the configuration of the firewall maintained?
The Infrastructure Operations Team is exclusively responsible for maintaining the firewalls.

9.15 Do you review your firewall logs?
If yes, how frequently and with what kind of tools?

Logs are available and maintained and are reviewed from time to time.

9.16 How many people support the administration of your production servers?
There are fourteen staff members that administer the production servers.

9.17 How many of these people are FTEs vs. contractors?
There are fourteen FTEs that administer the production server.

9.18 Does this team perform network management, or is this a separate group?
There are three staff members that manage the network.

9.19 How many (total) people have administrator access to the production servers?
Does any of the management/executive team have administrator access?
There are a total of fourteen staff members that have administrative access to production servers and one management team member.

9.20 Describe the separation of duties with respect to system development and administration. (i.e., someone that writes the code is not the same person that installs the code)
Software development is performed exclusively by the Development Team. Quality assurance is performed by the Quality Assurance Team.
Software installation and maintenance is performed by the Infrastructure and Operations Team.

9.21 Describe any anti-fraud employee controls you have in place (code of conduct, etc).

Employees are bound by nondisclosure and confidentiality agreements. Also some employees have executed similar agreements with American Express as a client in particular.

9.22 How do you monitor your production servers, either externally or internally?

American Express Company SEQ V5 1/18/05
CONFIDENTIALITY: The information contained herein is considered confidential, trade secret, proprietary and/or sensitive, and shall not be copied, printed, or otherwise reproduced without the express written permission of American Express. American Express agrees to receive and maintain the information provided in trust and confidence, and will not disclose this information to any person, firm or enterprise, or use this information for the benefit of American Express or others (directly or indirectly) without first obtaining the vendor's written consent.    - 24 -

CONFIDENTIAL



Do you use SNMP based monitoring tools?
Have you written your own monitoring tools, and if so, what do they do?
Do you also have application monitoring?
If so, please describe.
Operating system and third party application resource levels are monitored via SNMP and EchoMail application performance is monitored by custom developed tools.

9.23 Please describe the escalation procedure in case of a production failure.
Is this escalation procedure documented?
How are customers informed of any outages?

The escalation procedure is documented. The Operations staff on duty detects the issue. The issue documented with a trouble ticket and sent to the customer. The issue is resolved if possible. If the issue is not resolvable by the on duty staff, a call is made to the staff that is on call. If the on call staff cannot resolve the issue, a call is placed to the manager of the Infrastructure Team.

9.24 Does your problem management/escalation procedure include tracking each individual problem in some kind of database?  (i.e. is a trouble ticket raised?)

Each problem that is identified is documented with a trouble ticket and stored in an online database.

9.25 When a severe security problem is announced, what process do you use to decide when to implement it?
Do you have an Incident Response Team?
What is your target timeframe from announcement to fix?

The Infrastructure Operations Team manages the implementation of all security fixes. A separate test server environment is used to test the fix before being applied to production servers. The production server fix change is coordinated with the customer and unless very urgent occurs during a scheduled maintenance time.

9.26 How do you protect your production system from disk failure?  Do you use OS-level disk mirroring, or an external RAID array?
If you use RAID, please describe what RAID level is used.
If RAID 5 is used, explain how the RAID 5 "write penalty" is avoided.
A combination of RAID-0+1 and RAID-5 is used to protect production server disk failures. Server based RAID controllers or external RAID arrays are used. RAID-5 write penalties are not avoided. In the cases where there is very high disk IO operations RAID-0+1 is used.

American Express Company TEQ V5 1/8/03
CONFIDENTIALITY: The information contained herein is considered confidential, trade secret, proprietary and/or sensitive, and shall not be copied, printed, or otherwise reproduced without the express written permission of American Express. American Express agrees to receive and maintain the information provided in trust and confidence and will not disclose such information to any person, firm or enterprise, or use this information for the benefit of American Express or others (directly or indirectly) without first obtaining the vendor's written consent.    - 25 -

CONFIDENTIAL



9.27 Please explain how system and database backups are performed. In particular, describe whether backups are full/incremental, how often they occur, whether/how database backups are taken, whether/how database log files are backed up, how many generations of tapes are retained, whether backups are kept on site or offsite to an offsite facility (please name vendor), whether/how the backups are ever tested (i.e., can you successfully recover using these files?).
System and database backup are performed using third party software and magnetic tape. Incremental backups are taken daily and full backups are taken weekly. Tapes are stored in the backup device as well as at the company owned offsite facility. Backup tapes are tested quarterly for data integrity assurance.

9.28 Describe what precautions you take to ensure that any third party who might intercept backup files containing confidential or trade secret information cannot utilize that information. Are back up files encrypted?
Backup files are not encrypted. However, the backup devices are protected by firewalls.

9.29 Please explain how the various tapes used during the backup process are managed.
Is this a fully manual process?
Do you use an automated silo (or a tape hopper)?
Do you use a software management system to help you manage the various tapes?
Automated tape changers are used to manage the backup process. The backup management software is configured for scheduling and expiration of tape volumes.

9.30 It is possible that we will be required to ask you not only to destroy data, but to demonstrate that you have done so.
How are you capable of documenting compliance with a request of data destruction without remnant? Answer from a policy and an audit perspective. Include any system tools and any attendant system generated documentation descriptions.

The automated backup software includes the capability to destroy any data present on any tape and would be used if a request is received to destroy archived data.

9.31 Do you have multiple data centers?
Are these established as peer sites, with traffic shared between them, or as an active/failover configuration?
Please fully explain this architecture, taking special care to describe how traffic is distributed amongst the centers & how database synchronization is achieved.
What are your archiving policies & procedures?

There is one data center that is used for operating production servers. There is an available offsite data center that would be used in the event of a catastrophic failure to the primary data center. There are two classifications of backup, availability and archival backups. The availability backups use tape that is rotated on a six-month basis. The archival backups are taken once per month and kept indefinitely.

American Express Company TSO V5 1/18/06
CONFIDENTIALITY: The information contained herein is considered confidential, trade secret, proprietary and/or sensitive, and shall not be copied, printed, or otherwise reproduced without the express written permission of American Express. American Express agrees to receive and maintain the information provided in trust and confidence, and will not disclose this information to any person, firm or enterprise, or use this information for the benefit of American Express or others (directly or indirectly) without first obtaining the vendor's written consent.

-26-

CONFIDENTIAL AXP 01251

CONFIDENTIAL



9.32 If you have a tier of application servers, how can you increase the capacity of this tier?
Are there any application changes needed, or is this purely an infrastructure/configuration issue?
The capacity of the application tier can be increased by using more powerful servers and load balancing across multiple servers. This is an infrastructure and configuration issue.

9.33 How can you scale your back-end DBMS?
How far down the growth path do you estimate that you have gone? (Asked another way, if you had to grow your database capability by a factor of 10, how hard would this be to achieve?)
The backend RDBMS is very scalable by using either more powerful servers or moving to a clustered server environment. It is very easy to achieve a factor of 10 increases at the RDBMS layer.

9.34 If the workload on the system is highly unpredictable and subject to large differences in average and peak loads (online trading is a good example of this), what steps do you take to ensure that you always have acceptable response times for your users?
The SNMP monitor and the application monitor are used to verify that the systems are running at acceptable performance levels.

9.35 How are application software releases rolled into production, and which teams perform this process?
The Infrastructure Operations Team is responsible for software installs and upgrades. All software upgrades are performed on test servers and verified before being scheduled for a production server upgrade.

9.36 Does this product or service capture any metrics and report to the customer?
If so, how are they delivered to Amex and are they shared with any other entities besides Amex?
Standard and customized reports from the applications are delivered to Amex via online access.

9.37 What financial controls exist within the system to manage the integrity of data within it? (i.e., balancing, reconciliation, general ledgering)
EchoMail does not manage any financial data for American Express currently. Hence financial controls are not implemented within EchoMail system.

9.38 Assuming that you administer your own production servers how is remote access to these servers provided?
In particular, describe how such connectivity is established – whether it is directly over the Internet, or via some kind of dedicated connection (T1, frame relay, etc.).
Do you use native commands (Telnet, etc. for Unix), or secured alternatives, such as SSH?
Is authentication via user-ID & password or is it augmented by one-time password generators (i.e. tokens)?

American Express Company TEQ V5 1/18/03
CONFIDENTIALITY: The information contained herein is considered confidential, trade secret, proprietary and/or sensitive, and shall not be copied, printed, or otherwise reproduced without the express written permission of American Express. American Express agrees to receive and maintain the information provided in trust and confidence and will not disclose this information to any person, firm or enterprise, or use this information for the benefit of American Express or others (directly or indirectly) without first obtaining the vendor's written consent.    - 27 -

CONFIDENTIAL



Remote access to servers is controlled by firewall and VPN. Remote desktop and telnet are used when necessary. Authentication is via username and password.

9.39 Assuming there is a direct connection between you corporate offices and the production environment, how is this protected to ensure that only authorized individuals or workstations can access production?
Who is considered 'authorized personnel'?
The Infrastructure Operations Team are the only authorized staff to connect to any production server. The is protected by firewall rules, VPN, and username/password.

9.40 If an email server is in the production environment what e-mail server do you use, and how do you protect it from attack?

Sendmail is the mail server of choice. EchoMail places relay restrictions on Sendmail servers. In addition we have SMTP anti-virus/SPAM content filtering server and firewall protection in front of all our mail servers.

9.41 What general anti-virus precautions do you take?
Please explain how the virus signatures are kept up-to-date on all platforms.

Latest virus definitions are updated every two hours on SMTP filtering servers and daily on all of the production/development servers and employee workstations.

9.42 Please describe where servers in your corporate HQ are located. Are they in a locked/unlocked closet or office, a locked server room, etc.?
Servers are located in a secured data center.

9.43 Please explain what precautions you have taken to protect these servers from physical damage or outage, and contrast this against the inconvenience / business disruption that would occur.
The data center is secured by a card key access system. It is protected from fire hazard by an FM200 fire suppression system. Redundant AC systems provide temperature and humidity controls. Redundant UPS systems provide filtered and conditioned electrical power. A diesel generator provides standby electrical power.

## g.  Development Processes and Procedures (Web-based Companies Only)

10.1 Do you have a formal well-documented development methodology?
Is it a conventional multi-phase methodology (waterfall) or prototype-based one (spiral)?

American Express Company TEQ V3 1/1805
CONFIDENTIALITY: The information contained herein is considered confidential, trade secret, proprietary and/or sensitive, and shall not be copied, printed, or otherwise reproduced without the express written permission of American Express. American Express agrees to receive and maintain the information provided in trust and confidence, and will not disclose such information to any other person, firm or enterprise, or use this information for the benefit of American Express or others (directly or indirectly) without first obtaining the vendor's written consent.                                                                           -28-

CONFIDENTIAL



Yes. It is predominantly a multi-phase methodology, though sometimes a prototype-approach is adopted based on project requirements.

10.2 Do you embrace object oriented design or programming?
If so, is reuse an explicit goal?
We embrace Object Oriented Programming. We have also implemented Extreme Programming practices.

10.3 If you do embrace OO, do you use any formal techniques, such as UML?
Do you use any tools such as Rational Rose?
Do you use design techniques, such as Design Patterns?
No.

10.4 What development languages do you use?
Java, C++, LotusScript.

10.5 What source control system do you use?
CS-RCS.

10.6 Please describe the testing process that's followed, starting with unit testing & taking it all the way through to final release.
See attached diagram EchoMail Development Process.jpg

Please explain what procedural controls are in place to ensure that "hot fixes" applied in one release are rolled forwards into the next release. Hot fixes applied to production are tracked in a "Services Server Information" system that is consulted before any upgrades to ensure any such hot fixes are not overwritten. Any such change done to production servers get a corresponding item Id in EchoMail Code Tracking System. Subsequent product versions take into account, and include fixes for, all such item Id's in the code Tracking System.

10.7 Do you have certified developers on your staff, i.e., Microsoft, JAVA, and Cisco?
EchoMail Staff includes IBM certified developers.

10.8 Are you providing a standard or one that you have customized?
Please explain your release schedules, major, minor and other?
EchoMail product version releases are classified generally into four types:
   ▪ Major Version Releases
   ▪ Feature Enhancement Releases
   ▪ Bug Fixes
   ▪ Optimization and other

Major Version Releases are planned to be every 12 to 18 months. 1 Feature Enhancement Release is done for every major version during the year, about 6 months after the version release. Bug Fixes are done based on the criticality of the reported bugs. Apart from critical bugs

American Express Company TEQ V3 1/18/05
CONFIDENTIALITY: The information contained herein is considered confidential, trade secret, proprietary and/or sensitive, and shall not be copied, printed, or distributed without the express written permission of American Express. American Express agrees to receive and maintain the information provided in trust and confidence, and will not disclose this information to any person, firm or enterprise, or use this information for the benefit of American Express or others (directly or indirectly) without first obtaining the vendor's written consent.
-29-

CONFIDENTIAL

that require immediate patches, up to 4 consolidated Bug Fix Versions are planned for every major version.

10.9 Do you subscribe to any recognized best practices either in progress or in place (e.g. I&T, ETOC, CMM)?
Our processes are ISO-9000 Certified.

10.10 Describe any on-going technical support provided: documents supplied, 7/24 call-in number, etc.
Attached service level agreement document describes technical support provided

American Express Company TEG V3 1/18/03
CONFIDENTIALITY: The information contained herein is considered confidential, trade secret, proprietary and/or sensitive, and shall not be copied, printed, or otherwise reproduced without the express written permission of American Express. American Express agrees to receive and maintain the information provided in trust and confidence, and will not disclose this information to any person, firm or enterprise, or use this information for the benefit of American Express or others (directly     -30-
or indirectly) without first obtaining the vendor's written consent.

CONFIDENTIAL AXP 01255

# **EXHIBIT D**

Page 1

1
2

UNITED STATES DISTRICT COURT

3                DISTRICT OF MASSACHUSETTS
4

ECHOMAIL, INC.,                )
5                               )
                    Plaintiff,  )
6                               )
            vs.                 ) No. 05-11318-NMG
7                               )
AMERICAN EXPRESS CO. and        )
8  IBM CORP.,                   )
                                )
9               Defendants.     )
   ----------------------------

10
11                                    COPY
12
13        DEPOSITION OF ANGELA RAMSAMMY
14              New York, New York
15          Wednesday, October 18, 2006
16
17
18
19
20
21
   Reported by:
22  NICOLE AMENEIROS, RPR
    JOB NO. 188387
23
24
25

Page 154

1                          Ramsammy

2          Q.   Other than that instance that

3     you've just referred to, do you recall any

4     other instance in which Echomail personnel

5     raised an issue about IBM's participation

6     over the phone in the architecture review?

7          A.   No.

8          Q.   Do you know if the initiation of

9     the IBM participants joined in the call they

10    identified themselves by name?

11         A.   Yes.

12         Q.   They did identify themselves by

13    name?

14         A.   Yes.

15         Q.   Do you know if they identified

16    themselves by company?

17         A.   I don't believe so.

18         Q.   Why do you not believe so?

19         A.   I -- I remember them naming their

20    group that they represented but not their

21    company name because they were representing

22    an American Express group or a group on

23    behalf of American Express.

24         Q.   And what would that group be?

25         A.   I think it was Security Services or

Page 155

```
 1                    Ramsammy
 2   something similar to that.
 3        Q.   Security Services is an Amex
 4   business unit?
 5        A.   No.
 6        Q.   What is it?
 7        A.   It's a -- a group that provides
 8   specific function within a business unit.
 9        Q.   One -- over one business unit or
10   multiple business units?
11        A.   They provide the function over one
12   business unit.
13        Q.   What business unit would that be?
14        A.   It would be the technologies group
15   inside of American Express Travel Related
16   Services.
17             MR. ROSE:  Okay.  Let's mark this
18        as the next exhibit 67.
19             (Plaintiff's Exhibit 67, affidavit,
20        marked for identification, as of this
21        date.)
22        Q.   You've been given what's marked as
23   Exhibit 67.  If you can take a minute to
24   review that document.  Do you recognize this
25   document?
```