```
                 United States District Court
                   District of Massachusetts
_____
                              )
EchoMail, Inc.,               )
        Plaintiff,            )
                              )
        v.                    )    Civil Action No.
                              )    05-11318-NMG
American Express Co. and      )
Industrial Business Machines  )
Corp.,                        )
        Defendants.           )
_____)
                              )
```

**MEMORANDUM & ORDER**

**GORTON, J.**

The instant case arises out of a business dispute between Plaintiff EchoMail, Inc. ("EchoMail") and Defendants American Express Company ("AmEx") and International Business Machines Corp. ("IBM"). EchoMail has brought claims against both AmEx and IBM for misappropriation of trade secrets, unfair competition and unfair and deceptive trade practices. It has also sued AmEx for breach of contract, breach of the covenant of good faith and fair dealing and interference with contractual relations. AmEx has responded with various counterclaims against EchoMail, including one for breach of contract. Before the Court are IBM's motion for summary judgment on all claims against it and AmEx's motion for summary judgment on all claims against it and on its counterclaim for breach of contract.

-1-

I.  **Factual Background and Procedural History**

   A.  **Factual Background**

EchoMail is a provider of web-based software, hardware and services for email management and storage.  In July, 1999, EchoMail entered into a service contract with AmEx which was renewed through 2004.  In 2004, the parties entered into another contract ("the Stand Alone Agreement") but difficulties ensued in its implementation.  The parties also executed a Confidentiality Agreement which remained in force throughout their relationship.  In the Spring of 2005, AmEx considered replacing EchoMail.  It solicited bids from EchoMail's competitors through a Request for Information ("RFI") and Request for Proposal ("RFP"), even though nearly three years remained on its contract with EchoMail, and it informed EchoMail that the new version of its software was defective.  Plaintiff contends that AmEx was resistant to EchoMail's offers to help solve the problems that AmEx was having with the software.

In late April, 2005, AmEx notified EchoMail that it would conduct an "architecture review" ("AR") of an upgraded version of EchoMail's product.  When EchoMail inquired about the need for the AR, AmEx allegedly responded that it was merely a "formality," to introduce EchoMail to some new AmEx staff and to ensure that implementation of the upgrade would be successful.  In preparation for the AR, EchoMail provided AmEx certain

proprietary information and requested that AmEx forward to it a list of all likely attendees of the AR.

The AR was held on May 4 and 5, 2005, with some employees of AmEx participating in person at EchoMail's facility in Cambridge, Massachusetts, and others participating by telephone.  Two IBM employees attended the AR even though they had not been listed among possible participants and did not identify themselves as IBM representatives at the start of the AR.  Well into the AR and after EchoMail had revealed confidential and proprietary information, one of the IBM employees disclosed that he worked for IBM and that the information revealed by EchoMail "created a conflict".

EchoMail asserts that IBM has sought to obtain its confidential and proprietary information since 1996.  On several occasions, IBM allegedly inquired about establishing a business relationship with EchoMail.  EchoMail avers that it would not have consented to the AR had it known that IBM personnel would be present.

AmEx purportedly praised EchoMail during the AR and stated at that time that the AR had been a success.  Approximately three weeks later, however, it informed EchoMail that its product had failed the review and that, consequently, EchoMail would not be considered in the new RFP process.  AmEx is also alleged to have orally terminated its contract with EchoMail at that time.  The

-3-

following day, plaintiff notified AmEx in writing that it was terminating their relationship. As a result of those events, a business relationship between EchoMail and a sub-unit of AmEx ("NewCo") that was about to be spun off from AmEx also ceased. Plaintiff alleges that the AR was merely a pretext to conceal the true purpose of AmEx and IBM, namely, to obtain EchoMail's confidential and proprietary technology so that they could use it to evaluate the potential successors to EchoMail.

### B.   Procedural History

This case was originally filed in the Massachusetts Superior Court but removed by defendants to this Court on the basis of diversity jurisdiction. Each defendant denies liability in its answer and AmEx further asserts counterclaims against EchoMail for 1) breach of contract, 2) breach of the covenants of good faith and fair dealing, 3) replevin, 4) conversion, 5) restitution, 6) unjust enrichment, 7) breach of confidential duty and 8) unfair and deceptive acts and practices.

Upon removal of the case to federal court in 2005, EchoMail moved for a preliminary injunction to prevent both defendants from using or disseminating its trade secrets. After hearing that motion, the Court directed the parties to confer in good faith toward negotiating mutually satisfactory nondisclosure agreements. EchoMail and IBM reached such an agreement, thereby mooting EchoMail's request for a preliminary injunction against

IBM, but EchoMail and AmEx failed to come to terms. On July 15, 2005, the Court denied EchoMail's motion for a preliminary injunction with respect to AmEx on the grounds that EchoMail had failed to demonstrate a likelihood of success or irreparable injury. See EchoMail, Inc. v. Am. Express Co., 378 F. Supp. 2d 1 (D. Mass. 2005) (Docket No. 29).

After the Court denied EchoMail's motion for preliminary relief, AmEx moved for summary judgment as to count three of its counterclaim (replevin) and IBM sought judgment on the pleadings as to all counts. In an order entered July 14, 2006, this Court allowed AmEx's motion for summary judgment with respect to its claim for replevin but denied IBM's motion for judgment on the pleadings. See EchoMail, Inc. v. Am. Express Co., 445 F. Supp. 2d 87 (D. Mass. 2006) (Docket No. 55).

## II. Analysis

### A. Legal Standard

Summary judgment is appropriate where the moving party has shown, based upon the pleadings, discovery and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law". Fed. R. Civ. P. 56(c).

A fact is material if it "might affect the outcome of the suit under the governing law". Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." Id. A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party". Id.

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The Court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in that party's favor. O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993). If, after viewing the record in the non-movant's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate.

**B. Choice of Law**

A District Court sitting in diversity applies the substantive law of the state in which it sits. Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938). The choice-of-law rules are considered substantive for Erie purposes, so this Court must apply Massachusetts choice-of-law rules to determine what law applies to each claim in this case. Klaxon Co. v. Stentnor Elec. Mfg. Co., 313 U.S. 487 (1941).

Two of EchoMail's claims against AmEx (Count IV, breach of contract, and Count V, breach of the covenant of good faith and fair dealing) and AmEx's counterclaim against EchoMail (breach of contract) are governed by the choice-of-law provisions in their contracts. The Stand Alone Agreement and the Confidentiality Agreement both specify that New York law will govern their interpretation and enforcement and, because that is a reasonable election, this Court will not disturb it.

The remaining claims are non-contract torts. Massachusetts choice-of-law rules apply the laws of the jurisdiction wherein the tort allegedly occurred. Cosme v. Whitin Machine Works, Inc., 632 N.E.2d 832 (Mass. 1994). The choice-of-law task is therefore to determine in what state each tort occurred and then to apply the governing law of that jurisdiction.

The misappropriation of trade secrets alleged in Count I against each defendant began when EchoMail submitted confidential trade secrets to AmEx in preparation for the AR. It allegedly continued through the AR to AmEx's subsequent search for EchoMail's replacement. Although the tort occurred over a range of time and locations, it centers around the AR. The AR was itself a geographically disparate event (with individuals participating by telephone from several different states), but it was primarily conducted at EchoMail's facility in Cambridge, Massachusetts, so it is properly considered to have taken place

in Massachusetts. Therefore, Massachusetts law governs the misappropriation claims.

The unfair competition claim alleged in Count II concerns each defendant's representations to the marketplace and the likelihood that such representations resulted in confusion among consumers. This also relates to a broad range of time but because both defendants have their principal places of business in New York, both unfair competition claims will be evaluated according to New York law.

The alleged violations of the Consumer Protection Act, M.G.L.c. 93A ("Chapter 93A") in Count III, like the misappropriation claims, concern a course of behavior that took place over time and across multiple locations. Again the central event was the AR, so the conduct is properly governed by Massachusetts law and Chapter 93A will apply.

The claim for tortious interference with business relations in Count VI against AmEx took place entirely within the walls of AmEx. Because AmEx, and therefore NewCo, had its principal place of business in New York, the interference took place in New York and the law of that state governs the claim.

Therefore, with respect to each defendant, Counts I (misappropriation) and III (Chapter 93A) are governed by Massachusetts law and Count II (unfair competition) is governed by New York law. With respect to AmEx, Counts IV (breach of

contract), V (breach of the covenant of good faith and fair dealing) and VI (interference with business relations) are governed by New York law, as is its counterclaim for breach of contract.

### C. IBM's Motion for Summary Judgment

EchoMail pleads three causes of action against IBM: 1) misappropriation of trade secrets, 2) unfair competition and 3) unfair and deceptive trade practices in violation of the Consumer Protection Act, M.G.L.c. 93A ("Chapter 93A").

#### 1. Count 1: Misappropriation of Trade Secrets

Massachusetts law requires a plaintiff seeking recovery for misappropriation of trade secrets to prove three elements: 1) the existence of a trade secret, 2) that plaintiff took reasonable steps to protect the secret and 3) that defendant acquired and used, by improper means or through breach of a confidential relationship, the trade secret. Data General Corp. v. Grumman Systems Support Corp., 825 F. Supp. 340, 359 (D. Mass. 1993), aff'd 36 F.3d 1147 (1st Cir. 1994). For purposes of this motion IBM does not contest the first two elements so the determinative question on this count is whether or not IBM "used" EchoMail's trade secrets after it acquired them at the AR.

The parties describe the AR in radically different terms. IBM tells of an ordinary performance review being conducted by its client, AmEx, at which IBM provided routine computer-security

consulting services. It concedes that EchoMail was not notified that IBM representatives would be present at the review but attributes that to a simple oversight, resulting from the everyday nature of its contribution. IBM's security consultants assisted AmEx with its review but, pursuant to the terms of the confidentiality agreement between IBM and AmEx, never disclosed or made any other use of anything that they learned during that process.

EchoMail claims that the entire AR was a pretext, a complicated scheme intended to gain access for IBM to EchoMail's confidential information. According to EchoMail, AmEx had decided to terminate its relationship with EchoMail long before the AR and sought IBM's help in learning as much as it could about EchoMail before that termination took effect in order to use what it learned in shopping for a new vendor to replace EchoMail's services. Thus, the very fact that IBM was exposed to the trade secrets at all was improper, and the alleged use that it made of them, in advising AmEx on how to replace EchoMail, was itself a misappropriation even if nothing was disclosed to any third parties. EchoMail also emphasizes the "premier partnership" between IBM and KANA, one of EchoMail's competitors, but proffers no evidence that EchoMail's trade secrets were ever revealed to KANA in any way.

EchoMail alleges very little beyond bare, self-serving

-10-

assertions in the deposition of its CEO to support its account of the AR. Although those assertions were sufficient to survive a motion to dismiss on the pleadings, EchoMail v. Am. Express Co., 378 F. Supp. 2d 1 (D. Mass. 2005) (Docket No. 29), no genuine issue of material fact is apparent now, following discovery, to support EchoMail's allegations. Although the facts perhaps suggest bad faith on the part of AmEx, there is no evidence linking IBM to such actions. IBM's involvement in the AR does not support the inference that it was involved in the other decisions that AmEx made concerning EchoMail.

The Court will, therefore, allow IBM's motion for summary judgment with respect to the first count of the complaint, misappropriation of trade secrets.

### 2. Count 2: Unfair Competition

A claim for common law unfair competition under New York law is similar to a claim brought under the Lanham Act in that the plaintiff must show that the defendant's conduct is likely to cause confusion in the marketplace. See Coach Leatherware Co., Inc. v. AnnTaylor, Inc., 993 F.2d 162, 169 (2d Cir. 1991).

EchoMail asserts that confusion exists about the nature of the services provided by IBM without providing any details or evidentiary support. As with the misappropriation claim, that assertion in the pleadings was sufficient to survive a Rule 12(b)(6) motion but does not withstand scrutiny in this summary

judgment motion.

Therefore, the Court will allow IBM's motion for summary judgment with respect to the second count of the complaint, unfair competition.

### 3. Count 3: Unfair and Deceptive Trade Practices

The Consumer Protection Act, M.G.L.c. 93A ("Chapter 93A") requires that the alleged unfair practice fall

> "within at least the penumbra of some common-law, statutory, or other established concept of unfairness or [be] otherwise immoral, unethical, oppressive, or unscrupulous."

Bowers v. Baystate Tech., Inc., 101 F. Supp. 2d 53, 55 (D. Mass. 2000) (quoting PMP Assocs., Inc. v. Globe Newspaper Co., 366 Mass. 593, 596, 321 N.E.2d 915 (Mass. 1975)).  As with the claim of misappropriation of trade secrets, this charge turns on the factual question of what exactly was occurring during the AR.  If the entire review was a sham in which IBM knowingly misrepresented its purpose in order to gain access to EchoMail's proprietary information, the test may well be met.  If, on the other hand, IBM was providing standard security consulting services to its client in a routine review, the claim must fail.

Although such a factual issue would ordinarily present a question for the jury, the record here reveals no evidence beyond EchoMail's self-serving deposition testimony to support its assertions with respect to IBM.  As noted above, there is circumstantial evidence of AmEx's alleged bad faith but nothing

therein indicates wrongdoing on the part of IBM other than its presence, as a consultant, at an apparently routine performance review. Therefore, the Court will allow IBM's motion for summary judgment as to the third count, unfair and deceptive trade practices.

### D. AmEx's Motion for Summary Judgment

EchoMail states six causes of action against AmEx: 1) misappropriation of trade secrets in violation of Massachusetts and New York law, 2) unfair competition, 3) unfair and deceptive trade practices in violation of Chapter 93A, 4) breach of contract, 5) breach of the covenants of good faith and fair dealing and 6) interference with contractual or business relations. AmEx also seeks summary judgment with respect to the first count of its counterclaim, breach of contract.

#### 1. Count 1: Misappropriation of Trade Secrets

The issues regarding the first count of EchoMail's complaint against AmEx are essentially the same as those in its claim against IBM, as described in Part II.C.1 of this Memorandum. Unlike IBM, however, AmEx's good faith is called into question by some of EchoMail's evidence. The relevant facts are as follows: first, AmEx's decision to consider replacing EchoMail shortly after extending EchoMail's contract, second, AmEx's failure to respond to EchoMail's attempts to assist AmEx with the new version of its software, and finally, AmEx's statement to

-13-

EchoMail that the AR was a matter of routine. A reasonable jury could conclude, based upon those facts, that AmEx acted in bad faith and used EchoMail's proprietary information to guide its search for a new service provider. Therefore, the Court will deny AmEx's motion for summary judgment with respect to the first count of EchoMail's complaint, misappropriation of trade secrets.

### 2. Count 2: Unfair Competition

As noted above, a claim of unfair competition under New York law turns on plaintiff's ability to demonstrate confusion in the marketplace. See Coach Leatherware Co., Inc. v. AnnTaylor, Inc., 993 F.2d 162, 169 (2d Cir. 1991); 762 F. Supp. 404, EchoMail v. Am. Express Co., 445 F. Supp. 2d 87 (D. Mass. 2006) (Docket No. 55). EchoMail asserts that such confusion exists with respect to both IBM and AmEx without providing any evidence of what customers are confused about. With no evidence to support its allegations, this claim fails. The Court will allow AmEx's motion for summary judgment with respect to the second count of EchoMail's complaint, unfair competition.

### 3. Count 3: Unfair and Deceptive Practices, Ch. 93A

The same evidence that permits EchoMail's misappropriation claim to survive summary judgment can, when viewed in the light most favorable to EchoMail, support a claim for unfair and deceptive trade practices. Because a reasonable jury could infer from the premature search for a replacement, the refusal to

accept assistance with the upgrade and the mischaracterization of the AR that AmEx's behavior was "immoral, unethical, oppressive, or unscrupulous," Bowers v. Baystate Tech., Inc., 101 F. Supp. 2d 53, 55 (D. Mass. 2000) (quoting PMP Assocs., Inc. v. Globe Newspaper Co., 596, 321 N.E.2d 915 (Mass. 1975)), summary judgment on the Chapter 93A claim is inappropriate. The Court will deny AmEx's motion for summary judgment with respect to the third count of EchoMail's complaint, unfair and deceptive practices in violation of M.G.L.c. 93A.

### 4. Count 4: Breach of Contract

A claim for breach of contract, under New York law, requires that four elements be proved: 1) the existence of a contract, 2) performance by the plaintiff, 3) breach by the defendant and 4) damages. Harsco v. Segui, 91 F.3d 337, 348 (2d Cir. 1996).

The principal contract between the parties was the Stand Alone Agreement but EchoMail and AmEx also entered into a separate Confidentiality Agreement. EchoMail asserts several different theories as to how AmEx's conduct breached each of those agreements. First, IBM representatives were invited (unbeknownst to EchoMail) to the AR without a separate non-disclosure agreement governing that specific meeting. Second, EchoMail claims that AmEx duplicitously led it to believe that the proprietary information discussed there would not be shared with any third party, including consultants. Finally, EchoMail

asserts that Reena Panikar, the AmEx employee in charge of the parties' relationship, terminated the Stand Alone Agreement by telephone on May 26, 2005, by saying "That's it.  This is over.  We're done."

Because factual questions permeate the disputed account of those events, there is a genuine issue of material fact with respect to EchoMail's claim for breach of contract.  Summary judgment is, therefore, inappropriate and AmEx's motion will be denied as to the fourth count of EchoMail's complaint, breach of contract.

### 5. Count 5: Breach of Covenant of Good Faith and Fair Dealing

Under New York law, all contracts carry an implicit covenant of good faith and fair dealing.  This means that each contractor

"embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract".

Dalton v. Educational Testing Service, Inc., 663 N.E.2d 289, 291 (N.Y. 1995) (quoting Kirke La Shelle Co. v. Armstrong Co., 188 N.E. 163 (N.Y. 1933)).

AmEx argues that this claim must be dismissed because it is duplicative of the breach of contract claim, citing FlightSafety Int'l, Inc. v. Flight Options, LLC, 418 F. Supp. 2d 103 (E.D.N.Y. 2005).  As noted above, EchoMail alleges that its contracts with AmEx were breached on at least two specific occasions: at the AR and during the telephone conversation of May 26th.  The alleged

breach of the covenant of good faith and fair dealing is not limited to the alleged breach of contract, encompassing instead the behavior leading up to the end of the relationship as well. Although the events are related, the two counts clearly raise distinct factual issues. Thus, the argument that this count must be dismissed as a matter of law fails and AmEx has not carried its burden at the summary judgment stage of proving that no genuine issue of material fact exists as to the purported breach. The Court will deny AmEx's motion for summary judgment as to the fifth count of EchoMail's complaint, breach of the covenant of good faith and fair dealing.

### 6. Count 6: Interference with Business Relations

Under New York law, a claim for tortious interference with business relationships requires proof of, among other things, the existence of a business relationship, or at least a prospective relationship, with a "third party". <u>Cardiocall, Inc.</u> v. <u>Serling</u>, 492 F. Supp. 2d 139, 152 (E.D.N.Y. 2007). At issue with respect to this count is whether or not NewCo was a "third party" at the time that its negotiations with EchoMail broke off. EchoMail's relationship with AmEx ended in May, 2005, and NewCo "spun off" from the parent corporation into AmeriPrise Financial in September, 2005. EchoMail's submissions show the degree of control that AmEx still exercised over NewCo, including the fact that AmEx did not permit anyone affiliated with NewCo to continue

negotiating with EchoMail after the Stand Alone Agreement was terminated. That characterization suggests that NewCo was still functionally a sub-unit of AmEx rather than an independent third party. EchoMail cites no cases, and the Court finds none, defining circumstances in which the third party in a tortious interference case was a wholly-owned subsidiary of the defendant.

The Court will allow AmEx's motion for summary judgment with respect to the sixth count, tortious interference with contractual relations.

### 7. Counterclaim Count 1: Breach of Contract by EchoMail

The facts and issues surrounding the circumstances under which the Stand Alone Agreement was breached are described in Section II.D.4 above. As previously concluded, there are genuine issues of material fact concerning exactly when and how the Agreement was terminated, making summary judgment inappropriate on either side. The Court will deny AmEx's motion for summary judgment on the first count of its counterclaim, breach of contract.

**ORDER**

For the foregoing reasons, Defendant IBM's motion for summary judgment (Docket No. 73) is **ALLOWED**.  Defendant AmEx's motion for summary judgment (Docket No. 80) is, with respect to Count II (unfair competition) and Count VI (interference with business relations), **ALLOWED,** and is otherwise **DENIED**.

**So ordered.**

                                       /s/ Nathaniel M. Gorton  
                                      Nathaniel M. Gorton  
                                      United States District Judge  
Dated October 18, 2007